# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LONG TERM CARE PHARMACY ALLIANCE, and AMERICAN SOCIETY OF CONSULTANT PHARMACISTS, <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL O. LEAVITT, Secretary of the U.S. Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and CENTERS FOR MEDICARE AND MEDICAID SERVICES, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   Case No. 1:07-cv-01115 (ESH) |

## DEFENDANTS' MOTION TO DISMISS

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), defendants hereby

move the Court to dismiss plaintiffs' Complaint with prejudice, for the reasons set forth in the

accompanying Memorandum of points and authorities in support of this motion.

Dated: October 5, 2007     Respectfully submitted,

          PETER D. KEISLER
          Assistant Attorney General
          JEFFREY A. TAYLOR
          United States Attorney
          SHEILA M. LIEBER
          Deputy Director

          /s/ Kathryn L. Wyer
          KATHRYN L. WYER
          U.S. Department of Justice, Civil Division
          20 Massachusetts Ave., NW,
          Washington, D.C.  20530
          Telephone: (202) 616-8475 / Fax: (202) 616-8202

kathryn.wyer@usdoj.gov
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| LONG TERM CARE PHARMACY ALLIANCE, and AMERICAN SOCIETY OF CONSULTANT PHARMACISTS, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-01115 (ESH) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of the U.S. Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and CENTERS FOR MEDICARE AND MEDICAID SERVICES, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... v

INTRODUCTION ................................................................................................1

STATUTORY AND REGULATORY FRAMEWORK ..................................................4

I.    Medicare Modernization Act's Establishment Of Medicare Part D .......................................4

      A.    PDP Sponsor Participation ........................................................................4

      B.    Cost-Sharing Subsidies For Institutionalized Dual Eligibles ...................................5

      C.    Identification of Full-Benefit Dual Eligible Individuals ..........................................6

      D.    PDP Sponsor Contracts With Long-Term Care Pharmacies ...................................6

      E.    Procedures For Processing Cost-Sharing Subsidies For
            Institutionalized Dual Eligibles ................................................................7

FACTUAL AND PROCEDURAL BACKGROUND .........................................................9

      1.    Contractual Relationships Between Plaintiffs' Members, LTC
            Pharmacies, And PDP Sponsors ...............................................................9

      2.    Plaintiffs' Assertions Regarding Delays In Cost-Sharing Reimbursements
            From PDP Sponsors ..............................................................................10

      3.    Plaintiffs' Prior Suit Against A PDP Sponsor, United Health Group, Inc.,
            And CMS's Memoranda Encouraging PDP Sponsors To Resolve
            Reimbursement Issues With LTC Pharmacies ...............................................11

      4.    This Court's Denial Of Plaintiffs' Motion To Consolidate, Its Dismissal of
            Plaintiffs' Suit Against United Health Group, Inc., And The Current Suit.............13

STANDARD OF REVIEW ...................................................................................14

ARGUMENT ....................................................................................................16

I.    THERE IS NO JURISDICTION OVER PLAINTIFFS' CLAIMS UNDER THE
      MEDICARE ACT ........................................................................................16

II.   THE UNITED STATES HAS NOT WAIVED SOVEREIGN IMMUNITY
      BECAUSE PLAINTIFFS HAVE AN ADEQUATE REMEDY ELSEWHERE ............... 17

III.  PLAINTIFFS LACK STANDING TO BRING THIS ACTION ON BEHALF OF
      THEIR MEMBERS OR ON THEIR OWN BEHALF ........................................ 19

      A.   Neither Plaintiffs Nor Their Members Have Article III Standing ........................... 20

           1.   Plaintiffs Lack Organizational Standing Because The Only Injury
                They Assert Results From Their Alleged Efforts To Oppose
                Defendants, Including The Efforts Expended On This Lawsuit ................. 21

           2.   Plaintiffs' Members Lack Article III Standing Because Any Injuries
                They Have Sustained Result From Their Contracts With PDP
                Sponsors And Are Not Redressable By Any Obligation That This
                Court Could Impose On Defendants ............................................................ 22

                a.   Defendants Did Not Cause The Alleged Injuries ............................ 23

                b.   This Suit Cannot Redress The Alleged Injuries .............................. 28

      B.   Plaintiffs' Members Fail to Meet Prudential Standing Requirements
           Because Their Grievance Does Not Fall Within The Zone of Interests
           Protected By The MMA ........................................................................................ 30

IV.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER APA SECTION 706(1) ................... 33

      A.   The CMS Conduct That Plaintiffs Challenge Does Not Qualify as
           "Agency Action" Subject to Judicial Review .......................................................... 34

      B.   The Actions Plaintiffs Seek To Compel Are Not Legally Required ......................... 36

V.    PLAINTIFFS CANNOT SEEK DECLARATORY OR MANDAMUS RELIEF
      TO ENFORCE THE MEDICARE PART D STATUTES AND REGULATIONS
      THAT THEY CITE IN COUNT II ...................................................................................... 37

      A.   Plaintiffs Have No Private Right Of Action To Bring Claims Under The
           Cited Provisions .................................................................................................... 37

      B.   Plaintiffs Are Not Entitled To Mandamus Relief .................................................. 38

VI.   PLAINTIFFS' FIFTH AMENDMENT CLAIM IS WITHOUT MERIT ............................. 39

CONCLUSION ................................................................................................................. 39

# TABLE OF AUTHORITIES

PAGE(S)

**CASES**

ACLU v. NSA, 493 F.3d 644 (6th Cir. 2007) ...............................................................36

*Action Alliance of Senior Citizens v. Leavitt, 483 F.3d 852 (D.C. Cir. 2007) .......................16, 37

Air Transport Ass'n v. Reno, 80 F.3d 477 (D.C. Cir. 1996) ..................................19

*Alexander v. Sandoval, 532 U.S. 275 (2001) ...............................................37

Am. Chiropratic Ass'n, Inc. v. Leavitt, 431 F.3d 812 (D.C. Cir. 2005) ........................................31

Am. Chiropractic Ass'n v. Shalala, 108 F. Supp. 2d 1 (D.D.C. 2000) ...........................................38

Am. Legal Foundation v. FCC, 808 F.2d 84 (D.C. Cir. 1987) ......................................20

*Amgen Inc. v. Smith, 357 F.3d 103 (D.C. Cir. 2004) ........................................30, 32, 33

Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150 (1970) ....................................30

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007) ........................................15

Bennett v. Spear, 520 U.S. 154 (1997) ........................................30

Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d 1152 (D.C. Cir. 2005) ..............................21

Clarke v. Sec. Indus. Ass'n, 479 U.S. 388 (1987) ........................................30

Cobell v. Norton, 392 F.3d 461 (D.C. Cir. 2004) ........................................35

Coker v. Sullivan, 902 F.2d 84 (D.C. Cir. 1990) ........................................17, 19

*Council of & for the Blind of Del. County Valley, Inc. v. Regan,
709 F.2d 1521 (D.C. Cir. 1983) (en banc) ........................................17, 18, 19

Devlin v. Scardelletti, 536 U.S. 1 (2002) ........................................30

EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621 (D.C. Cir. 1997) ....................................15

Fair Employment Council of Greater Wash., Inc. v. BMC Mktg.,
28 F.3d 1268 (D.C. Cir. 1994) ........................................21

Friends of the Earth v. U.S. Dep't of Interior, 478 F. Supp. 2d 11 (D.D.C. 2007) ...................34, 35

Fund for Animals, Inc. v. BLM, 460 F.3d 13 (D.C. Cir. 2006) .....................................36

Ganem v. Heckler, 746 F.2d 844 (D.C. Cir. 1984) ............................................16

Gem County Mosquito Abatement Dist. v. EPA, 398 F. Supp. 2d 1 (D.D.C. 2005) ........................38

Gen. Elec. Co. v. EPA, 290 F.3d 377 (D.C. Cir. 2002) ..................................28

Gillis v. U.S. Dep't of Health & Human Servs., 759 F.2d 565 (6th Cir. 1985) ................................18

*Heckler v. Ringer, 466 U.S. 602, 614-15 (1984) .......................................16, 38

Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333 (1977) ...........................20

Indep. Petroleum Assoc. v. Babbitt, 235 F.3d 588 (D.C. Cir. 2001) ..............................35

Isenbarger v. Farmer, 463 F. Supp. 2d 13 (D.D.C. 2006) .......................................15

Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group, 219 F. Supp. 2d 20 (D.D.C. 2002),
    vacated and remanded on unrelated grounds by Cheney v.
    Dist. Court for Dist. of Columbia, 542 U.S. 367 (2004) ....................................38

Lowe v. Ingalls Shipbuilding, 723 F.2d 1173 (5th Cir. 1984) .........................................38

*LTCPA et al. v. United Health Group, Inc.,
    No. 06-1221, 2007 WL 2172793 (D.D.C. July 30, 2007) .................................11, 13, 21, 22

*Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ..................................20, 21, 23, 29

Monmouth Med. Ctr. v. Thompson, 257 F.3d 807 (D.C. Cir. 2001) ..................................16

Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,
    417 F.3d 1272 (D.C. Cir. 2005) ........................................................20, 30

Nat'l Athletic Trainers' Ass'n, Inc. v. U.S. Dep't of Health & Human Servs.,
    455 F.3d 500 (5th Cir. 2006) ........................................................... 32

Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479 (1998) ..........................30

Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930 (D.C. Cir. 2004) ..........................29

*Norton v. S. Utah Wilderness Alliance ("SUWA"), 542 U.S. 55 (2004) ............................33, 34, 36

Nuclear Energy Inst., Inc. v. EPA, 373 F.3d 1251 (D.C. Cir. 2004) .................................................20

Orange v. Dist. of Columbia, 59 F.3d 1267 (D.C. Cir. 1995) .........................................................39

Price v. Caruso, No. 07-117, 2007 WL 1521215 (W.D. Mich. May 22, 2007) ...............................38

Public Citizen v. Kantor, 864 F. Supp. 208 (D.D.C. 1994) ............................................................38

*Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.,
    489 F.3d 1267 (D.C. Cir. 2007) ...........................................................................................23, 29

Rogers v. Johnson-Norman, 466 F. Supp. 2d 162 (D.D.C. 2006) ..................................................15

Role Models Am., Inc. v. Harvey, 459 F. Supp. 2d 28 (D.D.C. 2006) ............................................15

Sandoz, Inc. v. Leavitt, 427 F. Supp. 2d 29 (D.D.C. 2007) ...........................................................36

Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1 (2000) ...............................................16

*Shays v. FEC, 414 F.3d 76 (D.C. Cir. 2005) ........................................................................20, 23

Shirk v. Barton, No. 07-0356, 2007 WL 2570426 (D.D.C. Sept. 6, 2007) .....................................15

Spann v. Colonial Vill., Inc., 899 F.2d 24 (D.C. Cir. 1990) ..........................................................21

TAP Pharmaceuticals v. U.S. Dep't of Health & Human Servs., 163 F.3d 199 (4th Cir. 1998).......32

Transohio Savings Bank v. OTS, 967 F.2d 598 (D.C. Cir. 1993) ...................................................17

Trudeau v. FTC, 456 F.3d 178 (D.C. Cir. 2006) ..........................................................................37

