**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **LONG TERM CARE PHARMACY ALLIANCE, et al.,** | ) ) ) |  |
|  | ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | **Case No. 1:07-cv-01115 (ESH)** |
| **MICHAEL O. LEAVITT, et al.,** | ) ) ) |  |
| Defendants. | ) ) |  |

_____

**REPLY IN SUPPORT OF PLAINTIFFS'
MOTION FOR ENLARGEMENT OF TIME TO
OPPOSE DEFENDANTS' MOTION TO DISMISS AND REQUEST FOR LEAVE TO
<u>TAKE JURISDICTIONAL DISCOVERY</u>**

Plaintiffs' motion for enlargement of time and request for leave to take jurisdictional

discovery should be granted for the following reasons:

• The targeted jurisdictional discovery satisfies the D.C. Circuit's "likely utility" standard in *Natural Resources Defense Council v. Pena* for supplementing allegations in the complaint with discovery. Here, Defendants have challenged the causal nexus between Defendants' failures and Plaintiffs' and their members' injuries and redressability. Plaintiffs are entitled to conduct discovery in response to these jurisdictional challenges.

• This case addresses Defendants' failures to provide timely and accurate eligibility data for institutionalized dual eligible beneficiaries and to ensure that no cost-sharing amounts are imposed for those beneficiaries. Despite Defendants' attempts to portray it as such, this case has nothing to do with the contracts between PDP sponsors and LTC Pharmacies.

• Defendants' sovereign immunity arguments confuse merits inquiries with jurisdictional questions and are contrary to section 702 of the Administrative Procedure Act. These arguments have no place in the analysis of whether Plaintiffs should be granted limited jurisdictional discovery to establish standing for all three of their claims. While the question of the adequacy of the Plaintiffs' available remedies may be relevant to whether they may ultimately prevail on the merits of their APA claim, it is not relevant to the question of the Court's jurisdiction.

<u>**Introduction**</u>

The instant motion addresses only the question of whether, in order to supplement their

jurisdictional allegations, Plaintiffs should be permitted limited discovery. The requested discovery

relates to Defendants' collection and provision of essential subsidy-eligibility status information that PDP sponsors, LTC Pharmacies, and institutionalized dual eligible beneficiaries depend on Defendants to provide in order to arrive at accurate cost-sharing and reimbursement decisions. Defendants' motion to dismiss questions Plaintiffs' standing to bring this action. Plaintiffs therefore have the right to adduce and present evidence demonstrating their standing and have moved for the ability to exercise that right.

Defendants' brief misses the point: Plaintiffs' motion for enlargement of time and request for leave to take jurisdictional discovery implicates neither the *bona fides* of Plaintiffs' standing nor the merits of Plaintiffs' claims. Plaintiffs will prove standing when they respond to Defendants' motion to dismiss and present the merits of their claims at trial.

It is particularly striking that Defendants oppose Plaintiffs' request to collect evidence supplementing their jurisdictional allegations, yet present their own evidence — the Block Declaration. At a minimum, Plaintiffs are entitled to probe and test Block's testimony through discovery before submitting their opposition to Defendants' motion to dismiss. Because Plaintiffs satisfy the D.C. Circuit's "likely utility" standard for jurisdictional discovery in supporting their claims of standing,[1] particularly with respect to the requirements of causation and redressability, the Court should grant Plaintiffs' motion.[2]

## Background

This Court is well aware of the new Medicare Prescription Drug benefit, and the difficulties that Long Term Care Pharmacies (LTCPs) have endured under the program. This new Medicare Part D program is a federal *government* program, and Congress tasked Defendants with overseeing

---

[1] *Natural Res. Def. Council v. Pena*, 147 F.3d 1012, 1024 (D.C. Cir. 1998).

[2] Plaintiffs' motion for leave to take discovery proposed a schedule, which is now out-dated. If the Court grants Plaintiffs' motion, Plaintiffs will confer with counsel for Defendants and propose a revised discovery and briefing schedule.

and administering it.  Congress enacted this new program for Medicare beneficiaries to obtain
federally-funded insurance coverage, and in many cases, full or partial subsidies, for the costs of
prescription drugs.   Under the new scheme, beneficiaries obtain prescription drugs from
participating pharmacies, the pharmacies are reimbursed by the participating PDP sponsors that
provide prescription drug insurance coverage for such beneficiaries, and the PDP sponsors are in
turn paid by Defendants for costs incurred for such coverage.  For this system to work, all
participants in the program rely on the flow of information regarding a beneficiary's eligibility for
coverage and subsidies between the States, Defendants, PDP sponsors and pharmacies, and rely on
it to be accurate and timely.

     Plaintiffs have alleged that Defendants' provision to PDPs of inaccurate and untimely data
about the subsidy-eligibility status of institutionalized dual eligible beneficiaries has caused a
breakdown of the PDP reimbursement process for prescription drugs dispensed to such
beneficiaries.  PDP sponsors maintain that they cannot reimburse LTC Pharmacies for co-payment
amounts that are improperly assessed for such institutionalized dual eligible beneficiaries where CMS
data does not reflect the subsidy-eligibility status of those beneficiaries, *see* pages 7-9 *infra*  and ¶¶ 29,
31, 41 of the complaint, because they will not be credited by CMS for such payments when it is time
to reconcile the PDP sponsors' actual costs with CMS interim payments.  *Id.*  The largest PDP
sponsor, UnitedHealth Group, has represented to this Court that it would be denied reimbursement
by CMS for any of the amounts paid with respect to such claims because the CMS data does not
reflect the beneficiaries' institutionalized dual eligible beneficiary status, even at the later date of the
reconciliation between the PDP sponsors and CMS.  *Id.*  Consequently, as the parties in the next link
of the chain, LTC Pharmacies that meet the everyday prescription drug needs of institutionalized
dual eligible beneficiaries are not fully reimbursed for medicines they have already dispensed.
Instead, the LTC Pharmacies are and will continue to be left indefinitely shouldering an increasing

cost burden of improperly assessed co-payments—co-payments that would not have been assessed by PDP sponsors in the first place had CMS's data been accurate and timely-provided.

Defendants have moved to dismiss the complaint, injecting a series of factual assertions into the case at this early stage. To fully respond to Defendants' Rule 12(b)(1) motion, Plaintiffs have sought limited discovery.

## I.    Plaintiffs' Request for Jurisdictional Discovery Satisfies the "Likely Utility" Test Established by the D.C. Circuit.

Discovery with respect to subject matter jurisdiction is appropriate where such discovery will have "likely utility" in supplementing a plaintiff's jurisdictional allegations. *Natural Res. Def. Council v. Pena*, 147 F.3d 1012, 1024 (D.C. Cir. 1998). Defendants concede that this is the applicable standard. Opposition at 4 n.2, 6-7.

The D.C. Circuit's standard is easily met in this case. The complaint makes detailed factual allegations regarding the relationship between Defendants, PDP sponsors, and LTC Pharmacies (*see, e.g.*, ¶¶ 25-38), the problems that CMS's provision of inaccurate and tardy eligibility data creates (*see, e.g.*, ¶¶ 4, 32, 33, 38, 41, 49, 53), the resulting improper assessments of co-payments for institutionalized dual eligible beneficiaries (*see, e.g.*, ¶¶ 4, 38, 41, 47, 49, 53), the deprivation of reimbursement amounts owed to LTC Pharmacies (*see, e.g.*, ¶¶ 4, 38, 41, 45, 47, 53), and the ever-growing burden of the improperly-assessed cost-sharing on LTC Pharmacies (*see, e.g.*, ¶¶ 41, 45, 53). These allegations involve the injuries suffered by Plaintiffs and their members,[3] the causal links

---

[3] Contrary to Defendants' suggestion, Plaintiffs have alleged specific details regarding the injuries they and their members have suffered. *See* ¶¶ 38, 41, 45, 53, 54, 62 of the complaint. Additionally, when they respond to Defendants' motion to dismiss, Plaintiffs intend to provide the Court with further evidence of those injuries. Such an evidentiary showing, however, should not be required for the purposes of Plaintiffs' motion for an enlargement of time and request for leave to take jurisdictional discovery relating to their allegations of causation and redressability. *See Friends of the Earth v. U.S. Dep't of Interior*, 478 F. Supp. 2d 11, 15-17 (D.D.C. 2007) (examining a plaintiff's standing at the motion to dismiss stage of a case).

4

between Defendants' failures to provide essential information and those injuries, and, implicitly, how putting an end to Defendants' failures through a court order will redress those injuries.

Defendants, however, contest the sufficiency of these allegations to establish subject matter jurisdiction. This is surprising, considering that others involved in the co-payment assessment and reimbursement issues understand that Defendants' data failures and the resulting improper assessment of co-payment amounts for institutionalized dual eligible beneficiaries constitute the root causes of the problems.[4] CMS itself acknowledged that "problems with cost sharing have disproportionately impacted beneficiaries who are residents of nursing homes, and for whom long-term care (LTC) pharmacies are holding receivable balances rather than charging beneficiaries incorrect cost sharing amounts." Their motion to dismiss, however, asserts otherwise, and, based on an erroneous perception of the facts, contests the Court's jurisdiction. Prior to responding to the motion to dismiss, including the Block Declaration which purports to be based on personal knowledge, Plaintiffs should be granted leave to take discovery.

Defendants' opposition and the Block Declaration provide, at most, a very general description of the eligibility data flow. The discovery Plaintiffs seek will detail the procedural steps of the essential eligibility data flow (which right now is known only to CMS) and how PDP sponsors' cost-sharing assessments and reimbursement decisions for institutionalized dual eligible

---

[4] For example, in hearings on Plaintiffs' motion for a temporary restraining/preliminary injunction order in *LTCPA v. UnitedHealth Group*, No. 06-1221, counsel for UnitedHealth Group told the Court of CMS's data failures:

> Mr. Fitzgerald: "…Now, Your Honor, what's happened here is, is the CMS data was wrong, particularly--"
> The Court: "So I gather."
> Mr. Fitzgerald: "Right."
> The Court: "So, they've got some responsibility too."
> Mr. Fitzgerald: "Absolutely, Your Honor. And what happens is, is that, because the eligibility files were wrong, CMS has been correcting those eligibility files. Both the pharmacies and the P.D.P.s rely upon those files…."

Tr. 4:18-25, 5:1-3, Mar. 22, 2007.

beneficiaries are driven by the inaccuracy and lateness of the data provided by CMS (again, which Plaintiffs believe is memorialized in communications between CMS and PDPs not currently available to Plaintiffs). It will also assist Plaintiffs in establishing that a Court order requiring Defendants to timely provide accurate eligibility data to PDP sponsors will redress the injuries described in the complaint, particularly on a going-forward basis.

Plaintiffs propose eight interrogatories. *See* **Exhibit A**, Plaintiffs' Proposed First Set of Interrogatories to Defendants. They focus on: (1) the processes by which States submit data to CMS relating to a beneficiary's eligibility for low-income subsidies; (2) the processes by which CMS determines that a beneficiary is an institutionalized dual eligible beneficiary; (3) the processes by which CMS notifies PDP sponsors of institutionalized dual eligible beneficiaries' subsidy-eligible status; (4) CMS's understanding of how PDP sponsors utilize the subsidy-eligibility information it provides for institutionalized dual eligible beneficiaries; (5) the information CMS receives from PDP sponsors regarding cost-sharing for institutionalized dual eligible beneficiaries; (6) each Defendant's awareness of the improper co-payment assessments for institutionalized dual eligible beneficiaries and attendant reimbursement issues, and the efforts each has taken that contradict their assertion that they have no involvement in this issue; and (7) the consequences PDP sponsors face if they reimburse LTC pharmacies for co-payment amounts where the CMS system does not reflect the Medicare beneficiary as an institutionalized dual eligible beneficiary. Plaintiffs also intend to take a Rule 30(b)(6) deposition on the same topics to the extent warranted.[5] *See* **Exhibit B**, Plaintiffs' Proposed Notice of Rule 30(b)(6) Deposition. Plaintiffs will request the documents relied upon by

---

[5] Although not initially requested in Plaintiffs' motion, to the extent that Ms. Block is not designated as Defendants' Rule 30(b)(6) witness for these jurisdictional issues, Ms. Block's deposition will be necessary as well, given her submission of a declaration in conjunction with Defendants' opposition.

