# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LONG TERM CARE PHARMACY ALLIANCE,** *et al.,* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| **MICHAEL O. LEAVITT,** *et al.,* ) | **Case No. 1:07-cv-01115 (ESH)** |
| ) | |
| Defendants. ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

November 16, 2007

John L. Oberdorfer (D.C. Bar No. 145714)
David J. Farber (D.C. Bar No. 415899)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
Counsel for Plaintiffs

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

STATEMENT OF THE CASE ......................................................................................3

STATEMENT OF FACTS .............................................................................................4

ARGUMENT...................................................................................................................7

I.    DEFENDANTS' SOVEREIGN IMMUNITY DEFENSE IS CONTRARY TO
      GOVERNING LAW AND MUST BE REJECTED...............................................7

      A.    The D.C. Circuit's *Trudeau* Decision Forecloses Defendants' Argument That
            Section 704's Judicial Review Provision Is Relevant To or Limits Section
            702's Waiver of Sovereign Immunity. .................................................8

      B.    Even If Defendants' Waiver of Sovereign Immunity Were Limited By the
            "No Adequate Remedy In A Court" Phrase In Section 704, Plaintiffs Do
            Not Have An Adequate Remedy. ......................................................13

II.   PLAINTIFFS HAVE STANDING TO BRING THIS MANDAMUS AND
      DECLARATORY ACTION AGAINST DEFENDANTS. ....................................17

      A.    Plaintiffs LTCPA and ASCP Meet the Requirements for Associational
            Standing........................................................................................18

            (i)     LTCPA and ASCP members have suffered injuries-in-fact. ...........18

            (ii)    Plaintiffs seek to protect interests that are germane to their purposes. ..........19

            (iii)   The individual participation of the members of LTCPA and ASCP is
                    not required....................................................................19

      B.    Plaintiffs Satisfy Prudential Standing Requirements........................................20

III.  PLAINTIFFS HAVE STATED A CLAIM UNDER 5 U.S.C. § 706(1)................23

      A.    Defendants Have A Specific, Non-Discretionary Legal Duty To Provide
            Accurate and Timely Notification of Beneficiary Eligibility Status............................23

IV.   DEFENDANTS'    ATTEMPT    TO    DISMISS    PLAINTIFFS'    FIFTH
      AMENDMENT CLAIM MUST FAIL. ..............................................................26

V.    MANDAMUS RELIEF IS WARRANTED ........................................................28

CONCLUSION................................................................................................30

## TABLE OF AUTHORITIES

### CASES

*Abigail Alliance for Better Access to Developmental Drugs v. Von Eschenbach*, 469 F.3d 129 (D.C. Cir. 2006) .................................................................................................................................17

*ACLU v. NSA*, 493 F.3d 644 (6th Cir. 2007) ...................................................................................24

*Alliance for Democracy v. FEC*, 362 F. Supp. 2d 138 (D.D.C. 2005) .........................................18

*American Chiropractic Association, Inc. v. Leavitt*, 431 F.3d 812 (D.C. Cir. 2005) ............... 20, 22

*\*Amgen Inc. v. Smith*, 357 F.3d 103 (D.C. Cir. 2004) ............................................. 3, 18, 20, 22

*Association of Community Organizations. For Reform Now v. FEMA*, 463 F. Supp. 2d 26 (D.D.C. 2006) .......................................................................................................................................20

*Bell Atlantic Corporation. v. Twombly*, 550 U.S. ---, 127 S. Ct. 1955 (2007) ...............................28

*Board of Regents v. Roth*, 408 U.S. 564 (1972) .............................................................................27

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ...............................................................................13

*Center for Auto Safety, Inc. v. National Highway Traffic Safety Administration*, 342 F. Supp. 2d 1 (D.D.C. 2004) .......................................................................................................................17

*Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ........................................... 9, 29

*Clarke v. Securities Industry Association*, 479 U.S. 388 (1987) ...................................................20

*Coker v. Sullivan*, 902 F.2d 84 (D.C. Cir. 1990) ...........................................................................16

*Council of and for the Blind of Delaware County Valley v. Regan*, 709 F.2d 1521 (D.C. Cir. 1983) .............16

*\*El Rio Santa Cruz Neighborhood Health Center v. Department of Health & Human Services*, 396 F.3d 1265 (D.C. Cir. 2005) ............................................................................................. 13, 17

*Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989) .................................................................13, 14, 15

*FAIC Securities, Inc. v. United States*, 768 F.2d 352 (D.C. Cir. 1985) .........................................21

*Fund for Animals, Inc. v. BLM*, 460 F.3d 12 (D.C. Cir. 2006) ............................................. 23, 24

*\*Furlong v. Shalala*, 238 F.3d 227 (2d Cir. 2001) ........................................................................3, 27, 28

*Furlong v. Shalala*, No. 94-4817, 2000 WL 194843 (S.D.N.Y. Feb. 18, 2000) .........................27

ii

*Furlong v. Shalala*, 156 F.3d 384 (2d Cir. 1998) ....................................................................27

*Godwin v. Secretary of Housing & Urban Development*, 356 F.3d 310 (D.C. Cir. 2004)............................15

*In re Long-Distance Telephone Service Federal Excise Tax Refund Litigation.*, 501 F. Supp. 2d 34 (D.D.C. 2007) ..........................................................................................................12

*Judicial Watch, Inc. v. National Energy Policy Development Group*, 219 F. Supp. 2d 20, 41-42 (D.D.C. 2002), *vacated and remanded on unrelated grounds by Chaney v. Dist. Court for D.C.*, 542 U.S. 367 (2004) ...................................................................................................29

*Levitt v. FBI*, 70 F. Supp. 2d 346 (S.D.N.Y. 1999) ...................................................... 10, 11

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ......................................................17

*National Cottonseed Products Association v. Brock*, 825 F.2d 482 (D.C. Cir. 1987)....................................21

*National Credit Union Administration v. First National Bank*, 522 U.S. 479 (1998)..................................22

*National Wrestling Coaches Association v. Department of Education*, 366 F.3d 930 (D.C. Cir. 2004)... 12, 15

*Pharmaceutical Research & Manufacturers of America v. Thompson*, 259 F. Supp. 2d 39 (D.D.C. 2003)..................................................................................................22

*Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989) ..................................7, 8, 11

*Public Warehousing Company K.S.C. v. Defense Supply Center Philadelphia*, 489 F. Supp. 2d 30 (D.D.C. 2007) ..........................................................................................................12

*Public Citizen v. Kantor*, 864 F. Supp. 208 (D.D.C. 1994)..........................................................29

*Radack v. Department of Justice*, 402 F. Supp. 2d 99 (D.D.C. 2005) .........................................................12

*Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474 (8th Cir. 1988) ..........................................11

*Sea-Land Service, Inc. v. Alaska Railroad*, 659 F.2d 243 (D.C. Cir. 1981) ..................................................7

*Transohio Savings Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992)....12, 15, 16

*\*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006)............................................................2, 7, 9, 10, 11, 12

*Viacom, Inc. v. United States*, 404 F. Supp. 2d 3 (D.D.C. 2005) ..............................................................23

*Washington Legal Foundation v. Alexander*, 984 F.2d 483 (D.C. Cir. 1993)..............................................15

*Women's Equity Action League v. Cavazos*, 906 F.2d 742 (D.C. Cir. 1990)..............................................15

*Wright v. Dominguez*, No. 04-5055, 2004 WL 1636961 (D.C. Cir. July 21, 2004)................................12

*Wright v. Foreign Service Grievance Board*, 503 F. Supp. 2d 163 (D.D.C. 2007)..........................................12

**STATUTES**

5 U.S.C. § 702...................................................................................................................................*passim*

5 U.S.C. § 704...................................................................................................................................*passim*

5 U.S.C. § 706(1) ....................................................................................................................................8

28 U.S.C. § 1361 ...................................................................................................................................28

42 U.S.C. § 1395b-9(a)(3).................................................................................................................. 7, 8

42 U.S.C. § 1395w-114...........................................................................................................................21

42 U.S.C. § 1395w-114(a)(1)) ................................................................................................................8

42 U.S.C. § 1395w-114(c)(1).......................................................................................... 1, 8, 22, 23, 25

**REGULATIONS**

42 C.F.R. § 423.120(a)(5) .....................................................................................................................26

42 C.F.R. § 423.782(a)(2)(ii).................................................................................................................8

42 C.F.R. § 423.800(a) ................................................................................................................8, 23, 25

**OTHER**

H.R. Rep. No. 94-1656 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6121 ............................................ 7, 8

S. Rep. No. 94-996 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6121 .......................................................7

**INTRODUCTION**

This case involves a request for equitable relief against the government agencies and officials responsible for the Medicare Prescription Drug benefit program (Part D). The Part D program's key element is prescription drug coverage. Members of the Plaintiff associations provide these drugs to persons in nursing homes. For most, known as "institutionalized full benefit dual eligibles"—[1]nursing home residents eligible for both Medicare and Medicaid—the government pays the entire cost of the drugs; for others, there is a cost-sharing "co-payment" arrangement.

The pharmacies that provide the drugs to beneficiaries, of course, have to be paid. No one denies that. Nor is there any question that the claims at issue are free from any other defect that would otherwise prevent payment by prescription drug plans (PDPs) to pharmacies. Indeed, for the claims at issue, PDPs paid all but the co-payment amounts.[2] But in order for the government's direct contractors—the PDPs—to fully reimburse the pharmacies for drugs provided, they have to know whether a recipient is eligible for a 100% subsidy for the Part D prescription, or has some cost-sharing co-payment responsibilities. Congress has directed that the Secretary provide accurate subsidy-eligibility notification. 42 U.S.C. § 1395w-114(c)(1)(A). It directs the Secretary to "provide a process whereby…(A) the Secretary provides for a notification of the PDP sponsor…that [a Part D beneficiary] is eligible for a subsidy and the amount of the subsidy…." *Id.* The Secretary, in turn, has delegated that responsibility to Defendant, the Centers for Medicare and Medicaid Services ("CMS").[3]

---

[1] Hereafter, "full benefit dual eligibles" will simply be referred to as "dual eligibles."

[2] The PDPs' payments of the claims minus the co-payment amounts shows the fallacy of the government's speculation that there are other infirmities with the claims that are causing the PDPs not to pay the co-payment amounts.

[3] Given these delegations of responsibility, this Opposition uses the terms "CMS," "the government," and "Defendants" interchangeably.

CMS has chronically failed to perform that duty in a timely manner. In many instances, it has failed to do so at all. These failures cause cost-sharing to be improperly assessed for institutionalized dual eligible beneficiaries. CMS's failure to provide this essential information has caused and will continue to cause the members of the two trade association Plaintiffs to not receive full reimbursement for drugs they have provided under Part D and to suffer injuries of tens of millions of dollars.

Prior efforts by this Court to informally persuade CMS to act to correct its failures did not succeed. Now, however, CMS is before the Court, but it is seeking to dismiss Plaintiffs' complaint and trying to avoid the request that the agency be held accountable and ordered to provide this core information. Such an order would end CMS's systemic failures, and the consequent injuries and inequities sustained by the pharmacies since the Part D program began almost two years ago.

The government's response to Plaintiffs' complaint? Invocation of sovereign immunity and other procedural defenses, all grounded on the proposition that CMS has nothing to do with the reimbursements by PDPs to pharmacies. But it cannot hide from its statutory duty, or the real issue—CMS's failure to provide beneficiary status information.

The jurisdictional and procedural bases for the government's motion are meritless. Its sovereign immunity defense under Rule 12(b)(1) is based on the erroneous proposition—rejected by this Circuit[4]—that the sovereign immunity waiver in section 702 of the Administrative Procedure Act is restricted by provisions in section 704 of the same act. Its challenges to the associations' standing on behalf of their members fail as well. The government's suggestion that its failure to provide beneficiary status information has not injured any pharmacy is nonsense, directly disproved by the declarations of representatives of two member companies. Each attests to the loss of tens of millions of dollars in cost-sharing assessments, an amount that is growing. And the government's

---

[4] *See Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006).

prudential standing challenge ignores governing court decisions that hold that to be within the "zone of interests" is not a high standard. Here, that standard is easily met by the fact that the pharmacies fulfill the purpose of the Part D program by providing the prescription drugs to the nursing home residents. Certainly, under the D.C. Circuit decision both sides believe governs,[5] the pharmacies' central role is "not 'so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"

The government also contends that Plaintiffs' members have adequate remedies under contract law against the PDPs, and, consequently, the complaint should be dismissed. The government tries to ignore that this is an equitable action for a prospective order that CMS provide the eligibility information, not a claim for the amounts owing. Individual contract proceedings by Plaintiffs' members against the PDPs cannot address or remedy the systemic data failure by CMS. That requires a writ of mandamus from this Court.

CMS's failures also have violated the Plaintiffs' members' Fifth Amendment due process rights. As in an analogous Second Circuit case,[6] Plaintiffs' members have a protected property interest in complete reimbursement for prescription drugs that they provide to institutionalized dual eligibles. The government's failure to provide accurate and timely notification of beneficiaries' eligibility status deprives Plaintiffs' members of that interest, and the administrative and financial burdens of fixing the government's failures are not high.

## STATEMENT OF THE CASE

This case challenges CMS's failure to provide subsidy-eligibility information about recipients of prescription drugs, in violation of its statutory and regulatory obligations to do so. Plaintiffs seek prospective equitable relief in the form of a declaratory judgment and writ of mandamus.

---

[5] *Amgen Inc. v. Smith*, 357 F.3d 103 (D.C. Cir. 2004).
[6] *Furlong v. Shalala*, 238 F.3d 227 (2d Cir. 2001).

3

Defendants have moved to dismiss Plaintiffs' complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Subsequent to Defendants' motion, the Court granted in part Plaintiffs' motion for leave to take jurisdictional discovery and ordered that Plaintiffs' response to the motion to dismiss for those issues not covered by the jurisdictional discovery granted be submitted by November 16, 2007.  This Opposition addresses all of the government's motion to dismiss except causation and redressability.  Pursuant to the Court's November 1, 2007 Order, that response is due December 10, 2007, after the close of discovery.  Pursuant to the schedule agreed upon between counsel, Defendants are to reply to written discovery by mid-day on November 20, 2007, and the deposition of their Rule 30(b)(6) witness will be taken on November 27, 2007.

This submission is supported by several declarations addressing jurisdictional issues.  Plaintiffs also are filing an Amended Complaint which: (1) removes allegations that could be construed to request relief in the form of an order requiring reimbursement by PDPs to Plaintiffs' members or to require enforcement action by CMS against PDPs; (2) removes allegations of the Plaintiffs' standing to sue on their own behalf; (3) deletes Count II; and (4) refines the articulation of the Fifth Amendment claim.[7]  (For the Court's convenience, a version showing the changes from the original Complaint is attached hereto as Exhibit 1.)

## STATEMENT OF FACTS

CMS has failed to timely, if ever, accurately identify many Part D beneficiaries as both "institutionalized" "dual eligibles," or both.  This failure has injured the long-term care pharmacies ("LTC pharmacies"), which dispense medications to nursing home residents.

In its Motion to Dismiss, CMS contends that it has nothing to do with this problem, has no accountability for it, and can do nothing about it.  The facts are otherwise.  Part D is a federal

---

[7] Because the Amended Complaint does not include Count II of the original Complaint, Plaintiffs do not respond to Defendants' Rule 12(b)(6) motion to dismiss that count.

government program.  It is operated at three tiers, all extensively directed by CMS.  Am. Compl. ¶ 17.  First, CMS contracts with PDPs, and sets the rules by which those PDPs provide the benefit to Medicare beneficiaries across the country.  *Id.* ¶ 34.  Then, pursuant to CMS rules, PDPs must contract with (among others) LTC pharmacies to actually provide the prescription drugs to nursing home residents.  *Id.* ¶¶ 25, 27.  The costs for Part D drugs are heavily subsidized by CMS.  As a general matter, approximately 75% of the cost of any beneficiary's drugs is paid by CMS to the PDPs.  Declaration of Darrell McKigney ("McKigney Decl.") ¶ 5, attached hereto as Exhibit 2.  However, for institutionalized dual eligible beneficiaries—previously eligible for prescription drug coverage under Medicaid—CMS subsidizes 100% of the costs of Part D prescription drugs.  *Id.*

Contrary to its claims (Defs. Mtn. to Dismiss at 1-3, 22-28), CMS does not have a "hands off" policy, but instead has a clear and direct role in how PDPs implement their Part D contracts.  For one, CMS dictated to PDPs that they must have network pharmacy contracts, including LTC pharmacy contracts.  Further, CMS's Medicare Prescription Drug Benefit Manual specifies the service criteria that PDPs are required, at a minimum, to include in their LTC pharmacy contracts.  These criteria are: (1) comprehensive inventory and inventory capacity; (2) pharmacy operations and prescription orders; (3) special packaging; (4) IV medications; (5) compounding/alternative forms of drug composition; (6) pharmacist on-call service; (7) delivery service; (8) emergency boxes; (9) emergency log books; and (10) miscellaneous reports, forms and prescription ordering supplies.  *See* Exhibit 1 to Declaration of Janice Rutkowski ("Rutkowski Decl."), attached hereto as Exhibit 3.  Further, as part of its ongoing supervisory obligations, CMS examines PDP-LTC pharmacy contracts to determine if each of the service criteria is included.  *Id.*

CMS and the fulfillment of its responsibilities also constitute an integral part of the operation of the Part D program.  Beyond paying for most of the program, CMS has an obligation to provide timely and accurate eligibility data so that the program can operate according to the law. CMS's

failure to do so, however, has caused a breakdown in the reimbursement process for drugs provided to institutionalized dual eligible beneficiaries.

