# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LONG TERM CARE PHARMACY ALLIANCE, and AMERICAN SOCIETY OF CONSULTANT PHARMACISTS, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )   Case No. 1:07-cv-01115 (ESH) |
| MICHAEL O. LEAVITT, Secretary of the U.S. Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and CENTERS FOR MEDICARE AND MEDICAID SERVICES, | ) ) ) ) ) ) |
| Defendants. | ) ) |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS[1]

---

[1]Defendants' motion to dismiss was originally filed on October 5, 2007, in connection with plaintiffs' original Complaint in this action.  On November 16, 2007, plaintiffs filed an Amended Complaint.  In a conference call on November 26, 2007, the parties agreed that the Amended Complaint did not raise new issues requiring supplemental briefing.  Rather than submitting a separate memorandum in support of their motion to dismiss plaintiffs' Amended Complaint, defendants have adopted, in support of that motion, their memorandum in support of their motion to dismiss plaintiffs' original Complaint, insofar as the arguments in that memorandum relate to claims asserted in the Amended Complaint.  This reply memorandum is therefore filed in support of defendants' motion to dismiss plaintiffs' Amended Complaint.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iv

INTRODUCTION ................................................................................................ 1

ARGUMENT ....................................................................................................... 5

I.  PLAINTIFFS HAVE NOT ASSERTED A COGNIZABLE APA CLAIM UNDER
    5 U.S.C. § 706(1) ...................................................................................... 5

    A.  Plaintiffs' Demand That CMS "Provide A Process" For Notifying PDP
        Sponsors That Medicare Part D Beneficiaries Are Eligible For Cost-
        sharing Subsidies Does Not Qualify As A Claim That CMS Has
        Withheld Or Delayed An "Agency Action" ................................................. 5

    B.  Plaintiffs' Claim That CMS Is Legally Required To Transmit CMS Data
        To PDP Sponsors In A Timely And Accurate Manner Relies On False
        Logic Which Would Deny CMS Its Discretion To Administer Medicare
        Part D In The Manner It Deems Appropriate ............................................. 8

II. PLAINTIFFS' APA CLAIM IS ALSO BARRED BECAUSE PLAINTIFFS
    HAVE AN ADEQUATE REMEDY ELSEWHERE ......................................... 11

    A.  The D.C. Circuit's Opinion In Trudeau Did Not Change Longstanding
        Circuit Precedent Holding That The APA Does Not Waive Sovereign
        Immunity Where An Adequate Remedy Is Available Elsewhere .............. 11

    B.  The Remedy Available To Plaintiffs Through Contract Actions Is Adequate
        Because It Would Redress The Injuries That Plaintiffs Allege, Assuming
        That Plaintiffs Have An Entitlement To The Amounts They Claim .......... 13

III. PLAINTIFFS' MEMBERS FAIL TO MEET THE INJURY-IN-FACT OR
     PRUDENTIAL STANDING REQUIREMENTS ............................................. 17

    A.  Plaintiffs' Claims Are Insufficient To Support The Injury-In-Fact
        Requirement Because They Can Only Have Been Injured If Their
        Contracts With PDP Sponsors Were Breached, But They Allege No
        Such Breach ........................................................................................... 17

    B.  LTC Pharmacy Interests In Ensuring Their Copayment Reimbursements
        Fall Outside The Zone Of Interests Of Medicare Part D ......................... 19

IV.     PLAINTIFFS' AMENDED COMPLAINT FAILS TO SAVE THEIR
        FIFTH AMENDMENT CLAIM BECAUSE THEY HAVE NO PROPERTY
        INTEREST AND IDENTIFY NO "PROCESS OF LAW" OF WHICH
        THEY WERE DEPRIVED ................................................................................................. 21

V.      PLAINTIFFS CANNOT SEEK MANDAMUS RELIEF ....................................................... 23

CONCLUSION ............................................................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

PAGE(S)

**CASES**

<u>ACLU v. NSA</u>, 493 F.3d 644, 678 (6th Cir. 2007) ...................................................5, 6

<u>Am. Farm Bureau v. EPA</u>, 121 F. Supp. 2d 84 (D.D.C. 2000) .........................................7

*<u>Amgen, Inc. v. Smith</u>, 357 F.3d 103 (D.C. Cir. 2004) ...........................................19, 20

<u>Bagenstose v. Dist. of Columbia</u>, 503 F. Supp. 2d 247 (D.D.C. 2007) ......................21, 23

<u>Beamon v. Brown</u>, 125 F.3d 965 (6th Cir. 1997) .......................................................... 12

<u>Black v. Snow</u>, 272 F. Supp. 2d 21 (D.D.C. 2003) ...........................................................24

<u>Board of Regents v. Roth</u>, 408 U.S. 564 (1972) ..............................................................22

<u>Bublitz v. Brownlee</u>, 309 F. Supp. 2d 1 (D.D.C. 2004) ....................................................15

<u>Canadian Commercial Corp. v. Dep't of Air Force</u>, 442 F. Supp. 2d 15 (D.D.C. 2006) ...............11

<u>Ctr. for Auto Safety, Inc. v. Nat'l Highway Traffic Safety Admin.</u>,
        342 F. Supp. 2d 1 (D.D.C. 2004) ...............................................................6

<u>Coker v. Sullivan</u>, 902 F.2d 84 (D.C. Cir. 1990) .....................................................15, 16

<u>Council of & for the Blind of Del. County Valley, Inc. v. Regan</u>,
        709 F.2d 1521 (D.C. Cir. 1983) (en banc) .............................................16

<u>Daskalea v. Wash. Humane Soc'y</u>, 480 F. Supp. 2d 16 (D.D.C. 2007) ...........................22

<u>Doe by Fein v. Dist. of Columbia</u>, 93 F.3d 861 (D.C. Cir. 1996) (per curiam) ................23

<u>El Rio Santa Cruz Neighborhood Health Ctr. v. Dep't of HHS</u>, 396 F.3d 1265 (D.C. Cir. 2005) .....15

*<u>Fornaro v. James</u>, 416 F.3d 63 (D.C. Cir. 2005) ..................................................... 11, 12

<u>Fund for Animals, Inc. v. BLM</u>, 460 F.3d 12 (D.C. Cir. 2006) .........................................5

<u>Furlong v. Shalala</u>, 156 F.3d 384 (2d Cir. 1998) ............................................................23

<u>Hardy v. Birmingham Bd. of Educ.</u>, 954 F. 2d 1546 (11th Cir. 1992) ........................... 24

Infante v. DEA, 938 F. Supp. 1149 (E.D.N.Y. 1996) ........................................................12

In re Long-Distance Tele. Serv. Fed. Excise Tax Refund Litig.,
        No. 07-51, 2007 WL 2284756 (D.D.C. Aug. 10, 2007) ....................................... 11

Levitt v. FBI, 70 F. Supp. 2d 346 (S.D.N.Y. 1999) ..........................................................12

Lujan v. National Wildlife Federation," 497 U.S. 871 (1990) ...........................................6

Mathews v. Eldridge, 424 U.S. 319 (1976) .....................................................................23

*Norton v. S. Utah Wilderness Alliance ("SUWA"), 542 U.S. 55 (2004) ...............5, 6, 7, 8, 10, 24

Pharm. Research & Mfrs. v. Thompson, 259 F. Supp. 2d 39 (D.D.C. 2003) ....................21

Presbyterian Church v. United States, 870 F.2d 518 (9th Cir. 1989) ..............................12

Pub. Warehousing Co. v. Defense Supply Ctr., 489 F. Supp. 2d 30 (D.D.C. 2007) ......................12

Red Lake Band of Chippewa Indians v. Barlow, 846 F.2d 474 (8th Cir. 1988) ..............12

Suburban Mtg. Assocs. v. HUD, 480 F.3d 1116 (Fed. Cir. 2007) ................................... 12

*Transohio Savings Bank v. OTS, 967 F.2d 598 (D.C. Cir. 1993) .......................3, 11, 12

Trudeau v. FTC, 456 F.3d 178 (D.C. Cir. 2006) .....................................................3, 11, 12

Tucson Airport Auth. v. Gen. Dynamics Corp., 136 F.3d 641 (9th Cir. 1998) .................12

Wash. Legal Foundation v. Alexander, 984 F.2d 483 (D.C. Cir. 1993) .......................... 14

Wis. Pub. Power, Inc. v. FERC, 493 F.3d 239 (D.C. Cir. 2007) ..................................... 17

Yan v. Mueller, No. 07-0313, 2007 WL 1521732 (S.D. Tex. May 24, 2007) ..............................24

## STATUTES

5 U.S.C. § 702 ..................................................................................................... 11, 12

5 U.S.C. § 704 .............................................................................................. 11, 12, 13, 16

5 U.S.C. § 706 ................................................................................. 1, 5, 6, 8, 10, 13, 19, 24

42 U.S.C. § 1395b-9 ................................................................................................................. 6

42 U.S.C. § 1395w-114 ................................................................................................. 6, 7, 9, 21


## **REGULATIONS**

42 C.F.R. § 423.782 ................................................................................................................. 7

42 C.F.R. § 423.800 ........................................................................................................ 7, 9, 10

## INTRODUCTION

Plaintiffs have asked this Court to provide their members – long-term care ("LTC") pharmacies –  with a remedy against the Centers for Medicare and Medicaid Systems ("CMS") and other defendants ("defendants" or "CMS") for the alleged failures of private Prescription Drug Plan ("PDP") sponsors to pay the pharmacies what they allegedly owe.  Defendants have set forth numerous defects in plaintiffs' claims that warrant dismissal of this action.  In their attempt to overcome these defects, plaintiffs employ the equivalent of a smoke and mirrors routine by which they seek to cover over one difficulty at a time, in each case assuming that the other defects do not exist.  However, in every instance, plaintiffs' efforts to save their claims from dismissal must fail based on two fundamental weaknesses – first, the fact that the monetary injuries that plaintiffs' members claim to have suffered depend on their contractual relationships with third party private entities and not on any statutory, regulatory, or contractual relationship with CMS; and second, the fact that the relief plaintiffs demand would require this Court to take upon itself, on behalf of long-term pharmacies, the supervision of CMS's ongoing administration of a complex federal program – a program that Congress intended to benefit Medicare beneficiaries, not pharmacies.

