IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

—————————————————————

LONG TERM CARE PHARMACY
ALLIANCE, *et al.*,

      Plaintiffs,

    v.

MICHAEL O. LEAVITT, *et al.*,     Case No. 1:07-cv-01115 (ESH)

      Defendants.
—————————————————————

## PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### REQUEST FOR ORAL ARGUMENT

December 10, 2007

John L. Oberdorfer (D.C. Bar No. 145714)
David J. Farber (D.C. Bar No. 415899)
Meagan T. Bachman (D.C. Bar No. 478970)
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

Counsel for Plaintiffs

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................................1

SUPPLEMENTAL STATEMENT OF THE CASE .........................................................3

SUPPLEMENTAL STATEMENT OF JURISDICTIONAL FACTS..............................3

ARGUMENT........................................................................................................................5

I.      CAUSATION IS PRESENT—CMS'S FAILURE TO PROVIDE PDPS WITH
        ACCURATE ELIGIBILITY DATA IS AT LEAST A "SUBSTANTIAL
        FACTOR" IN PDP DECISIONS TO ASSESS COST-SHARING FOR
        INSTITUTIONALIZED DUAL ELIGIBLE BENEFICIARIES...............................5

        A.      Plaintiffs' Declarations Show Causation. ...........................................7

        B.      The Government's Discovery Responses Concede Causation.......................8

                1.      PDPs rely on the information provided by CMS to set cost-sharing
                        amounts for beneficiaries...........................................................9

                2.      PDPs rely on the subsidy-eligibility information from CMS to make
                        reimbursement decisions on prescription drug claims. ......................9

        C.      CMS's "Best Available Evidence Policy" is (i) an Admission that CMS's
                Subsidy-Eligibility Notifications for Many Institutionalized Dual Eligibles are
                Inaccurate, and (ii) Further Evidence of CMS's Abdication of Its Statutory
                and Regulatory Obligation to Ensure Zero Cost-Sharing for Institutionalized
                Dual Eligibles. ......................................................................10

        D.      Summary. ..............................................................................12

II.     REDRESSABILITY: AN ORDER REQUIRING DEFENDANTS TO PROVIDE
        TIMELY AND ACCURATE DATA WILL END PDP ASSESSMENT OF COST-
        SHARING FOR INSTITUTIONALIZED DUAL ELIGIBLES............................13

CONCLUSION...................................................................................................................16

REQUEST FOR ORAL ARGUMENT...............................................................................16

i

## TABLE OF AUTHORITIES

### CASES

*Block v. Meese*, 793 F.2d 1303 (D.C. Cir. 1986) .......................................................13

*Center for Auto Safety v. National Highway Traffic Safety Administration*, 342 F. Supp. 2d 1 (D.D.C. 2004) 13

*Coalition for Underground Expansion v. Mineta*, 333 F.3d 193 (D.C. Cir. 2003) ...........................5

*Dean v. American Federation of Government Employees Local 476*, 402 F. Supp. 2d 107 (D.D.C. 2005)........5

*\*Emergency Coalition to Defend Educational Travel v. U.S. Department of Treasury*,
    498 F. Supp. 2d 150 (D.D.C. 2007) ..................................................................... 13, 14

*Focus on the Family v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263 (11th Cir. 2003) .........7

*Friends of the Earth v. U.S. Department of Interior*, 478 F. Supp. 2d 11 (D.D.C. 2007) ................6

*Herbert v. National Academy of Sciences*, 974 F.2d 192 (D.C. Cir. 1992) ........................5

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) ...............13

*In re Medicare Reimbursement Litigation*, 414 F.3d 7 (D.C. Cir. 2005) .......................16

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...............................................2, 13

*Massachusetts v. EPA*, 549 U.S. ---, 127 S. Ct. 1438 (2007) .......................................13

*National Wrestling Coaches Association v. Department of Education*, 366 F.3d 930 (D.C. Cir. 2004)...... 13, 14

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ..............................16

*Renal Physicians Association v. U.S. Department of Health & Human Services*, 489 F.3d 1267
    (D.C. Cir. 2007) .................................................................................................14

*Settles v. U.S. Parole Commission*, 429 F.3d 1098 (D.C. Cir. 2005) ...............................5

*\*Shays v. Federal Election Commission*, 414 F.3d 76 (D.C. Cir. 2005) ........................2, 13

*Steel Company v. Citizens for a Better Environment*, 523 U.S. 83 (1998) ..........................5

*\*Tozzi v. U.S. Department of Health & Human Services*, 271 F.3d 301 (D.C. Cir. 2001) .... 2, 5, 6, 7, 13, 16

*University Medical Center v. Shalala*, 173 F.3d 438 (D.C. Cir. 1999) ..............................14

*Village of Elk Grove Village v. Evans*, 997 F.2d 328 (7th Cir. 1993) ..............................13, 16

## **STATUTES**

42 U.S.C. § 1395w-114(a)(1)(D)(i) ................................................................. 3

42 U.S.C. § 1395w-114(c)(1)(A) ........................................................... 3, 10, 11

42 U.S.C. § 1395w-114(c)(1)(B) .................................................................. 4

## **REGULATIONS**

42 C.F.R. § 423.782(a)(2)(ii) ......................................................................... 3

42 C.F.R. § 423.800 .................................................................................... 10

42 C.F.R. § 423.800(b) ................................................................................. 3

42 C.F.R. § 423.800(c) .............................................................................. 4, 12

70 Fed. Reg. 4194 (Jan. 28, 2005) .............................................................. 12

## **OTHER**

13 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper,
*Federal Practice and Procedure* § 3531.5 ..................................................... 6

**INTRODUCTION**

The discovery authorized by the Court for the present limited jurisdictional inquiry completely undercuts the government's causation and redressability arguments.

The government's designated witness, Abby Block, testified that it is CMS—not anyone else—who calculates whether a beneficiary is entitled to a zero dollar co-payment, and CMS—not anyone else—who so notifies the Part D plans (PDPs) who pass the information directly down to the pharmacies and onto the beneficiaries. Where CMS indicates zero co-payment,[1] the PDPs appropriately reimburse the pharmacies for the institutionalized dual eligibles'[2] claims. When CMS indicates a co-payment is due, the PDPs incorrectly assess co-payments[3] against the beneficiaries or, in this case, the long-term care (LTC) pharmacies. Thus, not only does CMS have the direct legal obligation to provide the correct information, but in fact CMS is causing the problem, and should be directed to fix it.

The government attempts to deny causation by resorting to finger-pointing—that the causes of injury to the pharmacies are something else, either the states, or the payment terms of the PDP-pharmacy contracts. But CMS's designated witness testified that the states' submission of information to CMS is timely and has not been found by CMS to be inaccurate, thus barring the government from arguing otherwise in its brief.[4] The government's claim that this is but a contractual dispute fares no better. Witness Block conceded that, by CMS mandate, PDP sponsors not only had to offer pharmacies standard contracting terms and conditions, but that every PDP-

---

[1] Zero co-payment indicates that the government fully subsidizes that beneficiaries' prescription drugs.

[2] Institutionalized dual eligibles are those beneficiaries that reside in nursing homes and qualify for both Medicare and Medicaid benefits.

[3] The assessment of co-payments is referred to as cost-sharing.

[4] Attached hereto as Exhibit A is the transcript and exhibits thereto of the 30(b)(6) Deposition of Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services, by and through its designee, Abby L. Block, December 4, 2007 (Block Dep.).

pharmacy contract had to include provisions that require pharmacies to comply with the law—*including the prohibition on charging institutionalized duals for co-payments*.  Contradicting the rhetoric in the government's brief, she admitted that there is no "unique provision" between PDPs and pharmacies that CMS mandates with respect to cost-sharing for subsidy-eligible beneficiaries.  Why?  Because the issue of charging co-payments to institutionalized duals is already included by incorporation of the *statutory requirements*.

The government does not controvert Plaintiffs' declarations that PDPs assess cost-sharing when CMS fails to timely provide accurate data about an institutionalized dual eligible beneficiary's subsidy-eligibility.  Nor does it dispute that same evidence (corroborated in this Court last March by counsel for the largest PDP—UnitedHealth Group) that, when PDPs assess cost-sharing for institutionalized dual eligibles based on CMS data, they have not reimbursed LTC pharmacies for cost-sharing amounts.  Instead, all the government's motion offers is speculation that there must be some other reason the pharmacies are not being paid in full.  The above evidence, together with the fact that PDPs have paid and are paying all but the co-payment amounts assessed as a result of CMS's inaccurate eligibility notification, refute that speculation, and more than satisfy the "substantial factor" test, which is the standard in this Circuit.  *See Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 309 (D.C. Cir. 2001).

A favorable decision and order directing CMS to provide the wanting information can and is likely to redress the injuries suffered by the LTCPA and ASCP members.  "Likelihood," as opposed to "mere speculation," is the standard for redressability.  *See Shays v. Fed. Election Comm'n*, 414 F.3d 76, 83 (D.C. Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  No matter how the Defendants try to couch it, Plaintiffs' request for a court order directing CMS to provide information accurately and timely reflecting a beneficiary's status is well within the Court's power, and will fix the problem.

## SUPPLEMENTAL STATEMENT OF THE CASE

The proceedings relevant to this supplemental opposition concern only jurisdictional issues raised by the Defendants in that part of their Motion to Dismiss brought under Rule 12(b)(1).  To update the Court, since its Minute Order of November 26, 2007, Defendants provided limited documents and interrogatory responses, and the deposition of their Rule 30(b)(6) witness was taken.[5]  This opposition addresses the causation and redressability issues upon which Plaintiffs conducted discovery.

## SUPPLEMENTAL STATEMENT OF JURISDICTIONAL FACTS

The following additional facts pertain to the causation and redressability issues raised by the government's Motion to Dismiss.

Individuals who are full-benefit dual eligibles <u>and</u> institutionalized are not to be assessed any co-payments under the Part D program.   42 U.S.C. § 1395w-114(a)(1)(D)(i); 42 C.F.R. § 423.782(a)(2)(ii).  CMS "must notify PDP sponsors that individuals in their plans are eligible for subsidies, and the amount of the subsidy, including for individuals who qualify as institutionalized dual eligibles."  Declaration of Abby Block ¶ 6 (citing 42 U.S.C. § 1395w-114(c)(1)(A)), Doc. No. #13-3 (attached hereto as Exhibit B).  For such beneficiaries, CMS (and, in turn, the PDPs and pharmacies who deal directly with the beneficiaries) must reduce the cost-sharing amount to zero. 42 C.F.R. § 423.800(b).

Further, "**[o]nce** CMS notifies PDP sponsors that beneficiaries, such as institutionalized dual eligibles, are eligible for subsidies, the PDP sponsors **must then** 'reduce [ ] the premiums or cost-sharing otherwise imposed by the amount of the applicable subsidy and submit [ ] to [CMS] information on the amount of each reduction.'"  Block Decl. ¶ 6 (quoting 42 U.S.C. § 1395w-

---

[5] The deposition was left open in order for Defendants to provide responses to questions that the witness was not prepared on, even though the subject matter of the questions was in the deposition notice. Defendants were also asked to remove objections to the production of documents.

114(c)(1)(B)) (emphasis added). To the extent that an organization has paid cost-sharing on behalf of a beneficiary before a PDP was notified by CMS of the beneficiary's subsidy-eligible status, the PDP must reimburse that organization for the amount paid. 42 C.F.R. § 423.800(c).

The two pieces of information necessary to establish the correct cost-sharing and premium amounts for institutionalized dual eligible beneficiaries are: whether a beneficiary is (1) a dual eligible (entitled to both Medicaid and Medicare benefits) <u>and</u> (2) institutionalized. But CMS does not provide either of these pieces of information to PDPs. Block Dep. 68:3-18, 78:16-79:2. Rather, CMS informs the PDPs only of the <u>amount</u> of co-payment and premium owed by such beneficiaries, leaving PDPs to infer that when the amount is zero, the beneficiary is in fact an institutionalized dual eligible, and that the PDP should pay the full costs of the drug to the pharmacy. *Id.*

Where the records at CMS show a co-payment is to be paid, a PDP will assess a co-payment and pay a pharmacy its reimbursement claim less the co-payment amount, leaving an LTC pharmacy with a debt from the beneficiary for the co-payment amount. Block Dep. 181:12-22, 182:1-17. The injury and this cause of action exists because CMS does not inform, or incorrectly informs, a PDP that an institutionalized dual eligible beneficiary has some amount of co-payment due. Declaration of Donald Amorosi ¶¶ 4, 13 (Pls.' Nov. 16, 2007 Opp'n Ex. 4, Doc. No. 16-6); Declaration of Janice Rutkowski ¶¶ 6, 14 (Pls.' Nov. 16, 2007 Opp'n Ex. 3, Doc. No. 16-5). As a direct result, the PDP does not treat that beneficiary as an institutionalized dual eligible. Amorosi Decl. ¶ 11; Rutkowski Decl. ¶ 12. Consequently, when an LTC pharmacy makes a claim to the PDP for full reimbursement for the prescription drugs it provided to that beneficiary, the PDP refuses to pay the pharmacy the co-payment the pharmacy did not collect from the beneficiary (because it knew the beneficiary to be entitled to zero cost-sharing). Amorosi Decl. ¶¶ 10, 11; Rutkowski Decl. ¶¶ 11, 12.

4

**ARGUMENT**

**STANDARDS FOR A RULE 12(b)(1) MOTION**

Plaintiffs are entitled to all favorable inferences at this jurisdictional stage of the case. "[C]ounseled complaints . . . are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005). In addition, in consideration of a Rule 12(b)(1) motion, the Court may "'consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Dean v. Am. Fed'n of Gov't Employees Local 476*, 402 F. Supp. 2d 107, 109 (D.D.C. 2005) (quoting *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003)).

There are few, if any disputed facts here. Consequently, "[i]f the trial court rests on [the undisputed facts] in deciding the motion to dismiss, necessarily it will not need to decide among conflicting factual positions, taking instead the undisputed facts within or outside the pleadings as true." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). With respect to resolving any disputed facts, "though the trial court may rule on disputed jurisdictional facts at any time, if they are inextricably intertwined with the merits of the case it should usually defer its jurisdictional decision until the merits are heard." *Id.* at 198; *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 n.2 (1998) (noting "a merits question cannot be given priority over an Article III question")

**I.    CAUSATION IS PRESENT—CMS'S FAILURE TO PROVIDE PDPS WITH ACCURATE ELIGIBILITY DATA IS AT LEAST A "SUBSTANTIAL FACTOR" IN PDP DECISIONS TO ASSESS COST-SHARING FOR INSTITUTIONALIZED DUAL ELIGIBLE BENEFICIARIES.**

Plaintiffs' allegations, declarations, and discovery of the government go well beyond the D.C. Circuit's requirement of making "only a showing that the agency action is at least a substantial factor motivating the third parties' actions [that directly cause the injuries]." *Tozzi*, 271 F.3d at 308 (citation and quotations omitted). "[I]t is sufficient to show that agency action is a 'substantial

factor' in a third party's decision to engage in the activity at issue, especially where the agency is in a position to directly regulate and even proscribe that activity." *Friends of the Earth v. U.S. Dep't of Interior*, 478 F. Supp. 2d 11, 20 (D.D.C. 2007). As a leading treatise opines, indirect causation suffices. 13 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3531.5 ("Indirect causation is often accepted, both in circumstances that leave little doubt that a causal nexus could be shown and in more uncertain circumstances. It may be enough that the defendant's conduct is one among multiple causes.").

In *Tozzi*, the D.C. Circuit held that the causation prong of standing was easily satisfied as the record left "little doubt" that the challenged government statement regarding the carcinogenicity of dioxin was a "substantial factor" motivating the decisions of the third parties that were the direct source of the plaintiff's injuries. 271 F.3d at 308-09. A manufacturer of medical supplies made of PVC plastic had challenged a decision by HHS to add the chemical dioxin to the category of "known" carcinogens, and alleged that the decision harmed its business reputation and profits because concern over the dioxin hazards associated with the incineration of PVC plastic deterred the manufacturer's customers from purchasing its products.

Plaintiffs' case against CMS also leaves "little doubt" about causation. CMS will not credit PDPs with cost-sharing amounts if CMS's records do not show a beneficiary's status as an institutionalized dual eligible, and therefore, his or her eligibility for zero cost-sharing. *See* Defs.' Resp. Interrog. No. 7 at 20 attached hereto as Exhibit C. Thus, PDP reimbursement decisions for cost-sharing amounts for institutionalized dual eligibles are substantially influenced (indeed, actually dictated) by whether the data in the CMS system recognizes the eligibility of such beneficiaries for zero co-payments (full subsidies by the government). Block Dep. 68:3-18, 78:16-79:2. Indeed, CMS itself dictates the amount due. Block Dep. 68:3-18, 78:16-79:2.

The government's motion attempts to deny this causal connection, arguing that the "*direct*" cause of LTCPA and ASCP members' injuries is the failure of third parties—individual PDPs—to pay individual members co-payment amounts they allegedly owe (at 22).  That is wrong as a matter of fact, as Ms. Block clearly testified that it is CMS, not anyone else, who tells the PDPs what the cost-sharing amount should be.  Block Dep. 68:3-18, 78:16-79:2.  Moreover, even if CMS did not dictate the amount, the D.C. Circuit does not require "direct" causation and has "never applied a 'tort' standard of causation to the question of traceability."  *Tozzi*, 271 F.3d at 308.  As another Circuit has explained, "[i]mportantly, in evaluating Article III's causation (or 'traceability') requirement, we are concerned with something less than the concept of 'proximate cause.' . . . [N]o authority even remotely suggests that proximate causation applies to the doctrine of standing.  Instead, even harms that flow *indirectly* from the action in question can be said to be 'fairly traceable' to that action for standing purposes."  *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) (emphasis added) (quotations and citations omitted).

Plaintiffs' declarations and Defendants' discovery responses referenced below show there is substantial evidence of causation.

### A.    Plaintiffs' Declarations Show Causation.

Plaintiffs' uncontroverted declarations of Donald Amorosi of Omnicare and Janice Rutkowski of PharMerica explain that the claims at issue here are "clean," meaning that they have been accepted and paid by the PDPs in all but the co-payment amounts.[6]  Amorosi Decl. ¶ 10; Rutkowski Decl. ¶ 11.  The PDPs consistently and repeatedly have refused to reimburse LTCPA and ASCP members, such as Omnicare and PharMerica, for only one reason—CMS has incorrectly

---

[6] The PDPs' payments of the claims less the co-payment amounts demonstrates the fallacy of the government's speculation (at 23, 24, & 29) that there are other infirmities with the claims that are causing the PDPs not to pay the co-payment amounts.  Specifically, the government speculates (at 23) that "[a] PDP sponsor's failure to pay an LTC pharmacy *could* result from the pharmacy's failure to follow the procedures specified in the contract, or it *could* result from the PDP sponsor's breach of the contract." (Emphasis added).

identified those beneficiaries in the CMS system as owing a co-payment.  The effect of CMS's action is PDPs assessment cost-sharing amounts unless and until CMS's system identifies them as having no cost-sharing responsibilities.  Amorosi Decl. ¶ 11; Rutkowski Decl. ¶ 12; Declaration of Tom Clark ¶ 7 (Pls.' Nov. 16, 2007 Opp'n Ex. 6, Doc. No. 16-8).[7]  The government does not, and cannot, dispute these facts.

  **B.**  **The Government's Discovery Responses Concede Causation.**

   The government's interrogatory responses and witness testimony also admit that its subsidy-eligibility data constitutes a substantial factor in PDP decisions regarding co-payment reimbursements to LTC pharmacies.  The government's designated witness acknowledged this reality, as well as the PDPs' inability to reduce an incorrectly assessed cost-sharing amount without accurate subsidy-eligible information:

> Q: And in our situation where the records at CMS show that there was a co-pay to be paid, the PDP would then assess the co-pay.  Correct?  That's the situation we're talking about?
>
> A:  In that situation, they would pay the claim less the co-pay amount.
>
> Q: Right.  And the co-pay amount would need to be assessed to—co-pay charge would need to be assessed to the institutionalized dual for payment?
>
> A: No.  The Co-pay charge wouldn't be assessed to anyone.  The claim would be paid—let's take a hypothetical.  Let's say the claim is for 20 dollars and the co-pay is 2 dollars.  The PDP would authorize payment for 18 dollars, period.
>
> Q: And who would pay the co-pay?  Who would pay the 2?
>
> A: Nobody would pay the 2.  The 2 simply wouldn't be paid to whoever provided that medication.  So the long-term care pharmacy in your situation would be carrying a debt for 2 dollars.

---

[7] The PDPs have similarly asserted that CMS is responsible for setting the co-payments.  Counsel for UnitedHealth Group advised the Court that it refused to reimburse cost-sharing amounts for such beneficiaries because CMS's system did not recognize them as institutionalized dual eligible.  *See LTCPA v. UnitedHealth Group*, No. 06-1221, March 22, 2007 Transcript at 7-10.  That is consistent with Ms. Block's testimony and the declarations of Plaintiffs' declarants.

Block Dep. 181:12-182:17.

Other passages from discovery substantiate the causal effect of CMS's data provision failures.

1.    **PDPs rely on the information provided by CMS to set cost-sharing amounts for beneficiaries.**

The government's deposition testimony concedes that PDPs use the subsidy-eligibility information provided by CMS to set co-payment amounts for beneficiaries:

•    The notifications CMS provides to PDPs of beneficiaries' eligibility status—transmittal response reports ("TRRs")—inform the PDPs of the enrollees in their respective plans and the premium and co-payment amounts for those enrollees.  Block Dep. 66:10-66:18, 68:3-68:13.  For institutionalized dual eligible beneficiaries recognized as such in CMS's TRRs, the premium and co-payment amounts are reflected as zero.  Block Dep. 68:14-68:18.

•    CMS's system, not the PDPs', makes the co-payment and premium calculations for institutionalized dual eligible beneficiaries.  Block Dep. 85:21-86:12.

•    The only way that a PDP knows if a beneficiary is institutionalized or not is an inference based upon the co-payment level reported by CMS to the PDP.  Block Dep. 88:1-89:1.

•    PDPs use CMS's subsidy-eligibility data "to set their members' default low-income cost-sharing (LICS) and premium subsidy levels in their own payment systems, with an effective date based on the effective dates provided in these [CMS] reports."  Defs.' Resp. Interrog. No. 5 at 9 attached hereto as Exhibit C; Block Dep. 121:22-122:10.

2.    **PDPs rely on the subsidy-eligibility information from CMS to make reimbursement decisions on prescription drug claims.**

Similarly, the government's testimony and interrogatory responses demonstrate the reliance of PDPs on CMS's subsidy-eligibility notifications in making reimbursement decisions on reimbursement claims made by LTC pharmacies:

•    When a PDP receives a claim for reimbursement from an LTC pharmacy for an institutionalized dual eligible beneficiary, it can check its own records (which are based on CMS's data) or it can query the CMS system to determine the cost-sharing amounts to charge for that beneficiary.[8]  Block Dep. 80:8-81:7.

---

[8] The government's witness testified to CMS's issuance of a "Best Available Evidence policy."  As discussed in Section I.C. *infra*, this policy effectively admits the inaccuracy of CMS's eligibility notifications and evidences CMS's abdication of its statutory and regulatory obligations.

•      PDPs use the subsidy-eligibility information provided by CMS to reconcile prior prescription drug claims for Part D beneficiaries.[9]  Defs.' Resp. Interrog. No. 7.

•      Where the records at CMS show that a co-payment is to be paid, a PDP will assess a co-payment and pay a pharmacy reimbursement claim less the co-payment amount, leaving an LTC pharmacy with a debt for the co-payment amount.  Block Dep. 181:12-22, 182:1-17.

•      If, during the final reconciliation between a PDP and CMS, CMS's records do not show a beneficiary's status as an institutionalized dual eligible beneficiary, and therefore his or her eligibility for zero cost-sharing, "Part D sponsors will not be credited with cost-sharing amounts for those members."  Defs.' Resp. Interrog. No. 7 at 20.

C.      **CMS's "Best Available Evidence Policy" is (i) an Admission that CMS's Subsidy-Eligibility Notifications for Many Institutionalized Dual Eligibles are Inaccurate, and (ii) Further Evidence of CMS's Abdication of Its Statutory and Regulatory Obligation to Ensure Zero Cost-Sharing for Institutionalized Dual Eligibles.**

Improperly confusing the merits of Plaintiffs' claims with the jurisdictional questions presently before the Court, the government injects CMS's "Best Available Evidence policy" (the "BAE policy") into the discussion of causation, implying that its existence somehow establishes that it has fulfilled its responsibilities under 42 U.S.C. § 1395w-114(c)(1)(A) and 42 C.F.R. § 423.800. Even though this is not a jurisdictional issue, we respond to it out of an abundance of caution.

The BAE policy is a systemic effort to push the responsibility to provide key beneficiary status information off CMS's desk and on to almost anyone else—the pharmacies, the nursing homes, the PDPs, and even the patient-beneficiaries living in nursing homes or their designated representatives.  Its existence does not diminish the fact that CMS's failure to provide accurate and timely subsidy eligibility data to PDPs is a substantial factor in the PDPs' assessment of cost-sharing for institutionalized dual eligibles.  Consequently, if at all relevant to jurisdiction, it actually supports

---

[9] CMS's response to Interrogatory No. 5 again acknowledges the role that its subsidy-eligibility notification plays in PDP reimbursement decisions for LTC pharmacies.  There the government admits that through CMS's December 22, 2006 memorandum (Pls.' Nov. 16, 2007 Opp'n Ex. 5), "CMS has encouraged Part D sponsors to work with their network pharmacies to provide them with direct reimbursement for any cost-sharing amounts not collected from LIS-eligible enrollees."  Defs.' Resp. Interrog. No. 5 at 10.  Issuance of this memorandum shows that CMS's subsidy-eligibility data for such beneficiaries is a substantial factor in PDP reimbursement decisions.

Plaintiffs. CMS's creation and constant revision of the so-called BAE policy stands as an admission by CMS that its notification of subsidy-eligibility and subsidy-amounts is inaccurate for many institutionalized dual eligible beneficiaries and is a substantial cause of PDPs not paying pharmacies the co-payment amount.

CMS must notify PDPs of individuals' eligibility for subsidies and the amount of those subsidies. Block Decl. ¶ 6 (citing 42 U.S.C. § 1395w-114(c)(1)(A)); Block Dep. 33:1-5. But, recognizing that it had not fulfilled that duty, CMS instituted an ever-changing BAE policy.[10] The current iteration of the policy provides that, in order to avoid having an incorrect cost-sharing amount assessed by the PDP based on CMS's inaccurate data, beneficiaries, their designated representatives, and pharmacies obtain and provide to PDPs certain types of evidence that CMS deems acceptable proof of beneficiaries' subsidy-eligibility. Block Dep. 177:20-178:9, 178:22-179:14.

Under the BAE policy, neither the PDPs nor CMS, the two entities charged by Congress with ensuring correct cost-sharing for subsidy-eligible beneficiaries, carry any of the responsibility (or costs) associated with proving these beneficiaries' subsidy-eligibility. Block Dep. 178:22-179:4, 188:8-189:7. Instead, the responsibility, costs, and administrative hurdles are on someone else. CMS is aware that LTC pharmacies do not have direct access to beneficiaries' records, and instead, they must go through a third party for the information. Block Dep. 187:16-18, 188:4-7. To do so is both costly and administratively burdensome. (The government admits that it has never evaluated the costs its BAE policy imposes on those who must prove the subsidy-eligible status of beneficiaries that CMS is charged with correctly identifying in the first place. Block Dep. 188:8-

---

[10] The BAE policy has changed through a series of Q&As, tip sheets, and subregulatory guidances issued by CMS. Block Dep. 91:13-92:9; Block Dep. Exs. 5-7, 11. While CMS considers the BAE policy a guidance that is "binding" because it expects PDPs to follow it, at its highest form, the BAE policy is only subregulatory guidance. Block Dep. 38:22-40:14, 136:22-137:3. Consequently, as CMS admits, it is not mandatory and is unenforceable. Block Dep. 123:12-18, 175:3-176:3.

189:7.)[11]  Even if such information is collected by one of the third parties and provided to the PDPs, the policy does not require the PDPs to follow through and request the change in the CMS system. Block Dep. Ex. 11.  Moreover, best available evidence is not actually available to LTC pharmacies in most cases.  Amorosi Decl. ¶ 11.

### D.    Summary.

The case law requires evidence that the agency action or inaction be a "substantial factor" in a third party's decision to engage in the activity at issue.  That evidence is overwhelming, and the causation requirement of standing is well satisfied.[12]

The record establishes beyond question that the government's failure to provide accurate and timely subsidy-eligibility data to PDPs constitutes a substantial factor in PDP assessments of cost-sharing for institutionalized dual eligibles and PDP refusals to reimburse ASCP and LTCPA members for the cost-sharing amounts they carry on behalf of such beneficiaries.  Here, there is substantial evidence—the declarations of Rutkowski, Amorosi and Clark—which are corroborated

---

[11] For the 2006 coverage year, CMS attempted to implement a so-called "amnesty" policy based on its then relevant BAE policy.  *See* Defs.' Resp. Interrog. No. 7.  CMS touts the amnesty policy as rectifying the problematic 2006 claims.  *Id.*  CMS, however, did not communicate to the PDPs the particulars of the amnesty policy, including the fact that PDPs could submit for full acceptance otherwise rejectable claims. Block Dep. 98:17-101:12.  Moreover, CMS never communicated the existence of the amnesty policy at all to LTC pharmacies.  Block Dep. 98:17-99:2.  CMS has now closed the 2006 coverage year (Block Dep. 96:10-97:16) leaving millions of dollars of unreimbursed claims at issue.

[12] The government argues in its causation section that LTC pharmacies' debts are not within the scope of 42 C.F.R. § 423.800(c).  This is an issue of merits, not jurisdiction.  Nonetheless, Plaintiffs briefly address it. First, the government argues that LTC pharmacies have not actually "paid" the cost-sharing amounts on behalf of institutionalized dual eligibles, but instead have "simply not collected these amounts from beneficiaries who do not owe them."  The government's argument, however, elevates semantics over substance and ignores the plain reality of the protection that LTC pharmacies provide to beneficiaries whom CMS fails to accurately identify as institutionalized dual eligible beneficiaries.

Second, the government places an unwarrantedly restrictive gloss on the term "organization" in 42 C.F.R. § 423.800 that is neither supported by the text of the regulation nor the preamble of the final rule they cite. Neither define "organization"; nor do they limit its reach to "eleemosynary organizations," as the government indicates.  42 C.F.R. § 423.800(c); 70 Fed. Reg. 4194, 4391 (Jan. 28, 2005).  Instead, the regulation states that PDP sponsors must reimburse "organizations paying cost-sharing on behalf of [subsidy eligible] individuals" after the individual qualifies as a subsidy eligible individual.  Where CMS provides correct information, PDPs reimburse pharmacies.

by the government's designated witness (*see* Section I.B. *supra*) and not controverted except by unsupported speculation in the government's brief. Contrary to any argument by the government here, the BAE policy does not diminish the damage to pharmacies caused by CMS's failure to fulfill its statutory and regulatory obligations to provide subsidy-eligibility information.

## II.    REDRESSABILITY: AN ORDER REQUIRING DEFENDANTS TO PROVIDE TIMELY AND ACCURATE DATA WILL END PDP ASSESSMENT OF COST-SHARING FOR INSTITUTIONALIZED DUAL ELIGIBLES.

LTCPA and ASCP have Article III standing to pursue this action on behalf of their members[13] because it is likely, as opposed to merely speculative, that a favorable decision will redress their injuries. *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 83 (D.C. Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Plaintiffs need only demonstrate that they would obtain "at least some" relief to establish redressability. *See Tozzi*, 217 F.3d at 310. Redressability may also be satisfied by showing that the relief would "reduce the probability" of injury. *See Village of Elk Grove Village v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993), *cited with approval in Massachusetts v. EPA*, 549 U.S. ---, 127 S. Ct. 1438, 1458 n.23 (2007).

The legal principle espoused in both *Emergency Coalition to Defend Educational Travel v. U.S. Department of Treasury*, 498 F. Supp. 2d 150 (D.D.C. 2007), and *National Wrestling Coaches Association v. Department of Education*, 366 F.3d 930 (D.C. Cir. 2004) (citing *Tozzi*, 271 F.3d 301, and *Block v. Meese*, 793 F.2d 1303 (D.C. Cir. 1986)) on redressability applies in this case. That is, redressability is met where the record presents substantial evidence of a causal relationship between the government

---

[13] Plaintiffs refer to LTCPA's and ASCP's standing as "associational standing" based on this Court's adherence to the Supreme Court's description of the doctrine. *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 342 F. Supp. 2d 1, 9 n.13 (D.D.C. 2004) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). *Compare* Gov't Reply at 17 n.12.

policy and the third-party conduct injuring the plaintiff, leaving little doubt as to causation and the likelihood of redress.[14]

In *Emergency Coalition*, plaintiffs challenged a government regulation preventing them from teaching at or attending educational programs offered by U.S. schools in Cuba.  Since the U.S. schools, not the plaintiffs, were the subject of the regulation, the court followed the "third-party redressability requirement":  whether the evidence presented by a plaintiff to establish standing is more than merely speculative that the "requested change in government policy [would] alter the behavior of regulated third parties that [are] the direct cause of the plaintiff's injuries."  498 F. Supp. 2d at 160 (citation and quotations omitted).  Because the evidence presented by the plaintiffs in *Emergency Coalition* was not speculative but rather factual statements that led one to logically infer that, if the regulation was repealed, the U.S. schools would reinstate their former programs, this Court found plaintiffs' alleged harm to be redressable.

The same is true here—Plaintiffs' declarations and Defendants' discovery responses— especially the Block deposition—inescapably lead to the conclusion that an appropriate Court order

---

[14] The government misconstrues *National Wrestling Coaches*, *University Medical Center v. Shalala*, 173 F.3d 438, 442 (D.C. Cir. 1999), and *Renal Physicians Association v. U.S. Department of Health & Human Services*, 489 F.3d 1267 (D.C. Cir. 2007), in support of its challenge to redressability.  While all are based on the same legal principle, all involve much different fact situations than here.  In contrast to this case, the third party conduct in those cases would not cease if the relief requested were granted.  In *National Wrestling Coaches*, the court held that even if the agency's interpretive rules were repealed, the universities were still subject to Title IX. 366 F.3d at 933, 944.  Here, however, the <u>only</u> reason PDPs make the incorrect assessments of co-payments for institutionalized dual eligible beneficiaries in the first place is the incorrect co-payment information provided to them by CMS.  If CMS's failures are corrected, PDPs will not have a basis to assess incorrect co-payments on institutionalized dual eligible beneficiaries and, therefore, no need to reject a pharmacy claim for such co-payment charges.

*University Medical Center* and *Renal Physicians Association* are also distinguishable.  In *University Medical Center*, plaintiff sought reimbursement of money owed to it.  Plaintiffs here are seeking prospective relief.  The plaintiffs in *Renal Physicians Association* did not have standing because their proof rested on speculation and there was evidence that the harm would not be abated if the requested relief was ordered.  Here, neither of these barriers exist for Plaintiffs.

would redress the injury being sustained by Plaintiffs' members. If CMS complies with a Court order to properly characterize institutionalized dual eligibles, Plaintiffs' members' harm will be cured.

The government argues (at 28-29) that other contractual provisions between the PDPs and LTC pharmacies may create barriers to redressability, but that argument is baseless. For each of the claims at issue in this case, the PDPs already reimburse the LTC pharmacies for the entire claim minus only the cost-sharing incorrectly identified by CMS. Amorosi Decl. ¶¶ 10, 11; Rutkowski Decl. ¶¶ 11, 12. In fact, one PDP has already argued that it is not at fault for these claims. *See LTCPA v. UnitedHealth Group*, No. 06-1221, March 22, 2007 Transcript at 7-10. Not only the pharmacies, but also the PDPs claim that with accurate data from CMS, the co-payments withheld would otherwise be payable. *Id.* Only CMS can provide this relief—it cannot be obtained through the PDP-LTC pharmacy contracts.

The government also argues, without merit, that a Court order could not solve the problem because CMS relies on the states to provide it with the subsidy-eligibility data and the states are not parties to this case (at 28, n.6). This argument of incapability is dispelled by the testimony of its designated witness. First, Ms. Block testified that the state data is timely and accurate. Block Dep. 45:19-47:3. Second, although initially there were issues with the accuracy of the state data, CMS believes such problems have been rectified. Block Dep. 141:15-146:3. Third, the witness acknowledged that there are alternative ways in which CMS can verify a beneficiary's eligibility status, including receipt of the beneficiary's Medicaid number and date of admission to the nursing home. Block Dep. 190:2-191:19, 193:3-9. Thus, state data does not need to be the source of CMS's decision, and, in any event, according to CMS, is not the source of the problem.

CMS's additional argument that Plaintiffs are asking the Court to run the program is no longer a part of Plaintiffs' case. Plaintiffs amended their complaint to remove all allegations that could have been construed as related to enforcement. What this action seeks is the prospective

correction of the systemic data failures that serve as the root cause of the incorrect assessments and consequent PDP refusals to reimburse LTC pharmacies for cost-sharing amounts held on behalf of institutionalized dual eligible beneficiaries.

Pursuant to the standard set forth by the Supreme Court in *Norton v. Southern Utah Wilderness Alliance (SUWA)*, Plaintiffs are not asking the Court to direct how CMS should act, only for CMS to act. 542 U.S. 55, 65 (2004). Nor, in keeping with *SUWA*, are Plaintiffs seeking an order compelling CMS to generally comply with broad statutory mandates. *Id.* at 66. The relief sought by Plaintiffs is narrowly focused—it does not call for either CMS's administration or enforcement of the Part D program; nor does it require "pervasive oversight" by the Court. *Id.* at 65-67. By its very nature, mandamus entails a court affirmatively ordering an agency official to take action. 28 U.S.C. § 1361. *See, e.g., In re Medicare Reimbursement Litig.*, 414 F.3d 7, 12 (D.C. Cir. 2005) (affirming the issuance of mandamus relief compelling the Secretary of HHS to reopen final payment decisions over agency objections that such relief would create a "very difficult and uncertain process [and it would be] extraordinarily time-consuming to audit and verify").

There can be no dispute that the relief sought, if granted, would provide "at least some" relief or "reduce the probability" of injury, thus, satisfying the redressability criterion. *See Tozzi*, 217 F.3d at 310; *Village of Elk Grove Village*, 997 F.2d at 329. Consequently, this Court can order relief that redresses Plaintiffs' harm.

## CONCLUSION

For the foregoing reasons, the Court has jurisdiction in the instant case. Plaintiffs respectfully request that the Court deny the Defendants' Motion to Dismiss.

## REQUEST FOR ORAL ARGUMENT

Pursuant to L.Cv.R. 7(f), Plaintiffs respectfully request an oral argument on Defendants' Motion to Dismiss and Plaintiffs' opposition thereto.