Univ. Med. Ctr. v. Shalala, 173 F.3d 438 (D.C. Cir. 1999) ..........................................................28

Webman v. Fed. Bur. of Prisons, 441 F.3d 1022 (D.C. Cir. 2006) .................................................17

Women's Equity Action League v. Cavazos, 906 F.2d 742 (D.C. Cir. 1990) ...........................18, 38

## STATUTES

5 U.S.C. § 551 .........................................................................................................................34

5 U.S.C. §§ 701-706 ............................................................................ 3, 14, 17

5 U.S.C. § 704 .............................................................................................. 17

5 U.S.C. § 706(1) .......................................................................3, 13, 33, 34, 36

28 U.S.C. § 1331 .....................................................................................16, 17

Mandamus Act, 28 U.S.C. § 1361 ...............................................3, 16, 17, 38

42 U.S.C. § 405 ......................................................................................16, 37

Medicare Act, 42 U.S.C. §§ 1395 et seq. ..........................................................4

42 U.S.C. § 1395b-9 .................................................................................14, 37

42 U.S.C. § 1395w-21 Note ..............................................................................4

42 U.S.C. §§ 1395w-101 to -152 .....................................................................4

42 U.S.C. § 1395w-101 .....................................................................................4

42 U.S.C. § 1395w-102 .................................................................................4, 5

42 U.S.C. § 1395w-111 .....................................................................................4

42 U.S.C. § 1395w-112 .....................................................................................5

42 U.S.C. § 1396w-114 ................................................ 5, 6, 7, 14, 24, 30, 36, 37

42 U.S.C. § 1395ii ...........................................................................................16

42 U.S.C. § 1396-1396v ....................................................................................5

42 U.S.C. § 1396a .........................................................................................5, 6

42 U.S.C. § 1396b .............................................................................................5

42 U.S.C. § 1396o .............................................................................................5

42 U.S.C. § 1396u-5 ..........................................................................................6

Medicare Prescription Drug, Improvement, and Modernization Act of 2003,

Pub. L. No. 108-173, 117 Stat. 2066 (2003) ................................................................4

## REGULATIONS

42 C.F.R. §§ 423.1 -.910 .............................................................................................4

42 C.F.R. § 423.100 ....................................................................................................7

42 C.F.R. § 423.120 ................................................................................6, 7, 26, 30, 33

42 C.F.R. §§ 423.251 -.272 ........................................................................................4

42 C.F.R. § 423.335 ...........................................................................................8, 25, 36

42 C.F.R. § 423.343 ...........................................................................................8, 25, 36

42 C.F.R. § 423.350 ....................................................................................................8

42 C.F.R. § 423.503 ..............................................................................................14, 37

42 C.F.R. § 423.504 ....................................................................................................5

42 C.F.R. § 423.505 ................................................................................................5, 26

42 C.F.R. § 423.772 ....................................................................................................5

42 C.F.R. § 423.773 .................................................................................................5, 6

42 C.F.R. § 423.774 ....................................................................................................6

42 C.F.R. § 423.782 ..........................................................................................5, 14, 37

42 C.F.R. § 423.800 .......................................................8, 10, 11, 14, 25, 26, 27, 35

42 C.F.R. § 423.902 ....................................................................................................6

42 C.F.R. § 423.904 ..........................................................................................6, 25, 28

42 C.F.R. § 447.53 ......................................................................................................5

## ADMINISTRATIVE MATERIALS

CMS, Medicare Prescription Drug Benefit Final Rule, 70 Fed. Reg. 4194, 4389 (Jan. 28, 2005).....26

**INTRODUCTION**

In this action, plaintiffs seek to compel the government defendants to intervene in the contractual relationships that plaintiffs have with private corporate entities that are not before this Court, in an effort to claim entitlement to payments that may or may not be required by the terms of these contracts.  The context for this action is the new prescription drug program that Congress established with the enactment of Medicare Part D, which went into effect January 1, 2006.  This program relies on private insurers, who act as prescription drug plan ("PDP") sponsors, to coordinate the distribution of prescription drugs to eligible beneficiaries through intermediary pharmacies.  Plaintiffs represent the interests of long-term care pharmacies that have contracted with PDP sponsors to provide prescription drugs to Medicare beneficiaries in nursing and other long-term care facilities.  According to plaintiffs, PDP sponsors have wrongfully refused to reimburse these pharmacies for copayment amounts that certain beneficiaries, by virtue of their status as institutionalized "dual eligibles," are not required to pay.

Plaintiffs admit that their members could seek relief by suing individual PDP sponsors.  Instead of doing so, plaintiffs find it more convenient to ask this Court to compel the Centers for Medicare and Medicaid Services ("CMS") to speed up the process through which it informs PDP sponsors which beneficiaries are eligible for copayment and other cost-sharing subsidies, and to otherwise supervise the activities of PDP sponsors.  Plaintiffs' claims ignore the fact that CMS relies on states to provide the necessary information.  The timing of CMS's notifications to PDP sponsors thus does not lie within CMS's exclusive control.  These claims also ignore the fact that the amount, if any, that individual LTC pharmacies are owed by individual PDP sponsors is entirely dependent on the terms of the contracts that the pharmacies and the PDP sponsors

- 1 -

negotiated and agreed upon.  In effect, plaintiffs would have this Court put CMS in the role of either enforcing private contracts between pharmacies and PDP sponsors or of protecting pharmacies from their failure to negotiate terms in these contracts that could have been enforced. However, the laws and regulations governing Medicare Part D simply do not impose any requirements on the payment obligations between PDP sponsors and pharmacies, and plaintiffs therefore cannot obtain relief by suing the government under these laws.  Rather, the only effective avenue of relief must be for the individual pharmacies to bring contract actions directly against the appropriate PDP sponsors.

Because plaintiffs' members have an adequate remedy elsewhere, the United States has not waived sovereign immunity for the claims they assert here.  The availability of another remedy also precludes this Court from granting mandamus relief.  Moreover, plaintiffs lack standing to assert the instant claims.  The plaintiff organizations have not themselves sustained any injury sufficient to establish standing.  Thus, plaintiffs' standing depends on whether any of their members could assert standing.  The alleged injury suffered by individual pharmacies is their failure to be reimbursed by PDP sponsors for the copayment amounts.  However, because this injury depends on the terms of the pharmacies' contracts with PDP sponsors, which CMS had nothing to do with, the causation and redressability requirements of standing are not met. Moreover, because beneficiaries remain unaffected by this contractual dispute between pharmacies and PDP sponsors, the pharmacies' grievance  is not within the zone of interests protected by Medicare Part D.

Turning to the CMS conduct that plaintiffs ask this Court to change, as mentioned, plaintiffs focus on the requirement that CMS notify PDP sponsors about beneficiary eligibility

for copayment subsidies.  This notification requirement is simply part of the process that CMS

follows in order to ensure that PDP sponsors will not impose charges on subsidy-eligible

beneficiaries for copayments that they do not owe.  The notification is not a discrete "agency

action" that is subject to judicial review under the Administrative Procedure Act ("APA"), 5

U.S.C. §§ 701-706.  Moreover, the timing of the notification is not fixed by the relevant statutes

or regulations, so there is no nondiscretionary duty that CMS has failed to perform, that plaintiffs

can enforce under either 5 U.S.C. § 706(1) or the Mandamus Act, 28 U.S.C. § 1361.  Indeed,

because CMS depends on states to provide some of the necessary information, timing is not

entirely in its control.

   Most importantly, the link that plaintiffs try to construct between CMS's notifications and

PDP sponsors' reimbursements to pharmacies does not exist in Medicare law.  CMS regulations

provide that PDP sponsors will receive reimbursements for copayments and other cost-sharing

amounts that are subsidized for, and thus not paid by, beneficiaries, but the regulations do not

strictly tie CMS's reimbursements to its receiving and providing accurate, much less perfect,

information regarding individuals' eligibility.  Instead, CMS makes interim payments throughout

the year based on estimates, and the balance of what is owed and what has been paid is

reconciled at the end of the year.  There is no reason, under the Medicare provisions, that similar

terms could not be included in the contracts between LTC pharmacies and PDP sponsors.

Because no government action deprived plaintiffs' members of any contractual right they might

have to cost-sharing reimbursement amounts, plaintiffs' Fifth Amendment claim also fails.

## STATUTORY AND REGULATORY FRAMEWORK

**I.     Medicare Modernization Act's Establishment Of Medicare Part D**

Title XVIII of the Social Security Act of 1935, commonly known as the "Medicare Act,"

42 U.S.C. §§ 1395 et seq., establishes a federally-funded health insurance program for the elderly

and disabled.  As originally enacted, Medicare (Parts A and B) generally did not provide

coverage for outpatient prescription drugs.  With the Medicare Prescription Drug, Improvement,

and Modernization Act of 2003 ("Medicare Modernization Act" or "MMA"), Pub. L. No. 108-

173, 117 Stat. 2066 (2003), Congress added Medicare Part D "to provide for a voluntary program

for prescription drug coverage under the Medicare Program."  117 Stat. at 2066.  Under Part D,

which is codified at 42 U.S.C. §§ 1395w-101 to -152, each "eligible individual," as defined in 42

U.S.C. § 1395w-101(a)(3)(A), is "entitled to obtain qualified prescription drug coverage," as

described in 42 U.S.C. § 1395w-102(a), in accord with the scheme set forth in these provisions.

42 U.S.C. § 1395w-101(a)(1).  CMS, acting under authority delegated by the HHS Secretary, is

responsible for carrying out the Secretary's obligations under Part D and has promulgated

regulations in accord with this responsibility at 42 C.F.R. §§ 423.1 -.910.  Following a transition

period, Part D went into effect on January 1, 2006.  42 U.S.C. § 1395w-101(a)(2); see also 42

U.S.C. § 1395w-21 Note.

**A.     PDP Sponsor Participation**

The Part D scheme relies heavily on the participation of private-sector prescription drug

plan ("PDP") sponsors.  A PDP sponsor must be approved by CMS, through a bidding and

negotiation process, in order to become an available PDP provider within a particular PDP

region.  42 U.S.C. § 1395w-111(a)-(e); see 42 C.F.R. §§ 423.251 -.272.  If CMS approves the

terms of a PDP sponsor's proposal, CMS and the PDP sponsor must enter into a contract through

which "the sponsor agrees to comply with the applicable requirements and standards of

[Medicare Part D] and the terms and conditions of payment as provided for in [Medicare Part D

provisions]."  42 U.S.C. § 1395w-112(b)(1); see 42 C.F.R. § 423.504 -.505.