Defendants to respond to the interrogatories and prepare for the Rule 30(b)(6) deposition.  *See* **Exhibit C**, Plaintiffs' Proposed First Set of Requests for Production of Documents to Defendants.[6]

> **A.**    **The connection between PDP sponsors' receipt of subsidy-eligibility data and reimbursements to LTC Pharmacies is as strong in this case as in the *Situ v. Leavitt* case, where that court endorsed similar discovery in the form of interrogatories and a Rule 30(b)(6) deposition.**

Defendants concede that the information Plaintiffs seek through the requested discovery is relevant "<u>if</u> there is some connection between the PDP sponsors' receipt of this information and their payments to LTC pharmacies."  Opposition at 8.  What Defendants ignore, however, is that Plaintiffs have alleged that such a connection exists—certain PDP sponsors refuse to reimburse LTC Pharmacies for the improperly assessed co-payment amounts in the absence of complete, updated and accurate eligibility data from CMS.  Complaint at ¶¶ 4, 29, 31, 41, 49, 53, 62.

Defendants' claim that *Situ* is inapposite is wrong because the dependency on timely and accurate CMS information is just as strong here as in the *Situ* case.[7]  Plaintiffs' analogy between the dependence of *beneficiaries' subsidies* on CMS eligibility data and *the amounts of cost-sharing to be assessed* on such data is valid.  That same dependency on timely and accurate CMS data drives the cost sharing assessed for *institutionalized dual eligible beneficiaries' subsidies* and, therefore the reimbursement amounts owed to the LTC Pharmacies covering such erroneously assessed cost-sharing.

Defendants cannot credibly represent (at 10) that LTC Pharmacies are not part of the chain that relies on eligibility information.  Plaintiffs do not allege that LTC Pharmacies are entitled to

---

[6] The requested discovery is not burdensome, intrusive or expensive.  Defendants have compiled similar information for the data flow process for non-institutionalized dual eligible beneficiaries in the *Situ* case, as evidenced by the submission of (i) interrogatory responses by Secretary Leavitt (attached hereto as **Exhibit D**), which were attached as an exhibit to Kevin Prindiville's, an attorney at the National Senior Citizens Law Center, declaration in support of the *Situ* plaintiffs' opposition to the motion to dismiss, and (ii) declarations of Ms. Block.  Moreover, Plaintiffs do not seek extensive documentary discovery; rather, they seek on-the-record explanations from Defendants about the data processes at issue in this case.

[7] Defendants also claim that the court in *Situ* wrongly decided this issue, but provide no explanation of how or why.

subsidies under Medicare law.  Rather, they allege that the institutionalized dual eligible beneficiaries to whom the pharmacies dispense prescription drugs <u>are</u> so entitled; therefore, when CMS provides tardy and/or inaccurate data about the subsidy-eligibility status of those beneficiaries, certain PDP sponsors erroneously assess a co-payment for those beneficiaries and LTC Pharmacies that have covered the co-payments for those beneficiaries are left without payment.  Any suggestion by Defendants otherwise is not well founded.

## B.  Neither the case nor the jurisdictional discovery implicates any contracts between PDP sponsors and LTC Pharmacies.

Defendants mistake the content of the complaint.  This suit is not about the contracts between the PDP sponsors and LTC Pharmacies, or "the payment obligations between PDP sponsors and LTC pharmacies."  It is about Defendants' systemic failures to timely provide accurate data about beneficiaries' institutionalized dual eligible status to PDP sponsors and the consequent (1) improper assessment of co-payment amounts and (2) reimbursement problems that arise between PDP sponsors and LTC Pharmacies as a result of those improper assessments.   Had the data been timely and correct in the first place, these improper assessments, and, therefore, reimbursement failures and injuries to the pharmacies, would have been avoided.

Defendants also incorrectly assert (at 2-3) that the "only information relevant to the causation and redressability of [Plaintiffs'] alleged injuries is information that relates to the contracts between these pharmacies and these PDP sponsors…."  The complaint alleges that Defendants' failures (1) to comply with their statutory and regulatory duties to provide timely and accurate data and (2) to ensure that no cost-sharing is imposed for institutionalized dual eligible beneficiaries drive PDP cost-sharing and reimbursement decisions, to the detriment of Plaintiffs and their members.[8]

---

[8] Defendants mix apples and oranges in the last section of their opposition where they argue that jurisdictional discovery should not be granted because even if it revealed information that CMS <u>could</u> have caused the alleged injuries, it could not establish that CMS <u>did</u> cause the injuries.  Plaintiffs do not need to establish at this stage of the litigation that CMS's failures are the legal cause of the injuries.  Rather, the

Ordering Defendants to provide accurate and timely eligibility data will redress the problem of erroneous co-payment assessments for institutionalized dual eligible beneficiaries and provide PDP sponsors with the necessary information to make appropriate reimbursement decisions for those beneficiaries.

Defendants imply that because PDP sponsors are the entities that ultimately reimburse LTC Pharmacies, no decision by the Court in this case can redress the injuries asserted by Plaintiffs and their members.  That is incorrect.  An order requiring CMS to provide timely and accurate data is exactly what is necessary for the proper assessment of cost sharing.  Such an order will redress the injuries that *Defendants* are causing.  Whether, on a going-forward basis, PDP sponsors will refuse payment to LTC Pharmacies, notwithstanding correct data cost-sharing assessments is not only speculative, but unlikely (especially given the representations by the PDP defendant in *LTCPA v. UnitedHealth Group*).

Defendants' focus (at 7-9) on the interim payments CMS makes to PDP sponsors is diversionary.  Plaintiffs' suit is not concerned with CMS's payment obligations to PDP sponsors; nor does it ask the Court to require any payments or enforce any contract terms between the PDP sponsors and the LTC Pharmacies.  *Compare* Opposition at 7-9 with Prayer for Relief.  As CMS witness Block obliquely acknowledges in her declaration (at ¶ 7), PDP sponsors and CMS engage in a "true-up" process whereby the two reconcile actual cost-sharing expenses and the interim payments made.  Block Decl. ¶ 7.  This true-up process fails to account for those institutionalized dual eligibles whose status CMS has *still* not correctly characterized, thus leaving the pharmacies short of full compensation for the prescription medicines provided by them.

---

standing analysis requires "no more than *de facto* causality."  *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986).  *See also Tozzi v. U.S. Dept. of Health and Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2002) (where "the alleged injury flows not directly from the challenged agency action, but rather from independent actions of third parties, we have required only a showing that 'the agency action is at least a substantial factor motivating the third parties' actions.'").

II.    **Defendants' Arguments Regarding Waiver of Sovereign Immunity and Prudential Standing Ignore Section 702 of the APA and Supreme Court Precedent and Impose No Barrier to Proceeding With Discovery.**

Defendants argue (at 5-6) that jurisdictional discovery with respect to establishing causation and redressability for all three of Plaintiffs' claims is premature because Defendants have also moved to dismiss on the grounds that there has been no waiver of sovereign immunity. But those arguments erroneously conflate the analysis of the merits of Count I of the complaint (Plaintiffs' Administrative Procedure Act claim) with the analyses required for (1) subject matter jurisdiction and (2) whether Plaintiffs should be permitted jurisdictional discovery.

Section 702 of the APA waives sovereign immunity for all equitable causes of action for specific relief against a federal agency or officer acting in an official capacity.[9] *Trudeau v. Fed. Trade Comm.*, 456 F.3d 178, 187 (D.C. Cir. 2006); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989). In *Trudeau*, the D.C. Circuit held that section 702 waived the United States' sovereign immunity for not only the plaintiff's APA cause of action, but also the nonstatutory and First Amendment actions that sought equitable relief. 456 F.3d at 187.

In *Presbyterian Church*, the Ninth Circuit discussed in detail the scope of section 702's waiver of sovereign immunity and the legislative history of the 1976 amendment of that section. 870 F.2d at 523-26. First, the court looked to the plain meaning of the second sentence of section 702, which was added through an amendment in 1976. The court stated: "On its face, the 1976 amendment is an ***unqualified*** waiver of sovereign immunity in actions seeking nonmonetary relief against legal wrongs for which governmental agencies are accountable." *Id.* at 525 (emphasis added). The court dismissed the government's attempt "to restrict the waiver of sovereign immunity to actions

---

[9] Specifically, 5 U.S.C. § 702 provides: "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein denied on the ground that it is against the United States…."

challenging 'agency action' as technically defined in § 551(13)" because it "offends the plain meaning of the amendment." *Id.*

Reviewing the legislative history of the 1976 amendment to section 702, the Ninth Circuit stated that "the amendment to § 702 was designed to 'strengthen [government] accountability by withdrawing the defense of sovereign immunity in actions seeking relief other than money damages, such as an injunction, declaratory judgment, or writ of mandamus.'" *Id.* at 524 (quoting H.R. Rep. No. 94-1656, 94th Cong., 2d Sess. 5, reprinted in 1976 U.S. Code Cong. & Admin. News 6121, 6125).

Contrary to Defendants' arguments, section 702's waiver is not confined by reference to any of the provisions of Section 704—including any requirement that Plaintiffs have no alternative adequate remedy. *See Trudeau*, 456 F.3d at 187 (holding that section 702's waiver applies regardless of whether the elements of an APA cause of action—in that case section 704's requirement of "final agency action"—are satisfied); *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988) ("[T]he waiver of sovereign immunity contained in section 702 is not dependent on application of the procedures and review standards of the APA. It is dependent on the suit against the government being one for non-monetary relief."); *Levitt v. FBI*, 70 F. Supp. 2d 346, 349-50 (S.D.N.Y. 1999) (holding that the adequacy of the plaintiff's available remedy as evaluated under section 704 "is relevant to whether he may prevail in this action, but not to the Court's power to entertain it."). Accordingly, under section 702, the United States has waived its sovereign immunity for each of the three claims brought in the complaint, and jurisdictional discovery relevant to the issue of standing is warranted.

Defendants' argument that jurisdictional discovery should be denied on the basis of their erroneous sovereign immunity argument also is misguided. Defendants do not cite any case involving the actual question they present. Indeed, the only case Defendants cite is *Phoenix*

*Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000), which involves the Foreign

Sovereign Immunities Act.  In contrast to the extraordinarily limited circumstances under which a

foreign sovereign may be sued in a federal court in the United States for its commercial activities,

Section 702 of the APA affects a broad waiver of sovereign immunity for equitable cases against the

United States.  *Trudeau*, 456 F.3d at 187; *Presbyterian Church*, 870 F.2d at 525.

Defendants also assert that jurisdictional discovery should be denied because their motion to

dismiss questions whether Plaintiffs' members meet the prudential standing requirements, but

provide no support for this statement.  The zone of interest test is not "especially demanding."

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).  As providers of the prescription medicines for

this federal program, the Plaintiffs' members' claims are not "so marginally related to or inconsistent

with the purposes implicit in the statute that it cannot reasonably be assumed that Congress

intended to permit the suit."  *Id.*  Plaintiffs will demonstrate further in their opposition to the

motion to dismiss that Defendants' prudential standing argument has no validity.

<u>Conclusion</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion

for enlargement of time to oppose defendants' motion to dismiss and request for leave to take

jurisdictional discovery.