Due to CMS's data failures, when the LTC pharmacies submit their claims to the PDPs, the PDPs routinely reject responsibility for the co-payment amount of the claims because the eligibility data they have received from CMS does not identify the beneficiaries at issue as institutionalized dual eligibles who are exempt from such co-payments. Amorosi Decl. ¶ 10; Rutkowski Decl. ¶ 11. These PDPs have explained to the LTC pharmacies that, until CMS has identified the beneficiary as "institutionalized" and "dual eligible" in the CMS system to which the PDPs have to report, they do not believe they can fully reimburse the cost-sharing amounts to the LTC pharmacies. Amorosi Decl. ¶ 11; Rutkowski Decl. ¶ 12. Yet, CMS has failed, and continues to fail, to provide this necessary accurate eligibility data in a timely manner that facilitates payment by the PDPs to the LTC pharmacies.[8] Am. Compl. ¶¶ 32, 33; Declaration of Donald Amorosi ("Amorosi Decl.") ¶¶ 4, 10, attached hereto as Exhibit 4; Rutkowski Decl. ¶¶ 6, 11. The issue is not simply one of data delay—there remain today millions of dollars of co-payments from 2006 that have not been remedied, and for which the data will never catch up. Amorosi Decl. ¶ 13 (noting approximately $20 million of 2006 claims remain pending as of September 30, 2007).

CMS's failures have caused LTC pharmacies millions of dollars worth of harm. For Omnicare, the harm is approximately $36 million as of September 30, 2007 (Amorosi Decl. ¶ 13); and for PharMerica, $10.5 million as of September 30, 2007 (Rutkowski Decl. ¶ 14). As CMS continues to fail to provide accurate and/or timely eligibility data on institutionalized dual eligible beneficiaries, the financial harm to LTC pharmacies will continue to grow.

---

[8] Because much of the process by which CMS provides eligibility data to the PDPs is opaque, following the jurisdictional discovery Plaintiffs are undertaking, this Statement of Facts will be supplemented to provide additional explanation of the essential eligibility data flow.

## ARGUMENT

I.    **DEFENDANTS' SOVEREIGN IMMUNITY DEFENSE IS CONTRARY TO GOVERNING LAW AND MUST BE REJECTED.**

This is an equitable suit.  It seeks an order requiring a government agency to fulfill its statutory duty to provide information so that the businesses that provide the essential component of the Part D program get paid for the prescription drugs they dispense to beneficiaries.  Despite the fact that CMS is tasked with administering the entire Part D program, *see* 42 U.S.C. § 1395b-9(a)(3)(A), it seeks to avoid accountability for its failures by invoking sovereign immunity.

Section 702 of the APA, however, waives sovereign immunity for all equitable causes of action for specific relief against a federal agency or officer acting in an official capacity.[9]  *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989).  More specifically, "[t]he Judiciary Committees of both Houses, in their reports on the 1976 amendment [adding the second sentence of section 702], identified as the measure's clear purpose 'elimina(tion of) the sovereign immunity defense in *all* equitable actions for specific relief against a Federal agency or officer acting in an official capacity.'"  *Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C. Cir. 1981) (emphasis in original) (quoting S. REP. NO. 94-996, at 8 (1976) and H.R. REP. NO. 94-1656, at 9 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6121, 6129).

This case, with its request for declaratory and mandamus relief against the government, is precisely the kind of case section 702 was added to sustain.  According to the House Report, "the amendment to § 702 was designed to 'strengthen [government] accountability by withdrawing the defense of sovereign immunity in actions seeking relief other than money damages, such as an

---

[9] 5 U.S.C. § 702 provides: "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States…."

injunction, declaratory judgment, or writ of mandamus.'" *Presbyterian Church*, 870 F.2d at 524 (quoting H. Rep. No. 94-1656, at 5 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6121, 6124)).

Plaintiffs' claims fall squarely within section 702's waiver of sovereign immunity for equitable claims against U.S. agencies and officials.  Plaintiffs allege that (1) Defendants' failures to provide complete, updated and accurate eligibility data to PDPs in a timely fashion, and (2) the resulting improper assessment of co-payments for institutionalized dual eligible beneficiaries and deprivation of reimbursement amounts owed to LTC pharmacies violate the law.  The legal provisions applicable to Plaintiffs' claims are: (1) section 706(1) of the Administrative Procedure Act, which provides that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed"; (2) various sections of the Medicare Prescription Drug Improvement and Modernization Act of 2003 ("MMA") and their implementing regulations;[10] and (3) the Fifth Amendment's guarantee of procedural due process. The provisions of the MMS and CMS regulations include 42 U.S.C. § 1395w-114(c)(1)(A)-(B), which provides that the Secretary must:

> provide a process whereby…(A) the Secretary provides for a notification of the PDP sponsor…that [a Part D beneficiary] is eligible for a subsidy and the amount of the subsidy…[and] (B) the sponsor or organization involved reduces the premiums or cost-sharing otherwise imposed by the amount of the applicable subsidy…,"

and 42 C.F.R. § 423.800(a), which  provides:

> *Notification of eligibility for low-income subsidy.*  CMS notifies the Part D sponsor offering the Part D plan, in which a subsidy eligible individual is enrolled, of the individual's eligibility for a subsidy under this section and the amount of the subsidy;

**A.    The D.C. Circuit's *Trudeau* Decision Forecloses Defendants' Argument That Section 704's Judicial Review Provision Is Relevant To or Limits Section 702's Waiver of Sovereign Immunity.**

Defendants recognize the force of section 702, but try to avoid waiver by claiming that the Court should graft on to it a requirement that for sovereign immunity to be waived, Plaintiffs must

---

[10] 42 U.S.C. § 1395b-9(a)(3)(A), 42 U.S.C. § 1395w-114(a)(1)(D)(i), 42 U.S.C. § 1395w-114(c)(1), 42 C.F.R. § 423.782(a)(2)(ii), and 42 C.F.R. § 423.800(a).

demonstrate the unavailability of alternative adequate remedies (a phrase found in section 704 of the APA) to the relief sought in this lawsuit. Defendants incorrectly claim that Plaintiffs' members have an adequate remedy for recovery of wrongfully withheld co-payment reimbursements in contract actions against the PDPs, and therefore, section 702's waiver of sovereign immunity does not apply here.

Defendants' position is contrary to prevailing law. The D.C. Circuit rejected just such an argument last year in *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006), ruling that the requirements of section 704 are separate and distinct from those for the waiver of sovereign immunity under section 702 and that the elements of an APA cause of action do not need to be satisfied for section 702's waiver of sovereign immunity to apply. In *Trudeau*, the Federal Trade Commission tried to argue that in addition to being limited to waiver for actions seeking relief other than money damages, section 702's waiver is limited in two more respects: (1) it applies only to actions arising under the APA; and (2) because review under APA section 704 is limited to review of "final agency action," section 702's waiver of sovereign immunity is restricted to conduct that qualifies as "final agency action." *Id.* at 186.

*Trudeau* carefully analyzed the issue and rejected both arguments. It first held that section 702's waiver of sovereign immunity permitted the plaintiff's non-statutory and Constitutional causes of action, as well as his APA claim. *Id.* (quoting *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996)). Second, it ruled that section 702's waiver of sovereign immunity is not restricted by section 704's requirement that there be "final agency action" before judicial review could be obtained.[11] The court based the second holding on two grounds: (1) because the language of section

---

[11] In the same case, the D.C. Circuit held that because the APA does not confer jurisdiction, section 704's requirement of final agency action is not jurisdictional. *Trudeau*, 456 F.3d at 184. The court also characterized the "judicial review provisions" of the APA, which include section 704, as providing "a limited cause of action," *i.e.*, part of the equation in determining the validity of an APA claim. *Id.* at 185. It held, therefore, that the district court had erred in granting the FTC's 12(b)(1) motion to dismiss based on its conclusion that

702 did not use section 704's language of "final agency action," that requirement does not restrict

section 702's waiver of sovereign immunity, and (2) the fact that section 702's waiver applies to

**non-APA** cases against the government, as well as APA cases, precludes requiring satisfaction of the

elements of an APA cause of action in order to establish jurisdiction:

> [H]olding that the waiver is not limited to APA cases – and hence that it applies regardless of whether the elements of an APA cause of action are satisfied – removes the linchpin of the FTC's argument [that the "final agency" action language of section 704 restricts section 702's waiver of sovereign immunity]. Moreover, the language of the waiver sentence again provides no support for the FTC's contention. While the sentence [in section 702] does refer to a claim against an "agency" and hence waives immunity only when the defendant falls within that category, it does not use either the term "final agency action" or the term "agency action."

*Id.* at 187.

The same analysis compels rejection of Defendants' suggestion (at 17) that section 704's

provision of judicial review of "[a]gency action made reviewable by statute and final agency for

which there is no other adequate remedy in a court" limits section 702's waiver of sovereign

immunity for Plaintiffs' APA and Due Process claims. Just as it does not include the terms "final

agency action" or "agency action," the second sentence of section 702 also does not use the term

"no other adequate remedy in a court." If the "final agency action" language of section 704 cannot

limit section 702's waiver of sovereign immunity, neither can the "no other adequate remedy in a

court" phrase in the same sentence.

*Levitt v. FBI*, 70 F. Supp. 2d 346, 349-50 (S.D.N.Y. 1999), also squarely contradicts

Defendants' attempt to read section 704's "no other adequate remedy" language into section 702.

There, the Southern District of New York held that the adequacy of the plaintiff's available remedy

---

it lacked subject matter jurisdiction on the grounds that the FTC press release did not constitute final agency action under section 704. *See id.* at 183, 187. This portion of the Court's decision provides additional support for the principle that section 704's provision of judicial review only for "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court" is not meant to limit subject matter jurisdiction in any way, including the jurisdictional question of the waiver of sovereign immunity provided by section 702.

as evaluated under section 704 "is relevant to whether he may prevail in this action, **but not to the Court's power to entertain it**." 70 F. Supp. 2d at 349 (emphasis added). In reaching its holding, the court rejected *dicta* from a prior district court decision, stating:

> [t]he provision of Section 704 [regarding adequate remedy in another court] to which the <u>Infante v. IDEA</u>, 938 F. Supp. 1149 (E.D.N.Y. 1996),] court referred long antedates the limited waiver of sovereign immunity contained in Section 702, as amended in 1976. There is no suggestion in the latter statute that Congress intended to confine the waiver of immunity by reference to Section 704. To the contrary, Section 702 explicitly waived sovereign immunity while at the same time preserving 'other limitations on judicial review [and] the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground.' In other words, Congress waived the government's immunity from suit, although it preserved whatever defense or objection to relief the government may have by virtue of Section 704.

*Id.*

　　　　Decisions elsewhere have reached the same conclusion: section 702's waiver neither requires the satisfaction of any other APA conditions before it is applicable, nor does it refer to the elements required for judicial review of an agency action under other provisions of the APA. In *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988), the Eighth Circuit ruled that "the waiver of sovereign immunity contained in section 702 is not dependent on application of the procedures and review standards of the APA. It is dependent on the suit against the government being one for non-monetary relief." Likewise, in *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989), the Ninth Circuit held that the defendant's "attempt to restrict the waiver of sovereign immunity to actions challenging 'agency action'…offends the plain meaning of [section 702]."

　　　　Defendants fail to mention or acknowledge *Trudeau* in their sovereign immunity argument.[12] Rather, to support their argument that section 702's waiver is restricted to occasions when a plaintiff

---

[12] Defendants cited *Trudeau* (at 37) only in that portion of their motion that seeks to dismiss Count II of the original Complaint, which Plaintiffs no longer are pursuing. They failed, however, to mention *Trudeau's* precedential effect on their sovereign immunity argument.

has no adequate remedy elsewhere, Defendants cite only one case: *Transohio Savings Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 607 (D.C. Cir. 1992).   In particular, Defendants cite *Transohio's* statement that the APA excludes from its waiver of sovereign immunity: (1) claims for money damages; (2) claims for which an adequate remedy is available elsewhere; and (3) claims seeking relief expressly or impliedly forbidden by another statute.

Transohio, however, was decided ten years prior to *Trudeau*, and this part of the opinion has been superseded by *Trudeau's* careful analysis of the relationship between sections 702 and 704. *Transohio* appears to have assumed, without analysis or citing any authority, that section 704's provision of judicial review for agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court implicitly limits section 702.[13]   Moreover, *Transohio* held contrary to the result urged by Defendants here.   It held there was no waiver of sovereign immunity, the no adequate remedy language was satisfied and the government had in fact waived sovereign immunity under section 702.   967 F.2d at 608, 612.   *See infra* Section I.B.

*Trudeau* controls here.   That decision is clear: any attempt to insert into section 702's waiver of sovereign immunity the judicial review elements of section 704 must be rejected.

---

[13] Some decisions by and within the D.C. Circuit have cited *Transohio's* recitation of the limitations on section 702's waiver of immunity.  *See, e.g.*, *Wright v. Dominguez*, No. 04-5055, 2004 WL 1636961, at *1 (D.C. Cir. July 21, 2004); *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 947 (D.C. Cir. 2004); *In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 501 F. Supp. 2d 34, 50 (D.D.C. 2007); *Wright v. Foreign Serv. Griev. Bd.*, 503 F. Supp. 2d 163, 180 (D.D.C. 2007); *Public Warehousing Co. K.S.C. v. Def. Supply Ctr. Phila.*, 489 F. Supp. 2d 30, 36 (D.D.C. 2007); *Radack v. Dep't of Justice*, 402 F. Supp. 2d 99, 104 (D.D.C. 2005).  All of the D.C. Circuit Court of Appeals' decisions that cite *Transohio* for that proposition, however, precede *Trudeau*.  Moreover, unlike *Trudeau*, none of the circuit or district court cases address the specific question of whether section 704 can be imported into section 702 to limit the waiver of sovereign immunity.  Given that the D.C. Circuit cases citing *Transohio* precede the *Trudeau* decision and that the district court cases citing *Transohio* neither squarely face the issue, nor cite *Trudeau* on section 702, the Court should disregard these cases in favor of *Trudeau's* precedential holdings that section 704 is non-jurisdictional and that section 702's waiver for APA and non-APA cases cannot be limited by the language in section 704.

**B.    Even If Defendants' Waiver of Sovereign Immunity Were Limited By the "No Adequate Remedy In A Court" Phrase In Section 704, Plaintiffs Do Not Have An Adequate Remedy.**

For argument's sake, even if section 704's requirement of "no adequate remedy" were to be imported into section 702 to limit its waiver of sovereign immunity (which *Trudeau* precludes), Plaintiffs would not have an adequate remedy.  Section 704 is to be read narrowly so as not "to defeat the central purpose of providing a broad spectrum of judicial review of agency action."  *Bowen v. Massachusetts*, 487 U.S. 879, 903-04 (1988).  While section 704's purpose is to codify the exhaustion requirement, it was also designed to ensure that courts acting under authority of section 702 did not duplicate or preempt "special and adequate review procedures" for agency action in other legislation. *See El Rio Santa Cruz Neighborhood Health Center v. Dep't of HHS*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) (citing *Bowen*, 487 U.S. at 903-04); *Esch v. Yeutter*, 876 F.2d 976, 982 (D.C. Cir. 1989) (citing *Bowen*, 487 U.S. at 903).  Accordingly, the question posed by section 704 is, in reality, a practical one: Would the alternative remedy alleged to exist by the defendant agencies afford the same relief to plaintiffs as suit under the APA?  In this case, the answer is a resounding "no."