The lack of a discrete "agency action" as the basis for plaintiffs' challenge is a particular problem.  Under Supreme Court authority, the "agency action" requirement is an essential element of plaintiffs' claim under the APA provision 5 U.S.C. § 706(1).  Here, plaintiffs assert that CMS has failed to provide a process for notifying PDP sponsors, in a sufficiently timely and accurate manner, that certain Medicare Part D beneficiaries are eligible for low-income subsidies, which relieves these beneficiaries' obligation to pay copayments under the program.  Plaintiffs'

- 1 -

contention that CMS's alleged failure to provide a notification "process" is equivalent to an agency's failure to take decisive action in regard to a particular claimant contravenes basic principles of APA review. The "agency action" requirement ensures that a court will not end up micromanaging an agency's implementation of an entire government program, which is exactly what plaintiffs ask this Court to do.

In addition, plaintiffs have failed to show that CMS is legally required to notify PDP sponsors through the particular mechanism that plaintiffs demand, or that there are any set deadlines for such notifications. Rather, CMS has discretion to implement any reasonable method for conveying information to PDP sponsors that would allow them to recognize beneficiaries as subsidy eligible, including a process whereby the information is obtained directly from other sources, including pharmacies. Plaintiffs' notion that CMS is legally obligated to improve the timing and accuracy of the CMS to PDP transmission of information obtained from states ignores the alternative possibility that CMS might instead call upon PDP sponsors to accept information received directly from other sources and transmit this information to CMS. Plaintiffs' demand would interfere with CMS discretion and instead force CMS, by court order, to implement the Medicare Part D subsidy program in the manner that long-term care pharmacies choose.

Plaintiffs also attempt to deflect the significance of the fact that their members could seek relief for their alleged injuries – to the extent they are true "injuries" entitled to such relief – directly from the PDP sponsors with whom they have contracts. Under 5 U.S.C. § 704, this adequate remedy, which would allow plaintiffs' members to recover everything they are legitimately owed, precludes plaintiffs' APA claim. While plaintiffs do not deny that APA

claims are precluded where an adequate alternative remedy exists, they contend – contrary to the Circuit's longstanding decision in Transohio Savings Bank v. OTS, 967 F.2d 598, 607 (D.C. Cir. 1993) – that the bar is not jurisdictional.  Their contention that the D.C. Circuit's panel opinion in Trudeau v. FTC, 456 F.3d 178 (D.C. Cir. 2006), overruled Transohio is baseless.  Trudeau is not an en banc opinion and, moreover, did not even address Transohio's holding that an alternative adequate remedy renders the APA's waiver of sovereign immunity inapplicable.

In regard to standing, aside from the causation and redressability issues that the parties will address in subsequent briefing, plaintiffs' members cannot have sustained an injury-in-fact unless they are actually entitled to the payments they claim under their contracts with PDP sponsors.  Yet, neither the Amended Complaint nor the declarations that plaintiffs have submitted allege any facts that, if true, suggest that PDP sponsors have actually breached their contracts with pharmacies.  In at least one of these declarations by a plaintiff's member pharmacy, it is conceded that the pharmacy has not provided information that would be necessary to verify that the Medicare Part D beneficiaries in question are entitled to low-income subsidies.  There is no reason to suspect that PDP-pharmacy contracts require PDP sponsors to pay pharmacies subsidy amounts without adequate verification that the beneficiaries in question were entitled to subsidies.  If there is no contractual breach, plaintiffs' members have not been injured; they have simply received what they are entitled to under the terms of their contract.

Plaintiffs also assert that they have prudential standing to request the Court's ongoing involvement with CMS's administrative activities because their members' interests in receiving cost-sharing subsidy reimbursements from PDP sponsors are sufficiently aligned with the interests of Medicare Part D beneficiaries that they fall within the zone of interests protected by

Medicare's Part D program. In fact, however, the goal of plaintiffs' members to have CMS take on full responsibility for ensuring the payments to which LTC pharmacies claim they are entitled is inconsistent with CMS's discretion to impose obligations on PDP sponsors to accept subsidy eligibility information they have received from other sources and provide this information to CMS in some circumstances when doing so will best protect the beneficiaries' interests. The fact that plaintiffs' member pharmacies may, as an incidental result, be required to transfer information from beneficiaries, LTC facilities, or other sources to sponsors does not violate any CMS obligation to pharmacies because CMS has no such obligation.

Plaintiffs' claimed procedural due process violation is unsustainable. Plaintiffs entirely misconstrue the nature of procedural due process, incorrectly contending that this doctrine requires agencies to remedy supposed procedural inadequacies in their program administration. Under a correct understanding of the doctrine, there is no government deprivation of a property interest at all when, as here, the supposed property right derives solely from contracts with private entities. Moreover, plaintiffs identify no form of notice or opportunity to be heard that they should have received before the government allegedly deprived them of property.

Finally, despite plaintiffs' withdrawal of their demand for mandamus relief directly under Medicare statutory provisions, plaintiffs argue that mandamus relief is appropriate. In regard to plaintiffs' APA claim, mandamus relief simply mirrors whatever relief plaintiffs might be entitled to under 5 U.S.C. § 706(1), and here is unwarranted for the same reasons that plaintiffs have failed to state an APA claim. Mandamus relief is also unavailable for plaintiffs' procedural due process claim because no ministerial duty is at issue.

- 4 -

## ARGUMENT

I.    **PLAINTIFFS HAVE NOT ASSERTED A COGNIZABLE APA CLAIM UNDER 5 U.S.C. § 706(1)**

    A.    **Plaintiffs' Demand That CMS "Provide A Process" For Notifying PDP Sponsors That Medicare Part D Beneficiaries Are Eligible For Cost-sharing Subsidies Does Not Qualify As A Claim That CMS Has Withheld Or Delayed An "Agency Action"**

As explained in defendants' opening brief, in order to state a claim under the APA provision 5 U.S.C. § 706(1), a claimant must allege that an agency has "unlawfully withheld or unreasonably delayed" an "agency action." Defs.' Op. Br. at 33-34. The Supreme Court has made clear that only "discrete" actions – such as decisions that grant or deny rights or benefits to particular individuals – that an agency is "required" to take can be compelled under § 706(1). Norton v. S. Utah Wilderness Alliance ("SUWA"), 542 U.S. 55, 64 (2004). In response to defendants' discussion demonstrating that no discrete and required agency action is at issue here, plaintiffs assert that the "action" they seek to compel is "CMS's failure to timely provide accurate eligibility data to PDPs."[2] Pls.' Opp. Mem. at 23. In doing so, plaintiffs simply ignore SUWA's holding, which they fail to cite, and conflate the idea that CMS has a "duty" to provide a notification system with § 706(1)'s requirement that an agency "action" be at issue. Indeed, plaintiffs attempt to distinguish the holdings in ACLU v. NSA, 493 F.3d 644, 678 (6th Cir. 2007), and Fund for Animals, Inc. v. BLM, 460 F.3d 12, 19 (D.C. Cir. 2006), which applied SUWA's "discrete agency action" requirement, simply by alleging that here CMS has "notification duties" that are "statutorily- and regulatorily-required" in order to "implement

_____

    [2]Recognizing that plaintiffs' sentence makes no sense, defendants interpret plaintiffs' assertion to mean that plaintiffs seek to compel CMS to comply with the asserted duty to establish a process through which timely and accurate notification is effected.

Congress's directive." Pls.' Opp. Mem. at 23-24 n.19.

Of course, federal agencies such as CMS have a wide variety of obligations with respect to their ongoing implementation and administration of federal programs. Indeed, in regard to Medicare Part D, Congress has listed among CMS's "duties" the "administration" of the program itself. 42 U.S.C. § 1395b-9(a)(3)(A). Similarly, the provision on which plaintiffs rely, 42 U.S.C. § 1395w-114(c)(1), appears under the heading "Administration of subsidy program." Id. § 1395w-114(c).

However, SUWA recognized that an agency's duty to administer the programs under its supervision, which necessarily encompasses duties to take action of some kind, is not equivalent to the performance of a discrete "agency action" within the meaning of the APA. SUWA, 542 U.S. at 64 ("The limitation to discrete agency action precludes the kind of broad programmatic attack we rejected in Lujan v. National Wildlife Federation," 497 U.S. 871 (1990).). Instead, agency actions in this sense are limited to discrete rulemaking and adjudication decisions, issuances of licenses and permits, and other such specific and concrete acts. See ACLU, 493 F.3d at 678 (noting that, "[u]nder Supreme Court precedent, classic examples of 'agency action' include the issuance of an agency opinion, or a declaratory ruling" (citation omitted)); cf. Ctr. for Auto Safety, Inc. v. Nat'l Highway Traffic Safety Admin., 342 F. Supp. 2d 1, 10 n.17 (D.D.C. 2004) (holding that plaintiff's § 706(2) claim challenging a "specific and concrete policy that permits certain regional recalls" was distinguishable from an impermissible programmatic attack brought under § 706(1)). CMS's compliance with Congress's direction to "provide a process whereby" it "provides for a notification" is not an "agency action" that can be compelled under

- 6 -

the APA.[3]  As the Supreme Court has stated, "[t]he prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA."  SUWA, 542 U.S. at 67.