Respectfully submitted,

December 10, 2007                       /s/ John L. Oberdorfer
                                        John L. Oberdorfer (D.C. Bar No. 145714)
                                        David J. Farber (D.C. Bar No. 415899)
                                        Meagan T. Bachman (D.C. Bar No. 478970)
                                        PATTON BOGGS LLP
                                        2550 M Street, N.W.
                                        Washington, D.C.  20037
                                        Telephone:  (202) 457-6000
                                        Facsimile:  (202) 457-6315
                                        Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

LONG TERM CARE PHARMACY    )

ALLIANCE, et al.,              )

      Plaintiffs,        )

      v.                  )No. 1:07-CV-01115(ESH)

MICHAEL O. LEAVITT, et al.,)

      Defendants.        )

      - - - - - - - - - - -


30(b)(6) DEPOSITION OF CENTERS FOR MEDICARE AND

MEDICAID SERVICES OF THE UNITED STATES DEPARTMENT

OF HEALTH AND HUMAN SERVICES, by and through its

designee, ABBY L. BLOCK

Tuesday, December 4, 2007

Washington, D.C.


Reported by:  Cheryl A. Lord, RPR, CRR

Job No. 1-1075

Page 2

```
 1
 2
 3
 4                    December 4, 2007
 5                    9:03 AM
 6
 7
 8    30(b)(6) DEPOSITION OF CENTERS FOR MEDICARE AND
 9    MEDICAID SERVICES OF THE UNITED STATES DEPARTMENT
10    OF HEALTH AND HUMAN SERVICES, by and through its
11    designee, ABBY L. BLOCK, held at the offices of:
12
13    PATTON BOGGS LLP
14      2445 M Street, N.W., 2nd Floor
15      Washington, D.C.  20037
16
17
18
19    Pursuant to notice before Cheryl A. Lord,
20    Registered Professional Reporter, Certified
21    Realtime Reporter, and Notary Public in and for
22    the District of Columbia.
```

Page 4

```
 1              APPEARANCES CONTINUED
 2
 3      and
 4    Bridgette L. Kaiser, Esquire
 5    UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
 6    SERVICES
 7    Office of the General Counsel - CMS Division
 8    330 Independence Avenue, S.W., Room 5309
 9    Washington, D.C.  20201
10    (202) 205-5872
11
12    Also present:
13      William James
14
15
16
17
18
19
20
21
22
```

Page 3

```
 1                 APPEARANCES
 2
 3    For Plaintiffs:
 4      David J. Farber, Esquire
 5      John L. Oberdorfer, Esquire (AM session only)
 6      Samantha R. Petrich, Esquire
 7      David Hain, Esquire
 8      Karen Thiel, Esquire
 9    PATTON BOGGS LLP
10      2445 M Street, N.W., 2nd Floor
11      Washington, D.C.  20037
12      (202) 457-6516
13
14    For Defendants:
15      Kathryn L. Wyer, Esquire
16    UNITED STATES DEPARTMENT OF JUSTICE
17    CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
18      20 Massachusetts Avenue, N.W.
19      Washington, D.C.  20044-4271
20      (202) 616-8475
21
22
```

Page 5

```
 1                 CONTENTS
 2
 3    EXAMINATION BY                    PAGE
 4    Mr. Farber                 6
 5
 6                  EXHIBITS
 7    NO.   DESCRIPTION                PAGE
 8    1    Plaintiffs' Notice of
 9         Fed.R.Civ.P. 30(b)(6)
10         Deposition          11
11    2    Fact Sheet, CMS           129
12    3    Tip Sheet as of April 2006   133
13    4    Memorandum, 5-5-06         138
14    5    CMS Part D Question and
15         Answer Database, 5-26-06    158
16    6    Memorandum, 10-30-06,
17         Nos. L000173-75           163
18    7    Memorandum, 12-6-06        169
19    8    Memorandum, 12-22-06       194
20    9    Memorandum, 5-25-07        197
21    10   Memorandum, 6-1-07         205
22    11   Memorandum, 6-27-07        208
```

Page 6

| | |
|---|---|
| 1 | PROCEEDINGS |
| 2 | |
| 3 | ABBY L. BLOCK, |
| 4 | a witness called for examination, having been |
| 5 | first duly sworn, was examined and testified as |
| 6 | follows: |
| 7 | |
| 8 | EXAMINATION BY COUNSEL FOR PLAINTIFFS |
| 9 | BY MR. FARBER: |
| 10 | Q. Good morning, Ms. Block. |
| 11 | My name is David Farber. I'm an |
| 12 | attorney at Patton Boggs, representing the |
| 13 | plaintiffs in this action. |
| 14 | Have you ever been deposed before? |
| 15 | A. Yes. |
| 16 | Q. Okay. When was the most -- the last |
| 17 | time you were through a deposition? |
| 18 | A. A month or so ago. |
| 19 | Q. What kind of case was it? |
| 20 | A. It was a litigation regarding the -- |
| 21 | the ability of providers to provide information |
| 22 | to beneficiaries regarding choice of a plan, a |

Page 7

| | |
|---|---|
| 1 | prescription drug plan versus steering. |
| 2 | Q. Got it. |
| 3 | And so if you've been deposed in the |
| 4 | last month or so, you're familiar with how |
| 5 | depositions work. |
| 6 | In the deposition, I ask questions, |
| 7 | and you need to provide complete answers. If any |
| 8 | question I ask you is not clear to you or you |
| 9 | have any questions about a meaning, please |
| 10 | interrupt me. If you don't ask me to clarify |
| 11 | something, I'll assume that you've understood the |
| 12 | question in the way that I've asked it. |
| 13 | Of course, in the deposition, to |
| 14 | accommodate the court reporter, we need to give |
| 15 | verbal answers rather than a shake of a head or a |
| 16 | nod or anything like that. |
| 17 | Is that clear? |
| 18 | A. Yes. |
| 19 | Q. Thank you. Great. |
| 20 | Before starting, I thought it would |
| 21 | be helpful for the 2 of us to make sure we're |
| 22 | talking about the same thing. So I wanted to |

Page 8

| | |
|---|---|
| 1 | just run through a series of terms and define |
| 2 | them for you, or get your definition of them so |
| 3 | that when we use these terms during the |
| 4 | deposition, we're talking about the same thing. |
| 5 | Is that all right? |
| 6 | A. Yes. |
| 7 | Q. Okay. So the first term is |
| 8 | plaintiffs, which will be the Long Term Care |
| 9 | Pharmacy Alliance and ASCP. |
| 10 | Are you comfortable with using that |
| 11 | term? |
| 12 | A. Yes. |
| 13 | Q. And for defendants, I will refer to |
| 14 | CMS and HHS. |
| 15 | A. Yes. |
| 16 | Q. Okay. And when I may refer to the |
| 17 | government, that's the same thing as referring to |
| 18 | defendants. |
| 19 | Is that okay? |
| 20 | A. Yes. |
| 21 | Q. Okay. When we talk about LTC |
| 22 | pharmacies, do you understand that phrase to mean |

Page 9

| | |
|---|---|
| 1 | long-term care pharmacies? |
| 2 | A. Yes. |
| 3 | Q. And do you know what a long-term |
| 4 | care pharmacy is? |
| 5 | A. Yes. |
| 6 | Q. I might add as an aside: Sometimes |
| 7 | I ask questions that seem very basic. The real |
| 8 | purpose is to make sure that we capture the |
| 9 | information on the transcript, not to insult your |
| 10 | intelligence. I obviously know you know what an |
| 11 | LTC pharmacy is. |
| 12 | But again, for the record, if you |
| 13 | could just explain what an LTC pharmacy is, |
| 14 | please. |
| 15 | A. It's a pharmacy that provides |
| 16 | pharmaceutical services to people who are in a |
| 17 | nursing home or other type of institutional |
| 18 | setting. |
| 19 | Q. Okay. Thank you. |
| 20 | And we may use the term |
| 21 | institutionalized. |
| 22 | Could you define that term, please? |

Page 10

1    A.    Particularly as it applies to part
2    D, it applies to nursing home stay.
3    Q.    Okay.  Thank you.
4         And we may also use the term full
5    benefit dual eligible.
6         Could you very briefly as pertains
7    to part D describe that term.
8    A.    That would be an individual that
9    would be eligible for a full subsidy based on the
10   fact that they are both Medicare- and
11   Medicaid-eligible.
12   Q.    Okay.  And sometimes just to
13   shorthand the expression if it's all right with
14   you, we'll call those folks dual eligibles rather
15   than full benefit dual eligibles.
16   A.    Yes.
17   Q.    Is that okay?
18   A.    Yes.
19   Q.    Great.
20        And I may over the course of the
21   deposition refer to a PDP or a part D sponsor or
22   a part D plan.  I may use those terms

Page 11

1    interchangeably.
2         Is that acceptable to you?
3    A.    Yes.
4    Q.    Could you just briefly describe what
5    a PDP or a part D sponsor is.
6    A.    Well, a part D sponsor sponsors a
7    prescription drug plan under the Medicare
8    prescription drug program.
9    Q.    And we've talked about the part D
10   program, and just briefly, your explanation of
11   what the part D program is?
12   A.    That's the program that provides
13   prescription drug coverage for Medicare-eligible
14   beneficiaries.
15   Q.    Created by the MMA, Medicare
16   Modernization Act of 2003.
17        Correct?
18   A.    That's correct.
19   Q.    Let me show you what we've already
20   marked I believe as the first exhibits.
21            - - -
22        (Exhibit Block 1

Page 12

1    was marked for identification.)
2            - - -
3         BY MR. FARBER:
4    Q.    Ms. Block, I've handed you what
5    we've marked as deposition exhibit 1.
6         Have you seen that document before?
7    A.    Yes, I have.
8    Q.    Okay.  And could you identify it,
9    please?
10   A.    It's the plaintiffs' notice of
11   deposition.
12   Q.    Okay.
13        MR. FARBER:  And I would note for
14   the record that the document is the 30(b)(6)
15   notice of deposition.  I would note for the
16   record that this is a limited deposition for
17   purposes of jurisdictional discovery, and in that
18   regard, we intend to leave the deposition open at
19   the end so that both on 30(b)(6) topics as well
20   as other topics that Ms. Block may need to
21   testify about as the case proceeds, we can
22   continue in that vein.

Page 13

1         So again, just noting that this is a
2    limited deposition.  We're not covering the full
3    range of either 30(b)(6) topics or the topics in
4    a deposition that might be appropriate for
5    Ms. Block to testify to.
6         BY MR. FARBER:
7    Q.    And, Ms. Block, do you understand
8    that you are testifying today not in your
9    personal knowledge but on behalf of the
10   defendants in this case?
11   A.    Yes.
12   Q.    What did you do to prepare for this
13   deposition since you're speaking on behalf of the
14   agency and the government?
15   A.    I read this document.  I read the
16   interrogatories.  I read some of the guidance
17   issued by members of my staff.
18   Q.    Okay.  Were you involved in
19   preparing the interrogatory answers?
20   A.    No.
21   Q.    Do you know who was involved in
22   preparing the interrogatory answers?

Transperfect Deposition Services (212) 400-8845

Page 14

1        A.   Yes, members of my staff, the people
2    in the Medicare enrollment and appeals group,
3    people in Medicare prescription drug, Medicare
4    drugs benefit group, people in the Medicare
5    planned payment group.
6        Q.   And are those the 3 groups under --
7    within the Center for Beneficiary Choices?
8        A.   They are 3 of the groups.
9        Q.   And I assume it goes without saying,
10   but let me make it explicit for the record.
11       When I'm asking you questions about
12   who you consulted with, talked to, et cetera, I had
13   do not mean to include any discussions you had
14   with counsel.  Those obviously are privileged.
15   You don't need to testify about those.
16       Could you be a little more specific
17   as to people in those groups?
18       Were there any particular people
19   that you consulted with in preparation for this
20   deposition?
21       A.   Tracey McCutcheon in the Medicare
22   drug benefit group, Danielle Moon in the Medicare

Page 15

1    enrollment and appeals group, and Jeff Grant in
2    the Medicare planned payment group.
3        Q.   Did you also consult with Cynthia
4    Tudor?
5        A.   No, I did not.
6        Q.   How about with Jeff Kelman?
7        A.   Not specifically in preparation for
8    this, no.
9        Q.   Did you consult with Dr. Kelman?
10       A.   I consult with Dr. Kelman generally.
11   He is my medical adviser.
12       Q.   Did you consult with any people
13   outside of the agency?
14       A.   No.
15       Q.   Any former employees of CMS?
16       A.   No.
17       Q.   When you were talking about
18   documents that you reviewed, did you review the
19   documents that were produced by the government to
20   us in the course of the jurisdictional discovery
21   that we're engaged in now?
22       A.   Yes, I do.

Page 16

1        Q.   Did you review any documents in
2    addition to those that were produced by the
3    government to us?
4        A.   Yes.
5            I reviewed the guidance issued by
6    CMS relevant to this issue.
7        Q.   Okay.  In particular, which guidance
8    was that?
9        A.   The May 5th guidance, the December
10   6th guidance, and June guidance, I believe, June
11   27th.  That would be 2007.  The others were 2006.
12       Q.   Thank you.
13           Were there any other documents
14   besides the 3 guidances that you've just referred
15   to other than the documents produced to us by
16   your counsel that you reviewed in preparation for
17   the deposition?
18       A.   I briefly skimmed one chapter of our
19   manual, I believe chapter 5.
20       Q.   Are the documents that you're
21   listing for me -- were those the documents within
22   the documents produced by the government to us

Page 17

1    that you reviewed?
2            Because I note that all 4 of the
3    documents you referred to so far were in the set
4    that were produced to us by the government.
5        A.   I'm really not familiar with exactly
6    what documents were produced for you.  You should
7    know that I approve all issuance, all guidance
8    that comes out of the Center for Beneficiary
9    Choices, so at some point in time, back when
10   various pieces of guidance were issued, I would
11   have reviewed that guidance.
12           I'm referring to what I reviewed
13   specifically in preparation for this deposition.
14       Q.   Okay.  Good.  So was I.
15           So you've listed 4 documents so far.
16           Beyond the 3 guidances, the May 5,
17   December 6, June 27, and chapter 5 of the manual,
18   was there anything else you reviewed in preparing
19   for the deposition?
20       A.   No.
21       Q.   Okay.  Did you review each of the
22   categories of information that were listed in

Page 18

1  exhibit 1, the deposition notice?
2      A.   To the degree that they were covered
3  in the interrogatories, I believe I did.  And I
4  believe that most of the information requested is
5  covered in the interrogatories.
6      Q.   Okay.  One of the interrogatory
7  requests asks for any information CMS has about
8  NCPDP coding issues, where they meet
9  institutional status.
10         Did you review any information
11  related to that?
12         MS. WYER:  Objection.
13  Interrogatory requests?
14         MR. FARBER:  Excuse me.
15         The 30(b)(6) requests.  It was also
16  in the interrogatories.
17      A.   I didn't review any written
18  information regarding that.  I did discuss with
19  my staff the issue of what is a locator code.
20  That was a verbal discussion.
21      BY MR. FARBER:
22      Q.   Okay.  And other than Ms. Moon,

Page 19

1  Mr. Grant, and Ms. McCutcheon, you didn't talk to
2  anybody else at CMS in preparation for the
3  deposition?
4      A.   Not specifically in preparation for
5  today.  I have spoken with some of the other
6  people you referenced, Cynthia Tudor, for
7  example, in general about this case.
8      Q.   When was the last time you talked to
9  Ms. Tudor about this case?
10      A.   Probably several weeks ago.
11      Q.   You're aware that Ms. Tudor is the
12  author of many of the guidance documents you
13  referred to?
14      A.   Yes.
15      Q.   Did you review any other guidance
16  documents issued by Ms. Tudor relating to the
17  payment of co-payments or co-pays related to this
18  case?
19      A.   No.
20      Q.   You're aware that there are several
21  other guidance documents issued by CMS relating
22  to the co-pay issue, correct, other than the 3

Page 20

1  that you reviewed.
2         Correct?
3      A.   Yes.
4         And as I mentioned earlier, I would
5  have reviewed them at the time they were issued.
6      Q.   Okay.  But you didn't review them
7  now to refresh your recollection as to what they
8  said?
9      A.   No.
10      Q.   Okay.  Did you review any emails,
11  internal agency emails about the co-pay issue?
12      A.   No.
13      Q.   When I refer to the co-pay issue,
14  just so we have a clear understanding of what
15  that means, what do you understand the co-pay
16  issue to be?
17      A.   I understand the issue to be the
18  question of when a dual eligible beneficiary has
19  been charged a co-pay in excess of what their
20  status would have entitled them to, how and who
21  has collected that co-pay, and then how or who
22  can be reimbursed if they've paid the co-pay in

Page 21

1  the beneficiary's behalf.
2      Q.   Okay.  Do you understand this case
3  to be limited to institutional duals?
4      A.   Yes, I do.
5      Q.   And do you also understand it to be
6  limited to situations in which the pharmacy has
7  not charged the beneficiary a co-pay and the
8  pharmacy is holding the debt?
9      A.   Yes, I do.
10      Q.   Okay.  And did you review any
11  documents specific to long-term care pharmacies
12  and the co-pay issue?
13      A.   No.
14      Q.   Do you believe you're generally
15  familiar with the documents that the agency has
16  issued on that subject?
17      A.   Yes.
18      Q.   I'm sorry.
19         I think I asked you a moment ago
20  about emails.
21         Did you review any emails about the
22  co-pay issues at issue in this case?

Page 22

1    A.  I did not.
2    Q.   Okay.  Do you know if there are
3  agency emails on that issue?
4         MS. WYER:  Objection, relevance.
5         BY MR. FARBER:
6    Q.   Okay.  Your counsel may object to
7  questions from time to time.  You still have to
8  answer them unless instructed by your counsel not
9  to answer.
10   A.   As I recall, there were emails on
11 this issue.  I did not review them, however.
12   Q.   Okay.  And were some of those emails
13 prepared by you personally?
14        MS. WYER:  Objection.
15        This is beyond the scope of the
16 deposition.
17        I instruct you not to answer.
18        MR. FARBER:  You can't -- unless you
19 have a privilege --
20        MS. WYER:  It's beyond the scope of
21 the court order.
22        MR. FARBER:  Unless you have a

Page 23

1  privileged objection, you cannot instruct the
2  witness not to answer the question.
3         Are you raising privilege?
4         MS. WYER:  No.
5         I'm saying that the -- it's beyond
6  what the court allowed.  So it's beyond --
7         MR. FARBER:  I appreciate that that
8  may be your interpretation, but it is not my
9  interpretation.  This may be background for
10 another question.
11        You have no basis upon which to
12 instruct the witness not to answer.  Even if you
13 thought it was beyond the scope, it's still not a
14 basis upon which to issue that kind of an
15 instruction.
16        BY MR. FARBER:
17   Q.   So Ms. Tudor -- excuse me --
18 Ms. Block, let me ask you again, did you
19 personally prepare emails on the subject of
20 long-term care pharmacies and the co-pay issue?
21        MS. WYER:  You can answer, but I
22 maintain the objection.

Page 24

1         MR. FARBER:  You're welcome to enter
2  a standing objection if you'd like.
3         Do you want to do that?
4         MS. WYER:  No.
5         I'll keep objecting if I want.
6         MR. FARBER:  Okay.  Good.
7    A.   As best I can recall, I was actually
8  the recipient of emails, and I may -- very well
9  may have responded to some of those emails.  I
10 don't remember initiating any emails on that
11 subject.
12        MR. FARBER:  Okay.  Obviously, we
13 would call for the immediate production of the
14 emails.  They're clearly relevant to the subject
15 matter, and frankly, there's no reason why the
16 government hasn't produced them in this case.
17 We'd expect them.
18        If you can initiate the search
19 process now so that we have them by the close of
20 the deposition, that would be helpful.  If not,
21 we'd expect them first thing tomorrow morning.
22        MS. WYER:  If you are asking for

Page 25

1  production of documents, you can submit a
2  request.
3         MR. FARBER:  We already did.
4         MS. WYER:  She did not rely on those
5  emails to prepare for this deposition.
6         MR. FARBER:  We appreciate that too,
7  but that wasn't what the document request was
8  related to.  The emails responsive to the
9  document request, you can take a look at it, but
10 there's no basis for you not to have produced
11 those emails already.
12        BY MR. FARBER:
13   Q.   Okay.  Ms. Block, you're aware that
14 as the 30(b)(6) designee for the government
15 today, your testimony is binding upon the
16 government.
17        Correct?
18   A.   Yes.
19   Q.   Okay.  Ms. Block, I'm going to ask
20 you a series of -- provide you a series of
21 statements now, and I'd like you to tell me
22 whether you agree or disagree with the statement.

Page 26

1        Okay?
2        That simple.
3        The first statement is as follows:
4  CMS cannot characterize an individual as a full
5  benefit dual eligible unless the state has
6  determined that the individual is eligible for
7  Medicaid, and CMS relies on states to provide it
8  with this information.
9        Do you agree or disagree with that
10  statement?
11     A.   I disagree.
12     Q.   Disagree.  Okay.
13        Do you believe that there is
14  therefore other sources of information about --
15  upon which CMS can determine whether a
16  beneficiary is institutionalized or a dual?
17     A.   Yes, I agree.
18     Q.   What are those sources?
19     A.   There is best available evidence,
20  which can be produced by a beneficiary, by a
21  health plan, by a pharmacy, by others in support
22  of a beneficiary.  And we have provided specific

Page 27

1  guidance as to why it would be acceptable as best
2  available evidence.
3        Q.   Other than best available evidence,
4  are there other ways for CMS to know whether a
5  beneficiary is institutionalized or a dual?
6        A.   No.
7        State or best available evidence.
8        Q.   Are you answering as a matter of CMS
9  policy or as a matter of fact?
10       A.   I believe both.
11        I don't know of any way other than
12  the state -- information from the state directly
13  received by CMS in the state file or best
14  available evidence produced -- initiated by
15  someone else.  And that initiation, as I said,
16  could be by various parties and in various ways.
17        But ultimately, there would have to
18  be production of either one of the methods
19  identified as best available evidence or
20  information on the state file.
21        Q.   Okay.  If CMS were given a
22  beneficiary's Medicaid number without any other

Page 28

1  documentation, just the number by a third party,
2  and it didn't get it from the state, would that
3  be information that CMS could rely upon to
4  establish that the beneficiary is dual?
5        MS. WYER:  Objection.
6        BY MR. FARBER:
7        Q.   I'm not asking in the context --
8        MR. FARBER:  Let me finish the
9  question, please.
10        BY MR. FARBER:
11        Q.   I'm not asking in the context of the
12  agency's best available policy.
13        MS. WYER:  Objection.
14        This is beyond the scope of what
15  this deposition is about.
16        MR. FARBER:  I appreciate that.
17  Fair enough.
18        MS. WYER:  I instruct you not to
19  answer.
20        This deposition is about what
21  actually occurs.  It's about causation and
22  redressability issues.  It's not about

Page 29

1  speculation about what CMS might do.
2        MR. FARBER:  I note your objection,
3  but it's not a basis to instruct the witness not
4  to answer.  So --
5        MS. WYER:  Yes, it is.
6        MR. FARBER:  Well, we're going to
7  get the judge on the phone in about a minute if
8  we have to go through this question after
9  question.  So it's your choice, Kathryn.
10        MS. WYER:  I'm instructing the
11  witness not to answer speculative questions about
12  what CMS might do.  It's about what CMS actually
13  does and causation and redressability issues.
14        Let's go off the record.
15        MR. FARBER:  No, no, no.  We're not
16  going off.
17        MS. WYER:  Let's go off the record
18  and you can explain to me how this is --
19        MR. OBERDORFER:  Don't go off the
20  record.
21        MR. FARBER:  No, no, no.
22        We're staying on the record.

Page 30

1         I'm mystified at your objection --
2    at the objection.
3         You have no basis for the
4    instruction, so --
5         MS. WYER:  Where is this in the list
6    of topics of the deposition notice?
7         MR. FARBER:  Are you instructing the
8    witness not to answer?
9         MS. WYER:  I don't understand how
10   this is included within the deposition notice.
11        MR. FARBER:  That may be.  I
12   think -- I agree with you, you don't understand.
13        But that being said, the question
14   has been posed.  We can have it read back.
15        In fact, why don't we read it back,
16   and then you can note your objection, and we can
17   continue.
18        I'll say it one last time.  There's
19   no basis to instruct the witness not to answer
20   unless it's a question of privilege.
21        MS. WYER:  That is not correct.
22        MR. FARBER:  That's totally correct.

Page 31

1         MS. WYER:  When the court has issued
2    an order allowing discovery within a specified
3    scope, I am entitled to instruct the witness not
4    to answer questions that exceed that scope.
5         MR. FARBER:  You don't get to make
6    that judgment, Kathryn.
7         Please read the question back.
8         (The reporter read the record as
9         follows:
10        "Question:  Okay.  If CMS were given
11        a beneficiary's Medicaid number
12        without any other documentation,
13        just the number by a third party,
14        and it didn't get it from the state,
15        would that be information that CMS
16        could rely upon to establish that
17        the beneficiary is dual?")
18        I can think of no circumstance where
19   that would occur in the real world.
20        BY MR. FARBER:
21   Q.   But if it did, would CMS be able to
22   identify that beneficiary as a dual on the basis

Page 32

1    of a Medicaid number alone?
2    A.   No.
3    Q.   Why not?
4    A.   Because one would need an effective
5    date, at least a start date of the eligibility.
6         A number alone would not tell CMS
7    whether that person was a current
8    Medicaid-eligible or not.
9    Q.   What other information would CMS
10   need other than a start date?
11   A.   I'm very confused by your question
12   since there is no context for me to answer your
13   question.  There is no situation in which what
14   you're asking would actually occur that I'm aware
15   of.
16   Q.   Okay.  Let's continue on.
17        Would you agree or disagree with the
18   following statement:  The only way CMS can
19   characterize an individual as an
20   institutionalized full benefit dual eligible is
21   if it receives such information from a state?
22   A.   I disagree.

Page 33

1    Q.   Do you agree or disagree with the
2    following:  CMS notifies PDP sponsors of
3    individuals' eligibility for a subsidy and the
4    amount of a subsidy?
5    A.   I agree.
6    Q.   You agree with that.
7         In the case of a full benefit dual
8    eligible, this notification cannot occur until
9    after CMS receives the necessary information from
10   the state Medicaid agencies regarding
11   individuals' Medicaid status?
12   A.   I disagree.
13   Q.   Agree or disagree with the
14   following:  The MMA provides that
15   institutionalized full benefit dual eligibles
16   should not be assessed any charges for
17   cost-sharing amounts?
18   A.   I agree.
19   Q.   Agree or disagree:  Under the MMA,
20   network pharmacies should not charge cost-sharing
21   amounts to institutionalized full benefit dual
22   eligibles?

9 (Pages 30 to 33)

Page 34

1    A.   I agree.
2    Q.   Agree or disagree:  CMS is charged
3  with providing a profit through which
4  institutionalized full benefit dual eligibles are
5  not charged for cost-sharing amounts?
6    A.   I agree.
7    Q.   Agree or disagree:  CMS and PDP
8  sponsors engage in an ongoing exchange of
9  concrete data with CMS providing data on status
10  determinations for subsidy-eligible individual.
11       Want me to read it again?
12    A.   Please.
13    Q.   CMS and PDP sponsors engage in an
14  ongoing exchange of concrete data with CMS
15  providing data on status determinations for
16  subsidy-eligible individuals.
17    A.   I can only partially agree since
18  you've described a 1-way process, and there is
19  actually a 2-way process.
20    Q.   Could you describe the 2-way
21  process, please.
22    A.   PDPs can also provide information to

Page 35

1  CMS.
2    Q.   And that's the best available
3  evidence?
4    A.   Yes.
5    Q.   Okay.  Agree or disagree:  CMS
6  regulations require PDP sponsors to offer
7  long-term care pharmacies standard contracting
8  terms and conditions?
9    A.   I agree.
10    Q.   Okay.  Agree or disagree:  CMS does
11  not regulate the terms of contracts between PDP
12  sponsors and long-term care pharmacies?
13    A.   Again, I can only partially agree.
14    Q.   Please explain.
15    A.   CMS can provide requirements so long
16  as those requirements are not payment-related.
17  There are requirements that we can require that
18  relate to beneficiary protections but not to
19  payment.
20    Q.   Okay.  So is your testimony as the
21  30(b)(6) today that CMS has no requirements on
22  PDPs relating to payments involving pharmacies?

Page 36

1    A.   That's correct.
2    Q.   Agree or disagree:  All contracts
3  between part D plan sponsors and pharmacies must
4  contain certain provisions that are aimed at
5  protecting beneficiaries and ensuring that
6  pharmacies comply with federal law?
7    A.   That's correct.
8    Q.   Agree or disagree:  CMS does not
9  regulate the terms of payment between PDP
10  sponsors and LTC pharmacies?
11    A.   Agree.
12    Q.   What do you mean in that -- what do
13  you understand the phrase terms of payment to
14  mean in that sentence?
15    A.   We don't regulate the timeliness of
16  payment, the amount of payment, the frequency of
17  payment, or any of those things.
18    Q.   Do you regulate whether pharmacies
19  are allowed to charge co-payments to
20  institutionalized dual eligibles?
21    A.   The statute says that
22  institutionalized dual eligibles will not be

Page 37

1  charged a co-payment.
2    Q.   So my question is, does CMS dictate
3  terms of contracts between PDPs and pharmacies
4  relating to the charging of co-payments to
5  institutionalized duals?
6    A.   No.
7       It's a statutory provision.
8    Q.   It's a statutory provision, but you
9  don't require the PDPs to include contractual
10  terms to implement that statutory provision?
11    A.   Not specifically.
12       The contractual provisions would
13  have to abide by all statutory provisions.  That
14  one specifically and individually would not need
15  to be referenced since the contracts would have
16  to require that all statutory provisions be
17  adhered to.
18    Q.   So there's no unique --
19    A.   No unique provision.
20    Q.   -- contractual provision between
21  PDPs and pharmacies that CMS mandates because the
22  issue of charging co-pays to institutionalized

10  (Pages 34 to 37)

Page 38

1  duals is already included by incorporation of the
2  statutory requirements?
3      A.   That's correct.
4      Q.   Okay.  Thank you.
5          Agree or disagree:  CMS has worked
6  with states, pharmacies, and plans to ensure that
7  all relevant parties are aware of a dual eligible
8  status and his or her eligibility for low-income
9  subsidy to minimize problems with data and to
10  achieve quick resolution of any problems that
11  arise?
12      A.   That's correct.
13      Q.   Agree or disagree:  LTC pharmacies
14  are themselves not regulated by the provisions of
15  Medicare part D?
16      A.   I agree.
17      Q.   Agree or disagree:  CMS does not
18  comment upon specific terms of contract
19  provisions between long-term care pharmacies and
20  PDPs?
21      A.   I agree.
22      Q.   Agree or disagree:  CMS guidance to

Page 39

1  PDPs are legally binding documents enforceable
2  against the PDPs?
3      A.   That really is a very interesting
4  question.
5      Q.   Thank you.
6          What do you mean by, an interesting
7  question?
8      A.   Well, you know, clearly anything in
9  statute or regulation is legally binding.
10  Subregulatory guidance doesn't fall into either
11  of those categories, so it would really be a
12  matter of determination whether and how binding
13  subregulatory guidance is.
14      Q.   What is the agency's perspective on
15  that?
16      A.   The agency's perspective is that
17  subregulatory guidance is intended to be
18  followed.  The agency intends the recipients to
19  follow the guidance.
20      Q.   I'd like to shift the focus of our
21  conversation -- back on that last point before we
22  shift topics.

Page 40

1          The best available evidence policy
2  that you've referred to, is that in a statute?
3      A.   No.
4      Q.   Is it in a regulation?
5      A.   No.
6      Q.   Is it in agency guidance?
7      A.   Yes.
8      Q.   Okay.  Is it binding on PDPs?
9      A.   We take the position that it is
10  binding.
11      Q.   And when you say it's binding, what
12  do you mean by that?
13      A.   It means that I expect anyone who
14  contracts with CMS to follow our guidance.
15      Q.   Okay.  How is the best available
16  evidence guidance binding on the PDPs?
17          Does it require -- what I mean by
18  that is, does it require PDPs to search out best
19  available evidence if they are made aware that a
20  particular beneficiary may be an
21  institutionalized dual?
22      A.   It does not require them to search

Page 41

1  it out.  It requires them to respond if it is
2  presented to them.
3      Q.   What do you mean by, respond, and
4  what do you mean by, presented to them?
5          If what is presented to them?
6      A.   If any one of the things that we
7  have defined as best available evidence is
8  presented to a PDP, they are to correct their
9  system accordingly and inform CMS of the change.
10      Q.   But if I understand your answer, if
11  a PDP is told that a particular beneficiary is an
12  institutionalized dual, but that -- but it's just
13  verbal communication to the PDP, the PDP doesn't
14  have an obligation to go out and collect best
15  available evidence to ensure -- to present to
16  CMS; is that correct?
17      A.   That's correct.
18      Q.   Okay.  Does the PDP have any
19  obligation to investigate whether or not a
20  beneficiary is an institutionalized dual?
21      A.   No.
22      Q.   Okay.  How do the PDPs know whether

Page 42

1  a beneficiary is an institutionalized dual?
2      A.   They can know in one of 2 ways.
3          They can either be informed by CMS
4  through one of the various exchanges, file
5  exchanges that we routinely provide to PDPs, or
6  they can receive best available evidence.
7      Q.   Okay.  We've talked a little bit
8  about the state processes.  The states -- and I'd
9  like to explore how the states submit data to CMS
10 about both institutionalized status and dual
11 status.
12         Let's break them out so we're
13 talking about them separately.  First let's talk
14 about dual status.
15         Could you explain how the states
16 provide information to CMS about dual status.
17 And if you could begin your answer by describing
18 how the process worked in January of 2006 and
19 then how it changed, if it changed till today.
20     A.   The states provide CMS with a file
21 once a month typically sometime between the 15th
22 of the month and the end of the month that lists

Page 43

1  all of their Medicare and Medicaid eligibles.
2  And that would include in terms of Medicaid both
3  full and partial dual eligibles.
4      Q.   Okay.  For purposes of our
5  discussion, why don't we restrict our discussion
6  to the full duals only.
7          Okay?
8      A.   Okay.
9      Q.   Thank you.
10         And has the process changed at all
11 in terms of the state provision of data?
12     A.   Not since late 2005 forward.  The
13 states have been providing monthly files on a
14 regular basis.
15     Q.   And does CMS check those files when
16 they come in?
17     A.   Yes, CMS checks those files.
18     Q.   Okay.  How does CMS check the files?
19     A.   CMS has a contractor that checks
20 those files.
21     Q.   And is that contractor Mathematica?
22     A.   Yes.

Page 44

1      Q.   Is Mathematica still under contract
2  with CMS today to do that checking?
3      A.   Yes.
4      Q.   And what does Mathematica check for?
5      A.   They check for the data accuracy.
6  So they would look at the quality of the data to
7  make sure that in fact there's no data error.
8      Q.   Okay.  Do they check on the accuracy
9  of all the -- well, what data points specifically
10 do they check?
11         Do they check spellings of names?
12     A.   They check against name.  They check
13 against HICN, H-I-C-N, health insurance number.
14 They may check against Social Security number,
15 date of birth.
16     Q.   Did they check Medicare eligibility?
17     A.   No.
18         Medicare eligibility is checked
19 through a match with the Medicare beneficiary
20 database.
21     Q.   Okay.  So Mathematica doesn't check
22 Medicare eligibility?

Page 45

1      A.   No.
2          As I understand it, the file is run
3  against the Medicare beneficiary database, and
4  that would confirm Medicare eligibility.
5      Q.   And who does that match?
6      A.   The office of our systems people.
7      Q.   So that's done within CMS?
8      A.   Yes.
9      Q.   Okay.  Are there any checks to
10 determine whether or not the state has provided
11 the complete roll of Medicaid beneficiaries?
12     A.   No.
13         Actually, there would be no way to
14 be -- to determine if a beneficiary was missing
15 entirely from the file.
16     Q.   So CMS does not check for that?
17     A.   As far as I know, there's no way we
18 could determine that someone was missing.
19     Q.   Okay.  Has a state ever missed a
20 monthly report?
21     A.   I believe not.
22     Q.   Have states been late in their

Transperfect  Deposition  Services  (212) 400-8845

Page 46

1  monthly reports?
2      A.  I believe not.
3          My understanding is that the states
4  have been very consistent in complying with the
5  requirement and have been reporting monthly.
6      Q.  Okay.  So to the best of your
7  understanding -- again, it's testifying on behalf
8  of the agency, not yourself -- no state has ever
9  missed a monthly reporting?
10     A.  Not that I'm aware of.
11     Q.  Okay.  Have you inquired into that
12 in preparation for this deposition?
13     A.  I actually did, and what I was told
14 was that the states have consistently complied.
15     Q.  Okay.  Good.
16         And in terms of the error rates in
17 state reporting, is it CMS's experience that some
18 states have been more accurate than others?
19     A.  I believe that the accuracy rate of
20 states overall is very high.
21     Q.  What do you mean by, very high?
22     A.  In the 90 to 95 percent range.

Page 47

1      Q.  Okay.  But how about within states?
2          Are some states better than others?
3      A.  Not that I'm aware of.
4      Q.  Okay.  And again, did you inquire
5  into that?
6      A.  No, I did not inquire about that.
7      Q.  Okay.  When you testified that the
8  accuracy rate was between 90 and 95 percent, what
9  is that other 10 percent?
10         What kinds of problems would exist
11 there?
12     A.  As I understand it, data mismatches.
13     Q.  Meaning?
14     A.  Meaning that one of the factors that
15 I mentioned earlier didn't match.
16     Q.  A social number or a birth date?
17     A.  Yes.
18     Q.  Or a typo on a name?
19     A.  Exactly.
20     Q.  When the mismatches occur, what
21 happens to that cohort of beneficiaries?
22         How is the information reconciled

Page 48

1  between the state and CMS?
2      A.  The state receives a response file
3  from us, and that file would identify any
4  mismatches.  The state then has the opportunity
5  to correct the error if it's a correctable error,
6  and it would be resubmitted and it's filed.
7      Q.  For any beneficiaries that go back
8  as part of this error file, there's an
9  opportunity to clean those up the following
10 month?
11     A.  That's correct.
12         The file is a complete file so that
13 every Medicare- , Medicaid-eligible beneficiary
14 is listed each month.
15     Q.  So if I were a dual in Arkansas in
16 January, February, or March, my full data would
17 appear in the January report, the February
18 report, and the March report; is that correct?
19     A.  That's correct.
20         It's a full placement file.
21     Q.  Okay.  In this cohort of the
22 mismatches as I'll call them for shorthand for

Page 49

1  the deposition, does CMS track the repeated error
2  rates in correcting that data?
3          In other words, if in my
4  hypothetical of me being a dual in Arkansas, does
5  CMS track whether I reject in January and again
6  in February?
7      A.  Not that I'm aware of, no.
8      Q.  Okay.  So is it possible that within
9  this 5 to 10 percent of mismatched group, that
10 those mismatches can repeat month after month?
11     A.  I suppose so.
12     Q.  Okay.  Does CMS know whether that's
13 happening or not?
14     A.  Not that I'm aware of, no.
15     Q.  Okay.  And to what database do the
16 states submit their monthly data?
17     A.  They submit it to the office of
18 information systems.  I don't know specifically
19 what database.
20     Q.  Does it get compared against the
21 Medicare beneficiary database?
22     A.  Ultimately, yes.