### B.    Cost-Sharing Subsidies For Institutionalized Dual Eligibles

Before Medicare Part D, some Medicare beneficiaries were already receiving prescription

drug coverage because they were also eligible for benefits under Medicaid, 42 U.S.C. §§ 1396-

1396v, a separate medical assistance program for low-income individuals that is operated by

states with federal assistance.  See id. §§ 1396b(a)(12) (including "prescribed drugs" within the

definition of "medical assistance"), 1396o(e) (providing that although copayments may be

imposed under a state Medicaid plan, services may not be denied for failure to pay these

copayments); cf. 42 C.F.R. § 447.53.  The Medicare Modernization Act required that prescription

drug coverage for these "dual eligible" individuals be transferred from state Medicaid programs

to Medicare Part D.  In order that this transfer not result in higher costs for these individuals, the

MMA further provides that the copayments and other cost-sharing normally required for

Medicare Part D assistance, see 42 U.S.C. § 1395w-102(b), will be subsidized for "dual eligible"

individuals.  42 U.S.C. § 1396w-114; 42 C.F.R. § 423.773(a)(1)(D)-(E).  In particular, those

"full-benefit dual eligible" individuals who are inpatients in a medical institution or nursing

facility ("institutionalized," as defined in 42 U.S.C. § 1396a(q)(1)(B); see also 42 C.F.R. §

423.772), are entitled to "the elimination of any beneficiary coinsurance" that would otherwise be

imposed.  42 U.S.C. § 1395w-114(a)(1)(D)(i); see also 42 C.F.R. § 423.782(a)(2)(ii).

Other individuals may also be eligible for cost-sharing subsidies if they meet certain

- 5 -

income- or resource-level requirements and apply for and receive eligibility determinations. 42 C.F.R. §§ 423.773, .774. However, a full-benefit dual eligible individual, along with a few other categories of individuals, "must be treated as meeting the eligibility requirements for full subsidy eligible individuals" without needing to apply for such a determination. 42 C.F.R. § 423.773(c)(1)(i), (2); see 42 U.S.C. § 1395w-114(a)(3)(B)(v)(I). Such an individual is notified by CMS that he or she will be "deemed eligible for a full subsidy for a period up to one year." 42 C.F.R. § 423.773(c)(2).

### C.    Identification of Full-Benefit Dual Eligible Individuals

A full-benefit dual eligible individual is defined in the Medicaid laws as someone who has Medicare Part D coverage for an entire month and "is determined eligible by the State" for full Medicaid benefits for the same month. 42 U.S.C. § 1396u-5(c)(6); see also 42 C.F.R. § 423.902. Thus, CMS cannot categorize an individual as full-benefit dual eligible unless a state has determined that the individual is eligible for Medicaid, and CMS relies on states to provide it with this necessary information. Id. § 1396u-5(a)(2); see also 42 C.F.R. § 423.904(4). In the case of institutionalized dual eligibles, a state Medicaid agency must determine that the individual is eligible for Medicaid assistance under the state Medicaid plan and that the individual has been an inpatient in a medical institution or nursing facility, with the stay paid for by Medicaid, throughout the entire month. 42 U.S.C. § 1396a(q)(1)(B).

### D.    PDP Sponsor Contracts With Long-Term Care Pharmacies

The Part D regulations require that PDP sponsors ensure that beneficiaries will have convenient access to pharmacies in their Part D networks. See 42 C.F.R. § 423.120. PDP sponsors must establish a "contracted pharmacy network consisting of retail pharmacies" within

specified distances of Medicare beneficiaries.  Id. § 423.120(a).  Aside from this retail pharmacy network, PDPs "must provide convenient access to long-term care pharmacies consistent with written policy guidelines and other CMS instructions."  Id. § 423.120(a)(5).  To this end, the PDP "must offer standard contracting terms and conditions . . . to all long-term care pharmacies in its service area."  Id.  A pharmacy qualifies as a "long-term care pharmacy" if it is "owned by or under contract with a long-term care facility to provide prescription drugs to the facility's residents."  Id. § 423.100.

### E.    Procedures For Processing Cost-Sharing Subsidies For Institutionalized Dual Eligibles

The MMA requires that CMS "provide a process whereby" CMS notifies PDP sponsors of any Part D eligible individuals who are eligible for subsidies under 42 U.S.C. § 1395w-114(a), which would include individuals who qualify as institutionalized dual eligibles.  42 U.S.C. § 1395w-114(c)(1)(A).  PDP sponsors must then "reduce[] the premiums or cost-sharing otherwise imposed by the amount of the applicable subsidy and submit[] to [CMS] information on the amount of such reduction."  Id. § 1395w-114(c)(1)(B).  CMS then "periodically and on a timely basis reimburses the [PDP] sponsor . . . for the amount of such reductions."  Id. § 1395w-114(c)(1)(C).  The MMA provides that "[t]he reimbursement . . . with respect to cost-sharing subsidies may be computed on a capitated basis, taking into account the actuarial value of the subsidies and with appropriate adjustments to reflect differences in the risks actually involved."  Id. § 1395w-114(c)(2).

Pursuant to CMS regulations, CMS has adopted a payment method whereby CMS makes "interim payments" to PDP sponsors during the year "based on the low-income cost-sharing

assumptions" that have been made during the initial bidding and negotiation process between

CMS and PDP sponsors.  42 C.F.R. § 423.335(d)(2)(i).  Meanwhile, CMS notifies PDP sponsors

of individuals' "eligibility for a subsidy . . . and the amount of the subsidy."  Id. § 423.800(a).  In

the case of full-subsidy dual eligibles, this notification cannot occur until after CMS receives the

necessary information from state Medicaid agencies regarding individuals' Medicaid eligibility.

After receiving this notification, PDP sponsors then reduce the individuals' cost-sharing "as

applicable, and provide information to CMS on the amount of those reductions, in a manner

determined by CMS."  Id. § 423.800(b).  In addition, PDP sponsors "must reimburse subsidy

eligible individuals, and organizations paying cost-sharing on behalf of such individuals, any

excess premiums and cost-sharing paid by such individual or organization after the effective date

of the individual's eligibility for a subsidy."  Id. § 423.800(c).  PDP sponsors track their actual

cost-sharing expenses.  Id. § 423.800(b).

     CMS ultimately makes retroactive adjustments and reconciles the amount it has paid PDP

sponsors for cost-sharing through interim payments and the costs PDP sponsors claim that they

have actually incurred.  Id. § 423.343(d).  If the final balance so requires, CMS "makes final

payment for low-income cost-sharing subsidies after a coverage year after obtaining all of the

information necessary to determine the amount of payment."  Id.  PDP sponsors are required to

submit cost data within six months of the end of a plan year.  Id. § 423.343(d)(1).  PDP sponsors

may file an administrative appeal regarding CMS's application of this methodology in a given

case, but this process may not be used as a means of correcting or submitting new information

about the PDP sponsors' costs.  Id. § 423.350(a)(1)(iii), (2).

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Long Term Care Pharmacy Alliance ("LTCPA") is a limited liability company that engages in advocacy on behalf of its membership, which is comprised of long-term care ("LTC") pharmacies, including, according to plaintiffs' Complaint, the three largest LTC pharmacy companies in the United States.  Compl. ¶¶ 6-7.  Plaintiff American Society of Consultant Pharmacists ("ASCP") is an incorporated entity that "serves as the international professional society" for LTC pharmacists.  Id. ¶ 8.  Many of ASCP's members own and operate LTC pharmacies.  Id.

1.    **Contractual Relationships Between Plaintiffs' Members, LTC Pharmacies, And PDP Sponsors**

According to plaintiffs' Complaint, LTC pharmacies do not provide retail pharmacy services.  Id. ¶ 15.  Rather, they operate through contracts with LTC facilities in order to provide not only prescription medications but also "specialized medication packaging . . . , specialized drug regimen reviews, chart reviews, and consultant pharmacy services" on a twenty-four-hour-a-day basis.  Id. ¶¶ 16, 27.  Plaintiffs' Complaint indicates that LTC pharmacies, presumably in accord with their contracts with LTC facilities, "provide all medically necessary prescription drugs, without regard to which party is liable for payment, in order to enable the long-term care facilities to fulfill their federal statutory obligations to their residents to provide such medications."  Id. ¶ 27.

Under Medicare Part D, as described above, LTC pharmacies also enter into contracts with PDP sponsors.  See id. ¶ 26.  Pursuant to these contracts, LTC pharmacies dispense prescription medications to beneficiaries enrolled in a PDP sponsor's plan.  Id. ¶ 28.  At the time

they dispense the medications, they "collect[] any co-payment that may be due from the beneficiary." Id. However, they "do not collect co-payments from" institutionalized dual eligible beneficiaries. Id. (The Complaint does not indicate how LTC pharmacies become aware of the status of institutionalized dual eligibles.) Subsequently, the LTC pharmacies bill the PDP sponsor for reimbursement for the dispensed medications, based on "an agreed-upon amount . . . less any cost-sharing that is to be borne by the beneficiary." Id. According to plaintiffs' Complaint, although the basis for this practice is not explained, a PDP sponsor will withhold the cost-sharing amount from the total reimbursement it provides to LTC pharmacies unless it has already received the notification regarding institutionalized dual eligibles' eligibility for cost sharing that CMS is supposed to provide PDP sponsors pursuant to 42 C.F.R. § 423.800(a). Compl. ¶ 31.

2.   **Plaintiffs' Assertions Regarding Delays In Cost-Sharing Reimbursements From PDP Sponsors**

    Plaintiffs' Complaint alleges that there "has often been, and continues to be," a "significant lag time between a beneficiary's enrollment [with a PDP sponsor's  plan under Medicare Part D], CMS's obtaining data [regarding the institutionalized dual eligible status of the beneficiary], and CMS's provision of [this] data to PDPs." Id. ¶ 32. The Complaint estimates that approximately fifteen per cent of those known to plaintiffs to be institutionalized dual eligibles are not designated as such in the most recent data that CMS has provided to PDP sponsors. Id. ¶ 33.

- 10 -

3.    **Plaintiffs' Prior Suit Against A PDP Sponsor, United Health Group, Inc.,
And CMS's Memoranda Encouraging PDP Sponsors To Resolve
Reimbursement Issues With LTC Pharmacies**

Plaintiffs originally complained of PDP sponsors' failure to reimburse LTC pharmacies in

a suit filed against a PDP sponsor, United Health Group, Inc., on July 6, 2006, in this Court.  See

Compl., No. 1:06cv1221 (D.D.C. filed July 6, 2006) [doc. # 1].  In that case, plaintiffs disputed

the procedure that United Health Group allegedly required LTC pharmacies to follow in order to

receive reimbursement for cost sharing expenses that they had incurred.  See LTCPA et al. v.

United Health Group, Inc., No. 06-1221, 2007 WL 2172793, at *2 (D.D.C. July 30, 2007).

On December 22, 2006, after plaintiffs filed suit against United Health Group, CMS

issued a Memorandum addressed to PDP sponsors, which plaintiffs cite in their Complaint,

Compl. ¶ 48.  The Memorandum stated that CMS recognized that "problems with cost sharing

have disproportionately impacted beneficiaries who are residents of nursing homes, and for

whom long-term care (LTC) pharmacies are holding receivable balances rather than charging

beneficiaries incorrect cost sharing amounts."  Mem. at 1 (attached to this brief as Ex. 1).  CMS

affirmed that its "general policy" pursuant to 42 C.F.R. § 423.800(c) requires that, "[i]n

situations where cost sharing has been overpaid by beneficiaries," PDP sponsors meet their

"obligation to make the . . . beneficiary whole by refunding any improperly collected cost

sharing" by either sending the beneficiaries a check or offsetting future expenses.  Mem. at 1.

However, CMS urged PDP sponsors to "be aware of the role LTC pharmacies have played with

respect to cost sharing amounts overcharged to LTC residents," observing that "[m]any LTC

pharmacies did not collect the cost sharing amounts that were incorrectly charged."  Id.  CMS

advised PDP sponsors to "work with [LTC pharmacies] to ensure appropriate reconciliation of

amounts owed." Id.