Respectfully submitted,

October 29, 2007                     __/s/ John L. Oberdorfer_____
                                     John L. Oberdorfer (D.C. Bar No. 145714)
                                     David J. Farber (D.C. Bar No. 415899)
                                     PATTON BOGGS LLP
                                     2550 M Street, N.W.
                                     Washington, D.C.  20037
                                     Telephone:  (202) 457-6000
                                     Facsimile:  (202) 457-6315
                                     Counsel for Plaintiffs

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

LONG TERM CARE PHARMACY            )
ALLIANCE, et al.,                  )
                                   )
                      Plaintiffs,  )
                                   )
            v.                     )   Case No. 1:07-cv-01115 (ESH)
                                   )
MICHAEL O. LEAVITT, et al.,        )
                                   )
                      Defendants.  )
_____)

## PLAINTIFFS' PROPOSED FIRST SET OF INTERROGATORIES TO DEFENDANTS

Pursuant to Federal Rules of Civil Procedure 26 and 33 and Local Civil Rule 26.2, Plaintiffs Long Term Care Pharmacy Alliance and American Society of Consultant Pharmacists, by counsel, hereby request that Defendant Centers for Medicare and Medicaid Services of the U.S. Department of Health and Human Services answer these interrogatories within thirty (30) days after service of this request. These interrogatories are continuing in nature, so as to require Defendant to supplement its answers thereto up to and through the time of trial.

### INSTRUCTIONS AND DEFINITIONS

1.      When answering, furnish all responsive information known to or in the custody, control or possession of Defendant and/or his or her agents, representatives, or attorneys.

2.      If, after exercising due diligence to secure the information requested, an interrogatory cannot be answered in full, so state and answer to the extent possible specifying the basis for the inability to answer the remainder, stating whatever information or knowledge Defendants have of the unanswered portion.

3.      Where exact information cannot be furnished, estimated or approximate information is to be supplied to the extent possible. When estimation is used, it should be so indicated and an

explanation should be given as to the basis on which the estimate was made and the reason exact information cannot be furnished.

    4.    As used in these requests, the following terms are defined as set forth below:

    A.    "ASCP" shall mean Plaintiff American Society of Consultant Pharmacists and its members.

    B.    "CMS" shall mean Defendant Centers for Medicare and Medicaid Services and its agents, contractors, servants and employees, representatives or attorneys.

    C.    "Communication" means any statement or statement that is written or recorded in any manner, conveyed by one person to another person, any statement made by one person in the presence of one or more other persons, and any document delivered, including delivery by any electronic or digital means, by or for one person to another person.

    D.    "Defendants" shall mean CMS, HHS, and the Secretary and each of their respective members, agents, contractors, servants and employees, representatives and attorneys.

    E.    "Dual eligible" shall have the meaning set forth in 42 U.S.C. § 1396u-5(a)(6)(A).

    F.    "Document" shall be used in its broadest sense and shall include any writing (whether handwritten, typed, printed, or otherwise made), drawing, graph, chart, photograph, phono-record, or electronic or mechanical matter (including microfilm of any kind or nature, tapes, or recordings), or other data compilations from which information can be obtained (translated, if necessary, through detection devices into reasonably usable form), and shall include, without limiting the generality of the foregoing, all correspondence, telegraphs, teletypes, facsimiles, agreements, studies, reports, quotations, memoranda, minutes, journal entries, notes, books, accounts, ledgers, invoices, bills of lading, transcripts, statements, lists, schedules, newspaper clippings, e-mails, business records, and any and all other writings or papers of any kind, including drafts, copies of reproduction of any of the foregoing that in any way differ from the original, and information stored in computers or other data storage or processing equipment in the possession, custody, or control of any of your agents, officers, employees, or representatives.

G.    "Identify" with respect to a Communication shall mean state (i) the date and time of the Communication; (ii) the identities of the parties to the Communication; (iii) the form of the Communication (e.g., e-mail, instant message, voice mail, letter, facsimile, telephone conversation, in-person conversation, etc.); (iv) a detailed description of the content or, if a written Communication, an attached copy of the Communication; (v) the identity of any witnesses to the Communication; and (vi) any Documents relating to such Communication and the person who is in possession of such Documents.  With regard to any Communication that you assert is privileged, you should fully Identify such Communication, except you need not describe the content of the Communication or provide a copy, but should instead indicate the basis for the claim of privilege.

H.    "Identify" with respect to a natural person shall mean state the individual's (i) name, (ii) employer, (iii) employment address, and (iv) employment telephone number.

I.    "Institutionalized" shall have the meaning as set forth in 42 U.S.C. § 1396a(q)(1)B).

J.    "HHS" shall mean Defendant U.S. Department of Health and Human Services and its agents, servants and employees, representatives or attorneys.

K.    "LTCPA" shall mean Plaintiff Long Term Care Pharmacy Alliance and its members.

L.    "Person" means any natural person, any corporation, partnership, association, joint venture, sole proprietorship, firm or other business enterprise or legal entity or any employee or agent thereof and means both the singular and plural.

M.    "Process" or "processes" shall include the technical steps involved, the timing of each step (including the timing in relation to (a) when an LTC Pharmacy dispenses prescription medicines to an institutionalized dual eligible beneficiary and/or (b) when CMS notifies a PDP sponsor of an institutionalized dual eligible beneficiary's subsidy-eligible status), the identity of the persons (including individuals, agents, contractors and/or departments) acting on behalf of CMS, the nature of the information involved, and the technologies, computer systems, software, programs and/or databases utilized.

3

N.     "SSA" shall mean the U.S. Social Security Administration and its agents, servants, employees, representatives or attorneys.

O.     Use of "and" includes "or" and use of "or" includes "and."

P.     "Plaintiffs" shall mean Plaintiffs LTCPA and ASCP and their members.

Q.     "Secretary" shall mean Defendant Michael O. Leavitt and his agents, servants, employees, representatives or attorneys.

R.     Use of the singular shall be deemed to include the plural and use of the masculine shall be deemed to include the feminine, as appropriate, and vice versa.

S.     Use of the past tense includes the present tense, and use of the present includes the past tense.

T.     "Relating to" shall mean concerning, supporting, constituting, containing, alluding to, responding to, connected with, commenting on, in respect of, about, regarding, discussing, involving, showing, describing, analyzing, embodying, reflecting, identifying, incorporating, referring to, dealing with or in any way pertaining to.

## INTERROGATORIES

1.     Identify by name, position title, and description of job duties, each of the persons responsible for answering each of the following interrogatories.

2.     From 2005 to the present, specifically describe each step of the process or processes by which States submit data to CMS relating to a beneficiary's eligibility for low-income subsidies, particularly relating to full-benefit dual eligible beneficiaries.

3.     From 2005 to the present, specifically describe each step of the process or processes by which CMS determines that a beneficiary is an institutionalized dual eligible beneficiary.

4.     From 2005 to the present, specifically describe each step of the process or processes by which CMS notifies PDP sponsors of institutionalized dual eligible beneficiaries' subsidy-eligible status.

5.      Describe CMS's understanding of how PDP sponsors use the information provided by CMS about a beneficiary's subsidy-eligible status.

6.      From 2005 to the present, specifically describe each step of the process or processes by which PDP sponsors share with CMS coverage and cost-sharing data for institutionalized dual eligible beneficiaries and what CMS does with that data.

7.      Describe the consequences PDP sponsors face if they reimburse LTC pharmacies for co-payment amounts where the CMS system does not reflect the Medicare beneficiary as an institutionalized dual eligible beneficiary.

8.      Identify the Communications by which CMS, HHS and/or the Secretary first became aware of issues relating to reimbursements to LTC Pharmacies for cost-sharing amounts erroneously assessed for institutionalized dual eligible beneficiaries and describe any and all efforts taken by each Defendant to resolve such issues.

Respectfully submitted,

October __, 2007

_____
John L. Oberdorfer (D.C. Bar No. 145714)
David J. Farber (D.C. Bar No. 415899)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

Counsel for Plaintiffs

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LONG TERM CARE PHARMACY ALLIANCE, et al., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 1:07-cv-01115 (ESH) |
| MICHAEL O. LEAVITT, et al., | ) ) ) |
| Defendants. | ) ) |

## PLAINTIFFS' PROPOSED NOTICE OF FED. R. CIV. P. 30(b)(6) DEPOSITION

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, Plaintiffs Long Term Care Pharmacy Alliance and American Society of Consultant

Pharmacists (collectively, "Plaintiffs") will take the deposition of a designated officer, director,

managing agent, or other person who may consent to testify on behalf of Defendant Centers for

Medicare and Medicaid Services of the U.S. Department of Health and Human Services on

_____ at 9:00 a.m. at the offices of Patton Boggs LLP, 2550 M Street, NW, Washington, DC

20037. The deposition shall be taken before a Notary Public or other person authorized to

administer oaths or conduct depositions in the District of Columbia and shall be taken for discovery

purposes or for use at trial, or any other lawful purpose. If the deposition is not completed on the

day on which it is scheduled, it will continue from day to day until completion.

Pursuant to Rule 30(b)(6), Plaintiffs will examine the designated deponent on the following

topics:

1.    The process or processes by which States submit data to CMS relating to a beneficiary's

eligibility for low-income subsidies, particularly relating to full-benefit dual eligible beneficiaries,

including:

     a.      When States submit such data and the frequency with which States submit such data;

     b.      To whom the States submit such data;

     c.      What information is included in the States' data and the accuracy of such information;

     d.      What information necessary to the determination of whether a beneficiary is an institutionalized dual eligible beneficiary is not included in the States' data;

     e.      Whether CMS compares the States' data to any other data in its possession, custody or control; and

     f.      What actions, if any, CMS takes when a State submits data that is late, incomplete, inaccurate, or otherwise insufficient to determine dual eligible status or the level of low-income subsidy.

2.     The process or processes by which CMS determines that a beneficiary is an institutionalized dual eligible beneficiary, including but not limited to:

     a.      Which individuals, agents, contractors and/or departments are responsible for making that determination;

     b.      The sources upon which CMS relies to determine that a beneficiary is institutionalized, including, if applicable, the use of the National Council for Prescription Drug Programs "locator" code for institutionalized status;

     c.      The technologies, computer systems, software, programs and/or databases CMS utilizes in making these determinations;

     d.      When in the eligibility-status determination process CMS learns that a beneficiary is institutionalized;

     e.      How long after CMS learns that an individual is an institutionalized dual eligible beneficiary it notifies the PDP sponsor of the beneficiary's institutionalized status;

f.    On average, how long after an LTC Pharmacy first dispenses prescription medicines to an institutionalized dual eligible beneficiary CMS learns that a beneficiary is institutionalized;

g.    The sources upon which CMS relies to determine that a beneficiary is a dual eligible beneficiary;

h.    When in the eligibility-status determination process CMS learns that a beneficiary is a dual eligible beneficiary;

i.    On average, how long after an LTC Pharmacy first dispenses prescription medicines to an institutionalized dual eligible beneficiary CMS learns that a beneficiary is a dual eligible beneficiary;

j.    How long after CMS learns that a beneficiary is a dual eligible beneficiary it notifies the PDP sponsor of the beneficiary's subsidy-eligible status;

k.    How, where and when CMS records its determination that a beneficiary is an institutionalized dual eligible beneficiary; and

l.    Who has access to CMS records regarding beneficiaries' status as an institutionalized dual eligible beneficiary and the nature of that access.

3.    The process or processes by which CMS notifies PDP sponsors of institutionalized dual eligible beneficiaries' subsidy-eligible status, including but not limited to:

a.    What information CMS provides to PDP sponsors regarding institutionalized dual eligible beneficiaries;

b.    How often CMS notifies PDP sponsors of the subsidy-eligible status of institutionalized dual eligible beneficiaries;

c.    How long after CMS has determined that an individual is an institutionalized dual eligible beneficiary it notifies the PDP sponsor of the beneficiary's subsidy-eligible status;

3

   d.  How long after a State has determined that a beneficiary is a dual eligible beneficiary CMS notifies the PDP sponsor of the beneficiary's subsidy-eligible status;

   e.  On average, how long after an LTC Pharmacy first dispenses prescription medicines to an institutionalized dual eligible beneficiary CMS notifies the PDP sponsor of the beneficiary's subsidy-eligible status;

   f.  The mechanism by which CMS notifies PDP sponsors of institutionalized dual eligible beneficiaries' subsidy-eligible status;

   g.  Queries received as to whether specific beneficiaries have been determined to be institutionalized dual eligible beneficiaries;

   h.  What actions, if any, CMS takes if a PDP sponsor or anyone else informs CMS that a beneficiary is an institutionalized dual eligible but (i) CMS has not yet determined that the beneficiary is in fact an institutionalized dual eligible beneficiary or (ii) CMS's data indicates that the beneficiary is not an institutionalized dual eligible beneficiary;

   i.  CMS's understanding of how PDP sponsors use the information provided by CMS about a beneficiary's subsidy-eligible status; and

   j.  What consequences PDP sponsors face if they reimburse LTC pharmacies for co-payment amounts where the CMS system does not reflect the Medicare beneficiary as an institutionalized dual eligible beneficiary.