Defendants contend that pursuant to the LTC-PDP contracts, Plaintiffs can file separate court actions against PDP sponsors to collect cost-sharing amounts; therefore, they say, Plaintiffs' injuries[14] can be adequately remedied in those individual suits.[15]  Defendants miss the point.  The

---

[14] The government misconstrues the scope of Plaintiffs' injuries to be the cost-sharing amounts alone.  See Section II.A.(i) *infra*, for a discussion of the nature and scope of injuries-in-fact suffered by Plaintiffs' members.

[15] Defendants claim (at 27) that any harm Plaintiffs suffer as a result of CMS's failure to provide timely eligibility data to PDP sponsors is Plaintiffs' fault because they did not structure their contracts with the PDP sponsors to include interim payments.  Defendants are off-base with this argument.  First, the interim payments would not correct CMS's failures.  Second, Defendants ignore the reality created by CMS's delays.  PDP sponsors' premature payment of cost-sharing amounts to LTC Pharmacies could ultimately result in the lack of credit to PDP sponsors for such cost-sharing amounts by CMS if CMS's data does not correctly characterize the status of the institutionalized dual eligibles.  It is not credible to suggest that PDP sponsors would agree to an arrangement which could result in the loss of money to them due to CMS's inaccurate and untimely system.  As a result, LTC Pharmacies are left with millions of dollars of improperly assessed cost-sharing amounts.

13

prospective injunctive relief sought against the government in this lawsuit differs fundamentally from the contract remedies that may be available in individual actions against PDPs. Here, Plaintiffs seek to correct CMS's systemic data failures, which are the root cause of the "problems with cost sharing [that] have disproportionately impacted beneficiaries who are residents of nursing homes, and for whom LTC pharmacies are holding receivable balances rather than charging beneficiaries incorrect cost sharing amounts." Exhibit 5 hereto, Dec. 22, 2006 CMS Memorandum from Cynthia Tudor, Director, Medicare Drug Benefit Group, to All Part D Sponsors Re: Reconciling Incorrect Cost Sharing Paid by LTC Pharmacies. Plaintiffs do not seek recovery of wrongfully-assessed co-payment amounts from PDPs or Defendants.

The equitable relief Plaintiffs seek against the government here cannot be obtained through individual contract proceedings against PDPs for several reasons. Those proceedings cannot address "agency action made reviewable by statute and final agency action." The initial improper assessment of co-payment amounts by PDPs will not be remedied in any individual suit against a PDP—only this suit, which addresses the source of those improper assessments—Defendants' systemic failures—will remedy that injury. In addition, separate damage actions against PDPs (which in many instances are not available as a business matter, *see* Amorosi Decl. ¶ 15) do not address CMS's failures to provide status information, the recurring nature of the failures, and the consequent administrative costs and burdens on LTC pharmacies.

Section 704's "no other adequate remedy in a court" requirement also is satisfied because Plaintiffs' claims do not duplicate or preempt "special and adequate review procedures" in other federal legislation. *See El Rio Santa Cruz*, 396 F.3d at 1271-75 (holding that APA cause of action not precluded). Defendants cite no legislation or procedure that provides for review of their notification failures. Indeed, they agree (at 16) that "…CMS provides no administrative grievance procedures

14

through which plaintiffs or their member pharmacies might bring claims of the type plaintiffs allege."

This case falls well outside the "distinct line of cases" for which the D.C. Circuit has held "APA review is unavailable" because "a private cause of action [exists] against a third party otherwise subject to agency regulation." *El Rio Santa Cruz*, 96 F.3d at 1270-71. These cases all share certain characteristics not present here, especially that each "alternative and adequate" private cause of action be derived implicitly or expressly from federal law.[16]

Defendants cite several cases from the D.C. Circuit to try to buttress their faulty argument regarding alternate remedies. As mentioned, Defendants' principal case—*Transohio*—actually concludes the opposite of what they ask the Court to find here. In *Transohio*, the court faced, *inter alia*, the thorny intersection between the Tucker Act and the APA. Its analysis of the phrase "adequate remedy" focused on the differences between the relief that the plaintiff could obtain against the government in the Claims Court under the Tucker Act versus the relief sought in district court under the APA, and, consequently, under which statutory scheme the plaintiff's claim could proceed.

Specifically, the government argued that the plaintiff had "an adequate remedy in the Claims Court under the Tucker Act and that, therefore, the APA does not authorize judicial review of the thrift's claims in district court." *Id.* at 608. The D.C. Circuit, however, concluded that because the Claims Court could not grant the requested equitable relief—specific performance or rescission of the forbearance agreement—the plaintiff did not have an "adequate remedy" under the Tucker Act

---

[16] *See Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930 (D.C. Cir. 2004) (finding as an adequate remedy an implied cause of action under Title IX against universities that discriminate); *Godwin v. Secretary of HUD*, 356 F.3d 310 (D.C. Cir. 2004) (finding as an adequate remedy an express private cause of action under the Fair Housing Act against discriminatory landlord); *Wash. Legal Found. v. Alexander*, 984 F.2d 483 (D.C. Cir. 1993) (finding as an adequate remedy implied cause of action under Title VI, specifically against the discriminating entity); *Women's Equity Action League v. Cavazos*, 906 F.2d 742 (D.C. Cir. 1990) (same).

and therefore, that the so-called "adequate remedy" limitation did not interfere with the district court's jurisdiction over the plaintiff's claims. *Id.*

The instant case does not involve a claim for money damages against the government; nor does it implicate the intersection between the APA and the Tucker Act (or any other federal statutory scheme, for that matter). *Transohio* actually supports Plaintiffs' position, rather than Defendants' argument because the relief Plaintiffs seek here is unavailable elsewhere.

*Council of and for the Blind of Delaware County Valley v. Regan*, 709 F.2d 1521 (D.C. Cir. 1983), and *Coker v. Sullivan*, 902 F.2d 84 (D.C. Cir. 1990), do not support Defendants' argument either. *Council of and for the Blind* involved an APA action against the Secretary of the Treasury alleging failure to adequately respond to administrative complaints in violation of the Revenue Sharing Act ("RSA"). 709 F.2d at 1524-25. The court held that the plaintiffs failed to state a cause of action under the APA (a merits question as opposed to a jurisdictional issue) because the enforcement scheme of the RSA provided judicial review that adequately remedied the discrimination alleged. *Id.* at 1531-33. In *Coker v. Sullivan*, the plaintiffs filed a complaint against the federal government to require it to monitor and enforce state compliance with state Emergency Assistance plans, a component of the Aid to Families with Dependent Children program. Relying on *Council of and for the Blind*, the court held that the APA claim was barred because alternative judicial review and remedies were available to the plaintiffs—namely fair hearing procedures before a state administrative agency—and through direct suits against the states that violated the law. *Coker*, 902 F.2d 88-90.

In contrast, as Defendants agree (at 16), the MMA does not contain an enforcement scheme for LTC pharmacies to pursue when CMS fails to comply with its statutory and regulatory duties of notification to PDPs of beneficiaries' eligibility status. Unlike the statutory scheme at issue in *Council of and for the Blind* and *Coker*, neither the MMA nor any other federal or state legislation provides for

alternative judicial review of the actions complained of in this case.  Nor could a court (or arbitrator) presiding over an individual suit between an LTC pharmacy and a PDP order the equitable relief sought here against the government.  This inability of other tribunals to grant prospective equitable relief against the government renders any contract litigation not the kind of "special and adequate review procedure" of agency action that would oust the district court of its normal jurisdiction under the APA.  *See El Rio Santa Cruz*, 396 F.3d at 1274-75.

## II.    PLAINTIFFS HAVE STANDING TO BRING THIS MANDAMUS AND DECLARATORY ACTION AGAINST DEFENDANTS.

Defendants also dispute Plaintiffs' standing to maintain their claims.  But Plaintiffs have associational standing to bring this suit on behalf of their members[17] and satisfy the prudential concerns that attend the Court's exercise of jurisdiction.

Standing requirements derive from two sources: the limits Article III of the United States Constitution places on federal court jurisdiction and prudential limitations on the exercise of such jurisdiction.  *Ctr. For Auto Safety, Inc. v. Nat'l Highway Traffic Safety Admin.*, 342 F. Supp. 2d 1, 8 (D.D.C. 2004).  For associational standing under Article III, Plaintiffs must demonstrate that: (a) their members would otherwise have standing to sue in their own right (i.e., they meet the requirements of Article III);[18] (b) the interests each seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  *Abigail Alliance for Better Access to Dev. Drugs v. Von Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006).  To satisfy the prudential considerations of standing,

---

[17] In their Amended Complaint, Plaintiffs have withdrawn their allegations that they have standing to pursue this action on their own behalf.  Accordingly, Plaintiffs will address only their standing to pursue this action in their representational capacities on behalf of their members.

[18] Article III requires a showing of: (1) a concrete and particularized injury that is actual or imminent rather than conjectural or hypothetical; (2) a causal connection between that alleged injury and conduct that is fairly traceable to the defendant; and (3) likelihood that the injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Plaintiffs must demonstrate that their injuries fall within the "zone of interests" to be protected by the Medicare Act. *Amgen Inc. v. Smith*, 357 F.3d 103, 108 (D.C. Cir. 2004).

Because Defendants argue (at 19-33) that this action should be dismissed under Rule 12(b)(1) for lack of standing, the Court must accept as true all material allegations of the complaint and must construe it in favor of Plaintiffs. *Alliance for Democracy v. FEC*, 362 F. Supp. 2d 138, 142-43 (D.D.C. 2005).

### A.    Plaintiffs LTCPA and ASCP Meet the Requirements for Associational Standing.

Plaintiffs Long Term Care Pharmacy Alliance (LTCPA) and American Society of Consultant Pharmacists (ASCP) meet each of the three requirements for associational standing—their members have standing to sue in their own right, the interests Plaintiffs seek to protect in this suit are germane to their purposes, and this suit does not require the participation of individual members.  This Opposition addresses the injuries-in-fact that LTCPA and ASCP members have suffered.  Pursuant to the Court's Order, Plaintiffs' post-jurisdictional discovery opposition (due December 10, 2007) will address how the members meet Article III's causation and redressability requirements.

### (i)    LTCPA and ASCP members have suffered injuries-in-fact.

Plaintiff LTCPA is an organization that represents the interests of the major national LTC pharmacies that serve three out of every five residents of long-term care facilities nationwide. McKigney Decl. ¶ 8.  LTCPA's members all provide specialty pharmacy services to nursing home facility residents.  McKigney Decl. ¶ 8.  Plaintiff ASCP is a professional society of pharmacists who work in and own LTC pharmacies that serve nursing homes and assisted-living facility residents across the United States.  Declaration of Tom Clark ("Clark Decl.") ¶ 4, attached hereto as Exhibit 6.  Omnicare and PharMerica are members of both organizations.

LTCPA and ASCP members have suffered concrete and particularized injuries.  Not only have they been denied reimbursements for cost-sharing that they are unquestionably owed (having

not collected such cost-sharing from the institutionalized dual eligible beneficiaries they serve), but they have also suffered: (1) improper assessment of cost-sharing in the first place and the hurdles to reimbursement those assessments create; (2) the ever-increasing financial burden of carrying as receivables such cost-sharing on behalf of institutionalized dual eligible beneficiaries; and (3) the infliction of such injuries on a continuous (daily, even) basis.  As the attached declarations of Ms. Rutkowski and Messrs. Amorosi, McKigney and Clark show, these injuries are concrete, particularized, and ever-increasing.  Accordingly, Defendants' challenge to Plaintiffs' members' injuries can be readily rejected.

### (ii)    Plaintiffs seek to protect interests that are germane to their purposes.

Plaintiffs also satisfy the second requirement for associational standing.  Plaintiff LTCPA's core mission is to protect and promote the profession and practice of long-term care pharmacy by advocating on issues that are critical to the pharmacies that meet the needs of more than 60% of the nation's long-term care residents.  McKigney Decl. ¶ 4.  Plaintiff ASCP's core mission is to protect and promote the professional practice of specialized long-term care pharmacy, including providing leadership, education, advocacy, and resources to advance the practice of consultant and senior care pharmacy.  *See* http://www.ascp.com/about/.  The interests Plaintiffs seek to vindicate here— fulfillment of CMS's duty to timely and accurately notify PDPs as to institutionalized eligible beneficiaries' status and thereby ensure appropriate cost-sharing assessments for the institutionalized dual eligibles' LTC pharmacies—are critical interests for the LTC pharmacy industry.  When these interests are not satisfied—as is the case now with CMS's systemic data failures—the profession and practice of long-term care pharmacy are hindered.

### (iii)    The individual participation of the members of LTCPA and ASCP is not required.

Contrary to the government's argument, the individual participation of LTCPA and ASCP members is not required for the Court to grant the requested relief.  As discussed in Section I, *supra*,

Plaintiffs seek only prospective equitable relief in the form of declaratory judgment and a writ of mandamus requiring Defendants to timely provide accurate eligibility data to PDPs. They do not seek either money damages or any other type of relief that would require the Court to make any determination of the reimbursement amounts owed to Plaintiffs' members. *See Ass'n of Cmty. Orgs. For Reform Now v. FEMA*, 463 F. Supp. 2d 26, 32-33 (D.D.C. 2006) (If the plaintiff organization is seeking declaratory and/or injunctive relief, such relief is not the type that requires an individualized determination or the individual participation of members). These injuries can be redressed on a group-wide basis through an end to Defendants' systemic data failures.

**B.    Plaintiffs Satisfy Prudential Standing Requirements.**

Defendants also have challenged the prudential standing of Plaintiffs' members. The prudential standing test is not intended to be "especially demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). The question "is whether Congress meant to exclude this class of plaintiffs from those who may sue to enforce their view of the Act, right or wrong." *Am. Chiropractic Ass'n v. Leavitt*, 431 F.3d 812, 815 (D.C. Cir. 2005). As *Amgen Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004), (which Defendants rely on) recognizes, a plaintiff fails to be within the "zone of interests" only if its interests are "'so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" 357 F.3d at 108 (quoting *Clarke*, 479 U.S. at 399). "Congruence of interest, rather than identity of interests is the benchmark...." *Amgen*, 357 F.3d at 109. Because the injuries suffered by Plaintiffs' members fall well within the "zone of interests" to be protected by the Medicare Act, Plaintiffs satisfy the prudential considerations for standing.

The relationship between the Plaintiffs' members and the institutionalized dual eligible beneficiaries to whom they dispense prescription drugs under Part D constitutes a vendor-vendee relationship—a relationship that *ipso facto* provides LTCPA and ASCP members prudential standing

to pursue their claims.  *See Nat'l Cottonseed Prods. Ass'n v. Brock*, 825 F.2d 482, 492 (D.C. Cir. 1987) (holding the plaintiff had prudential standing "'on the basis of the vendor-vendee relationship alone'") (quoting *FAIC Secur., Inc. v. United States*, 768 F.2d 352, 361 (D.C. Cir. 1985)).  It is indisputable that institutionalized dual eligible beneficiaries would have prudential standing to challenge CMS's failure to adequately implement the Part D program that is intended to help them.  As vendor of Part D prescription drugs to institutionalized dual eligibles, Plaintiffs' members have independent prudential standing to challenge the same failures.  *See id.* at 490-92.

The members' interests are directly aligned with Congress's purpose, as expressed in 42 U.S.C. § 1395w-114, of ensuring that institutionalized dual eligible beneficiaries are not assessed any cost-sharing for prescription drugs provided under the Part D.  Under that law, the Secretary is to provide a process for notifying PDPs of a beneficiaries' subsidy-eligibility status so that such PDPs timely and accurately reduce the cost-sharing for such beneficiaries.  Indeed, CMS has explicitly recognized this congruence.  In contradiction to its suggestion (at 2) that beneficiaries are unaffected by CMS's notification failures, CMS's December 22, 2006 guidance concedes that "problems with cost sharing **have disproportionately impacted beneficiaries who are residents of nursing homes**, and for whom **long-term care (LTC) pharmacies** are holding receivable balances rather than charging beneficiaries incorrect cost sharing amounts." (emphasis added).