Nor can the "agency action" in question be CMS's compliance with its own regulation, 42 C.F.R. ¶ 423.800(a), which states that "CMS notifies" sponsors of subsidy eligibility information.  As explained in defendants' opening brief, Defs.' Op. Br. at 35, that provision sets forth a single step in the process that CMS has developed for the administration of the subsidy program, the purpose of which is to ensure compliance by PDP sponsors with their duty to provide required subsidies to those who are eligible for them.  This notification no more qualifies as an "agency action" than the process as a whole does.  See id. (pointing out that the notification at issue is not the equivalent of an agency action such as a rule, order, license, sanction, or relief).

---

[3]Plaintiffs grossly mischaracterize defendants' position by stating that defendants "minimize their obligations . . . to the point where they assert that they have none."  Pls.' Opp. Mem. at 23.  It is not, of course, defendants' position that they have no obligation to comply with 42 U.S.C. § 1395w-114(c).  To the contrary, defendants have complied with that statutory provision by promulgating implementing regulations at 42 C.F.R. §§ 423.782, .800, and by implementing a "best available evidence" policy that allows PDP sponsors to accept evidence of subsidy-eligible status from other sources as well as from CMS and to submit correction requests to CMS that allow CMS to update beneficiaries' eligibility status in its own systems based on this evidence.  While, at the motion to dismiss stage, defendants have not submitted an administrative record that would document these efforts for the Court's evaluation, the Court may take judicial notice of CMS regulations, and the fact – as indicated in Part D Plan Sponsor Guidance on LIS Corrections Based on Best Available Evidence ("BAE Guidance"), at 4 (chronicling history of CMS guidance related to BAE policy) (attached to this memorandum as ex. A) – that CMS has issued guidance on a continuing basis since the Part D program began, for purposes of analyzing whether plaintiffs have stated a claim.  Am. Farm Bureau v. EPA, 121 F. Supp. 2d 84, 106 (D.D.C. 2000) (taking judicial notice of agency materials).  These ongoing efforts are in the nature of what an agency does when implementing a Congressional directive to administer a program and further demonstrate why there is no APA challenge possible here based on a discrete "agency action."

**B.      Plaintiffs' Claim That CMS Is Legally Required To Transmit CMS Data To PDP Sponsors In A Timely And Accurate Manner Relies On False Logic Which Would Deny CMS Its Discretion To Administer Medicare Part D In The Manner It Deems Appropriate**

While ignoring the APA's "agency action" requirement, plaintiffs do assert that CMS has failed to perform a legal requirement by "fail[ing] to timely provide accurate eligibility data to PDPs." Pls.' Opp. Mem. at 23. Plaintiffs do not deny that CMS does provide eligibility data to PDPs. The legal requirement that they are asserting, therefore, is limited to the notion that CMS's provision of this information must be accomplished in a manner that meets some standard of timeliness and accuracy that plaintiffs fail to define. For the proposition that this undefined degree of timeliness and accuracy is legally required, plaintiffs rely on inference, which they allege must be drawn from Part D's purpose, rather than any statute or regulation. They essentially claim that because the purpose of providing eligibility information to PDP sponsors is to ensure that Part D beneficiaries are not erroneously assessed cost-sharing expenses, they are entitled under 5 U.S.C. § 706(1) to compel, through mandamus, a certain degree of timeliness and accuracy, presumably leaving up to the Court the determination of the requisite parameters, where Congress has imposed none.

The supposed inference that plaintiffs put forth as sufficient to subject CMS to judicial compulsion under 5 U.S.C. § 706(1) is a far cry from the "categorical [statutory] imperative" that SUWA recognized was necessary to invoke this provision of the APA. SUWA, 542 U.S. at 66. Furthermore, plaintiffs' reasoning is flawed because it relies on an erroneous assumption – that CMS's provision of subsidy eligibility data to PDP sponsors is the only means by which eligible beneficiaries can be assured of receiving subsidies. The process that CMS has, in its discretion, implemented to administer Medicare Part D's subsidy program is specifically designed so that

subsidy-eligible beneficiaries need not rely on instantaneous data transmission to receive

subsidies.  As discussed in defendants' opening brief, Defs.' Op. Br. at 7-8, 36-37, the regulatory

scheme ensures that CMS will provide the bulk of Part D financing to PDP sponsors during a

plan coverage year through prospective interim payments based on estimates derived from

sponsors' initial bids, leaving the reconciliation of payments with actual data until at least six

months after the end of the coverage year.  This system ensures that PDP sponsors receive

sufficient financing to provide subsidy coverage during the year without regard to CMS's

provision of information.  This interim financing mechanism in turn allows CMS to exercise its

discretion in regard to developing a system through which subsidy-eligible beneficiaries may

receive the benefit of their subsidies.

Significantly, 42 U.S.C. § 1395w-114(c) does not limit CMS's discretion in regard to

who must provide eligibility notifications to PDP sponsors.  While the regulations indicate that

CMS will provide notifications, 42 C.F.R. § 423.800(a), CMS can also include, as part of the

overall notification process, a mechanism for beneficiaries or their representatives, either directly

or through pharmacies, to provide PDP sponsors with eligibility information.[4]  Nothing in the

regulations prevents PDP sponsors from then covering beneficiary subsidies based on this

information.[5]  Moreover, beneficiaries may recover subsidy amounts to which they are entitled at

---

[4]Indeed, this is exactly what CMS has done through its Best Available Evidence policy, referenced above.  However, it is not necessary for purposes of this argument that CMS has actually implemented such a policy.  The fact that CMS has discretion to implement such a policy demonstrates that plaintiffs' logical premise is flawed.

[5]Plaintiffs present the hearsay assertion of one PDP sponsor, which they attribute to others as well, that sponsors do not believe they can cover cost-sharing subsidies unless CMS data reflects a beneficiary's subsidy eligibility.  Pls.' Opp. Mem. at 25 n.21.  The Court should accord no weight to this unsubstantiated claim, which, aside from being hearsay, also fails to

any time after PDP sponsors are informed of their eligibility.  42 C.F.R. § 423.800(c).  Plaintiffs'

claim that CMS "obviously" must provide this "core information" on a "timely basis in order for

the program to work," Pls.' Opp. Mem. at 25, ignores CMS' flexibility to make adjustments in

the subsidy program over time that utilize mechanisms other than the one on which plaintiffs

focus to achieve the program's goals.

      This flaw in plaintiffs' logic illustrates the overall fallacy of their purported APA claim.

Were the Court to agree with plaintiffs that some unspecified degree of timeliness and accuracy

of CMS-provided notifications was a legally required "agency action" that the Court may compel

under 5 U.S.C. § 706(1), the Court would essentially be imposing on CMS a particular manner of

administering the Part D subsidy program that Congress did not prescribe, and it would do so

without regard to CMS's practical assessment of how program goals may best be achieved.

Where Congress has left such matters to an agency's discretion, it is not a court's role to "direct[]

*how* [the agency] shall act."  SUWA, 542 U.S.C. at 64 (internal quotation omitted).  Because

plaintiffs point to no discrete agency action that is legally required, they fail to state a claim under

5 U.S.C. § 706(1).

_____

acknowledge that, to the extent this might be a legitimate problem, it is one that CMS could
remedy by means other than the one that plaintiffs would have the Court require. CMS could – as
it indeed has under the Best Available Evidence policy – allow PDP sponsors to initiate
corrections of CMS data themselves by submitting subsidy eligibility information that they have
gathered from beneficiaries.  Again, plaintiffs' logic here is flawed.

**II.    PLAINTIFFS' APA CLAIM IS ALSO BARRED BECAUSE PLAINTIFFS HAVE AN ADEQUATE REMEDY ELSEWHERE**

    **A.    The D.C. Circuit's Opinion In <u>Trudeau</u> Did Not Change Longstanding Circuit Precedent Holding That The APA Does Not Waive Sovereign Immunity Where An Adequate Remedy Is Available Elsewhere**

As explained in defendants' opening brief, the waiver of sovereign immunity set forth in the APA provision 5 U.S.C. § 702 does not apply in situations where an "adequate remedy" for the claimant's alleged injury is "available elsewhere."  Defs.' Op. Br. at 17 (citing <u>Transohio Savings Bank v. OTS</u>, 967 F.2d 598, 607 (D.C. Cir. 1993)).  The interpretation of the APA's sovereign immunity waiver set forth in <u>Transohio</u> is well established and widely followed.  <u>E.g.</u>, <u>Fornaro v. James</u>, 416 F.3d 63, 66 (D.C. Cir. 2005) ("As we explained in <u>Transohio</u> . . . , the APA excludes from its waiver of sovereign immunity . . . claims for which an adequate remedy is available elsewhere . . . ." (internal quotation and alteration marks omitted)); <u>In re Long-Distance Tele. Serv. Fed. Excise Tax Refund Litig.</u>, No. 07-51, 2007 WL 2284756, at *14 (D.D.C. Aug. 10, 2007) (similar).