Page 50

1      Q.   And we were talking about dual
2  eligibility before we -- and we'll later talk
3  about institutional.
4          What data elements to the best of
5  your knowledge does the state provide that
6  identify beneficiary as a full benefit dual?
7      A.   The name, the HICN, the Social
8  Security number, the date of birth, the Medicaid
9  status, that is, whether the individual is a full
10 or a partial dual, and also the institutional
11 status.
12     Q.   Okay.  Does the state provide data
13 on when the Medicaid eligibility began?
14     A.   Yes.
15     Q.   Okay.  So there's a Medicaid start
16 date as well?
17     A.   Yes.
18     Q.   As the files are run each month, how
19 is retroactive eligibility determined?
20         What I mean by that is, let's say
21 someone was rejected because of some data problem
22 in month 1, and in month 2, that problem is

Page 51

1  corrected.
2          Is the correction retroactive to
3  month 1, or is it only effective in month 2?
4      A.   It's retroactive, because the
5  correct effective date would have to be entered
6  on the file.
7      Q.   Okay.  And has that always been the
8  case, or is that -- or was that a change made as
9  the process went along?
10     A.   So far as I know, it's always been
11 the case.
12     Q.   Okay.  Have there been any changes
13 from January 1, 2006, the beginning of the
14 program, to date, in the way that states report
15 dual status to CMS?
16     A.   Not that I'm aware of.
17     Q.   Okay.  And has CMS issued specific
18 direction to the states as to how to report data?
19     A.   Yes.
20     Q.   Okay.  Is that the data dictionary?
21     A.   Yes.
22     Q.   Okay.  And the government produced

Page 52

1  to us a version dated December 2006.
2          Was there such a document that
3  predated December 2006?
4      A.   I don't know.
5          MR. FARBER:  We'd ask the government
6  for production of any documents before December
7  2006, which also encompassed the time period of
8  issue in the case.
9          MS. WYER:  We'll have to discuss
10 document requests at another time.
11         BY MR. FARBER:
12     Q.   Let's talk about the institutional
13 status.
14         How does CMS learn whether or not a
15 beneficiary is institutionalized?
16         Is that also from the states?
17     A.   It can be from the states, yes.
18     Q.   And if not from the States?
19     A.   It's about BAE, best available
20 evidence.
21         That's correct.
22     Q.   And when the state provides data on

Page 53

1  institutional status, what particular data
2  element specific to institutional status does the
3  state provide CMS?
4      A.   The state would tell us only those
5  people who actually qualify as having
6  institutional status in accordance with the
7  Medicaid rules, so that not every individual who
8  is in an institution qualifies as having
9  institutional status.  If the individual actually
10 meets the criteria for Medicaid institutional
11 status, then that would be noted on the file that
12 the state sends us.
13     Q.   Okay.  And what are the criteria?
14         Are you referring to being in a
15 nursing home as opposed to being in an
16 assisted-living facility?
17     A.   That would be one of the criteria,
18 yes.
19     Q.   Are you also referring to being in a
20 nursing home for -- effective the first day of
21 the following month postadmission?
22     A.   Yes.

Page 54

1      Q.    Any other criteria?
2      A.    I'm thinking.
3            The person would have to be there as
4  a Medicaid person rather than a Medicare part A
5  person.
6      Q.    Okay.  So the part A stay would have
7  ended and they would be -- and the stay would be
8  funded by Medicaid?
9      A.    Yes.
10     Q.    And has CMS dictated to the states
11  how they should calculate those 3 criteria?
12     A.    I would assume that's in the
13  dictionary.  That's not an area that I'm familiar
14  with.
15     Q.    Okay.  But it's up to the state to
16  determine the effective date of institutional
17  status, in other words, first day of the next
18  month for its state beneficiaries that it's
19  reported to CMS; is that correct?
20     A.    Yes.
21     Q.    Okay.  And does CMS ever check
22  whether the states have gotten that calculation

Page 55

1  correct?
2      A.    I don't believe so.
3      Q.    And does CMS ever check to determine
4  whether the state has properly calculated when
5  the part A stay ends and when the Medicaid
6  institutional status begins for these
7  beneficiaries?
8      A.    That's not something I have
9  knowledge of.
10     Q.    Okay.  To the best of your
11  knowledge, you're not aware of any check on that
12  element either, are you?
13     A.    To the best of my knowledge.
14     Q.    Okay.  Your personal knowledge?
15     A.    My personal knowledge.
16     Q.    Do you know who would know that?
17     A.    The people in CMSO, the Center for
18  Medicaid Stay Operations.
19     Q.    Would Jeff Grant know that?
20     A.    No.
21     Q.    Who in Medicaid stay operations
22  would know that?

Page 56

1      A.    I don't recall the name of the
2  person.
3      Q.    Dennis Smith?
4      A.    Well, Dennis Smith has that
5  operation.
6      Q.    Okay.  Would he have information
7  about that?
8      A.    I would imagine so, or someone on
9  his staff would.
10     Q.    Okay.  And does CMS ever check
11  whether the state has properly determined that
12  the institution in which the dual resides is
13  actually an institution that qualifies for part D
14  institutional status?
15           In other words, that the person is
16  in a nursing home as opposed to an
17  assisted-living facility?
18     A.    As best I understand it, we rely on
19  the information provided by the state.
20     Q.    Okay.  So if a state provided
21  information designating someone as an
22  institutional dual, but that person actually

Page 57

1  lived in an assisted-living facility, CMS would
2  not check that information against any other
3  source to catch that and would treat the person
4  as a zero co-pay?
5      A.    That's my understanding.
6      Q.    Are you aware of any financial
7  implications to states in terms of designating
8  beneficiaries as institutional duals and
9  reporting them up to CMS?
10     A.    Not specifically, no.
11     Q.    Does it affect their so called
12  claw-back payment?
13     A.    The information as I understand it
14  is used in determining the claw-back payment.
15     Q.    There's probably an nicer term for
16  "claw-back."  I don't mean to use a pejorative
17  term, but that's the shorthand by which I know
18  it.
19           So does a state's payment increase
20  based upon the number of institutional duals that
21  it reports to CMS?
22     A.    The state's payment wouldn't

Page 58

1   increase.
2       Q.   So how is the data used in this
3   calculation of the state payment?
4       A.   Again, that's really outside of the
5   scope of my jurisdiction.
6       Q.   Okay.  We've talked about best
7   available evidence.
8           Have PDPs actually presented best
9   available evidence to CMS?
10      A.   They haven't been required to
11  actually present it up until this point in time.
12      Q.   Okay.  When will they be required to
13  present it?
14      A.   They will be required to present it
15  when we do payment reconciliation for 2007.
16  Should there be any claims, that is, PDEs, where
17  they are claiming the subsidy for an individual
18  who doesn't appear to be eligible in our system.
19      Q.   And a PDE is a prescription drug
20  event?
21      A.   Yes.
22      Q.   And that PDE reconciliation will

Page 59

1   happen sometime in May or June of 2008 for plan
2   year 2007?
3       A.   Yes.
4       Q.   Although PDPs may not be required to
5   present best available evidence up to CMS, have
6   any?
7       A.   Not that I'm aware of.
8       Q.   Do you know whether any PDPs are
9   actually collecting best available evidence?
10      A.   I would assume.
11      Q.   Does CMS know whether any PDPs are
12  actually collecting -- I'm not asking for your
13  assumption.
14          I'm asking you if CMS is aware of
15  any PDP that's actually collecting best available
16  evidence.
17      A.   That's not something I would know.
18      Q.   Okay.  Is it something that anybody
19  in CMS would know?
20      A.   Possibly.
21      Q.   Okay.  But in preparation for the
22  deposition today, you did not learn of any PDP

Page 60

1   that is actually collecting best available
2   evidence?
3       A.   No.
4       Q.   Okay.  So to the best of CMS's
5   knowledge, the agency is unaware today, December
6   4th, 2007, whether PDPs are or are not collecting
7   best available evidence; is that correct?
8       A.   No, that's not correct, because
9   there is another way in addition to the PDEs.
10  That is, a PDP can make a request to a regional
11  office to make a change in a beneficiary's status
12  based on best available evidence.
13          And we have issued guidance telling
14  PDPs how to go about making such a request.
15  Those requests come to the CMS regional offices.
16          And I have no specific information
17  as to whether or how many of those requests have
18  been received or processed.
19      Q.   Do you know if any have?
20      A.   I have not inquired, and so I don't
21  know.
22          MR. FARBER:  Okay.  Well, we're

Page 61

1   going to leave a blank in the transcript and ask
2   that that information be provided, again within
3   24 hours given the nature of this discovery.  It
4   is very relevant to what we're talking about
5   here.
6           So we need to know whether any PDPs
7   have requested through a regional office changes
8   in the system based upon best available evidence,
9   and if so, how many that number is.
10          MS. WYER:  I'm not agreeing to
11  provide that.  I don't think that's relevant.
12          MR. FARBER:  You're under an
13  obligation to do so.  We're asking for it to be
14  provided within 24 hours.
15          BY MR. FARBER:
16      Q.   If any of those were made, would
17  those be brought to the attention of Center for
18  Beneficiary Choices?
19      A.   No.
20      Q.   Who would know about them?
21      A.   The regional offices would know.
22  They would make the entry, I believe, into the

Page 62

1    system, so whoever did the processing in the
2    regional office would know.
3        Q.    Okay.  Is anyone at headquarters
4    tracking any of such changes made to the Medicare
5    beneficiary database through which changes are
6    made to the system on the basis of best available
7    evidence?
8        A.    No.
9        Q.    No reports are run like that?
10       A.    Not at this time, no.
11       Q.    So there's no one at headquarters
12   who knows one way or the other whether or not
13   such changes have ever been made?
14       A.    Not at this time.
15       Q.    Other than the data dictionary, has
16   CMS dictated to the states any other specifics
17   about how dual or institutional status should be
18   reported by the states up to the CMS?
19       A.    Not that I'm aware of.
20       Q.    Okay.
21           MR. FARBER:  I notice by the way
22   we're reaching about an hour.

Page 63

1           Would you like a break?
2           THE WITNESS:  No, not yet.
3           MR. FARBER:  Please let me know when
4    you'd like one.
5           BY MR. FARBER:
6        Q.    Does CMS require that the states
7    provide the address of an institutionalized
8    beneficiary in its report?
9        A.    I don't know.
10       Q.    Okay.  How does CMS -- does CMS
11   maintain a central database of all nursing home
12   addresses or -- the addresses of facilities that
13   were qualified as institutions within the part D
14   provisions that we're discussing?
15       A.    Again, I really don't know.
16       Q.    Would someone in the agency know?
17       A.    Yes, but I don't know who that would
18   be.
19       Q.    Any of the subunits within the
20   Center for Beneficiary Choices?
21       A.    I truly don't know.
22       Q.    I'm not asking you specifically.

Page 64

1        A.    I'm not going to speculate.  I don't
2    know.
3        Q.    I appreciate that.
4           We made reference earlier before to
5    the NCPDP locator code.
6           Are you familiar with that?
7        A.    Yes.
8        Q.    You've inquired into what the
9    locator code is for purposes of preparing for the
10   deposition.
11          Correct?
12       A.    Correct.
13       Q.    Does CMS today utilize NCPDP locator
14   code to determine institutionalized status?
15       A.    No.
16       Q.    Why not?
17       A.    Because as I understand it, the
18   locator code simply says where the claim
19   originated from.  It doesn't address the criteria
20   for eligibility for institutional status in order
21   for the beneficiary to be entitled to a zero
22   co-pay.

Page 65

1        Q.    And who provided you with that
2    information?
3        A.    Someone on my staff.
4        Q.    Other than an attorney?
5        A.    Yes.
6           It was one of the people that I was
7    talking with on my staff.  I don't recall
8    specifically which one.
9        Q.    Do you know if it was Tracey
10   McCutcheon?
11       A.    It may have been Tracey.
12       Q.    Could it have been Danielle Moon?
13       A.    It could have been any one of the
14   people that I spoke with.  I really don't
15   remember specifically which one it was.
16       Q.    You've described how the states
17   provide their monthly reports between I think you
18   said the 15th and the 25th of the month?
19       A.    I said the 15th and the end of the
20   month.
21       Q.    Okay.  And then CMS runs several
22   checks against that data.

Page 66

1            Correct?
2     A.   Yes.
3     Q.   How long does that checking process
4  take roughly?
5     A.   That checking process as I
6  understand it is done very, very quickly, because
7  early in the month at the very beginning of the
8  month, CMS then transmits information to the PDPs
9  through a TRR.
10    Q.   What's a TRR?
11    A.   It's a transmittal response report.
12    Q.   Okay.  And what's the TRR?
13    A.   It informs the PDP of people who
14  have enrolled and that are recorded in the CMS
15  systems for that particular plan.
16    Q.   So each plan gets only its
17  enrollees?
18    A.   That's correct.
19    Q.   And approximately what day of the
20  month does the TRR go out to each plan?
21    A.   They go out weekly, so that they go
22  out -- they're sent on Saturday of each week, and

Page 67

1  we see it available on Monday morning at the
2  plant sites.
3     Q.   Which of these weekly TRRs will
4  obtain the updated information that comes from
5  the state monthly transmission?
6            Will it be the first or second TRR
7  of the month, or does it vary?
8     A.   As I understood it, the information
9  is transmitted immediately, so it would be at the
10  beginning of the month.
11    Q.   "Immediately" meaning outside the
12  TRR process --
13    A.   No.
14            As next.
15    Q.   -- or as part of the next TRR?
16    A.   Yes.
17    Q.   Has it always been the first TRR of
18  the month in which the new state information is
19  transmitted to the PDPs?
20    A.   As I understood it, yes.
21    Q.   Okay.  Has CMS ever missed that and
22  it's rolled over into the second TRR of the

Page 68

1  month?
2     A.   I don't know.
3     Q.   And do the updated TRRs, that first
4  TRR of the month, indicate both a beneficiary's
5  dual status as well as their institutionalized
6  status?
7     A.   Yes.
8            What it actually indicates is the
9  individual's co-pay level.
10    Q.   Okay.  So it doesn't really say
11  dual, nondual, or institutional --
12    A.   It says what your premium and co-pay
13  level is.
14    Q.   Okay.  For an institutionalized
15  dual, that would be zero?
16    A.   Yes.
17    Q.   Both on premium and co-pay?
18    A.   Yes.
19    Q.   Okay.  Other than CMS, do any of the
20  PDPs have access to the state data?
21    A.   They could.  They can -- they don't
22  have access to the file that's sent to CMS, but

Page 69

1  they can contact the states directly.
2     Q.   Are you aware of any PDPs that do
3  contact states directly?
4     A.   That's not anything I've inquired
5  about.
6     Q.   Does CMS track whether PDPs contact
7  states?
8     A.   No.
9     Q.   Does CMS track whether PDPs contact
10  nursing homes to determine institutionalized
11  status?
12    A.   That's not something I'm aware of
13  one way or the other.
14    Q.   Has CMS ever instructed the PDPs
15  through guidance or otherwise that they should
16  contact states to determine dual status?
17    A.   No.
18    Q.   Has CMS ever instructed PDPs to
19  contact nursing homes to determine
20  institutionalized status?
21    A.   No.
22    Q.   Has CMS ever instructed the PDPs to

Transperfect  Deposition  Services  (212)  400-8845

Page 70

```
1   contact the states to verify reports of dual
2   status?
3        A.   Our best available evidence guidance
4   doesn't instruct a PDP to do that.  It says that
5   it can use that information, so it presumes that
6   a PDP may contact a state.
7        Q.   But CMS has never issued guidance
8   that tells the PDP that it should contact the
9   state to verify dual or institutionalized status?
10       A.   Our best available evidence guidance
11  tells PDPs and others what it will accept as best
12  available evidence.
13       Q.   Will CMS accept anything as best
14  available evidence other than what's -- any other
15  data as best available evidence other than the
16  data specified in the policies?
17       A.   No.
18       Q.   And was the best available evidence
19  policy specific to the long-term care sector, or
20  is for all beneficiaries, ambulatory and
21  long-term care?
22       A.   It's for all beneficiaries.
```

Page 71

```
1        Q.   Okay.  Has CMS ever considered a
2   separate best available evidence policy for
3   long-term care?
4        MS. WYER:  Objection, best
5   deliberative process.
6        MR. OBERDORFER:  I believe you told
7   the judge that you were not asserting any
8   objections in your discovery responses, including
9   the deposition.
10       MS. WYER:  That's not correct.
11       MR. OBERDORFER:  Then my ears were
12  wrong.
13       MS. WYER:  I instruct you not to
14  answer that.
15       MR. FARBER:  And the basis of your
16  objection?
17       MS. WYER:  Privilege.
18       MR. FARBER:  And what privilege
19  would that be?
20       MS. WYER:  Deliberative process.
21  You're asking us why CMS has considered doing.
22  That's privileged.
```

Page 72

```
1        BY MR. FARBER:
2        Q.   Has CMS ever established a best
3   available evidence process for long-term care
4   than is different for the ambulatory population?
5        A.   No.
6        Q.   And without disclosing the subject
7   of the conversations, have you ever had
8   discussions with anybody at -- have there ever
9   been discussions within CMS on that subject
10  without getting into what the discussions were?
11       A.   No.
12       Q.   Are you familiar with the biweekly
13  deemed LIS premium report data files?
14       A.   I know that such a thing exists,
15  yes.
16       Q.   Okay.  Do you know if the state data
17  is also incorporated into those biweekly deemed
18  LIS premium report data files?
19       A.   Yes.
20       Q.   And is it on -- is the data update
21  within a day or 2 of -- within a week of
22  receiving the state data?
```

Page 73

```
1        A.   Again, it's biweekly, so it would
2   come out twice during the month.  So presumably,
3   yes, it would be within a week or 2.
4        Q.   Okay.  Does CMS know on average how
5   long after a long-term care pharmacy dispenses
6   medication between an institutionalized dual -- a
7   new institutionalized dual -- does CMS learn the
8   beneficiary is institutionalized or dual?
9        A.   That would depend.
10       Q.   Let me present to you a hypothetical
11  so we can be a little more concrete.
12            A beneficiary turns 65 on June 1 and
13  enters a nursing home on that same -- enters a
14  nursing home on that same, say, June 15.
15            With me so far?
16       A.   M-hm.
17       Q.   On July 1, the long-term care
18  pharmacy dispenses prescriptions to that
19  beneficiary, so we've satisfied the first day of
20  the next month criteria.
21            Correct?
22       A.   M-hm.
```

Page 74

1    Q.  Okay.  And the person is a dual, but
2  they just turned dual in June.
3         When would CMS first report to the
4  PDPs that the beneficiary is an institutionalized
5  dual?
6    A.  That information might already be
7  available at the PDP because we have a special
8  provision in place for people who are aging in to
9  Medicare.  Since that can be known in advance, we
10 have made special provisions to make sure that
11 the records are updated for those people in
12 advance so that information for that type of
13 individual could be available immediately.
14   Q.  Okay.  And the aging -- what did you
15 call it?
16   A.  Aging in.
17   Q.  -- aging in system, was that a
18 change to the state reporting requirements over
19 the course of 2006?
20   A.  Yes, that was a change.  It was an
21 update, and I don't recall the exact date that
22 that change was made, but I believe sometime

Page 75

1  during 2007.
2    Q.  Okay.  Is the aging in update
3  mandatory on the states to report?
4    A.  Yes.
5    Q.  Do all states report it?
6    A.  Yes.
7    Q.  And does CMS check that data?
8    A.  Yes.
9    Q.  Okay.  And has CMS found that the
10 data is accurate?
11   A.  So far as I know, yes.
12   Q.  Okay.  And does CMS have any way to
13 determine if the state has filed to report
14 someone who is aging in?
15   A.  No.
16   Q.  So CMS would never know if a state
17 has missed designating someone who is actually
18 aging in; is that correct?
19   A.  That's correct.
20   Q.  Okay.  So let's assume for purposes
21 of my hypothetical that this is someone the
22 states missed as aging in.

Page 76

1         So again, this is someone who turned
2  65 on June 1.  The state hasn't reported it as
3  aging in, but the state identifies it in the next
4  report, which would be the July 1 report; is that
5  correct?
6    A.  Yes.
7    Q.  And when would --
8    A.  States as I said typically report
9  the 15th to the end of the month, so not July 1.
10   Q.  So if this were a Medicaid
11 beneficiary who turned eligible on June 1, when
12 would the state report that to CMS approximately?
13   A.  They might very well report it on
14 June 15th.
15   Q.  Okay.  Sometime between June 15th
16 and the end of the month?
17   A.  M-hm.
18   Q.  And then CMS -- when would CMS
19 report that to the PDPs, approximately?
20   A.  Approximately it could be early in
21 July, beginning of July.
22   Q.  Okay.  Okay.

Page 77

1         And if the pharmacy had dispensed on
2  July 1 and submitted that claim to the PDP, when
3  would the PDP -- how would the PDP know what
4  co-pay to assess on that claim?
5    A.  It would depend on when the PDP
6  received the information from CMS and updated its
7  system.
8    Q.  Okay.  And what's -- do you know the
9  average lag at the PDP of updating its system
10 once it receives the information from CMS?
11   A.  Well, we ask PDPs to update their
12 systems very quickly, so again, I don't know
13 precisely from PDP to PDP exactly when they
14 update their system, but the instruction -- the
15 guidance from CMS is to do that quickly.
16   Q.  Okay.  And what do you mean by,
17 quickly?
18         Day, week, month, year?
19   A.  No.
20         Week.
21   Q.  Okay.  So within a week?
22   A.  Yes.

Page 78

1    Q.   Okay.  So back to our hypothetical
2  for a moment.
3        So it is likely that the PDP would
4  update their system sometime by the first or
5  second week of July?
6    A.   Likely.  Again, this is very
7  speculative.
8    Q.   I understand.
9        It's a hypothetical.
10       And do you have any reason to think
11 that the PDP's updating of the institutional
12 status of the dual would be any different than
13 the PDP updating of the dual status of that
14 beneficiary?
15   A.   No.
16   Q.   And on the TRR, CMS doesn't actually
17 report to the PDPs institutional or dual status.
18 They only report co-pay amount.
19       I think you said that before.
20       Is that right?
21   A.   Yes.
22   Q.   It's not a trick question.

Page 79

1    A.   No.
2        Co-pay amount and premium amount.
3    Q.   Thank you.
4        Has CMS ever assisted long-term care
5  pharmacies in working to correct cases where the
6  co-pay information was not up to date?
7    A.   I don't believe so.  CMS has
8  assisted long-term care pharmacists in other
9  ways, but I don't believe specifically in terms
10 of co-pay information.
11   Q.   Okay.  What other ways?
12   A.   CMS early in the program assisted
13 long-term pharmacies by providing them a -- a
14 mechanism for them to determine what plan a
15 resident was enrolled in.
16   Q.   This is the E 1 process?
17   A.   No, it was not the E 1 process.
18       It was a process by which working
19 through 1-800 Medicare, an institution, a nursing
20 home could find out what plans its residents were
21 enrolled in, and once the nursing home has the
22 information, then the long-term care pharmacy of

Page 80

1  course transmits that information to the nursing
2  home.
3    Q.   So was that a process only for the
4  nursing home, for the long-term care facility?
5    A.   Yes.
6        It was a process for the long-term
7  care facility as I understand it.
8    Q.   Okay.  When the PDP receives a
9  claim, it can match that claim against its own
10 database of beneficiaries updated by the TRRs.
11       Correct?
12   A.   Yes.
13   Q.   It can also submit a query to CMS as
14 to the co-pay status of that particular
15 individual associated with the claim?
16   A.   Yes, it can.
17   Q.   How does that process work?
18   A.   There's a beneficiary eligibility
19 query, and it accesses the Medicare beneficiary
20 database in a batch mode.
21   Q.   Okay.  And would there ever be a
22 reason that the Medicare beneficiary database

Page 81

1  would have different data than the TRR reports?
2    A.   No, they should not be.
3    Q.   Okay.  So in what instance would a
4  PDP query the Medicare beneficiary database
5  rather than its own beneficiary database?
6    A.   It would just be a verification or a
7  check on accuracy.
8    Q.   Okay.  Are you aware of any
9  instances where PDPs have queried the database
10 because the eligibility information that they're
11 getting associated with the claim indicates zero
12 co-pay but their own databases indicate that a
13 co-pay is due because the beneficiary is not
14 institutionalized?
15   A.   I'm not directly aware of what
16 queries are actually made of the database.
17   Q.   Okay.  Does CMS track that?
18   A.   Not that I'm aware of.
19   Q.   Do you know if CMS tracks queries
20 about institutional status?
21   A.   I really don't know.
22   Q.   Okay.  Do you know if CMS tracks

Page 82

1    queries by dual status?
2        A.   I really don't know.
3        Q.   Has CMS ever found discrepancies
4    between the Medicare beneficiary database and PDP
5    databases about institutional status?
6        A.   We do a check actually.  We have a
7    contractor that does a verification check.  And
8    again, as I understand it, the match is very
9    high.
10            And in fact, the match is not
11   necessarily a hundred percent, because the PDP
12   database could be more current than the Medicare
13   database if the PDP has updated its own database
14   based on best available evidence.
15       Q.   Okay.  Are you aware of any instance
16   where CMS has found that a PDP database is more
17   current than the Medicare beneficiary database
18   because of the updates due to best available
19   evidence?
20       A.   I have not looked at the
21   information.  I just know that the accuracy or
22   match rate is very high.  It's actually a

Page 83

1    quality -- a plan performance measure, and it's
2    publicly reported.  But I have not looked at the
3    specifics of the data.
4        Q.   Who is the contractor?
5        A.   Acumen.
6        Q.   And does Acumen provide reports to
7    the agency as to the discrepancies it's found?
8        A.   They do.
9        Q.   Okay.  And did you review any of
10   those --
11       A.   No.
12       Q.   -- in preparation for the
13   deposition?
14       A.   I didn't.
15       Q.   Okay.  Do you know if Acumen reports
16   discrepancies based on dual status?
17            Or let me phrase the question
18   better.
19            Do you know if Acumen reports
20   discrepancies associated with differences in dual
21   status reported by the Medicare beneficiary
22   database and PDP databases?

Page 84

1        A.   I believe they report all
2    discrepancies.
3        Q.   So would they report it by category?
4        A.   I believe so.
5        Q.   So if there was discrepancies
6    associated with co-pay amounts, they would report
7    that?
8        A.   I believe so.
9        Q.   And if there were discrepancies
10   associated with premium amounts, they would
11   report that?
12       A.   Yes.
13            I believe they report all categories
14   of discrepancies.
15       Q.   Okay.  Has Acumen been reporting
16   that data since the beginning of the program in
17   January 2006?
18       A.   I don't think at the very beginning
19   of the program.  I don't recall the exact date
20   that contract was put in place.
21       Q.   Roughly?
22       A.   I really don't.

Page 85

1        Q.   Do you think it was before or after
2    June 2006?
3        A.   I really don't remember.
4            MR. FARBER:  Let's take a break.
5            - - -
6            (Recessed at 10:29 a.m.)
7            (Reconvened at 10:42 a.m.)
8            - - -
9            MR. FARBER:  Back on the record.
10           BY MR. FARBER:
11       Q.   Ms. Block, we were talking just
12   before the break about the interaction between
13   regional offices and their role in the best
14   available evidence implementation.
15           Has headquarters done any training
16   of the regional offices on the best available
17   evidence policy?
18       A.   I don't know.
19       Q.   Did you participate in any?
20       A.   I did not.
21       Q.   Okay.  And you also described how
22   the states provide CMS with certain data points

Page 86

1    about institutional status and dual status and
2    dual eligibility date, but CMS provides to the
3    PDPs only the amount of the co-pay and the
4    premium.
5          Who does the calculation to
6    determine the dates upon which the premium and
7    the co-pays go to zero?
8      A.    The system does the calculation.  It
9    would not be done manually.  It would be done
10   electronically.
11     Q.    Okay.  That's the CMS system?
12     A.    Yes.
13     Q.    And that's just a matter of computer
14   programming?
15     A.    Yes, exactly.
16     Q.    Okay.  We were talking about the PDP
17   queries up to CMS to check the PDP records
18   against the CMS Medicare beneficiary database
19   records.
20          If a PDP queries the CMS system to
21   determine institutionalized status of a
22   beneficiary, will the Medicare beneficiary

Page 87

1    database be able to apprise a PDP of the answer
2    to that question, is a person institutionalized
3    or not?
4      A.    If the system knows, it will, yes.
5      Q.    Okay.  In other words, the PDP
6    databases themselves would not know whether a
7    beneficiary is institutionalized because there's
8    no way for the PDP to get that information from
9    CMS.
10          Correct?
11          When CMS provides the TRR report, it
12   doesn't indicate whether a beneficiary is
13   institutionalized or not?
14     A.    It indicates all the information
15   about the beneficiary, including their co-pay
16   levels.
17     Q.    I thought you told me it only
18   communicates co-pay levels.
19          It doesn't indicate
20   institutionalized or dual?
21     A.    That's correct.
22          It indicates the co-pay levels.

Page 88

1      Q.    So if a PDP wanted to know whether
2    or not a beneficiary is a dual, how would it find
3    out that information other than best available
4    evidence?
5      A.    It would query the database.
6      Q.    And does CMS require that PDPs
7    maintain information on whether beneficiaries are
8    duals or nonduals?
9      A.    Yes, it does.
10     Q.    So where do PDPs get that
11   information on beneficiaries if they're not
12   contained within the TRR?
13     A.    The system would infer from the
14   co-pay what the beneficiary's status was.
15     Q.    Is the same true of that
16   institutionalized status?
17     A.    Yes.
18     Q.    So the only way that a PDP knows if
19   a beneficiary is institutionalized or not is an
20   inference based upon the co-pay level reported by
21   CMS to the PDP?
22     A.    I'm really not sure.  That's how I

Page 89

1    understand it.
2      Q.    Are you aware of any instance in
3    which a PDP has questioned whether CMS's TRR
4    reports are accurate in reporting
5    institutionalized status of beneficiaries?
6      A.    I am not.
7      Q.    Does CMS measure PDP quality based
8    upon the interaction of the PDPs with pharmacies
9    and their networks?
10     A.    I'm not sure I know what you mean
11   by, based on the interaction.
12     Q.    Does CMS measure plan quality based
13   upon the plan's services to its network
14   pharmacies?
15     A.    Services to its network
16   pharmacies -- I don't know what that means.
17     Q.    You don't know what that means
18   either.  Okay.
19          Does the effectiveness of a PDP's
20   relationship with its pharmacies -- strike that.
21          Is the effectiveness of a plan's
22   relationship with its network pharmacies used as

1   one of the measures by CMS of plan compliance
2   with contractual requirements?
3       A.   CMS measures plan performance in
4   relation to beneficiaries, not in relation to
5   contractors.  A pharmacy would be a contractor of
6   a PDP.  We don't measure performance between a
7   prime contractor and a subcontractor.
8       Q.   Now, what happens to a PDP if they
9   treat a beneficiary as a zero co-pay based upon
10  the representation of a long-term care pharmacy
11  that in fact that beneficiary is an
12  institutionalized dual and a CMS data does not
13  match and reflect that that particular
14  beneficiary is either institutionalized or is
15  dual?
16          What happens to the PDP?
17      A.   In 2006, we accepted the PDEs as
18  submitted by the PDP and paid accordingly.  For
19  2007, we have put the PDPs on notice that they
20  will have to provide documentation in accordance
21  with the best available evidence guidance in
22  order for us to accept a PDE that was otherwise

1   rejected because the person was not shown as a
2   zero co-pay eligible on our system.
3       Q.   So let's break that answer into the
4   2 different time periods.
5           First, for plan year 2006, you said
6   that CMS accepted the PDP representations.
7       A.   Yes, we did.
8       Q.   When did CMS inform the PDPs that it
9   would accept those representations?
10      A.   We never really informed them
11  specifically that we would accept the
12  representation.
13          What we did was, again, this was an
14  evolving policy.  When the benefit was brought up
15  on January 1 of 2006, we began to learn of some
16  issues.  Initially we thought that they were data
17  transmittal issues.  We then became aware of some
18  lag time issues.
19          And so our initial guidance
20  essentially said, if you believe that an
21  individual is a dual eligible, default their
22  co-pay to the 2-dollar, 5-dollar level.

1       Q.   Okay.
2       A.   As we began to recognize what was
3   happening in May of 2006, we talked about best
4   available evidence.  I believe that was the first
5   time we actually talked about best available
6   evidence and started to say, these are some of
7   the things you could rely on in terms of
8   modifying the information that you're getting
9   from CMS.
10      Q.   Okay.  Did you ever tell the --
11  strike that.
12          You indicated that -- we're now
13  talking about 2006.
14          At first you thought it was a data
15  transmission issue.
16          What do you mean by that?
17      A.   Initially, remember, over 6 million
18  people were transferred for prescription drug
19  purposes from the Medicaid system to the Medicare
20  system.  So clearly when you have 6 million
21  people who are being moved to a brand-new system
22  in a brand-new program and CMS is transmitting

1   data to the PDPs, the PDPs are transmitting back
2   to CMS.
3           They're submitting information to
4   the E 1 contractor.  Information is going between
5   the pharmacies and the PDPs.  There's a lot of
6   information that's being transmitted.  The volume
7   is very, very high initially.
8           And so, you know, we understood that
9   the systems were not communicating perfectly and
10  that there were data transmittal issues.
11      Q.   In 2007, are there still data
12  transmission issues?
13      A.   Not really.  That's been working
14  quite well in 2007.
15      Q.   Okay.  And you also mentioned lag
16  times issues.
17          In 2006, what were the lag time
18  issues?
19      A.   The lag time issues that I'm talking
20  about are the ones that we've discussed earlier
21  in terms of when the states report to us, when we
22  process their reports, how quickly that

Page 94

1  information gets to the PDP, how quickly the PDP
2  system gets updated so that the information is
3  available when the pharmacy submits a claim and
4  so on.
5      Q.    Did the lag time issues continue
6  into 2007?
7      A.    Yes.
8          They're systemic.  I mean, they're
9  built into the process.
10      Q.    Okay.  You talked about earlier that
11  CMS took the claims that the PDP had treated as
12  duals and processed those through.
13          Was -- did CMS accomplish that by
14  turning off the code 715 edit?
15      A.    I don't know technically how it was
16  done, but that would make some sense, I think.
17      Q.    Okay.  Do you know what the code 715
18  edit is?
19      A.    Vaguely, yeah.
20      Q.    You saw the references in the
21  interrogatory answers.
22          Correct?

Page 95

1      A.    Yeah.
2      Q.    Okay.  But has CMS turned on the
3  code 715 edit in 2007?
4      A.    Yes, I believe so.
5      Q.    Okay.  And will it turn it off only
6  for those claims that have best available
7  evidence?
8      A.    Yes, for 2007.
9      Q.    And you talked only in your prior
10  answers the last 2 or 3 minutes about dual
11  status.
12          How about institutional status?
13          Did CMS identify the same problems
14  with data transmission and with lag time issues
15  associated with institutional status as well as
16  dual status?
17      A.    Yes.
18          The situation would be similar.
19      Q.    Did CMS allow plans to process
20  claims for beneficiaries that the PDP had
21  recognized as being institutionalized even though
22  the CMS system did not in 2006?

Page 96

1      A.    Yes.
2      Q.    Okay.  So those folks were treated
3  as zero co-pays?
4      A.    Yes.
5      Q.    To the extent that --well, is plan
6  year 2006 closed for the PDPs at this point?
7      A.    We have issued final decisions which
8  are subject to appeal.  It is my understanding
9  that there are some appeals pending.
10      Q.    Okay.  If there are unresolved
11  co-pay claims for plan year 2006, would PDP still
12  have the option of paying those co-pays even
13  though the CMS data for 2006 did not match
14  submitting them and having CMS turn off the code
15  715 edit for those claims?
16      A.    If they had appealed the decision
17  that we provided them.
18      Q.    Okay.  If the PDP had not paid the
19  co-pay in 2006 but was prepared to pay it today,
20  could CMS process those plan year 2006 claims
21  today and turn off the code 715 edit?
22      A.    If there's an appeal pending.

Page 97

1          If there is no appeal pending, that
2  means that the PDP has accepted whatever monetary
3  determination CMS has made, and that monetary
4  determination could go either way.  It could be a
5  determination that says that the PDP owes CMS
6  money or that CMS owes the PDP money.
7      Q.    And if a plan has accepted CMS's
8  determination for plan year -- if PDP has
9  accepted CMS's determination as to plan year
10  2006, is the matter closed?
11          Are all the claims for 2006 closed
12  at this point?
13      A.    For that plan, yes.
14      Q.    Okay.
15      A.    Unless CMS determines that it needs
16  to be reopened.
17      Q.    Okay.  And is CMS aware of 2006
18  claims for which the long-term care pharmacies
19  are holding the co-pay amounts and have had all
20  but the co-pay reimbursed by the PDP for
21  beneficiaries that the pharmacies believe are
22  institutionalized duals as those terms are used

1  under the statute?
2      A.  I believe that's the subject of this
3  litigation.
4      Q.  That is correct.
5          But is CMS aware that there's a
6  universe of those claims out there?
7      A.  Are we aware directly?
8      Q.  Yes.
9          Other than through the litigation.
10     A.  As far as I know, we are aware
11 through the litigation.
12     Q.  Are you aware -- was CMS aware of
13 that other than through the litigation?
14     A.  I believe CMS was made aware of that
15 through some discussion between representatives
16 of long-term care pharmacies and CMS.
17     Q.  Okay.  And has CMS ever advised the
18 long-term care pharmacies or the PDPs that those
19 claims could be processed through by the PDPs and
20 that CMS would turn off the code 715 edit and
21 honor the designations by the PDPs of those
22 beneficiaries as institutionalized duals?