However, the December 22, 2006 Memorandum further stated that, "[b]efore reimbursement is made directly to LTC pharmacies, plan sponsors need to ensure that the pharmacies in question have not collected or otherwise waived the cost sharing charges, and, in fact, are carrying a debt for the amounts owed." Id. at 2. The Memorandum suggested that PDP sponsors "may accomplish this by working with their network LTC pharmacies to ensure appropriate documentation and attestations are provided to justify payment to the LTC pharmacy for excess cost sharing amounts that should have been paid by the plan under the low-income subsidy." Id.

In a June 1, 2007, Memorandum addressed to PDP sponsors, which is attached to plaintiffs' Complaint, CMS indicated its awareness that PDP sponsors "may not have been provided with addresses that would help them: (1) confirm that a beneficiary is institutionalized, and (2) identify the particular long-term care (LTC) facility in the sponsor's service area in which those enrollees reside." Compl. ex. 1, at 1. The Memorandum indicated that CMS computer systems currently did not provide PDP sponsors with beneficiaries' "address information that would allow sponsors to link an enrollee to a particular institution," and that CMS was working on a change to its systems that would allow this information to be transmitted. Id. CMS indicated that, "[i]n the interim," it "expect[ed] that sponsors will obtain address information from network pharmacies that serve enrollees in a sponsor's plan(s) within the scope of their current contacts." Id.

**4.    This Court's Denial Of Plaintiffs' Motion To Consolidate, Its Dismissal of Plaintiffs' Suit Against United Health Group, Inc., And The Current Suit**

On June 21, 2007, when the case against United Health Group had been pending for nearly a year, plaintiffs filed the instant action against defendants and moved to consolidate the two cases. See Mot. to Consolidate, No. 1:06cv1221 (D.D.C. filed June 25, 2007) [doc. # 29]. This Court denied the plaintiffs' motion to consolidate as moot after holding that plaintiffs lacked standing to bring their claims against United Health Group and dismissing those claims. See United Health Group, Inc., No. 06-1221, 2007 WL 2172793, at *8; Order, No. 1:06cv1221 (D.D.C. issued July 30, 2007) [doc. #34]. In reaching its conclusion that plaintiffs lacked standing to bring their claims against United Health Group, this Court reasoned that plaintiffs could not sue on their own behalf because they had not suffered "a legitimate injury-in-fact." Id. at *4. The Court also held that plaintiffs could not sue as representatives of individual pharmacies because the participation of each individual pharmacy would be necessary in order to determine whether that pharmacy was owed money by United Health Group and, if so, how much. Id. at *6. The Court recognized, first, that it was "not in a position to issue a declaration stating that monies are owed under the various contracts in the absence of any knowledge of the terms of these contracts," and second, that, "even if the contracts were uniform and their terms were undisputed by the parties, the amount of money owed to each pharmacy is certainly not uniform or undisputed." Id.

In the instant case, plaintiffs raise three claims against defendants CMS, the Department of Health and Human Services ("HHS"), and HHS Secretary Michael O. Leavitt. First, they assert that "[d]efendants' failures to timely (i) provide complete, updated and accurate eligibility

data to PDPs and (ii) properly implement the MMA and its implementing regulations warrant

relief" under 5 U.S.C. § 706(1), a provision of the APA, 5 U.S.C. §§ 701-706.  Compl. ¶ 52.

Second, they assert claims directly under the MMA and its implementing regulations, including

the claim that "[d]efendants' failures to provide complete, updated and accurate eligibility data to

PDPs for 2006" and "to timely provide" such data "on an ongoing basis" violate 42 U.S.C. §

1395w-114(c)(1) and 42 C.F.R. § 423.800(a).  Compl. ¶¶ 57-58.  In addition, they assert that

[d]efendants' failures to properly implement the MMA and CMS's regulations violate" 42

U.S.C. §§ 1395b-9(a)(3)(A) & 1395w-114(a)(1)(D)(i) and 42 C.F.R. §§ 423.782(a)(2)ii) &

.503(d).  Compl. ¶ 59.  Third, plaintiffs assert that "[d]efendants' failure to provide adequate

procedural safeguards" in regard to providing eligibility data to PDP sponsors "violates

Plaintiffs' members' right to due process under the Fifth Amendment."  Compl. ¶ 64.  Plaintiffs

seek declaratory relief as well as a writ of mandamus that would require defendants to provide

eligibility data to PDP sponsors within a time period that is not set forth in any statute or

regulation but that is to be "defined by the Court" and to continue to provide PDP sponsors with

"complete, updated and accurate" data on an "ongoing basis," and would further compel

defendants to require PDP sponsors "to pay the LTC pharmacies for co-payment amounts

improperly withheld from reimbursements for prescription drugs provided to institutionalized

dual eligibles."  Compl. at p. 16.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 12(b)(1), the court must dismiss any claim over which it lacks

subject matter jurisdiction.  Because federal courts are courts of limited jurisdiction, the law

presumes that any claim lies outside this limited jurisdiction, and "the plaintiff bears the burden

- 14 -

of establishing that the court has subject-matter jurisdiction." Role Models Am., Inc. v. Harvey,

459 F. Supp. 2d 28, 33-34 (D.D.C. 2006). The factual allegations in a plaintiff's complaint "will

bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure

to state a claim," and material other than these allegations may be considered in determining

whether subject matter jurisdiction exists, "so long as [the court] still accepts the factual

allegations in the complaint as true." Isenbarger v. Farmer, 463 F. Supp. 2d 13, 18 (D.D.C.

2006).

      Under Fed. R. Civ. P. 12(b)(6), the court's decision whether to dismiss for failure to state

a claim upon which relief may be granted is based on "the legal sufficiency of the complaint."

Shirk v. Barton, No. 07-0356, 2007 WL 2570426, at *2 (D.D.C. Sept. 6, 2007). The Supreme

Court has recently revised the applicable 12(b)(6) standard. See id. Following Bell Atlantic

Corp. v. Twombly, 127 S. Ct. 1955 (2007), while the complaint need not provide "detailed

factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." Id. at 1964-65. The alleged facts must "state a claim for relief that is

plausible on its face" rather than merely "conceivable." Id. at 1974.

      In determining whether dismissal is warranted for failure to state a claim, a court may

consider "'the facts alleged in the complaint, any documents either attached to or incorporated in

the complaint and matters of which [the court] may take judicial notice.'" Rogers v. Johnson-

Norman, 466 F. Supp. 2d 162, 165 n.3 (D.D.C. 2006) (quoting EEOC v. St. Francis Xavier

Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997)). "[T]he court must treat the complaint's

factual allegations . . . as true and draw all reasonable inferences therefrom in the plaintiff's

favor," but "the court need not accept as true inferences unsupported by facts set out in the

complaint or legal conclusions cast as factual allegations." <u>Shirk</u>, 2007 WL 2570426, at *2.

<u>**ARGUMENT**</u>

**I.   THERE IS NO JURISDICTION OVER PLAINTIFFS' CLAIMS UNDER THE MEDICARE ACT**

Plaintiffs assert that this Court has jurisdiction over their claims under 28 U.S.C. § 1331

and 28 U.S.C. § 1361.  Normally, 42 U.S.C. § 405(g), "to the exclusion of 28 U.S.C. § 1331, is

the sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act." <u>Heckler v.</u>

<u>Ringer</u>, 466 U.S. 602, 614-15 (1984) (citing 42 U.S.C. § 405(h), which is made applicable to the

Medicare Act by 42 U.S.C. § 1395ii); <u>see</u> <u>Action Alliance of Senior Citizens v. Leavitt</u>, 483 F.3d

852, 858 (D.C. Cir. 2007).  However, federal question jurisdiction under 28 U.S.C. § 1331 may

lie for such claims "where application of §§ 1395ii and 405(h) would mean 'no review at all' of a

plaintiff's claim." <u>Id.</u> at 859 (quoting <u>Shalala v. Ill. Council on Long Term Care, Inc.</u>, 529 U.S.

1, 20 (2000)).  It is not necessary in this case to examine whether plaintiffs' claims "arise under"

the Medicare Act because, even if they do, defendants would agree that CMS provides no

administrative grievance procedures through which plaintiffs or their member pharmacies might

bring claims of the type plaintiffs allege.  Defendants therefore agree that, if the Court has

jurisdiction over these claims at all, it must be based on 28 U.S.C. §§ 1331 or 1361.[1]  However,

---

[1]The Supreme Court has not ruled on the question of whether a court has jurisdiction under 28 U.S.C. § 1361 for claims that "arise under" the Medicare Act but for which § 405(g) provides no judicial review based on the absence of an applicable administrative grievance process.  <u>See</u> <u>Ringer,</u> 466 U.S. at 616; <u>Monmouth Med. Ctr. v. Thompson</u>, 257 F.3d 807, 813 (D.C. Cir. 2001).  The D.C. Circuit has held that jurisdiction under § 1361 is not barred by § 405(h).  <u>Monmouth Med. Ctr.</u>, 257 F.3d at 813 (citing <u>Ganem v. Heckler</u>, 746 F.2d 844, 850-52 (D.C. Cir. 1984)).

- 16 -

for the reasons set forth below, plaintiffs' claims are jurisdictionally barred because the United

States has not waived its sovereign immunity from those claims that are brought under 28 U.S.C.

§ 1331, and mandamus relief is unavailable under 28 U.S.C. § 1361.

## II.    THE UNITED STATES HAS NOT WAIVED SOVEREIGN IMMUNITY BECAUSE PLAINTIFFS HAVE AN ADEQUATE REMEDY ELSEWHERE

It is well established that the United States is immune from suit without its consent, and

this consent is a prerequisite to a court's jurisdiction.  Webman v. Fed. Bur. of Prisons, 441 F.3d

1022, 1025 (D.C. Cir. 2006).  Sovereign immunity may be waived by statute, but any such

waiver must be strictly construed in favor of the sovereign.  Id.  For claims seeking nonmonetary

relief against the government, the APA, 5 U.S.C. §§ 701-706, waives sovereign immunity, but

only if there is no "adequate remedy . . . available elsewhere."  Transohio Savings Bank v. OTS,

967 F.2d 598, 607 (D.C. Cir. 1993) (citing 5 U.S.C. § 704).  Here, plaintiffs' claims  are barred

by sovereign immunity because, assuming that PDP sponsors have, as plaintiffs allege,

wrongfully withheld copayment reimbursements, an adequate remedy is available to their

members through individual breach of contract actions against the relevant PDP sponsors.

An adequate remedy must be understood as one that would redress plaintiffs' alleged

injuries – here, the monetary costs that plaintiffs' members have allegedly incurred due to PDP

sponsors' failure to reimburse erroneously-assessed cost-sharing expenses which plaintiffs claim

to hold as a current debt.  See Coker v. Sullivan, 902 F.2d 84, 90 n.5 (D.C. Cir. 1990)

(recognizing § 704 "'bar[s] suits where a plaintiff's injury may be remedied in another action,

even if that remedy would have no effect upon the challenged agency action'" (citing Council of

& for the Blind of Del. County Valley, Inc. v. Regan, 709 F.2d 1521 (D.C. Cir. 1983) (en banc))).