4.  The process or processes by which PDP sponsors share with CMS coverage and cost-sharing data for institutionalized dual eligible beneficiaries, including but not limited to:

   a.  What information PDP sponsors provide to CMS regarding costs associated with coverage of institutionalized dual eligible beneficiaries;

   b.  What information PDP sponsors provide to CMS regarding cost-sharing data for institutionalized dual eligible beneficiaries;

4

c.    What information PDP sponsors provide to CMS regarding reimbursement issues for institutionalized dual eligible beneficiaries;

d.    How often PDP sponsors provide to CMS coverage and/or cost-sharing information for institutionalized dual eligible beneficiaries; and

e.    What CMS does with information provided by PDP sponsors regarding institutionalized dual eligible beneficiaries.

5.    When and how CMS, HHS and/or the Secretary first became aware of issues relating to reimbursements to LTC Pharmacies for cost-sharing amounts erroneously assessed for institutionalized dual eligible beneficiaries and any and all efforts taken by each Defendant to resolve such issues.

Respectfully submitted,

October ____, 2007    _____
John L. Oberdorfer (D.C. Bar No. 145714)
David J. Farber (D.C. Bar No. 415899)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

Counsel for Plaintiffs

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LONG TERM CARE PHARMACY
ALLIANCE, et al.,

               Plaintiffs,

       v.

MICHAEL O. LEAVITT, et al.,

              Defendants.

Case No. 1:07-cv-01115 (ESH)

## PLAINTIFFS' PROPOSED FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

Pursuant to Federal Rules of Civil Procedure 26, 34 and Local Civil Rule 26.2, Plaintiffs

Long Term Care Pharmacy Alliance and American Society of Consultant Pharmacists, by counsel,

hereby request that Defendant Centers for Medicare and Medicaid Services of the U.S. Department

of Health and Human Services produce and permit the inspection and copying or deliver copies of

the following designated documents, within thirty (30) days after service of this request, to the law

offices of Patton Boggs LLP, 2550 M Street, N.W., Washington, D.C. 20037. These document

requests shall be deemed to be continuing in nature, so as to require Defendant to supplement its

answers thereto up to and through the time of trial.

## INSTRUCTIONS AND DEFINITIONS

1.    When answering, furnish all responsive information known to or in the custody,

control or possession of Defendant and/or his or her agents, representatives, or attorneys.

2.    Where exact information cannot be furnished, estimated or approximate information

is to be supplied to the extent possible. When estimation is used, it should be so indicated and an

explanation should be given as to the basis on which the estimate was made and the reason exact

information cannot be furnished.

3.    If an objection is made to production of any information or document requested:

      a)    Identify such information or document with sufficient particularity to allow the matter to be brought before the Court;

      b)    State the nature of the objection asserted;

      c)    State all factual and legal bases for the objection.

4.    If you believe that any word or phrase in a request below is ambiguous, or if you do not understand any word or phrase in a request, identify the ambiguity or source of confusion and explain the definition or understanding that you relied upon in responding.

5.    Unless otherwise specified, the time frame for each request shall be deemed to be from January 1, 2002 until the present.

6.    As used in these requests, the following terms are defined as set forth below:

      A.    "ASCP" shall mean Plaintiff American Society of Consultant Pharmacists and its members.

      B.    "CMS" shall mean Defendant Centers for Medicare and Medicaid Services and its agents, servants and employees, representatives or attorneys.

      C.    "Communication" means any statement or statement that is written or recorded in any manner, conveyed by one person to another person, any statement made by one person in the presence of one or more other persons, and any document delivered, including delivery by any electronic or digital means, by or for one person to another person.

      D.    "Defendants" shall mean CMS, HHS, and the Secretary and each of their respective members, agents, servants and employees, representatives and attorneys.

      E.    "Dual eligible" shall have the meaning set forth in 42 U.S.C. § 1396u-5(a)(6)(A).

      F.    "Document" shall be used in its broadest sense and shall include any writing (whether handwritten, typed, printed, or otherwise made), drawing, graph, chart, photograph, phono-record, or electronic or mechanical matter (including microfilm of any kind or nature, tapes, or recordings), or other data compilations from which information can be obtained (translated, if

necessary, through detection devices into reasonably usable form), and shall include, without limiting the generality of the foregoing, all correspondence, telegraphs, teletypes, facsimiles, agreements, studies, reports, quotations, memoranda, minutes, journal entries, notes, books, accounts, ledgers, invoices, bills of lading, transcripts, statements, lists, schedules, newspaper clippings, e-mails, business records, and any and all other writings or papers of any kind, including drafts, copies of reproduction of any of the foregoing that in any way differ from the original, and information stored in computers or other data storage or processing equipment in the possession, custody, or control of any of your agents, officers, employees, or representatives.

G.    "Identify" with respect to a Communication shall mean state (i) the date and time of the Communication; (ii) the identities of the parties to the Communication; (iii) the form of the Communication (e.g., e-mail, instant message, voice mail, letter, facsimile, telephone conversation, in-person conversation, etc.); (iv) a detailed description of the content or, if a written Communication, an attached copy of the Communication; (v) the identity of any witnesses to the Communication; and (vi) any Documents relating to such Communication and the person who is in possession of such Documents.  With regard to any Communication that you assert is privileged, you should fully Identify such Communication, except you need not describe the content of the Communication or provide a copy, but should instead indicate the basis for the claim of privilege.

H.    "Identify" with respect to a natural person shall mean state the individual's (i) name, (ii) employer, (iii) employment address, and (iv) employment telephone number.

I.    "Identify" with respect to a business entity shall mean state the entity's (i) name, (ii) principal address, (iii) main telephone number.

J.    "Identify," when used with reference to a Document, means state the Document's date and type (e.g., letter, memorandum, e-mail, summaries, diary, etc.) or other appropriate means of describing it, the author's full name, and the Document's present location and custodian.  The identification should be with "reasonable particularity" so as to enable Defendant to request the Document's production.  When asked in an interrogatory to identify a Document, it will be sufficient to attach the Document as an exhibit to Defendants' answers to the interrogatories.  If

any such Document was, but is no longer, in Defendants' possession, custody or control, state what disposition was made of the Document and anyone who Defendants believe may have the original Document or a copy of the document.

      K.    "Institutionalized" shall have the meaning as set forth in 42 U.S.C. § 1396a(q)(1)B).

      L.    "HHS" shall mean Defendant U.S. Department of Health and Human Services and its agents, servants and employees, representatives or attorneys.

      M.    "LTCPA" shall mean Plaintiff Long Term Care Pharmacy Alliance and its members.

      N.    "Person" means any natural person, any corporation, partnership, association, joint venture, sole proprietorship, firm or other business enterprise or legal entity or any employee or agent thereof and means both the singular and plural.

      O.    "SSA" shall mean the U.S. Social Security Administration and its agents, servants, employees, representatives or attorneys.

      P.    Use of "and" includes "or" and use of "or" includes "and."

      Q.    "Plaintiffs" shall mean Plaintiffs LTCPA and ASCP and their members

      R.    "Secretary" shall mean Defendant Michael O. Leavitt and his agents, servants, employees, representatives or attorneys.

      S.    Use of the singular shall be deemed to include the plural and use of the masculine shall be deemed to include the feminine, as appropriate, and vice versa.

      T.    Use of the past tense includes the present tense, and use of the present includes the past tense.

      U.    "Relating to" shall mean concerning, supporting, constituting, containing, alluding to, responding to, connected with, commenting on, in respect of, about, regarding, discussing, involving, showing, describing, analyzing, embodying, reflecting, identifying, incorporating, referring to, dealing with or in any way pertaining to.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.    All documents relied upon to respond to Plaintiffs' First Set of Interrogatories.

2.    All documents relied upon in preparation for testimony by the witness and/or witnesses designated by Defendants in response to Plaintiffs' Rule 30(b)(6) Notice of Deposition.


Respectfully submitted,

October ___, 2007                    _____
                                     John L. Oberdorfer (D.C. Bar No. 145714)
                                     David J. Farber (D.C. Bar No. 415899)
                                     PATTON BOGGS LLP
                                     2550 M Street, N.W.
                                     Washington, D.C. 20037
                                     Telephone: (202) 457-6000
                                     Facsimile: (202) 457-6315

                                     Counsel for Plaintiffs

# EXHIBIT D

1  PETER D. KEISLER
   Assistant Attorney General
2  SHEILA M. LIEBER
   Deputy Director
3  JOHN R. GRIFFITHS (D.C. Bar No. 449234)
   Senior Trial Counsel
4  U.S. Department of Justice
   Civil Division, Federal Programs Branch
5  20 Massachusetts Avenue NW
   Washington, DC 20530
6  Telephone: (202) 514-4652
   Facsimile: (202) 616-8460
7  Email: john.griffiths@usdoj.gov

8  KEVIN V. RYAN (CSBN 118321)
   United States Attorney
9  JOANN M. SWANSON (CSBN 88143)
   Chief, Civil Division
10 STEVEN J. SALTIEL (CSBN 202292)
   Assistant United States Attorney

11     450 Golden Gate Avenue, Box 36055
12     San Francisco, California 94102
       Telephone: (415) 436-6996
13     FAX: (415) 436-6748
       Email: steven.saltiel@usdoj.gov

14 Attorneys for Defendant

15               UNITED STATES DISTRICT COURT
16             NORTHERN DISTRICT OF CALIFORNIA

17 XIUFANG SITU, et al.                    )
                                           )
18          Plaintiffs,                    )
                                           )
19                                         )   Civil Action No. C06-02841 TEH
       v.                                  )
20                                         )
   MICHAEL O. LEAVITT,                     )
21 Secretary of Health and Human Services )
                                           )
22          Defendant.                     )
                                           )
23 _____     )

   **DEFENDANT'S RESPONSES TO PLAINTIFFS' FIRST SET**
24 **OF INTERROGATORIES AND REQUESTS FOR ADMISSION**

25     Pursuant to Rules 33, 34 and 36 of the Federal Rules of Civil Procedure, Defendant

26 hereby responds as follows to Plaintiffs' first set of interrogatories and requests for admissions

27 (hereinafter, the "Discovery Requests").

28

## GENERAL OBJECTIONS

All responses are made subject to the following general objections, regardless of whether a specific objection also is made to a particular Discovery Request:

1. Defendant will respond to Plaintiffs' Discovery Requests subject to, without waiving, and expressly preserving (a) any objections as to competency, relevancy, materiality, confidentiality, privilege and admissibility of any of the responses and documents to be provided; and (b) the right to object to other discovery requests involving or relating to the subject matter of the interrogatories and document requests.

2. Defendant objects to the Discovery Requests to the extent they seek information protected by the deliberative process privilege, the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

3. Defendant objects to the Discovery Requests to the extent they seek information protected from disclosure by the Privacy Act, 5 U.S.C. § 552a.

4. Defendant objects to the Discovery Requests to the extent they seek to impose any obligation on Defendant that is beyond the scope of the Federal Rules of Civil Procedure or other applicable law.

5. Defendant's responses are based solely upon information and documentation currently available and in Defendant's possession, custody or control.

6. Defendant reserves the right to assert additional objections and supplement his responses as appropriate.

## RESPONSES TO INTERROGATORIES

Interrogatory No. 1:

Identify by name, position title, and description of job duties, each of the persons responsible for answering each of the following interrogatories.