Defendants concede (at 31-32) a multitude of circumstances in which the providers of Medicare services or medications are within the zone of interests of Medicare provisions and acknowledge that the zone of interest requirement is satisfied "where the interests asserted by providers will, if vindicated, have a tangible positive impact on the interests of Medicare beneficiaries…."  Plaintiffs' members provide prescription drugs to institutionalized dual eligible beneficiaries.  That is a key component of this program.  The interests of Plaintiffs' members in ensuring timely and accurate notification of a beneficiaries' subsidy-eligible status and in ensuring

21

that cost-sharing is not improperly assessed for institutionalized dual eligibles have a tangible positive impact on the interests of such beneficiaries.

Congress could not have intended to exclude LTC pharmacies from bringing suit to address Defendants' failures in providing accurate and timely subsidy-eligibility data. *See Amgen*, 357 F.3d at 108. While the LTC pharmacies and pharmacists are not themselves named in § 1395w-114(c)(1), they are indisputably part of the process pursuant to which beneficiaries' eligibility status is ascertained, cost-sharing amounts assessed, and prescription drugs provided to institutionalized dual eligible beneficiaries. Therefore, they "as a practical matter [are] regulated by that action." *Pharm. Research & Mfrs. of Am. v. Thompson*, 259 F. Supp. 2d 39, 56-57 (D.D.C. 2003) (finding drug manufacturers had prudential standing to challenge the government's approval of a state supplemental rebate scheme on the grounds that the drug manufacturers were affected by the allegedly improperly approved agreements), *affirmed by* 362 F.2d 817 (D.C. Cir. 2004).

Finally, Defendants wrongly argue (at 31) that Plaintiffs' members' profits and commercial motives are relevant to the prudential standing analysis. The D.C. Circuit, however, has rejected such a suggestion. The *Amgen* decision that Defendants rely on recognizes that a plaintiff's objectives in a suit "need not be 'eleemosynary in nature'" and "whether they are is 'beside the point'" for the purposes of assessing prudential standing. 357 F.3d at 108 (quoting *Nat'l Cred. Union Admin. v. First Nat'l Bank*, 522 U.S. 479, 478 (1998)). Even if the interests of an association's members in bringing suit were purely commercial, they could still meet the zone of interest test. *See Am. Chiropractic Ass'n*, 431 F.3d at 815-16 (holding prudential standing existed and that it was "of no moment" that the association plaintiff was seeking to promote the financial interests of its members).

22

### III.    PLAINTIFFS HAVE STATED A CLAIM UNDER 5 U.S.C. § 706(1)

Defendants move under Rule 12(b)(6) to dismiss Plaintiffs' APA section 706(1) claim. Under Fed. R. Civ. P. 12(b)(6), the allegations in Plaintiffs' complaint are to be taken as true and all reasonable factual inferences construed in Plaintiffs' favor. *Viacom, Inc. v. United States*, 404 F. Supp. 2d 3, 6 (D.D.C. 2005).  In support of their argument, Defendants make two untenable arguments: (1) that the statutory and regulatory mandate for CMS to provide a process for timely and accurate notification to PDPs of subsidy-eligibility does not qualify as "agency action" for the purposes of section 706(1); and (2) that such notification is not legally required.  Both are wrong.

### A.    Defendants Have A Specific, Non-Discretionary Legal Duty To Provide Accurate and Timely Notification of Beneficiary Eligibility Status.

Defendants' attempts to minimize their obligations with respect to the provision of eligibility status notification and correct cost-sharing assessments—to the point where they assert that they have none—are astonishing.  Defendants claim (at 35) that it is a "mystery" as to what action Plaintiffs seek to compel in this action.  But, pursuant to the MMA and CMS implementing regulations, Defendants have a discrete, nondiscretionary duty to "provide a process whereby…(A) the Secretary provides for a notification of the PDP sponsor…that [a Part D beneficiary] is eligible for a subsidy and the amount of the subsidy…[and] (B) the sponsor or organization involved reduces the premiums or cost-sharing otherwise imposed by the amount of the applicable subsidy…."  Am. Compl. ¶ 29, citing 42 U.S.C. 1395w-114(c)(1)(A)-(B).  Additionally, 42 C.F.R. § 423.800(a) imposes a duty upon CMS to notify PDPs of beneficiaries' eligibility and the amount of subsidy applicable to such beneficiaries.  Am. Compl. ¶ 30.[19]  CMS's failure to timely provide accurate eligibility data to PDPs is exactly what Plaintiffs seek to compel.

---

[19] There is no merit to Defendants' argument (at 35-36) that CMS's eligibility notification is "part of the 'wide variety of activities that comprise the common business of managing government programs' that agencies spend much of their time engaged in."  Their reliance on *Fund for Animals, Inc. v. BLM*, 460 F.3d 12, 19 (D.C.

23

Defendants also misconstrue the statute and the regulations, arguing (at 35) that CMS's notification duty is "simply a means by which CMS seeks to facilitate PDP sponsors' compliance with their contractual obligation not to collect co-payments from beneficiaries who are not supposed to pay them, and to provide reimbursements to beneficiaries when they discovery that co-payments have been collected in error." But neither the statute nor the regulations refer to PDP "contractual obligations." Rather, the unquestionable purpose of these mandates is to ensure that any cost-sharing for subsidy-eligible beneficiaries is appropriately reduced. Defendants' minimization of the importance of the notification process (which is explicitly mandated by the statute) also mischaracterizes the actual process by which prescription drugs are dispensed and co-payments collected: LTC pharmacies are the entities that collect co-payments (when appropriate) from beneficiaries in the first instance, at the time drugs are dispensed, not PDPs. Defendants' failures to provide timely and accurate data prevents PDP sponsors from properly reducing cost-sharing amounts for subsidy-eligible beneficiaries at the reimbursement of claims stages. The result of these failures is that Plaintiffs' members are either not fully paid and carry a cost-sharing burden for institutionalized dual eligible beneficiaries that should never have been assessed in the first place (as is the case today), or the beneficiary will be assessed a co-pay that is not due.

Defendants further argue that the duties that Plaintiffs seek to compel are not legally required and that there are no statutory deadlines for completing them. They are wrong. The

---

Cir. 2006) and *ACLU v. NSA*, 493 F.3d 644 (6th Cir. 2007), is erroneous. *Fund for Animals* held that the Bureau of Land Management's budget request, which included an explanation of the need for additional funding and how it <u>proposed</u> to expend those funds, did not constitute an instance in which the agency could be deemed to have acted within the APA's definition of "agency action." 460 F.3d at 20. The D.C. Circuit found it particularly compelling that the strategy outlined in the budget request was aspirational in nature, rather than a specific step implementing such a proposal. In *ACLU*, the Sixth Circuit distinguished the NSA's general surveillance activities from an agency activity that was formally enacted pursuant to the strictures of the APA. 493 F.3d 644. In contrast to both cases, CMS's notification duties here are statutorily- and regulatorily-required actions to implement Congress's directive that subsidy-eligible beneficiaries not be improperly assessed cost-sharing for prescription drugs dispensed under the Part D program. The action required here is fundamentally different than CMS's "common business of managing government programs."

program went into effect almost two years ago, and still the agency fails to provide this core information, which obviously is to be provided on a timely basis in order for the program to work. Both the MMA and the implementing regulations place a clear, legal requirement on the Secretary to provide timely eligibility data and subsidy amounts to PDP sponsors. *See* 42 U.S.C. § 1395w-114(c)(1)(A); 42 C.F.R. § 423.800(a). The purpose of both the statute and the regulations is to ensure that PDPs reduce the amount of cost-sharing assessed for subsidy-eligible beneficiaries and to enable PDP sponsors' reimbursements to cost-sharing entities. The ministerial act that CMS must perform is the provision of eligibility data to PDPs.

Finally, Defendants argue (at 36) that Congress "did not expect notifications always to be made with perfect timing and accuracy." That argument distorts and contradicts the clear language of the statute,[20] which requires that CMS provide a notification process whereby "the sponsor or organization involved reduces the premiums or cost-sharing otherwise imposed by the amount of the applicable subsidy…." 42 U.S.C. § 1395w-114(c)(1)(B). This does not detract from the fact that appropriate reductions cannot be made if notification of a beneficiary's eligibility status is unreasonably delayed or, as is currently the situation for many beneficiaries, never comes at all. (Even today, at the close of 2007, there remains a significant problem with CMS eligibility data for 2006 and many outstanding 2006 claims have yet to be resolved because of CMS's data problems, despite the fact that CMS has purported to reconcile all of the PDP-CMS accounts for 2006.) Because the notifications have not been made in a timely and accurate fashion and this chronic failure by CMS is continuing, Congress' directive has been unreasonably delayed.[21]

---

[20] The argument also misses the point, in that "perfect" timing and accuracy is far from the issue. Today, there are literally tens of thousands of 2006 claims where CMS has failed to provide accurate data at all. Amorosi Decl. ¶ 13 (Approximately $20 million of the unreimbursed amounts relates to 2006.).

[21] Defendants' focus (at 3, 25) on the interim payments CMS established for PDPs based on estimates is a red herring. PDPs (including UnitedHealth Group) assert that they must assess cost-sharing for beneficiaries where CMS's data does not reflect their institutionalized dual eligible status because such PDPs fear, that at

## IV.    DEFENDANTS' ATTEMPT TO DISMISS PLAINTIFFS' FIFTH AMENDMENT CLAIM MUST FAIL.

Defendants move under Rule 12(b)(6) to dismiss Plaintiffs' procedural due process claim. Specifically, Defendants dispute that Plaintiffs' members have a protected property interest because such an interest "must derive from the terms of the contracts between LTC pharmacies and PDP sponsors." They argue that it is the PDPs, not the government, that have failed to reimburse LTC pharmacies. Therefore, they say "no deprivation of property by the government can have occurred." These arguments are wrong, and certainly do not establish that Plaintiffs have not pled a valid count.

Plaintiffs have a protected property right in reimbursement for the prescription drugs they provide under the Part D program. Congress created the Part D program, which depends on the contracts that are entered into pursuant to that program, such as the LTC-PDP contracts, to work. Pursuant to CMS rules, PDPs must contract with LTC pharmacies to actually provide the benefit to nursing home residents. Am. Compl. ¶¶ 25 (citing 42 C.F.R. § 423.120(a)(5)), 27. CMS created the program, set the rules of the program, is intimately involved in the payment obligations of the PDPs, and has limited the services that may be covered in the payments made by the PDPs to the LTC pharmacies. Am. Compl. ¶ 26. It also examines PDP-LTC pharmacy contracts to determine if specified service criteria are included, *see id.*, and issues agency guidance documents commenting on

---

the time the accounts are reconciled, they will not receive credit for the cost-sharing (or potentially even the entire claim) because CMS's system still does not recognize such beneficiaries' subsidy-eligible status. *See, e.g., LTCPA v. UnitedHealth Group*, No. 06-1221, March 22, 2007 Transcript at 7, lines 24-25, 8, lines 1-10:

Mr. Fitzgerald: "…Let's say there's a hundred dollar claim here, a prescription drug that costs a hundred dollars, the co-pay is $5. Ordinarily, under our contract with the pharmacies, we would pay them a hundred less the five dollars, which is what we did here because we thought that these people—"

Mr. Fitzgerald: "All right. But we only paid them 95. Now, in order to submit to CMS, not just for the $5, we have to process that and get that out the door. We cannot process, we don't think we can submit for the $95 to CMS for the claim at all. Unless the claim is completely processed, you can't submit it for reimbursement."

terms and practices for such contracts that it finds acceptable or unacceptable. *Id.* Moreover, Plaintiffs' members' reimbursement rights are protected under the state contract laws that govern the LTC-PDP contracts. *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) ("Property interests…are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law…rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.").

Plaintiffs' members' property interest in complete reimbursement for prescription drugs provided to institutionalized dual eligible beneficiaries under the Part D program is similar to the protected property right recognized in *Furlong v. Shalala*, 238 F.3d 227 (2d Cir. 2001). In *Furlong*, a group of physicians who did not accept assignments of patient's Medicare reimbursements ("non-assignee physicians") brought a due process challenge to a Health Care Financing Agency (the agency predecessor of CMS) policy. That policy permitted application by a third party insurance carrier of a rule to reduce payments for a certain invasive anesthesia procedure, despite the fact that the payment amounts for the procedures involved in that anesthesia process had been previously set at a higher rate under a fee schedule. The Second Circuit held that those Medicare providers had a Fifth Amendment protected property interest in being reimbursed at the higher rate set by the fee schedule for their services. 238 F.3d at 231, 236 (citing *Furlong v. Shalala*, 156 F.3d 384, 392-96 (2d Cir. 1998) and *Furlong v. Shalala*, No. 94-4817, 2000 WL 194843, at *7 (S.D.N.Y. Feb. 18, 2000)).

As in *Furlong*, the LTC pharmacies here have been denied reimbursement by a procedural violation by the government agency. The government's deprivation of Plaintiffs' members' property right in this case, however, is even stronger than in *Furlong*. In *Furlong*, the Second Circuit held that the lack of agency review of the third-party insurance carrier's reimbursement determination constituted a procedural defect that presented a significant risk of deprivation of the plaintiffs' right

to reimbursement at the higher rates set by the fee schedule, and a basis for a Fifth Amendment Claim. Here, it is the government agency's own failure to take required notification action that deprives Plaintiffs' members of their right to full reimbursement for Part D prescription drugs. Knowing that, Defendants attempt to place full responsibility on the PDPs for the denial of reimbursements (and therefore attempt to argue that there is no government deprivation). But the government's argument is wrong, as the fact remains that but for CMS's failures, PDP improper assessment of cost-sharing for institutionalized dual eligible beneficiaries would not have occurred in the first place or continue to occur. Am. Compl. ¶ 4, 29, 40. (Recall that the PDPs have paid all but the co-payment portion of the claims at issue.)

Plaintiffs have alleged that Defendants' procedural failures in notifying PDPs of beneficiaries' eligibility status have deprived LTC pharmacies of their rights to reimbursement for improperly-assessed cost-sharing amounts for institutionalized dual eligible beneficiaries and that the administrative and fiscal burdens of remedying that defect are minimal.[22] Am. Compl. ¶¶ 1-47, 53-57. These allegations are sufficient to provide Defendants with notice of the nature of Plaintiffs' members' claimed injuries and the procedural inadequacies Plaintiffs have identified as the cause of the deprivation of their property rights. Plaintiffs have pled a plausible claim for violation of their members' Fifth Amendment right to procedural due process. *See Bell Atl. Corp. v. Twombly*, 550 U.S. ---, 127 S. Ct. 1955 (2007). Accordingly, Defendants' motion to dismiss Plaintiffs' due process claim must be rejected.

## V.    MANDAMUS RELIEF IS WARRANTED

Defendants argue (at 38-39) the availability of contract proceedings against individual PDPs precludes the mandamus relief sought against the government in this case. Once again, Defendants' focus on such proceedings is misplaced. For the reasons articulated in Section I.B., *supra*, Plaintiffs

---

[22] Defendants do not contest the latter factor in their motion to dismiss.

meet the requirements for mandamus relief under 28 U.S.C. § 1361. The alternative "adequate remedies" Defendants insist are available through private suits by LTC pharmacies against PDPs are, in reality, neither "alternative" to this lawsuit nor "adequate." To reiterate, this lawsuit seeks equitable relief against CMS in order to rectify the systemic data failures that are causing the improper assessment of cost-sharing for institutionalized dual eligible beneficiaries. The money damages that could be recovered in suits against PDP sponsors for any overdue amount will not fix the problem. Such damages do not address the source of the improper cost-sharing assessment—inaccurate or tardily-provided CMS data—and certainly are not an adequate substitute for the prospective relief that the Plaintiffs seek in this case.

Defendants also argue (at 38) that Plaintiffs are not entitled to mandamus relief because "there is no clear authority for recognizing an independent right of action under the Mandamus Act, 28 U.S.C. § 1361."[23] Actually, 28 U.S.C. § 1361 provides an avenue for relief for Plaintiffs even if the MMA does not. *See Judicial Watch, Inc. v. National Energy Policy Development Group*, 219 F. Supp. 2d 20, 41-42 (D.D.C. 2002) (citing *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)), *vacated and remanded on unrelated grounds by Chaney v. Dist. Court for D.C.*, 542 U.S. 367 (2004). The court in *Judicial Watch* held that plaintiff sufficiently alleged a claim for mandamus relief and it was "premature and inappropriate" to evaluate the merits of the claim at the motion to dismiss stage. 219 F. Supp. 2d at 42, 44. The same is true here.