Plaintiffs' claim that <u>Transohio</u> has been overruled on this point by the D.C. Circuit's opinion in <u>Trudeau v. FTC</u>, 456 F.3d 178 (D.C. Cir. 2006), is wholly without merit.  The D.C. Circuit panel in <u>Trudeau</u> nowhere stated that its holding on an entirely different issue – whether the "final agency action" requirement in 5 U.S.C. § 704 had to be met in order for the § 702 waiver to apply in a non-APA action – "overruled" the Circuit's earlier decision in <u>Transohio</u>, nor could it.  <u>See</u> <u>Canadian Commercial Corp. v. Dep't of Air Force</u>, 442 F. Supp. 2d 15, 40 n.11 (D.D.C. 2006) ("It is well-settled that a decision of the D.C. Circuit may only be overruled by either an en banc panel or the Supreme Court.").

Moreover, <u>Trudeau</u>'s analysis of the "final agency action" requirement has no bearing on

- 11 -

the reasoning behind <u>Transohio</u>'s decision that the APA does not waive sovereign immunity for cases where an "adequate remedy" is available elsewhere.  As courts have repeatedly explained, even after <u>Trudeau</u>, § 702 expressly excludes from its sovereign immunity waiver suits where the relief sought is "expressly or impliedly forbid[den]" by another statute.  <u>Fornaro</u>, 416 F.3d at 66; <u>Pub. Warehousing Co. v. Defense Supply Ctr.</u>, 489 F. Supp. 2d 30, 36 (D.D.C. 2007) (citing <u>Fornaro</u>).  Section 704 precludes granting relief under the APA in suits where an adequate remedy is otherwise available.  5 U.S.C. § 704 (providing that judicial review of final agency action under the APA, in the absence of any other statute providing a right of action, is only available where there is "no other adequate remedy in a court").  Thus, while the "final agency action" requirement may be regarded as an element of an APA cause of action, and thus nonjurisdictional, the existence of an adequate alternative remedy renders the § 702 sovereign immunity waiver inapplicable.  Plaintiffs' attempt to cast doubt on the continuing validity of <u>Transohio</u> by pointing to a case that nowhere claimed to overrule this well established decision and did not even address the "adequate remedy" exclusion should be rejected out of hand.[6]

---

[6]In support of their interpretation of § 702, plaintiffs point to one Eighth Circuit decision that, like <u>Trudeau</u>, addressed only the "final agency action" requirement of § 704, <u>Red Lake Band of Chippewa Indians v. Barlow</u>, 846 F.2d 474, 475 (8th Cir. 1988) (rejecting defendant's claim that the § 702 waiver did not apply where agency had not made a "final agency decision"), and one Ninth Circuit decision rejecting the claim that the reference in § 702 to "agency action" imposed a similar limitation on the sovereign immunity waiver, <u>Presbyterian Church v. United States</u>, 870 F.2d 518, 525 (9th Cir. 1989).  Otherwise, plaintiffs rely on a single district court case in another jurisdiction, <u>Levitt v. FBI</u>, 70 F. Supp. 2d 346 (S.D.N.Y. 1999).  However, the weight of authority in other jurisdictions favors <u>Transohio</u>.  <u>See, e.g.</u>, <u>Suburban Mtg. Assocs. v. HUD</u>, 480 F.3d 1116, 1125 (Fed. Cir. 2007) (holding that courts should begin a § 702 sovereign immunity analysis by asking whether plaintiffs have an adequate remedy elsewhere); <u>Tucson Airport Auth. v. Gen. Dynamics Corp.</u>, 136 F.3d 641, 645 (9th Cir. 1998) (§ 702 waiver applies "only if" there is no other adequate remedy); <u>see also</u> <u>Beamon v. Brown</u>, 125 F.3d 965, 968 (6th Cir. 1997); <u>Infante v. DEA</u>, 938 F. Supp. 1149, 1154 (E.D.N.Y. 1996).

**B.     The Remedy Available To Plaintiffs Through Contract Actions Is Adequate Because It Would Redress The Injuries That Plaintiffs Allege, Assuming That Plaintiffs Have An Entitlement To The Amounts They Claim**

Even if this Court did conclude – contrary to Circuit precedent – that the existence of an adequate remedy elsewhere did not render the APA's sovereign immunity waiver inapplicable, it is undisputed that such an alternative remedy would still remove plaintiffs' claims from APA review under 5 U.S.C. § 704.  As defendants have explained, an adequate remedy is available here because plaintiffs' members may, assuming their claims of entitlement to cost-sharing amounts are valid,[7] bring contract actions against PDP sponsors, which are the entities that plaintiffs claim have incorrectly withheld these cost-sharing subsidy amounts.  Defs.' Op. Br. at 17-19.  Plaintiffs concede in their Amended Complaint that this remedy is available, Am. Compl. ¶ 51, and they do not deny its availability in their opposition memorandum.  Plaintiffs' APA claim under 5 U.S.C. § 706(1), as asserted in Count I of their Amended Complaint, is therefore barred in any event.

Plaintiffs claim that the availability of individual actions by their member LTC pharmacies against the PDP sponsors that have allegedly erroneously withheld cost-sharing subsidy amounts "miss[es] the point."  Pls.' Opp. Mem. at 13.  Essentially, they claim that this remedy, though available,[8] would be inadequate because plaintiffs seek prospective action on the

---

[7]As explained below, plaintiffs have not alleged that they are owed reimbursements under their contracts, or that their contracts have been breached.  However, such an allegation is essential to their having standing to bring suit; otherwise, they are not entitled to the amounts that they claim, so they have not suffered any injury-in-fact.

[8]Relying on an unsupported assertion in one of the declarations attached to their opposition memorandum, plaintiffs state that contract actions may not always be available "as a business matter."  Pls.' Opp. Mem. at 14.  The declarant's suggestion that the costs of bringing contract actions would exceed the amounts that his company could hope to recover is difficult to

- 13 -

part of CMS, and because the breach-of-contract causes of action that LTC pharmacies have

against PDP sponsors do not derive from federal law.  See Pls.' Opp. Mem. at 13-17.

The analysis of whether an available remedy is adequate, for purposes of § 704, focuses

on whether the claimant's alleged injuries can be redressed through that remedy.  See Wash.

Legal Foundation v. Alexander, 984 F.2d 483, 486 (D.C. Cir. 1993) (discussing the D.C.

Circuit's  prevailing view that a remedy is adequate "where a plaintiff's *injury* may be remedied

in another action, even if that remedy would have no effect upon the challenged agency action"

(internal quotation omitted)).  Here, plaintiffs' claimed injury is monetary, in an amount equal to

the cost-sharing amounts allegedly owed them by PDP sponsors.[9]  The fact that plaintiffs seek to

have this Court compel CMS to "timely provide complete, updated and accurate eligibility data"

to PDP sponsors "on an ongoing basis" so that pharmacies may, under plaintiffs' theory, more

easily obtain subsidy reimbursements forever after, Am. Compl. ¶ 3, does not suffice to change

---

reconcile with the same declarant's claim that his company is owed approximately $36 million in
erroneously withheld cost-sharing payments.  See Amorosi Decl. ¶¶ 13-15 (attached to Pls.' Opp.
Mem. as ex. 4).  In any case, plaintiffs cite no authority for the proposition that availability
should be measured based on factors other than the existence of a cause of action that provides a
remedy, should the action succeed.

[9]Plaintiffs assert that their members' alleged injuries should be construed to encompass
more than the deprivation of "the cost-sharing amounts alone."  Pls.' Opp. Mem. at 13 n.14.
Specifically, they allege that their members have also suffered "improper assessment of cost-
sharing in the first place and the hurdles to reimbursement those assessments create; (2) the ever-
increasing financial burden of carrying as receivables such cost-sharing . . . ; and (3) the infliction
of such injuries on a continuous . . . basis."  Pls.' Opp. Mem. at 19.  Essentially, plaintiffs are
claiming that more than money is at issue because their members have had to exert efforts in
order to attempt to recover the money allegedly owed, because the amounts at issue are allegedly
large, and because the alleged withholding of amounts owed has recurred on an ongoing basis.
The size and frequency of the alleged injury does not change the fact that the alleged injury
consists of the alleged improper withholding of cost-sharing amounts by PDP sponsors (not by
CMS).

the monetary nature of the relief that is sought.  Cf. Bublitz v. Brownlee, 309 F. Supp. 2d 1, 7

(D.D.C. 2004) (recognizing, in a Tucker Act jurisdictional analysis, that equitable relief that

lacks "considerable value independent of any future potential for monetary relief" should be

recognized as equivalent to a request for monetary relief).  Plaintiffs' asserted injuries are

monetary, the remedies they seek only benefit them financially, and breach of contract actions

against their contracting partners provide an adequate, and the appropriate, remedy.[10]

    As discussed in defendants' opening brief, the fact that the remedy is available from a

third party rather than from CMS is irrelevant.  Defs.' Op. Br. at 17-19.  Plaintiffs incorrectly

assert that the "adequate remedy" bar only applies where a federal statute provides "special and

adequate review procedures."  Pls.' Opp. Mem. at 13.  Yet, the case on which plaintiffs

principally rely for that assertion recognizes that, in addition to instances involving such

procedures, there is a "distinct line of cases" holding that a "private cause of action against a

third party" constitutes an adequate, and indeed favored, remedy because it relieves courts of the

responsibility of regulating federal agencies based only those agencies' regulatory authority over

the third parties.  El Rio Santa Cruz Neighborhood Health Ctr. v. Dep't of HHS, 396 F.3d 1265,

1270-71 (D.C. Cir. 2005).