1  long-term care pharmacies would be advised of
2  anything by CMS.  We have no direct relationship
3  with long-term care pharmacies.
4      Q.  But CMS issues Q and A's all the
5  time.
6          Correct?
7      A.  Yes.
8      Q.  Did it ever put that in a Q and A?
9      A.  I believe that it put in a Q and A
10 information about how PDEs will be processed in
11 2006 and what the expectations will be for 2007.
12     Q.  Okay.  Was there a specific
13 reference in the Q and A's to the turning off
14 code 715 edits?
15     A.  I don't believe that Q and A's are
16 us-- -- use that kind of technical language.
17 Perhaps they do, but they generally discuss
18 policy, not codes.
19     Q.  Understood.
20         Without using the specific phrase
21 code 715 edit, was the policy of accepting all
22 PDP claims where there was a mismatch been the

1      A.  I'm not aware of any discussions at
2  that level of specificity.
3          I believe that the long-term care
4  pharmacists were made aware of the best available
5  evidence policy.
6      Q.  Right.
7          But turning off the code 715 edit
8  has nothing to do with the best available
9  evidence policy, does it?
10     A.  Well, it does indirectly, because
11 once best available evidence is presented and
12 accepted, that would change what's in the CMS
13 system.
14     Q.  So we don't confuse issues, I'm only
15 talking about plan year 2006 now.
16         Okay?
17     A.  For plan year 2006, any PDE
18 presented by a PDP would be accepted.
19     Q.  But the PDP and the long-term care
20 pharmacies were not advised of that fact prior to
21 closing plan year 2006; is that correct?
22     A.  There would be no reason why

1  beneficiary database and the PDP designation of
2  treatment of a beneficiary as an
3  institutionalized dual communicated through a Q
4  and A?
5      A.  I really don't recall whether it was
6  communicated through a Q and A.
7          There is lots of discussion that
8  goes on between my staff and PDPs, who are our
9  contractors, and there was lots of discussion
10 that went on during the reconciliation process.
11         There would not have been any direct
12 discussion with long-term care pharmacists.
13     Q.  When a beneficiary first enrolls in
14 the program, they enroll in a particular PDP.
15         Correct?
16     A.  That's correct.
17     Q.  Okay.  And the application they
18 submit to enroll in the program goes directly to
19 the PDP?
20     A.  Yes.
21     Q.  And how about the application for
22 low-income subsidy?

Page 102

1    Does that also go directly to the
2  PDP?
3    A.    That goes to the Social Security
4  Administration.
5    Q.    And then SSA checks the financial
6  representations against SSA data?
7    A.    Yes.
8    Q.    Okay.  And how does a beneficiary
9  who is enrolling into a particular PDP identify
10  themselves as a dual?
11    A.    I'm not sure that they do.
12    Q.    Okay.  So how --
13    A.    There may be something on the
14  enrollment form that asks that question.
15    Q.    But that would be up to each PDP
16  whether or not they wanted to put that on the
17  enrollment form?
18    A.    No.
19    We have a model enrollment form.  I
20  just don't recall whether that element is on
21  there.  I would suspect it would be.
22    Q.    And when -- if a PDP enrolling into

Page 103

1  let's say the Humana plan designates themselves
2  as a dual, is the PDP obligated to accept that
3  representation by the beneficiary?
4    I may have asked the question the
5  wrong way.  Let me try it again.
6    When a beneficiary signing up for
7  the Humana plan designates themselves as a dual,
8  does Humana have to accept that designation?
9    A.    No.
10    Q.    Does Humana have to get confirmation
11  from CMS before they can actually treat the
12  beneficiary as a dual?
13    A.    It has to get confirmation from CMS,
14  who has to get confirmation from the state,
15  unless there's best available evidence.
16    Q.    When did CMS first become aware of
17  the co-pay problem with institutional duals?
18    MS. WYER:  Objection,
19  mischaracterization.
20    Define what you mean by, co-pay
21  problem.
22    Oh, you've already defined that.

Page 104

1    Okay.
2    Go ahead.
3    A.    Again, I'm not sure what you mean
4  by, co-pay problem.
5    BY MR. FARBER:
6    Q.    Are you aware of any problems with
7  the payment of co-pays for institutionalized full
8  benefit duals in the part D program?
9    A.    I would have to say that I'm aware
10  that there is not always evidence available
11  immediately when a claim is filed of an
12  individual's dual status.
13    Q.    Okay.  Are you aware that there are
14  claims for which information through the CMS
15  process has never been available related to
16  institutionalized duals that would allow them to
17  be treated as zero co-pays?
18    A.    I'm not sure that there's ever a
19  situation where there is not a way that evidence
20  could be obtained and made available.  The tone
21  of your question, the tenor of your question is
22  that such information is in some cases never

Page 105

1  available, and I disagree with that.
2    I think through the best available
3  evidence process, again, that information can be
4  available if sought out.
5    Q.    Well, can the best available
6  evidence policy be used today for claims in plan
7  year 2006 for which a plan and CMS have already
8  closed out the reconciliation?
9    A.    The best available evidence policy
10  could be used between a PDP and a claimant, a
11  pharmacy, or other claimant.  Whether that would
12  reopen the reconciliation between CMS and the PDP
13  is really irrelevant.
14    Q.    Are you aware of any PDP that is
15  paying claims for plan year 2006 to pharmacies
16  after it's closed its reconciliation with CMS?
17    A.    The reconciliation process is not a
18  specific claim-by-claim process.  At the point at
19  which we did a calculation and informed PDPs of
20  the results of that calculation in terms of
21  either they owed us money or we owed them money,
22  there was either an acceptance of that amount or

27 (Pages 102 to 105)

Page 106

1  there was an appeal filed by the PDP.  That is
2  not relevant to the specific processing of any
3  particular claim by a PDP.
4      Q.   How do PDPs specifically process
5  claims with CMS?
6      A.   They submit PDEs, and those are
7  either accepted or rejected.  But the amount that
8  we informed PDPs they owed us or we owed them was
9  based on those claims that had been processed by
10  a specific date, which I believe was July 31.
11      Q.   Okay.  And can we call all the
12  acceptances or rejections by CMS of PDP PDE
13  claims a reconciliation process, or would you
14  like to use another term?
15      A.   The reconciliation process is
16  broader than that.
17      Q.   How is it broader?
18      A.   Well, there is considered as part of
19  the reconciliation process a direct and indirect
20  reimbursement.  There are other factors that go
21  into a reconciliation process, so it's not
22  strictly based on PDEs per se.

Page 107

1      Q.   Okay.  Fair enough.
2          So what shall we call the PDE
3  reconciliation process, the process by which over
4  the course of a plan year through the end of
5  reconciliation PDPs submit and have reconciled by
6  CMS each PDE?
7      A.   It's part of the reconciliation
8  process.
9      Q.   So are you aware of any PDPs that
10  will pay a pharmacy a co-pay for an
11  institutionalized dual where CMS has already
12  rejected the PDE for that beneficiary as an
13  institutionalized dual?
14      A.   That would be between the PDP and
15  the pharmacy.  I have no knowledge of that.
16      Q.   Okay.  In your understanding of how
17  the program works -- this is CMS, not just you --
18  does CMS truly believe that a PDP would ever pay
19  a pharmacy a co-pay for a beneficiary that the
20  pharmacy believes is an institutionalized dual
21  but that -- but which CMS has rejected the PDE
22  for that beneficiary on the grounds that the CMS

Page 108

1  data doesn't show that the beneficiary is
2  institutionalized or a dual absent best available
3  evidence?
4      A.   That would be in the contractual
5  relationship between the PDP and the pharmacy.
6  And I don't know what's in those contracts, so I
7  can't opine on that.
8      Q.   Doesn't the CMS regional office
9  review the contracts?
10      A.   No.
11      Q.   Has CMS's regional offices ever
12  reviewed pharmacy PDP contracts?
13      A.   They review standard terms and
14  conditions, but truly that is not something that
15  CMS has any role in.  That is part of the
16  contractual relationship between the PDP and the
17  pharmacy, and that is not something that I will
18  opine on.
19      Q.   You've testified earlier that CMS
20  does review PDP pharmacy contracts to make sure
21  that beneficiary protections are in those
22  contracts.

Page 109

1          Correct?
2      A.   In general.
3      Q.   In general?
4      A.   In general.
5      Q.   It doesn't look at any of the
6  specific clauses?
7      A.   No.  I'm not saying that.
8          I am saying, in general, it would
9  review a standard contract.  It doesn't review
10  every single contract between every PDP and every
11  pharmacy.  That would be impossible given the
12  volume.
13      Q.   Okay.  Does it review any PDP
14  pharmacy contracts that are not standard terms
15  and conditions?
16      A.   Not so far as I know.
17      Q.   Has CMS ever opined on the
18  permissibility of particular contractual
19  provisions between PDPs and long-term care
20  pharmacies other than standard terms and
21  conditions contracts?
22      A.   Have we opined on provisions?

Transperfect  Deposition  Services  (212)  400-8845

Page 110

1          I believe there was a situation
2  where some long-term care pharmacies were asking
3  that things be put in their contract with the PDP
4  that were above and beyond the requirements that
5  CMS has for beneficiary protections.  And I
6  believe we opined that those were above and
7  beyond our requirements.
8          Q.   Okay.  And the particular instance
9  you're thinking about, that wasn't a standard
10  terms and conditions of a PDP pharmacy contract,
11  was it?
12          A.   That was something I think outside
13  of that.  That was actually brought to our
14  attention.
15          Q.   Who brought it to your attention?
16          A.   It may have been as I recall, and
17  I'm trying to remember this as best as I can, the
18  long-term care pharmacy that wished to institute
19  those additional terms and conditions.
20          Q.   So the pharmacy asked you to opine
21  on its contract?
22          A.   I think the pharmacy notified us

Page 111

1  that it was putting those -- the provisions or
2  negotiating those provisions in its contract with
3  PDPs.
4          Q.   Okay.
5          A.   And that's really the best that I
6  recall about that situation.
7          Q.   All right.  Any other pharmacies
8  other than the one that you recall ask you to
9  opine on their contracts?
10          A.   No.
11          Q.   Are you aware of any other situation
12  where CMS has looked at a pharmacy PDP contract
13  other than the one you just testified about
14  that's not a standard terms and conditions?
15          A.   No.
16          I mean, we have looked at, for
17  example, by survey, not by particular contract,
18  but have asked PDPs for example what kinds of
19  prompt payment provisions they have in their
20  contracts.  That's not been because we have a
21  specific requirement, nor is it because we
22  reviewed the specific contract, but because

Page 112

1  prompt payment was at one point an issue, we did
2  do a survey of our PDPs on that issue.
3          Q.   Okay.  And prompt payment is a
4  payment condition.
5          Correct?
6          A.   Yes.
7          And so, we have no requirement.  We
8  simply did an informational query to say, what is
9  it that you are providing in your contracts.
10          Q.   Okay.  So in fact, CMS has looked at
11  payment conditions --
12          A.   No, we didn't look at the contract.
13          We did a survey and asked, what are
14  the prompt payment time frames in your contract.
15  It's just informational.
16          Q.   You had plans to report the
17  information but not actually send in the
18  contracts?
19          A.   Exactly.
20          Q.   Got it.
21          Okay.  Any other surveys you've done
22  relating to payment provisions?

Page 113

1          A.   No.
2          Q.   And going back to a question of mine
3  a few minutes ago, is it -- does CMS believe that
4  PDPs will pay pharmacies a co-payment for someone
5  the pharmacy claims is an institutionalized dual,
6  and in the pharmacy's review, is due a zero
7  co-payment, after CMS has rejected a PDE for zero
8  co-payment and advised the PDP that a co-payment
9  is due?
10          A.   I have no basis to opine on that.
11  That is something between the PDP and the
12  pharmacy.
13          Q.   But CMS must have an expectation
14  about that?
15          A.   I have no expectation about that.
16  It's outside of my purview.
17          Q.   Can you imagine a reason that a PDP
18  would treat a beneficiary as an institutionalized
19  dual when CMS has rejected the claim and advised
20  the PDP that it will not reimburse the co-pay?
21          A.   Yes, I can imagine a situation where
22  based on best available evidence the pharmacy can

Page 114

1    demonstrate that in fact the person is entitled
2    to a zero co-pay.
3        Q.    And if there were no best available
4    evidence available, is there a situation you can
5    imagine, then, where --
6        A.    This is truly outside of my purview.
7            You asked me if I could contemplate
8    a situation. I can, because under the standard
9    terms and conditions of the contract between a
10   PDP and a pharmacy, there will be some agreement
11   as to what the reimbursement rate will be for the
12   cost of the drug plus the dispensing fee. And so
13   I can imagine a situation in which if somehow
14   best available evidence demonstrates that in fact
15   the individual was eligible for zero co-pay and
16   therefore the pharmacy was underpaid on a claim
17   for that individual in accordance with the terms
18   of the contract between the PDP and the pharmacy,
19   that PDP might determine that it owed the
20   pharmacy that money and would pay that
21   differential.
22       Q.    Does CMS pay the PDPs for the

Page 115

1    administrative expense they incur in collecting
2    the best available evidence?
3        A.    Administrative expenses are lumped
4    together in the bid process. They are not
5    typically broken out to that level as far as I
6    know.
7        Q.    Going back to a question I asked
8    about 15 minutes ago.
9            CMS is aware that there are a number
10   of claims in plan year -- associated with plan
11   year 2006 for which long-term care pharmacies
12   contend there's been no reimbursement for co-pays
13   by the PDPs because of faulty CMS data.
14           Correct?
15       A.    I object to the conclusion that it's
16   because of faulty CMS data.
17           You've made us aware through the
18   litigation that there are long-term pharmacies
19   that allege that they are owed co-pay money.
20       Q.    But CMS was aware of that before the
21   litigation as well.
22           You testified to that earlier.

Page 116

1            Correct?
2        A.    We were notified by the pharmacies
3    that they believed they were owed co-pay money.
4        Q.    In fact CMS was aware of this as of
5    January 2006. That's when the problem was first
6    identified.
7            Correct?
8        A.    No.
9            The program just began in January of
10   2006. January 1, 2006, was the inception of the
11   program.
12       Q.    I didn't say January 1. I said
13   January.
14       A.    No.
15           We were not aware in January of
16   2006. January of 2006 was the very inception of
17   the program. And if anybody was aware of it that
18   early, I personally was not.
19       Q.    Again I'm asking about CMS.
20       A.    I have no knowledge that anybody in
21   CMS was aware of the problem in January of 2006.
22       Q.    Who was Larry Kocot in CMS in

Page 117

1    January 2006?
2        A.    Larry Kocot was a senior adviser to
3    the administrator.
4        Q.    Would it surprise you to learn that
5    Mr. Kocot was advised of this problem on January
6    3, 2006?
7        A.    It would surprise me, yes, because I
8    was not aware that he was so informed.
9        Q.    When did you personally as the head
10   of Center for Beneficiary Choices learn of this
11   issue?
12       A.    Much later, and I don't remember the
13   specific date.
14       Q.    Much later as in a year later or as
15   in several months later?
16       A.    Several months later.
17       Q.    Before CMS put out its first best
18   available evidence policy?
19       A.    Yes.
20       Q.    Has the best available evidence
21   policy changed since CMS put out its first
22   policy?

Transperfect Deposition Services (212) 400-8845

Page 118

1      A.   It's become more defined, I would
2  say.  And it has changed in the sense that once
3  we put in place the ability of the system to
4  override the state file information.  Initially
5  the way the system was programmed, there was no
6  way to override what the state file provided.
7          And so, yes, there was a
8  clarification a procedure put in place that
9  once that system change was made would enable
10 plans and others to go to the regional office and
11 request a status change.
12         And the specific procedures for
13 doing that were then published.
14     Q.   Are you aware that today there are
15 for plan year 2007 numerous claims presented by
16 pharmacies to PDPs with zero co-pay amounts that
17 the PDPs continue to reject on the basis of
18 co-pays that are actually owed by
19 institutionalized duals?
20     A.   I'm aware that there's litigation
21 between one long-term care pharmacy and one plan.
22     Q.   Are you aware of any other long-term

Page 119

1  care pharmacies other than that one pharmacy and
2  the one plan which are encountering this problem?
3      A.   Not directly, no.
4      Q.   Has anybody in CMS been advised of
5  this?
6      A.   I don't know.
7      Q.   Do you know if Ms. Tudor has had
8  discussions with any long-term care pharmacies
9  about this problem?
10     A.   I don't know.
11     Q.   Do you know if Mr. Grant has had any
12 discussions?
13     A.   (Shaking head.)
14     Q.   How about Mr. Kocot before he left
15 CMS?
16     A.   I don't know.
17     Q.   And how about Tracey McCutcheon?
18     A.   I don't know.
19     Q.   So to the best of CMS's knowledge
20 today other than one PDP being sued by one
21 long-term care pharmacy, CMS is unaware of the
22 scope of any issues associated with unreimbursed

Page 120

1  co-pays associated with institutionalized duals?
2      A.   I specifically am not aware.
3      Q.   Again just -- you know you're not
4  being asked these questions in your personal
5  knowledge.  I'm asking about CMS.
6      A.   And I can only answer to the best of
7  my knowledge, and I don't know.
8      Q.   Did you inquire into that issue
9  before --
10     A.   No, I did not.
11     Q.   You did not?
12     A.   No, I did not.
13     Q.   Has CMS had any conversations with
14 PDPs in 2007 about reimbursing long-term care
15 pharmacies for co-pays that the long-term care
16 pharmacies believe should be paid because the
17 beneficiaries were institutionalized duals?
18     A.   CMS has issued guidance encouraging
19 PDPs to make appropriate reimbursement to
20 beneficiaries, to other organizations, or to work
21 with long-term care pharmacies to ensure that the
22 proper reimbursement was made.

Page 121

1      Q.   Has CMS had discussions with PDPs
2  about this subject?
3      A.   Not verbal discussion.  We have
4  issued guidance encouraging PDPs to work to
5  resolve those issues.
6      Q.   So it's your testimony that CMS has
7  engaged in no verbal discussions with PDPs about
8  the subject of reimbursed co-pays associated with
9  institutionalized duals?
10     A.   Again, there are many, many people
11 who work for CMS, and I am not in a position to
12 tell you what any individual may have had a
13 conversation with an individual in a PDP about.
14         I can tell you that there have been
15 no formal discussions, that what we have done has
16 been to issue guidance.
17     Q.   Has CMS discussed the issue with
18 AHIP, A-H-I-P?
19     A.   CMS has discussed best available
20 evidence with AHIP, yes.
21     Q.   Has CMS -- strike that.
22         Does CMS expect that PDPs will use

31 (Pages 118 to 121)

Page 122

1   the response file that they get back from
2   querying -- response files they get back from
3   querying the Medicare database to set the
4   members' default low-income subsidy and premium
5   levels?
6       A.   We would expect that they would use
7   those response files appropriately based on
8   whatever information they were seeking to begin
9   with.  Whatever information they get back, they
10  should use to make their files correct, yes.
11      Q.   Now, the best available evidence
12  policy was first articulated on May 5, 2006.
13           Before May 5 of 2006, was there any
14  other source of information for a PDP to set in
15  its system what subsidy and premium levels for
16  beneficiaries should be?
17      A.   Yes.
18           As I recall, there was guidance out
19  there that said, if a beneficiary asserted that
20  they were entitled to dual eligible status, to
21  set the co-pay at 2 dollars and 5 dollars.
22      Q.   Okay.  What did CMS do to verify

Page 123

1   that the PDP actually did that, set the co-pays?
2       A.   I don't recall that we did anything.
3            In a situation where a PDP didn't do
4   that, we would have gotten a complaint typically
5   from the affected beneficiary or someone
6   representing them.  And we would then go back to
7   the PDP and get that resolved.
8       Q.   Did you ever force PDPs to set the
9   level -- the co-pay levels at 2 or 5 dollars
10  based upon the complaints?
11      A.   I have no knowledge that any PDP
12  ever didn't react appropriately.  So I can only
13  say hypothetically that if we had information
14  that a PDP didn't follow our guidance, we would
15  have taken appropriate action.
16      Q.   What action would that have been?
17      A.   We would have gone back to that PDP
18  and directed them to follow our guidance.  I have
19  no information that that ever happened.
20      Q.   Do you have any information that
21  PDPs did update their data based upon complaints
22  to set a co-pay of 2 dollars and 5 dollars?

Page 124

1       A.   I had no information that we had
2   specific complaints that they didn't.
3       Q.   But CMS was aware before May of 2006
4   that co-pays were being incorrectly assessed
5   against beneficiaries contrary to what the
6   beneficiary believed the right co-pay should be.
7            Correct?
8       A.   Wherever an issue was presented, the
9   way the system worked, and we have specific
10  customer service representatives that work with
11  beneficiaries, if a problem arose, it would have
12  been handled through that customer service
13  process.  I have no specific information about
14  how many of those situations occurred if any.
15      Q.   Is CMS aware that nursing home
16  residents typically don't have access to
17  telephones?
18           There's usually a telephone on a
19  floor rather than in an individual's room?
20      A.   That sounds logical, but I have no
21  specific information to that effect.
22      Q.   Is CMS aware that institutional

Page 125

1   beneficiaries in nursing homes on average 60
2   percent of a population is cognitively impaired?
3       A.   Yes.
4       Q.   How would CMS expect the beneficiary
5   who is an institutionalized dual to file a
6   complaint with that information?
7       A.   The complaint can be filed on behalf
8   of the individual.
9       Q.   Okay.  And is CMS aware of the
10  percentage of institutionalized duals who don't
11  have a designated representative on their behalf?
12      A.   I presume CMS is -- I'm not aware of
13  the exact percent.
14      Q.   Do you have a rough estimate?
15      A.   No.
16      Q.   Is CMS generally aware that the
17  policies it sets for the ambulatory population in
18  part D don't always work in the institutional
19  setting?
20      A.   Yes.
21      Q.   You're not aware of any file
22  transmission of best available evidence to any of

Transperfect Deposition Services (212) 400-8845

Page 126

1  the CMS regional offices to date; is that
2  correct?
3      A.   I'm sorry.
4          I don't know what you mean by, file
5  transmission.
6      Q.   Okay.  Withdraw the question.
7          What is a low-income status
8  correction request?
9      A.   That would be a request that would
10  come from a PDP to a CMS regional office
11  requesting a change in a beneficiary's status in
12  the records.
13      Q.   Okay.  And do you have --
14  approximately -- strike that.
15          Can you give us an estimate of the
16  number of LIS status corrections that came into
17  the office in 2007?
18      A.   You asked me that question earlier.
19  I do not have that information.
20      Q.   Do you have any information that any
21  LIS requests have come in?
22      A.   I do not have specific information

Page 127

1  about requests.
2          I have information about the
3  procedures that we outlined for making such a
4  request.
5      Q.   Short of receiving best available
6  evidence from a third party, is a PDP under any
7  obligation to make such a request today if it is
8  put on notice that a beneficiary in its plan is
9  an institutionalized dual and the CMS data in the
10  Medicare beneficiary database does not yet
11  reflect that?
12      A.   I'm not sure how it would be put on
13  notice.
14      Q.   Beneficiary called the plan
15  complaint line and said, I'm an institutionalized
16  dual.
17          That's one way.
18      A.   Evidence would have to be provided.
19      Q.   So short of having the best
20  available evidence documents, PDP would not have
21  to submit an LIS correction request?
22      A.   It couldn't short of having

Page 128

1  appropriate documentation.
2      Q.   When CMS suspended the 715 code that
3  we talked about before, the best available
4  evidence policy was in place at that time.
5          Correct?
6      A.   The best available evidence policy
7  was in place for 2007.  It was clear that we were
8  not going to require that level of documentation
9  for 2006.
10      Q.   How was it clear?
11      A.   It was made clear in our guidance
12  through -- for the reconciliation process that
13  for 2006 because of guidance that CMS had
14  provided to PDPs that we were not going to
15  penalize those contractors for having followed
16  our guidance.
17      Q.   Is it correct that the best
18  available evidence policy for 2006 did not
19  require documentation, but best available
20  evidence policy for plan year 2007 does require
21  documentation?
22      A.   Yes.

Page 129

1          For 2006, when we issued the policy
2  in May, we put the contractors on notice that,
3  you need to start collecting this evidence, and
4  then going forward in 2007, we will reject PDEs
5  where you cannot provide the appropriate
6  documentation.
7      Q.   When you say, going forward in 2007,
8  you mean going forward for plan year 2007 claims?
9      A.   Yes, exactly.
10      Q.   Okay.  Did CMS -- strike that.
11          MR. FARBER:  Mark this as the next
12  exhibit, please.
13              - - -
14          (Exhibit Block 2
15  was marked for identification.)
16              - - -
17          BY MR. FARBER:
18      Q.   Ms. Block, I've handed you a
19  document we've marked as deposition exhibit
20  number 2.
21          Could you identify what this
22  document is, please.

33 (Pages 126 to 129)

Page 130

1      A.   It appears to be a fax sheet
2  regarding ensuring transition of dual eligibles
3  from Medicaid to Medicare part D.
4      Q.   Have you seen the document before?
5      A.   I don't believe so.  It was not
6  anything that I reviewed in preparing for this
7  deposition.
8      Q.   Okay.  Is this a document issued by
9  CMS?
10     A.   Yes.
11         It's a document issued by CMS, and I
12 may have reviewed it in 2005, but if I did, I
13 certainly don't recall that now.
14     Q.   Okay.  I don't believe there's a
15 date on it.  I'll represent to you that it was
16 issued on December 20, 2005.  I'd like you to
17 turn to the second page.
18         Let me put a question:  I want to
19 focus you particularly on the bottom of page 2 in
20 section D, protecting dual eligible residents of
21 long-term care facilities, and the third sentence
22 there:  Each plan will be notified as to which of

Page 131

1  their enrollees live in a long-term care setting,
2  which will help the plans and facilities prepare
3  for any potential changes to the beneficiaries
4  drug regimen.
5          Do you see that?
6      A.   M-hm, yes.
7      Q.   And back in December 2005, it was
8  CMS's intention that CMS would be the source of
9  information to the PDPs as to institutionalized
10 status of an institutionalized dual.
11         Correct?
12     A.   It was assumed that CMS would see
13 the information from the states, and the process
14 was already in place for the states to provide
15 that information, and therefore that CMS would in
16 turn use the information provided by the states
17 to inform the plans.
18     Q.   Did CMS ever have the states provide
19 the data directly to the plans?
20     A.   No, I don't believe so.
21     Q.   Ever since then has CMS had the
22 states provide the data directly to the plans?

Page 132

1      A.   A plan could request information
2  directly from a state.  And if a plan did so, the
3  state could provide it.
4      Q.   Could?
5      A.   Could.
6      Q.   Is there any CMS guidance on that
7  point?
8      A.   In terms of best available evidence,
9  it's implied that one way of verifying a claim to
10 dual eligibility would be a contact with a state
11 representative.  Documentation of such a contract
12 is one of the categories of best available
13 evidence.
14     Q.   So it's implied in an agency
15 guidance that a plan could contact the state
16 Medicaid agency?
17     A.   Yes.
18     Q.   Is it also implied that a pharmacy
19 could contact?
20     A.   Yes.
21     Q.   And that a nursing home could
22 contact?

Page 133

1      A.   Yes.
2      Q.   And a beneficiary could contact the
3  state Medicaid agency?
4      A.   Yes.
5      Q.   Or anybody else could contact --
6      A.   Anybody could do that.
7      Q.   So it's not implied specifically
8  that the plan should.
9          Anybody could contact?
10     A.   Yes.
11         MR. FARBER:  Let's mark this as
12 exhibit 3, if we could.
13             -  -  -
14         (Exhibit Block 3
15 was marked for identification.)
16             -  -  -
17         BY MR. FARBER:
18     Q.   We've handed you what's been marked
19 as deposition exhibit 3.
20         Can you identify it?
21     A.   I don't recall ever seeing it
22 before.

34 (Pages 130 to 133)

Page 134

1    Q.   Okay.  Do you believe it's a CMS
2  document?
3    A.   Yes.
4       It appears to be a CMS document.
5    Q.   You see it's dated April 2006.
6       Correct?
7    A.   Yes.
8    Q.   Why don't you take a moment and read
9  the first page.
10      (Pause.)
11      BY MR. FARBER:
12   Q.   Okay.  I'd like to focus you on the
13  section, how will pharmacies be reimbursed for
14  payments they have made on behalf of unidentified
15  dual eligibles who live in long-term care
16  facilities.
17      Do you see that?
18   A.   M-hm.
19   Q.   Do you see the reference to:
20  Pharmacies will receive a one-time payment for
21  the amount of any uncollected co-payments for
22  people who are mistakenly identified as having to

Page 135

1  pay co-payment amounts?
2    A.   M-hm.
3    Q.   Did CMS ever implement this policy?
4       MS. WYER:  Objection to
5  characterization as a "policy."
6    A.   The note makes very clear that this
7  is a process that may vary between plans and that
8  the process is determined between the plan and
9  the pharmacy.
10      As I read this, this means that
11  pharmacies will receive a one-time payment from a
12  plan and that plan will have to be negotiated between
13  the plan and the pharmacy.
14      BY MR. FARBER:
15   Q.   And what did CMS do to
16  operationalize this policy between the plans and
17  the pharmacy?
18      MS. WYER:  Objection, not
19  established that CMS regards this as a policy.
20      MR. FARBER:  Let me ask that you not
21  make speaking objections.  If you have an
22  objection, state your objection and the basis for

Page 136

1  it.
2       Please don't lead the witness.  I
3  don't need your statements.  Just:  Objection,
4  leading, objection, vague, whatever it is.  No
5  speaking objections, please.
6    A.   This is a tip sheet that was
7  published in 2006.  When CMS provides guidance in
8  any form -- and a tip sheet by the way is not
9  formal subregulatory guidance -- we don't do
10  something specific to operationalize the
11  guidance.
12      We make the assumption that our
13  guidance will be followed, and we deal with
14  individual complaints in situations where an
15  individual believes that they have not been
16  treated appropriately.
17      BY MR. FARBER:
18   Q.   You said that a tip sheet is not
19  formal agency guidance.
20      Is a Q and A formal agency guidance?
21   A.   No.
22      Actually, what we consider to be

Page 137

1  subregulatory guidance are signed HPMS letters,
2  and those are letters that go out through our
3  HPMS system.
4    Q.   What does HPMS stand for?
5    A.   Oh, gosh, I'm not going to remember
6  at this point.
7       But it is a system through which CMS
8  communicates with plans and others.  It's a
9  fairly public system.  And so what we consider to
10  be subregulatory guidance would actually go out
11  in the form of signed letters, which neither of
12  those are, but --
13   Q.   We'll get to some.
14   A.   You have some examples of signed
15  letters.
16   Q.   Okay.  But to the best of your
17  knowledge, CMS did nothing to operationalize this
18  one-time payment for the amount of any
19  uncollected co-payments between the pharmacies
20  and the PDPs?
21   A.   This is not the kind of thing that
22  CMS would operationalize since we would consider

Page 138

1  it to be something between the plans and the
2  pharmacies. I think the note makes that clear.
3        MR. FARBER: 4?
4        THE COURT REPORTER: Yes.
5              - - -
6        (Exhibit Block 4
7  was marked for identification.)
8              - - -
9        BY MR. FARBER:
10       Q.   And we've handed you what's been
11  marked as exhibit 4.
12            Can you identify it, and while we're
13  there if you can tell me if this is a
14  subregulatory guidance or not.
15       A.   Yes.
16            This would be considered
17  subregulatory guidance that went out under the
18  signature of Gary Bailey, who was then my deputy,
19  and I did review this prior to today.
20       Q.   And in the first sentence of the
21  memo, it says CMS has received numerous
22  complaints concerning full benefit dual eligible

Page 139

1  beneficiaries being charged incorrect co-payments
2  at the pharmacy.
3        Do you see that?
4    A.   Yes.
5    Q.   And could you describe what those
6  complaints were?
7    A.   As I mentioned earlier, we were
8  transitioning over 6 million people from Medicaid
9  to Medicare prescription drug coverage. And the
10  volume initially early in 2006 was very, very
11  considerable, and so the information available at
12  the pharmacy counter regarding dual eligibility
13  status was not always current or correct.
14       Q.   What percentage of the time was it
15  incorrect?
16       A.   I don't have a specific percentage.
17       Q.   How about an approximate percentage?
18            More or less than 50 percent of the
19  time?
20       A.   Less than 50 percent.
21       Q.   Less than 20 percent, or is that
22  more in the neighborhood?

Page 140

1    A.   I don't really have a specific
2  percent in mind. I would say less than 20
3  percent given the fact that we're talking about
4  over 6 million people. 20 percent would be a
5  very large number.
6    Q.   300,000 -- correct? -- no -- 1.2
7  million.
8    A.   Yeah.
9        We did not have 1.2 million
10  complaints.
11       Q.   Was it several hundred thousand
12  complaints?
13       A.   More like thousands.
14       Q.   And CMS was aware that there were
15  many people who were incorrectly charged co-pays
16  who did not file complaints.
17            Correct?
18       A.   I would have no way of knowing that.
19            If they didn't file a complain, how
20  would we know?
21       Q.   CMS was surveying beneficiaries at
22  the time, was it not?

Page 141

1    A.   In what way?
2    Q.   Did it find out how they were
3  performing under the plans?
4        Wasn't CMS conducting beneficiary
5  surveys in or around May 2006?
6    A.   Not that I remember.
7    Q.   Weren't other organizations like
8  Kaiser surveying?
9    A.   Other organizations were.
10       Q.   And they were reporting the
11  percentage of inappropriately assessed co-pay
12  statistics, weren't they?
13       A.   If they were, I don't specifically
14  recall that.
15       Q.   In the second sentence, there's a
16  reference to CMS prior instruction to the states
17  to report only current or prospective changes to
18  beneficiary institutional status.
19            What was that about?
20            5 lines down.
21       A.   Yeah.
22            I'm reading it.

36 (Pages 138 to 141)

Page 142

1          (Pause.)
2      A.   That was about as I recall the fact
3   that the states at that time were not reporting
4   retroactive changes to beneficiaries'
5   institutional status.
6          BY MR. FARBER:
7      Q.   What does "retroactive changes"
8   mean?
9      A.   It means that the state when it
10  originally reported did not report the individual
11  as institutional, but upon learning that the
12  individual qualified for institutional status
13  going back possibly a month or 2, it was not
14  reporting back to the original effective date.
15     Q.   Were the states at the time updating
16  their system to report that at least the state
17  now had information that the person was
18  institutionalized, or once they were on the state
19  roll, did they stay in whatever status they'd
20  been originally reported?
21     A.   No.
22          They were reporting current or

Page 143

1   prospective changes.  They were not going back
2   and saying, in fact, this person had
3   institutional status 2 months ago.
4      Q.   Got it.
5          Okay.  If you look down at the next
6   paragraph, CMS began to fix that and expected the
7   data to be updated no later than July 2006.
8      A.   That's correct.
9      Q.   Did it get done by 2006?
10     A.   Yes, it did.
11     Q.   When did CMS provide that updated
12  data to the PDPs?
13     A.   As soon as it received it.
14     Q.   What did CMS do to make sure that
15  the PDPs updated their own systems with that new
16  retroactive data?
17     A.   Again, we make the assumption that
18  our guidance is being followed.  We do compliance
19  audits of plans, and that would be something that
20  might be audited in a compliance audit, but we
21  didn't begin compliance audits of PDPs until
22  fairly recently.

Page 144

1      Q.   You anticipated my next question.
2   Thank you.
3          On the next page, there's a
4   discussion about best available data, plan system
5   lag, and LTC pharmacy reimbursement for incorrect
6   co-payments charged.
7          First, is there a difference between
8   best available data and best available evidence?
9      A.   They're essentially the same thing,
10  except that we realized at some point that all
11  evidence may not be in the form of data.  So we
12  simply changed the terminology so that it
13  reflected all types of evidence that would be
14  acceptable.
15     Q.   According to this memo, exhibit 4,
16  under best available evidence, the second
17  sentence says:  For example, if a plan has
18  knowledge from the nursing facility or an
19  advocate acting on behalf of the beneficiary that
20  the individual is covered by Medicaid for his or
21  her institutional stay, and this goes on, the
22  plan should make changes to its systems to

Page 145

1   accommodate the revised co-payment level.
2          Would verbal advice from the nursing
3   facility to the PDP have been sufficient to
4   satisfy the best available data requirements in
5   this memo?
6      A.   In 2006, yes.
7      Q.   But even if the PDP made the change
8   to its system, CMS soon learned that the weekly
9   TRRs that CMS was sending down to the PDPs would
10  override the changes.
11          Correct?
12     A.   At some point, we realized that, and
13  so what we put in place was guidance again to the
14  PDPs to categorize those changes in their system
15  in such a way that our information would not
16  override their information until such time as our
17  information from the states caught up.
18     Q.   Okay.  And if you never got
19  information from the state, if the state failed
20  to report a beneficiary as a dual, even if the
21  PDP had gotten information from a nursing
22  facility for example, your data would have never

Page 146

1  caught up, what would you have done with that
2  claim?
3      A.    Well, for 2006, we would have paid
4  the claim.  For 2007, if the PDP has best
5  available evidence and updated its system based
6  on best available evidence, after 60 days, that
7  information remains permanent and doesn't --is
8  not overridden by what's in the state file.
9      Q.    Okay.  And do you see the reference
10  in this memo to plan system lag?
11          Has the plan system lag been
12  shortened at all from May 2006 to today?
13      A.    Yes, I believe it has.
14          We have worked closely with the
15  industry to encourage plans to process the
16  information that they get on the TRRs as quickly
17  as possible.  And to the best of my knowledge,
18  that has been happening, so that over time,
19  there's been an improvement in processing time.
20      Q.    How about the processing time prior
21  to the TRR hitting the PDP?
22          In other words, all the data

Page 147

1  transmission that occurs before the TRR is
2  submitted to the PDP?
3          Has that time been shortened?
4      A.    I'm not sure what processing time
5  you're referring to.
6      Q.    There's data that starts at the
7  states, has to be reported up to CMS.  CMS then
8  put it on the Medicare beneficiary database.  CMS
9  then turns it into a TRR and then transmits that
10  TRR to the PDPs.
11          You've indicated when I asked you
12  about plan system lag remedies that the time for
13  the PDP to process the TRR has somewhat been
14  shortened and you've been working with industry
15  to shorten that.
16          How about any of the other time lags
17  in the chain?
18          Have any of those been shortened?
19      A.    So far as I know, not.
20      Q.    Okay.  And in the last bullet here,
21  LTC pharmacy reimbursement for incorrect co-pays
22  charged.