- 17 -

Plaintiffs acknowledge in their Complaint that their members have the option of "institut[ing]

and litigat[ing] . . . actions against individual PDPs" in order to collect money owed in specific

instances.  Compl. ¶ 54.  However, they maintain that such a course of action is "undesirable."

Id.  Undoubtedly, LTC pharmacies would find it more convenient if the Court were to require

CMS to take on the responsibility of enforcing individual PDP sponsors' compliance with the

contracts that they have with individual LTC pharmacies.  However, the inconvenience that may

result from the burden of instigating multiple lawsuits and the unavailability of a systemic

solution does not render an alternative remedy inadequate.  See Gillis v. U.S. Dep't of Health &

Human Servs., 759 F.2d 565, 578 (6th Cir. 1985) ("Neither inconvenience nor a speculative

disincentive to entity compliance render resort to the private suit remedy . . .  inadequate."); see

also Women's Equity Action League v. Cavazos, 906 F.2d 742, 751 (D.C. Cir. 1990)

(recognizing that although "[s]uits directly against [private] entities may be more arduous, and

less effective in providing systemic relief, than continuing judicial oversight of federal

government enforcement[,] . . . situation-specific litigation affords an adequate, even if

imperfect, remedy"); Council of & for the Blind, 709 F.2d at 1532 ("Even if we agreed that one

nationwide suit would be *more effective* than several ... suits, that does not mean that the remedy

provided by Congress is *inadequate* ").  Understandably, the APA's waiver of the sovereign

immunity of the United States does not extend to situations where plaintiffs simply prefer that

the government enforce a third party's contractual obligations when the contracting parties could

do so themselves.

In fact, LTC pharmacy suits against PDP sponsors are likely to be far more effective in

correcting plaintiffs' alleged harm than the current action.[2]  See Coker, 902 F.2d at 89-90

(holding that direct actions against states "are not merely adequate [in comparison with an action

against HHS]; they are also more suitable avenues for plaintiffs to pursue the relief they seek"

because "[t]he states are the immediate cause of the injuries of which the [plaintiffs] complain");

Council of & for the Blind, 709 F.2d at 1532 (holding that individual suits against local

government entities provided an adequate remedy and noting that "it is not clear at all that a

nationwide suit [against a federal agency seeking to compel enforcement of nondiscrimination

requirements] would remedy appellants' grievances more *effectively* than several . . . suits"

against the local governments subject to the federal requirements).  Individual contract remedies

are therefore adequate and make inoperable the APA's waiver of sovereign immunity.  Thus, this

Court lacks jurisdiction over plaintiffs' claims.

## III.    PLAINTIFFS LACK STANDING TO BRING THIS ACTION ON BEHALF OF THEIR MEMBERS OR ON THEIR OWN BEHALF

This Court also lacks jurisdiction because plaintiffs, two corporate entities with

memberships comprised of LTC pharmacies and pharmacy owners and operators, have no

standing to bring suit against defendants.  An organization may have standing to sue on behalf of

its members ("representational" standing) or on its own behalf ("organizational" standing).  Air

Transport Ass'n v. Reno, 80 F.3d 477, 483 & n.6 (D.C. Cir. 1996).  Plaintiffs assert standing in

both their representational and their organizational capacities, Compl. ¶¶ 7-8, but neither

assertion can be sustained.

---

[2]Indeed, as discussed below, such actions are the only type of actions that could actually redress LTC pharmacies' asserted injuries.  At least one contract action by an LTC pharmacy against a PDP sponsor is currently underway.  See Omnicare, Inc. v. Blue Cross Blue Shield of Michigan, No. 07-12346 (E.D. Mich. filed May 31, 2007).

In order to bring suit in a representational capacity, a membership organization must establish that "(a) [its] members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977); see Am. Legal Foundation v. FCC, 808 F.2d 84, 89 (D.C. Cir. 1987). To bring suit on its own behalf, an organization must itself meet the requirements for standing. Id. Thus, either plaintiffs or at least some of their members must satisfy both constitutional standing prerequisites under Article III and prudential standing considerations. See Nuclear Energy Inst., Inc. v. EPA, 373 F.3d 1251, 1266 (D.C. Cir. 2004).

### A. Neither Plaintiffs Nor Their Members Have Article III Standing

"Derived from the Constitution's "case-or-controversy" requirement for federal court jurisdiction, Article III standing requires plaintiffs to establish, as an 'irreducible constitutional minimum,' that they face 'injury in fact' caused by the challenged conduct and redressable through relief sought from the court." Shays v. FEC, 414 F.3d 76, 83 (D.C. Cir. 2005) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)); see also Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 417 F.3d 1272, 1287 (D.C. Cir. 2005) (listing injury-in-fact, causation, and redressability as the three requirements). An "injury in fact" refers to "an invasion of a concrete and particularized legally protected interest," where the harm is "actual or imminent," not "conjectural or hypothetical." Shays, 414 F.3d at 83 (internal quotation omitted). To satisfy causation, there must be "'a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant,

- 20 -

and not the result of the independent action of some third party not before the court.'" Id.

(quoting Lujan, 504 U.S. at 560). To satisfy redressability, it must be "'likely, as opposed to

merely speculative, that the injury will be redressed by a favorable decision.'" Id. (quoting

Lujan, 504 U.S. at 560).

> **1.  Plaintiffs Lack Organizational Standing Because The Only Injury They Assert Results From Their Alleged Efforts To Oppose Defendants, Including The Efforts Expended On This Lawsuit**

As indicated above, plaintiffs assert in their Complaint that they have suffered injury by

virtue of the fact that they have diverted time and resources from other activities in order to try to

"address" or "deal with" defendants' alleged failure to properly implement Medicare Part D. See

Compl. ¶ 10. This Court rejected the notion that diversion of resources provides a basis for

organizational standing when plaintiffs made the same argument in their suit against United

Health Group, Inc. See United Health Group, No. 06-1221, 2007 WL 2172793, at *4. The Court

reasoned that, under D.C. Circuit precedent, "a diversion of resources only becomes relevant

where a defendant's conduct impedes the plaintiff organization's activities." Id. (citing Fair

Employment Council of Greater Wash., Inc. v. BMC Mktg., 28 F.3d 1268, 1277 (D.C. Cir.

1994)).

Here, as in their case against United Health Group, plaintiffs have not alleged that

defendants have impeded their activities in any way. The "reallocation of resources alone does

not constitute an injury-in-fact." Id. (citing Ctr. for Law & Educ. v. Dep't of Educ., 396 F.3d

1152, 1162 n.4 (D.C. Cir. 2005)); see also Spann v. Colonial Vill., Inc., 899 F.2d 24, 27 (D.C.

Cir. 1990) ("An organization cannot, of course, manufacture the injury necessary to maintain a

suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant

could create injury in fact by bringing a case, and Article III would present no real limitation.").

Plaintiffs therefore have no standing to bring suit on their own behalf.

> ## 2. Plaintiffs' Members Lack Article III Standing Because Any Injuries They Have Sustained Result From Their Contracts With PDP Sponsors And Are Not Redressable By Any Obligation That This Court Could Impose On Defendants

Plaintiffs also do not have standing in their representational capacity because their members could not establish, on their own behalf, that the causation and redressability requirements for standing are met. Plaintiffs have alleged that their members have been injured because they "have not been paid co-payment amounts they are owed" by PDP sponsors, and that this injury is "[a]s a consequence of Defendants' failures." Compl. ¶ 9. Plaintiffs provide absolutely no factual details to substantiate their members' alleged injuries.[3] Even assuming that plaintiffs' members have sustained an injury, however, plaintiffs themselves acknowledge that the direct cause of this injury is the failure of third parties – individual PDP sponsors – to pay individual LTC pharmacies the copayment amounts that they allegedly owe. See id. Moreover, plaintiffs further acknowledge that LTC pharmacies' only connection to CMS is through their contractual relationships with these PDP sponsors, who in turn have contracts with CMS. The contracts between PDP sponsors and LTC pharmacies determine the procedures LTC pharmacies must follow to receive payments from the PDP sponsors for the medications that the pharmacies dispense. Id. ¶ 28 (noting PDP sponsors must pay LTC pharmacies "an agreed-upon amount").

---

[3]Their assertion implies that their members are uniformly owed cost-sharing amounts by all PDP sponsors. This is hardly plausible, given the likely variations between different PDP sponsors and different LTC pharmacies, and in the contractual provisions that govern the payment procedures and obligations between them. Cf. United Health Group, No. 06-1221, 2007 WL 2172793, at *6.

### a.    Defendants Did Not Cause The Alleged Injuries

Plaintiffs' members cannot establish causation because any injuries they have suffered

through their contractual relationships with PDP sponsors are "the result of the independent

action of some third party not before the court." Shays, 414 F.3d at 83. A PDP sponsor's failure

to pay an LTC pharmacy could result from the pharmacy's failure to follow the procedures

specified in the contract, or it could result from the PDP sponsor's breach of the contract. Either

way, the failure to pay does not result from any action or failure to act by CMS.

It is not enough to assert that CMS also has contracts with PDP sponsors. "'When . . . a

plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of

regulation) of someone else, much more is needed.'" Renal Physicians Ass'n v. U.S. Dep't of

Health & Human Servs., 489 F.3d 1267, 1274 (D.C. Cir. 2007) (quoting Lujan, 504 U.S. at 562).

In this circumstance, "[i]t becomes the burden of the plaintiff to adduce facts showing that . . .

choices [of the independent actors] have been or will be made in such manner as to produce

causation and permit redressability of injury. Thus, when the plaintiff is not himself the object of

the government action or inaction he challenges, standing . . . is ordinarily *substantially more*

*difficult to establish*.'" Id. (quoting Lujan, 504 U.S. at 562). Here, plaintiffs have failed to meet

their burden of adducing facts to support their members' standing. See id. at 1276 ("[E]ven at

the pleading stage, a party must make factual allegations showing that the relief it seeks will be

likely to redress its injury.").

According to plaintiffs' Complaint, after dispensing prescribed medications to a Medicare

Part D beneficiary in an LTC facility, an LTC pharmacy will "collect[] any co-payment that may

be due from the beneficiary" unless the beneficiary is an institutionalized dual eligible. Compl. ¶

- 23 -

28. The LTC pharmacy will then apply to the PDP sponsor for reimbursement of the "agreed-upon amount . . . less any cost-sharing that is to be borne by the beneficiary." Id.  Plaintiffs do not provide the details necessary to fully understand how their members are injured through this process, leaving us to speculate whether somehow LTC pharmacies receive information identifying individuals as institutionalized dual eligibles but that, for some unexplained reason, PDP sponsors refuse to accept the same data as a basis for including the cost-sharing amount for these individuals in their reimbursements to LTC pharmacies, or whether LTC pharmacies are prevented, by the terms of their contracts with LTC facilities, from attempting to collect copayment amounts from beneficiaries even without accurate information about whether the benficiaries are eligible for subsidies.  We are not told whether the terms of the contracts between the PDP sponsors and the LTC pharmacies specify, in some or all cases, that PDP sponsors will only pay the cost-sharing amounts if they receive notification from CMS regarding dual eligibles' status, or whether, alternatively, these contracts contain no such limitation and PDP sponsors have breached the contracts by refusing to accept dual eligible status information from LTC pharmacies instead of from CMS.  Whatever the case, the issue arises from the contractual relationship between PDP sponsors and LTC pharmacies, and its resolution depends on the terms of these contracts.