- 2 -

1  Response to Interrogatory No. 1:

2      Danielle Moon is responsible for answering Interrogatory Nos. 2 and 3, with the

3  exception of those portions addressing complaint data, and Interrogatories 6, 7, 8, and 14. Ms.

4  Moon is the Deputy Director of the Medicare Enrollment and Appeals Group ("MEAG") of the

5  Center for Beneficiary Choices ("CBC") within the Centers for Medicare & Medicaid Services

6  ("CMS"). MEAG is responsible for all Medicare enrollment and appeals policy under fee-for-

7  service Medicare, the Medicare Advantage program, and the new prescription drug program.

8  MEAG also directs all Medicare appeals operations at CMS, and has a consumer protection

9  component that has primary responsibility at CMS for beneficiary notice and liability issues. As

10  its Deputy Director, Ms. Moon assists in overseeing all operations of MEAG.

11      Cynthia Tudor is responsible for the portions of Defendant's Responses to Interrogatories

12  2-4 addressing complaint data, and for answering Interrogatories 5, 9, 10, 15, and 16. Ms. Tudor

13  is the Director of the Medicare Drug Benefit Group ("MDBG") of CBC. MDBG is responsible

14  for oversight and operations of all drug benefit plans offered under both the Medicare Advantage

15  Program and the new prescription drug program. As its Director, Ms. Tudor oversees all

16  operations of MDBG.

17      Henry Chao is responsible for the portion of Defendant's Response to Interrogatory 4

18  addressing how pharmacies obtain LIS information, and for answering Interrogatories 11, 12, and

19  13. Mr. Chao is the Deputy Director of the Information Services Design and Development

20  Group, Office of Information Services, within CMS. He oversees the development, design,

21  implementation, maintenance, and operation of CMS's Medicare Advantage and Part D systems.

22      Ms. Moon, Ms. Tudor, and Mr. Chao are with CMS, located at 7500 Security Boulevard,

23  Baltimore Maryland, 21244-1850.

24

25

26

27

28                                    - 3 -

1    <u>Interrogatory No. 2</u>:

2        For each month from January 2006 through the present, or for whatever period(s) of time

3    you have this information, please state the number of dual eligibles who at any given point in

4    time have not been enrolled in any Part D prescription drug plan. Of these, how many obtained

5    medications as a result of the point of service plan?

6    <u>Response to Interrogatory No. 2</u>:

7        Defendant does not possess data that would show how many full benefit dual eligibles

8    have, at any given time since the program began, not been enrolled in a Part D prescription drug

9    plan. CMS has made great efforts to auto-enroll all full benefit dual eligibles, beginning months

10    before the January 1, 2006, effective date of the program. Nearly 6 million full benefit dual

11    eligibles are currently enrolled in Part D Prescription Drug Plans. In addition, approximately

12    680,000 full benefit dual eligibles are enrolled in other plans, including Medicare Advantage

13    plans, that provide prescription drug coverage. If CMS learns of a full benefit dual eligible who

14    is not enrolled in a Part D plan, CMS ensures that that person is enrolled in a Part D plan either

15    by auto-enrolling that person into a Prescription Drug Plan, or by notifying their Medicare

16    Advantage plan, if applicable, that the beneficiary is a full benefit dual eligible. (As described in

17    more detail in Defendant's Response to No. 14, Medicare Advantage plans are required to enroll

18    their full benefit dual eligible members into an MA-PD plan in the same organization.)

19    Therefore, if a full benefit dual eligible is not enrolled in a prescription drug plan, it may be

20    because (1) the individual has declined (or "opted out of") Part D coverage; (2) the individual is

21    in the process of being auto-enrolled but the auto-enrollment has not been completed or the

22    beneficiary has not been notified yet of the auto-enrollment; (3) the individual is a member of an

23    MA-only plan and has not yet been enrolled into that organization's MA-PD plan; or (4) CMS is

24    not aware that the beneficiary is a full benefit dual eligible. Even if the individual has not yet

25    been identified as a full benefit dual eligible, or has been so identified but the auto-enrollment

26    process has not been completed or the beneficiary is not yet aware of the enrollment, he or she

27

28                           - 4 -

1  can still use the POS mechanism to obtain prescription drug coverage. As described further in

2  Defendant's Response to Interrogatory No. 8, the auto-enrollment is retroactive so as to ensure

3  no gap in prescription drug coverage.

4        As of September 7, 2006, approximately 9,300 full benefit dual eligible beneficiaries had

5  opted out of Part D. Attachment A shows a cumulative listing of how many full benefit dual

6  eligibles have opted out per month since February 2006.

7        CMS does not have data on the total number of full benefit dual eligibles who did not opt

8  out but yet were not enrolled in a Part D plan. The only data available to CMS that may speak to

9  this issue is data on the number of full benefit dual eligibles who have received prescriptions

10  through the Point of Service ("POS") mechanism, see July 14, 2006, Declaration of Abby Block,

11  ¶ 22-26, data on beneficiaries in Medicare Advantage plans that do not offer prescription drug

12  coverage, and data related to complaints made to CMS.

13        As of September 10, 2006, approximately 37,000 full benefit dual eligible beneficiaries

14  who were not already enrolled in a Part D plan had received prescriptions through the POS

15  mechanism. Attachment B shows this information on a monthly basis.

16        As of June 2006, approximately 7,100 full benefit dual eligible beneficiaries were

17  members of Medicare Advantage plans that did not offer prescription drug coverage and had not

18  yet been enrolled by the organization into an MA plan that does offer prescription drug coverage.

19  It is important to note that these beneficiaries may have other prescription drug coverage from

20  another source (e.g., coverage provided by their employer) and that enrollment in a Part D

21  prescription drug plan could adversely impact this coverage. CMS has been working with the

22  plans in question to ensure that those members who should be enrolled in an MA-PD plan are

23  enrolled.

24        Information on complaints filed by beneficiaries is given in Defendant's Response to

25  Interrogatory No. 5, and information on communications from pharmacies is given in

26  Defendant's Response to Interrogatory No. 16.

27

28                         - 5 -

1    Interrogatory No. 3:

2         For each month from January 2006 through the present, or for whatever period(s) of time

3    you have this information, please state the number of dual eligibles who at any given point in

4    time were enrolled in more than one Part D prescription drug plan.

5    Response to Interrogatory No. 3:

6         CMS's systems are designed so that a beneficiary (including a full benefit dual eligible

7    beneficiary) can only be enrolled in one plan at a time.  Once a beneficiary becomes enrolled in a

8    new plan, he or she is automatically disenrolled from the prior plan.  CMS records thus would

9    not reflect concurrent enrollments in more than one Part D plan.

10        A full benefit dual eligible beneficiary may believe that he or she is enrolled in more than

11   one plan for a number of reasons.  For example, during the time between when a beneficiary

12   submits a request to change plans and when the change becomes effective (see Defendant's

13   Response to Interrogatory No. 6, below), the beneficiary might receive materials from both the

14   original plan and the new plan.  Even after the effective date of the new coverage, the original

15   plan might continue to send out membership information and consider the account active until it

16   has updated its records.  The original plan also might continue to provide coverage when a

17   beneficiary mistakenly submits claims to that plan after the effective date of the new enrollment

18   (and then seek reconciliation with the beneficiary's new plan later).  None of this would be

19   reflected in CMS's records.

20

21   Interrogatory No. 4:

22        For each month from January 2006 through the present, or for whatever period(s) of time

23   you have this information, please state the number of dual eligibles who were enrolled in a Part

24   D plan but whose status as LIS individuals did not appear on the pharmacy's computer.

25   Response to Interrogatory No. 4:

26        Defendant objects to this interrogatory on the basis that the term "pharmacy computer" is

27

28                              - 6 -

1   ambiguous.  Defendant notes that the LIS does not "appear" on the pharmacy computer except as

2   part of the claims adjudication process.  In order for a pharmacy to obtain LIS data, the pharmacy

3   has to submit a claim by, for example, entering the name of the beneficiary, the billing

4   information, the prescription drug name, etc.  Once the claim is processed, the various elements

5   that are part of the beneficiary's profile loaded in the adjudication system are automatically taken

6   into account in assigning the appropriate co-pay level for that prescription.  The only way that

7   CMS would know that a full benefit dual eligible's status as an LIS individual was not reflected

8   in the co-pay level would be if the beneficiary or pharmacy notified CMS.  Information on

9   complaints filed by beneficiaries is given in Defendant's Response to Interrogatory No. 5, and

10  information on communications from pharmacies is given in Defendant's Response to

11  Interrogatory No. 16.

12

13  <u>Interrogatory No. 5</u>:

14        For each month from January 2006 through the present, please state the number of

15  emails, written complaints and calls received by 1-800 MEDICARE, or other CMS Part D

16  assistance line, in which a dual eligible individual had a problem because he/she:

17        a) was not in a Medicare Part D plan,

18        b) was enrolled in two or more plans,

19        c) was in a different plan than the individual signed up for or believed they signed up for,

20        d) had problems because they were charged premiums or co-pays which did not reflect

21  the Low Income Subsidy

22        e) had problems obtaining their prescriptions at the appropriate co-payment for their

23  income level as a person receiving the LIS.

24        f) had more than one of the problems listed in parts a)-e).

25  <u>Response to Interrogatory No. 5</u>:

26        Defendant objects to this discovery request as unduly burdensome, not reasonably

27

28                    - 7 -

1   calculated to lead to discovery of admissible evidence, and overly broad in its scope.  Defendant

2   does not categorize complaint data according to the categories listed in Interrogatory 5a)-e).

3   Consequently, responding to this interrogatory in the manner requested by Plaintiffs would

4   require Defendant to review manually tens of thousands of complaint summaries.

5         In an effort to respond to Interrogatory No. 5, however, Defendant provides, as

6   Attachment C, a month-by-month listing of those complaints from full benefit dual eligibles that

7   may fall under topics listed in Interrogatory No. 5a)-e) for the period May 1, 2006, through

8   September 19, 2006.  This listing is categorized according to topics included in CMS's

9   Complaint Tracking Module ("CTM").  CMS does not maintain this data in a manner that would

10  allow it to determine whether any full benefit dual eligibles filed complaints that fell into more

11  than one of these categories.

12        Collecting data for the January through April period would be overly burdensome and

13  would provide inconsistent results.  CMS does not have data available for the January through

14  April 2006 period because it did not start tracking complaints through its CTM until May 2006.

15  Prior to that date, tracking of complaints was performed by the regional offices using a variety of

16  basic methods.

17

18  Interrogatory No. 6:

19        Once a dual eligible has indicated his or her intention either to CMS or to a plan to switch

20  to another plan, describe each step (including necessary data exchanges) involved and the time

21  frame to complete each step required to effectuate the change of Part D plans to the point where

22  the change will show up on the pharmacy computer.

23  Response to Interrogatory No. 6:

24        ·  Each step is described below.  Generally, the entire process should take from 7 to 14

25  days, from the time the beneficiary submits a request to a plan until the time the information is

26  available to the pharmacy via the E-1 query.  The exact length of time varies depending on how

27

28                                          - 8 -

1   quickly each plan completes its responsibilities. CMS has encouraged plans to submit

2   enrollments promptly and as early in the month as possible in order to ensure that a beneficiary's

3   information is available at the pharmacy when his or her enrollment is effective. See Attachment

4   D, Memorandum from Gary A. Bailey to All PDP Sponsors and MA Organizations dated

5   December 15, 2005. In addition, some organizations follow the process outlined below, but also

6   send the necessary enrollment materials to the beneficiary, such as the ID card, earlier in the

7   process, so that the beneficiary can obtain prescription drugs at the pharmacy as soon as coverage

8   is effective. CMS has also encouraged beneficiaries to enroll or change plans as early in the

9   month as possible to ensure that their enrollment is processed prior to coverage becoming

10   effective.