---

[23] Plaintiffs need not distinguish Defendants' reliance on *Public Citizen v. Kantor*, 864 F. Supp. 208 (D.D.C. 1994), because, even as Defendants' concede (at 38), *Judicial Watch, Inc. v. National Energy Policy Development Group*, 219 F. Supp. 2d 20, 41-42 (D.D.C. 2002), *vacated and remanded on unrelated grounds by Chaney v. Dist. Court for D.C.*, 542 U.S. 367 (2004), overruled it.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

Motion to Dismiss.

Respectfully submitted,

November 16, 2007          ___/s/ John L. Oberdorfer_____

John L. Oberdorfer (D.C. Bar No. 145714)
David J. Farber (D.C. Bar No. 415899)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
Counsel for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| **LONG TERM CARE PHARMACY ALLIANCE, *et al.*,** | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| **MICHAEL O. LEAVITT, *et al.*,** | ) **Case No. 1:07-cv-01115 (ESH)** ) |
| Defendants. | ) ) |

_____

<u>[PROPOSED] ORDER</u>

Upon consideration of Defendants' Motion to Dismiss [Dkt. #11], and the Plaintiffs'

Opposition thereto, it is hereby **ORDERED** this [Day] of [Month] 2007, that Defendants' Motion

to Dismiss is **DENIED**.

   **SO ORDERED**.

_____
Judge Ellen Segal Huvelle
United States District Judge

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LONG TERM CARE PHARMACY ALLIANCE,<br>1776 Massachusetts Avenue, N.W., Suite 410<br>Washington, D.C. 20036, and<br><br>AMERICAN SOCIETY OF<br>  CONSULTANT PHARMACISTS,<br>1321 Duke Street,<br>Alexandria, VA 22314,<br>                Plaintiffs,<br><br>      v.<br><br>MICHAEL O. LEAVITT,<br>  Secretary of the U.S. Department of<br>  Health and Human Services,<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201,<br><br>U.S. DEPARTMENT OF<br>  HEALTH AND HUMAN SERVICES,<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201,<br><br>and<br><br>CENTERS FOR MEDICARE AND<br>  MEDICAID SERVICES,<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201,<br>             Defendants. | CASE NO. 1:07-cv-0115 (ESH)<br><br><br><br><br><br><br><br><br>AMENDED COMPLAINT FOR<br>DECLARATORY JUDGMENT<br>AND MANDAMUS RELIEF |

## NATURE OF THE DISPUTE

1.  Plaintiffs Long Term Care Pharmacy Alliance ("LTCPA") and American Society of Consultant

Pharmacists ("ASCP"), for themselves and on behalf of their members (collectively the "LTC

Pharmacies"), seek to remedy through the issuance by this Court of a mandamus order and

declaratory judgment past and continuing failures by Defendants Centers for Medicare and

Medicaid Services ("CMS"), Secretary Michael O. Leavitt (the "Secretary"), and the United States Department of Health and Human Services ("HHS") to execute their duties under the Medicare Prescription Drug Improvement and Modernization Act ("Act" or the "MMA"), 42 U.S.C. §§ 1395w-101-152, and its implementing regulations.

2. Defendants have the statutory and regulatory duty to implement a key component of the program – the provision of prescription drugs without the imposition of a co-payment obligation under the Medicare Part D program to certain beneficiaries who are Medicaid- and Medicare-eligible nursing home residents ("institutionalized dual eligibles"). Defendants have failed to do so, thereby injuring LTC Pharmacies.

3. ~~There are three~~ specific failures by Defendants ~~are~~: (a) failing to timely provide complete and accurate eligibility data to prescription drug plans ("PDPs"); ~~and~~ (b) enabling and causing the improper assessment of co-payments for a class of beneficiaries who, under the MMA, are not to be assessed any co-payments~~; and (c) failing to require PDPs to comply with the MMA and CMS regulations.~~ Paramount is CMS's acknowledged failure during the entire seventeen months of the Medicare Part D program to provide PDPs with adequate data. These failures have created and perpetuate a systemic data-based impediment to the proper functioning of the Part D program.

4. As a result of Defendants' repeated failures, PDPs have improperly assessed co-payments for institutionalized dual eligible beneficiaries and have not paid Plaintiffs' member LTC Pharmacies in full for the medications these pharmacies have dispensed to those beneficiaries. Consequently, LTC Pharmacies are carrying an enormous and ever-increasing cost-sharing burden of institutionalized dual eligible beneficiaries who have been unlawfully charged co-payments. Plaintiffs estimate that the amount owed to the LTC Pharmacies by PDPs for these co-payments is currently tens of millions of dollars.

5.  A court order declaring Defendants to have violated their duties and compelling them to fulfill their statutory and regulatory obligations is necessary to address and relieve the injuries Defendants' failures have caused ~~the~~ Plaintiffs'~~and their~~ members.

## PARTIES

6.  Plaintiff LTCPA is a Delaware limited liability company headquartered in the District of Columbia and organized for the purposes of protecting the interests of LTC Pharmacies and long-term care facility residents and advocating on their behalf before governmental and other entities.

7.  LTCPA's members include, but are not limited to, the ~~three~~ two ~~largest~~ leading long-term care pharmacy companies in the United States.  The LTC Pharmacies represented by LTCPA play a vital role in providing prescription medications and drug therapy for tens of thousands of senior citizens and individuals with chronic illnesses living in long-term care facilities, including seniors and other individuals residing in long-term care facilities who have prescription drug coverage under the new Medicare Part D prescription drug benefit program.  LTCPA brings this action on behalf of ~~itself and~~ its members.

8.  Plaintiff ASCP is a Massachusetts corporation, with its principal place of business in Alexandria, Virginia.  ASCP serves as the international professional society representing thousands of practicing senior care and consultant pharmacists, including pharmacists across the United States (including in the District of Columbia), by providing leadership, education, advocacy, and resources to advance the practice of senior care pharmacy.  Consultant pharmacists and senior care pharmacists play a vital role in reviewing optimal drug therapy for millions of senior citizens and individuals with chronic illnesses living in long-term care facilities and other community settings.  Many ASCP members own and operate long-term care pharmacies.  ASCP brings this action on behalf of ~~itself and~~ its members.

9.  As a consequence of Defendants' failures, members of LTCPA and ASCP have been and continue to be injured. LTCPA and ASCP members, such as Omnicare, Inc. and, PharMerica Corporationand Kindred Pharmacy Services, have not been paid co-payment amounts they are owed and have been forced to carry the cost-sharing burden of misclassified beneficiaries. Accordingly, the members of LTCPA and ASCP would have standing to bring this suit on their own behalf. The member interests that LTCPA and ASCP seek to protect in this action are germane to their purposes of protecting the interests of LTC Pharmacies, senior care and consultant pharmacists and residents of long-term care facilities. Neither the claims asserted nor the mandamus and declaratory relief sought require the participation of the individual members of LTCPA or ASCP.

10. Additionally, Plaintiffs LTCPA and ASCP have themselves been harmed by Defendants' failure to rectify the problems created by improper co-payment assessments for certain beneficiaries, continuing failure to timely provide accurate and complete eligibility data, and continuing failure to execute their oversight responsibilities over PDPs. Both LTCPA and ASCP have been diverted from pursuing their legislative goals by these failures. For example, if LTCPA did not have to divert time and resources to address Defendants' failures, it could focus on pursuing specific policy objectives, including addressing the problem of long-term care residents who are not enrolled in Part D. Similarly, ASCP's advocacy efforts related to Medicare Part B payments for medication therapy management in clinical situations have been sidelined to allow more time and resources to deal with Defendants' failures.

10. Defendant U.S. Department of Health and Human Services ("HHS") is the agency tasked by law with administration of the Social Security program, including Medicare and Medicaid. Defendant CMS is the agency within HHS that administers the Medicare and Medicaid

programs and is responsible for the continued oversight and enforcement of the Medicare and Medicaid regulations, including the administration of the Medicare Part D Program.

11. Defendant Michael O. Leavitt is the Secretary of HHS. In that capacity, he has responsibility for the conduct and policies of HHS, including responsibility for CMS. He is sued in his official capacity.

## JURISDICTION AND VENUE

12. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (Federal Question) and 28 U.S.C. § 1361 (Mandamus Act).

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because Plaintiff LTCPA resides in this District, all Defendants reside in this District, and events giving rise to the claims occurred and are occurring in this District.

## BACKGROUND

### LTC Pharmacies and the Residents They Serve

14. LTCPA members and many ASCP members own and operate long-term care pharmacies. These pharmacies do not provide retail pharmacy services. Rather, LTC Pharmacies focus on serving individuals who are frail, elderly, or disabled and who reside in long-term care facilities, such as nursing homes. The average long-term care facility patient is approximately 83 years old, has approximately 8 different medical diagnoses, and requires an average of 8 medications at any given time.

15. In serving long-term care facility residents, LTC Pharmacies provide numerous services in dispensing drugs beyond those provided by retail pharmacies. For example, LTC Pharmacies provide specialized medication packaging in "unit dose packages" (referred to as "blister packs"), specialized drug regimen reviews, chart reviews, and consultant pharmacy services. In addition, LTC Pharmacies deliver medications to long-term care residents and are available on a

5

24-hour a day basis every day of the year. These extra services not only provide effective and efficient care for long-term care facility residents, but also offer protection to these residents from possible medication errors. As a consequence, the federal health care programs, Medicare and Medicaid, save billions of dollars through the avoidance of medication errors and additional health care costs.

The Federal Medicare Prescription Drug Program

16. In December 2003, as part of the MMA, Congress made new prescription drug coverage available to all Medicare beneficiaries. The benefit, also known as "Part D," became effective on January 1, 2006.

17. The MMA tasks the Secretary with administering the Part D program, and the Secretary has in turn delegated this obligation to CMS. 42 U.S.C. § 1395b-9(a)(3)(A).

18. Within the class of all Medicare beneficiaries, there exists a special class of beneficiaries who are eligible under both the Medicare and Medicaid programs, commonly referred to as "dual eligibles." These individuals previously received prescription drug coverage through their respective state Medicaid programs.

19. On January 1, 2006, the Part D coverage for dual eligibles replaced the coverage previously available to them under the Medicaid program.

20. Over 60 percent of the long-term care residents participating in Part D qualify as "institutionalized dual eligibles." "Institutionalized" refers to residents in long-term care facilities whose services are being covered by Medicaid for the month. 42 U.S.C. § 1396a(q)(1)(B) and 42 C.F.R. § 423.772. CMS processes data submitted by states to identify institutionalized dual eligibles, which affords those beneficiaries access to certain low-income subsidies under Part D, including relief from the obligation to pay premiums and cost-sharing amounts.

21. "Cost sharing" refers to the amounts that Part D beneficiaries who are not institutionalized dual eligibles must pay as part of the cost of medications covered under their Part D benefit. Co-payments constitute one type of cost-sharing and are pre-determined amounts payable by the beneficiary with respect to the cost of each covered medication (e.g., a requirement that the beneficiary pay $5 of the cost of each branded drug).

22. When it passed the MMA, Congress mandated zero cost-sharing under Part D for institutionalized dual eligibles, as had been the practice under Medicaid. The MMA and implementing regulations provide that individuals who qualify as institutionalized "full-benefit dual eligibles" are not to be assessed any co-payments for covered medications obtained through their Part D plans. 42 U.S.C. § 1395w-114(a)(1)(D)(i); 42 C.F.R. § 423.782(a)(2)(ii).

23. CMS has recognized that for institutionalized dual eligibles, assessment of even a small cost-sharing amount would be a hardship: "We believe the Congress intended this provision to address the fact that dual-eligible persons residing as inpatients in medical institutions are permitted to retain only a small personal needs allowance, which precludes payment of even nominal copayments." 70 Fed. Reg. 4372 (Jan. 28, 2005).

The Part D Program and the Relationship Among CMS, PDPs and LTC Pharmacies

24. PDPs are the private entities that directly provide drug coverage to Medicare beneficiaries. They participate in the program through contracts with Defendant CMS.

25. CMS's regulations require PDPs to contract with LTC Pharmacies in their respective service areas to actually provide medications to institutionalized beneficiaries. 42 C.F.R. § 423.120(a)(5). Following enrollment in a PDP, institutionalized dual eligibles receive their prescription drugs from the LTC Pharmacy that has contracted with their chosen PDP or PDPs. The provision of those drugs by LTC Pharmacies is an essential piece of the Part D program.

7

26. CMS plays a significant and ongoing role in shaping the PDP-LTC Pharmacy contracts. For example, CMS has mandated certain services that must be covered in payments by PDPs to the LTC pharmacies. It also examines PDP-LTC Pharmacy contracts to determine if certain service criteria (which CMS has specified must be included in the contracts) are present and issues agency guidance documents commenting on terms and practices for the contracts that it deems acceptable or unacceptable.

26.27. Additionally, by contract with long-term care facilities, LTC Pharmacies provide all medically necessary prescription drugs, without regard to which party is liable for payment, in order to enable the long-term care facilities to fulfill their federal statutory obligations to their residents to provide such medications.

27.28. The process for PDP's payment to an LTC Pharmacy is as follows: After the LTC Pharmacy dispenses a drug to a beneficiary enrolled in a PDP's plan, it bills the PDP for reimbursement with the PDP. The LTC Pharmacy collects any co-payment that may be due from the beneficiary. The PDP is required to pay the LTC Pharmacy an agreed-upon amount for the prescribed medication less any cost-sharing that is to be borne by the beneficiary. As stated above, in the case of institutionalized dual eligible beneficiaries, there is no cost-sharing and the LTC Pharmacies do not collect co-payments from such beneficiaries. Indeed, LTC Pharmacies are prohibited from billing institutionalized dual eligible beneficiaries for the amounts withheld by the PDPs, as these constitute obligations of the PDP. The PDP is required to reimburse the LTC Pharmacy the full amount for the provided medications without any deduction for co-payments.

28.29. As part of his duties in administering the Part D program, the Secretary is obligated to establish a process for (a) providing the eligibility data to PDPs and (b) appropriate reduction of cost-sharing so that the right cost-sharing levels under the statute are charged. In particular, the

8

Secretary must "provide a process whereby... (A) the Secretary provides for a notification of the PDP sponsor... that [a Part D beneficiary] is eligible for a subsidy and the amount of the subsidy... [and] (B) the sponsor or organization involved reduces the premiums or cost-sharing otherwise imposed by the amount of the applicable subsidy... ."   42 U.S.C. § 1395w-114(c)(1)(A)-(B).   If the Secretary fails to do so, the LTC Pharmacies are not fully compensated for the prescription drugs they have provided to institutionalized dual eligibles.

29.30.   The regulations for the Part D program impose a duty upon CMS to provide eligibility data to PDPs.   Specifically, 42 C.F.R. § 423.800(a) provides:

> *Notification of eligibility for low-income subsidy.*   CMS notifies the Part D sponsor offering the Part D plan, in which a subsidy eligible individual is enrolled, of the individual's eligibility for a subsidy under this section and the amount of the subsidy.

30.31.   PDPs rely upon the data provided by CMS to determine their reimbursement amounts to LTC Pharmacies.   LTC Pharmacies depend upon CMS to timely provide accurate and complete eligibility data in order to be reimbursed the amounts they are owed for the prescription medicines they dispense to institutionalized dual eligibles.

31.32.   There has often been, and continues to be, significant lag time between a beneficiary's enrollment, CMS's obtaining data, and CMS's provision of data to PDPs.   Since January 1, 2006, in many instances, CMS has provided eligibility data on specific beneficiaries to PDPs several months after an LTC Pharmacy has dispensed prescription medicines to those individuals and submitted reimbursement claims to the PDP.

32.33.   For a large number of institutionalized dual eligible beneficiaries, CMS has failed to provide PDPs with eligibility data accurately reflecting such beneficiaries' status.   On information and belief, for an estimated 15% of persons known to LTC Pharmacies to be institutionalized dual eligibles, the data currently provided by CMS to PDPs still fail to reflect the fact that those

beneficiaries are institutionalized and/or eligible under both the Medicare and Medicaid programs.

34. ~~CMS also is obligated to ensure that PDPs comply with the program. 42 C.F.R. § 423.503(d)(1):~~ ~~"CMS oversees a Part D plan sponsor's continued compliance with the requirements for a Part~~ ~~D plan sponsor." Under 42 C.F.R. § 423.503(d)(2), "[i]f a Part D plan sponsor no longer meets~~ ~~those requirements, CMS terminates the contract in accordance with § 423.509."~~

~~33.~~34. The MMA provides that in the contract that CMS is required to sign with each PDP, the PDP must agree to comply with the statutory and regulatory requirements of the Part D program. 42 U.S.C. § 1395w-112(b)(1). Accordingly, a model contract between CMS and PDPs requires that the PDPs agree:

> to operate in accordance with the regulations at 42 CFR § 423.1 through 423.910..., sections 1860D-1 through 1860D-42... of the Social Security Act, and the solicitation, as well as all other applicable Federal statutes, regulations, and policies. This contract is deemed to incorporate any changes that are required by statute to be implemented during the term of this contract and any regulations or policies implementing or interpreting such statutory provisions.