    Plaintiffs seek to distinguish the numerous cases, cited by defendants, in this category that

recognize remedies against third parties as adequate by claiming that in those cases, the adequate

---

[10]Plaintiffs claim that they "do  not seek recovery of wrongfully-assessed copayment
amounts from PDPs or Defendants."  Pls.' Opp. Mem. at 14.  Thus, plaintiffs have evidently
waived any claim to retroactive injunctive relief in regard to eligibility notification problems that
they allege occurred during the 2006 coverage year or during the current coverage year prior to
the present time. This does not alter the monetary nature of their claim, the entire basis of which
rests on the premise that changes in CMS's current eligibility notification process would redress
financial injuries that plaintiffs speculate will otherwise occur in the future.

alternative remedy "derived implicitly or expressly from federal law." Pls.' Opp. Mem. at 15. This distinction, however, should only strengthen the Court's reluctance to displace the private remedy in favor of one that would require ongoing Court supervision of a federal program's administration. In the cases plaintiffs describe, the claimants actually had a federal statutory right to relief for the alleged injury. E.g., Coker v. Sullivan, 902 F.2d 84, 89 (D.C. Cir. 1990) (recognizing claimants could sue states under 42 U.S.C. § 1983 or the Supremacy Clause). Here, in contrast, the structure of the program leaves the creation of any actual rights on the part of plaintiffs' member pharmacies to state contract law. There is no reason to presume that a state law remedy would not be adequate. At the same time, there is certainly reason to presume that where alleged rights derive from a contract between two private parties,[11] and not from federal law at all, the Court should exercise considerable caution before recognizing a federal action against a government agency as the appropriate mechanism for seeking relief. The courts in Coker, 902 F.2d at 90, and Council of & for the Blind of Del. County Valley, Inc. v. Regan, 709 F.2d 1521, 1532 (D.C. Cir. 1983) (en banc), recognized that the adequate remedy bar in 5 U.S.C. § 704 was a means of allowing a court to avoid ongoing oversight of a federal agency where actions against third parties that are the direct cause of the alleged injury are available. The adequate remedy bar serves the same purpose here, and the Court should therefore follow Congress' and CMS' lead in leaving pharmacies to work out their contract disputes through actions against PDP sponsors rather than through an APA claim.

---

[11]Plaintiffs recognize that the rights they assert derive from a private contractual relationship, stating that their members' "reimbursement rights are protected under the state contract laws that govern the LTC-PDP contracts." Pls.' Opp. Mem. at 27.

III.    **PLAINTIFFS' MEMBERS FAIL TO MEET THE INJURY-IN-FACT OR PRUDENTIAL STANDING REQUIREMENTS**

Plaintiffs, as associations representing the interests of long-term care pharmacies, assert representational standing to bring suit on behalf of their members.  Am. Compl. ¶ 9.[12]  Pursuant to the Court's Order of November 1, 2007, defendants will address causation and redressability issues in post-jurisdictional discovery supplemental briefing and here limit their discussion to other defects in plaintiffs' attempt to establish standing.

A.    **Plaintiffs' Claims Are Insufficient To Support The Injury-In-Fact Requirement Because They Can Only Have Been Injured If Their Contracts With PDP Sponsors Were Breached, But They Allege No Such Breach**

Plaintiffs claim that their members have been injured because they "have not been paid co-payment amounts they are owed and have been forced to carry the cost-sharing burden of misclassified beneficiaries."  Am. Compl. ¶ 9.  However, neither plaintiffs' Amended Complaint nor their submitted declarations allege any facts that could, if true, establish that plaintiffs' members are entitled to the reimbursements they claim.  An "injury-in-fact" for purposes of standing is an "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  Wis. Pub. Power, Inc. v. FERC, 493 F.3d 239, 267 (D.C. Cir. 2007).

There is no provision in federal law that entitles pharmacies to reimbursements for Part D copayment subsidies.  Therefore, in order for the supposed injury here – PDP sponsor's failure to pay copayment amounts that plaintiffs' members are allegedly owed – to qualify as an invasion

_____

[12]Plaintiffs have withdrawn their assertion of organizational standing.  Pls.' Opp. Mem. at 17 n.17.  Defendants therefore only address plaintiffs' lack of  representational (which plaintiffs call "associational") standing.

of a "legally protected interest," plaintiffs' member pharmacies must have a contractual right to these copayments – one that PDP sponsors have failed to honor. In other words, the PDP sponsors must have breached their contracts with the pharmacies. Plaintiffs allege no such contractual right in their Amended Complaint. In their opposition memorandum, however, they do assert that their members' "reimbursement rights are protected under the state contract laws that govern the LTC-PDP contracts." Pls.' Opp. Mem. at 27.

Yet, they do not allege any breach of members' contracts. The declarations submitted by four of plaintiffs' members do allege that PDP sponsors have refused to pay them copayment amounts for enrollees whom CMS systems do not show as subsidy-eligible. E.g., Rutkowski Decl. ¶ 12 (Pls.' ex. 3); Amorosi Decl. ¶ 11 (Pls.' ex. 4). What they fail to allege is that their contract with PDP sponsors requires that they be paid copayment amounts before CMS systems show enrollee entitlement to such subsidies. If their contracts do not require such payments, plaintiffs' members have not been injured. They have merely received what they bargained for.

The declarations also allege that PDP sponsors have refused to accept "credible alternative information" that beneficiaries qualify as dual eligible. Rutkowski Decl. ¶ 12; Amorosi Decl. ¶ 11. Again, plaintiffs fail to allege that PDP-pharmacy contracts require PDP sponsors to accept such information. Under CMS's Best Available Evidence policy, CMS will accept appropriate information from PDP sponsors that beneficiaries are subsidy-eligible and will update its systems to reflect a subsidy-eligible status. See BAE Guidance at 4-6 (ex. A). The Amorosi Declaration acknowledges that some PDP sponsors have indicated their willingness to submit BAE information to correct CMS systems if pharmacies would provide this information. Amorosi Decl. ¶ 11. However, Mr. Amorosi states that his company "does not have 'Best

- 18 -

Available Evidence' in its possession." Id. Again, there is no injury if the failure to receive copayment expenses is due not to breach of contract but to pharmacies' failure to provide necessary information to verify enrollees' subsidy-eligible status. The requirement that some verification be provided is surely reasonable and appropriate, and CMS's BAE Guidance sets forth with specificity the information that it has deemed acceptable for this purpose.[13] BAE Guidance at 5-6. Because plaintiffs fail to allege facts crucial to their claim of injury, their injury is purely speculative, and they therefore lack standing on that basis.

> **B.** **LTC Pharmacy Interests In Ensuring Their Copayment Reimbursements Fall Outside The Zone Of Interests Of Medicare Part D**

Plaintiffs concede, Pls.' Mem. Opp. at 20, that the prudential standing requirement excludes as proper plaintiffs those parties "whose interests are not consistent with the purposes of the statute in question." Amgen, Inc. v. Smith, 357 F.3d 103, 109 (D.C. Cir. 2004) (internal quotation omitted). The reason for this exclusion is that "lawsuits by such plaintiffs carry a considerable potential for judicial intervention that would distort the regulatory process." Id. (internal quotation and alteration marks omitted). Here, LTC pharmacies are interested in receiving copayment subsidy payments in a manner that, assuming plaintiffs' assessment of causation were correct, would cost them no effort whatsoever. This interest in avoiding any business costs associated with obtaining subsidy payments is not shared by subsidy-eligible beneficiaries, whose overriding interest is in receiving prescription drugs at the proper subsidy level. The inconsistency between these two interests is easily demonstrated by comparing what plaintiffs seek with what CMS has, in its discretion, decided is the best manner of implementing

---

[13]Significantly, plaintiffs have not sought to challenge CMS' BAE Guidance under 5 U.S.C. § 706(2).

the subsidy program. LTC pharmacies ask this Court to impose on CMS the entire burden of obtaining subsidy eligibility information and of keeping this information up-to-date in CMS systems. CMS, on the other hand, has established a Best Available Evidence policy that imposes some obligation on PDP sponsors to accept information verifying the subsidy eligibility of their plan's beneficiaries from sources other than CMS if there is a lag between the time a beneficiary becomes eligible and the reflection of this status in CMS systems. BAE Guidance at 4-6 (ex. A). If PDP sponsors then submit this information to CMS, CMS will correct its records. Id. at 4, 6-7. As the entities that dispense prescription medications, pharmacies may find themselves, under this policy, in the position of transferring the required information from beneficiaries to PDP sponsors. This may be an inconvenience to them. However, CMS has determined that this structure will best serve beneficiaries' interests. If the Court were to hold that plaintiffs have prudential standing to impose on CMS the view of long-term care pharmacies regarding how best to administer the subsidy program, beneficiaries' interests may be harmed rather than served.

Plaintiffs claim that they have a "vendor-vendee" relationship with institutionalized dual eligible Medicare Part D beneficiaries and that their interests are therefore necessarily aligned with these beneficiaries. Pls.' Opp. Mem. at 21. This characterization is inaccurate. The alignment of interests that Amgen recognized between a vendor and a vendee, stems from their mutual commercial interest, the one in selling, the other in buying the same product. Amgen, Inc., 357 F.3d at 109 (recognizing plaintiff's commercial interest in selling more new treatments to beneficiaries, which would be served if medical providers received higher reimbursement rates for those treatments, was aligned with beneficiaries' interest in being prescribed, and thus buying, more new treatments). The common feature is the desire for the product to be sold. That

is not what is going on here.  Subsidy-eligible beneficiaries will not buy more prescription drugs, and LTC pharmacies will not sell more, if plaintiffs were to obtain the relief they seek.