Page 148

1          The memo says:  Part D plans are
2  encouraged to reimburse LTC pharmacies directly
3  when implementing retroactive subsidy level
4  changes.
5          Did you ever monitor the PDP in plan
6  year 2006 to see how many actually implemented
7  retroactive subsidy level changes?
8      A.    No.
9      Q.    Do you know how many did or didn't?
10      A.    No, I did not.
11      Q.    Do you know how many PDPs directly
12  reimbursed long-term care pharmacies for the
13  co-payments at issue?
14      A.    No, that that's not information that
15  would be relevant to us.  That's again something
16  between the LTC and the PDP.
17      Q.    Why were you encouraging the PDPs to
18  do it?
19      A.    We are encouraging them to do it
20  because we think that it is important -- and I
21  think the key sentence here really is not that,
22  but that plans not automatically reimburse

Page 149

1  beneficiaries residing in long-term care
2  facilities.
3          The issue there being that there is
4  a requirement in regulation that if the wrong
5  co-pay has been charged that the beneficiary or
6  organizations that pay in their behalf be
7  reimbursed by the plan.  And so there was a
8  situation as I understand it where some plans
9  asserted that because of that provision, they
10  would reimburse beneficiaries and only
11  beneficiaries.
12          We then made it clear that it was
13  inappropriate to reimburse somebody who had not
14  actually paid the co-pay.  And that was the point
15  of this provision in this document.
16          We encouraged them -- and it's not a
17  directive or a requirement -- that they -- in
18  fact if the long-term care pharmacy can
19  demonstrate that it is carrying a debt for that
20  co-payment, that it is not inappropriate for the
21  plan to reimburse the long-term care pharmacy
22  directly.

Transperfect Deposition Services (212) 400-8845

Page 150

1      Q.   If a team was carrying a debt for
2  that co-payment, wouldn't in effect the pharmacy
3  have paid for the co-payment on behalf of the
4  beneficiary?
5      A.   They would have not collected the
6  co-pay.
7      Q.   But CMS never deemed the pharmacy to
8  be an entity -- within the definition of the reg
9  to be an entity that it actually paid the
10  co-payment on behalf of the beneficiary, did it?
11     A.   No, it did not.
12     Q.   Why did not CMS designate the
13  pharmacy as one of those entities?
14         MS. WYER:  Objection.
15         That's privileged information.
16         MR. FARBER:  It's not privileged.
17  I'm asking why the agency decided something, not
18  what its lawyers advised it.
19         The agency made a decision.  I want
20  to know what was the basis of the agency's
21  decision, not your decision, not the Justice
22  Department's decision, not the Office of General

Page 151

1  Counsel's decision, the agency.
2         MS. WYER:  That's deliberative
3  process of the agency.
4         MR. FARBER:  No, it's not.
5         Deliberative process is when the
6  deliberations were about a decision.
7  Deliberative process privilege doesn't apply to a
8  final agency decision.
9         This was an agency decision.  I'm
10  allowed to know the reason why the agency made
11  the decision, not the deliberations that went
12  into it.  Deliberative process doesn't apply in
13  that manner.
14         The law is extremely clear on that
15  point.  That's why it's called the deliberative
16  process privilege.
17         Right?
18         MS. WYER:  Are you asking about the
19  agency's reason for promulgating that regulation?
20         MR. FARBER:  No.
21         The agency's reasoning for
22  determining that a long-term care pharmacy did

Page 152

1  not meet -- that was holding a debt for
2  co-payments that otherwise would have been
3  charged to the beneficiary, why that long-term
4  care pharmacy is not an agency -- not an entity
5  who has paid the co-payment within the terms of
6  the regulation, why did CMS make that
7  determination.
8         MS. WYER:  Where is the final
9  decision there?
10         MR. FARBER:  We just heard it on the
11  record here.  Ms. Block just testified to it.
12         Want to look at the transcript?
13         That was the agency decision.  We
14  just heard the testimony.  I'd like to know why
15  the agency reached that decision.
16         Read my last question back before
17  the objection, please.
18         (The reporter read the last
19         question.)
20         MR. FARBER:  Why don't you read a
21  question or 2 before that just so we get the
22  context.

Page 153

1         (The reporter read the record as
2         follows:
3         "Question:  But CMS never deemed the
4         pharmacy to be an entity -- within
5         the definition of the reg to be an
6         entity that it actually paid the
7         co-payment on behalf of the
8         beneficiary, did it?
9         "Answer:  No, it did not.")
10         BY MR. FARBER:
11     Q.   Then the next question was, why did
12  it not.
13         I can rephrase the question if you
14  want to fix that.
15         What was the basis of the agency's
16  decision not to deem the pharmacies holding the
17  co-payment debts to fall outside of the terms of
18  the regulation requiring the co-payments to be
19  made to entities that paid the co-payments on
20  behalf of the beneficiary?
21         MS. WYER:  Can you just establish a
22  foundation that there was a decision.

Page 154

1           MR. FARBER:  You just heard on the
2  record.  The agency made a decision.  I want to
3  know why.  I've now phrased the question to your
4  co-counsel's satisfaction I hope.
5           MS. KAISER:  I thought what we heard
6  was, what we never deemed.
7           BY MR. FARBER:
8      Q.   Can you answer the question?
9           Without answering, can you answer
10  the question, Ms. Block?
11      A.   I think I can, yes.
12      Q.   Okay.
13           MR. FARBER:  Counsel?
14      A.   I think we interpreted the
15  regulation to mean organizations that actually
16  pay in behalf of the beneficiary, such as an
17  SPAP, in the case of a long-term care pharmacy,
18  they did not actually pay.  They simply didn't
19  collect from the beneficiary.
20           BY MR. FARBER:
21      Q.   And CMS is aware that this class of
22  beneficiaries, institutionalized rules had never

Page 155

1  been assessed co-pays before January 1, 2006, in
2  the Medicaid when these beneficiaries received
3  their drugs through the Medicaid program.
4           Correct?
5      A.   I believe so.
6      Q.   And CMS was -- is also aware that
7  the reason that there's a zero co-pay for these
8  beneficiaries is because they have no money,
9  because any money they have is going to the
10  nursing home.
11           Correct?
12      A.   It was my understanding that they
13  have some nominal amount of moneys.
14      Q.   That was 30 dollars a month that the
15  Medicaid gave them for personal spending?
16      A.   Yes.
17      Q.   Is that Medicaid personal spending
18  money supposed to be used to pay co-pays for part
19  D?
20      A.   No.
21           Nevertheless, that's how we
22  interpreted the regulation.

Page 156

1      Q.   So if the long-term care pharmacies
2  had assessed the co-pay and not collected it
3  because these beneficiaries have no money to pay
4  it, would they then have fit into the regulatory
5  term?
6      A.   Again, our interpretation of the
7  regulation was that it applied only to
8  organizations that actually paid, and the primary
9  example of that would be an SPAP that actually
10  pays premiums, co-pays, and other things for its
11  members.
12      Q.   So there has to be an actual payment
13  to fit within the reg?
14      A.   That was our interpretation.
15      Q.   I'd like to go back to the first
16  page of the May 5 memo.
17           We've already talked about the first
18  of the 3 steps, which was the March 22nd request
19  by CMS to the states to fix this retroactive
20  reporting issue.
21           The second step the memo notes was
22  conducting additional outreach with the pharmacy

Page 157

1  community.
2           What was involved with that?
3      A.   As I recall, there was some
4  misunderstanding in the pharmacy community in
5  terms of when an institutionalized beneficiary
6  was eligible for zero co-payment.  I believe
7  there was some misunderstanding that any
8  institutionalized beneficiary was entitled to
9  zero co-payment, and as you know, that's not the
10  case.
11      Q.   Was there any discussion with
12  pharmacies about outstanding co-payments other
13  than this first day of the next month issue?
14      A.   My understanding is that as I recall
15  this outreach was designed to clarify for
16  long-term care pharmacies what constituted a
17  beneficiary entitled to a zero co-pay.
18      Q.   During that outreach, did CMS hear
19  of any complaints from long-term care pharmacies
20  about appropriate institutionalized dual claims
21  that were being rejected for co-pays by PDPs
22  because of lags in CMS data?

Page 158

1      A.   I have no direct knowledge, but I
2   would infer that that was probably the case.
3      Q.   Under the best available data
4   section on page 2, the last line says:  We are
5   working on an automated process for updating our
6   systems when after a lag the correct co-payment
7   level is still not reflected.
8      What is that about?
9      A.   That's about what I mentioned
10   earlier where originally there was no way to
11   update the system to change the information that
12   was received on the state file.  And the purpose
13   of this was to update the system so that in fact
14   it could be overridden if there was a request by
15   the PDP based on best available evidence.
16      MR. FARBER:  Let's mark this as the
17   next exhibit.
18            - - -
19   (Exhibit Block 5
20   was marked for identification.)
21            - - -
22      BY MR. FARBER:

Page 159

1      Q.   I think we've marked as exhibit 5
2   CMS Q and A ID 7346 dated May 26th.
3      Ms. Block, are you familiar with the
4   exhibit?
5      A.   Yes.
6      Q.   Okay.  Did the Center for
7   Beneficiary Choices review this Q and A before it
8   was published?
9      A.   Yes.
10      Q.   Okay.  And I'm going to focus you
11   particularly on the provisions relating to
12   long-term care facilities, which is a bit into
13   the answer.
14      You see where it says there:  A plan
15   may develop procedures that rely on attestations
16   from LTC pharmacy and facility personnel that
17   certain residents who are enrollees of the plan
18   are Medicaid-eligible, have been or expected to
19   be residents of the facility for a full calendar
20   month, and are under a Medicaid coverage stay?
21      Do you see that?
22      A.   I do.

Page 160

1      Q.   Based upon the claims experience
2   that CMS has been through for plan year 2006, how
3   many PDP claims were -- override the system based
4   upon these pharmacy attestations?
5      A.   I don't know an exact number.
6      Q.   Approximately?
7      A.   I have no idea.
8      Q.   Do you think it's more or less than
9   10,000?
10      A.   I don't know.
11      Q.   Okay.  Are you aware of any claims
12   that PDPs attempted to override the CMS system
13   with that were based upon pharmacy attestations?
14      A.   It is my understanding again that
15   this is something that would be worked out
16   between the PDP and the pharmacy.  And based on
17   what the PDP and the pharmacy have agreed to, we
18   would have in 2006 accepted that claim.
19      Q.   Here you're specifying pharmacy
20   attestations.
21      Right?
22      A.   It says that:  A plan may develop

Page 161

1   procedures that rely on attestations from
2   long-term care pharmacy and facility personnel.
3      And so if they develop those
4   procedures and it's a may -- it says that we
5   would accept, but that -- the result of that
6   agreement between the PDP and the long-term care
7   pharmacy.
8      Q.   What was the question that the Q and
9   A was answering?
10      A.   The question that the Q and A is
11   answering is, what do we mean by, best available
12   data.
13      Q.   And what was the answer?
14      Anything that the plan and the
15   pharmacy came up with?
16      I'm only interested in long-term
17   care.
18      A.   Yes.
19      For 2006, that was the answer.
20   Remember, we said clearly in the May 5 document
21   that going forward, we would outline what would
22   be considered best available evidence, and that

Page 162

1   beginning in 2007, that's when we would require
2   that kind of documentation.
3       So we made very clear that the rules
4   for 2006 were different than the rules for 2007.
5       Q.   Were you aware that when you said
6   that in May of 2006 that the plans took that --
7   that it effectively froze the plans because they
8   anticipated that you would define later on what
9   you meant, and therefore, they wouldn't act on
10  any of the unpaid co-pays unless they got that
11  definition?
12      A.   That was not the intention since it
13  clearly talked prospectively about 2007 and said,
14  start gearing up for this in 2007.
15      Q.   Was CMS aware that that was the
16  effect of what happened?
17      A.   No.
18      Q.   And to the best of your knowledge,
19  speaking on behalf of CMS, you don't know if
20  there were any claims that came in for plan year
21  2006 based upon this attestation or any other
22  procedures set up between the PDPs and the

Page 163

1   long-term care pharmacies that overrode the CMS
2   system?
3       A.   We would have no reason to make such
4   a determination in 2006.
5       Q.   This attestation policy is no longer
6   the policy for 2007.
7       Correct?
8       A.   Correct.
9       MR. FARBER:  Let's mark this as the
10  next exhibit, please.
11      - - -
12      (Exhibit Block 6
13  was marked for identification.)
14      - - -
15      BY MR. FARBER:
16      Q.   Okay.  We've marked as exhibit 6 a
17  memo dated October 30, 2006.
18      Ms. Block, you're familiar with the
19  document?
20      A.   Yeah.
21      I've seen the document.  I haven't
22  really carefully examined it.

Page 164

1       Q.   Okay.  I want to focus you on the
2   first sentence of the background section.
3       It states:  As you may recall, CMS
4   instructed part D plan sponsor on May 5, 2006,
5   that they are required to use best available
6   evidence to make changes to their systems.
7       You have the May 5, 2006, guidance
8   in front of you.
9       Where in there did CMS require the
10  plans to use best available evidence?
11      A.   I don't believe it specifically says
12  that.
13      It talks about best available data
14  and says, plans are required to use the best
15  available data when they have knowledge that a
16  beneficiary's co-share is not correct.
17      And then it does say that as part of
18  the confirmation process, plans will be required
19  to keep appropriate records.
20      Q.   Did it specify what the records
21  were?
22      A.   No.

Page 165

1       In the May 5 document, it doesn't
2   specify what the records are.
3       Q.   Before this instruction came out
4   October 30, 2006, how did plans know how to
5   process low-income subsidy status changes?
6       A.   I'm not sure what you mean by, how
7   did they know.
8       Q.   How did -- I mean, this memo
9   implements the best available data policy and
10  instructs the plans on how to process LIS system
11  notifications.
12      Right?
13      A.   Yes.
14      Q.   How did plans know how to process
15  these system notifications when the PDP had
16  contrary information about beneficiary cost
17  sharing before it got this October 30 memo?
18      A.   I think by implication, it would
19  have known from some of these earlier documents
20  that there was an expectation that -- and we
21  clearly had an expectation certainly early in
22  2006 that we did not want any beneficiary

42 (Pages 162 to 165)

Page 166

1  disadvantaged.  And that's why we put the 2- and
2  5-dollar default in place.
3            And it was that kind of information
4  that plans had that basically said, during this
5  transition period, because we've got more than 6
6  million people moving from Medicaid to Medicare
7  coverage we're going to basically bend over
8  backwards not to disadvantage beneficiaries.
9      Q.  Did you put in a zero cost-sharing
10  default in place for the institutionalized duals?
11      A.  The default was 2 dollars, 5
12  dollars.
13      Q.  Why wasn't it for the
14  institutionalized duals?
15      A.  Well, it wasn't 1 dollar, 3-dollar
16  either.
17          We took what would be the maximum
18  that any dual eligible would be required to pay,
19  which was 2 dollars and 5 dollars, because the
20  information was not precise as to whether they
21  were institutionalized, a partial dual, or a full
22  dual.  We took the maximum amount, which was 2,

Page 167

1  5, and made that the default.
2      Q.  What if a beneficiary hit the
3  doughnut hole?
4          Would the default still have been 2
5  dollars or 5 dollars, or the full amount of the
6  drug, full cost of the drug?
7      A.  No.
8          Beneficiaries are subsidized, and we
9  don't know if they are in fact dual eligibles.
10      Q.  So it would have been 2 dollars or 5
11  dollars?
12      A.  Yes.
13      Q.  Did you ever monitor how many
14  beneficiaries the PDPs defaulted to 2 dollars and
15  5 dollars?
16      A.  No.
17          That's not something that we would
18  have had any reason to monitor.
19      Q.  Okay.
20          MR. FARBER:  Why don't we take a
21  lunch break for, say, 45 minutes.
22          (Discussion off the record.)

Page 168

1                    * * *
2        Washington, D.C.; December 4, 2007
3                  1:34 p.m.
4                    * * *
5
6          MR. FARBER:  Back on the record.
7
8  FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS
9      BY MR. FARBER:
10      Q.  Ms. Block, before we broke for
11  lunch, we were talking about the October 30,
12  2006, memo to the PDPs.
13          Around October 30, 2006, do you
14  recall that there was a special low-income
15  subsidy resynchronization report that was
16  distributed to all the PDPs with the updates from
17  the states?
18      A.  No.
19      Q.  Do you recall that there was ever a
20  special computer data dump for lack of a better
21  word to the PDPs to address the gaps in the LIS
22  data characterization?

Page 169

1      A.  No, I'm not aware of that.
2          MR. FARBER:  Let's mark this as the
3  next exhibit.
4              - - -
5          (Exhibit Block 7
6  was marked for identification.)
7              - - -
8          BY MR. FARBER:
9      Q.  We've marked as exhibit 7 a memo
10  dated December 6, 2006, from Cynthia Tudor.
11          Ms. Block, do you recognize the
12  document?
13      A.  Yes.
14      Q.  Okay.  Was this another one of the
15  guidances put out to the PDP?
16      A.  Yes.
17      Q.  I'd like to focus you on the
18  instructions for 2006, in the first sentence, for
19  those LIS beneficiaries who were included on the
20  October 30, 2006, special LIS resynchronization
21  report.
22          Do you see that reference?

Page 170

1    A.   Yes, I do.
2    Q.   Does that refresh your recollection
3  at all as to --
4    A.   I really still have never heard of
5  that report.
6    Q.   Okay.  Now, you've in the course of
7  the morning referred to guidance put out by the
8  agency in December 2006.
9      Is this the guidance that you were
10 referring to earlier in the day?
11   A.   Yes.
12   Q.   Okay.  And in the this memo, does
13 CMS change some of the instructions that it was
14 giving to PDPs about how to manage low-income
15 subsidy information?
16   A.   Well, it makes specific what the
17 requirements will be for 2007.
18   Q.   Okay.  It also addresses how the
19 plans should treat LIS changes for 2006.
20     Correct?
21   A.   Yes, I believe so.
22   Q.   You see on the first page where it

Page 171

1  says, contrary to the October 30 memorandum, do
2  not follow the instructions?
3    A.   I'm sorry.
4      Where are you?
5    Q.   Under, other LIS changes.
6    A.   Okay.
7      (Pause.)
8    A.   Yeah.
9      I mean, as I understand this, the
10 intent of this was to be clear that the 2006
11 status would not carry forward into 2007 without
12 appropriate documentation.  And -- well, never
13 mind.
14     BY MR. FARBER:
15   Q.   But you would agree on December 6,
16 2006, CMS amended the -- some of the instructions
17 that it issued just 5, 6 weeks earlier.
18   A.   Yes.
19   Q.   And is this the CMS document that
20 for the first time defines what best available
21 evidence will be?
22   A.   Yes.

Page 172

1    Q.   And is that -- are those the
2  documents that are identified in attachment 1?
3    A.   Yes.
4    Q.   Okay.  Now, for -- I'm going to ask
5  you the following series of questions for
6  institutional and nursing home residents only.
7  I'm not talking about ambulatory now.
8    A.   Yes.
9    Q.   So for institutional -- you're aware
10 that in the institutional pharmacy setting, the
11 pharmacist never has direct personal contact with
12 the beneficiary.
13     Correct?
14   A.   Yes, that's correct.
15   Q.   Okay.  And the PDP also never has
16 contact with the beneficiary?
17   A.   That's correct.
18   Q.   Okay.  So a pharmacist has no
19 natural opportunity unlike in a retail pharmacy
20 to actually see a copy of a beneficiary's
21 Medicaid card.
22     Would you agree?

Page 173

1    A.   Well, I simply don't know.
2      I mean, the pharmacists clearly
3  while they may not have any direct interaction
4  with the beneficiary has an interaction with the
5  facility.  And to the degree that the facility
6  may have a copy of the Medicaid card on file or
7  whatever, I mean, I simply don't know that.
8      But there are certainly ways that a
9  pharmacist working within a facility would have
10 access to information that the facility has.
11   Q.   Okay.  And how would the PDP get
12 access to that?
13   A.   By somebody coming forward and
14 providing best available evidence.
15   Q.   Okay.  So this best available
16 evidence documentation policy relies on some
17 third party coming forward with a document that
18 meets one of the criteria identified in
19 attachment 1; is that correct?
20   A.   That's correct.
21   Q.   Okay.  To whom does the MMA --
22 strike that.

44 (Pages 170 to 173)

Page 174

1    And to the extent that the -- some
2 third party needs to come forward with one of
3 these documents that's listed on attachment 1 of
4 this memo, could that third party provide that
5 information to CMS just as easily as they could
6 provide it to a long-term care pharmacy or PDP
7 for that matter?
8    A.   I don't know that there's any
9 process in place for it to be provided directly
10 to CMS.
11    The processes that I'm familiar with
12 have to do with providing the evidence to a PDP.
13 And our instructions are to PDPs in terms of how
14 they're to use such evidence.
15    Q.   Okay.  Well, who created the process
16 by which third parties could get the information
17 to PDPs?
18    Didn't CMS create that process?
19    A.   Yes.
20    Q.   Okay.  So CMS set up the process for
21 PDPs to accept the data, accept this best
22 available evidence.

Page 175

1    Correct?
2    A.   Yes.
3    Q.   Okay.  And CMS didn't make it
4 mandatory on the PDP to go get the evidence, did
5 it?
6    A.   No, it didn't.
7    Q.   Okay.  And CMS didn't obligate any
8 third parties to actually provide the data to the
9 PDPs, did it?
10    A.   No, it did not.
11    Q.   Okay.  So CMS was simply setting up
12 a process that it told the PDPs it would suggest
13 without any evidence or knowledge that anybody
14 would actually participate in producing the
15 evidence to the PDP.
16    Correct?
17    A.   There would be no reason why when
18 CMS issues guidance it requires itself to have
19 evidence that anyone will follow its guidance.
20    It simply issues guidance in order
21 to facilitate a process or establish a policy or
22 implement -- give instructions as to how to

Page 176

1 implement a process.  It doesn't determine before
2 it issues guidance that somebody is going to
3 follow it.
4    Q.   I want to focus you just so we can
5 keep our chronology straight -- the guidance that
6 was -- or the documents identified in attachment
7 1 were only proposed documents that were going to
8 be finalized later on, and I refer you to the
9 bottom of paragraph -- of page 2.
10    A.   Yes, that's correct.
11    Q.   Okay.  So as of December 6, these
12 documents weren't yet the definitive guidance
13 from CMS as to what best available evidence would
14 be?
15    A.   That's correct.
16    Q.   And for 2007, did you instruct the
17 pharmacies that when they could not obtain
18 documentation that they had to revert and charge
19 the co-pay?
20    A.   We don't provide instructions to
21 pharmacies.
22    Q.   I said, the PDP.

Page 177

1    A.   No.
2    You said, the pharmacies.
3    Q.   Oh, my apologies.
4    And in this memo, did you instruct
5 the PDPs that in the event that they were not
6 able to obtain documentation that satisfied the
7 proposed criteria that they would have to revert
8 and charge a co-pay to the beneficiary?
9    A.   I think that this document talks
10 about if substantiating information cannot be
11 secured, it tells plans that they must send a
12 notice to inform beneficiaries that their LIS
13 will not continue into 2007.
14    Q.   What if the beneficiary was actually
15 an institutionalized dual, but CMS could not
16 get -- but the PDP could not get the
17 documentation?
18    What then?
19    A.   There has to be documentation.
20    There is no such thing as a PDP
21 can't get the documentation.  Somebody has to
22 come forward and provide the documentation.

Page 178

1    The responsibility is on the
2 beneficiary or someone acting on behalf of the
3 beneficiary to provide the PDP with
4 documentation.  Since there is a fairly extensive
5 list of things that would be acceptable as
6 documentation, it's not clear to me why somebody
7 who was in fact eligible wouldn't be able to
8 provide one of these categories of evidence that
9 would be acceptable.
10    MR. FARBER:  Could you read back the
11 answer, please.
12    (The reporter read the record as
13    follows:
14    "Answer:  There has to be
15    documentation.
16    There is no such thing as a PDP
17    can't get the documentation.
18    Somebody has to come forward and
19    provide the documentation.")
20    MR. FARBER:  Okay.  Thanks.
21    That's all I need.
22    A.   What I mean by that, by the way, the

Page 179

1 obligation is not on the PDP to get the
2 documentation.  The obligation is on somebody who
3 is claiming status, either institutional or dual
4 eligible status, to provide the documentation.
5    BY MR. FARBER:
6    Q.   So the CMS believe it is an
7 institutionalized dual's obligation to prove
8 their status to a PDP before they're eligible for
9 zero co-pay?
10    A.   Or somebody acting in their behalf.
11    And we have made clear in our -- in
12 some of these documents that you've shared with
13 me that a long-term care pharmacy, for example,
14 could initiate such an action.
15    Q.   I'm not talking about "could."  I'm
16 talking about "must."
17    Is it -- let me finish the question,
18 please.
19    A.   Somebody must initiate it.
20    Q.   Okay.  So is it CMS's understanding
21 that it is the -- in our situation here,
22 institutionalized duals, it is CMS's

Page 180

1 understanding that a -- it is the obligation of
2 the institutionalized dual to prove to its PDP
3 that it is eligible for zero co-pay?
4    A.   I'll say it again.
5    It is not the requirement on the
6 institutionalized dual him or herself.  If they
7 are not able to do that, somebody can do it in
8 their behalf.
9    Q.   But if they're not able to do it and
10 there's nobody -- they don't have a designated
11 direct, for example, there's no -- and the
12 pharmacy won't do it for them, who must -- who
13 else can do it for them?
14    They don't have a designated rep.
15 Their nursing home is not interested in doing it
16 for them, and their pharmacy isn't.
17    How will the PDP ever know?
18    A.   They won't.
19    Q.   So what will happen to the -- that
20 institutionalized dual's zero co-pay if the state
21 data doesn't match?
22    A.   If nobody demonstrates that that

Page 181

1 institutionalized dual is in fact a qualified
2 institutionalized dual, then there has been no
3 documentation that that person is eligible for
4 the zero co-pay.
5    Q.   And then the PDP in plan year 2007
6 would assess that institutionalized dual a
7 co-pay; is that correct?
8    It would have to under this case?
9    A.   They would pay the claim based on
10 whatever co-pay their records show was
11 appropriate for that individual.
12    Q.   Okay.  And in our situation where
13 the records at CMS show that there was a co-pay
14 to be paid, the PDP would then assess the co-pay.
15    Correct?
16    That's the situation we're talking
17 about?
18    A.   In that situation, they would pay
19 the claim less the co-pay amount.
20    Q.   Right.
21    And the co-pay amount would need to
22 be assessed to -- co-pay charge would need to be

Transperfect  Deposition  Services  (212) 400-8845

Page 182

1  assessed to the institutionalized dual for
2  payment?
3      A.  No.
4          The co-pay charge wouldn't be
5  assessed to anyone.
6          The claim would be paid -- let's
7  take a hypothetical.
8          Let's say the claim is for 20
9  dollars and the co-pay is 2 dollars.  The PDP
10 would authorize payment for 18 dollars, period.
11     Q.  And who would pay the co-pay?
12         Who would pay the 2?
13     A.  Nobody would pay the 2.  The 2
14 simply wouldn't be paid to whoever provided that
15 medication.  So the long-term care pharmacy in
16 your situation would be carrying a debt for 2
17 dollars.
18     Q.  And does that debt ever get paid by
19 anybody?
20     A.  There are ways in which that debt
21 can get paid.
22     Q.  And in the hypothetical, there's no

Page 183

1  one stepping up to provide the best available
2  evidence?
3      A.  Well, somebody would have to step up
4  and provide best available evidence, in which
5  case the pharmacy in accordance with the standard
6  terms and conditions of its contract with the PDP
7  would go back to the PDP and say, our contract
8  says you owe me 20 dollars on this claim, you
9  only paid me 18, you owe me 2 dollars.
10     Q.  And what -- you've seen the
11 standards terms and conditions contracts.
12         In that situation, when the pharmacy
13 went back to the PDP, what would then happen when
14 the pharmacy asked the PDP for the 2 dollars?
15         PDP says:  Hey, we were told by CMS
16 we're only owed -- we're only obligated to pay 18
17 dollars.
18         Who pays the 2 dollars?
19     A.  The pharmacy would have to take some
20 action or somebody would have to take some action
21 to provide the PDP with best available evidence
22 that in fact that individual was entitled to the

Page 184

1  zero co-pay.
2      Q.  So it's the pharmacy's obligation to
3  provide the evidence?
4      A.  It's an arrangement between the PDP
5  and the pharmacy.  And there are ways that a PDP
6  and a pharmacy can contract in their contractual
7  arrangement which has nothing to do with CMS to
8  handle such situations.
9      Q.  Whose obligation is it to provide
10 the best available evidence so the pharmacy can
11 get paid the 2 dollars?
12     A.  There's no specific designated
13 person with such an obligation.  The situation --
14 the process is not what you're describing.
15         The process is what I've described,
16 which is that what the PDP will pay will be what
17 its records say is owed in the case of that
18 particular beneficiary.  And if somebody believes
19 that that is not the appropriate amount, they
20 have the opportunity to provide evidence to the
21 contrary.
22     Q.  Okay.  And the PDP would get its

Page 185

1  information from the CMS Medicare beneficiary
2  database.
3          Correct?
4      A.  It would get it from the state
5  through the CMS database.
6      Q.  Well, does it get it from the state
7  directly?
8      A.  No.
9          It gets it via --
10     Q.  -- CMS?
11     A.  Yes.
12         It gets the information that CMS
13 relied upon that was provided to it by the state.
14     Q.  Are you aware of any instance where
15 CMS has changed some of the data provided to it
16 by the states before any data errors where data
17 gets changed before it goes from the states to
18 CMS and then CMS to the PDPs?
19         In other words, state reports, you
20 know, one piece of data and a different piece of
21 data in that same field for that same beneficiary
22 gets reported by CMS to the PDPs?

Transperfect Deposition Services (212) 400-8845

Page 186

1      A.   Only if there was a mismatch.
2      Q.   So sometimes it happens?
3      A.   Well, mismatches happen, yes.
4      Q.   Okay.  So going back to our
5   hypothetical, our 20-dollar, 2-dollar.  And I've
6   told you that the pharmacy and the nursing home
7   and -- can't get any of this documentation for
8   whatever reason.  You've told me that there's no
9   obligation on them to get the documentation.
10       Let's say our institutionalized dual
11   has no designated rep and they're cognitively
12   impaired.  I'll throw that in just to make it
13   crystal-clear.
14       In our hypothetical, all the PDP
15   will pay the pharmacy in 2007 is 18 dollars.
16       Is there any other source of
17   information that you're aware of that will allow
18   the pharmacy to collect the 2-dollar co-pay, or
19   is the pharmacy just out of luck?
20       A.   Again, you keep telling me that this
21   is an impaired -- mentally impaired beneficiary,
22   as though that was the only way that best

Page 187

1   available evidence could be obtained and
2   presented.
3       That is simply not the case.
4       Q.   Well, I've also told you -- let me
5   add one more fact to our hypothetical.
6       Let's say it costs 5 dollars to
7   obtain the best available evidence.  That's what
8   it cost.
9       You accept the assumption or
10   hypothetical?
11       A.   No, I don't accept that assumption.
12       Q.   You don't think --
13       A.   No, because if you look at the items
14   on the list, there's no cost attached to
15   obtaining that information.
16       Q.   Is a Medicaid card something that a
17   pharmacy naturally has?
18       A.   No, but a facility might have it.
19       Q.   Might have it.
20       The facilities have it or they
21   don't -- or what percentage of the time?
22       Do you know?

Page 188

1      A.   No.
2      Q.   So CMS doesn't know whether the
3   facilities have Medicaid cards or not.
4       How about screenshots from Medicaid
5   agencies?
6       Is that something a pharmacy has?
7      A.   It's something that's obtainable.
8      Q.   How much -- has CMS examined the
9   cost to a nursing home to obtain any -- in terms
10   of staff time and other expenses that it would
11   take to obtain any one of these documents?
12       A.   No, we have not.
13       Q.   Has CMS examined that cost for a
14   pharmacy?
15       A.   No.
16       It's not CMS's obligation or
17   practice to examine the costs of people that it
18   doesn't contract with and that it doesn't have a
19   relationship with.
20       Q.   Has CMS examined the cost to a
21   designated representative of the beneficiary?
22       A.   No.

Page 189

1      Q.   Does CMS ever examine the
2   practicality of obtaining any of these pieces of
3   evidence for a pharmacy or a nursing home or a
4   designated rep?
5      A.   People in CMS who are thoroughly
6   familiar with how nursing homes operate believe
7   that this information is obtainable.
8      Q.   Does CMS believe this is the only --
9   well, strike that.
10       What facts are these pieces of
11   information intended to demonstrate?
12       A.   That the fact that the individual
13   actually meets either the statutory requirements
14   of -- to demonstrate that they are in fact
15   low-income subsidy eligible or full dual eligible
16   or in the case of institutionalized individuals,
17   zero co-pay eligible.
18       Q.   Okay.  We can leave out the
19   low-income subsidy because we're only concerned
20   with the full benefit duals in this case.
21       We were talking earlier in the day
22   about what other data points might demonstrate

Page 190

1   those same issues.
2         Would the date of admission into the
3   nursing home be a sufficient fact to demonstrate
4   that a person is institutionalized, assuming that
5   they hadn't left, of course?
6         A.   It would be a sufficient fact to
7   indicate that they're institutionalized, but not
8   that there's zero co-pay.
9         Q.   Right.
10        Just asking zero institutionalized.
11        A.   Presuming that you had evidence that
12  they hadn't since left.
13        Q.   Of course.
14        A.   There are 2 factors.  There's an
15  entry date and a potential --
16        Q.   -- exit date?
17        A.   -- exit date.
18        Q.   Right.
19        So assuming the person hadn't left,
20  if you had the date of admission into the nursing
21  home, that would be enough to demonstrate that
22  the person was in fact institutionalized.

Page 191

1         Correct?
2         A.   M-hm.
3         Q.   Can't say "m-hm" because the
4   transcript --
5         A.   Yes.
6         Q.   If you had the beneficiary's
7   Medicaid number, wouldn't that be sufficient --
8   and the date that Medicaid was first applicable,
9   the date of their first date of eligibility,
10  would that not be a sufficient fact to
11  demonstrate that they were a dual?
12        A.   Yes.
13        I mean, this says specifically, a
14  copy of a member's Medicaid card.  I would assume
15  that if you had the number and the eligibility
16  date that that would be sufficient, but you would
17  have to go back, then, and verify that with the
18  state to demonstrate that in fact that was a
19  valid number.
20        Q.   Well, does a PDP have an obligation
21  to go back and verify with the state whether the
22  copy of the Medicaid card is in fact a valid

Page 192

1   Medicaid card?
2         A.   No.
3         Q.   Okay.  So why --
4         A.   Because you've got a physical card
5   in your hands, but it may not be valid anymore.
6         Q.   Maybe the person is no longer
7   eligible for Medicaid.  They're now out of
8   status.
9         A.   That is clearly a concern.
10        Q.   Okay.  But there's no obligation on
11  the PDP if they get a copy of the member's
12  Medicaid card to check with the state to make
13  sure the Medicaid card is still valid and the
14  person is still Medicaid-eligible, is there?
15        A.   No.
16        Q.   In fact once the PDP gets that copy
17  of the Medicaid card, that person is deemed a
18  dual for the rest of the plan year?
19        A.   That's what this says.
20        Q.   And it will be redeemed for the
21  following year unless there's new information
22  from the state that would undeem them.

Page 193

1         Correct?
2         A.   That's correct.
3         Q.   Okay.  So if you had just a Medicaid
4   number without the card, would that be sufficient
5   for a PDP to rely upon, just the number, no copy
6   of the physical card -- could the PDP rely on
7   that to demonstrate that a beneficiary is a dual?
8         A.   It makes sense to me that it would.
9   That's not what this says.
10        Q.   Thank you.
11        Now, in fact, CMS eventually
12  finalized the documents we see on attachment 1 as
13  the criteria.
14        Correct?
15        A.   I'll have to read it.
16        Q.   I'll show you the document in a
17  moment, but please read it.
18        (Pause.)
19        A.   I believe that at some point, the
20  last bullet item under proof of low-income
21  subsidy status was removed.
22        Q.   Do you know why, why it was removed,

49  (Pages 190 to 193)

Page 194

1  that is?
2      A.   I really don't.
3          I would guess it was removed because
4  it says it has to be backed up by one of the
5  above indicators post point of sale in any event,
6  so -- it was -- would have been better to rely on
7  the concrete evidence in the above items.
8          MR. FARBER:  Let's mark this as the
9  next exhibit.
10                  - - -
11         (Exhibit Block 8
12  was marked for identification.)
13                  - - -
14         BY MR. FARBER:
15      Q.   We've marked as exhibit number 8 a
16  memo dated December 22, 2006.
17         Ms. Block, are you familiar with it?
18      A.   Yes, I am.
19      Q.   Okay.  Now, in this -- is this an
20  agency guidance document, regulatory guidance?
21      A.   Yes.
22      Q.   And it attaches a Q and A that was

Page 195

1  issued in April.
2          Does the effect of this document now
3  turn that Q and A into subregulatory guidance as
4  well?
5      A.   Yes, I believe it does.
6      Q.   Okay.  And in this document, CMS
7  recognizes that many long-term care pharmacies
8  did not assess co-pays for -- to
9  institutionalized duals, and instead were holding
10  the debt themselves.
11         Correct?
12      A.   Yes, that's correct.
13      Q.   Okay.  So CMS was aware back in
14  December 2006 that this continued to be a problem
15  at the long-term care pharmacy level.
16         Correct?
17      A.   Yes, that's correct.
18      Q.   And did CMS demand that -- or insist
19  that plan sponsors -- try to make that English.
20         Withdraw the question.
21         Did CMS require PDPs to work
22  directly with pharmacies to -- and directly

Page 196

1  reimburse the pharmacies for the cost-sharing
2  amounts that were not collected from the LIS
3  eligible beneficiaries by the pharmacies?
4      A.   It didn't direct them.  The word
5  that's used is "should."  It doesn't say "must."
6      Q.   Okay.  How about "need to"?
7          That more of a "must" or more of a
8  "should" in the third-to-the-last line of the
9  page?
10      A.   Are you looking at the last
11  paragraph?
12      Q.   Yes, on the first page.
13      A.   Oh.  Again, that's a "should."
14  That's not a "must."
15      Q.   Okay.
16      A.   When we mean "must" or when it is an
17  absolute requirement, we say, must or shall.
18      Q.   Okay.
19      A.   These are encouragements rather than
20  directives.
21      Q.   All right.  Now, this -- on the
22  second page, there's a reference in the first

Page 197

1  full sentence:  Plan sponsors may accomplish this
2  by working with their network LTC pharmacies to
3  ensure appropriate documentation and attestations
4  are provided.
5          Would CMS have accepted pharmacy
6  attestations to support low-income subsidy
7  claims?
8      A.   We accepted them for 2006.
9          I believe we did not accept
10  attestations for 2007.
11         MR. FARBER:  Let's mark this as the
12  next exhibit, please.
13                  - - -
14         (Exhibit Block 9
15  was marked for identification.)
16                  - - -
17         BY MR. FARBER:
18      Q.   We've marked as exhibit 9 a memo
19  dated May 25, 2007, to part D plan sponsors from
20  Cynthia Tudor.
21         Ms. Block, are you familiar with the
22  document?