Significantly, the statutory provisions of Medicare Part D and the CMS implementing regulations are silent on the issue of whether and under what circumstances PDP sponsors should pay LTC pharmacies cost-sharing amounts for institutionalized dual eligibles.  The MMA directs that CMS provide for timely reimbursement of PDP sponsors' cost-sharing expenses.  42 U.S.C. § 1395w-114(c)(1)(C).  CMS is charged with "provid[ing] a process" through which this will

occur, and through which PDP sponsors shall "reduce[] the premiums or cost-sharing otherwise imposed by the amount of the applicable subsidy and submit[] to [CMS] information on the amount of such reduction." Id. § 13952-114(c)(1)(B), (C).

CMS has complied with the first part of this obligation, providing a process through which PDP sponsors will be reimbursed for the cost-sharing expenses of subsidy-eligible beneficiaries, such as institutionalized dual eligibles, through the multi-step procedure described above. Following this procedure, CMS makes interim reimbursement payments to each PDP sponsor throughout the year, without requiring any documentation of actual costs, based on assumptions that were established during the bidding and negotiation process that led to the contract between CMS and the PDP sponsor. See 42 C.F.R. § 423.335(d)(2)(i). CMS meanwhile waits for the necessary information from states concerning individuals' Medicaid status. Id. § 423.904(4). As this occurs, CMS and the PDP sponsor engage in an ongoing exchange of concrete data, with CMS providing information on status determinations for subsidy-eligible individuals, and the PDP sponsor providing information on actual cost sharing expenses that it has incurred. Id. § 423.800(a)-(b). On an annual basis, the estimated payments that CMS has made to the sponsor are reconciled with the sponsor's actual costs, and the final payment amount is adjusted accordingly. Id. § 423.343(d). Nothing in this process can plausibly be alleged to result in injury to LTC pharmacies. Indeed, the fact that CMS makes interim payments to PDP sponsors based on prior estimates, without regard to the timing of its eligibility notifications, undermines plaintiffs' assertions that these notifications must necessarily – as a matter of Medicare Part D law – precede PDP sponsors' reimbursements to LTC pharmacies.

In regard to the second part of CMS's obligation, ensuring that cost-sharing amounts paid

to PDP sponsors are passed through to subsidy-eligible beneficiaries, CMS regulations require that PDP sponsors must "reimburse subsidy eligible individuals, and organizations paying cost-sharing on behalf of such individuals, any excess premiums and cost-sharing paid by such individual or organization after the effective date of the individual's eligibility for a subsidy under this subpart." 42 C.F.R. § 423.800(c). Notably absent from either the statute or CMS's implementing regulation is any direction regarding PDP sponsors' – let alone CMS's – payment obligations to LTC pharmacies with whom PDP sponsors enter into contracts.[4]

Nor do any other CMS regulations impose any requirements in regard to such obligations. As described above, CMS regulations require PDP sponsors to offer LTC pharmacies "standard contracting terms and conditions" in order to ensure convenient access to Medicare beneficiaries. 42 C.F.R. § 423.120(a)(5); see id. § 423.505(b)(18) (providing that the contract between CMS and a PDP sponsor must include a provision specifying that the PDP sponsor will "have a standard contract with reasonable and relevant terms and conditions of participation whereby any willing pharmacy may access the standard contract and participate as a network pharmacy"). In addition, "[a]ll contracts . . . between Part D plan sponsors and pharmacies . . . must contain" certain provisions that are aimed at protecting beneficiaries and ensuring that the pharmacies

_____

[4]Plaintiffs' Complaint appears to contend that LTC pharmacies qualify as "organizations" within the meaning of 42 C.F.R. § 423.800(c) because by "holding the debt for the unreimbursed cost-sharing amounts," they have "effectively" paid these amounts on behalf of institutionalized dual eligibles. Compl. ¶ 49. However, LTC pharmacies have not actually paid cost sharing amounts; they have simply not collected these amounts from beneficiaries who do not owe them. The term "organizations" in § 423.800(c) refers to charities and programs such as State Pharmacy Assistance Programs that do actually pay cost sharing amounts on behalf of individuals. See CMS, Medicare Prescription Drug Benefit Final Rule, 70 Fed. Reg. 4194, 4389 (Jan. 28, 2005). In contrast to such eleemosynary organizations, LTC pharmacies are businesses with contractual relationships with PDP sponsors through which they can negotiate the terms of their payment for dispensing drugs under Medicare Part D.

- 26 -

comply with federal law.  Id. § 423.505(i)(3).  Nothing in these provisions gives any direction whatsoever regarding the timing, amounts, or requirements associated with PDP sponsors' payments to pharmacies for the prescription medications that the pharmacies provide to Medicare Part D beneficiaries.  In addition, no statute or regulation requires LTC pharmacies to contract with any PDP sponsor whose contracts or performance the LTC pharmacies believe to be deficient.

Thus, while Medicare law imposes obligations on PDP sponsors for the protection of beneficiaries, it leaves the allocation of any risk, and the timing of any payments, between PDP sponsors and the pharmacies in their network up to the parties to negotiate between themselves, as long as the beneficiaries remain protected.[5]  Any injury that LTC pharmacies have sustained in this regard must be a result either of the terms of their contracts with PDP sponsors or the PDP sponsors' breach of those terms.  Either way, the problem is not one that was caused by CMS.

Plaintiffs appear to suggest that CMS has somehow admitted guilt by issuing a guidance memorandum on December 22, 2006, in which it clarifies to PDP sponsors that they are not, under the language of 42 C.F.R. § 423.800, required to reimburse beneficiaries for cost-sharing amounts that the beneficiaries have not paid, and indicates awareness of LTC pharmacies' predicament.  See Compl. ¶ 48.  By issuing this clarification, CMS has simply attempted to eliminate confusion on the part of PDP sponsors regarding their reimbursement obligations toward beneficiaries.  CMS also voluntarily sought to encourage PDP sponsors to "be aware of the role LTC pharmacies have played" and to "work directly with" LTC pharmacies to resolve

---

[5]For example, nothing in the Medicare Part D statutes or regulations would prevent a contract between a PDP sponsor and an LTC pharmacy from providing for the same kind of interim payments that occur between CMS and PDP sponsors.

the payment issues between them.  However, the December 22, 2006 memorandum did not

purport to interpret any statute or regulation as requiring PDP sponsors to follow any particular

course of action.  Nor did the memorandum itself impose any agency requirements on PDP

sponsors, or create any enforcement mechanism for LTC pharmacies, and CMS has not sought to

enforce any such requirements against PDP sponsors.  See Gen. Elec. Co. v. EPA, 290 F.3d 377,

383 (D.C. Cir. 2002) (explaining that "an agency pronouncement will be considered binding as a

practical matter if it either appears on its face to be binding, . . . or is applied by the agency in a

way that indicates it is binding").

### b.    This Suit Cannot Redress The Alleged Injuries

For the same reasons that CMS actions (or inaction) cannot be viewed as causing LTC

pharmacies' alleged injuries, these injuries are not redressable through the current lawsuit.[6]  As

explained above, the statutory and regulatory framework imposes no obligations on CMS with

regard to monitoring or enforcing any cost-sharing reimbursements between PDP sponsors and

LTC pharmacies, nor does it impose any obligations on PDP sponsors with regard to cost-sharing

reimbursements to LTC pharmacies.  This Court therefore cannot force PDP sponsors to

reimburse LTC pharmacies the amounts that are allegedly owed by issuing an order that requires

CMS to comply with Medicare Part D statutes or regulations, nor is it clear that such an order

would ever lead to that result.  Cf. Univ. Med. Ctr. v. Shalala, 173 F.3d 438, 442 (D.C. Cir.

---

[6]Even if a delay in CMS's cost-sharing eligibility notifications to PDP sponsors could be
viewed as causing PDP sponsors to deny cost-sharing reimbursements to LTC pharmacies, it
would not be redressable through this action because, as explained above, CMS necessarily relies
on information from state Medicaid agencies to determine the status of institutionalized dual
eligibles.  See 42 C.F.R. § 423.904(d)(4).  As these state agencies are not parties in the current
lawsuit, this Court has no power to compel them to provide eligibility information more quickly.

1999) (holding that "[e]ven if [the plaintiff, a Medicaid covered entity,] had a declaratory

judgment that [HHS] unlawfully delayed in placing [plaintiff] on the [discount eligibility] list, it

has never explained how, or under what legal theory, it would be entitled to recover against the

[drug] manufacturers" who had contracts with HHS but were not parties to the suit).  Rather, this

is a situation where the "status quo is held in place by other forces" – the contracts between PDP

sponsors and LTC pharmacies.  See Renal Physicians Ass'n, 489 F.3d at 1278.  No action by

CMS can affect the rights and obligations that PDP sponsors and LTC pharmacies have mutually

agreed to in these contracts, or the sponsors' compliance with the contracts' terms.  For example,

if the contracts between PDP sponsors and LTC pharmacies require LTC pharmacies to provide

documentation in order to receive reimbursement, and LTC pharmacies fail to provide this

documentation, CMS's enforcement of Medicare provisions cannot require PDP sponsors to

waive this contractual requirement, nor is there any reason to believe they would do so

voluntarily.  See Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 943 (D.C. Cir.

2004) ("Speculative and unsupported assumptions regarding the future actions of third-party

market participants are insufficient to establish Article III standing.).  Plaintiffs' broad challenge

to CMS's implementation of Medicare Part D thus demonstrates the "obvious difficulties insofar

as proof of causation or redressability is concerned" that the Supreme Court observed in Lujan,

504 U.S. at 568.  As the Court there recognized, "suits challenging, not specifically identifiable

Government violations of law, but the particular programs agencies establish to carry out their

legal obligations ... [are] rarely if ever appropriate for federal-court adjudication."  Id. (internal

quotation omitted).  Because plaintiffs' members lack Article III standing to sue CMS for their

alleged injuries, this Court lacks jurisdiction, and the case should be dismissed.

**B.  Plaintiffs' Members Fail to Meet Prudential Standing Requirements Because Their Grievance Does Not Fall Within The Zone of Interests Protected By The MMA**

Prudential standing requirements generally "prohibit[] . . .  a litigant's raising another person's legal rights."  Devlin v. Scardelletti, 536 U.S. 1, 7 (2002) (internal quotation omitted). Thus, even where constitutional standing requirements are met, a plaintiff must also have a grievance that "'arguably fall[s] within the zone of interests protected or regulated by the statutory provision'" in question.  Nat'l Ass'n of Home Builders, 417 F.3d at 1287 (quoting Bennett v. Spear, 520 U.S. 154,162 (1997)).  For APA purposes, a plaintiff meets the zone of interests test if he is himself the "'subject of the contested regulatory action,'" or if his interests "are not 'so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"  Amgen Inc. v. Smith, 357 F.3d 103, 108 (D.C. Cir. 2004) (quoting Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987)).[7]

Here, LTC pharmacies' interests in receiving cost-sharing reimbursements from PDP sponsors, and receiving these reimbursements in what they consider to be a timely manner, are not "arguably within the zone of interests to be protected or regulated by" the Medicare Act or Medicare Part D.  See Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 488 (1998) (internal quotation omitted).  LTC pharmacies are not themselves regulated by the provisions of Medicare Part D.  Under the framework described above, the statutes and

---

[7]The Supreme Court has explained that "the breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the "'generous review provisions'" of the APA may not do so for other purposes."  Bennett, 520 U.S. at 163 (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 156 (1970)).

regulations subject PDP sponsors to certain requirements regarding their administration of Part D

plans, and they also subject Medicare beneficiaries to requirements in order to obtain the benefits

of the program.  LTC pharmacies are only mentioned in the regulations that require PDP

sponsors to ensure that their networks include pharmacies available to beneficiaries that reside in

LTC facilities.  See 42 C.F.R. § 423.120(a)(5).