11   **Step 1: Beneficiary Submits Request to Plan or CMS**

12       Beneficiaries (including full benefit dual eligible beneficiaries) can change plans by

13   submitting a paper application to the new plan, or, if available, by submitting a request through

14   the plan's website or toll-free number. (Plans are required to accept paper forms, but may choose

15   to also accept requests via phone and internet.) Beneficiaries can also change plans by calling 1-

16   800-MEDICARE or via CMS's website at www.medicare.gov. Requests received by CMS in

17   this manner are made available to the plans on a nightly basis. Plans are required to access and

18   upload these enrollments and then process them as they would requests they receive directly.

19   **Step 2: Plan Reviews Request**

20       Plans are required to review each request to ensure that it is complete and that the

21   individual is eligible to enroll in the plan. Prior to the effective date of enrollment, plans must

22   acknowledge receipt of a completed request and provide all the necessary information about

23   being a member of the Prescription Drug Plan ("PDP") sponsor, including evidence of coverage,

24   so that the beneficiary may begin using the plan services as of the effective date. If the

25   enrollment request is received late in the election period (such that it is impossible for the plan to

26   provide the necessary information prior to the effective date of coverage), plans must provide this

27

28                            - 9 -

1 | information within seven business days of receiving the request.

2 | **Step 3: Plan Sends Information to CMS**

3 |      If the enrollment is complete, the plan sends information necessary for CMS to add the

4 | beneficiary to its records as an enrollee. Until recently, this information, in the form of an

5 | "enrollment transaction," had to be sent to CMS within 30 calendar days of receipt of the

6 | complete enrollment request. This timeframe was changed to 14 calendar days in a recent CMS

7 | guidance update dated September 8, 2006.

8 | **Step 4: CMS Processes Transaction**

9 |      Upon receipt of the enrollment transaction, CMS's system will immediately accept or

10 | reject each transaction for processing and report the disposition of the transaction to the plan.

11 | Transactions that are rejected for errors in basic format or content are reported back to the plans

12 | as "failed" transactions via the Failed Transaction Report. Plans use this information to correct

13 | errors in data or format and resubmit the transactions. Transactions that do not fail are either

14 | accepted or rejected for enrollment and the disposition of these transactions is reported back to

15 | plans in the Batch Completion Status Summary report. Additionally, CMS provides a weekly

16 | reply report to each plan that summarizes the disposition of transactions received for the week.

17 | This is called a Weekly Transaction Reply Report, or TRR. The exact dates of these reports may

18 | vary from one month to next, but they are generally provided on a weekly basis, typically on

19 | Saturdays, and a summary monthly report is provided at the end of each month containing

20 | responses to all of the enrollment requests processed during the monthly processing cycle. If the

21 | beneficiary is currently enrolled in another plan, and the enrollment request meets CMS's

22 | requirements, CMS will disenroll the beneficiary from his or her current plan effective the first of

23 | the following month. CMS will notify the current plan of the disenrollment on the next weekly

24 | report and the monthly report.

25 |

26 |

27 |

28 |                         - 10 -

1   **Step 5:  Plan Receives Response From CMS**

2        Plans are required to process responses from CMS on the TRR promptly and notify the

3   beneficiary that his/her enrollment has been confirmed within seven business days of receiving

4.  the reply from CMS.

5   **Step 6:  Plan Sends Drug Coverage Information Back to CMS**

6        Plans are also required to submit certain billing information, known as 4Rx data, to CMS

7   about the beneficiary's prescription drug coverage.   Plans must submit this information within

·8   72 hours of when CMS sends the TRR confirming the beneficiary's enrollment.

9   **Step 7:  CMS Updates Systems**

10       CMS updates its systems within 24 hours of receiving the 4Rx data from the plan.  CMS

11   sends this information to the TrOOP Facilitation Contractor on a nightly basis, and it is available

12   for pharmacists to query the next day.

13

14   <u>Interrogatory No. 7</u>:

.15       For each month from January 2006 through the present, or for whatever period(s) of time

16   you have this information, please state the number of dual eligibles who have received any

17   prescription drugs via the point of service plan.

18   <u>Response to Interrogatory No. 7</u>:

19       As stated in Defendant's Response to Interrogatory No. 2, as of September 10, 2006,

20   approximately 37,000 full benefit dual eligible beneficiaries who were not already enrolled in a

21   Part D plan had received prescriptions from the POS solution.  Please see Attachment B for

22   monthly data.

23

24   <u>Interrogatory No. 8</u>:

25       Please describe each step of the process (including data exchanges necessary to complete

26   the step) and the time frames (minimum, maximum and average) to complete each step related to

27

28                                          - 11 -

1  how CMS becomes aware of a Medicaid beneficiary's becoming dually eligible, being enrolled

2  in a Part D plan and receiving prescription drugs at the pharmacy with the correct LIS co-

3  payments.

4  <u>Response to Interrogatory No. 8</u>:

5        Each step is described below. The process begins in the middle of each month, when

6  CMS begins receiving data from the States identifying full benefit dual eligibles, and ends in the

7  middle of the following month, when information about the beneficiary's enrollment is available

8  for pharmacists to query. The exact length of time varies depending on how quickly each plan

9  completes its responsibilities. As with other enrollments, CMS has encouraged plans to submit

10  the necessary information promptly and to ensure that beneficiaries have information about the

11  plan into which they are auto-enrolled prior to coverage becoming effective. CMS also notifies

12  Prescription Drug Plans of the assignment early in the process (Step 3) so that the plans are

13  aware of the number and names/addresses of full benefit duals who will be enrolled into their

14  plans, and can send them necessary information prior to receiving confirmation of the enrollment

15  from CMS.

16  **Step 1:  CMS Receives Data from States or Social Security Administration ("SSA")**

17        States submit monthly files to CMS in which they identify individuals eligible for full

18  Medicaid benefits and those in the Medicare Savings Programs (also described as "partial

19  duals"). States submit these files between the 15th and the 30th of each month. SSA sends daily

20  files to CMS that identify individuals who have applied for the low-income subsidy and found

21  eligible. SSA also sends information about those eligible for the Supplemental Security Income

22  ("SSI") program around the third week of each month.

23  **Step 2:  CMS Deems Beneficiaries Eligible for LIS, Enrolls Them in a Plan**

24        CMS uses the data submitted from States and SSA to determine which beneficiaries are

25  "deemed" eligible for LIS. This process occurs at the beginning of the month. CMS then assigns

26  beneficiaries to a Part D plan on or about the 3rd of the month, and completes the enrollment on

27

28  - 12 -

1    or about the 4th of the month. As part of the auto-enrollment process, CMS notifies full benefit

2    dual eligibles of the PDP to which they have been auto-enrolled, the effective date of that

3    enrollment, and their right to change plans. In addition, CMS identifies beneficiaries' LIS

4    subsidy and copay levels. After auto-enrollment is completed in the early part of the month,

5    CMS immediately generates a mail notification file that is sent to a contractor, who prints and

6    mails the notices. The auto-enrollment notice is then mailed to the beneficiary within seven

7    business days.

8        Coverage is effective as follows:

9    • Full benefit dual eligibles — Coverage is retroactive to the point in time when the

10        beneficiary first became a full benefit dual eligible, or, where the full benefit dual

11        eligible previously disenrolled from a plan without opting out of Part D or enrolling in

12        another plan, to the point in time where he or she was last enrolled in a Part D plan.

13    • Other LIS Eligibles (Partial duals, SSI recipients, and applicants) – Coverage is

14        effective the first day of the second month after they are included in the enrollment

15        process. (For example, coverage is effective September 1 for those beneficiaries

16        included in the July processing run.)

17    **Step 3: CMS Notifies Prescription Drug Plans**

18        CMS sends information about the full benefit dual eligibles (including their subsidy level,

19.   co-pay level, and addresses) to the appropriate PDP between the 2nd and the 16th of the month,

20    usually around the 5th of the month, and includes information about beneficiaries' LIS (i.e.,

21    appropriate premium subsidy and co-pay level) and addresses.

22    **Step 4: CMS Sends Enrollment Confirmation to PDPs**

23        CMS sends a weekly report to all plans that includes information about confirmed

24    enrollments and other pertinent information on the plan's members for each plan. (This is called

25    a Weekly Transaction Reply Report-TRR that is sent to the plans every Saturday.) This is

26    usually between one and six days after the end of the auto-assignment, depending on what day

27.

28        - 13 -

1   the auto-assign runs. Information about the specific plan's auto-enrollments is included in the

2   first weekly TRR report after CMS auto-enrolls the beneficiaries, which is typically on or about

3   the 4th of the month.

4   **Step 5: Plan Sends Drug Coverage Information Back to CMS**

5            Plans are also required to submit certain billing information, known as 4Rx data, back to

6   CMS about the beneficiary's prescription drug coverage. Plans must submit this information

7   within 72 hours of when CMS sends the Weekly TRR confirming the beneficiary's enrollment.

8   **Step 6: CMS Updates Systems**

9            CMS updates its systems within 24 hours of receiving the 4Rx data from the plan. CMS

10  sends the Part D and 4Rx data to the TrOOP Facilitation Contractor on a nightly basis, and it is

11  available for pharmacists to query the next day.

12

13  Interrogatory No. 9:

14           In his testimony to Congress dated February 8, 2006, Administrator McClellan described

15  "a demonstration project to reimburse states for the direct and administrative costs they have

16  incurred since the initiation of the drug benefit, in temporarily filling this coverage gap for dual

17  eligibles transitioning from Medicaid to Medicare drug coverage . . . ." For each month from

18  January 2006 through the present, or for whatever period(s) of time you have this information,

19  please state the amount that has been paid or that CMS expects to pay to the states for direct

20  costs under this demonstration project and the number of prescriptions and dual beneficiaries that

21  this cost reflects.

22  Response to Interrogatory No. 9:

23           Defendant objects to this interrogatory on the basis that "direct costs" is ambiguous.

24  Defendant interprets the term "direct costs" to mean the costs associated with payment of

25  individual claims (i.e. prescriptions). When CMS receives claims from states as part of the

26  demonstration project, CMS pays 95% of the amount of those claims. CMS withholds the

27

28                                          - 14 -

1    remaining 5% until it finalizes the amount of payment it will make on those claims by resolving

2    any potential issues on claim eligibility, claim amounts, duplicate claims, and the like.

3    Attachment E gives a month-by-month listing of (1) amounts CMS has actually paid to states for

4    the costs of paying claims under this demonstration project (excluding payment for

5    administrative costs), which is 95% of the estimate of what CMS ultimately will pay for these

6    claims; (2) the 5% of payment that currently is being withheld; and (3) the number of claims

7    reflected in these payments. CMS only has data on the number of claims that these payments

8    represent, and not the number of full benefit dual eligibles. CMS does not have data on amounts

9    it will pay for claims it receives in the future under this demonstration project or on claims that

10   CMS has not yet processed.

11

12   Interrogatory No. 10:

13         In that testimony, Administrator McClellan also stated that "information transfers among

14   states, CMS, and plans did not occur perfectly for all beneficiaries who changed plans." For each

15   month from January 2006 through the present, or for whatever period(s) of time you have this

16   information, please state the number of instances in which imperfect information transfers caused

17   dual eligibles not to receive the prescription drugs to which they were entitled.

18   Response to Interrogatory No. 10:

19         Defendant objects to this interrogatory on the basis that the term "imperfect information

20   transfers" is ambiguous and overly broad. Without waiving this objection, Defendant states that

21   he does not have data that would reflect whether and when so-called "imperfect information

22   transfers" led to full benefit dual eligibles not receiving prescription drugs. Unless a full benefit

23   dual eligible (or his or her representative) or a pharmacy contacted CMS, CMS would be

24   unaware that he or she did not receive prescription drugs. Thus, the only information available

25   that speaks to this issue is the complaint information contained in Defendant's Responses to

26   Interrogatories 5 and 16. This information does not reflect whether a particular complaint

27

28                                              - 15 -

1    resulted from an imperfect information transfer, however, or whether in fact the beneficiary did

2    not receive prescription drugs to which he or she was entitled.