PDP-CMS Contract, Article IA. Upon information and belief, each PDP contract with CMS contains such language.

~~34.~~35. CMS's regulations require that PDPs must reduce a subsidy-eligible individual's premiums and cost-sharing by the amounts applicable to the subsidy-eligible individual's status. 42 C.F.R. § 423.800(b) provides:

> *Reduction of premium or cost-sharing by PDP sponsor or organization.* The Part D sponsor offering the Part D plan, in which a subsidy eligible individual is enrolled must reduce the individual's premiums and cost-sharing as applicable, and provide information to CMS on the amount of those reductions, in a manner determined by CMS. The Part D sponsor must track the application of the subsidies under this subpart to be applied to the out-of-pocket threshold.

In the case of an institutionalized dual eligible beneficiary, then, PDPs must reduce the premiums and cost-sharing to zero.

35.36. CMS's regulations require that if an institutionalized dual eligible beneficiary has paid premiums or cost-sharing above the amounts he or she is required to, or if an organization has paid those excess amounts on behalf of that individual, then the PDP must reimburse the excess amounts to the appropriate party, *i.e.*, the party who paid. 42 C.F.R. § 423.800(c) provides:

> (c) *Reimbursement for cost-sharing paid before notification of eligibility for low-income subsidy.* The Part D sponsor offering the Part D plan must reimburse subsidy eligible individuals, and organizations paying cost-sharing on behalf of such individuals, any excess premiums and cost-sharing paid by such individual or organization after the effective date of the individual's eligibility for a subsidy under this subpart.

36.37. Because institutionalized dual eligibles do not pay premiums or cost-sharing, PDPs must reimburse the LTC Pharmacies— which have been carrying the cost-sharing debt— for any co-payments that were improperly assessed.

## COUNT I – CLAIM UNDER
## THE ADMINISTRATIVE PROCEDURE ACT—
## MANDAMUS AND DECLARATORY RELIEF REQUESTED

37.38. Paragraphs 1-367 of this Amended Complaint are incorporated by reference.

38.39. CMS has a continuing duty to administer the Medicare Part D program and to ensure that institutionalized dual eligible beneficiaries are not assessed co-payments. 42 U.S.C. § 1395b-9(a)(1); 42 U.S.C. § 1395b-9(a)(3)(A); 42 U.S.C. § 1395w-114(a)(1)(D)(i); 42 C.F.R. § 423.782(a)(2)(ii).

39.40. CMS also has a continuing duty to provide complete, updated and accurate eligibility data to PDPs in a timely fashion. 42 C.F.R. § 423.800(a). In the absence of such eligibility data indicating beneficiaries' institutionalized dual eligible status, certain PDPs are refusing to reimburse the LTC Pharmacies for co-payment amounts. The result of CMS's failure to provide timely eligibility data to PDPs is the improper assessment of co-payments to beneficiaries, the corresponding deprivation of reimbursement amounts indisputably owed to LTC Pharmacies,

11

and the attendant burden on LTC Pharmacies of carrying improperly assessed cost-sharing amounts.

40.41.  During 2006, and continuing through the present, CMS has failed to provide complete, updated and accurate eligibility data to PDPs.

41.42.  In a March 6, 2007 memorandum from the Director of its Medicare Plan Payment Group, CMS stated that it would shortly thereafter provide PDPs with complete eligibility data for 2006. The data provided, however, were incomplete in many respects and still did not properly classify many beneficiaries as institutionalized dual eligibles.

42.43.  CMS has acknowledged that during the seventeen months since the program began, it has failed to provide PDPs with adequate data. *See* Exhibit 1 hereto (June 1, 2007 Memorandum from Cynthia Tudor, Ph.D., Director, Medicare Drug Benefit Group, CMS to All Part D Plan Sponsors Re: Convenient Access to LTC Pharmacies).   CMS admitted in the same memorandum that it has failed to implement a system that allows PDPs to link an enrollee to a particular institution.

45.CMS's failure to carry out its duty under 42 C.F.R. § 423.503(d) to ensure that PDPs are complying with the MMA and its implementing regulations has harmed LTC Pharmacies, including Plaintiffs' members, which are deprived of reimbursements owed and are forced to carry the cost-sharing burden of institutionalized dual eligibles who are misclassified, as well as Plaintiffs themselves, which are forced to divert resources that cannot be reimbursed from other important programmatic concerns to attempt to rectify the untenable situation CMS has created.

46.CMS issued a series of guidances addressing the reimbursement issue.  CMS, however, has not sought to enforce these guidances or otherwise ensure PDP compliance with the MMA and its implementing regulations.

43.44. PDPs are obligated not to assess co-payments for institutionalized dual eligible beneficiaries, and to reconcile and pay any co-payments that they do withhold for such beneficiaries. PDPs, however, continue to assess such co-payments and have failed to fully reconcile and pay co-payments previously withheld. ~~Despite an obligation to compel PDP compliance with the MMA and CMS regulations, CMS has failed to do so.~~

44.45. CMS has acknowledged that its failure to properly administer the Part D program is injuring residents of long-term care facilities and the LTC Pharmacies. In a guidance that it issued on December 22, 2006, CMS stated that "problems with cost sharing have disproportionately impacted beneficiaries who are residents of nursing homes, and for whom long-term care (LTC) pharmacies are holding receivable balances rather than charging beneficiaries incorrect cost sharing amounts."

45.46. Due to CMS's failure to provide PDPs with complete and accurate eligibility data, certain PDPs indicated that they would take the extraordinary step of issuing reimbursement payments directly to long-term care facility residents. It is undisputed that the beneficiaries did not pay the co-payments at issue and that the LTC Pharmacies are the organizations that effectively paid the cost-sharing on behalf of such individuals by holding the debt for the unreimbursed cost-sharing amounts. If Defendants had fulfilled their duties, there would not have been an improper assessment of co-payments in the first instance, and LTC Pharmacies would have received full payment for the prescription drugs they provided.

46.47. Throughout 2006, Plaintiffs attempted to work with CMS and PDPs to address the problems created by CMS's misclassifications of eligible individuals, especially CMS's failure to provide necessary eligibility data on a timely basis and the consequent refusals of certain PDPs to reimburse LTC Pharmacies for the improperly withheld co-payments.

47.48. The Administrative Procedure Act, 5 U.S.C. § 706(1), provides that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed."

48.49. Defendants' failures to timely (i) provide complete, updated and accurate eligibility data to PDPs and (ii) properly implement the MMA and its implementing regulations warrants relief under 5 U.S.C. § 706(1).

49.50. Plaintiffs' and their members have no adequate remedy at law to address Defendants' failures. As a result of Defendants' continued failures to perform their duties, institutionalized dual eligible beneficiaries have in effect been improperly assessed co-payments, and LTC Pharmacies have been deprived of reimbursements owed to them and forced to carry tens of millions of dollars of cost-sharing debt on behalf of misclassified institutionalized dual eligibles. That burden grows by millions of dollars each month that Defendants fail to fulfill their duties. While the LTC Pharmacies have absorbed that burden since the inception of the Part D program, as the amount of that cost-sharing debt multiplies each month, their ability to continue to do so is not unlimited.

50.51. LTC Pharmacies are prohibited from billing the institutionalized dual eligible beneficiaries for the amounts withheld by the PDPs. Absent the requested relief, Plaintiffs' members face two undesirable choices: (i) institute and litigate dozens, if not hundreds, of actions against individual PDPs contesting the systematic underpayment of many thousands of $3 to $5 co-payment amounts for 2006 to the present; or (ii) continue to absorb the ever-increasing burden of the co-payments that have been improperly assessed and withheld.

51.52. Defendants have repeatedly avoided their statutory and regulatory duties, and, consequently, only the declaratory and mandamus relief that this Court can provide will redress the injuries that Defendants' failures have caused Plaintiffs' and their members.

### COUNT II - VIOLATION OF THE MMA AND ITS IMPLEMENTING REGULATIONS

14

MANDAMUS AND DECLARATORY RELIEF REQUESTED

~~56. Paragraphs 1-55 of this Complaint are incorporated by reference.~~

~~57. Defendants' failures to provide complete, updated and accurate eligibility data for 2006 to PDPs violate 42 U.S.C. § 1395w-114(c)(1) and 42 C.F.R. § 423.800(a).~~

~~58. Defendants' failures to timely provide complete, updated and accurate eligibility data to PDPs on an ongoing basis violate 42 U.S.C. § 1395w-114(c)(1) and 42 C.F.R. § 423.800(a).~~

~~59. Defendants' failures to properly implement the MMA and CMS's regulations violate 42 U.S.C. §§ 1395b-9(a)(3)(A), 42 U.S.C. § 1395w-114(a)(1)(D)(i), 42 C.F.R. § 423.782(a)(2)(ii), and 42 C.F.R. § 423.503(d).~~

## COUNT III— VIOLATION OF
## FIFTH AMENDMENT RIGHT TO DUE PROCESS—
## MANDAMUS AND DECLARATORY RELIEF REQUESTED

~~55.~~53.  Paragraphs 1-~~52~~59 of this Amended Complaint are incorporated by reference.

~~56.~~54.  LTC Pharmacies have a property ~~right~~ interest ~~in to~~ complete reimbursement (which includes payment of co-payment amounts improperly-assessed for institutionalized dual eligible beneficiaries) ~~payment of the co-payment amounts improperly withheld from their reimbursements~~ for prescription drugs they have dispensed to institutionalized dual eligibles under the Part D program.

~~57.~~55.  The inadequacy of the procedures by which Defendants provide eligibility data to PDPs have resulted in multiple and continuing failures by the agency to timely provide complete and accurate eligibility data to PDPs.  These procedural inadequacies and attendant failures have had the direct and foreseeable effects of erroneously and wrongfully depriving LTC Pharmacies of property – full ~~monetary payment~~reimbursement for prescription drugs to institutionalized dual eligible beneficiaries they have provided pursuant to the Part D program.  As a consequence, ~~their ability to collect reimbursements they are owed in a timely manner and of improperly~~

15

~~forcing~~ LTC Pharmacies have not received many payments and have had others delayed for substantial periods of time. CMS's failure to provide adequate procedures has forced and is forcing LTC Pharmacies to incur large administrative costs related to attempts to obtain full reimbursement and to carry an ever-increasing amount of cost-sharing burden for institutionalized dual eligibles who have been improperly assessed co-payments by PDPs.

~~58.~~56. The administrative and ~~fiscal~~ financial burdens ~~on Defendants~~ of providing ~~additional~~ adequate procedures~~al~~ with respect to provision of eligibility data ~~safeguards~~ are minimal.

~~59.~~57. Defendants' failure to provide adequate procedural safeguards to protect against deprivation of the Plaintiff' ~~associations'~~ members' right to payment for the prescription drugs provided pursuant to the Part D program violates Plaintiffs' members' right to due process under the Fifth Amendment to the United States Constitution.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request this Court to:

1. Assume jurisdiction over this action.

2. Enter a declaratory judgment that:

    a. Relief under 5 U.S.C. § 706(1) is warranted because Defendants have failed to timely provide complete and accurate eligibility data; and

    ~~b.Defendants have violated 42 U.S.C. § 1395b-9(a)(3)(A), 42 U.S.C. § 1395w-114(a)(1)(D)(i), 42 U.S.C. § 1395w-114(c)(1), 42 C.F.R. § 423.782(a)(2)(ii), 42 C.F.R. § 423.800 and 42 C.F.R. § 423.503(d) by failing to provide complete and accurate eligibility data on a timely basis and by failing to properly implement the MMA and CMS's regulations; and~~

    ~~c.~~b.Defendants have violated Plaintiffs' members' Fifth Amendment right to due process.

3.  Grant and issue a writ of mandamus compelling Defendants, their agents, employees, and all persons acting in concert with Defendants, to:

    a.  Provide ~~timely,~~ complete, updated and accurate eligibility data to PDPs within a time to be defined by the Court; _and_

    b.  On an ongoing basis, timely provide complete, updated and accurate eligibility data to PDPs.~~; and~~

    ~~c.In accordance with applicable regulations and statutory requirements, require PDPs to pay the LTC Pharmacies for co-payment amounts improperly withheld from reimbursements for prescription drugs provided to institutionalized dual eligibles.~~

4.  Issue such writs as are appropriate in aid of this Court's jurisdiction pursuant to the All Writs Act, 28 U.S.C. § 1651(a);

5.  Award Plaintiffs' costs, expenses, and attorneys' fees incurred herein; and

6.  Grant such other relief as the Court deems proper and necessary.

~~June 21~~November 16, 2007                         ~~————~~Respectfully submitted,

_____
John Oberdorfer (D.C. Bar No. 145714)
David Farber (D.C. Bar No. 415899)
~~George M. Borababy (D.C. Bar No. 288860)~~
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C.  20037
Telephone:  (202) 457-6000
Facsimile:  (202) 457-6315

Counsel for Plaintiffs

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LONG TERM CARE PHARMACY
ALLIANCE, et al.,

                        Plaintiffs,

            v.                                    Case No. 1:07-cv-01115 (ESH)

MICHAEL O. LEAVITT, et al.,

                        Defendants.

## DECLARATION OF DARRELL MCKIGNEY

I, Darrell McKigney, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.    I am over 21 years of age and I am competent to make this Declaration.

2.    I make this Declaration based on personal knowledge, except as to matters stated to be on information and belief.

3.    I am currently the Executive Director of the Long Term Care Pharmacy Alliance ("LTCPA"), one of the Plaintiffs in this action. Prior to becoming Executive Director, I served as LTCPA's Director of Government Affairs. I am submitting this Declaration in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint in this action in order to bring to this Court's attention additional facts regarding LTCPA's members' injury.

4.    LTCPA's core mission is, in essence, to protect and promote the profession and practice of long-term care pharmacy by advocating on issues that are critical to the pharmacies, which meet the needs of more than 60% of the nation's long term care residents.

5.    Part D was created by Congress in 2003. It is operated at three tiers – the Center for Medicare and Medicaid Services (CMS), an agency of the US Department of Health and Human

4919422                                     1

Services (HHS), administers the benefit. CMS contracts with Prescription Drug Providers (PDPs), and sets the rules by which the PDPs provide the benefit to Medicare beneficiaries across the country. In turn, PDPs contract with pharmacies, such as LTCPA's members, which in turn actually provide the prescription drugs to beneficiaries. In general terms, approximately 75% of the cost of any beneficiary's drugs is paid by CMS to the PDPs. For institutionalized dual eligible beneficiaries, 100% of the cost of their drugs is paid by CMS to the PDPs.

6.      It is my understanding that PDPs are required to provide CMS with copies of their pharmacy network contracts for CMS approval. CMS, through guidance, has also repeatedly commented on the terms and conditions of long-term care pharmacy contracts. Thus, CMS exercises extensive influence over the terms of the PDP-long term care pharmacy contracts.

7.      One of these critical issues is ensuring that pharmacy benefits claims are processed and submitted for reimbursement on behalf of institutionalized dual eligible beneficiaries who receive prescription drug coverage from federal health care programs, including the Medicare Part D program. Because pharmacies owned by LTCPA members depend upon reimbursements from prescription drug plan (PDP) sponsors to cover the cost of medications they have already dispensed to patients, LTCPA regularly advocates to improve program administration and compliance with federal statues and regulations, as well as to provide an efficient flow of information about federal health care programs affecting its members and that affect the day-to-day provision of pharmacy services. It is precisely these interests that LTCPA is seeking to protect through this litigation.

8.      LTCPA represents the interests of the major national long-term care pharmacies that serve three out of every five residents of long-term care facilities nationwide. LTCPA's members all provide specialty pharmacy services to nursing home facility residents.

9.      LTCPA's membership has been harmed, and will continue to suffer harm, as a result of the improperly withheld co-payments. The Association's two publicly traded members, for

4919422                                    2

example, have disclosed millions of dollars of unreimbursed co-payments as a result of CMS's failure to properly administer the benefit. One of the members, Omnicare, Inc., has reported that as of September 30, 2007 it is owed approximately $36 million in unreimbursed co-payments, of which $20 million represents amounts for 2006 claims. Similarly, another member, PharMerica Corporation, has reported that it is still owed over $10.5 million as of September 30, 2007. Thus, there is no question that there has been real and actual harm to the Association's members.