Plaintiffs also argue that LTC pharmacies qualify as regulated parties under Medicare Part D.  As support, they cite Pharm. Research & Mfrs. v. Thompson, 259 F. Supp. 2d 39, 56-57 (D.D.C. 2003), which recognized drug manufacturers as regulated by a provision of Medicaid law that, although it did not impose requirements on manufacturers directly, was intertwined with other statutory provisions that did impose such requirements.  The situation here is distinguishable because the Medicare provision that plaintiffs seek to enforce, 42 U.S.C. § 1395w-114(c), neither regulates pharmacies nor is intertwined with other provisions that do.  The only connection that pharmacies have to the subsidy program, which is the subject of that provision, and to the entire Medicare Part D program, is through their contracts with PDP sponsors.  They are therefore not "regulated by" 42 U.S.C. § 1395w-114(c).  Instead, the Medicare Part D program anticipates that pharmacies will participate in dispensing prescription medications to Part D beneficiaries as market actors who have freely negotiated acceptable terms of payment by PDP sponsors and have incorporated these terms in their contracts.

## IV. PLAINTIFFS' AMENDED COMPLAINT FAILS TO SAVE THEIR FIFTH AMENDMENT CLAIM BECAUSE THEY HAVE NO PROPERTY INTEREST AND IDENTIFY NO "PROCESS OF LAW" OF WHICH THEY WERE DEPRIVED

The Fifth Amendment prohibits the government from depriving persons of "'property, without due process of law.'"  Bagenstose v. Dist. of Columbia, 503 F. Supp. 2d 247, 256 (D.D.C. 2007) (quoting U.S. Const. amend. V).  Defendants previously argued that plaintiffs' Complaint had failed to state a claim that plaintiffs' members were deprived of a protected property interest.  Defs.' Op. Br. at 39.  Plaintiffs have amended their complaint in order to assert

- 21 -

a "property interest" in "complete reimbursement . . . for prescription drugs they have dispensed to institutionalized dual eligibles under the Part D program."  Am. Compl. ¶ 54.  This amendment does not resolve the fatal defects in plaintiffs' Fifth Amendment claim, however.

For one thing, it remains the case that the so-called "property interest" that plaintiffs assert does not derive from any relationship with the government.  No statute or CMS regulation or policy establishes pharmacies' entitlement to reimbursements.  Plaintiffs' situation is thus distinguishable from those described in the cases upon which plaintiffs rely.  For example, in Board of Regents v. Roth, 408 U.S. 564 (1972), while the Court did recognize state contract law as a potential source of a plaintiff's property interest, the essential fact was that the contract in question would be with the government.  Id. at 576-77 (citing instances where university staff had property interests in their employment based on employment contracts with state universities).  In Furlong v. Shalala, 156 F.3d 384, 395 (2d Cir. 1998), the court looked to "controlling Medicare law," including prior ALJ decisions, as the potential source for the physicians' asserted property interest.  Where the government had no involvement with the creation of the interest in the first place, it cannot be said – outside the context of a takings claim, which plaintiffs do not assert – that government actions deprived plaintiffs of property without due process of law.

Plaintiffs argue in their opposition memorandum that they have adequately pled a procedural due process violation.  Their description of their claim warps the concept of procedural due process beyond recognition.  The right protected by the procedural due process guarantee is the right to "notice and some kind of hearing before final deprivation of a property interest."  Daskalea v. Wash. Humane Soc'y, 480 F. Supp. 2d 16, 32 (D.D.C. 2007) (internal

- 22 -

quotation omitted).  In order to state a claim, a plaintiff must "identify the process that is due."

Bagenstose, 503 F. Supp. 2d at 257 (quoting Doe by Fein v. Dist. of Columbia, 93 F.3d 861, 870

(D.C. Cir. 1996) (per curiam)).  In the case relied on by plaintiffs, for example, the plaintiff

physicians claimed they were entitled to the right to appeal insurance carriers' reimbursement

decisions implementing agency directives to CMS's predecessor agency.  See Furlong, 156 F.3d

at 392.

Here, plaintiffs do not identify what form of notice or opportunity to be heard CMS

should have provided them before or after PDP sponsors allegedly denied their reimbursement

claims.  Instead of seeking procedural protection from deprivation of property, plaintiffs claim

that CMS procedures actually caused the alleged deprivation.  Plaintiffs then assert that the

"administrative and fiscal burdens of remedying th[e] [alleged procedural] defect are minimal."

Pls.' Opp. Mem. at 28.  Here, plaintiffs appear to be applying the Mathews v. Eldridge, 424 U.S.

319, 335 (1976), analysis for determining the level of procedural protection that is required in a

given case.  However, they utterly confuse the distinction between the pre-deprivation procedural

protections at issue in a legitimate procedural due process claim and the "inadequate procedures"

that plaintiffs here allege were the mechanism that deprived them of property.  They argue that

CMS procedures should be improved not as a means of adding procedural protections (better

notice, or a greater opportunity to be heard) but as a direct means of eliminating the alleged

deprivation altogether.  This is not a procedural due process claim.

## V.    PLAINTIFFS CANNOT SEEK MANDAMUS RELIEF

Plaintiffs contend that mandamus relief is warranted here, Pls.' Opp. Mem. at 28,

presumably in opposition to defendants' assertion that plaintiffs were not entitled to mandamus

relief.  However, defendants made that argument in regard to Count II of plaintiffs' complaint, which plaintiffs have withdrawn in their Amended Complaint.  For purposes of Count I of plaintiffs' Amended Complaint – their APA claim under 5 U.S.C. § 706(1) – the analysis of whether mandamus relief is available is essentially the same as the analysis of whether plaintiffs have stated a § 706(1) claim.  See SUWA, 542 U.S. at 63 (recognizing § 706(1) has its roots in traditional mandamus practice); Black v. Snow, 272 F. Supp. 2d 21, 28 n.6 (D.D.C. 2003) (noting that the same reasons that the same considerations making relief under § 706(1) inappropriate "doom[ed] plaintiff's bid for a writ of mandamus"); see also Yan v. Mueller, No. 07-0313, 2007 WL 1521732, at *8 (S.D. Tex. May 24, 2007) ("Because [the Mandamus Act and § 706(1)] offer similar means of compelling an agency to take action which by law it is required to take, claims made under this provision of the APA and the federal mandamus statute are subject to the same standard. ").  In regard to the current Count II of plaintiffs' Amended Complaint – their procedural due process claim – curing a procedural due process violation is not a ministerial act, and mandamus relief is therefore not appropriate.  E.g., Hardy v. Birmingham Bd. of Educ., 954 F. 2d 1546, 1552 (11th Cir. 1992) (recognizing that "[r]einstatement of an employee terminated in violation of procedural due process is not a ministerial act subject to a writ of mandamus").  To the extent the question of mandamus relief remains relevant, therefore, plaintiffs are not entitled to it.

## **CONCLUSION**

For the foregoing reasons as well as those set forth in defendants' opening brief, the

- 24 -

claims raised in plaintiffs' Complaint should be dismissed in their entirety.

Dated: December 5, 2007                 Respectfully submitted,
                                        JEFFREY S. BUCHOLTZ
                                        Acting Assistant Attorney General
                                        JEFFREY A. TAYLOR
                                        United States Attorney
                                        SHEILA M. LIEBER
                                        Deputy Director

                                        /s/ Kathryn L. Wyer
                                        KATHRYN L. WYER
                                        U.S. Department of Justice, Civil Division
                                        20 Massachusetts Ave., NW,
                                        Washington, D.C. 20530
                                        Telephone: (202) 616-8475 / Fax: (202) 616-8202
                                        kathryn.wyer@usdoj.gov
                                        *Attorneys for Defendants*

# EXHIBIT A

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop S3-16-16
Baltimore, Maryland 21244-1850



Center for Beneficiary Choices

MEMORANDUM

DATE:        June 27, 2007

TO:          All Part D Sponsoring Organizations

FROM:        Cynthia Tudor, Ph.D., Director, Medicare Drug Benefit Group
             Anthony Culotta, Director, Medicare Enrollment and Appeals Group

RE:          Part D Guidance – Low-Income Subsidy (LIS) Status Corrections Based on Best
             Available Evidence

This document provides guidance to Part D plan sponsors on the policies and procedures for
initiating corrections to CMS' low-income subsidy data for plan enrollees for whom the plan has
documentation— "best available evidence" (BAE)—about their Medicaid eligibility or residence
in an institution under a Medicaid-covered stay.  We are providing this guidance in advance of
the implementation training, which will take place in the July 11, 2007 User Group Call. Plans
should review the guidance and submit any questions by July 6, 2007.  Plans are asked to ensure
that appropriate business and system staff who are responsible for implementing this policy
attend the call.

If you have any questions on this guidance, please contact Deborah Larwood via email at
Deborah.Larwood@cms.hhs.gov or by phone at 410-786-9500, or Jill Gotts at
Jill.Gotts@cms.hhs.gov or 410-786-7794.