Page 198

1    A.   No, I don't believe so.
2    Q.   Take a moment and read it, please.
3    (Pause.)
4    A.   Yes, I am familiar with this.
5         This made clear that the timely
6    filing deadline could be reopened under certain
7    circumstances.
8    BY MR. FARBER:
9    Q.   And the timely filing deadline meant
10   that your claim for 2006 had to be filed by March
11   31, 2007?
12   A.   Yes.
13   Q.   Okay.  And who had to file then?
14        Did the pharmacies have to file the
15   claims with the PDPs, or was it PDPs had to file
16   them with CMS?
17   A.   No.
18        Actually the pharmacies had to file
19   the claims with the PDPs.  The filing date for
20   the PDPs to file with CMS was later as I recall,
21   in May, I believe.
22   Q.   May, and then extended to 2007?

Page 199

1    A.   Extended, yes.
2    Q.   And so this memo addresses a
3    particular situation where eligibility is
4    determined retroactive into 2006?
5    A.   Yes.
6    Q.   So -- but you only learned about
7    that after the March 31 deadline?
8    A.   Yes.
9    Q.   Does the memo still hold true today
10   for plans that have closed out plan year 2006
11   with CMS?
12        In other words, in December of 2007,
13   CMS -- a state reports to CMS a lost beneficiary
14   who in fact it had deemed Medicaid-eligible a
15   year earlier in December 2006.
16        Can a pharmacy even though CMS and
17   the plan have closed the year, no appeal, the
18   plan hasn't appealed -- can a pharmacy still file
19   a claim for that lost beneficiary with the plan
20   for December 2006 claim?
21   A.   My understanding -- I'll try to get
22   this technically correct -- is, because of a

Page 200

1    provision in the DRA, a state can still file a
2    claim.  And so we are -- plans as I understand it
3    are accepting claims from SPAPs and state
4    institutions, and I believe they have a 3-year
5    window, under the DRA that states have a 3-year
6    window.  As far as I know, that applies only to
7    claims filed by a state.
8    Q.   But states are prohibited by statute
9    from paying for part D drugs in 2006, so what
10   would the state file a claim for?
11   A.   There are no states -- for example,
12   there are people in state institutions, state
13   facilities where the state is eligible to be
14   reimbursed as a facility.
15   Q.   Okay.  So states would be allowed to
16   file those claims, but private pharmacies would
17   not?
18   A.   That is my understanding, that the
19   DRA provides specifically for a window for states
20   to file claims late.
21   Q.   I learned something today.
22   A.   And I hope I have that technically

Page 201

1    correct.
2    Q.   We'll find out, Karen.
3    A.   But it is one of the things that
4    we're hearing from plans.  It was one of their
5    concerns in closing out reconciliation for 2006,
6    that they are still receiving claims from states.
7    MS. WYER:  Can I --
8    MR. FARBER:  Off the record.
9    (Discussion off the record.)
10   MR. FARBER:  Why don't we put that
11   on the record just so we're all clear.
12   THE WITNESS:  It's the Deficit
13   Reduction Act of 2005.
14   MR. FARBER:  Thank you.
15   BY MR. FARBER:
16   Q.   So if I understand your answer,
17   there's no mechanism once a plan is closed out, a
18   plan year with CMS, for a pharmacy to file a
19   claim for that closed-out plan year?
20   A.   I think that would be something that
21   would be determined between the plan and the
22   pharmacy.  There's no mechanism for the plan to

Page 202

1  file that claim with CMS.  There's no way that a
2  PDE could then be filed for that claim.
3      Q.   So if the PDE for our lost
4  beneficiary in my hypothetical had been processed
5  as a 2-dollar, 5-dollar co-pay, it couldn't then
6  be reopened?
7      A.   Not between the PDP and CMS.
8      I'm not privy to what the
9  arrangements might be between the PDP and a
10 pharmacy.  That would be subject to the terms of
11 their contract.
12     Q.   What if a pharmacy had a claim
13 pending with the PDP?
14     When CMS and the PDP adjudicated the
15 claim year in an effort to close it, would those
16 open claims ever be taken into consideration?
17     A.   That's not really -- your assumption
18 is that the reconciliation process is so precise.
19 The reconciliation process really attempts to
20 reconcile payments that were initially based on
21 estimates.
22     Q.   Right.

Page 203

1      A.    And we're talking about billions of
2  dollars here.  And in relation to any PDP, in
3  some cases, the amounts of money were in fact in
4  billions of dollars, in many cases in millions of
5  dollars.
6      Q.   I've seen the OIG report.
7      A.   And so when talk about a claim, it
8  simply -- nobody is dealing in the realm of a
9  single claim.
10     Q.   But isn't there reconciliation of
11 every single claim that every PDP pays through
12 the PDE process?
13     I mean, every PDE has got to be
14 accepted or rejected.
15     A.   No.
16     The reconciliation again was based
17 on CMS determining an amount owed to it or an
18 amount it owed based on PDEs and that had been
19 accepted through January 31.  If the PDP chose to
20 accept that determination, we either recovered
21 the money from the PDP or sent them a check for
22 what we owed them.  If they did not choose to

Page 204

1  accept that determination, they filed an appeal.
2      Q.   What about claims that the PDP had
3  not yet submitted in the PDE to CMS?
4      A.   It was up to the PDP to decide
5  whether it chose to accept the determination, the
6  amount that CMS determined, or not.  If it
7  accepted it, that was the end of the story.  If
8  it chose not to accept it, it filed an appeal.
9      Q.   Are there instances you're aware of
10 where if PDPs had submitted additional PDEs after
11 the January 31 cutoff, they would have owed CMS
12 even greater amounts of money, in other words,
13 was it to certain PDPs' advantage knowing that
14 they were going to already owe CMS money to not
15 file PDEs?
16     A.   No.
17     On the contrary.  The more PDEs they
18 filed, the less money they would owe.
19     Q.   So are there instances where PDPs
20 were not able to file all their PDEs before the
21 January 31 cutoff but nevertheless --
22     A.   There was no January 31 cutoff.

Page 205

1      Q.   I thought you had said --
2      A.   July 31.
3      Q.   July.
4      I'm sorry.
5      Okay.  Has CMS encountered any
6  situation where after July 31, a state has
7  corrected a designation of a beneficiary as a
8  dual back into -- to some period in 2006?
9      A.   No.
10     We are not looking at those -- at
11 anything like that.  That's not how the
12 reconciliation process works.
13     Q.   It has nothing to do with
14 reconciliation.
15     I'm talking about the states to CMS.
16     A.   No, not that I'm aware of.
17     - - -
18     (Exhibit Block 10
19 was marked for identification.)
20     - - -
21     BY MR. FARBER:
22     Q.   For the record, exhibit 10 is a June

Page 206

1  1, 2007, memo from Cynthia Tudor to part D plan
2  sponsors.
3       Ms. Block, do you recognize the
4  document?
5       A.  No, I don't.
6       Q.  Okay.  Take a moment to review it.
7       (Pause.)
8       BY MR. FARBER:
9       Q.  Have you reviewed the document?
10      A.  Yes.
11           This is exactly what I was referring
12  to.  This talks about state-owned pharmacies.
13  And it's exactly state-owned pharmacies or other
14  state facilities that are submitting claims
15  beyond the deadline.
16      Q.  Focusing you on the first page, how
17  would -- I want you to look at the first
18  sentence:  Recently CMS has been made aware that
19  part D sponsors may not have been provided with
20  addresses that would help them, 1, confirm that a
21  beneficiary is institutionalized.
22           You see that?

Page 207

1       A.  Yes, I see it.
2       Q.  How would the address of a part D --
3  of a beneficiary help the PDP confirm that the
4  beneficiary is institutionalized?
5       A.  It would be possibly -- now, let me
6  think about that.
7           I'm not sure how that would be,
8  because in many cases, the address is not the
9  address of the institution.  In many cases, as I
10  believe, the address may even be the address of
11  the representative rather than the beneficiary
12  themself.
13      Q.  Do you know a reason why a part D
14  sponsor would want to confirm that a
15  beneficiary -- would want a beneficiary's address
16  to confirm that the beneficiary is
17  institutionalized?
18      A.  Well, I mean, it's just -- would be
19  an initial indication, not a conclusive
20  indication, that that person might be eligible
21  for zero co-pay.
22      Q.  And then the point 1 below,

Page 208

1  identifying the location of institutionalized
2  enrollees.
3       Why did CMS systems not provide the
4  address information?
5       A.  I'm not sure that the systems -- I
6  don't know actually.
7       Q.  Okay.
8       A.  I really don't know.
9       Q.  In the next -- in next-to-last
10  sentence that starts:  In the interim, however,
11  we would expect that sponsors will obtain address
12  information from network pharmacies.
13           Was that obligatory on the PDPs or
14  optional?
15      A.  "Expect" is not a requirement.  It's
16  an option.
17                 - - -
18      (Exhibit Block 11
19  was marked for identification.)
20                 - - -
21      BY MR. FARBER:
22      Q.  And for the record, we've marked as

Page 209

1  exhibit 11 a memo dated June 27th to part D
2  sponsors from Cynthia Tudor, along with
3  12-page -- 13-page attachment.
4           Ms. Block, are you familiar with
5  this document?
6       A.  I am.
7       Q.  And just generally describe to us
8  what it is, please.
9       A.  This document is the followup
10  document that I referred to earlier that once our
11  systems had been reprogrammed so that the
12  information provided by the state could be
13  overridden, this document lays out the procedures
14  for initiating LIS status corrections based on
15  best available evidence.
16      Q.  Okay.  And is June 27 the first time
17  the -- well, first, is the definitive procedure
18  today for best available evidence and overriding
19  that in the system?
20      A.  Yes.
21      Q.  Was there a definitive procedure
22  before June 27, 2007?

Page 210

1    A.    There was not, because changes had
2  to be made to the CMS system to allow for the
3  override.
4    Q.    Okay.  And when -- once this went
5  out, when was it effective?
6         Was it effective as of June 27?
7         In other words, if a plan wanted to
8  override data in the system on June 28, would it
9  have been able to do so?
10    A.    I believe so.
11    Q.    Okay.
12    A.    Although this clearly mentions that
13  there was a training schedule during July and so
14  on, so it seems to me however there would have
15  been no prohibition on a plan using the process,
16  but there was a couple of weeks subsequent to
17  June 27 in which specific training was provided
18  to facilitate the use.
19    Q.    I'd like you to turn to page 6.
20         Before we do that, on page 5,
21  required documentation, it says:  Plan sponsors
22  must obtain documentation to support a change to

Page 211

1  the beneficiary's LIS status.
2         In this document, did CMS change its
3  policy and now require PDPs to go out and collect
4  the data?
5    A.    No.
6         What this says is, you can't change
7  the status unless you have documentation.
8    Q.    Okay.  And up above under,
9  procedures for initiating LIS status corrections,
10  to initiate LIS status correction, part D plan
11  sponsors must follow best available evidence
12  guidance.
13         Does this now obligate -- does this
14  "must" now obligate the PDP to go out and get the
15  document?
16    A.    No.
17         It obligates them to accept the
18  documents.
19    Q.    Well, it talks about, collect
20  documentation to substantiate the beneficiary's
21  LIS status.
22         Does "collect" mean "accept" or does

Page 212

1  "collect" mean --
2    A.    I'm sorry.
3         Where is the word?
4    Q.    Under procedures for initiating LIS
5  status correction.  To initiate -- I'll read it
6  to you:  To initiate LIS --
7    A.    I see it.
8    Q.    What does CMS mean by, collect
9  documentation?
10    A.    It means the same thing.  It means
11  that if you are going to change a beneficiary's
12  LIS status, you must have the appropriate
13  documentation.
14    Q.    But there's no obligation upon a
15  plan to initiate an LIS status correction even if
16  it's been made aware that the beneficiary at
17  issue is an institutionalized dual who is
18  otherwise eligible for zero co-payment?
19    A.    That's correct.
20    Q.    But if the PDP does initiate the
21  status correction, it must follow the guidance
22  and it must collect documentation to substantiate

Page 213

1  the status; is that correct?
2    A.    I believe that the intent of the
3  collect documentation really means that it must
4  have the documentation in its possession so that
5  it can present the documentation if necessary.
6    Q.    Let's go to page 6 in the timing
7  section.
8         You see it says:  The manual system
9  is not intended to supplant the state data files?
10    A.    Yes.
11    Q.    And then it -- underneath, it
12  recommends that plan sponsors allow a reasonable
13  time of somewhere between 30 and 60 days to see
14  if the state data in the CMS files catches up?
15    A.    That's correct.
16    Q.    Okay.  So if a claim comes up from a
17  pharmacy to a PDP, and the pharmacy asks for a
18  hundred percent reimbursement because there's no
19  co-pay, pharmacy says, this is an
20  institutionalized dual, and the PDP then submits
21  the PDE to CMS, CMS data comes back and says, we
22  don't recognize this person as an

Page 214

1  institutionalized dual, there's a 5-dollar
2  co-pay.
3      A.   No, that's not how the system would
4  work at all.
5      Q.   How would the system work?
6      A.   The plan having updated its own
7  system not necessarily reporting to CMS would
8  have paid the claim correctly, so the pharmacist
9  would have received the full payment amount.
10  When the plan submitted that PDE to CMS, it would
11  be rejected.
12          However, the plan could then
13  resubmit that PDE a couple of months later, and
14  that -- once the CMS system had been updated,
15  that same PDE would be accepted.  PDEs are
16  frequently submitted and resubmitted multiple
17  times.
18          There are many reasons why a PDE may
19  be rejected initially.  Ultimately -- many of the
20  PDEs that are initially rejected are ultimately
21  accepted.
22      Q.   Are you aware of any PDP policies by

Page 215

1  which PDPs refused to reimburse pharmacies until
2  the PDP clears?
3      A.   No, I'm not aware of any such
4  policies.
5      Q.   Has CMS inquired as to whether such
6  policies exist?
7      A.   No.
8      Q.   Okay.  Does CMS know any reason why
9  on claims where the pharmacy believes the
10  beneficiary is an institutionalized dual that the
11  CMS data doesn't reflect it, the PDPs pay all but
12  the co-pay and refuse to reimburse the pharmacies
13  the co-pay?
14      A.   The way the system works as I
15  understand it is, if the PDP has best available
16  evidence, it is required to accept best available
17  evidence.  It then is required to update its
18  system and should be paying that claim properly.
19      Q.   I think I understand where we're not
20  talking to each other.
21          In my hypothetical, I was assuming
22  that there was no best available evidence yet.

Page 216

1          Was that clear to you?
2      A.   No, that was not clear to me.
3          Could you repeat your question.
4      Q.   Sure.
5          Let's work with the following
6  hypothetical.
7          There's no best available evidence
8  yet.  The pharmacy submits a claim to a PDP,
9  represents -- asks for a hundred percent
10  reimbursement, represents to the PDP that there's
11  zero co-pay due because this is an
12  institutionalized dual.
13          In that situation, is it your
14  understanding that the PDP checks the claim
15  against its file and may also submit a PDE to CMS
16  if it has a discrepancy between what the pharmacy
17  claims and -- the beneficiary is an
18  institutionalized dual and what's in the PDP file
19  showing that in my hypothetical that the
20  beneficiary is not eligible for a zero co-pay?
21      A.   I'm sorry.
22          You've totally lost me.

Page 217

1      Q.   Let me withdraw the hypothetical and
2  we can move on.
3          At the time that CMS finalized the
4  best available evidence policy as before us in
5  the June 27th memo, did CMS communicate any of
6  this policy to pharmacies?
7      A.   CMS does outreach with pharmacies,
8  and although I have no direct knowledge, I would
9  certainly assume that as part of its outreach
10  effort, that would be work that Larry Kocot, for
11  example, who you referred to earlier, was
12  actively engaged in.  There was ongoing
13  communication with pharmacies about many things
14  on an educational, informational basis.
15      Q.   How about beneficiaries?
16          How did they know about this?
17      A.   Again, CMS has partnership
18  relationships with the state -- the ships
19  (phonetic), the many other community
20  organizations, beneficiary advocates, and
21  information is shared with those groups as well,
22  sometimes informally, and of course once an

Page 218

1    official guidance is issued, they all have access
2    to that information.
3        Q.   Okay.  Is it your understanding that
4    the best available evidence policy was
5    communicated to beneficiaries through the various
6    partnership agencies?
7        A.   It was certainly made available to
8    the various beneficiary partner agencies.  All
9    information that's put out in this format is
10    publicly available and certainly made available
11    to partner agencies.
12        Q.   Okay.
13            MR. FARBER:  Let's take a break for
14    5 minutes if we could.
15                - - -
16            (Recessed at 2:47 p.m.)
17            (Reconvened at 2:59 p.m.)
18                - - -
19            MR. FARBER:  Back on.
20            BY MR. FARBER:
21        Q.   To the best of CMS's knowledge, who
22    actually charges beneficiaries -- any

Page 219

1    beneficiaries co-pays in the part D benefit?
2            Who actually assesses the co-pay on
3    the beneficiary?
4        A.   A retail pharmacy might.
5        Q.   Okay.  And is CMS headquarters aware
6    of information provided to the regions that even
7    if long-term care pharmacies are providing best
8    available evidence, PDPs are still not paying --
9    reimbursing the co-pays?
10        A.   I'm not aware of any such
11    information.
12        Q.   Okay.  If you -- if any such
13    information were brought to light, what would CMS
14    do about it vis-a-vis the PDPs?
15        A.   Our guidance is clear that a PDP
16    must accept best available evidence, so we would
17    contact that organization and so inform them.
18        Q.   Would you allow the PDP a 60- to
19    90-day window before you enforce the best
20    available evidence policy against them, given the
21    time lag that they have to update the files?
22        A.   No.

Page 220

1            That's not how the system works.
2    They're supposed to update their file
3    immediately.  They have -- they're told to wait
4    30 to 60 days to notify CMS in order to give our
5    files time to catch up through the state process.
6    But the PDP is supposed to update its own files
7    immediately and start paying the claims
8    correctly.
9        Q.   Is a PDP -- can a PDP update its
10    files while waiting on the best available
11    evidence, the physical hard copies of paper?
12        A.   No.
13            I believe that it's supposed to have
14    its -- the evidence in hand before it updates its
15    files.
16            MR. FARBER:  No further questions at
17    this point.
18            As I mentioned at the beginning of
19    the deposition, we intend to leave it open both
20    for Ms. Block in her personal capacity as well as
21    for further 30(b)(6) categories later down the
22    road, and in addition, to fill in some of the

Page 221

1    gaps both for which we've left blanks in the
2    transcript as well as documents and other
3    information we requested that we believe is
4    responsive.
5            With that, we'll end here, unless
6    you have cross.
7            MS. WYER:  No.
8            I just want to retain our right to
9    read and sign.
10            THE COURT REPORTER:  Ms. Wyer, do
11    you want to order a copy of the transcript?
12            MS. WYER:  Yeah.
13            (Discussion off the record.)
14            MS. WYER:  I want the final
15    tomorrow.  I want the draft too.
16            (Deposition concluded at 3:09 PM.)
17            (Signature reserved.)
18
19
20
21
22

56 (Pages 218 to 221)

Page 222

```
 1        CERTIFICATE OF COURT REPORTER
 2   UNITED STATES OF AMERICA  )
 3   DISTRICT OF COLUMBIA    )
 4        I, CHERYL A. LORD, the reporter before
 5   whom the foregoing deposition was taken, do
 6   hereby certify that the witness whose testimony
 7   appears in the foregoing deposition was sworn by
 8   me; that the testimony of said witness was taken
 9   by me in machine shorthand and thereafter
10   transcribed by computer-aided transcription; that
11   said deposition is a true record of the testimony
12   given by said witness; that I am neither counsel
13   for, related to, nor employed by any of the
14   parties to the action in which this deposition
15   was taken; and, further, that I am not a relative
16   or employee of any attorney or counsel employed
17   by the parties hereto, or financially or
18   otherwise interested in the outcome of this
19   action.
20
21             CHERYL A. LORD
          Notary Public in and for the
22        District of Columbia
```

57 (Page 222)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LONG TERM CARE PHARMACY ALLIANCE, et al.,** )  )  ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:07-cv-01115 (ESH) |
| ) | |
| **MICHAEL O. LEAVITT, et al.,** ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFFS' NOTICE OF FED. R. CIV. P. 30(b)(6) DEPOSITION

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs Long Term Care Pharmacy Alliance and American Society of Consultant Pharmacists (collectively, "Plaintiffs") will take the deposition of a designated officer, director, managing agent, or other person who may consent to testify on behalf of Defendant Centers for Medicare and Medicaid Services of the U.S. Department of Health and Human Services on **November 27, 2007 at 9:00 a.m.** at the offices of Patton Boggs LLP, 2550 M Street, NW, Washington, DC 20037. The deposition shall be taken before a Notary Public or other person authorized to administer oaths or conduct depositions in the District of Columbia and shall be taken for discovery purposes or for use at trial, or any other lawful purpose. If the deposition is not completed on the day on which it is scheduled, it will continue from day to day until completion.

Pursuant to Rule 30(b)(6), Plaintiffs will examine the designated deponent on the following topics:

1.     The process or processes by which States submit data to CMS relating to a beneficiary's eligibility for low-income subsidies, particularly relating to full-benefit dual eligible beneficiaries, including:

EXHIBIT
1-Block
12-4-07a

     a.      When States submit such data and the frequency with which States submit such data;

     b.      To whom the States submit such data;

     c.      What information is included in the States' data and the accuracy of such information;

     d.      What information necessary to the determination of whether a beneficiary is an institutionalized dual eligible beneficiary is not included in the States' data;

     e.      Whether CMS compares the States' data to any other data in its possession, custody or control; and

     f.      What actions, if any, CMS takes when a State submits data that is late, incomplete, inaccurate, or otherwise insufficient to determine dual eligible status or the level of low-income subsidy.

2.     The process or processes by which CMS determines that a beneficiary is an institutionalized dual eligible beneficiary, including but not limited to:

     a.      Which individuals, agents, contractors and/or departments are responsible for making that determination;

     b.      The sources upon which CMS relies to determine that a beneficiary is institutionalized, including, if applicable, the use of the National Council for Prescription Drug Programs "locator" code for institutionalized status;

     c.      The technologies, computer systems, software, programs and/or databases CMS utilizes in making these determinations;

     d.      When in the eligibility-status determination process CMS learns that a beneficiary is institutionalized;

     e.      How long after CMS learns that an individual is an institutionalized dual eligible beneficiary it notifies the PDP sponsor of the beneficiary's institutionalized status;

f.      On average, how long after an LTC Pharmacy first dispenses prescription medicines to an institutionalized dual eligible beneficiary CMS learns that a beneficiary is institutionalized;

g.      The sources upon which CMS relies to determine that a beneficiary is a dual eligible beneficiary;

h.      When in the eligibility-status determination process CMS learns that a beneficiary is a dual eligible beneficiary;

i.      On average, how long after an LTC Pharmacy first dispenses prescription medicines to an institutionalized dual eligible beneficiary CMS learns that a beneficiary is a dual eligible beneficiary;

j.      How long after CMS learns that a beneficiary is a dual eligible beneficiary it notifies the PDP sponsor of the beneficiary's subsidy-eligible status;

k.      How, where and when CMS records its determination that a beneficiary is an institutionalized dual eligible beneficiary; and

l.      Who has access to CMS records regarding beneficiaries' status as an institutionalized dual eligible beneficiary and the nature of that access.

3.      The process or processes by which CMS notifies PDP sponsors of institutionalized dual eligible beneficiaries' subsidy-eligible status, including but not limited to:

a.      What information CMS provides to PDP sponsors regarding institutionalized dual eligible beneficiaries;

b.      How often CMS notifies PDP sponsors of the subsidy-eligible status of institutionalized dual eligible beneficiaries;

c.      How long after CMS has determined that an individual is an institutionalized dual eligible beneficiary it notifies the PDP sponsor of the beneficiary's subsidy-eligible status;

d.      How long after a State has determined that a beneficiary is a dual eligible beneficiary CMS notifies the PDP sponsor of the beneficiary's subsidy-eligible status;

e.      On average, how long after an LTC Pharmacy first dispenses prescription medicines to an institutionalized dual eligible beneficiary CMS notifies the PDP sponsor of the beneficiary's subsidy-eligible status;

f.      The mechanism by which CMS notifies PDP sponsors of institutionalized dual eligible beneficiaries' subsidy-eligible status;

g.      Queries received as to whether specific beneficiaries have been determined to be institutionalized dual eligible beneficiaries;

h.      What actions, if any, CMS takes if a PDP sponsor or anyone else informs CMS that a beneficiary is an institutionalized dual eligible but (i) CMS has not yet determined that the beneficiary is in fact an institutionalized dual eligible beneficiary or (ii) CMS's data indicates that the beneficiary is not an institutionalized dual eligible beneficiary;

i.      CMS's understanding of how PDP sponsors use the information provided by CMS about a beneficiary's subsidy-eligible status; and

j.      What consequences PDP sponsors face if they reimburse LTC pharmacies for co-payment amounts where the CMS system does not reflect the Medicare beneficiary as an institutionalized dual eligible beneficiary.

4.    The process or processes by which PDP sponsors share with CMS coverage and cost-sharing data for institutionalized dual eligible beneficiaries, including but not limited to:

a.      What information PDP sponsors provide to CMS regarding costs associated with coverage of institutionalized dual eligible beneficiaries;

b.      What information PDP sponsors provide to CMS regarding cost-sharing data for institutionalized dual eligible beneficiaries;

c.      What information PDP sponsors provide to CMS regarding reimbursement issues for institutionalized dual eligible beneficiaries;

d.      How often PDP sponsors provide to CMS coverage and/or cost-sharing information for institutionalized dual eligible beneficiaries; and

e.      What CMS does with information provided by PDP sponsors regarding institutionalized dual eligible beneficiaries.


                                        Respectfully submitted,

November 2, 2007
                                        _____
                                        John L. Oberdorfer (D.C. Bar No. 145714)
                                        David J. Farber (D.C. Bar No. 415899)
                                        PATTON BOGGS LLP
                                        2550 M Street, N.W.
                                        Washington, D.C.  20037
                                        Telephone:  (202) 457-6000
                                        Facsimile:  (202) 457-6315

                                        Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2007 a copy of the foregoing Plaintiffs' Federal Rule of

Civil Procedure 30(b)(6) Notice of Deposition was served by email and first class mail, upon:

Kathryn L. Wyer
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., N.W.
Washington, DC 20530
kathryn.wyer@usdoj.gov

_____

Meagan T. Bachman

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
200 Independence Avenue, SW
Washington, DC 20201



**Office of External Affairs Office**

# FACT SHEET

## ENSURING AN EFFECTIVE TRANSITION OF DUAL ELIGIBLES FROM MEDICAID TO MEDICARE PART D

Beginning January 1, 2006, responsibility for the prescription drug coverage for over 6 million low-income Medicare beneficiaries who also are enrolled in Medicaid shifts from the states to the federal government consistent with the Medicare Modernization Act of 2003. These beneficiaries, referred to as the full-benefit dual eligibles, will qualify for Medicare prescription drug coverage with low or no premiums and co-payments of a few dollars.

CMS recognizes the enormity of this transition from Medicaid drug coverage to Medicare and has been working intensively with many partners in and out of government to ensure that the transition process for these beneficiaries is as seamless and efficient as possible. The most important goal of this transition is to ensure full-benefit dual eligible beneficiaries will get the prescription drug coverage they need as of January 1, 2006.

CMS is committed to accomplishing the following two key objectives to ensure a safe and appropriate transition of the dual eligible population from Medicaid to Medicare Prescription Drug Coverage:

I.  Providing comprehensive coverage and high quality prescription drug coverage plans for all people with Medicare, but especially for the dually eligible population, who often take a number of prescriptions to manage one or more chronic conditions. To achieve this objective, CMS has taken the following steps:

    A. Robust Formulary Requirements – CMS developed a set of checks and oversight activities to ensure that prescription drug plans offer a comprehensive benefit that reflects best practices in the pharmacy industry, as well as current treatment standards. Plan formularies must recognize the special needs of particular types of beneficiaries, such as mental health patients, those with HIV/AIDS, those living in nursing homes, people with disabilities, and other beneficiaries who are stabilized on certain drug regimens. CMS has reviewed these formularies and benefit structures to verify that plans are in compliance with the following critical requirements:

        1. Multiple drugs in each class – minimum statutory requirement is that a formulary must include at least two drugs in each approved category and class



(unless only one drug is available for a particular category or class). In addition, we have required that each plan's formulary include all or substantially all drugs in each of the following key categories: antidepressants, antipsychotics, anticonvulsants, anticancer drugs, immunosuppressants and antiretrovirals for treating HIV/AIDS.

2. Each Medicare prescription drug plan's formulary was developed and reviewed by the plan's pharmacy and therapeutics committee. Each must be consistent with widely used industry best practices.

3. CMS compared the prescription drug plans' use of benefit management tools to the way these tools are used in existing drug plans to ensure that they are being applied in a clinically appropriate fashion.

B. Transition Guidance – CMS has required each Medicare prescription drug plan to establish an appropriate transition process for all new enrollees. All of these transition plans include at least a one-time fill of a prescription drug excluded from the plan's formulary in order to accommodate situations in which a beneficiary presents at a participating pharmacy with a prescription he or she has previously filled but that is not on the formulary. Each transition process addresses the plan sponsor's method of educating both beneficiaries and providers to ensure a safe and complete accommodation of an individual's medical needs with the plan's formulary. Additionally, CMS recommends that this transition process address unplanned transitions as individuals change treatment settings due to a change in their level of care.

C. Exceptions Procedures – CMS has developed exceptions procedures designed to ensure that enrollees receive prompt decisions regarding whether medications are medically necessary. For example, if an enrollee requests a non-formulary drug, the plan must make its decision as expeditiously as the enrollee's health condition requires after it receives the request, but no later than 24 hours for an expedited coverage determination or 72 hours for a standard coverage determination.

D. Protecting Dual Eligible Residents of Long-Term Care Facilities - CMS established specific protections for beneficiaries who live in long-term care facilities and get their prescriptions from long-term care pharmacies. A condition of participation requires every plan to provide in-network coverage to all enrollees who live in any nursing home in its region. Each plan will be notified as to which of their enrollees live in a long-term care setting, which will help the plans and the facilities prepare for any potential changes to the beneficiary's drug regimen. Because a large number of long-term care residents are full-benefit dual eligibles, it is important for the transition process that plans employ to account for any issues associated with filling the first prescription of a non-formulary drug. CMS has also developed ways to assist long-term care facilities in identifying the plan in which their dual eligible residents are enrolled to allow for early

accommodations to new formularies, if necessary.  In addition to using the web-based Prescription Plan Finder tool at www. Medicare.gov for individual resident inquiries, long-term care facilities without Internet access or who need Medicare prescription drug plan enrollment information for multiple residents can now do so via a special CMS fax-based procedure.

II. Ensuring continuity of prescription drug coverage and care for the dual eligibles.

A. Outreach & Partnerships – CMS has conducted targeted education and outreach to ensure dual eligible beneficiaries are aware of the upcoming changes to their prescription drug coverage, including the transition in coverage, auto-enrollment, and their individual rights. CMS is conducting an integrated education effort incorporating both paid and earned multi-media, direct mail, and extensive grassroots operations organized down to the county level. This effort is run in cooperation with thousands of trained traditional and non-traditional partners across the country, including other federal agencies, state and local governments, pharmacists, nursing homes and other health care providers, faith-based organizations, and community based organizations.

B. Auto-enrollment – To ensure that there is no lapse in prescription drug coverage for full dual eligibles; CMS will make sure that full-benefit dual eligibles are enrolled in a Medicare prescription drug plan by January 1, 2006.  In November, anyone who was a dual eligible for even one month beginning in March, 2005 received a letter which informed them of their new plan and the option to choose another plan.  Dual eligible individuals also will have the opportunity to switch plans at any time.  This ensures continuity of care when Medicaid prescription drug coverage ends, while also retaining the personal right to select a plan that best meets their needs.  If a beneficiary is unaware of the plan in which they have been auto-assigned he/she can call 1-800-MEDICARE or look at the "Medicare Prescription Drug Plan Finder" on www.medicare.gov.  In the future, we will identify and auto-enroll those about to become full-benefit dual eligibles prior to the end of their Medicaid coverage to ensure a seamless transition on an on-going basis. This includes those Medicaid beneficiaries who will age into Medicare, or who will reach the end of the 24-month Medicare disability waiting period.

C.  Targeted Assistance – CMS will have special protocols and specially trained operators and case work coordinators ready to provide dual-eligibles focused assistance in January for any questions or concerns that may arise.  We will track any issues and act on them quickly. CMS will work closely with States and with our many partners around the country to ensure that dual eligibles have a smooth transition to Medicare drug coverage.

D.  Collaboration with States – CMS is committed to working with States on an ongoing and collaborative basis to ensure both the immediate need of a smooth transition for their current dual eligible residents is met and a continuing basis ensuring a successful transition for Medicaid beneficiaries who age into Medicare, the newly dually eligible individuals.  This work commenced  in August 2004  with convening of the State Issues Workgroup which included representatives from State Medicaid Agencies, the Social Security Administration and CMS. In addition to the ongoing efforts of the State Issue Workgroup, CMS engaged the

4

States in a series of summits, conference calls and workshops to discuss and work through the implementation issues of the MMA. Finally, CMS has worked especially closely with states on ensuring their monthly data feed identifying full-benefit dual eligible individuals to CMS is complete and accurate. CMS has a nationally recognized expert in Medicaid data validate each state's monthly feed, and the number matched consistently exceeds 99%.

E. Automatic Eligibility Checks and Coordination of Benefits in Pharmacies – In unprecedented coordination with all segments of the pharmacy and prescription drug payer industries, CMS has participated in the development of an automated Part D eligibility query and coordination of benefits (COB) process. The new eligibility capability will allow pharmacies to use existing pharmacy systems to identify a Medicare beneficiary's plan billing information, which will save pharmacists time and money in processing prescriptions for Medicare beneficiaries. This billing information will also allow pharmacists to immediately coordinate benefits with any other coverages the beneficiary may have through other payers, even if the beneficiary does not present the plan ID card or is even aware that he/she has been auto-enrolled into a Part D plan. These services will be open and accessible by all pharmacies regardless of the network or pharmacy management system they use.

F. Point of Sale Protection – CMS is making its best effort to identify and auto-enroll all dual-eligible beneficiaries prior to the effective date of their Part D eligibility. However, it is possible that some beneficiaries may go to pharmacies before they have been auto-enrolled in a Part D plan. For this reason, CMS has developed a process for a point-of-sale solution to ensure full dual eligible individuals experience no coverage gap when Part D coverage commences.

If a beneficiary presents at a pharmacy with evidence of both Medicaid and Medicare eligibility, but without current enrollment in a Part D plan, the beneficiary will be able to leave the pharmacy with their prescriptions and a CMS contractor, which will be announced later today, will immediately follow up to validate eligibility and facilitate enrollment into a Part D plan.

CMS and its contractor will provide a uniform and straightforward set of instructions that all pharmacists can follow no matter which plan network they are in or where they are in the country. To achieve this objective, CMS is contracting with a single national plan to manage a single national account for payment of prescription drug claims for the very limited number of dual eligible beneficiaries who have not yet been auto-enrolled into a Part D plan at they time they present a prescription at the pharmacy.

For further detail about this additional component of the dual transition work plan please click here: http://questions.cms.hhs.gov/cgi-bin/cmshhs.cfg/php/enduser/std_adp.php?p_faqid=6248

5



Timeline

| Aug-04 | | May-05 | | | Nov-05 | | Jan-05 |
| Start with States (test file) | | Notice to Dual Eligible Beneficiaries on US Status | | | Autoenroll Notices sent to Dual Eligible Beneficiaries/ Plans Notified | | Part D Effective Date |

Continuously working with states to get good data



★ ★ TIP SHEET ★ ★

★ ★ TIP SHEET ★ ★

## Information Partners Can Use on:

# How Medicare Drug Plan Members can Seek Repayment of Premiums and Copayments

New Medicare Prescription Drug Coverage                    As of April 2006

This fact sheet offers guidance to ensure that people with Medicare know how to get paid back for Medicare drug plan copayment and/or premium amounts.

## How to get reimbursed from a Medicare Prescription Drug Plan

**What should someone do if they paid out-of-pocket for their drug costs because they needed to fill a prescription before receiving their plan membership card or confirmation letter?**

If a person with Medicare pays for prescriptions that should be covered by their plan, they should take the following steps to get reimbursed:

1) Save the original receipt from the drug purchase.
2) Call the customer service number on their membership card, read the plan's printed materials, or look on the plan's member website to find out about the reimbursement process.
3) Get a copy of the plan's claim submission or reimbursement form, if needed.
4) Fill out the form and submit it to the plan with the original receipt.

**What should someone do if they qualified for the Low-Income Subsidy (LIS) but are not charged for the correct deductible or copayment amount?**

If a person with the LIS isn't charged the correct deductible or copayment amount, they should contact their plan to find out how to submit a claim for reimbursement of the amount the plan should have paid and the cost sharing they should have paid, if applicable. The person will need to save the original receipt from the purchase in case they need to submit it with the claim. The Medicare drug plan will refund any amount that is due.

**How will pharmacies be reimbursed for payments they have made on behalf of unidentified dual eligibles who live in long-term care facilities and qualify for the $0 copayment?**

Dual eligibles who reside in long-term care facilities may not have to pay copayments for their prescription drugs. Pharmacies will receive a one-time payment for the amount of any uncollected copayments for people who were mistakenly identified as having to pay copayment amounts. The pharmacy will need to submit a spreadsheet with claim information to the prescription drug plan.

Note: Processes may vary between plans. Following the drug plan's directions may ensure timely reimbursements.

EXHIBIT

3-Blak
12-40a

PENGAD 800-631-6989

## What should someone do if they don't have a plan membership card?

To avoid paying prescription drug costs that are covered by their plan, people with Medicare should take the following steps if they need to fill a prescription before receiving a plan membership card:

- Take the plan confirmation or acknowledgement letter to the pharmacy.
- If they haven't gotten a confirmation or acknowledgement letter yet, they can let the pharmacist know the plan's name and take one or more of the following to the pharmacy:
  - a welcome letter from the plan,
  - an enrollment confirmation number from the plan, or
  - a copy of an enrollment application.
- If the person has both Medicare and Medicaid or has been approved for the federal low-income subsidy (extra help paying for prescriptions), they can take a copy of their yellow automatic enrollment letter from Medicare, their Medicaid card, their approval letter from Social Security, or other proof that they qualify for extra help from the Federal government.

## Premium Payments

People with Medicare can pay their Medicare drug plan premiums in a variety of ways, including

- mailing monthly premium payments directly to the plan,
- having the monthly premium transferred electronically from a checking or savings account to the plan, or
- having monthly premiums deducted from their Social Security benefit.

### What should someone do if the correct premium amount is not deducted from their Social Security benefit?

If there is a premium overpayment, such as when a person changes plans and the premium change doesn't immediately go into effect, Social Security will automatically refund the premium overpayment. The person will receive a refund check separate from their regular monthly benefit. It may take 2–3 months to receive a refund.