 In addition, LTC pharmacies' interests are too marginally related to, and indeed

inconsistent with, the purposes of Medicare Part D to be considered "protected."  The interests

protected by Medicare Part D are the interests of Medicare beneficiaries in obtaining prescription

drug coverage.  In particular, 42 U.S.C. ¶ 1395w-114 protects the interests of institutionalized

dual eligibles in continuing to receive prescription drugs without incurring any cost-sharing

expenses.  These interests are not implicated in any way by the claims plaintiffs raise in their

Complaint.  There is no suggestion, for example, that institutionalized dual eligibles have

suffered any injury associated with the injury alleged by plaintiffs.  Indeed, the Complaint asserts

that these individuals have received their prescription medications and have not been assessed

any cost-sharing expenses.  Compl. ¶¶ 27-28.  LTC pharmacies are private commercial actors

that are presumptively competent to protect their own interests when entering into contracts with

PDP sponsors, and to take appropriate action if PDP sponsors breach these contracts.  To

measure the success of CMS's actions in implementing its obligations under Medicare Part D by

whether LTC pharmacies have earned their anticipated profits would make no sense in this

context, and any obligations that the Court might impose in this regard would serve to divert

CMS's attention and resources from Part D beneficiaries.

 A number of cases have addressed whether the interests of providers of Medicare services

or medications are within the zone of interests of various Medicare provisions.  Courts have

concluded the zone of interests requirement is satisfied in cases where the interests asserted by

providers will, if vindicated, have a tangible positive impact on the interests of Medicare

beneficiaries; in such cases, the interests of providers and beneficiaries are aligned.  Cf. Am.

Chiropratic Ass'n, Inc. v. Leavitt, 431 F.3d 812, 816 (D.C. Cir. 2005) (holding providers of

chiropractic services had interests aligned with Medicare beneficiaries where the alleged injury

was preventing beneficiaries from receiving chiropractic services); Amgen, Inc., 357 F.3d at 109

(holding a drug manufacturer's "commercial interest in selling [a particular drug] is congruent

with the interests of beneficiaries in obtaining access to the technology" where Medicare's

payment structure was based on the premise that "hospitals inadequately reimbursed for new

drugs or biologicals are less likely to provide them and more likely to steer beneficiaries towards

older, less expensive treatments"); Nat'l Athletic Trainers' Ass'n, Inc. v. U.S. Dep't of Health &

Human Servs., 455 F.3d 500, 503 (5th Cir. 2006) (holding an association representing medical

providers had prudential standing where the statutory "interest comports with the physician's

interest in providing services and the Medicare beneficiary's interest in receiving those

services").

On the other hand, where a provider is simply looking out for its own commercial

interests, and the remedy it seeks will have no positive impact on beneficiaries, its interests have

been held to lie outside the applicable zone of interests for prudential standing purposes.  See

TAP Pharmaceuticals v. U.S. Dep't of Health & Human Servs., 163 F.3d 199, 205 (4th Cir.

1998) (holding that a pharmaceutical company's interest in selling a particular brand of drug was

not aligned with Medicare beneficiaries' interests where there was no reason to believe the

company's brand was superior to others).  While the D.C. Circuit considered the Fourth Circuit's

analysis in TAP too limiting, Amgen Inc., 357 F.3d at 110, the test that it set forth as an

alternative – that a party "in practice can be expected to police the interests that the statute

protects," id. (internal quotation omitted) –   is not satisfied here.  Here, as indicated, because the

grievance that plaintiffs allege merely involves the allocation of risks and burdens between LTC

pharmacies and PDP sponsors, and beneficiaries have suffered no injury, the interests of

beneficiaries are unaffected.  Moreover, because LTC pharmacies are governed by their

contractual relationships with LTC facilities, on the one hand, and PDP sponsors, on the other,

the pharmacies cannot be expected to "police the interests" of Medicare beneficiaries who

participate in Medicare Part D.  If anything, it is PDP sponsors that are required by the statutory

and regulatory framework to police the interests of beneficiaries by requiring in their contracts

that LTC pharmacies adhere to Medicare requirements.  See 42 C.F.R. § 423.120(a)(5) (requiring

PDP sponsors to include "performance and service criteria" in their contracts with LTC

pharmacies)

      For all these reasons, plaintiffs' claims are subject to dismissal on standing grounds.

However, if this Court concludes it does have jurisdiction over plaintiffs' claims, they must

nevertheless be dismissed for failure to state a claim upon which relief may be granted.

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER APA SECTION 706(1)

      Plaintiffs request relief under the APA provision that allows a court to "compel agency

action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  Relief under § 706(1)

is only available when an agency has failed to take an "agency action," as that term is defined in

the APA, and the action is one that is "legally required."  Norton v. S. Utah Wilderness Alliance

("SUWA"), 542 U.S. 55, 62-63 (2004). In addition, "[w]here no other statute provides a private

right of action, the 'agency action'" that a plaintiff seeks to compel "must be 'final agency

action.'" Id. at 62. Because the APA does not provide a remedy for the type of ongoing system-

wide programmatic failure that plaintiffs allege, plaintiffs' APA claim is subject to dismissal for

failure to state a claim. See Friends of the Earth v. U.S. Dep't of Interior, 478 F. Supp. 2d 11, 23

(D.D.C. 2007) ("A dismissal for failure to satisfy the APA's requirements for judicial review of

agency action is . . . a dismissal for failure to state a claim under Rule 12(b)(6) . . . .").

### A. The CMS Conduct That Plaintiffs Challenge Does Not Qualify as "Agency Action" Subject to Judicial Review

The term "agency action" is defined in 5 U.S.C. § 551(13) to include "the whole or a part

of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to

act." See SUWA, 542 U.S. at 62. Based on this definition, the Court has concluded that "a claim

under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete*

agency action that it is *required to take*." Id. at 64. The Court then held that the plaintiff in

SUWA could not obtain relief under § 706(1) because the plaintiff sought to compel the Bureau

of Land Management's compliance with its mandate to manage federal lands in a manner that

would not damage their wilderness value. Id. at 66. "General deficiencies in compliance," the

Court stated, "lack the specificity requisite for agency action." Id. The Court reasoned:

> If courts were empowered to enter general orders compelling compliance with
> broad statutory mandates, they would necessarily be empowered, as well, to
> determine whether compliance was achieved – which would mean that it would
> ultimately become the task of the supervising court, rather than the agency, to
> work out compliance with the broad statutory mandate, injecting the judge into
> day-to-day agency management.

Id. at 66-67. "The prospect of pervasive oversight by federal courts over the manner and pace of

agency compliance with such congressional directives is not contemplated by the APA."  Id. at

67; see Cobell v. Norton, 392 F.3d 461, 475 (D.C. Cir. 2004) (vacating an injunction against the

Department of Interior insofar as the district court had directed the Department to comply with a

comprehensive plan).

Here, it is a mystery what final discrete "agency action" plaintiffs might be seeking to

compel defendants to take.  See Friends of the Earth, 478 F. Supp. 2d at 25 ("A sure sign that a

complaint fails the 'final agency action' requirement is when 'it is not at all clear what agency

action [plaintiff] purports to challenge." (quoting Indep. Petroleum Assoc. v. Babbitt, 235 F.3d

588, 595 (D.C. Cir. 2001))).  As stated above, plaintiffs point to defendants' alleged "failures to

timely (i) provide complete, updated and accurate eligibility data to PDPs and (ii) properly

implement the MMA and its implementing regulations."  Compl. ¶ 52.  CMS's "proper[]

implement[ation]" of the MMA (or alleged lack thereof) certainly does not qualify as an "agency

action" under the foregoing definition. In addition, CMS's notification, pursuant to 42 C.F.R. §

423.800(1), to a PDP sponsor that a particular individual is eligible for a cost-sharing subsidy is

not an "agency rule, order, license, sanction, relief, or the equivalent" and thus does not qualify

as an "agency action," much less a final agency action, for purposes of APA review.[8]  Instead, the

regulation that requires CMS to provide this notification to PDP sponsors is simply a means by

which CMS seeks to facilitate PDP sponsors' compliance with their contractual obligation not to

collect copayments from beneficiaries who are not supposed to pay them, and to provide

reimbursements to beneficiaries when they discover that copayments have been collected in

_____

[8]It is important to note that the actual determination of cost-sharing eligibility is not what
plaintiffs seek to challenge.  Rather, plaintiffs' claims simply relate to the ongoing administrative
activity of passing information obtained from state Medicaid agencies on to PDP sponsors.

error.  Thus, rather than "agency action," the notifications are part of the "wide variety of

activities that comprise the common business of managing government programs" that agencies

spend much of their time engaged in.  Fund for Animals, Inc. v. BLM, 460 F.3d 13, 19 (D.C. Cir.

2006) (holding that an agency's budget request did not constitute "agency action" within the

meaning of 5 U.S.C. § 702); see also ACLU v. NSA, 493 F.3d 644, 678-79 (6th Cir. 2007)

(holding plaintiffs could not challenge the NSA's general surveillance activities because they did

not constitute agency action).

### B.    The Actions Plaintiffs Seek To Compel Are Not Legally Required

Even if the conduct that plaintiffs seek to compel is held to qualify as "agency action,"

plaintiffs' Complaint fails to satisfy the second requirement to state a claim under § 706(1) – that

the action sought be legally required.  See Sandoz, Inc. v. Leavitt, 427 F. Supp. 2d 29, 34

(D.D.C. 2007).  An order to compel agency action under § 706(1) "must be limited to directing

the agency to 'perform a ministerial or non-discretionary act, or to take action upon a matter,

without directing *how* it shall act.'"  Id. (quoting SUWA, 542 U.S. at 64).  Neither the MMA nor

CMS regulations impose any deadline on CMS's notification of PDP sponsors regarding

beneficiary eligibility for cost sharing subsidies.  The MMA simply instructs CMS to "provide a

process" whereby such notifications will occur.  42 U.S.C. § 1395w-114(c)(1)(A).  This in itself

indicates that Congress recognized the potential difficulties CMS would face in implementing the

requirement and did not expect notifications always to be made with perfect timing and accuracy.