3

4    Interrogatory No. 11:

5        What percentage of Medicaid recipients who have become eligible for Medicare since

6    January 1, 2006 have been enrolled in a Part D plan which shows up on the pharmacy computer,

7    respectively, two weeks, one months, six weeks, two months, and more than two months after

8    becoming eligible for Medicare?

9    Response to Interrogatory No. 11:

10       Defendant objects to this interrogatory on the basis that the term "pharmacy computer" is

11   ambiguous. Defendant does not possess the information requested in Interrogatory No. 11, as it

12   does not have access to information available on pharmacy computers. To the extent Plaintiffs

13   are asking what percentage of Medicaid recipients had their status appear in the E1 system within

14   a certain time period after becoming eligible for Medicare, Defendant refers Plaintiffs to his

15   Response to Interrogatory No. 8. A pharmacist can query the E1 system to obtain information on

16   a beneficiary's Medicare eligibility, plan enrollment, and billing information. As outlined in the

17   response to Interrogatory No. 8, the amount of time between when a Medicaid beneficiary

18   becomes eligible for Medicare and the time his or her enrollment information should appear on

19   the E1 system varies, depending on what date the beneficiary becomes dually eligible as

20   compared to the time period in which States typically send their files to CMS (between the 15th

21   and 30th of the month), the date CMS assigns beneficiaries to a Part D plan (on or about the 3rd of

22   the month) and the date CMS completes the auto-enrollment (on or about the 4th of the month).

23   CMS does not have the capability of tracking the exact amount of time it has taken for this

24   process in individual cases, or what percentage of Medicaid recipients who have become eligible

25   since January 1, 2006, had their enrollments on the E1 system within particular periods of time.

26

27

28                                        - 16 -

1    Interrogatory No. 12:

2          What percentage of Medicaid recipients who have become eligible for Medicare since

3    January 1, 2006 have had their status as Low Income Subsidy individuals and their correct co-

4    payment amount based on their income appear on the computer used by the pharmacy contracting

5    with Part D plans within, respectively, two weeks, one month, six weeks, two months, and more

6    than two months after being enrolled in a Part D plan?

7    Response to Interrogatory No. 12:

8          Defendant objects to this interrogatory on the basis that the term "pharmacy computer" is

9    ambiguous. Defendant notes that the LIS does not "appear" on the pharmacy computer except as

10   part of the claims adjudication process. See Defendant's Response to Interrogatory No. 4. To

11   the extent Plaintiffs are asking what percentage of Medicaid recipients had their status as LIS

12   individuals appear in the pharmacy computer as part of the claims adjudication process, CMS

13   does not have the capability to track the exact amount of time it has taken for this process in

14   individual cases.

15

16   Interrogatory No. 13:

17         What percentage of dual eligibles who decide to disenroll from one Part D plan and enroll

18   in another Part D plan have their new enrollment choice appear on the pharmacy computer,

19   respectively, two weeks, one month, six weeks, two months, and more than two months after

20   their choice?

21   Response to Interrogatory No. 13:

22         Defendant objects to this interrogatory on the basis that the term "pharmacy computer" is

23   ambiguous. Defendant does not possess the information requested in Interrogatory No. 13, as it

24   does not have access to information available on pharmacy computers. To the extent Plaintiffs

25   are asking what percentage of full benefit dual eligibles who changed their enrollment had their

26   changed enrollment appear in the E1 system within a certain time period, Defendant can state

27

28                                          - 17 -

1   only that the entire process should take from 7 to 14 days, from the time the beneficiary submits a

2   request to a plan until the time the information is available to the pharmacy via the E-1 query.

3   See Response to Interrogatory No. 6. CMS does not have the capability to track the exact

4.  amount of time it has taken for this process in individual cases, however, or what percentage of

5 · full benefit dual eligibles who changed their enrollment had their changed status reflected on the

6   E1 system within particular periods of time. ·

7

8   Interrogatory No. 14:

9       Once CMS has determined that a beneficiary is a dual eligible individual, describe how

10  and when the individual is autoenrolled into a PDP or MA PD. Once this determination is made,

11  when are notices issued to the beneficiaries to inform them of their enrollment? How long does

12  this process take, beginning the moment CMS determines a beneficiary to be a dual eligible and

13  concluding when the beneficiary receives notice and starts receiving Medicare Part D benefits?

14  Response to Interrogatory No. 14:

15      Please see Response to Interrogatory No. 8 for a description of the process and

16  timeframes for auto-enrolling newly identified full benefit dual eligibles into PDPs, along with a

17  description of the notice sent to full benefit dual eligibles of their enrollment.

18      With respect to full benefit dual eligibles already enrolled in MA-only plans, CMS directs

19  their MA organization to enroll them into an MA-PD plan in the same organization. The process ·

20  and timeframes are as follows:

21  **Step 1: CMS Identifies New Full Benefit Dual Eligibles To MA Organization** ·

22      Around the 5th of each month, CMS sends a file to MA organizations that have MA-only

23  plans which identifies their full dual eligible enrollees.

24  **Step 2: MA Organization Assigns Full Benefit Dual Eligibles to MA-PD Plan**

25      The MA organization identifies those dual eligibles in their MA-only plan, and assigns

26  them into an MA-PD plan with the lowest combined Part C and D premium (in 2006 only, they

27

28                    – 18 –

1   have the option to enroll the beneficiary into the MA-PD with the lowest Part D premium). If

2   more than one MA-PD plan qualifies, assignment is random among qualifying plans.

3   **Step 3:  MA Organization Notifies Full Benefit Dual Eligible of Enrollment**

4         The MA organization notifies the full benefit dual eligible of the enrollment, and that they

5   have ten business days to decline the enrollment before it becomes effective.

6   **Step 4:  MA Organization Submits Enrollment Transaction**

7         The MA organization submits an enrollment transaction to CMS to enroll the beneficiary

8   to the MA-PD plan.

9   **Step 5:  CMS Sends Enrollment Confirmation to MA Organization**

10      CMS sends a weekly report to all plans that includes information about confirmed

11   enrollments for each plan for the transactions that were processed during that week. (This is

12   called a Weekly Transaction Reply Report or TRR.) Information about these enrollments is

13   included in the first weekly report after the MA organization submitted them. (There is also a

14   Monthly TRR that reflects the current processing month's transactions that is sent to the plans as

15   part of an entire suite of reports about a week after each month's processing cutoff date, usually

16   around the 16th of each month).

17   **Step 6:  Plan Sends Drug Coverage Information Back to CMS**

18       Plans are also required to submit certain billing information, known as 4Rx data, back to

19   CMS about the beneficiary's prescription drug coverage.  Plans must submit this information

20   within 72 hours of when CMS sends the TRR confirming the beneficiary's enrollment.

21   **Step 7:  CMS Updates Systems**

22       CMS updates its systems within 24 hours of receiving the 4Rx data from the plan. CMS

23   sends this information to the TrOOP Facilitation Contractor on a nightly basis, and it is available

24   for pharmacists to query the next day.

25

26

27

28                                    - 19 -

1    Interrogatory No. 15:

2        For each month from January 2006 through the present, or for whatever period of time

3    you have the information, identify the number and percentage of rejections or error messages or

4    E1 Queries or other pharmacy computer inquiries or methods used by Part D plan pharmacist to

5    provide medication for dual eligibles under the Part D system.

6    Response to Interrogatory No. 15:

7        Defendant objects to this interrogatory as ambiguous. To the extent Defendant

8    understands the interrogatory, Defendant does not possess the information requested, as it does

9    not have access to information available on pharmacy computers. To the extent Plaintiffs are

10   asking about E1 queries, Defendant only has data on E1 queries for all Medicare beneficiaries,

11   and does not have data identified as to whether an E1 query was related to a full benefit dual

12   eligible beneficiary. With respect to the aggregate data on Medicare beneficiaries, CMS's data

13   does not indicate whether an E1 query resulted in a "rejection" or an "error message." Rather, it

14   shows whether a query from a pharmacist resulted in a "match" in terms of the pharmacist being

15   able to obtain the information he or she sought, or a "non-match," meaning that the beneficiary

16   information provided by the pharmacist to the E1 system was not sufficient to be matched with a

17   unique Medicare beneficiary in CMS records and return any billing information requested. In an

18   effort to be responsive, defendant provides, as Attachment F, a month-by-month listing of the E1

19   queries related to Part D plan enrollment queries with respect to any Medicare beneficiary, along

20   with information on whether these queries resulted in a "match" or "non-match" and calculations

21   of the percentage of times each month a query resulted in a "non-match." Neither the fact that an

22   E-1 query was made, or that a "non-match" resulted from the query, can be interpreted as the

23   system not working properly. For instance, pharmacists may have used the E-1 system to

24   determine if they could get other payer data in an automated way, instead of entering it manually,

25   even when the beneficiary produced a prescription drug card. Moreover, CMS does not know

26

27

28                                        - 20 -

1    how rigorously pharmacists followed instructions to check documentation for Medicaid or

2    Medicare eligibility before submitting an E-1 query.

3

4    Interrogatory No. 16:

5        For each month from January 2006 through the present, or for whatever period of time

6    you have the information, identify the number of telephone calls made by pharmacists to plans or

7    CMS on behalf of dual eligibles having problems with plan enrollment, disenrollment, the Low

8    Income Subsidy, or point of service plan.

9    Response to Interrogatory No. 16:

10       Defendant refers Plaintiffs to Attachment G for Defendant's Response to Interrogatory

11   No. 16.

12

13   Interrogatory No. 17:

14       State the name(s), title or position, e-mail and regular mail address and other contact

15   information for the person or persons at CMS who can most accurately and in the most detail

16   describe the data sharing systems that are used by CMS, SSA, Part D plans, state Medicaid

17   programs and TrOOP facilitator in connection with identifying dual eligibles, enrolling and

18   disenrolling them from plans and providing their plans with correct LIS status information.  You

19   may limit your answer to this question to 15 persons, so long as you, to the extent possible, rank

20   the list with the most knowledgeable person listed first.

21   Julie Boughn
     CMS Chief Information Officer and Director
22   Office of Information Services
     Centers for Medicare & Medicaid Services
23   7500 Security Boulevard
     Baltimore, Maryland  21244-1850
24   Julie.Bough@cms.hhs.gov

25

26

27

28                                          - 21 -

1   Henry Chao
    Deputy Director, Information Services Design and Development Group
2   Office of Information Services
    Centers for Medicare & Medicaid Services
3   7500 Security Boulevard
    Baltimore, Maryland 21244-1850
4   Henry.Chao@cms.hhs.gov

5   Jeffrey Grant
    Director, Division of Payment Systems
6   Medicare Plan Payment Group
    Center for Beneficiary Choices
7   Centers for Medicare & Medicaid Services
    7500 Security Boulevard
8   Baltimore, Maryland 21244-1850
    Jeffrey.Grant@cms.hhs.gov

9
    Roger Buchanan
10  Director, Division of Information Analysis & Technical Assistance
    Finance, Systems, and Budget Group
11  Centers for Medicare & Medicaid Services
    7500 Security Boulevard
12  Baltimore, Maryland 21244-1850
    Roger.Buchanan@cms.hhs.gov
13

14              **RESPONSES TO REQUESTS FOR ADMISSION**

15  <u>Request for Admission No. 1:</u>

16       Using the Point of Service system is optional for Part D participating pharmacists.

17  <u>Response to Request for Admission No. 1:</u>

18       Admit that using the Point of Service System is optional for pharmacists. By way of

19  further answer, defendant avers that there is no such thing as a "Part D participating pharmacist."

20  Drug plan sponsors participate in Part D, not pharmacists. Pharmacists may contract with a

21  participating drug plan to provide drugs to the plan's enrollees, but the MMA imposes no

22  requirements on pharmacists.

23

24  <u>Request for Admission No. 2:</u>

25       Pharmacists who use the Point of Service system to bill for someone he/she believes is a

26  dual eligible is at risk of non-payment for that bill.

27

28                              - 22 -

1  <u>Response to Request for Admission No. 2:</u>

2       Denied, except to admit that pharmacists who submit incorrect information into the Point

3  of Service system to bill for someone he/she believes is a dual eligible are at risk of non-payment

4  for that bill.