10.    LTCPA is seeking mandamus and declaratory relief, which will redress the injuries of LTCPA's members.

November 15, 2007

Darrell McKigney

4919422

3

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LONG TERM CARE PHARMACY
ALLIANCE, et al.,

                   Plaintiffs,

            v.                             Case No. 1:07-cv-01115 (ESH)

MICHAEL O. LEAVITT, et al.,

                   Defendants.

## DECLARATION OF JANICE D. RUTKOWSKI

1.     I am a Senior Vice President and Chief Clinical Officer of PharMerica Corporation ("PharMerica"). I am over 21 years of age and I submit this declaration based on personal knowledge, as well as perceptions from my extensive involvement and experience in the Medicare Prescription Drug program (Part D) on behalf of PharMerica.

2.     PharMerica is a newly formed merger of two of the country's leading long term care pharmacy providers, a company called PharMerica, Inc. (now PharMerica Long-Term Care, Inc., and formerly a subsidiary of AmeriSource Bergen) and Kindred Pharmacy Services (formerly a subsidiary of the Kindred Health Group). PharMerica is a member of the Long Term Care Pharmacy Alliance and its pharmacists are members of the American Society of Consultant Pharmacists.

3.     PharMerica participates as a long-term care "network" pharmacy for Prescription Drug Plans (or PDPs) providing drugs to nursing home residents under Part D created by Congress in 2003. PharMerica has contracts with virtually all PDPs.

4.     I understand that in this case CMS is asserting that it has no role whatsoever in the network contracts between the PDPs and the pharmacies, such as PharMerica. That is simply not true. CMS has dictated to PDPs both that they must have network pharmacy contracts, including long term care pharmacy contracts, as well as specified many of the terms and conditions of those contracts. For example, there are specific service criteria CMS requires PDPs to include in their long term care pharmacy networks. Exhibit 1, Chapter 5 of the Medicare Prescription Drug Benefit Manual (listing the following 10 service criteria that PDPs need to assure are present in their long term care pharmacy networks: (1) comprehensive inventory and inventory capacity, (2) pharmacy operations and prescription orders, (3) special packaging, (4) IV medications, (5) compounding/alternative forms of drug composition, (6) pharmacist on-call service, (7) delivery service, (8) emergency boxes, (9) emergency log books, (10) miscellaneous reports, forms and prescription ordering supplies). Similarly, it is my understanding that PDPs are required to provide CMS with copies of their pharmacy network contracts for CMS approval. CMS, through guidance, has also repeatedly

commented on the terms and conditions of long-term care pharmacy contracts. Thus, CMS exercises extensive influence over the terms of the PDP-long term care pharmacy contracts.

5.      PharMerica is a party to several network contracts with Medco, United Healthcare, and other PDP sponsors under the Part D program. Pursuant to these contracts, PharMerica provides prescription medicines to Medicare beneficiaries in nursing facilities ("institutionalized beneficiaries"). To the extent the costs of such medicines are not covered by co-payments from such beneficiaries, the PDPs that provide prescription drug coverage for such beneficiaries compensate PharMerica for the drugs dispensed.

6.      There has been and continues to be a serious information problem in the administration of the benefit for many nursing home residents to whom PharMerica dispenses medications on behalf of PDPs. These involve prescription "co-payments" that the PDPs should be paying, but are refusing to pay to PharMerica due to CMS's failure to timely and properly identify these beneficiaries. The fundamental problem is CMS's failure to provide timely and accurate data as to whether a recipient is an institutionalized full benefit dual eligible. CMS's failure to do so has resulted in our company being unable to collect millions of dollars of co-payments. We need a court order to ensure that these incidences will not continue. I will explain the process in detail below.

7.      PharMerica typically receives a patient census from each nursing home to which it delivers drugs. In virtually all instances the census identifies the individuals to whom the drugs are being delivered as "Medicaid eligible." To the extent that PharMerica is delivering drugs to skilled nursing home residents, those residents are necessarily "institutionalized," as that term is defined by CMS. Any other classification essentially ignores the entire purpose for which individuals enter long-term care facilities.

8.      From the day that PharMerica began delivering drugs to Medicare Part D beneficiaries, it is almost virtually certain that the beneficiary is an "institutionalized full benefit dual eligible" and thus PharMerica knows whether the beneficiary is an "institutionalized full benefit dual eligible."

9.      Once PharMerica is aware of that information, it has no reason to charge the beneficiary a co-payment because it knows that the beneficiary is not obligated to pay the amount. Indeed, many of PharMerica's PDP contracts require PharMerica to determine whether the beneficiary has a co-payment obligation, and to charge or not charge a co-payment based upon the beneficiary's status. Moreover, federal law prohibits collecting any cost-sharing amount from institutionalized dual eligible beneficiaries.

10.     For those beneficiaries whom PharMerica identifies as institutionalized dual eligibles, PharMerica appropriately bills the responsible PDP the entire charge for the drug that was dispensed. By law (and often by contract), the PDP is obligated to pay the full cost of the drug dispensed, and CMS in turn is obligated to reimburse the PDP that same amount.

11.     Since January 2006, and continuing through today, however, CMS has routinely and consistently failed to timely and properly identify to the PDPs the beneficiaries who are either "institutionalized," "dual eligibles," or both. When PharMerica submits online its claim for payment, the PDP often accepts the claim, but rejects responsibility for the co-payment. Consequently, PharMerica will only receive partial payment from that PDP. At times, the "co-

4921331                                      2

payment" can equal 100% of the claim, depending on several factors, including whether the beneficiary is within the so-called "donut hole" of the PDP's benefit design.

12. PharMerica has an on-going dialogue with PDPs, including Medco and United Healthcare. Consistently, the PDPs refuse to reimburse PharMerica (and we believe all other long term care pharmacy companies) for the copays until CMS has identified the beneficiary as "institutionalized" and "dual eligible" in the CMS system to which the PDPs have to report. We have numerous credible alternative information to provide these PDPs, including information on Medicaid status, long-term care status, and even an attestation that these beneficiaries are institutionalized dual eligibles for which no co-payment is required, but they consistently and repeatedly refuse to change their policies until CMS correctly identifies the beneficiaries in the CMS system.

13. Even where such PDP sponsors acknowledge that PharMerica did not collect any cost-sharing amounts from the institutionalized dual eligible beneficiaries, they still refuse to reimburse PharMerica for the portion of the amount due that represents the cost-sharing amount that would be due if the beneficiary were not an institutionalized dual eligible beneficiary. In many instances, it is far more serious a problem than just allowing time for the data to "catch up" with the system. As of today, there are thousands of claims from the 2006 calendar year that CMS still has incorrectly identified, resulting in millions of dollars of unreimbursed charges. Yet, CMS has officially closed out the 2006 plan year knowing that these issues have not been resolved.

14. PharMerica has suffered direct harm as a result of CMS's failure to properly identify and classify beneficiaries as institutionalized dual eligibles. From January 1, 2006, through September 30, 2007, PharMerica has dual eligible co-payment receivables from the PDPs of $10.5 million.

15. The effect of the current regulatory regime is to make long-term care pharmacies the ultimate payor for the drug. This is an inequity that requires immediate remediation.

I hereby declare, under penalty for perjury, that the foregoing is true and correct to the best of my knowledge.

Janice D. Rutkowski

November 16 2007

# EXHIBIT 1 TO

# DECLARATION OF JANICE RUTKOWSKI

# Prescription Drug Benefit Manual

# Chapter 5:  Benefits and Beneficiary Protections

**Table of Contents**

10      Benefits and Beneficiary Protections

    10.1 – Introduction
    10.2 – Definition of Terms

20      Requirements Related to Qualified Prescription Drug Coverage

    20.1 – General
    20.2 – Availability of Prescription Drug Plans
    20.3 – Standard Prescription Drug Coverage
        20.3.1 – Defined Standard Coverage
        20.3.2 – Actuarially Equivalent Standard Coverage
    20.4 – Alternative Prescription Drug Coverage
        20.4.1  – Basic Alternative Coverage
        20.4.2  – Enhanced Alternative Coverage
        20.4.3  – Restrictions on the Offering of Enhanced Alternative Coverage
        by PDP Sponsors
        20.4.4  – Restrictions on the Offering of Enhanced Alternative Coverage
        by MA Organizations
        20.4.5 – Restrictions on the Offering of Enhanced Alternative Coverage
        by Cost Plans
    20.5 – Negotiated Prices
    20.6 – Dispensing Fees

30      Incurred / "True Out-of-Pocket" (TrOOP) Costs

    30.1 – Costs that Count as Incurred Costs
    30.2 – Costs that Do Not Count as Incurred Costs
    30.3 – Summary of TrOOP-Eligible and TrOOP-Ineligible Payers
    30.4 – Pharmacy Waiver/Reduction of Cost-Sharing and Applicability toward
    TrOOP

40      Prescription Drug Plan Sponsor Service Areas

50      Access to Covered Part D Drugs

    50.1 – Retail Pharmacy Access

50.2 – Mail-Order Pharmacy Access
50.3 – Specialty Pharmacy Access
50.4 – Home Infusion Pharmacy Access
50.5 – Long-Term Care (LTC) Pharmacy Access
    50.5.1 –Convenient Access to LTC Pharmacies
    50.5.2 – Performance and Service Criteria for Network LTC Pharmacies
    50.5.3 Other LTC Contracting Terms and Conditions and Uniformity of
    Benefits
    50.5.4 – Access to LTC Pharmacies for Enrollees Residing in IMDs,
    ICFs/MR, and LTC Hospitals
50.6 – I/T/U Pharmacy Access
50.7 – Waiver of Pharmacy Access Requirement
    50.7.1 – Waiver of Retail Pharmacy Access Requirements for MA-PD
    Plans and Cost Plans with Plan-Owned and Operated Pharmacies
    50.7.2 – Waiver of Pharmacy Access Requirements for Private Fee-for-
    Service Plans
50.8 – Pharmacy Network Contracting Requirements
    50.8.1 – Any Willing Pharmacy Requirement
    50.8.2 – Insurance Risk
50.9 – Differential Cost-Sharing for Preferred Pharmacies
50.10 – Level Playing Field Between Mail-Order and Retail Pharmacies
50.11 – Use of Identification Card for Accessing Negotiated Prices

60    Out-of-Network Access

60.1 – Out-of-Network Pharmacy Access
60.2 –Access to Vaccines
    60.2.2 – Facilitated OON Vaccine Access Approaches
    60.2.1 – In Network Vaccine Distribution Approaches

70    Public Disclosure of Pharmaceutical Prices for Equivalent Drugs

80    Privacy, Confidentiality, and Accuracy of Enrollee Records

**Note:  This manual is subject to change to both periodic and annual updates and currently reflects CY 2007 guidance.**

under a CMS designated contract number, relative to the number of LTC pharmacies contracted by the sponsor and licensed in the State(s) and/or territory(ies) covered by the total service area.

- For regional MA-PD plan sponsors and PDP sponsors: The number of nursing home beds (provided by CMS) in each of the State(s) or territory(ies) covered under the CMS designated contract number, relative to the number of pharmacies contracted by the sponsor and licensed in the State(s) and/or territory(ies).

We expect LTC pharmacy contracting activity will be ongoing as Part D sponsors continue to identify LTC facilities and LTC pharmacies, and as they examine their auto-enrollment assignments and incoming enrollments. To the extent that a beneficiary is enrolled in a Part D sponsor's plan that does not have a contract with a LTC pharmacy that can serve the LTC facility in which he or she resides, the appropriate action for a Part D sponsor to take is to contract with the facility's contracted LTC pharmacy or – if that pharmacy will not sign a contract – with another LTC pharmacy that can serve that facility. In some cases, a retroactive contract may be necessary.

### 50.5.2 – Performance and Service Criteria for Network LTC Pharmacies (NTLCPs)

In order to participate in Part D sponsor LTC pharmacy networks, a pharmacy must be capable of meeting certain minimum performance and service criteria (and relevant State laws governing the practice of pharmacy in the LTC setting), as well as any other standard terms and conditions established by the Part D sponsor for its network pharmacies. The following minimum performance and service criteria for pharmacies providing LTC services are based on widely used best practices in the market. These performance and service criteria must be incorporated into an addendum to a Part D sponsor's standard network contract for those pharmacies that would like to be designated NLTCPs.

1. ***Comprehensive Inventory and Inventory Capacity*** – NLTCPs must provide a comprehensive inventory of plan formulary drugs commonly used in the long-term care setting. In addition, NLTCPs must provide a secured area for physical storage of drugs, with necessary added security as required by Federal and State law for controlled substances. This is not to be interpreted as requiring the pharmacy to have inventory or security measures outside of the normal business setting.

2. ***Pharmacy Operations and Prescription Orders*** – NLTCPs must provide services of a dispensing pharmacist to meet the requirements of pharmacy practice for dispensing prescription drugs to LTC residents, including but not limited to the performance of drug utilization review (DUR). In addition, the NLTCP pharmacist must conduct DUR to routinely screen for allergies and drug interactions, to identify potential adverse drug reactions, to identify inappropriate drug usage in the LTC population, and to promote cost effective therapy in the LTC setting. The NLTCP must also be equipped with pharmacy software and

systems sufficient to meet the needs of prescription drug ordering and distribution to an LTC facility. Further, the NLTCP must provide written copies of the NLTCP's pharmacy procedures manual and said manual must be available at each LTC facility nurses' unit. NLTCPs are also required to provide ongoing in-service training to assure that LTC facility staff are proficient in the NLTCP's processes for ordering and receiving of medications. NLTCPs must be responsible for return for destruction and/or disposal of unused medications following discontinuance, transfer, discharge, or death as permitted by State Boards of Pharmacy. Controlled substances and out of date substances must be disposed of within State and Federal guidelines.

3. *Special Packaging* – NLTCPs must have the capacity to provide specific drugs in Unit of Use Packaging, Bingo Cards, Cassettes, Unit Dose or other special packaging commonly required by LTC facilities. NLTCPs must have access to, or arrangements with, a vendor to furnish supplies and equipment including but not limited to labels, auxiliary labels, and packing machines for furnishing drugs in such special packaging required by the LTC setting.

4. *IV Medications* – NLTCPs must have the capacity to provide IV medications to the LTC resident as ordered by a qualified medical professional. NLTCPs must have access to specialized facilities for the preparation of IV prescriptions (clean room). Additionally, NLTCPs must have access to or arrangements with a vendor to furnish special equipment and supplies as well as IV trained pharmacists and technicians as required to safely provide IV medications.

5. *Compounding /Alternative Forms of Drug Composition* – NLTCPs must be capable of providing specialized drug delivery formulations as required for some LTC residents. Specifically, residents unable to swallow or ingest medications through normal routes may require tablets split or crushed or provided in suspensions or gel forms, to facilitate effective drug delivery.

6. *Pharmacist On-call Service* – NLTCPs must provide on-call, 24-hour-per-day/7-day-a-week service with a qualified pharmacist available for handling calls after hours and to provide medication dispensing available for emergencies, holidays and after hours of normal operations.

7. *Delivery Service* – NLTCPs must provide for delivery of medications to the LTC facility up to seven days each week (up to three times per day) and in-between regularly scheduled visits. Emergency delivery service must be available 24 hours a day, 7 days a week. Specific delivery arrangements will be determined through an agreement between the NLTCP and the LTC facility. NLTCPs must provide safe and secure exchange systems for delivery of medication to the LTC facility. In addition, NLTCPs must provide medication cassettes, or other standard delivery systems, that may be exchanged on a routine basis for automatic restocking. The NLTCP delivery of medication to carts is a part of routine "dispensing."

8. ***Emergency Boxes*** – NLTCPs must provide "emergency" supply of medications as required by the facility in compliance with State requirements.

9. ***Emergency Log Books*** – NLTCPs must provide a system for logging and charging medication used from emergency/first dose stock. Further, the pharmacy must maintain a comprehensive record of a resident's medication order and drug administration.

10. ***Miscellaneous Reports, Forms and Prescription Ordering Supplies*** – NLTCPs must provide reports, forms and prescription ordering supplies necessary for the delivery of quality pharmacy care in the LTC setting. Such reports, forms and prescription ordering supplies may include, but will not necessarily be limited to, provider order forms, monthly management reports to assist the LTC facility in managing orders, medication administration records, treatment administration records, interim order forms for new prescription orders, and boxes/folders for order storage and reconciliation in the facility.