Part D Plan Sponsor Guidance —

LIS Status Corrections

Based on Best Available Evidence

L000301

**Part D Plan Sponsor Guidance on LIS Corrections**

**Based on Best Available Evidence**

Table of Contents

Background on Low-Income Subsidy Deeming ................................................................. 3

Background on Best Available Evidence Policy ............................................................. 4

Procedures for Initiating LIS Status Corrections ............................................................ 5

Required Documentation ..................................................................................... 5

Transmitting an LIS Status Correction Request to CMS .................................................. 6

Timing of LIS Status Correction Requests ................................................................. 6

LIS Status Correction Request ................................................................................ 6

Certification and Cover Memo ............................................................................... 7

Transmission Security Requirements ........................................................................ 8

Regional Office ..................................................................................................... 8

CMS Reporting to Plans ........................................................................................ 9

Timing of CMS Systems Updates ............................................................................ 10

Evidence Retention Requirements ............................................................................. 10

Impact of Subsequent State Reports on CMS Manual Updates ........................................ 10

Appendix – Using the SSA Award Letter to Determine Eligibility for the Full or Partial

Subsidy .............................................................................................................. 12

L000302

# Background on Low-Income Subsidy Deeming

The low-income subsidy is extra help for people with Medicare who have limited income and resources to help pay their Medicare prescription drug plan costs (plan monthly premiums, co-payments and the annual deductible).  Certain groups of Medicare beneficiaries are automatically deemed eligible for LIS.  These groups include full-benefit dual eligible individuals, partial dual eligible individuals (i.e., those who belong to a Medicare Savings Program as a Qualified Medicare Beneficiary, Specified Low-Income Medicare Beneficiary or Qualifying Individual), and people who receive Supplemental Security Income (SSI) benefits but not Medicaid.  Other individuals with limited incomes and resources who do not automatically qualify can apply for a low-income subsidy and have their eligibility determined by either the Social Security Administration (SSA) or their State Medicaid Agency.  Table 1 provides an overview of how people qualify for LIS.

*Table 1. Overview of how people qualify for LIS*

| People with Medicare and | Basis | Data Source | Changes During the Year |
|---|---|---|---|
| Medicaid benefits<br>• Full Medicaid benefits<br>• Medicare Savings Program | Automatically qualify | State files | • Qualify for a full calendar year<br>• Generally only favorable changes will occur |
| SSI benefits | | SSA | |
| Limited Income and Resources | Must apply | SSA (almost all) or states | • Some events can impact status through the year<br>• Extra help can increase, decrease, or terminate |

Once a beneficiary becomes deemed eligible, s/he is deemed, at a minimum, through the end of the current calendar year (December 31st), even if s/he is no longer eligible for Medicaid, a Medicare Savings Program or SSI.  In August of each year, CMS determines if individuals who are deemed eligible for LIS during the current calendar year will continue to be deemed eligible for the subsequent calendar year.  This "re-deeming" process for Medicaid and Medicare Savings Program participants begins with the month of July and continues through the calendar year.  If an individual is Medicaid eligible in any month during the period July through December, the individual is deemed LIS eligible for the months of Medicaid eligibility and for any subsequent months of the period as well as for the subsequent year.  Thus, for example, if a beneficiary is reported as Medicaid eligible for the month of March, then CMS will deem him/her March 1 through December 31 of the same calendar year.  On the other hand, if a beneficiary is reported as Medicaid eligible for the month of August, then CMS will deem him/her August 1 through December of that same calendar year and January 1 through December 31 of the subsequent calendar year.

L000303

# Background on Best Available Evidence Policy

Best available evidence policy is used when the low-income subsidy information in CMS' systems is not correct. CMS relies on monthly files from the states and Social Security to establish an individual's low-income subsidy deemed eligibility and appropriate cost-sharing level.  In certain cases, CMS systems do not reflect a beneficiary's correct LIS deemed status.  This may occur, for example, because a state has been unable to successfully report the beneficiary as Medicaid eligible or is not reporting him/her as institutionalized.

CMS implemented the policy requiring Part D plan sponsors to use "best available evidence" under these circumstances to substantiate a beneficiary's correct cost-sharing level.  This policy was first articulated in a memorandum to all Part D sponsors dated May 5, 2006, which also instructed sponsors to retain appropriate records of the evidence used to support plan-initiated changes in cost-sharing in order to reconcile low-income subsidy (LIS) payments with CMS.

On December 6, 2006, in a memorandum to all Part D sponsors, we provided instructions for implementing this policy for 2007.  We state therein that plans must no longer default to LIS status without applying the best available data policy requirements.  We also note, however, that plans may initially rely on evidence presented at the pharmacy to provide a lower cost-sharing status at point-of-sale, but must follow up with additional documentation within a specified period of time.  We recommend that sponsors consider this approach to address urgent situations.  In these cases, if the plan sponsor is unable to substantiate a basis for the beneficiary's lower cost-sharing status, the plan must use the CMS-provided subsidy level and send a notice to the beneficiary to recover the cost-sharing that should have been paid by the member during the discrepant period.  Plan sponsors must collect documentation confirming the beneficiary's dual status (and $0 co-payment level for institutionalized dual eligibles) no later than the last day of the 2nd month after the month of the onset of default cost-sharing.

In that December 6 memorandum, we also announced plans to implement the necessary modifications to our systems to permit CMS to input a beneficiary's correct LIS deemed status once the plan sponsor obtained and submitted documentation substantiating the beneficiary's dual eligible status.  As noted, this process will allow CMS and plan subsidy level records to be synchronized for those beneficiaries for whom Medicaid status has not been updated.

This document provides guidance to Part D plan sponsors on the procedures for initiating corrections to beneficiary LIS levels in cases in which the plan has documentation that constitutes "best available evidence" (BAE) about a beneficiary's Medicaid eligibility or residence in an institution under a Medicaid-covered stay.  There will be a separate, yet to be developed, process for cases involving beneficiaries who have been awarded LIS by the Social Security Administration (SSA), but whose eligibility is not reflected in CMS systems.  In the interim for these latter cases, Part D plan sponsors are still required to maintain members' LIS status on the basis of the SSA award letter; the appendix to this

L000304

document provides guidance on using the SSA award letter to determine whether the beneficiary is eligible for the full or partial subsidy.

# Procedures for Initiating LIS Status Corrections

To initiate LIS status corrections, Part D plan sponsors must follow best available evidence guidance and collect documentation to substantiate the beneficiary's LIS status. In addition, plan sponsors must:

   a. Override standard cost-sharing and maintain an exceptions process for that beneficiary until the CMS LIS correction is processed.  We recommend that sponsors use the same cost-sharing level as will be reflected in the CMS system once the manual correction is processed; that is: $1/$3.10 for full-benefit dual eligible individuals, and $2.15/$5.35 for partial dual eligible individuals.
   Plan sponsors must put processes in place that obviate the need to require the re-submission of documentation each month pending the correction of the beneficiary's LIS status in CMS systems.  Such processes should compare subsequent CMS reports with the BAE-based status to ensure that the sponsor does not incorrectly override the BAE-based status.

   b. Develop appropriate member services and pharmacy help desk scripting to triage cases involving BAE. CMS recommends that plan sponsors' BAE policies and procedures address the urgency of certain cases; e.g. a patient who is unable to access his/her antihypertensive medication.   Plan sponsors should prioritize urgent cases, educate their contracted pharmacies about their process for handling urgent cases, and develop possible stop-gap solutions, such as providing a temporary fill.

   c. Verify that CMS's systems do not already reflect the beneficiary's correct Medicaid/Medicaid institutional status for the purposes of establishing appropriate low-income cost-sharing status prior to a submitting a request for correction.  Verification may be accomplished by checking the most recent bi-weekly LIS report from CMS or via the MARx User Interface.

## *Required Documentation*

Plan sponsors must obtain documentation to support a change to the beneficiary's LIS status.  To establish Medicaid status at the high or low cost-sharing levels, the plan sponsor must obtain one or more of the following documents confirming the plan verified Medicaid eligibility:

   1. A copy of the member's Medicaid card which includes the member's name and an eligibility date during the discrepant period;

5
L000305

2. A report of contact including the date a verification call was made to the State Medicaid Agency and the name, title and telephone number of the state staff person who verified the Medicaid status during the discrepant period;

3. A copy of a state document that confirms active Medicaid status during the discrepant period;

4. A print out from the State electronic enrollment file showing Medicaid status during the discrepant period;

5. A screen print from the State's Medicaid systems showing Medicaid status during the discrepant period; or

6. Other documentation provided by the State showing Medicaid status during the discrepant period.

To establish that the beneficiary is institutionalized and qualifies for a zero cost-sharing level, the plan sponsor must furnish one or more of the following forms of proof:

1. A remittance from the facility showing Medicaid payment for a full calendar month for that individual during the discrepant period;

2. A copy of a state document that confirms Medicaid payment to the facility for a full calendar month on behalf of the individual; or

3. A screen print from the State's Medicaid systems showing that individual's institutional status based on at least a full calendar month stay for Medicaid payment purposes during the discrepant period.

# Transmitting an LIS Status Correction Request to CMS

### *Timing of LIS Status Correction Requests*

The manual LIS status correction process is not intended to supplant state MMA data files, in which states report their dual eligible beneficiaries to CMS between the 15th and the end of each month. CMS suspects that a manual update will not be necessary in all cases, as updated information on a subsequent state MMA file may automatically correct the data in CMS systems.