★

## Why would someone have two premiums deducted in one month?

If a person enrolls in a Medicare drug plan at the end of the month, they may be charged in one month for multiple premium payments. For instance, if someone enrolled in a Medicare drug plan in the last few weeks of December with an effective date of January 1, 2006, they may be billed in February for both January and February premiums. Depending on which payment method they selected, they will either

- receive a bill for two months premiums (Note: Plans generally send bills at either the beginning or the end of the month. It varies from plan to plan.) or;
- have two months premiums withdrawn from the selected account. This could show as two separate withdrawal amounts, or one withdrawal at double the amount, depending on the plan. (Note: These withdrawals generally happen at either the beginning or the end of the month.)

## What happens if a person who qualified for the Low-Income Subsidy is charged for a premium?

People who qualified for the full low-income subsidy should generally pay nothing in monthly premiums. There are some people however, who selected a plan that does not have a $0 premium. If this is the case, the person will have to pay a small premium amount.

Early in the program, some Medicare drug plans were not able to tell which members qualified for the low-income subsidy and should not have had to pay a full premium. In general, plans do not bill members until Medicare tells them what a member's actual premium should be. However, in some cases, plans might have mistakenly sent bills for full plan premiums to certain members.

Drug sponsors have been instructed that they should wait for correct premium information before billing members. They should also not take disenrollment action with members who haven't paid their premium bill, in cases where the person might qualify for the low-income subsidy and owe a reduced or $0 premium. If someone receives a notice that says they will be disenrolled for non-payment of premiums, they should call their plan.

If the drug plan billed a member who should have a reduced or $0 premium, and the member paid, the plan will refund the correct amounts as soon as possible. The member can call the customer service number on their membership card, read the plan's printed materials, or look on the plan's member website to find out about the reimbursement process.



**What happens if a person is in a Medicare Advantage Plan that lowers the Medicare Part B premium, but they are charged the full premium amount?**

Some Medicare Advantage Plans lower or cover their members' Medicare Part B premium as part of the plan enrollment. Medicare experienced some delays in implementing these premium reductions. Members did not see the increase in their Social Security check equal to the amount of the reduction in the Part B premium covered by the plan.

In these cases, the incorrect witholding amounts will be repaid to the member all at once. Depending on the payment method the member selected, they will either

- have three months of the amount of the plan's monthly Part B premium reduction in their benefit check or in a separate check from Social Security,

- have their regularly scheduled Social Security benefit payment increased for three months worth of the amount of the plan's monthly Part B premium reduction, or

- receive a refund check from the plan totaling three months of the amount of the plan's monthly Part B premium reduction (in some limited cases).

Medicare expects that the January, February, and March Part B premium refunds will occur in April.



DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850

**CENTER FOR BENEFICIARY CHOICES**

MEMORANDUM

TO:        All Part D Plan Sponsors

FROM:      Gary Bailey, Deputy Director

RE:        Incorrect Cost Sharing Charges to Dual Eligible Beneficiaries

DATE:      May 5, 2006


CMS has received numerous complaints concerning full benefit dual eligible beneficiaries being charged incorrect co-payments at the pharmacy. We are aware that a number of factors are contributing to the incorrect cost sharing for full benefit dual eligible individuals, including the lags associated with the scheduled reporting of information from the State to CMS, delays in Part D plans updating their systems, CMS's prior instruction to the States to report only current or prospective changes to beneficiary institutional status, and confusion in the long-term care provider community regarding when an institutionalized beneficiary qualifies for a zero copayment. To clarify this last point, an individual is considered institutionalized and qualified for a zero copayment when he or she is a full benefit dual eligible, a resident in a long-term care facility for a full calendar month, and under a covered Medicaid stay. Qualification for the zero copayment is effective on the first day of the month in which a beneficiary is expected to remain in a long term-facility for a full calendar month stay that is covered by Medicaid.

This memorandum is part of a three-step approach CMS is taking to address the issue of incorrect cost sharing. We initiated these efforts on March 22, 2006 by requesting that States begin to report retroactive changes in beneficiary institutional status on the State Monthly MMA Enrollment File no later than July 2006. As a second step, we are conducting additional outreach with the pharmacy community. In this outreach, we will explain when a beneficiary is considered institutionalized for the purposes of the zero copayment as well as address the data lag associated with monthly state reporting and its impact on the Part D plan's systems updates. We encourage you to undertake similar outreach efforts with your pharmacy networks.

The final step in this effort to mitigate incorrect cost sharing to dual eligible beneficiaries is to outline CMS's expectations in three areas related to Part D plans changing a beneficiary's cost sharing levels.



- <u>Best Available Data</u> -- Part D plans are required to use the "best available data" when they have knowledge that a beneficiary's cost sharing level is not correct. For example, if the plan has knowledge from the nursing facility, or an advocate acting on behalf of the beneficiary, that the individual is covered by Medicaid for his/her institutional stay or that the beneficiary is a full benefit dual eligible, the plan should make changes to its systems to accommodate the revised copayment level. As part of the confirmation process, plans will be required to keep appropriate records in order to reconcile low-income subsidy payments with CMS. We are working on an automated process for updating our systems when after a lag the correct copayment level is still not reflected.

- <u>Plan Systems Lag</u> -- Part D plans must update their systems for changes in copayment status when processing the transaction reply reports (TRRs) from CMS. We are aware of examples where institutional status indicators have been successfully transmitted by the states, but the drug claims are being processed against non-zero copayment amounts. Plans must ensure these critical systems updates are processed timely in order to avoid a prolonged lag period in which plan databases are not reflecting correct beneficiary copayment status.

- <u>LTC Pharmacy Reimbursement for Incorrect Copayments Charged</u> – Part D plans are encouraged to reimburse LTC pharmacies directly when implementing retroactive subsidy level changes. Plans should not automatically reimburse beneficiaries residing in long-term care facilities because it is unlikely that the LTC pharmacies have billed the beneficiaries for their copayments.

Please contact your account manager is you have any questions concerning this memorandum.

**CMS Part D Question and Answer Database**

**Date:**    May 26, 2006

**ID:**    7346

**Question:**    CMS instructed Part D plans on May 5, 2006 that they are required to use the "best available data" to make changes to their systems when they have knowledge that a dual eligible beneficiary's cost sharing level is not correct. What does CMS mean by best available data?

**Answer:**    Part D plans have flexibility to develop their own procedures for determining whether best available information is sufficient to change or update their systems to reflect appropriate cost sharing levels for dual eligibles. For example, with respect to dual eligibles who are community residents, a Part D plan may rely on the beneficiary showing the contracted pharmacy a current Medicaid card or on information provided by a state Medicaid office as proof of low-income subsidy status. Since the Part D plan will not know the exact subsidy level for the dual eligible beneficiary, it should default the enrollee to a $2/$5 benefit package. For full benefit dual eligibles who are residents of long term care (LTC) facilities, a plan may develop procedures that rely on attestations from LTC pharmacy and facility personnel that certain residents who are enrollees of the plan are Medicaid eligible, have been or are expected to be residents of the facility for a full calendar month, and are under a Medicaid-covered stay. For LTC facility residents, Part D plans should rely on information that clearly indicates the elements necessary to confirm Medicaid eligibility and LTC facility admission dates for purposes of establishing a full calendar month of LTC facility residency. This could include location codes on billing transactions from the LTC pharmacies, in conjunction with the institutional attestations necessary to confirm Medicaid eligibility and LTC facility admission dates for a Medicaid-covered inpatient stay. As part of their procedures, Part D plans should keep appropriate records in order to reconcile low-income subsidy payments with CMS after the end of the contract year.



EXHIBIT
5-Block
12-4-07U

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



**CENTER FOR BENEFICIARY CHOICES**

**Date:**      October 30, 2006

**To:**        Part D Plan Sponsors

**From:**      Cynthia Tudor, Ph.D., Director, Medicare Drug Benefit Group

**Subject:**   Implementing our Best Available Data Policy for Low-Income Subsidy (LIS) Status

The purpose of this memo is to provide your organization with instructions on how to process LIS systems' notifications when your organization has contrary information about a beneficiary's cost sharing status under CMS' best available data guidance.

Background

As you may recall, CMS instructed Part D plan sponsors on May 5, 2006 that they are required to use "best available data" to make changes to their systems when they have knowledge that a dual eligible beneficiary's cost sharing level is not correct.  As a result of implementing this policy, a sponsor may not process a change that disadvantages a beneficiary if the sponsor has evidence that a beneficiary was <u>Medicaid eligible,</u> thereby entitling the beneficiary to a lower cost sharing status.

Generally, these situations arise when the beneficiary has applied for Medicaid later in the year after having applied for LIS through the Social Security Administration (SSA).  As a result of time lags associated with state-reported data, CMS plan enrollment and eligibility files may not yet reflect a beneficiary's dual eligible status that entitles the beneficiary -- as a full benefit dual eligible -- to a $2/$5, $1/$3 or $0 cost sharing for covered Part D drugs.  In accordance with our best available data policy, the plan sponsor must reflect the true cost sharing status where the plan has contrary evidence that either the individual qualifies for (1) $0 copayments as a full-benefit dual eligible who is a resident in a long-term care facility for a full calendar month under a covered Medicaid-covered stay, or (2) $1/$3 or $2/$5 copayments as a full benefit dual eligible meeting certain poverty level income thresholds.

Instructions for Part D plan sponsors

There are two scenarios that will occur in your LIS reports from CMS.  Plan sponsors should take action according to the following logic.



**EXHIBIT**

6-Block

12-4-07 CW

PENGAD 800-531-6989

L000173

**If data places the individual in a less favorable status,** take these three steps:
- If you had applied the best available data policy and you determine that the information has a solid foundation, do not change the person's status.
- If you determine that the information you have does not have a solid foundation, change the member's LIS status as of the effective date provided in the CMS reports. The plan sponsor must then make reasonable attempts to collect the outstanding cost sharing (see Attachment). The plan sponsor must also adjust the associated prescription drug event data (PDEs).
- Follow the processes in the Marketing guidelines that describe providing the LIS Rider to the EOC to notify the member.

**If data places the individual in a more favorable status,** take these three steps:
- Change the status in your systems, using the effective date provided.
- Take appropriate actions to make the beneficiary whole, as appropriate, for excess cost sharing, and adjust the PDEs. (see Attachment)
- Follow the processes in the Marketing guidelines that describe providing the LIS Rider to the Evidence of Coverage document (EOC) to notify the member

*Summary of co-pay/premium hierarchy*

| Current LIS Status | | LIS Status as Reflected in the CMS LIS Plan Reports | | Action |
|---|---|---|---|---|
| Co-Pay Category | Premium Subsidy Percentage | Co-Pay Category | Premium Subsidy Percentage | |
| 1, 2 or 3 | 100 | 1 or 4 | 100 or 100,075,050,025 | Determine if best available data policy applies |
| 4 | 100, 75, 50, 25 or 0 | 1 or 4 | 100 or 100,075,050,025 | Apply change as of effective date indicated in report |

<u>Subsidy Changes During the Year</u>

It is important that Part D plan sponsors understand that there will continue to be changes throughout the year that may positively or negatively affect your members' LIS status. Changes can occur for a variety of reasons. For example, when a beneficiary appeals a determination, reports a subsidy changing event to SSA (e.g., changes in marital status), or becomes Medicaid eligible, the beneficiary's LIS status may change. Thus, it is important that plans understand when to update an enrollee's LIS status based on CMS reports, and when to apply our best available data policy.

<u>Points of Contact</u>

For **technical** questions about LIS notifications, please contact:
MMA Help Desk
Phone: 1-800-927-8069
Email: mmahelp@cms.hhs.gov

Hours of Operation: M-F 6 a.m. to 9 p.m. EST

For **policy** questions pertaining to reconciling LIS cost sharing, please contact:
Alissa Deboy 410-786-6041.

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



CENTERS for MEDICARE & MEDICAID SERVICES

## CENTER FOR BENEFICIARY CHOICES

**DATE**            December 6, 2006

**Memorandum to:**    All Part D Sponsors

**Subject:**        Reconciling CMS Low Income Subsidy (LIS) Status and "Best Available Data" Policy for 2006 and 2007

**From:**           Cynthia Tudor, Ph.D., Director, Medicare Drug Benefit Group

Early in 2006, a number of factors contributed to the problem of incorrect cost-sharing levels for full-benefit dual eligibles and other LIS eligible individuals. The purpose of this memorandum is to provide instructions for reconciling CMS LIS status and implementing the best available data policy[1] for 2006 and for 2007. This memorandum amends certain instructions issued in our October 30, 2006 memorandum entitled, "Implementing our Best Available Data Policy for Low-Income Subsidy (LIS) Status".

**Instructions for 2006**

**SSA Subsidy Level Changes:** For those LIS beneficiaries who were included on the October 30, 2006 Special LIS Resynchronization Report, continue to follow the instructions contained in the October 30, 2006 memorandum entitled, "Implementing our Best Available Data Policy for Low-Income Subsidy (LIS) Status".

**Other LIS Changes:** Contrary to the October 30th memorandum, do **not** follow the instructions in the October 30, 2006 memo in the subsection "If data places the individual in a less favorable status" for other beneficiaries for whom LIS status was defaulted based on prior CMS guidance. Instead, for those beneficiaries for whom LIS status was defaulted in 2006, who were not included on the October 30, 2006 Special LIS Resynchronization Report, and for whom CMS data files have never substantiated the default level, you must determine whether you have supporting evidence (i.e., currently meet criteria such as those outlined in Attachment I) to substantiate the continued adjudication of a subsidy status in accordance with the best available data policy and take one of two actions:

---

[1] In an effort to address issues associated with incorrect cost-sharing, CMS issued a memorandum to all Part D sponsors in May 5, 2006 directing plans to use the "best available data" when they had knowledge that a beneficiary's cost sharing level was not correct. Plans were instructed to keep appropriate records of the evidence supporting these changes in order to reconcile low-income subsidy payments with CMS.

PENGAD 800-631-6989

EXHIBIT

Z-Block
12-4-07 ell

1. If documented evidence is available to substantiate the defaulted status (see Attachment I), do not change the beneficiary's subsidy status (i.e., continue to adjudicate the benefit at the same level into 2007).

2. If substantiating information cannot be secured, change the member's LIS status to the status indicated in CMS files effective January 1, 2007, and

   o Plans must immediately send the attached model notice (see Attachment II) to inform beneficiaries that the default LIS will not continue into 2007 *(Note that contrary to the October 30, 2006 instructions, plans will not recoup the amount that was subsidized at the default LIS level).*

   o Plans will be permitted to report the actual LIS cost sharing charged on the PDEs for these individuals who were defaulted without documentation. However, since this will require further systems modifications to prevent the rejection of these data, PDE reporting instructions will be issued separately.

Plans will shortly be receiving two separate reports from CMS, one of which will identify beneficiaries who will be losing LIS status effective December 31, 2006 and the other reporting 2007 LIS status, if any, for all beneficiaries. Plans should review these reports to identify any beneficiaries for whom LIS status has been defaulted. If any of these beneficiaries is shown on either report as losing LIS effective December 31st or as having no or less favorable LIS status for 2007, plans must secure solid supporting documentation in order to continue the beneficiary under best available data policy. Individuals who do not qualify for a continued subsidy under the best available data policy must have their subsidy status be discontinued after 2006 and be handled according to the instructions in #2, above.

**Instructions for 2007**

For 2007, Part D plan sponsors must match the LIS subsidy status reflected in CMS files unless the best available data policy applies. Plans must no longer default to LIS status without applying the best available data policy requirements. If best available data policy requirements have been met, the plan must override CMS subsidy-level data and apply the appropriate cost-sharing level until CMS systems are updated to accurately reflect information about a beneficiary's dual eligibility.

In early 2007, CMS will be implementing a systems change that will permit CMS staff to manually input a beneficiary's correct LIS deemed status once the plan sponsor has obtained and submitted documentation confirming the beneficiary's dual eligible status. This process will allow CMS and plan subsidy level records to be synchronized for those beneficiaries for whom Medicaid status has not been updated within a certain period of time.

CMS will be finalizing the 2007 best available evidence policy and procedures for correcting low-income subsidy levels in the next several weeks. The following bullets describe the policy direction CMS is considering pending final guidance. Comments on this list and on other points

of clarification should be directed to your Trade Associations for consolidation and discussion with CMS.

- In general, while plans may initially rely on evidence presented at the pharmacy, they will need to follow up with additional documentation within a specified period of time. Specifically:

- **When confirming documentation is obtained:** For beneficiaries for whom confirming documentation is obtained (see Attachment I), the plan sponsor will continue the individual's lower cost-sharing status and relay the documentation to CMS for correction of CMS systems.

- **When confirming documentation cannot be obtained:** If the plan sponsor is unable to substantiate a basis for the beneficiary's lower cost-sharing status, the plan must reinstate the CMS-provided subsidy level. In these cases, plans will be required to send the attached model notice (see Attachment III) to recover excess cost-sharing paid on behalf of the member during the discrepant period.

- **Timeframe for obtaining documentation:** Plan sponsors must allow no more than the last day of the 2nd month, after the month of the onset of default cost-sharing, to collect documentation confirming the beneficiary's dual status (and $0 copayment level for institutionalized dual eligibles). For example, if a member presents evidence of his or her dual status at the pharmacy on February 2nd, the Part D plan sponsor needs to confirm status no later than the end of April.

For questions concerning the best available data policy and reconciling LIS cost-sharing, please contact Deborah Larwood at 410-786-9500.

Attachment I

## Proposed Evidence Necessary to Document
## A Necessary Change in Subsidy Level

Proof of Low-Income Subsidy Status:

- A copy of a member's Medicaid card with includes the member's name and the eligibility date during the discrepant period;
- A copy of a letter from the State or SSA showing Medicare Low-Income Subsidy status
- The date that a verification call was made to the State Medicaid Agency, the name and telephone number of the state staff person who verified the Medicaid period, and the Medicaid eligibility dates confirmed on the call;
- A copy of a state document that confirms active Medicaid status during the discrepant period;  or
- A screen-print from the State's Medicaid systems showing Medicaid status during the discrepant period; or
- Evidence at point-of-sale of recent Medicaid billing and payment in the pharmacy's patient profile, backed up by one of the above indicators post point-of-sale.

Proof of Institutional Status for a Full-Benefit Dual Eligible:

- A remittance from the facility showing Medicaid payment for a full calendar month for that individual during the discrepant period;
- A copy of a state document that confirms Medicaid payment to the facility for a full calendar month on behalf of the individual; or
- A screen print from the State's Medicaid systems showing that individual's institutional status based on at least a full calendar month stay for Medicaid payment purposes during the discrepant period.

4

Attachment II

## 2006 Model Notice of Error in Premiums and Cost Sharing

{*Plans: This letter is to inform a member of his/her new premiums and cost-sharing effective 1/1/2007. You will use this model to notify any members you had defaulted in 2006 to a lower cost-sharing status and for whom you never received confirmation from either the State Medicaid Agency or CMS that the member is Medicaid or LIS eligible. The marketing material code for this model notice is 7007. If you use this model notice without modification, CMS will waive the five-day waiting period associated with file and use pieces.*}

[Member#-if member # is SSN, only use last 4 digits]
[RxID]
[RxGroup]
[RxBin]
[RxPCM]

<Date>

Dear <Name of Member>:

During 2006, <Plan name> has been charging you a copayment of [$0]/[up to $1 or $3]/[up to $2 or $5]/[15%] for each prescription you filled because we received information earlier this year that you might qualify for extra help with your prescription drug costs. However, to date the Medicare Program has not confirmed that you qualify for extra help.

Because <Plan name> has not been able to confirm that you qualify for extra help, your Medicare prescription drug costs are changing. Beginning January 1, 2007, you will pay:

- [insert plan premium] per month for your <plan name> premium,
- [insert deductible amount] for your yearly prescription drug plan deductible, and
- [insert amount] when you fill a prescription covered by <plan name>.

If you believe you still qualify for Medicaid, please call our Member Services at <phone number><days and hours of operation>. TTY users should call <TTY number>. We may ask to you send us proof of your Medicaid eligibility.

If you don't qualify for Medicaid, belong to a Medicare Savings Program, or receive Supplemental Security Income (SSI) benefits, you may still qualify for extra help, but you must apply to find out. If you haven't already filled out an application for extra help, you can get an application or apply over the phone by calling Social Security at 1-800-772-1213, or apply online at www.socialsecurity.gov on the web. TTY users should call 1-800-325-0778.

If you have any other questions, please call our Member Services at <phone number><days and hours of operation>. TTY users should call <TTY number>.

Thank you.

5

Attachment III

## 2007 Model Notice of Error in Premiums and Cost Sharing

*{Plans: This letter is to inform a member that s/he is liable for cost-sharing amounts you have paid on his or her behalf. Beginning in 2007, you will use this model to notify any members for whom you were unable to substantiate a basis for the member's lower cost-sharing status. The marketing material code for this model notice is **7008**. If you use this model notice without modification, CMS will waive the five-day waiting period associated with file and use pieces.}*

[Member#-if member # is SSN, only use last 4 digits]
[RxID]
[RxGroup]
[RxBin]
[RxPCM]

<Date>

Dear <Name of Member>:

Since <Date>, <Plan name> has been charging you a copayment of [$0]/[up to $1 or $3.10]/[up to $2.15 or $5.35]for each prescription you filled because you or your pharmacist informed us that you may qualify for extra help with your prescription drug costs. The Medicare Program has not confirmed that you qualify for extra help. <Plan name> has contacted your state Medicaid agency but has not been able to confirm that you qualify for extra help because you don't qualify for Medicaid.

Because <Plan name> has not been able to confirm that you qualify for extra help, your Medicare prescription drug costs are changing. Effective <Date>, you will pay

- [insert plan premium] per month for your <plan name> premium,
- [insert deductible amount] for your yearly prescription drug plan deductible, and
- [insert amount] when you fill a prescription covered by <plan name>.

The Medicare Program requires <plan name> to charge you for past prescription drug costs for any premiums, deductible or cost sharing amounts you should have paid since <date>. <Plan name> will send you a notice telling you what you owe for past charges.

You may still qualify for extra help, but you must apply to find out. If you haven't already filled out an application for extra help, you can get an application or apply over the phone by calling Social Security at 1-800-772-1213, or apply online at www.socialsecurity.gov on the web. TTY users should call 1-800-325-0778.

If you have any questions, please call our Member Services at <phone number><days and hours of operation>. TTY users should call <TTY number>.

Thank you.

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



## CENTER FOR BENEFICIARY CHOICES

**Date:**            December 22, 2006

**Memorandum To:**   All Part D Sponsors

**Subject:**         Reconciling Incorrect Cost Sharing Paid by LTC Pharmacies

**From:**            Cynthia Tudor, Director, Medicare Drug Benefit Group

As the first year of the Medicare Prescription Drug Benefit draws to a close, we remind Part D plan sponsors that they are obligated to reconcile any claims that may have resulted in incorrect cost sharing for low income subsidy (LIS) eligible beneficiaries at the point-of-sale. We recognize that problems with cost sharing have disproportionately impacted beneficiaries who are residents of nursing homes, and for whom long-term care (LTC) pharmacies are holding receivable balances rather than charging beneficiaries incorrect cost sharing amounts. This is particularly true in situations where a beneficiary is a full benefit dual eligible and meets the definition of an institutionalized individual for whom there is no cost sharing for covered Part D drugs.

In previous guidance, we emphasized to plans the importance of adopting standardized procedures to reconcile incorrect cost sharing made by LIS-eligible beneficiaries. In accordance with our rules at 42 CFR 423.800(c), plan sponsors have an obligation to make the LIS-eligible beneficiary whole by refunding any improperly collected cost sharing. In situations where cost sharing has been overpaid by beneficiaries, the plan should send the enrollee a check for amounts owed, or offset future cost sharing if the amount owed is less than a minimal cut-off threshold.

While this is our general policy, it is important that Part D plans be aware of the role LTC pharmacies have played with respect to cost sharing amounts overcharged to LTC residents, particularly some dual eligibles who should not have paid any cost sharing for their covered Part D drugs. Many LTC pharmacies did not collect the cost sharing amounts that were incorrectly charged. As many of LTC pharmacies continue to hold receivable balances for cost sharing amounts that should have been subsidized by the plan, Part D plan sponsors need to work with them to ensure appropriate reconciliation of amounts owed.

As we stated in our attached question and answer guidance released last April (see Attachment I posted at _http://questions.cms.hhs.gov/_ , _Q&A ID 7683_), plan sponsors should not automatically reimburse beneficiaries for cost sharing amounts that were not collected by their LTC pharmacies. Rather, plan sponsors need to work directly with their network LTC pharmacies to provide them with direct reimbursement for any cost sharing amounts that were not collected from LIS-eligible beneficiaries. Before reimbursement is made directly to LTC pharmacies, plan



sponsors need to ensure that the pharmacies in question have not collected or otherwise waived the cost sharing charges, and, in fact, are carrying a debt for the amounts owed.  Plan sponsors may accomplish this by working with their network LTC pharmacies to ensure appropriate documentation and attestations are provided to justify payment to the LTC pharmacy for excess cost sharing amounts that should have been paid by the plan under the low-income subsidy.

If you have any questions on this policy, please contact Christine Hinds at (410) 786-4578.

Attachment I

## Reimbursement to LTC Pharmacies for
## Retroactive Subsidy-level Cost Sharing Charges

Q. In situations where a full-benefit dual eligible meets the definition of an institutionalized individual but is incorrectly charged cost sharing for prescriptions under the Part D benefit, may Part D plans reimburse their contracted long term care (LTC) pharmacies directly when implementing retroactive subsidy level changes?

A. Yes. When implementing retroactive subsidy level changes for a full-benefit dual eligible who meets the definition of an institutionalized individual but is incorrectly charged cost sharing under the Part D benefit, plans should not automatically reimburse beneficiaries residing in long-term care facilities. In such situations, it is unlikely that LTC pharmacies have collected the applicable cost-sharing from beneficiaries due to the expectation that the plan eventually would reimburse the pharmacy retroactively for such amounts. In such situations, Part D plans should work with their pharmacies to provide them with direct reimbursement for any cost-sharing amounts not collected from institutionalized individuals. Before reimbursement is made, Part D plans should ensure that LTC pharmacies have not collected the cost sharing amounts, otherwise waived the cost sharing charges, and, in fact, are carrying a debt for the amounts incorrectly charged to the beneficiary. For auditing purposes, plans should ensure that pharmacies certify that the amounts reimbursed are appropriate, owed and payable.

By regulation, Part D plans are required to reimburse subsidy eligible individuals, and organizations paying cost sharing on behalf of such individuals, any excess cost sharing paid after the effective date of the individual's eligibility for a subsidy ( 42 CFR 423.800(c)). Providing direct reimbursement to LTC pharmacies for excess cost sharing charges that have not been paid by Part D enrollees or waived by the pharmacy does not conflict with this requirement, since such amounts were never paid by either the institutionalized individual or others on his or her behalf.

3

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



**CENTER FOR BENEFICIARY CHOICES**

**DATE:** May 25, 2007

**Memorandum To:** All Part D Plan Sponsors

**Subject:** Special Transition Period for Retroactive Enrollment

**From:** Cynthia Tudor, Ph.D., Director, Medicare Drug Benefit Group

The purpose of this memorandum is to clarify the 2007 policy outlined in section 50.10 of Chapter 14 of the Prescription Drug Benefit Manual on Coordination of Benefits entitled, "Special Transition for Retroactive Enrollment Situations." It has come to our attention that a number of Part D plan sponsors are incorrectly pointing to the March 31, 2007 coverage year deadline as a reason for non-payment of 2006 claims for covered Part D drugs associated with retroactive enrollment situations.

The March 31, 2007 date relates to the regulatory definition of a coverage year (see 42 CFR 423.308). This deadline is necessary in order for plans to prepare for payment reconciliation for which the plan's prescription drug event data must be submitted to CMS by May 31st. However, it is important to distinguish cut-off dates for the submission of claims associated with payment reconciliation from the liability for payment of claims arising as a result of coordination of benefit situations.

In the case of retroactive enrollments, beneficiaries and other parties— who made payment during a retroactive period eligible for reimbursement under a special transition period— represent third party payers that are entitled to reimbursement by the plan under Part D coordination of benefit requirements regardless of CMS payment reconciliation timeframes. To ensure that these third party payers have opportunity to request reimbursement for claims incurred during the retroactive period, sponsors must use the date of the Medicaid notification to establish a new timely claims filing period.

Further, in order to give effective meaning to our special transition guidance, a March 31st deadline cannot be used as a barrier to payer requests for reimbursement of claims incurred during periods covered by the retroactive enrollment. Rather, Part D plan sponsors must accommodate and facilitate requests for reimbursement of claims associated with retroactive enrollment coverage.

Thus, for example, if a beneficiary is initially enrolled in a Part D plan in February 2007 and is retroactively determined eligible for Medicaid to September 2006, the plan sponsor must provide a special transition period to accommodate claims incurred during the no



greater than seven-month period of retroactive eligibility.[1]  Similarly, if a beneficiary who was not previously enrolled in a Part D plan is subsequently enrolled into a plan in 2007 with a retroactive coverage date to 2006, a special transition period applies.

It is important to note also that plans are liable for claims received after March 31st even in those instances when retroactive enrollment is not an issue.  While in these instances contractual provisions regarding timely claims filing may limit claims from network pharmacies, non-network pharmacies must still have the opportunity to submit claims for reimbursement.

In the attached document, we have described several frequently occurring scenarios to further clarify how the special transition period policy should be applied in retroactive enrollment situations.  If you have any questions concerning the special transition policy and reimbursing claims incurred during the period of retroactive eligibility, please contact Deborah Larwood at 410-786-9500.

---

[1] In our March 13, 2007 memorandum entitled "Reimbursing Auto-Enrollees for Coverage during a Retroactive Period," we noted that the 2007 special transition policy extends to retroactive enrollments into 2006.

Attachment

Special Transition Period for Retroactive Enrollment Scenarios

| Scenario | Required Action by the Part D Plan Sponsor |
|---|---|
| A beneficiary first enrolled in Part D in 2007 is retroactively determined to be dual eligible effective in 2006 and another payer paid for covered drugs in the retroactive period. | Sponsors must coordinate benefits with other payers as required by the regulations at 42 CFR 423.464(f) without imposing time limits. |
| A beneficiary first enrolled in Part D in 2007 is retroactively determined to be dual eligible effective in 2006 and a network pharmacy is holding receivables for claims in the retroactive period. | For claims incurred during the period of retroactive enrollment in Part D, sponsors must use the date of the Medicaid eligibility notification to establish a new timely claims filing period. |
| A beneficiary first enrolled in Part D in 2007 is retroactively determined to be dual eligible effective in 2006 and a non-network pharmacy (includes state-operated, facility-based pharmacies) is holding receivables for claims in the retroactive period. | Sponsors must consider the non-network pharmacy as an "other" payer and coordinate benefits without imposing time limits. |
| A beneficiary first enrolled in Part D in 2007 is retroactively determined to be dual eligible effective in 2006 and receives notice of Medicaid eligibility close to or after March 31, 2007. | Sponsors must use the date of Medicaid notification to establish a new timely claims filing period and treat the beneficiary as an "other" payer. |
| A beneficiary not previously enrolled in Part D is retroactively (auto- or) facilitated enrolled in 2007 with a coverage effective date in 2006. | Sponsors must accommodate claims for non-formulary Part D drugs during a no-greater-than-seven-month period of retroactive eligibility, and claims for formulary drugs during the entire period of retroactive coverage. |

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



## CENTER FOR BENEFICIARY CHOICES

---

MEMORANDUM

**Date:**       June 1, 2007

**To:**         All Part D Plan Sponsors

**From:**       Cynthia Tudor, Ph.D., Director, Medicare Drug Benefit Group

**Subject:**    Convenient Access to LTC Pharmacies

Recently, CMS has been made aware that Part D sponsors may not have been provided with addresses that would help them: (1) confirm that a beneficiary is institutionalized, and (2) identify the particular long-term care (LTC) facility in the sponsor's service area in which those enrollees reside. We have also heard of difficulties associated with contracting efforts between Part D sponsors and State-operated pharmacies serving beneficiaries in institutions for mental disease (IMDs) and intermediate care facilities for the mentally retarded (ICFs-MR) designated by States as institutions. This memorandum provides guidance to Part D sponsors on both these issues.

## 1. Identifying the Locations of Institutionalized Enrollees

Access by a Part D sponsor to the addresses of its enrollees residing in LTC facilities promotes the efficient administration of its Part D plan and the sponsors' compliance with various requirements under Part D. Currently, CMS systems do not provide sponsors with address information that would allow sponsors to link an enrollee to a particular institution. We are currently working on a change to our systems that would ensure that Part D sponsors receive address information for their enrollees who are identified in our systems as residing in an institution. In the interim, however, we expect that sponsors will obtain address information from network pharmacies that serve enrollees in a sponsor's plan(s) within the scope of their current contacts. For the reasons discussed in Attachment 1, CMS believes the pharmacies' disclosure of LTC enrollees' addresses is permissible under the HIPAA Privacy Rule.

## 2. Contracting with State-Run Pharmacies

We are aware that there are special issues associated with the operations of State-owned or in-house LTC pharmacies that serve Part D enrollees residing in facilities (e.g., IMDs and ICFs/MR) recognized by States as institutions and that have as inpatients any institutionalized individuals (any full benefit dual eligible for whom payment is made under Medicaid throughout

1



a month, as provided in section 1902(q)(1)(B) of the Social Security Act). In <u>section 50.5.1</u> of Chapter 5 of the *Prescription Drug Benefit Manual*, we have instructed sponsors to continue their contracting activity as they identify LTC facilities and LTC pharmacies, and as they examine their auto-enrollment assignments and incoming enrollments. As stated in <u>section 50.5.4</u> of Chapter 5 of the *Prescription Drug Benefit Manual*, sponsors are not compliant with our LTC convenient access standard if they do not provide access to covered Part D drugs via a LTC pharmacy in their network for all of their enrollees who reside in LTC facilities. Thus, to the extent that State-owned and operated LTC pharmacies are involved, Part D sponsors should be prepared to readily negotiate with States to address contracting issues.

Several States have raised concerns that some sponsors are not acting in good faith to finalize contracts with State-owned and operated LTC pharmacies for both 2006 and 2007. Further, such complaints specify that sponsors are using the March 31, 2007 coverage year deadline for claims submission to avoid contracting for 2006 and, thus, paying claims for enrollees residing in some IMDs and ICFs/MRs. We clarify that to the extent a State attempted to contract with a sponsor throughout 2006 (and can document those efforts) on its State-run pharmacies' behalf, sponsors are still expected to continue to process claims for any of their enrollees residing in LTC facilities and to whom they were required to provide convenient access to a network LTC pharmacy in 2006.

We also clarify that if a State can establish a clear fact pattern that demonstrates that it attempted to contract with a sponsor throughout 2006, that the sponsor did not act in good faith, and that this is the reason the State was unable to secure contracts for its State-run LTC pharmacies, CMS will intervene to undertake any appropriate enforcement actions against the sponsor.

If you have any questions regarding convenient access to LTC pharmacies, please contact Vanessa Duran at Vanessa.Duran@cms.hhs.gov or 410-786-8697. We appreciate your continued support in meeting the needs of Medicare beneficiaries. Without your help, the Medicare prescription drug benefit would not be a success.

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop S3-16-16
Baltimore, Maryland 21244-1850



Center for Beneficiary Choices

MEMORANDUM

DATE:        June 27, 2007

TO:          All Part D Sponsoring Organizations

FROM:        Cynthia Tudor, Ph.D., Director, Medicare Drug Benefit Group
             Anthony Culotta, Director, Medicare Enrollment and Appeals Group

RE:          Part D Guidance – Low-Income Subsidy (LIS) Status Corrections Based on Best
             Available Evidence

This document provides guidance to Part D plan sponsors on the policies and procedures for
initiating corrections to CMS' low-income subsidy data for plan enrollees for whom the plan has
documentation— "best available evidence" (BAE)—about their Medicaid eligibility or residence
in an institution under a Medicaid-covered stay.  We are providing this guidance in advance of
the implementation training, which will take place in the July 11, 2007 User Group Call. Plans
should review the guidance and submit any questions by July 6, 2007.  Plans are asked to ensure
that appropriate business and system staff who are responsible for implementing this policy
attend the call.

If you have any questions on this guidance, please contact Deborah Larwood via email at
Deborah.Larwood@cms.hhs.gov or by phone at 410-786-9500, or Jill Gotts at
Jill.Gotts@cms.hhs.gov or 410-786-7794.



Part D Plan Sponsor Guidance —

LIS Status Corrections

Based on Best Available Evidence

**Part D Plan Sponsor Guidance on LIS Corrections**

**Based on Best Available Evidence**

Table of Contents

Background on Low-Income Subsidy Deeming ................................................................. 3

Background on Best Available Evidence Policy ............................................................... 4

Procedures for Initiating LIS Status Corrections ............................................................ 5

    Required Documentation ............................................................................................... 5

Transmitting an LIS Status Correction Request to CMS .................................................. 6

    Timing of LIS Status Correction Requests .................................................................. 6

    LIS Status Correction Request ..................................................................................... 6

        Certification and Cover Memo ................................................................................. 7

    Transmission Security Requirements .......................................................................... 8

    Regional Office ............................................................................................................. 8

    CMS Reporting to Plans .............................................................................................. 9

    Timing of CMS Systems Updates ............................................................................. 10

Evidence Retention Requirements .................................................................................. 10

Impact of Subsequent State Reports on CMS Manual Updates ..................................... 10

    Appendix – Using the SSA Award Letter to Determine Eligibility for the Full or Partial Subsidy ........................................................................................................................ 12

# Background on Low-Income Subsidy Deeming

The low-income subsidy is extra help for people with Medicare who have limited income and resources to help pay their Medicare prescription drug plan costs (plan monthly premiums, co-payments and the annual deductible). Certain groups of Medicare beneficiaries are automatically deemed eligible for LIS. These groups include full-benefit dual eligible individuals, partial dual eligible individuals (i.e., those who belong to a Medicare Savings Program as a Qualified Medicare Beneficiary, Specified Low-Income Medicare Beneficiary or Qualifying Individual), and people who receive Supplemental Security Income (SSI) benefits but not Medicaid. Other individuals with limited incomes and resources who do not automatically qualify can apply for a low-income subsidy and have their eligibility determined by either the Social Security Administration (SSA) or their State Medicaid Agency. Table 1 provides an overview of how people qualify for LIS.