The process that CMS provides through its regulations suggests CMS's own awareness that

notification delays may occur.  Rather than imposing time limits on itself, CMS established a

system of interim subsidy reimbursements to PDP sponsors based on estimates, with final

reconciliation of accounts after all the information has been obtained.  See 42 C.F.R. §§ 423.335(d)(2)(i), .343(d).  CMS also has the authority to take other interim measures if necessary to ensure that beneficiaries are not negatively impacted by any delays in eligibility notification. Plaintiffs have not pointed to any statutory or regulatory duty that CMS has failed to perform. They therefore have no APA claim.

**V.    PLAINTIFFS CANNOT SEEK DECLARATORY OR MANDAMUS RELIEF TO ENFORCE THE MEDICARE PART D STATUTES AND REGULATIONS THAT THEY CITE IN COUNT II**

**A.    Plaintiffs Have No Private Right Of Action To Bring Claims Under The Cited Provisions**

Whether a plaintiff states a claim upon which relief may be granted "depends in part on whether there is a cause of action that permits [the plaintiff] to invoke the power of the court to redress the violations of law that [it] claims."  Trudeau v. FTC, 456 F.3d 178, 188 (D.C. Cir. 2006).  "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress."  Alexander v. Sandoval, 532 U.S. 275, 286 (2001).  Plaintiffs base Count II of their Complaint on alleged violations of 42 U.S.C. §§ 1395b-9 and 1395w-114, and 42 C.F.R. §§ 423.503, .782, and .800.  Compl. ¶¶ 57-59.  Essentially, in Count II plaintiffs simply recast the APA claims they assert in Count I as claims brought directly under the statutory and regulatory provisions.  However, none of these provisions give any indication that a private right of action is permitted.  As discussed above, judicial review under the Medicare Act must occur pursuant to 42 U.S.C. § 405(g), see Action Alliance, 483 F.3d at 858, but plaintiffs do not even attempt to assert that such review is available here.  Though plaintiffs seek declaratory relief, the Declaratory Judgment Act, 28 U.S.C. § 2201, does not provide a private right of action.  See

Gem County Mosquito Abatement Dist. v. EPA, 398 F. Supp. 2d 1, 12 (D.D.C. 2005) ("When a plaintiff has a legal claim under federal law, the Declaratory Judgment Act allows him to obtain a federal court declaration of his rights under that federal statute."); Price v. Caruso, No. 07-117, 2007 WL 1521215, at *1 (W.D. Mich. May 22, 2007) (recognizing as "well established" that the Declaratory Judgment Act "'is procedural only, not substantive, and hence the relevant cause of action must arise under some other federal law'" (quoting Lowe v. Ingalls Shipbuilding, 723 F.2d 1173, 1179 (5th Cir. 1984))).  Similarly, plaintiffs request mandamus relief, but there is no clear authority for recognizing an independent right of action under the Mandamus Act, 28 U.S.C. § 1361.  See, e.g., Public Citizen v. Kantor, 864 F. Supp. 208, 211 (D.D.C. 1994).  But see Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group, 219 F. Supp. 2d 20 (D.D.C. 2002) (recognizing Kantor as overruled), vacated and remanded on unrelated grounds by Cheney v. Dist. Court for Dist. of Columbia, 542 U.S. 367 (2004).  In any case, however, mandamus relief is clearly unavailable here.

### B.    Plaintiffs Are Not Entitled To Mandamus Relief

"'The common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty.'"  Am. Chiropractic Ass'n v. Shalala, 108 F. Supp. 2d 1, 11 (D.D.C. 2000) (quoting Ringer, 466 U.S. at 616).  Like the APA's waiver of sovereign immunity, mandamus relief is not available if an adequate remedy exists elsewhere.  Women's Equity Action League, 906 F.2d at 752.  Thus, mandamus relief is unavailable here for the same reasons that the APA's waiver of sovereign immunity does not apply.  See id. ("[A] determination that an APA action is barred by another remedy therefore demands the further

conclusion that mandamus is not available."). Mandamus relief is also inappropriate because, as also explained above, there is no clear nondiscretionary duty at issue that the Court can enforce.

## VI.    PLAINTIFFS' FIFTH AMENDMENT CLAIM IS WITHOUT MERIT

In Count III, plaintiffs raise a procedural due process claim under the Fifth Amendment. In order to establish a due process violation,  plaintiffs must show that the government has deprived them or their members of a protected liberty or property interest. See Orange v. Dist. of Columbia, 59 F.3d 1267, 1273 (D.C. Cir. 1995).  Plaintiffs assert that LTC pharmacies "have a right to payment of the co-payment amounts improperly withheld from their reimbursements for prescription drugs they have dispensed to institutionalized dual eligibles."  Compl. ¶ 61.  As discussed, any such right must derive from the terms of the contracts between LTC pharmacies and PDP sponsors, and the Complaint cites no details concerning these terms.  More importantly, due process violations can only occur when the government has deprived someone of a property interest without due process of law.  Here, it is the PDP sponsors that have allegedly failed to reimburse LTC pharmacies for cost sharing amounts.  As explained above, LTC pharmacies' alleged injuries are not "fairly traceable" to CMS's alleged failures for Article III standing purposes.  For the same reasons, no deprivation of property by the government can have occurred.  Thus, plaintiffs' Fifth Amendment claim must fail.

## CONCLUSION

For the foregoing reasons, the claims raised in plaintiffs' Complaint should be dismissed in their entirety.

Dated: October 5, 2007                 Respectfully submitted,
                                       PETER D. KEISLER

Assistant Attorney General
JEFFREY A. TAYLOR
United States Attorney
SHEILA M. LIEBER
Deputy Director

/s/ Kathryn L. Wyer
KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., NW,
Washington, D.C.  20530
Telephone: (202) 616-8475 / Fax: (202) 616-8202
kathryn.wyer@usdoj.gov
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LONG TERM CARE PHARMACY ALLIANCE,          )
and AMERICAN SOCIETY OF CONSULTANT          )
PHARMACISTS,                                )
                                            )
     Plaintiffs,                             )
                                            )
     v.                                      )      Case No. 1:07-cv-01115 (ESH)
                                            )
MICHAEL O. LEAVITT, Secretary of the        )
U.S. Department of Health and Human Services; )
U.S. DEPARTMENT OF HEALTH AND               )
HUMAN SERVICES; and CENTERS FOR             )
MEDICARE AND MEDICAID SERVICES,             )
                                            )
     Defendants.                             )
                                            )

## [Proposed] ORDER

     Upon the Court's consideration of defendants' motion to dismiss, the opposition thereto,

and the entire record herein, it is, this _____ day of _____, 2007,

ORDERED that defendants' motion to dismiss is granted; and it is

FURTHER ORDERED that plaintiffs' Complaint is dismissed with prejudice.


                                     _____
                                     The Honorable Ellen S. Huvelle
                                     United States District Judge

# EXHIBIT #1

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



## CENTER FOR BENEFICIARY CHOICES

**Date:**            December 22, 2006

**Memorandum To:**   All Part D Sponsors

**Subject:**         Reconciling Incorrect Cost Sharing Paid by LTC Pharmacies

**From:**            Cynthia Tudor, Director, Medicare Drug Benefit Group

As the first year of the Medicare Prescription Drug Benefit draws to a close, we remind Part D plan sponsors that they are obligated to reconcile any claims that may have resulted in incorrect cost sharing for low income subsidy (LIS) eligible beneficiaries at the point-of-sale. We recognize that problems with cost sharing have disproportionately impacted beneficiaries who are residents of nursing homes, and for whom long-term care (LTC) pharmacies are holding receivable balances rather than charging beneficiaries incorrect cost sharing amounts. This is particularly true in situations where a beneficiary is a full benefit dual eligible and meets the definition of an institutionalized individual for whom there is no cost sharing for covered Part D drugs.

In previous guidance, we emphasized to plans the importance of adopting standardized procedures to reconcile incorrect cost sharing made by LIS-eligible beneficiaries. In accordance with our rules at 42 CFR 423.800(c), plan sponsors have an obligation to make the LIS-eligible beneficiary whole by refunding any improperly collected cost sharing. In situations where cost sharing has been overpaid by beneficiaries, the plan should send the enrollee a check for amounts owed, or offset future cost sharing if the amount owed is less than a minimal cut-off threshold.

While this is our general policy, it is important that Part D plans be aware of the role LTC pharmacies have played with respect to cost sharing amounts overcharged to LTC residents, particularly some dual eligibles who should not have paid any cost sharing for their covered Part D drugs. Many LTC pharmacies did not collect the cost sharing amounts that were incorrectly charged. As many of LTC pharmacies continue to hold receivable balances for cost sharing amounts that should have been subsidized by the plan, Part D plan sponsors need to work with them to ensure appropriate reconciliation of amounts owed.

As we stated in our attached question and answer guidance released last April (see Attachment I posted at *http://questions.cms.hhs.gov/* , *Q&A ID 7683)*, plan sponsors should not automatically reimburse beneficiaries for cost sharing amounts that were not collected by their LTC pharmacies. Rather, plan sponsors need to work directly with their network LTC pharmacies to provide them with direct reimbursement for any cost sharing amounts that were not collected from LIS-eligible beneficiaries. Before reimbursement is made directly to LTC pharmacies, plan

sponsors need to ensure that the pharmacies in question have not collected or otherwise waived the cost sharing charges, and, in fact, are carrying a debt for the amounts owed.  Plan sponsors may accomplish this by working with their network LTC pharmacies to ensure appropriate documentation and attestations are provided to justify payment to the LTC pharmacy for excess cost sharing amounts that should have been paid by the plan under the low-income subsidy.

If you have any questions on this policy, please contact Christine Hinds at (410) 786-4578.

Attachment I

## Reimbursement to LTC Pharmacies for
## Retroactive Subsidy-level Cost Sharing Charges

Q.  In situations where a full-benefit dual eligible meets the definition of an institutionalized individual but is incorrectly charged cost sharing for prescriptions under the Part D benefit, may Part D plans reimburse their contracted long term care (LTC) pharmacies directly when implementing retroactive subsidy level changes?

A.  Yes. When implementing retroactive subsidy level changes for a full-benefit dual eligible who meets the definition of an institutionalized individual but is incorrectly charged cost sharing under the Part D benefit, plans should not automatically reimburse beneficiaries residing in long-term care facilities.  In such situations, it is unlikely that LTC pharmacies have collected the applicable cost-sharing from beneficiaries due to the expectation that the plan eventually would reimburse the pharmacy retroactively for such amounts.  In such situations, Part D plans should work with their pharmacies to provide them with direct reimbursement for any cost-sharing amounts not collected from institutionalized individuals.  Before reimbursement is made, Part D plans should ensure that LTC pharmacies have not collected the cost sharing amounts, otherwise waived the cost sharing charges, and, in fact, are carrying a debt for the amounts incorrectly charged to the beneficiary.   For auditing purposes, plans should ensure that pharmacies certify that the amounts reimbursed are appropriate, owed and payable.

By regulation, Part D plans are required to reimburse subsidy eligible individuals, and organizations paying cost sharing on behalf of such individuals, any excess cost sharing paid after the effective date of the individual's eligibility for a subsidy ( 42 CFR 423.800(c)). Providing direct reimbursement to LTC pharmacies for excess cost sharing charges that have not been paid by Part D enrollees or waived by the pharmacy does not conflict with this requirement, since such amounts were never paid by either the institutionalized individual or others on his or her behalf.