5

6  As to objections and responses
  to requests for admission:

7

8

  Dated: September 27, 2006        PETER D. KEISLER

9                            Assistant Attorney General

10                           SHEILA M. LIEBER
                          Deputy Director
11

12

13                           JOHN R. GRIFFITHS (D.C. Bar No. 449234)
                          Senior Trial Counsel
14                           U.S. Department of Justice
                          Civil Division, Federal Programs Branch
15                           KEVIN V. RYAN (CSBN 118321)
                          United States Attorney
16

17                           JOANN M. SWANSON (CSBN 88143)
                          Chief, Civil Division

18                           STEVEN J. SALTIEL (CSBN 202292)
                          Assistant United States Attorney
19

20                           Attorneys for Defendant

21

22

23

24

25

26

27

28                         - 23 -

I hereby declare under penalty of perjury that those portions of Defendant's Responses to Interrogatories 2 and 3 not addressing complaint data, and Defendant's Responses to Interrogatories 6, 7, 8, and 14, are true and correct, based on information available to me in the course of my official duties.

Executed on September 27, 2006, in Baltimore, Maryland.

Danielle Moon
Deputy Director, Medicare Enrollment and Appeals Group
Center for Beneficiary Choices
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850

I hereby declare under penalty of perjury that the portions of Defendant's Responses to Interrogatories 2 and 4 addressing complaint data, and Defendant's Responses to Interrogatories 5, 9, 10, 15, and 16, are true and correct, based on information available to me in the course of my official duties.

Executed on September 27, 2006, in Baltimore, Maryland.

Cynthia Tudor
Director, Medicare Drug Benefit Group
Center for Beneficiary Choices
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850

I hereby declare under penalty of perjury that the portion of Defendant's Response to

Interrogatory 4 regarding how pharmacies obtains LIS data, and Defendant's Responses to

Interrogatories 11-13, are true and correct, based on information available to me in the course of

my official duties.

Executed on September 27, 2006, in Baltimore, Maryland.

Henry Chao
Deputy Director
Information Services Design and Development Group
Office of Information Services
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland  21244-1850

1

2                    <u>CERTIFICATE OF SERVICE</u>

3          I hereby certify that a copy of Defendant's Responses to Plaintiffs' First Set of

4    Interrogatories and Requests for Admission, and attachments thereto, were served by electronic

5    mail and facsimile on the counsel listed below:

6

7    Jeanne Finberg
     National Senior Citizens Law Center
     1330 Broadway, Suite 525
8    Oakland, CA 94612
     Tel.:    (510) 663-1055
9    Fax:     (510) 663-1051

10

11   Date: September 27, 2006                    John R. Griffith

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Attachment A

to Defendant's Responses to Plaintiffs' First Set of Interrogatories
and Requests for Admission

Situ v. Leavitt, Civ. A. No. C06-02841 TEH (N.D. Cal.)

## Full Duals Opt-Out Counts

| Month | # Full Dual Opt-Outs |
|-------|----------------------|
| Feb-06 | 2,786 |
| Mar-06 | 4,251 |
| Apr-06 | 5,926 |
| May-06 | 5,845 |
| Jun-06 | 5,851 |
| Jul-06 | 6,518 |
| Aug-06 | 7,594 |
| Sep-06 | 9,317 |

Note:
-- data not available prior to February 2006
-- data is cumulative of those who have opted out to date (net of those who have died or lost entitlement)

# Attachment B

to Defendant's Responses to Plaintiffs' First Set of Interrogatories and Requests for Admission

Situ v. Leavitt, Civ. A. No. C06-02841 TEH (N.D. Cal.)

As of September 10, 2006, approximately 37,000 full benefit dual eligible beneficiaries who were not already enrolled in a Part D plan received prescriptions from the POS solution. The monthly totals* are as follows:

| Dates | Number of Dual Eligibles |
|---|---|
| January 1, 2006 – January 26, 2006 | 8,452 |
| January 27, 2006 – February 26, 2006 | 6,340 |
| February 27, 2006 – March 26, 2006 | 5,406 |
| March 27, 2006 – April 23, 2006 | 3,898 |
| April 24, 2006 – May 21, 2006 | 4,124 |
| May 22, 2006 – June 18, 2006 | 1,480 |
| June 19, 2006 – July 16, 2006 | 3,067 |
| July 17, 2006 – August 13, 2006 | 1,888 |
| August 14, 2006 – September 10, 2006 | 2,679 |
| **TOTAL** | **37,334** |

* Since CMS collects this information on a weekly basis, this data has been aggregated into rough monthly approximations.

# Attachment C

to Defendant's Responses to Plaintiffs' First Set of Interrogatories
and Requests for Admission

<u>Situ v. Leavitt</u>, Civ. A. No. C06-02841 TEH (N.D. Cal.)

Dual-Eligible Beneficiary Enrollment and Premium Related Complaints in the Complaints Tracking Module (CTM)
Date Range: 05/01/06 - 09/19/06, extract 09/20/06

| SUBCATEGORY DESCRIPTION | May | June | July | August | September | Grand Total |
|---|---|---|---|---|---|---|
| Beneficiary charged more than once for his/her premium costs | - | - | - | - | - | - |
| Delayed enrollment processing | 1,104 | 1,307 | 1,189 | 997 | 588 | 5,185 |
| Difficulty switching between plans | 410 | 306 | 342 | 345 | 147 | 1,550 |
| Disenrollment delayed | - | - | - | - | - | 1 |
| Enrollment delayed | - | - | - | - | 1 | 1 |
| Enrollment inappropriate | - | - | - | - | 1 | 1 |
| Facilitated enrollment issues | 391 | 339 | 452 | 511 | 289 | 1,982 |
| Inappropriate disenrollment | 3,096 | 2,387 | 1,721 | 1,573 | 820 | 9,597 |
| Inappropriate enrollment | 2,014 | 1,804 | 1,646 | 1,625 | 703 | 7,792 |
| Involuntarily switched to a different plan | 234 | 198 | 156 | 140 | 82 | 810 |
| MA-RD (MA RETRO DISENROLLMENTS) | - | - | - | - | 33 | 33 |
| Overcharged premium fees | 261 | 231 | 219 | 207 | 92 | 1,010 |
| PDP-RD (PDP RETROACTIVE DISENROLLMENTS) | - | - | 1 | 1 | 4 | 6 |
| Subsidy-eligible enrollees charged improper co-insurance | 3,040 | 2,172 | 1,439 | 1,365 | 651 | 8,667 |
| Untimely processing of disenrollment requests | 603 | 643 | 862 | 1,005 | 365 | 3,468 |
| Untimely processing of enrollment requests | 146 | 190 | 153 | 154 | 81 | 724 |

Note: The count of complaints per month represents the number of unique complaints received during that month. However, a beneficiary may be represented multiple times either in the same month or across months.

# Attachment D

to Defendant's Responses to Plaintiffs' First Set of Interrogatories
and Requests for Admission

<u>Situ v. Leavitt</u>, Civ. A. No. C06-02841 TEH (N.D. Cal.)

Date:      December 15, 2005

To:        All PDP Sponsors and MA Organizations

From:      Gary A. Bailey
           Deputy Director
           Plan Policy and Operations
           Center for Beneficiary Choices, CMS

Subject:   Provision of Enrollment Information Before Member's Effective Date

This purpose of this memo is to remind plans about the requirement to provide key enrollment-related information to new members before the effective date of enrollment. As described in existing guidance, plans must provide their new members with certain information about the member's coverage, rights, and responsibilities prior to the effective date of the individual's enrollment (or within 7 business days of receiving a complete enrollment request, if the request is received near the end of the month, or the applicable enrollment period).. This guidance can be found in Section 30.4.1 of the PDP Guidance on Eligibility, Enrollment and Disenrollment, and in Section 40.4.1 of Chapter 2 of the Medicare Managed Care Manual. The following information is required to be included in the member's notification:

- Acknowledgement of receipt of the completed enrollment request, and the expected effective date of coverage;

- How to obtain services as of effective date if ID card not yet received by individual (i.e. evidence of health insurance coverage);

- Information about the charges for which the prospective member will be liable (such as premiums, copayments, and low-income subsidy rules, if applicable;

- The potential for member liability if it is found that the member is not eligible for Part D at the time coverage begins and the member has used PDP services after the effective date;

- Copy of completed enrollment form where applicable, if the individual does not already have a copy of the form.

Please note that this information must be provided regardless of whether or when the PDP receives confirmation of the enrollment from CMS. The information ensures that individuals have the information needed to fill a prescription or obtain services through their PDP or MA plan, even in situations where the effective date of an individual's enrollment occurs before the complete processing of the enrollment transaction by CMS and the subsequent mailing of the official plan ID card and other enrollment materials.

Please contact your CMS Account Manager if you have any questions about this policy.

# Attachment E

to Defendant's Responses to Plaintiffs' First Set of Interrogatories
and Requests for Admission

<u>Situ v. Leavitt</u>, Civ. A. No. C06-02841 TEH (N.D. Cal.)

**Payments to States for the Section 402 Demonstration (State to Plan Reconciliation Demonstration)**

|  | Total Claims | Total Paid by CMS | 5% Withheld | Total |
|---|---|---|---|---|
| June | 3,315,514 | $ 234,182,201.52 | $ 12,657,424.26 | $ 253,148,485.16 |
| July | 284,782 | $ 19,640,671.15 | $ 1,033,719.53 | $ 20,674,390.88 |
| August | 219,615 | $ 15,694,404.28 | $ 826,021.28 | $ 16,520,425.56 |
| September | 233,357 | $ 19,605,904.55 | $ 1,031,889.71 | $ 20,637,794.26 |
| Total | 4,053,268 | $ 289,123,181.50 | $ 15,549,054.76 | $ 310,981,095.67 |

# Attachment F

to Defendant's Responses to Plaintiffs' First Set of Interrogatories
and Requests for Admission

Situ v. Leavitt, Civ. A. No. C06-02841 TEH (N.D. Cal.)

E-1 Queries for Part D Enrollment Information

|  | Match | Percent | Non-Match | Percent |
|---|---|---|---|---|
| JAN | 8,147,312 | 49.7% | 8,230,121 | 50.3% |
| FEB | 2,377,888 | 49.8% | 2,394,893 | 50.2% |
| MAR | 1,777,917 | 52.3% | 1,621,615 | 47.7% |
| APR | 1,291,696 | 52.0% | 1,193,083 | 48.0% |
| MAY | 1,748,679 | 54.3% | 1,470,053 | 45.7% |
| JUN | 1,631,081 | 57.7% | 1,193,566 | 42.3% |
| JUL | 1,068,820 | 53.6% | 924,677 | 46.4% |
| AUG | 1,071,286 | 52.6% | 966,557 | 47.4% |
| TOTAL | 19,114,679 |  | 17,994,565 |  |
| % of Total Jan-Aug | 51.5% |  | 48.5% |  |

# Attachment G

to Defendant's Responses to Plaintiffs' First Set of Interrogatories
and Requests for Admission

Situ v. Leavitt, Civ. A. No. C06-02841 TEH (N.D. Cal.)

Complaints by Pharmacist/Pharmacies made to CMS on behalf of dual eligibles with problems regarding enrollment, disenrollment, the Low Income Subsidy (LIS), and Point of Sale (POS).

| | May | June | July | August | September | Total |
|---|---|---|---|---|---|---|
| Enrollment | 3 | 0 | 1 | 0 | 0 | 4 |
| Disenrollment | 0 | 0 | 0 | 0 | 0 | 0 |
| LIS | 6 | 5 | 2 | 6 | 0 | 19 |
| POS | 2 | 2 | 4 | 2 | 0 | 10 |
| Total | 11 | 7 | 7 | 8 | 0 | 33 |

Complaints data from 5/1/06 to 9/11/06
Extract pulled 9/12/06

Note: The count of complaints per month represents the number of unique complaints received during that month. However, a pharmacy may be represented multiple times either in the same month or across months.