To qualify as a LTC pharmacy for a Part D sponsor's LTC pharmacy network, a pharmacy must currently have the capacity – either by itself or through subcontracts with other entities – to meet all these performance and service criteria, even if a LTC facility that pharmacy serves does not need a particular service subsumed under those performance and service criteria. Pharmacies subcontracting with other entities to meet the performance and service criteria must ensure that they comply with all relevant Part D requirements, including all performance and service criteria for the provision of long-term care pharmacy services. However, it will ultimately be up to LTC facilities and their contracted LTC pharmacy(ies) to determine which of these specific items or services a nursing facility needs. In other words, a LTC pharmacy must be capable of meeting all the aforementioned performance and service criteria at the time it contracts with a Part D sponsor, but it will not be required to provide all those services to LTC facilities if those facilities do not have a need for certain of those services.

These performance and service criteria are not intended to be exclusive or exhaustive. Rather, they are intended to be minimum requirements for becoming a NLTCP. While payment terms for LTC pharmaceutical and dispensing services are subject to negotiations between the Part D sponsor and its NLTCPs, we note that payment to LTC pharmacies under Part D may only cover drug ingredient costs and dispensing fees as defined in section 20.6. Specialized services provided in the administration of drugs after they are dispensed and delivered from the LTC pharmacy are specifically not covered by the Part D benefit.

### 50.5.3 Other LTC Contracting Terms and Conditions and Uniformity of Benefits

Outside of the minimum performance and service criteria, Part D sponsors and pharmacies may propose a number of contracting terms and conditions. With rare exceptions, CMS does not generally involve itself in determining whether standard

# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LONG-TERM CARE PHARMACY
ALLIANCE, et al.,

                Plaintiffs,

           v.

MICHAEL O. LEAVITT, et al.,

                Defendants.

Case No. 1:07-cv-01115 (ESH)

## DECLARATION OF DONALD AMOROSI

1.     I am the Vice President of Trade Relations of Omnicare, Inc. I am over 21 years of age and I submit this declaration based on personal knowledge, as well as perceptions from my extensive involvement and experience in the Medicare Prescription Drug program (Part D) on behalf of Omnicare.

2.     Omnicare is the nation's leading provider of long-term care pharmacy services. Through its pharmacies across the country, it serves residents of long-term care facilities, such as nursing homes. Omnicare is a member of both the Long Term Care Pharmacy Alliance, and its pharmacists are members of the American Society of Consultant Pharmacists.

3.     Omnicare is a party to network contracts with various PDP sponsors (or their pharmacy benefits managers) under the Part D program. Pursuant to these contracts, Omnicare provides prescription medicines to Medicare beneficiaries in nursing facilities ("institutionalized beneficiaries"). To the extent the costs of such medicines are not covered by co-payments from such beneficiaries, the PDPs that provide prescription drug coverage for such beneficiaries compensate Omnicare for the drugs dispensed.

4.     There has been and continues to be a serious information problem in the administration of the Part D benefit for many nursing home residents to whom Omnicare dispenses medications on behalf of PDPs. These involve prescription "co-payments" that the PDPs should be paying, but are refusing to pay to Omnicare, due to CMS's failure to timely and properly identify these beneficiaries. This problem has cost our company millions of dollars, and that amount will increase until it is corrected. I will explain the process in detail below.

5.     For a typical nursing home resident, Omnicare receives a patient census from each nursing home to which it delivers drugs. In virtually all instances the census identifies the individuals to whom the drugs are being delivered as "Medicaid eligible," with Medicaid paying for the individuals' nursing home stay. To the extent that Omnicare is delivering drugs to nursing home residents those residents are obviously "institutionalized," as that term is defined by CMS.

6.      Thus, except in situations where a patient is later retroactively qualified as Medicaid eligible, from the day that Omnicare began delivering drugs to Medicare Part D beneficiaries, it almost always knows whether the beneficiary is an "institutionalized full benefit dual eligible."

7.      Once Omnicare is aware of that information, it has no reason to charge the beneficiary a co-payment because the beneficiary is not obligated to pay the amount. Indeed, Omnicare's PDP contracts require Omnicare not to charge a beneficiary for any covered services, which would include co-payments that should have been covered by the PDP for institutionalized full benefit dual eligible beneficiaries.

8.      For those beneficiaries whom Omnicare identifies as institutionalized full benefit dual eligibles, Omnicare expects the responsible PDP to pay for the entire charge for the drug that was dispensed.

9.      The PDP is obligated to pay the full cost of the drug dispensed, and CMS, in turn, is obligated to reimburse the PDP that same amount.

10.     Since January 2006, and continuing through today, however, CMS has routinely and consistently failed to timely and properly identify to the PDPs the beneficiaries who are either "institutionalized," "dual eligibles," or both. When Omnicare submits online its claim for payment (which is done electronically within a day or so of the date the drug is dispensed), the PDP often accepts the claim, but rejects responsibility for the co-payment. Consequently, Omnicare will only receive partial payment from that PDP.

11.     The PDPs refuse to reimburse Omnicare for the co-payments until CMS has identified the beneficiary as "institutionalized" and "dual eligible" in the CMS system to which the PDPs have to report. We have offered verifying information to these PDPs, including information on Medicaid status, long-term care status, and even an attestation that Omnicare has not collected the co-payment from the beneficiary, but they consistently and repeatedly refuse to reimburse Omnicare for the co-payments owed unless and until CMS correctly identifies the beneficiaries in the CMS system. Some PDPs, or their pharmacy benefits managers, have indicated that they would pay Omnicare if Omnicare helped the PDPs correct the CMS system by providing what CMS calls "Best Available Evidence." Omnicare, however, does not have "Best Available Evidence" in its possession.

12.     Even where such PDP sponsors acknowledge that Omnicare did not collect any cost-sharing amounts from the institutionalized full benefit dual eligible beneficiaries, they still are not reimbursing Omnicare for the portion of the amount due that represents the cost-sharing amount that would be due if the beneficiary were not an institutionalized full benefit dual eligible beneficiary. As of today, there are thousands of claims from the 2006 calendar year for which CMS still has incorrectly identified the subsidy-eligible status of the beneficiary, resulting in millions of dollars of unreimbursed co-payment charges.

13.     Omnicare has suffered direct harm as a result of CMS's failure to properly identify and classify beneficiaries as institutionalized full benefit dual eligibles. As reported in our latest public filings, as of September 30, 2007, Omnicare was owed approximately $36 million in outstanding co-payments from PDPs due to these CMS failures. That figure had grown by $7 million over the last

quarter, up from $29 million as of the end of June 2007. Approximately $20 million of the unreimbursed amounts relates to claims from calendar year 2006.

14.    Omnicare has initiated proceedings against several PDP sponsors (or their pharmacy benefits managers) that have failed to reimburse it for the cost-sharing amounts such PDP sponsors improperly are assessing to institutionalized full benefit dual eligible beneficiaries.

15.    As a business matter, Omnicare has been unable to initiate proceedings against a number of PDP sponsors because the legal and administrative fees associated with bringing each action exceeds the cost-sharing amounts at issue in any individual case. However, in the aggregate these claims are significant and to date Omnicare has been unable to obtain reimbursement for them.

I hereby declare, under penalty for perjury, that the foregoing is true and correct to the best of my knowledge.

_____
Donald Amorosi

November 16, 2007

4920419                                              3

# EXHIBIT 5

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



## CENTER FOR BENEFICIARY CHOICES

**Date:**             December 22, 2006

**Memorandum To:**   All Part D Sponsors

**Subject:**          Reconciling Incorrect Cost Sharing Paid by LTC Pharmacies

**From:**             Cynthia Tudor, Director, Medicare Drug Benefit Group

As the first year of the Medicare Prescription Drug Benefit draws to a close, we remind Part D plan sponsors that they are obligated to reconcile any claims that may have resulted in incorrect cost sharing for low income subsidy (LIS) eligible beneficiaries at the point-of-sale. We recognize that problems with cost sharing have disproportionately impacted beneficiaries who are residents of nursing homes, and for whom long-term care (LTC) pharmacies are holding receivable balances rather than charging beneficiaries incorrect cost sharing amounts. This is particularly true in situations where a beneficiary is a full benefit dual eligible and meets the definition of an institutionalized individual for whom there is no cost sharing for covered Part D drugs.

In previous guidance, we emphasized to plans the importance of adopting standardized procedures to reconcile incorrect cost sharing made by LIS-eligible beneficiaries. In accordance with our rules at 42 CFR 423.800(c), plan sponsors have an obligation to make the LIS-eligible beneficiary whole by refunding any improperly collected cost sharing. In situations where cost sharing has been overpaid by beneficiaries, the plan should send the enrollee a check for amounts owed, or offset future cost sharing if the amount owed is less than a minimal cut-off threshold.

While this is our general policy, it is important that Part D plans be aware of the role LTC pharmacies have played with respect to cost sharing amounts overcharged to LTC residents, particularly some dual eligibles who should not have paid any cost sharing for their covered Part D drugs. Many LTC pharmacies did not collect the cost sharing amounts that were incorrectly charged. As many of LTC pharmacies continue to hold receivable balances for cost sharing amounts that should have been subsidized by the plan, Part D plan sponsors need to work with them to ensure appropriate reconciliation of amounts owed.

As we stated in our attached question and answer guidance released last April (see Attachment I posted at *http://questions.cms.hhs.gov/*, *Q&A ID 7683*), plan sponsors should not automatically reimburse beneficiaries for cost sharing amounts that were not collected by their LTC pharmacies. Rather, plan sponsors need to work directly with their network LTC pharmacies to provide them with direct reimbursement for any cost sharing amounts that were not collected from LIS-eligible beneficiaries. Before reimbursement is made directly to LTC pharmacies, plan

sponsors need to ensure that the pharmacies in question have not collected or otherwise waived the cost sharing charges, and, in fact, are carrying a debt for the amounts owed. Plan sponsors may accomplish this by working with their network LTC pharmacies to ensure appropriate documentation and attestations are provided to justify payment to the LTC pharmacy for excess cost sharing amounts that should have been paid by the plan under the low-income subsidy.

If you have any questions on this policy, please contact Christine Hinds at (410) 786-4578.

2

Attachment I

## Reimbursement to LTC Pharmacies for
## Retroactive Subsidy-level Cost Sharing Charges

Q. In situations where a full-benefit dual eligible meets the definition of an institutionalized individual but is incorrectly charged cost sharing for prescriptions under the Part D benefit, may Part D plans reimburse their contracted long term care (LTC) pharmacies directly when implementing retroactive subsidy level changes?

A. Yes. When implementing retroactive subsidy level changes for a full-benefit dual eligible who meets the definition of an institutionalized individual but is incorrectly charged cost sharing under the Part D benefit, plans should not automatically reimburse beneficiaries residing in long-term care facilities. In such situations, it is unlikely that LTC pharmacies have collected the applicable cost-sharing from beneficiaries due to the expectation that the plan eventually would reimburse the pharmacy retroactively for such amounts. In such situations, Part D plans should work with their pharmacies to provide them with direct reimbursement for any cost-sharing amounts not collected from institutionalized individuals. Before reimbursement is made, Part D plans should ensure that LTC pharmacies have not collected the cost sharing amounts, otherwise waived the cost sharing charges, and, in fact, are carrying a debt for the amounts incorrectly charged to the beneficiary. For auditing purposes, plans should ensure that pharmacies certify that the amounts reimbursed are appropriate, owed and payable.

By regulation, Part D plans are required to reimburse subsidy eligible individuals, and organizations paying cost sharing on behalf of such individuals, any excess cost sharing paid after the effective date of the individual's eligibility for a subsidy ( 42 CFR 423.800(c)). Providing direct reimbursement to LTC pharmacies for excess cost sharing charges that have not been paid by Part D enrollees or waived by the pharmacy does not conflict with this requirement, since such amounts were never paid by either the institutionalized individual or others on his or her behalf.

3

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LONG TERM CARE PHARMACY ALLIANCE, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Case No. 1:07-cv-01115 (ESH) |
| MICHAEL O. LEAVITT, et al., | ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF TOM CLARK

I, Tom Clark, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am over 21 years of age and I am competent to make this Declaration.

2.      I make this Declaration based on personal knowledge, except as to matters stated to be on information and belief.

3.      I am the Director of Policy and Advocacy for the American Society of Consultant Pharmacists ("ASCP"), a Plaintiff in this action. I am submitting this Declaration in support of Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint in this action in order to bring to this Court's attention additional facts regarding ASCP's members' injury.

4.      ASCP is a professional society of pharmacists who work in and own long-term care pharmacies ("LTC Pharmacies") serving nursing homes and assisted living facility residents across the United States, including the District of Columbia. ASCP has at least ten (10) members in the District of Columbia. ASCP members are directly involved in the distribution and monitoring of prescription medication for thousands of elderly, low-income, and often chronically ill beneficiaries

4919423                                    1

who are dual eligibles. As part of this process, ASCP members are involved in processing and submitting claims for verification and reimbursement on behalf of dual eligible beneficiaries who receive prescription drug coverage from federal health care programs, including the Medicare Prescription Drug program (Part D).

5.    There has been and continues to be a serious information problem in the administration of the Part D benefit for many nursing home residents to whom ASCP's members dispense medications on behalf of prescription drug plans (PDPs). These involve prescription "co-payments" that the PDPs should be paying, but are refusing to pay to ASCP's members due to CMS's failure to timely and properly identify these beneficiaries. The fundamental problem is CMS's failure to provide timely and accurate data as to whether a recipient is an institutionalized full benefit dual eligible. CMS's failure to do so has cost our members many tens, if not hundreds, of thousands of dollars and that amount will increase until CMS's failure is corrected.

6.    Since January 2006, and continuing through today, CMS has routinely and consistently failed to timely and properly identify to the PDPs the beneficiaries who are either "institutionalized," "dual eligibles," or both. When ASCP's members submit online claims for payment (which is done electronically within a day or so of the date the drug is dispensed), the PDPs often accept the claims, but reject responsibility for the co-payments. Consequently, the pharmacies owned by ASCP's members will only receive partial payment from the PDPs. Of course, this goes right to the "bottom line" and directly impacts those ASCP members that own pharmacies.

7.    ASCP's members have had repeated and numerous conversations with PDPs about this problem. Consistently, the PDPs refuse to reimburse ASCP's members' pharmacies for the co-payments until CMS has identified the beneficiary as "institutionalized" and "dual eligible" in the CMS system to which the PDPs have to report. ASCP's members have offered all sorts of verifying information to these PDPs, including information on Medicaid status, long-term care status, and

4919423                                    2

even an attestation that these beneficiaries are institutionalized dual eligibles for which no co-payment is required, but they consistently and repeatedly refuse to reimburse the co-payments owed unless and until CMS correctly identifies the beneficiaries in the CMS system.

8.    Even where such PDP sponsors acknowledge that the pharmacies did not collect any cost-sharing amounts from the institutionalized dual eligible beneficiaries, they still are not reimbursing the portion of the amount due that represents the cost-sharing amount that would be due if the beneficiary were not an institutionalized dual eligible beneficiary. In many instances, it is far more serious a problem than just allowing time for the data to "catch up" with the system. As of today, there are thousands of claims from the 2006 calendar year that CMS still has incorrectly identified the subsidy-eligible status of the beneficiary, resulting in millions of dollars of unreimbursed co-payment charges. Yet, CMS has officially closed out the 2006 plan year knowing that these issues have not been resolved.

9.    Many of ASCP's members have suffered direct harm as a result of CMS's failure to timely provide accurate information to PDPs about beneficiary institutional and dual eligibility status. Many of the pharmacies which our members work in and own are owed significant amounts by PDPs for the unreimbursed co-payments.

10.    ASCP is seeking mandamus and declaratory relief to remedy the faulty CMS data and the incorrect cost-sharing assessments that flow from such data that have injured ASCP's members.

11.    ASCP's members have no remedy available to them, other than the suit brought by LTCPA and ASCP, that will correct the information failure for which CMS is responsible. In particular, many of the smaller independent and midsize pharmacies that are owned by ASCP members have no way to collect the unreimbursed co-payment amounts, as they do not have the resources to sue the PDPs. Thus, they do not have any remedy to collect these co-payments for

beneficiaries that CMS simply failed to properly designate timely as institutional full benefit dual eligibles.

November 16, 2007

_Thomas R. Clark_
_____