Prior to submitting a correction request, plan sponsors should allow a reasonable time for updated information to be automatically entered into the CMS systems and reported to the plan. CMS recommends that the delay be a minimum of 30 and a maximum of 60 days, as it is likely that a significant portion of those who qualify under BAE policy in one month will be deemed for LIS via the normal process within the next several weeks.

### *LIS Status Correction Request*

LIS Status Correction Requests must be submitted to CMS via an Excel file. CMS recommends that plan sponsors establish a schedule for the monthly transmission of these requests. Each Excel file should contain information for all beneficiaries identified since the most recent prior request as requiring an LIS status correction. In other words, the correction request file should not be a cumulative record of previously submitted beneficiaries. The

L000306

required Excel file format for the request is shown below; a copy of this file format in Excel is attached.

Prior to submitting the request, plans should ensure that all beneficiary identifying information, such as name, date of birth, and HICN, is correct.

**Excel Format for LIS Status Correction Requests**

| Organization Name: | Primary Contact Name: |
|---|---|
| Contract Number: | Primary Contact Phone: |
| Organization Mailing Address: | Primary Contact E-Mail Address: |
| | Secondary Contact Name: |
| | Secondary Contact Phone: |
| | Secondary Contact E-Mail Address: |

**Request to Update CMS Medicaid Cost-Sharing Information**

| Bene Health Insurance Claim Number | Bene Last Name | Bene First Name | Bene Date of Birth | Bene Gender | Bene State of Residence |
|---|---|---|---|---|---|

| Start of Medicaid/ Medicaid Institutional Status (MM/CCYY) | Dual Eligible Status (Full/ Partial) | Institutional Status (Yes/No/ Unknown) | Type of Documentation Supporting Request | Description of "Other" State Documentation |
|---|---|---|---|---|

## Certification and Cover Memo

A certification of the request signed by an authorized representative of the Part D plan sponsor must be submitted to CMS and is available in the Certification worksheet that is included in the "Plan Requests for LIS Change" workbook attached. The required certification is shown below.

"I have read the contents of the LIS Status Correction Request dated (indicate month, day and year) for the above-stated Part D plan contract number and attest that the information contained herein, based on best knowledge, information, and belief as of the

date indicated below, is true, correct, and complete, and that our organization will retain the original supporting documentation for requested changes for as long as it is required under our regulations and for as long as it may be required for subsequent Government audit.  I further certify that I am an authorized representative of the business organization that is a Medicare Part D sponsor."

_____        _____
           Plan Sponsor Signature                                                            Date

Once the certification is signed, the document should be scanned, saved as a pdf. file and attached to the email that must be used to transmit each Excel correction request file. The transmittal email must include the plan sponsor's contract number (H#, S#, R#).

## *Transmission Security Requirements*

To ensure the security of the beneficiary information contained in the Excel spreadsheet, the document must be encrypted using a Federal Information Processing Standards approved encryption method.  Once encrypted, the file should be attached to transmittal email containing the information or a cover memo as specified above and submitted to the appropriate CMS regional office.

The plan sponsor must send the password for the encrypted file to the regional office in a separate email.

## *Regional Office*

CMS has designated an electronic mailbox in each regional office to which LIS Status Correction Requests must be sent.  The RO mailbox addresses are listed below.  Primary and secondary contact persons in each region are also provided, however these individuals should be contacted exclusively to address plan questions/issues that may arise relative to this process.

| CMS Region | Request Mailbox | Primary Contacts | Back-up Contacts |
|---|---|---|---|
| 1<br>Boston | PartDComplaints_RO1@cms.hhs.gov | Arlene DiSalvo<br>Arlene.DiSalvo@<br>cms.hhs.gov<br>617-565-1269 | Estella Ramirez<br>Estella.Ramirez@<br>cms.hhs.gov<br>617-565-1219 |
| 2<br>New York | PartDComplaints_RO2@cms.hhs.gov | Linda Sheo<br>Linda.Sheo@<br>cms.hhs.gov<br>212-616-2349 | Debra Smith<br>Debra.Smith@<br>cms.hhs.gov<br>212-616-2351 |
| 3<br>Philadelphia | PartDComplaints_RO3@cms.hhs.gov | Tammy McCloy<br>Tammy.McCloy@<br>cms.hhs.gov | Margaret Moon<br>Margaret.Moon@<br>cms.hhs.gov |

L000308

| CMS Region | Request Mailbox | Primary Contacts | Back-up Contacts |
|---|---|---|---|
| | | 215-861-4220 | 215-861-4754 |
| 4 Atlanta | PartDComplaints_RO4@cms.hhs.gov | Denise Stanley Denise.Stanley@ cms.hhs.gov 404-562-7366 | Pam Miller Pam.Miller@ cms.hhs.gov 404-562-7231 |
| 5 Chicago | PartDComplaints_RO5@cms.hhs.gov | Peter Bandemer Peter.Bandemer@ cms.hhs.gov 312-886-2569 | Natosha Lee Natosha .Lee@ cms.hhs.gov 312-353-1448 |
| 6 Dallas | PartDComplaints_RO6@cms.hhs.gov | Wanda Blakely Wanda.Blakely@ cms.hhs.gov 214-767-4411 | Rose Marie Thoreson RoseMarie.Thoreson@ cms.hhs.gov 214-767-6401 |
| 7 Kansas City | PartDComplaints_RO7@cms.hhs.gov | Peggy McQuitty Peggy.McQuitty@ cms.hhs.gov 816-426-6547 | Filipe Pereira Filipe.Pereira@ cms.hhs.gov 816-426-6385 |
| 8 Denver | PartDComplaints_RO8@cms.hhs.gov | Pamela Rivera Pamela.Rivera@ cms.hhs.gov 303-844-6137 | Sandra Mendez Sandra.Mendez@ cms.hhs.gov 303-844-1568 |
| 9 San Francisco | PartDComplaints_RO9@cms.hhs.gov | Jane Riney Jane.Riney@ cms.hhs.gov 415-744-3759 | John Muglia John.Muglia@ cms.hhs.gov 415-744-3593 |
| 10 Seattle | PartDComplaints_RO10@cms.hhs.gov | Brad Thuston Brad.Thuston@ cms.hhs.gov 206-615-2427 | Sandie Ihrig Sandie.Ihrig@ cms.hhs.gov 206-615-2377 |

The lead region model used for 1-800-Medicare complaint cases will be used for this process to determine the CMS RO to which plan sponsors should send the LIS status correction requests.

## CMS Reporting to Plans

Once CMS staff have completed action on the requests in the spreadsheet, CMS will complete the following three fields specified for CMS use and included in the attached Excel file format to report that the new data have been entered.  A copy of the updated file will be returned to the plan sponsor's primary point of contact as reflected on the file.

L000309



### *Timing of CMS Systems Updates*

Once a correction request is processed by CMS, the new data will be stored in MBD. CMS systems will then update during the next monthly deeming process that occurs at the beginning of each month and the subsequent weekly TRR will report the updated information verifying the change has been implemented in CMS systems.

The Transaction Reply Code (TRC) 194 Deemed Copay Correction (DEEMD COPAY CORR) is the unique TRC for these manual updates indicating that CMS has added or updated a deemed co-pay period. The effective dates for the added or updated deemed co-pay period are shown in the TRR fields.

## Evidence Retention Requirements

Plan sponsors must maintain for 10 years the original documentation used to substantiate the request for manual updating of the CMS system to accommodate subsequent periodic Government audits.

An alternative to the Part D Plan Sponsor maintaining the BAE documentation would be for the sponsor to delegate this activity to trusted business partners, such as a long-term care pharmacy provider. The partners must be contractually obligated to secure BAE from the State, attest to the beneficiary's LIS status, and retain the documentation until requested by the plan to support an audit. Since the risk associated with the delegation would be on the plan sponsor, the business partner could be required to indemnify the sponsor for the incorrect cost-sharing amount if the partner was unable to produce the required documentation when requested by the sponsor.

## Impact of Subsequent State Reports on CMS Manual Updates

When subsequent reports are received from the State, CMS systems will compare the beneficiary's current LIS status information to the newly reported information. Changes

L000310

will be made to the beneficiary's LIS status only if the new information will be more advantageous to the beneficiary.

It is important to note that once the deeming request is processed, if a plan receives a subsequent CMS notification of new LIS status changes, this new information must be processed.

L000311

# Appendix – Using the SSA Award Letter to Determine Eligibility for the Full or Partial Subsidy

When a beneficiary applies and qualifies for LIS with Social Security, s/he is awarded either the full or partial subsidy based on their income and resources.  SSA always provides the beneficiary with an award letter that explains if the award is for a full subsidy or a partial subsidy, a reduced deductible and reduced co-payments.  If the award is for a partial subsidy, the letter explains the percentage of the subsidy award.

[All dollar figures below are 2007 amounts.]
- A full subsidy award means that the beneficiary can enroll in a plan that will pay the full premium up to the regional low-income premium benchmark amount.  The beneficiary will pay no deductible and cost-sharing of covered prescriptions will be limited to $2.15/$5.35.
- A partial subsidy award letter will specify that the beneficiary is eligible for a subsidy of 25%, 50%, 75% or 100% of the regional low-income benchmark amount.  The beneficiary will be responsible for a deductible of no more than $53 with cost-sharing (coinsurance) of 15% until the catastrophic limit is reached ($5,451.25).  After the catastrophic limit is reached, co-pays will be $2.15/$5.35 for covered prescriptions.

Note that a beneficiary cannot be awarded a 75%, 50% or 25% premium subsidy and have no deductible.

L000312