*Table 1. Overview of how people qualify for LIS*

| People with Medicare and | Basis | Data Source | Changes During the Year |
|---|---|---|---|
| Medicaid benefits<br>• Full Medicaid benefits<br>• Medicare Savings Program | Automatically qualify | State files | • Qualify for a full calendar year<br>• Generally only favorable changes will occur |
| SSI benefits | | SSA | |
| Limited Income and Resources | Must apply | SSA (almost all) or states | • Some events can impact status through the year<br>• Extra help can increase, decrease, or terminate |

Once a beneficiary becomes deemed eligible, s/he is deemed, at a minimum, through the end of the current calendar year (December 31st), even if s/he is no longer eligible for Medicaid, a Medicare Savings Program or SSI. In August of each year, CMS determines if individuals who are deemed eligible for LIS during the current calendar year will continue to be deemed eligible for the subsequent calendar year. This "re-deeming" process for Medicaid and Medicare Savings Program participants begins with the month of July and continues through the calendar year. If an individual is Medicaid eligible in any month during the period July through December, the individual is deemed LIS eligible for the months of Medicaid eligibility and for any subsequent months of the period as well as for the subsequent year. Thus, for example, if a beneficiary is reported as Medicaid eligible for the month of March, then CMS will deem him/her March 1 through December 31 of the same calendar year. On the other hand, if a beneficiary is reported as Medicaid eligible for the month of August, then CMS will deem him/her August 1 through December of that same calendar year and January 1 through December 31 of the subsequent calendar year.

3

# Background on Best Available Evidence Policy

Best available evidence policy is used when the low-income subsidy information in CMS' systems is not correct. CMS relies on monthly files from the states and Social Security to establish an individual's low-income subsidy deemed eligibility and appropriate cost-sharing level. In certain cases, CMS systems do not reflect a beneficiary's correct LIS deemed status. This may occur, for example, because a state has been unable to successfully report the beneficiary as Medicaid eligible or is not reporting him/her as institutionalized.

CMS implemented the policy requiring Part D plan sponsors to use "best available evidence" under these circumstances to substantiate a beneficiary's correct cost-sharing level. This policy was first articulated in a memorandum to all Part D sponsors dated May 5, 2006, which also instructed sponsors to retain appropriate records of the evidence used to support plan-initiated changes in cost-sharing in order to reconcile low-income subsidy (LIS) payments with CMS.

On December 6, 2006, in a memorandum to all Part D sponsors, we provided instructions for implementing this policy for 2007. We state therein that plans must no longer default to LIS status without applying the best available data policy requirements. We also note, however, that plans may initially rely on evidence presented at the pharmacy to provide a lower cost-sharing status at point-of-sale, but must follow up with additional documentation within a specified period of time. We recommend that sponsors consider this approach to address urgent situations. In these cases, if the plan sponsor is unable to substantiate a basis for the beneficiary's lower cost-sharing status, the plan must use the CMS-provided subsidy level and send a notice to the beneficiary to recover the cost-sharing that should have been paid by the member during the discrepant period. Plan sponsors must collect documentation confirming the beneficiary's dual status (and $0 co-payment level for institutionalized dual eligibles) no later than the last day of the 2nd month after the month of the onset of default cost-sharing.

In that December 6 memorandum, we also announced plans to implement the necessary modifications to our systems to permit CMS to input a beneficiary's correct LIS deemed status once the plan sponsor obtained and submitted documentation substantiating the beneficiary's dual eligible status. As noted, this process will allow CMS and plan subsidy level records to be synchronized for those beneficiaries for whom Medicaid status has not been updated.

This document provides guidance to Part D plan sponsors on the procedures for initiating corrections to beneficiary LIS levels in cases in which the plan has documentation that constitutes "best available evidence" (BAE) about a beneficiary's Medicaid eligibility or residence in an institution under a Medicaid-covered stay. There will be a separate, yet to be developed, process for cases involving beneficiaries who have been awarded LIS by the Social Security Administration (SSA), but whose eligibility is not reflected in CMS systems. In the interim for these latter cases, Part D plan sponsors are still required to maintain members' LIS status on the basis of the SSA award letter; the appendix to this

4

document provides guidance on using the SSA award letter to determine whether the beneficiary is eligible for the full or partial subsidy.

# Procedures for Initiating LIS Status Corrections

To initiate LIS status corrections, Part D plan sponsors must follow best available evidence guidance and collect documentation to substantiate the beneficiary's LIS status. In addition, plan sponsors must:

a. Override standard cost-sharing and maintain an exceptions process for that beneficiary until the CMS LIS correction is processed. We recommend that sponsors use the same cost-sharing level as will be reflected in the CMS system once the manual correction is processed; that is: $1/$3.10 for full-benefit dual eligible individuals, and $2.15/$5.35 for partial dual eligible individuals.
Plan sponsors must put processes in place that obviate the need to require the re-submission of documentation each month pending the correction of the beneficiary's LIS status in CMS systems. Such processes should compare subsequent CMS reports with the BAE-based status to ensure that the sponsor does not incorrectly override the BAE-based status.

b. Develop appropriate member services and pharmacy help desk scripting to triage cases involving BAE. CMS recommends that plan sponsors' BAE policies and procedures address the urgency of certain cases; e.g. a patient who is unable to access his/her antihypertensive medication. Plan sponsors should prioritize urgent cases, educate their contracted pharmacies about their process for handling urgent cases, and develop possible stop-gap solutions, such as providing a temporary fill.

c. Verify that CMS's systems do not already reflect the beneficiary's correct Medicaid/Medicaid institutional status for the purposes of establishing appropriate low-income cost-sharing status prior to a submitting a request for correction. Verification may be accomplished by checking the most recent bi-weekly LIS report from CMS or via the MARx User Interface.

## *Required Documentation*

Plan sponsors must obtain documentation to support a change to the beneficiary's LIS status. To establish Medicaid status at the high or low cost-sharing levels, the plan sponsor must obtain one or more of the following documents confirming the plan verified Medicaid eligibility:

1. A copy of the member's Medicaid card which includes the member's name and an eligibility date during the discrepant period;

5

2. A report of contact including the date a verification call was made to the State Medicaid Agency and the name, title and telephone number of the state staff person who verified the Medicaid status during the discrepant period;
3. A copy of a state document that confirms active Medicaid status during the discrepant period;
4. A print out from the State electronic enrollment file showing Medicaid status during the discrepant period;
5. A screen print from the State's Medicaid systems showing Medicaid status during the discrepant period; or
6. Other documentation provided by the State showing Medicaid status during the discrepant period.

To establish that the beneficiary is institutionalized and qualifies for a zero cost-sharing level, the plan sponsor must furnish one or more of the following forms of proof:
1. A remittance from the facility showing Medicaid payment for a full calendar month for that individual during the discrepant period;
2. A copy of a state document that confirms Medicaid payment to the facility for a full calendar month on behalf of the individual; or
3. A screen print from the State's Medicaid systems showing that individual's institutional status based on at least a full calendar month stay for Medicaid payment purposes during the discrepant period.

# Transmitting an LIS Status Correction Request to CMS

## Timing of LIS Status Correction Requests

The manual LIS status correction process is not intended to supplant state MMA data files, in which states report their dual eligible beneficiaries to CMS between the 15th and the end of each month. CMS suspects that a manual update will not be necessary in all cases, as updated information on a subsequent state MMA file may automatically correct the data in CMS systems.

Prior to submitting a correction request, plan sponsors should allow a reasonable time for updated information to be automatically entered into the CMS systems and reported to the plan. CMS recommends that the delay be a minimum of 30 and a maximum of 60 days, as it is likely that a significant portion of those who qualify under BAE policy in one month will be deemed for LIS via the normal process within the next several weeks.

## LIS Status Correction Request

LIS Status Correction Requests must be submitted to CMS via an Excel file. CMS recommends that plan sponsors establish a schedule for the monthly transmission of these requests. Each Excel file should contain information for all beneficiaries identified since the most recent prior request as requiring an LIS status correction. In other words, the correction request file should not be a cumulative record of previously submitted beneficiaries. The

6

required Excel file format for the request is shown below; a copy of this file format in Excel is attached.

Prior to submitting the request, plans should ensure that all beneficiary identifying information, such as name, date of birth, and HICN, is correct.

**Excel Format for LIS Status Correction Requests**

| Organization Name: | Primary Contact Name: |
|---|---|
| Contract Number: | Primary Contact Phone: |
| Organization Mailing Address: | Primary Contact E-Mail Address: |
| | Secondary Contact Name: |
| | Secondary Contact Phone: |
| | Secondary Contact E-Mail Address: |

**Request to Update CMS Medicaid Cost-Sharing Information**

| Bene Health Insurance Claim Number | Bene Last Name | Bene First Name | Bene Date of Birth | Bene Gender | Bene State of Residence |
|---|---|---|---|---|---|

| Start of Medicaid/ Medicaid Institutional Status (MM/CCYY) | Dual Eligible Status (Full/ Partial) | Institutional Status (Yes/No/ Unknown) | Type of Documentation Supporting Request | Description of "Other" State Documentation |
|---|---|---|---|---|

## Certification and Cover Memo

A certification of the request signed by an authorized representative of the Part D plan sponsor must be submitted to CMS and is available in the Certification worksheet that is included in the "Plan Requests for LIS Change" workbook attached. The required certification is shown below.

"I have read the contents of the LIS Status Correction Request dated (indicate month, day and year) for the above-stated Part D plan contract number and attest that the information contained herein, based on best knowledge, information, and belief as of the

7

date indicated below, is true, correct, and complete, and that our organization will retain the original supporting documentation for requested changes for as long as it is required under our regulations and for as long as it may be required for subsequent Government audit. I further certify that I am an authorized representative of the business organization that is a Medicare Part D sponsor."

_____                    _____
        Plan Sponsor Signature                               Date

Once the certification is signed, the document should be scanned, saved as a pdf. file and attached to the email that must be used to transmit each Excel correction request file. The transmittal email must include the plan sponsor's contract number (H#, S#, R#).

## *Transmission Security Requirements*

To ensure the security of the beneficiary information contained in the Excel spreadsheet, the document must be encrypted using a Federal Information Processing Standards approved encryption method. Once encrypted, the file should be attached to transmittal email containing the information or a cover memo as specified above and submitted to the appropriate CMS regional office.

The plan sponsor must send the password for the encrypted file to the regional office in a separate email.

## *Regional Office*

CMS has designated an electronic mailbox in each regional office to which LIS Status Correction Requests must be sent. The RO mailbox addresses are listed below. Primary and secondary contact persons in each region are also provided, however these individuals should be contacted exclusively to address plan questions/issues that may arise relative to this process.

| CMS Region | Request Mailbox | Primary Contacts | Back-up Contacts |
|---|---|---|---|
| 1 Boston | PartDComplaints_RO1@cms.hhs.gov | Arlene DiSalvo Arlene.DiSalvo@ cms.hhs.gov 617-565-1269 | Estella Ramirez Estella.Ramirez@ cms.hhs.gov 617-565-1219 |
| 2 New York | PartDComplaints_RO2@cms.hhs.gov | Linda Sheo Linda.Sheo@ cms.hhs.gov 212-616-2349 | Debra Smith Debra.Smith@ cms.hhs.gov 212-616-2351 |
| 3 Philadelphia | PartDComplaints_RO3@cms.hhs.gov | Tammy McCloy Tammy.McCloy@ cms.hhs.gov | Margaret Moon Margaret.Moon@ cms.hhs.gov |

| CMS Region | Request Mailbox | Primary Contacts | Back-up Contacts |
|---|---|---|---|
| | | 215-861-4220 | 215-861-4754 |
| 4 Atlanta | PartDComplaints_RO4@cms.hhs.gov | Denise Stanley Denise.Stanley@ cms.hhs.gov 404-562-7366 | Pam Miller Pam.Miller@ cms.hhs.gov 404-562-7231 |
| 5 Chicago | PartDComplaints_RO5@cms.hhs.gov | Peter Bandemer Peter.Bandemer@ cms.hhs.gov 312-886-2569 | Natosha Lee Natosha .Lee@ cms.hhs.gov 312-353-1448 |
| 6 Dallas | PartDComplaints_RO6@cms.hhs.gov | Wanda Blakely Wanda.Blakely@ cms.hhs.gov 214-767-4411 | Rose Marie Thoreson RoseMarie.Thoreson@ cms.hhs.gov 214-767-6401 |
| 7 Kansas City | PartDComplaints_RO7@cms.hhs.gov | Peggy McQuitty Peggy.McQuitty@ cms.hhs.gov 816-426-6547 | Filipe Pereira Filipe.Pereira@ cms.hhs.gov 816-426-6385 |
| 8 Denver | PartDComplaints_RO8@cms.hhs.gov | Pamela Rivera Pamela.Rivera@ cms.hhs.gov 303-844-6137 | Sandra Mendez Sandra.Mendez@ cms.hhs.gov 303-844-1568 |
| 9 San Francisco | PartDComplaints_RO9@cms.hhs.gov | Jane Riney Jane.Riney@ cms.hhs.gov 415-744-3759 | John Muglia John.Muglia@ cms.hhs.gov 415-744-3593 |
| 10 Seattle | PartDComplaints_RO10@cms.hhs.gov | Brad Thuston Brad.Thuston@ cms.hhs.gov 206-615-2427 | Sandie Ihrig Sandie.Ihrig@ cms.hhs.gov 206-615-2377 |

The lead region model used for 1-800-Medicare complaint cases will be used for this process to determine the CMS RO to which plan sponsors should send the LIS status correction requests.

## CMS Reporting to Plans

Once CMS staff have completed action on the requests in the spreadsheet, CMS will complete the following three fields specified for CMS use and included in the attached Excel file format to report that the new data have been entered. A copy of the updated file will be returned to the plan sponsor's primary point of contact as reflected on the file.

9



| For CMS Only | | |
|---|---|---|
| Date Request Entered by CMS | Updated by | Comments |

### *Timing of CMS Systems Updates*

Once a correction request is processed by CMS, the new data will be stored in MBD. CMS systems will then update during the next monthly deeming process that occurs at the beginning of each month and the subsequent weekly TRR will report the updated information verifying the change has been implemented in CMS systems.

The Transaction Reply Code (TRC) 194 Deemed Copay Correction (DEEMD COPAY CORR) is the unique TRC for these manual updates indicating that CMS has added or updated a deemed co-pay period. The effective dates for the added or updated deemed co-pay period are shown in the TRR fields.

## Evidence Retention Requirements

Plan sponsors must maintain for 10 years the original documentation used to substantiate the request for manual updating of the CMS system to accommodate subsequent periodic Government audits.

An alternative to the Part D Plan Sponsor maintaining the BAE documentation would be for the sponsor to delegate this activity to trusted business partners, such as a long-term care pharmacy provider. The partners must be contractually obligated to secure BAE from the State, attest to the beneficiary's LIS status, and retain the documentation until requested by the plan to support an audit. Since the risk associated with the delegation would be on the plan sponsor, the business partner could be required to indemnify the sponsor for the incorrect cost-sharing amount if the partner was unable to produce the required documentation when requested by the sponsor.

## Impact of Subsequent State Reports on CMS Manual Updates

When subsequent reports are received from the State, CMS systems will compare the beneficiary's current LIS status information to the newly reported information. Changes

10

will be made to the beneficiary's LIS status only if the new information will be more advantageous to the beneficiary.

It is important to note that once the deeming request is processed, if a plan receives a subsequent CMS notification of new LIS status changes, this new information must be processed.

11

# Appendix – Using the SSA Award Letter to Determine Eligibility for the Full or Partial Subsidy

When a beneficiary applies and qualifies for LIS with Social Security, s/he is awarded either the full or partial subsidy based on their income and resources. SSA always provides the beneficiary with an award letter that explains if the award is for a full subsidy or a partial subsidy, a reduced deductible and reduced co-payments. If the award is for a partial subsidy, the letter explains the percentage of the subsidy award.

[All dollar figures below are 2007 amounts.]

- A full subsidy award means that the beneficiary can enroll in a plan that will pay the full premium up to the regional low-income premium benchmark amount. The beneficiary will pay no deductible and cost-sharing of covered prescriptions will be limited to $2.15/$5.35.
- A partial subsidy award letter will specify that the beneficiary is eligible for a subsidy of 25%, 50%, 75% or 100% of the regional low-income benchmark amount. The beneficiary will be responsible for a deductible of no more than $53 with cost-sharing (coinsurance) of 15% until the catastrophic limit is reached ($5,451.25). After the catastrophic limit is reached, co-pays will be $2.15/$5.35 for covered prescriptions.

Note that a beneficiary cannot be awarded a 75%, 50% or 25% premium subsidy and have no deductible.

12

PLAN REQUESTS FOR LIS CHANGE

(modified 9/18/2007 on CMS website)

Instructions:
Complete General Information About Your Organization:
Organization Name                                    Enter Organization's Legal Name
Contract ID                                          Enter CMS Assigned Contract ID, e.g. S1234 or H1234 (format as text field)
Organization Mailing Address
Primary and Second Points of Contact

The specifications for each data field are as follows:
Health Insurance Claim Number (HICN)                 Format as text field; do not insert dashes, e.g. 123456789A
Bene Last Name                                       Format as text field
Bene First Name                                      Format as text field
Bene Date of Birth                                   Format as MM/DD/CCYY, e.g. 5/6/1950
Bene Gender                                          Format as text field; Valid values are "M" or "F" for Male/Female
Bene State of Residence                              Format as text field; spell entire state name, e.g. Michigan
Start of Medicaid/Medicaid Institutional Status      Format as date field and enter the start date as MM/CCYY, e.g. 05/2007 for May, 2007
Most Recent Month of Medicaid/Medicaid Institutional Status   Format as date field and enter the most recent month as MM/CCYY, e.g. 05/2007 for May, 2007
Dual Eligible Status                                 Format as text field; valid values are "Full" or "Partial" for Full Dual/Partial Dual
Institutional Status                                 Format as text field; valid values are "Yes", "No" or "Unknown"
Type of Documentation Supporting Request             Select from pull-down list
Description of "Other" State Documentation           Format as text field

Date Request Entered by CMS                          FOR CMS COMPLETION ONLY
Updated by                                           FOR CMS COMPLETION ONLY
Comments                                             FOR CMS COMPLETION ONLY

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LONG TERM CARE PHARMACY ALLIANCE, and AMERICAN SOCIETY OF CONSULTANT PHARMACISTS, <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL O. LEAVITT, Secretary of the U.S. Department of Health and Human Services; U.S DEPARTMENT OF HEALTH AND HUMAN SERVICES; and CENTERS FOR MEDICARE AND MEDICAID SERVICES, <br><br> Defendants, | Case No. 1:07-cv-01115 (ESH) |

## DECLARATION OF ABBY BLOCK

I, Abby Block, declare the following, under penalty of perjury pursuant to 28 U.S.C. § 1746, to be a true and correct statement of facts:

1.    I am the Director of the Center for Beneficiary Choices ("CBC") within the Centers for Medicare and Medicaid Services ("CMS"). CMS is the federal agency within the United States Department of Health and Human Services ("HHS") responsible for administering the Medicare and Medicaid programs. The Medicare Enrollment and Appeals Group ("MEAG"), the Medicare Drug Benefit Group ("MDBG"), and the Medicare Plan Payment Group ("MPPG") are all part of CBC. The MEAG is responsible for all Medicare enrollment and appeals policy under fee-for-service Medicare, the Medicare Advantage program, and the prescription drug program. The MDBG is responsible for oversight and operations of all drug benefit plans offered under

both the Medicare Advantage Program and the prescription drug program. The MPPG is responsible for supporting payment policy development and implementing payment operations for the Medicare Advantage program and the prescription drug program. As the Director of CBC, I oversee all operations of MEAG, MDBG and MPPG.

2. I am familiar with the subject matter of the above-captioned lawsuit, which involves the operation of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. 108-173, 117 Stat. 2066, 42 U.S.C. § 1395w-101 et seq. (2003). The statements made in this Declaration are based on my personal knowledge and information furnished to me by CMS staff.

3. Title XVIII of the Social Security Act (the Medicare Statute), Pub. L. No. 89-97, 79 Stat 291 (1965) (codified as amended at 42 U.S.C. § 1395 et seq.), sets forth a federally funded health insurance program for the elderly and disabled, known as Medicare. Title I of the MMA amends the Medicare statute by inserting a new Part D ("Medicare Part D"), which establishes Medicare coverage of prescription drugs. See 42 U.S.C. §§ 1395w-101 et seq.

4. Prior to implementation of Medicare Part D, certain individuals who are eligible for both Medicare and Medicaid – known as full benefit dual eligibles ("Dual Eligibles") – received drug coverage from the states under the Medicaid program. Pursuant to the new Medicare drug coverage established by the MMA, however, those Dual Eligibles transitioned to Medicare Part D coverage for prescription drugs commencing on January 1, 2006. Medicare Part D coverage is offered through private prescription drug plans ("PDP sponsors") operating in various regions of the country.

5. Under the MMA, full benefit dual eligibles who are inpatients in a medical institution or nursing facility for which payment is made under Medicaid throughout a month

("institutionalized dual eligibles") are entitled to the "elimination of any beneficiary coinsurance" that would otherwise be imposed when they fill prescriptions at a pharmacy. 42 U.S.C. § 1395w-114(a)(1)(D)(i).

6. CMS must notify PDP sponsors that individuals in their plans are eligible for subsidies, and the amount of the subsidy, including for individuals who qualify as institutionalized dual eligibles. 42 U.S.C. § 1395 w-114(c)(1)(A). CMS, in turn, relies on the States for information about which beneficiaries are full benefit dual eligibles and which of the dual eligibles are institutionalized. Once CMS notifies PDP sponsors that beneficiaries, such as institutionalized dual eligibles, are eligible for subsidies, the PDP sponsors must then "reduce[]the premiums or cost-sharing otherwise imposed by the amount of the applicable subsidy and submit[]to [CMS] information on the amount of each reduction." Id. § 1395w-114(c)(1)(B). CMS then periodically reimburses the PDP Sponsor for the subsidies. Id. §1395w-114(c)(1)(C).

7. CMS has adopted a payment method whereby it makes interim payments to PDP sponsors during the year "based on the low-income cost-sharing assumptions" that have been made during the initial bidding and negotiation process between CMS and PDP sponsors. 42 C.F.R. § 423.335(d)(2)(i). PDP sponsors track their actual cost-sharing expenses and CMS ultimately makes retroactive adjustments and reconciles the amount it has paid PDP sponsors for cost-sharing through interim payments and the costs PDP sponsors claim that they have actually incurred. Id. § 423.343(d). If the final balance so requires, CMS makes final payment for subsidies, including subsidies for institutionalized dual eligibles, after a coverage year.

8. PDP sponsors enter into contracts with long-term care ("LTC") pharmacies, pursuant to which a pharmacy dispenses prescription medications to beneficiaries enrolled in the PDP

sponsor's plan. CMS regulations require that the PDP sponsors offer LTC pharmacies "standard contracting terms and conditions" in order to ensure convenient access to LTC pharmacies to Medicare beneficiaries. 42 C.F.R. § 423.120(a)(5). CMS also requires that contracts between Plan sponsors and pharmacies contain certain provisions aimed at protecting beneficiaries and ensuring that the pharmacies comply with federal law. Id. 423.505(i)(4).

9. CMS does not regulate the terms of payment between PDP sponsors and LTC pharmacies. Specifically, CMS does not regulate whether and under what circumstances PDP sponsors should pay LTC pharmacies cost-sharing amounts for institutionalized dual eligibles. CMS has encouraged the PDP sponsors to work with the LTC pharmacies to resolve between themselves issues regarding payment of cost-sharing amounts for institutionalized dual eligibles. But the agency has not imposed requirements on the PDP sponsors in this regard, nor created any enforcement mechanism for LTC pharmacies to pursue reimbursement of cost-sharing amounts from the PDP sponsors. The terms under which LTC pharmacies are paid cost-sharing amounts for institutionalized dual eligibles by PDPs are dictated purely by the agreements between the two types of entities, and are not affected by any CMS policy.

10. As noted above, CMS makes interim payments to PDP sponsors before obtaining final information about beneficiaries' subsidy eligibility. CMS is unaware of any obstacle that would prevent PDP Sponsors and LTC pharmacies from agreeing between themselves that the PDP sponsors could similarly make interim payments to the LTC pharmacies, or make any other

arrangement regarding payment of cost-sharing amounts that they might wish, regardless

of the timing of CMS's provision of eligibility information to the sponsors.

Executed on October $\cancel{K}$ , 2007
Washington, D.C.

ABBY BLOCK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **LONG TERM CARE PHARMACY ALLIANCE et al.,** | ) ) ) ) |
| **Plaintiffs,** | ) ) |
| **v.** | ) ) |
| **MICHAEL O. LEAVITT et al.,** | ) ) ) |
| **Defendants.** | ) ) ) |

**Case No. 1:07-cv-01115 (ESH)**

## DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Rules 33 of the Federal Rules of Civil Procedure, Defendant hereby responds as follows to Plaintiffs' first set of interrogatories.

### GENERAL OBJECTIONS

All responses are made subject to the following general objections, regardless of whether a specific objection also is made to a particular interrogatory:

1.     Defendants will respond to Plaintiffs' interrogatories subject to, without waiving, and expressly preserving (a) any objections as to competency, relevancy, materiality, confidentiality, privilege and admissibility of any of the responses provided and (b) the right to object to other discovery requests involving or relating to the subject matter of the interrogatories.

2.     Defendants object to the interrogatories to the extent they seek information

- 1 -

3.      Monthly Full Enrollment File – This file is issued on or about the fourth Wednesday of the month and provides the current status of every active plan member, including the current LIS subsidy level, LIS co-pay category and LIS effective start date.

4.      LIS History Report. This report is a comprehensive picture of the LIS history of each member of a plan.  It has been issued monthly since April 2007.

In addition to the above reports that CMS transmits to plans, plans may query CMS' systems for LIS status via the Beneficiary Eligibility Query (BEQ) or the Common User Interface.  The BEQ is a vehicle for Part D sponsors to submit batch inquiries for determining beneficiary eligibility prior to submitting a Part D enrollment transaction.  The Common User Interface allows Part D sponsors to view enrollment, payment, premium and beneficiary information.

**INTERROGATORY NO. 5:**  Describe CMS's understanding of how PDP sponsors use the information provided by CMS about a beneficiary's subsidy-eligible status.

**OBJECTIONS:**  Defendants object to this interrogatory to the extent it calls for CMS to speculate regarding matters about which it has no direct knowledge.  Defendants will provide their understanding of how CMS regulations and guidance advise Part D sponsors to use LIS eligibility information.  Defendants further object to this interrogatory to the extent that the phrase "information provided by CMS" implies that Part D sponsors rely entirely on CMS to provide information about a beneficiary's subsidy-eligible status.  Defendants have addressed the process by which Part D sponsors may obtain information about subsidy-eligible status from beneficiaries themselves, most often through pharmacies, and may submit this information to

- 8 -

CMS for the purpose of correcting CMS records, in their response to Interrogatory No. 6.

**RESPONSE:** Subject to and without waiving the general and specific objections, defendants respond to this interrogatory as follows:

CMS provides Part D sponsors with response files as described in the Response to Interrogatory No. 4. Part D sponsors use the information in these files concerning a beneficiary's subsidy-eligible status to:

1.      **Set a member's cost-sharing and premium levels**. CMS presumes that, as a practical matter, Part D sponsors will use the response files to set their members' default low-income cost-sharing (LICS) and premium subsidy levels in their own payment systems, with an effective date based on the effective dates provided in these reports.

2.      **Communicate LIS status to beneficiaries.** Part D sponsors send LIS-eligible members information regarding their LIS status. Specifically:

a) The LIS Rider. CMS requires Part D sponsors to provide their member beneficiaries with an explanation of coverage (EOC) which should contain information regarding the beneficiary's plan benefit package, including cost sharing parameters. CMS requires that Part D sponsors develop a rider to the EOC to address the specific cost-sharing structure the beneficiary will be subject to under the plan benefit package. The LIS Rider provides LIS beneficiaries with information regarding their specific maximum premium and cost-sharing obligations. It is sent at least once a year, as well as whenever a change in subsidy eligibility changes the member's premium or cost-sharing liability within 30 days of receiving systems' notification from CMS.

b) A member notification to the member upon receiving notification that a

- 9 -

member's LIS has been terminated.

    **3.**    **Reconcile prior claims.**  When a Part D sponsor determines, based on

information provided by CMS or otherwise obtained, for example by applying the best available

evidence policy described in Defendants' response to Interrogatory No. 6, that a LIS-eligible

enrollee was assessed a higher level of cost-sharing than he or she qualified for, CMS requires

the Part D sponsor to make the enrollee whole by refunding any improperly collected cost-

sharing.  The Part D sponsor offering the Part D plan must reimburse all low-income subsidy

eligible individuals, as well as organizations paying cost-sharing or premiums on behalf of such

individuals, if the beneficiary is found eligible for the LIS, or if the beneficiary is

institutionalized and subject to a lower cost sharing than was assessed.  (See July 10, 2006 Q and

A "LIS Incorrect Cost-Sharing -- Making the Beneficiary Whole.)  The basis for ensuring that

LIS beneficiaries are charged the correct cost sharing is 42 CFR 423.782 and 423.800, which

require the sponsor to reduce cost sharing when individuals are entitled to LIS.  We also require

that sponsors reconcile with other payers under our coordination of benefit requirements at 42

CFR 423.464 and the COB guidelines. (See Medicare Prescription Drug Benefit Manual, Chapter

14 – Coordination of Benefits.)  CMS regulations do not require that Part D sponsors reimburse

network pharmacies for cost-sharing amounts that the pharmacies did not collect from LIS-

eligible enrollees.  However, CMS has encouraged Part D sponsors to work with their network

pharmacies to provide them with direct reimbursement for any cost-sharing amounts not

collected from LIS-eligible enrollees.  (See CMS Memorandum titled Reconciling Incorrect Cost

Sharing Paid by Long-term Care Pharmacies, dated December 22, 2006.)

minimum of 30 and a maximum of 60 days, as it is likely that a significant portion of those who

qualify under BAE policy in one month will be deemed for LIS via the normal process within the

next several weeks.

**INTERROGATORY NO. 7:** Describe the consequences PDP sponsors face if they reimburse
LTC pharmacies for co-payment amounts where the CMS system does not reflect the Medicare
beneficiary as an institutionalized dual eligible beneficiary.

    **OBJECTIONS:** Defendants object to this interrogatory on the basis that the phrase

"consequences PDP sponsors face" is ambiguous and overly broad. Defendants interpret this

question as asking whether Part D sponsors will be denied payments by CMS if they reimburse

LTC pharmacies for copayment amounts where the CMS system does not reflect the Medicare

beneficiary as an institutionalized dual eligible beneficiary. This interrogatory also does not

specify a particular time period. The time period is relevant to defendants' answer insofar as

CMS's payment process is not a real-time system but is divided into two stages – during the

coverage year, when CMS payments to Part D sponsors are based on estimates; and after the

coverage year, when CMS reconciles its payments during the year with actual cost data. The

time period is also relevant insofar as CMS has modified its process over time. As of this date,

the final reconciliation process has occurred with respect to 2006 but not with respect to 2007.

Defendants will address these different time periods below. Defendants assume, for purposes of

this interrogatory, that Part D sponsors and LTC pharmacies are behaving reasonably and are not

attempting to defraud each other or CMS. Defendants therefore will not address hypothetical

consequences of fraudulent actions.

    **RESPONSE:** Subject to and without waiving the general and specific objections,

defendants respond to this interrogatory as follows:

A Part D sponsor will not face sanctions of any kind from CMS regardless of the amount of its payments to LTC pharmacies. CMS does not impose any requirements on Part D sponsors in regard to their payments to LTC pharmacies. CMS expects that the terms of payment between Part D sponsors and LTC pharmacies will be determined by contract. CMS does not consider a Part D sponsor to have violated any Medicare Part D requirement if the sponsor chooses to reimburse an LTC pharmacy for costs that the pharmacy claims as subsidy-related expenses where CMS' system does not reflect that a beneficiary is subsidy-eligible.

**Consequences during the coverage year:** A Part D sponsor will not face any adverse consequences from CMS, in terms of the amounts of the payments it receives from CMS, during a coverage year based on any payment decision that it makes during that year, including a decision to reimburse an LTC pharmacy for a copayment amount where CMS' systems do not show the beneficiary as eligible for a subsidy. The basis of the CMS to PDP payment process is found in Subpart G of the regulations codifying the statutory requirements of the Medicare Prescription Drug program. Generally, CMS provides monthly prospective payments to Part D sponsors (or "plans") based upon each Part D sponsor's standardized bid, which was submitted to CMS before the start of the coverage year. A Part D sponsor's bid includes assumptions about the numbers of its members who it expects will be eligible for low-income subsidies. CMS provides monthly payments to cover a Part D sponsor's prospective low-income cost-sharing estimated expenses based on the current data in CMS' systems at the beginning of that month. CMS calculates an amount per low-income subsidy-eligible member per month that represents an estimate of the total subsidy that a plan's members will be eligible for, on average, during the

- 16 -

month. The amount is adjusted to reflect retroactive recalculations of a previous month's payment where the current data shows that a plan enrollee's subsidy eligible status has been updated for the previous month. The total low-income cost-sharing amount is factored into the total prospective monthly payments that CMS makes to Part D sponsors. These monthly payments do not take into account any payments that Part D sponsors have actually made to pharmacies, nor are the payments intended to cover any specific beneficiary's costs during a month or year. The amounts are a flat per low-income member per month rate that is based on bid estimates rather than actual utilization and intended in aggregate to pay for the plan's entire low-income population.

**Consequences after the coverage year:** Following the end of the coverage year, CMS reconciles the monthly prospective year disbursements to Part D sponsors with updated enrollment and health status data based on the actual costs Part D sponsors have incurred, including low-income subsidy costs. The final reconciliation is conditional upon Part D sponsors' provision of information to CMS (see 42 CFR 423.322). The primary mechanism through which Part D sponsors provide payment data to CMS is the prescription drug event ("PDE"). Each PDE reflects a specific prescription drug transaction for a particular beneficiary on a particular date of service. The PDE notifies CMS of the cost that the Part D sponsor has incurred with respect to the particular prescription drug transaction, and separately identifies costs incurred due to low-income cost-sharing subsidies. Part D sponsors submit PDEs on an ongoing basis throughout the coverage year. Specific details on the methods by which Part D sponsors submit the PDE reports and the payment mechanisms are outlined in Subpart G of 42 C.F.R. Part IV and in the PDE Instructions and Participant Training Guide. (See PDE guidance;

- 17 -

see also

http://www.csscoperations.com/new/pdic/pdd-training/pdd-training.html .)  After Part D

sponsors submit a PDE to CMS, they receive a response one or two days later indicating whether

the PDE has been approved or rejected by CMS' systems. CMS' systems generally have in place

an edit that rejects a PDE if the PDE claims an incurred cost based on a low-income cost-sharing

subsidy where CMS' systems do not indicate the beneficiary is subsidy-eligible.  If a PDE has

been rejected, the basis for that rejection is indicated by code.  Code 715 indicates a rejection

based on a discrepancy between the subsidy-eligible status of the beneficiary in CMS' systems

and whether or not the Part D sponsor incurred a subsidy-based cost.  Thus, a response indicating

rejection based on Code 715 places the Part D sponsor on notice of such a discrepancy.  Part D

sponsors may resubmit PDEs for the same drug event at any time until five months following the

end of a coverage year.  (In 2006, this deadline was extended by two months so that Part D

sponsors had until July 31, 2007, to submit PDEs.) Following that time, using the PDE data

submitted by the Part D sponsors and accepted by CMS' systems, CMS makes final

reconciliation of payments for low-income cost-sharing subsidies.  Under CMS regulations, if the

reconciliation process shows that either CMS or a Part D sponsor owes the other a balance, the

balance may be paid either through a lump-sum payment or by adjusting monthly prospective

payments during the remainder of the payment year following the coverage year for which the

reconciliation occurred. In 2006, at the end of the reconciliation process, the balance of any credit

that CMS owed to a Part D sponsor was paid in the payment month following the completion of

reconciliation. The balance of any credit that a Part D sponsor owed to CMS was offset against

the monthly payment that CMS provided to the Part D sponsor in the month following the

completion of reconciliation, and if necessary in future months.

In December 2006, CMS notified Part D sponsors that it was adopting an amnesty for the 2006 coverage year and would put in place a process whereby PDEs for the coverage year 2006 would not be rejected where Part D sponsors indicated they had incurred a subsidy-related cost but CMS' systems did not reflect subsidy eligibility. On January 5, 2007, CMS turned off the edit in CMS' systems that caused automatic rejection of PDEs based on subsidy eligibility discrepancies. CMS then notified Part D sponsors to resubmit any PDEs that had been rejected based on code 715. These PDEs would be approved where Part D sponsors had incurred subsidy costs based on their belief that a beneficiary was eligible for a subsidy, even where CMS' systems did not reflect a subsidy-eligible status.

Therefore, as long as Part D sponsors resubmitted the appropriate PDEs for the coverage year 2006, Part D sponsors did not incur any unreimbursed costs as a result of treating a plan member as eligible for LIS cost-sharing where CMS' systems did not indicate the member's eligibility.

On December 6, 2006, CMS issued a memorandum providing Part D sponsors with guidance on how to transition from the amnesty policy in effect for coverage year 2006 to new policies that would be applied in the 2007 reconciliation process. For those members who were not verified as LIS-eligible in CMS' systems but who had received LIS cost-sharing in 2006, CMS required Part D sponsors to determine whether these members qualify as LIS-eligible under CMS's BAE policy. If so, Part D sponsors were instructed to submit Corrections Requests to CMS to change their status in CMS' systems. If not, Part D sponsors were instructed to change the member's LIS status to match that indicated in CMS' systems. The December 6, 2006 memo proposed a list of evidence that CMS would consider sufficient for purposes of a Part D

- 19 -

sponsor's submission of a Corrections Request to CMS, and invited comments on this list. Later guidance has confirmed to Part D sponsors that during the 2007 coverage year, they must accept best available evidence of a member's LIS eligibility. If they receive sufficient evidence of a member's LIS status, they must apply that cost-sharing level to that plan member immediately, without waiting for CMS' systems to be updated through a Corrections Request.

For purposes of coverage year 2007 and forward, therefore, CMS does not anticipate that Part D sponsors will face adverse consequences during the final reconciliation, in terms of CMS payments, where Part D sponsors have accepted best available evidence of LIS eligibility. Where CMS' systems do not show that a member is eligible at any given time, Part D sponsors may avoid any adverse consequences during the final reconciliation by applying the BAE policy and submitting Corrections Requests to CMS when appropriate. If the Corrections Request is approved and CMS updates its system, the Part D sponsor may then submit or, if necessary, resubmit the appropriate PDE.

Where Corrections Requests are not approved, Part D sponsors may resubmit data or appeal the denial. CMS records may also update as a result of new information provided by states. As long as CMS' systems are updated when final reconciliation occurs, at least six months after the end of the coverage year, any discrepancy between PDP records and CMS records will not affect the final reconciliation. Corrections may continue to be made after final reconciliation has occurred. If necessary, the reconciliation process may be reopened. Where Part D sponsors fail to submit the necessary evidence to justify a Correction, CMS will not be able to verify that the member is LIS-eligible. During the final reconciliation, Part D sponsors will not be credited with cost-sharing amounts for those members.

- 20 -