# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LONG TERM CARE PHARMACY ALLIANCE, and AMERICAN SOCIETY OF CONSULTANT PHARMACISTS, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 1:07-cv-01115 (ESH) |
| MICHAEL O. LEAVITT, Secretary of the U.S. Department of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and CENTERS FOR MEDICARE AND MEDICAID SERVICES, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' SUPPLEMENTAL REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

SUPPLEMENTAL STATEMENT OF FACTS ................................................................... 5

    1.    Operation Of The Process By Which CMS Receives Subsidy Eligibility
        Data From States And Transfers This Information To PDP Sponsors .................... 6

    2.    Supplemental Measures To Ensure Eligible Beneficiaries Receive Subsidies ......... 8

    3.    Best Available Evidence Policy, As Implemented In 2006 And 2007 ................... 9

    4.    Payment Reconciliation Between CMS And PDP Sponsors ................................. 11

    5.    Summary ............................................................................................................. 12

ARGUMENT ...................................................................................................................... 13

    I.    PLAINTIFFS HAVE FAILED TO ESTABLISH THAT THE TIMING
        OF SUBSIDY ELIGIBILITY NOTIFICATIONS HAS PLAYED A
        SUBSTANTIAL ROLE IN PDP SPONSORS' ALLEGED REFUSAL
        TO REIMBURSE LTC PHARMACIES FOR COPAYMENT AMOUNTS ........ 13

        A.    PDP Sponsors' Obligations, If Any, To Provide Copayment
            Reimbursements To LTC Pharmacies Depend Entirely On The
            Terms Of Their Contracts .......................................................................... 16

        B.    Far From An Admission, CMS' BAE Policy Compensates For The
            Brief But Inevitable Lag Time Inherent In The Notification Process
            By Allowing Beneficiaries To Receive The Benefit Of Their
            Subsidies Immediately .............................................................................. 21

    II.    PLAINTIFFS' MEMBERS' ALLEGED INJURIES ARE NOT
        REDRESSABLE BY A COURT ORDER COMPELLING CMS TO
        ALTER ITS NOTIFICATION PROCESS OR IMPOSING A DEADLINE
        BY WHICH CMS MUST PROVIDE PERFECTLY ACCURATE
        NOTIFICATIONS ...................................................................................... 24

CONCLUSION ................................................................................................................... 25

## TABLE OF AUTHORITIES

PAGE(S)

**CASES**

Auer v. Robbins, 519 U.S. 452 (1997) .........................................................14

Block v. Meese, 793 F.2d 1303 (D.C. Cir. 1986) ...........................................20

Cmty. for Creative Non-Violence v. Pierce, 814 F.2d 663 (D.C. Cir. 1987) .................................16

Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658 (D.C. Cir. 1996) .......................................15

Friends of the Earth v. U.S. Dep't of Interior, 478 F. Supp. 2d 11 (D.D.C. 2007) ........................15

Heckler v. Day, 467 U.S. 104 (1984) .............................................................13

*Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ...................................16

*Nat'l Wrestling Coaches v. Dep't of Educ., 366 F.3d 930 (D.C. Cir. 2004) .............................16, 20

*Norton v. SUWA, 542 U.S. 55 (2004) ...........................................................25

Tozzi v. U.S. Dep't of Health & Human Servs., 271 F.3d 301 (D.C. Cir. 2001) ..........................20

**STATUTES**

5 U.S.C. § 706(1) .................................................................................13, 25

5 U.S.C. § 706(2) .....................................................................................25

**REGULATIONS**

42 C.F.R. § 423.782 .................................................................................8, 9

42 C.F.R. § 423.800 .................................................................2, 8, 12, 14, 17

CMS, Medicare Prescription Drug Benefit Final Rule,
    70 Fed. Reg. 4194, 4389 (Jan. 28, 2005) .............................................14

**MISCELLANEOUS**

LTCPA v. UHG, Tr. of Hr'g (Mar. 22, 2007) .......................................................17, 18

LTCPA v. UHG, No. 06-1221, Tr. of Hr'g (D.D.C. Mar. 29, 2007) ..................................17

LTCPA v. UHG, Amended Compl. ...........................................................................17

**ADMINISTRATIVE MATERIALS**

CMS, Memo: Incorrect Cost Sharing Charges to Dual Eligible Beneficiaries
(May 5, 2006) (attached here as Exhibit D) ...........................................9, 10, 20

CMS, Q&A (May 25, 2006) (attached here as Exhibit E) ...........................................10

CMS, HPMS Release Q&A (July 7, 2006) (attached here as Exhibit C) .................................8, 21

CMS, Memo: Implementing our Best Available Data Policy for Low-Income Subsidy (LIS)
Status (Oct. 30, 2006) (attached here as Exhibit F) ...........................................10

CMS, Memo: Reconciling CMS Low Income Subsidy (LIS) Status and "Best Available
Data" Policy for 2006 and 2007 (Dec. 6, 2006) (attached here as Exhibit G) .............10, 11

CMS, Memo: Reconciliation Readiness Reviews (Feb. 27, 2007) (attached here as
Exhibit H) ................................................................................10-11, 23

CMS, Part D Plan Sponsor Guidance – LIS Corrections Based on Best Available Evidence
(Jun. 27, 2007) ("BAE Guidance") (attached to Defs.' Reply (dkt. # 19)
as Exhibit A) ...........................................................................11, 20, 22

CMS, Prescription Drug Benefit Manual, Ch. 5: Benefits and Beneficiary Protections,
§§ 50.5.2, 50.5.3 (attached here as Exhibit I) .................................................14-15

**Note on where to find other references:**

Declaration of Abby Block - dkt. # 13, Exhibit A

Transcript, Deposition of Abby Block - dkt. # 20, Exhibit A, Parts 1 & 2
Errata - attached here as Exhibit B

Defendants' Responses to Plaintiffs' First Set of Interrogatories - attached here as Exhibit A

## <u>INTRODUCTION</u>

Plaintiffs have failed to show that the causation and redressability prongs of the Article III standing requirement are satisfied in this case, and the jurisdictional discovery authorized by this Court has yielded no basis for holding otherwise.  As the agency charged with administering Medicare Part D, including its subsidy program, the Centers for Medicare and Medicaid Services ("CMS") has established a process through which information regarding the eligibility of Part D beneficiaries for copayment subsidies is transferred from states to CMS and on to the private entities who sponsor Part D prescription drug plans ("Part D sponsors" or "PDP sponsors").  Plaintiffs allege in this case that CMS has a duty to provide a process that not only notifies PDP sponsors of their members' subsidy eligibility status, but does so in a "timely" manner, and that CMS has unlawfully withheld or unreasonably delayed fulfillment of this duty because the notifications have not been sufficiently timely.  <u>See</u> Defs.' Reply at 8.[1]  In order to conclude that causation and redressability are satisfied, therefore, the Court must determine that there is some link between the timing of these notifications, on the one hand, and plaintiffs' alleged injury – the alleged failure of their member long-term care ("LTC") pharmacies to obtain copayment reimbursements from the Part D sponsors with whom they contract – on the other.

To the extent plaintiffs try to construct a chain of causation, their efforts rely on two unwarranted premises – first, that no one could reasonably expect PDP sponsors to reimburse LTC pharmacies for copayment amounts until the PDP sponsors are absolutely certain that they

---

[1] Pursuant to the Court's Order of November 1, 2007, defendants submitted a reply brief on non-causation and redressability issues ("Defs.' Reply") on December 5, 2007 [dkt. # 19]. This supplemental brief constitutes defendants' reply, following jurisdictional discovery, on causation and redressability issues.  <u>See</u> Order at 3.

will in turn be reimbursed for these amounts by CMS; and second, that the only way PDP sponsors can be certain of receiving reimbursements from CMS is if CMS systems have already been updated to reflect a beneficiary's subsidy-eligible status.  This rather simplistic reasoning ignores how things actually work in the real world, where contractual relationships, such as those between CMS and PDP sponsors and between PDP sponsors and LTC pharmacies,  solidify whatever guarantees exist, and otherwise assign risk between the contracting parties.

The processes that CMS has designed for notifying PDP sponsors concerning beneficiaries' subsidy eligibility, and for reimbursing PDP sponsors for actual subsidy costs incurred, are necessarily removed from the real-time point-of-sale transaction between a pharmacy and a Part D beneficiary.  As a practical matter, neither the transmission of information, which depends on state participation, nor the reconciliation of payments, which must account for retroactive adjustments, is, or can be, instantaneous.  Nor must they be, because PDP sponsors are obligated to follow CMS requirements that aim to protect beneficiaries by, among other things, ensuring that subsidy-eligible beneficiaries get the benefit of their subsidies.

The details of the notification process, involving CMS' reliance on state-provided data, suggest that a PDP sponsor may, in some cases, be notified of a beneficiary's eligible status several weeks after a state determines that status.  However, CMS has taken into account this inherent lag time by requiring PDP sponsors to reimburse subsidy-eligible beneficiaries for any excess copayments that the beneficiaries have made.  42 C.F.R. § 423.800(c).  CMS has also taken it into account by establishing a payment system by which PDP sponsors receive prospective payments from CMS throughout the year, followed by a final reconciliation that takes into account actual expenses the sponsors have incurred.  When the Part D program first

began in early 2006, CMS took additional measures to ease the transition of six million beneficiaries into the new Part D program, such as requiring PDP sponsors to provide beneficiaries with default subsidies where there was some indication – from sources other than CMS – that a beneficiary was eligible.  In 2006, this policy resulted in CMS' reimbursement of claims by PDP sponsors without any documentation that every beneficiary given a subsidy was actually eligible; in other words, PDP sponsors were reimbursed for subsidies without regard to the eligibility information contained in CMS systems.  In 2007, CMS continues to provide a means for beneficiaries to get the immediate benefit of their subsidies, but the policy has been changed to require documentation and, if necessary, to allow PDP sponsors, based on this documentation, to initiate changes to eligibility information in CMS systems.

In light of all this, there is no indication that the inherent lag time, which ranges from one to seven weeks, has played a substantial part in the alleged refusal of PDP sponsors – still, as of mid-December 2007 – to pay LTC pharmacies the copayment amounts that they claim are due in connection with 2006 transactions.  To the contrary, the processes that CMS has already put in place leave LTC pharmacies free to negotiate terms of payment through their contracts with PDP sponsors.  Disputes over these contractual terms are the likely cause of any outstanding issues regarding retroactive adjustments in payments.[2]

Plaintiffs have muddied the analysis considerably by failing to provide information that

---

[2]As discussed in defendants' reply brief, plaintiffs have failed to allege an injury-in-fact that is more than hypothetical because the only legally protected interest plaintiffs' members could have in reimbursement of copayments they fail to collect from Part D beneficiaries must derive from the terms of their contracts, and they fail to claim that these contracts have been breached.  See Defs.' Reply at 17-19.  If in fact the PDP-LTC contracts do not cover the timing and method by which LTC pharmacies can receive copayment reimbursements, the issue remains one for future negotiation between PDP sponsors and LTC pharmacies.

certainly must be within their possession or ability to obtain but that, for some reason, they have

chosen not to submit for the Court's consideration.  Most tellingly, plaintiffs have failed to

submit any examples of PDP-LTC contracts.  Under plaintiffs' theory, PDP sponsors' payments

to LTC pharmacies for prescription medications dispensed to LTC facility residents – and their

final decisions on whether to withhold a copayment amount from the total payment or to include

the copayment amount in the total – are necessarily affected by the subsidy eligibility information

in CMS and PDP systems at an unspecified point in time.[3]  Yet plaintiffs ask this Court to accept

this conclusion without knowing what the PDP-LTC contractual terms of payment actually are.

As previously explained, CMS imposes no obligations on the terms of payment between

PDP sponsors and LTC pharmacies, and their freedom to contract encompasses the freedom to

negotiate the terms under which PDP sponsors will reimburse copayment amounts that LTC

pharmacies do not collect from the PDP's members.  Indeed, CMS has specifically explained that

its regulations neither require nor restrict PDP sponsors' subsidy reimbursement payments to

LTC pharmacies.  Moreover, the notification and payment processes that CMS has established

between itself and PDP sponsors place no impediment on the practical ability of PDP sponsors to

reimburse LTC pharmacies according to whatever contractual provisions they have negotiated.

Rather than attempting to refute this fact, plaintiffs expend most of their efforts trying to

persuade the Court that various acts and statements by CMS amount to an "admission of

causation" in some vague sense.  Yet plaintiffs fail to establish that an inaccuracy in CMS

systems at any particular point in time regarding the subsidy eligibility status of a Part D

---

[3]Plaintiffs fail to indicate by when, under their theory, a PDP sponsor would require
accurate subsidy eligibility information in order to avoid plaintiffs' alleged injury.

beneficiary plays a substantial role in a PDP sponsor's ongoing refusal to reimburse an LTC pharmacy for subsidy amounts that the pharmacy did not charge subsidy-eligible beneficiaries. To the contrary, prior proceedings in this Court suggest that PDP sponsors have refused to provide such reimbursements because of a dispute between sponsors and LTC pharmacies over the contractual requirements for claiming the reimbursements. In the end, such contractual terms of payment determine whether, and when, LTC pharmacies receive copayment reimbursements. The timing of CMS notifications is not a substantial factor in that determination.

For similar reasons, plaintiffs have failed to establish that this Court can redress their members' alleged injuries by compelling CMS to make systemic changes in the notification process. Plaintiffs essentially demand that the Court somehow determine the appropriate timing for subsidy eligibility notifications – ignoring or rejecting the various mechanisms through which CMS currently compensates for notification lag time. Plaintiffs would then have the Court require CMS to guarantee that notifications will occur within that time – in such a way that LTC pharmacies never bear the burden of fronting subsidies to beneficiaries or of gathering documentation to establish eligibility status. In attempting to save these private businesses from such burdens, CMS would be compelled to divert resources from its programmatic priorities. Yet, LTC pharmacies would still have to comply with any reimbursement requirements set forth in their contracts with PDP sponsors, and neither CMS nor the Court can alter those requirements, or exercise full control over data that must come from states. There is no realistic possibility that any compelled action by CMS could redress the injuries alleged.

## SUPPLEMENTAL STATEMENT OF FACTS

Defendants have previously set forth in detail the relevant statutory and regulatory

requirements that govern the provision of cost-sharing subsidies to those Medicare Part D beneficiaries who are eligible for such subsidies ("dual eligible" or "subsidy-eligible" beneficiaries). See Memorandum in Support of Defendants' Motion to Dismiss ("Defs.' Op. Br.") [dkt. # 11], at 4-8; Block Decl. ¶¶ 3-9.[4]  As previously noted, the statutory and regulatory framework is intended to ensure that subsidy-eligible beneficiaries receive the benefit of their subsidies.  The framework leaves open the terms of payment between PDP sponsors – the private entities that contract directly with CMS to administer Part D plans – and pharmacies, including LTC pharmacies, who contract with PDP sponsors to dispense prescription drugs to beneficiaries enrolled in the plans of those PDP sponsors.  In other words, no statute or regulation imposes requirements on the timing, or the conditions under which, PDP sponsors will reimburse LTC pharmacies for copayments that pharmacies do not collect from plan members.

During the jurisdictional discovery allowed by this Court, defendants produced documents, interrogatory responses, and a 30(b)(6) deposition witness that provide supplemental information regarding how the Part D subsidy program has operated in practice during the first eighteen months of the program's existence, and how CMS made various adjustments during that time, again with the aim of ensuring that subsidy-eligible beneficiaries receive the subsidies to which they are entitled.  The relevant details of this additional information are set forth below.

**1.    Operation Of The Process By Which CMS Receives Subsidy Eligibility Data From States And Transfers This Information To PDP Sponsors**

In general, CMS originally relied, and continues to rely, for the most part, on information from states identifying individuals as institutionalized dual eligibles.  States submit this

---

[4]The Declaration of Abby Block ("Block Decl.") was attached as Exhibit A to defendants' memorandum opposing jurisdictional discovery [dkt. # 13].

- 6 -

information to CMS once a month, via electronic files that contain "all current information that the states have" about individuals who qualify as dual eligible. Interrog. #2, at 4.[5] CMS then verifies that the identified individuals are Medicare eligible by checking against its own database, and if the individuals are Medicare eligible, it then "deems" those individuals eligible for cost-sharing subsidies, and its database sets the subsidy level according to the information provided by the state. Id. at 5. This part of the process occurs during the last two weeks of every month. The various reports that CMS sends to PDP sponsors on a weekly, biweekly, and monthly basis concerning the status of their plan members incorporates the data obtained from states during the previous month. Interrog. #4, at 7-8; Block Dep. 66:5-68:7.[6] The first such report would be sent the first Saturday of the next month. Interrog #4, at 7. The lag time inherent in this process is therefore between one and seven weeks.[7] These reports indicate beneficiaries' premium and copayment levels, as calculated by CMS based on beneficiaries' institutionalized or other subsidy-eligible status. Block Dep. 68:8-18. Setting an individual's copayment level at zero indicates that that individual meets the MMA's definition of institutionalized and is eligible for a

---

[5]Defendants' Responses to Plaintiffs' First Set of Interrogatories ("Interrogs. #1-7") are attached to this brief as Exhibit A. Further attachments may be indicated using parentheticals (ex. __). Attached documents that were produced during jurisdictional discovery are referenced herein by Bates numbered pages.

[6]Plaintiffs have attached the transcript of the deposition of Abby Block as Exhibit A, Parts 1 and 2, to their supplemental opposition brief ("Pls.' Supp. Opp.") [dkt. # 20]. Defendants have provided the deponent's errata sheet as Exhibit B to this brief.

[7]In other words, if a state submits its file at the end of the month, the new data will be incorporated as soon as a week later in the report sent to PDP sponsors the first Saturday of the following month. If a state submits its file on the 15th of the month, and a beneficiary becomes eligible for a subsidy on the 16th, the state would not submit data indicating that beneficiary's subsidy-eligible status until the following month. CMS would then pass this information to the applicable PDP sponsor by the first Saturday of the month after that.

full copayment subsidy.  42 C.F.R. § 423.782(a)(2)(ii); Block Dep. 88:10-17.

CMS anticipates that PDP sponsors will use the information sent by CMS in these reports to set or update their plan members' default subsidy levels in their own systems.  Interrog. #5, at 9.  Where the information provides a retroactive correction to a plan member's subsidy level, PDP sponsors must reimburse the plan member or any organization acting on the member's behalf for any copayment amounts that were paid based on the prior, incorrect information.  42 C.F.R. § 423.800(c).  CMS has clarified that this obligation applies only where the plan member or organization has actually paid copayments; in other words, there is no obligation to reimburse a plan member where an LTC pharmacy did not collect copayments from the plan member.  CMS, HPMS Release Q&A (July 7, 2006), at L000171 (ex. C); Block Dep. 149:12-15.

2.    **Supplemental Measures To Ensure Eligible Beneficiaries Receive Subsidies**

In early 2006, soon after the Medicare Part D program went into effect, CMS began to implement additional measures, beyond the reimbursement requirement, to further address lag time issues as well as issues associated with the transfer of six million beneficiaries into the new program.  Block Dep. 91:13-93:10.  These measures are not intended to supplant the process by which CMS obtains eligibility information from states and passes that information to PDP sponsors, but they serve as an additional means of ensuring that eligible beneficiaries receive the benefit of their subsidies as soon as possible.

Initially, CMS instructed PDP sponsors to set default copay levels, for individuals whom sponsors believed to be subsidy eligible but who had not been identified as such by CMS, at

$2/$5.[8]  Block Dep. 91:19-22, 165:21-166:8.  On May 5, 2006, CMS issued a memo to PDP

sponsors indicating its recognition that "a number of factors are contributing" to dual eligibles

being charged incorrect copayments by pharmacies.  CMS, Memo: Incorrect Cost Sharing

Charges to Dual Eligible Beneficiaries (May 5, 2006), at L000166 (ex. D).  CMS attributed these

errors to "lags associated with the scheduled reporting of information from the State[s] to CMS,

delays in Part D plans updating their systems, CMS's prior instruction to the States to report only

current or prospective changes to beneficiary institutional status, and confusion in the long-term

care provider community regarding when an institutionalized beneficiary qualifies for a zero

copayment."  Id.  CMS indicated that on March 22, 2006, states were asked to report all

retroactive changes in beneficiary institutional status.  Id.  This was done by July 2006.  Block

Dep. 143:5-13.  CMS also directed PDP sponsors to ensure that their own systems are timely

updated upon receiving data from CMS.  May 5, 2006 Memo, at L000167; Block Dep. 146:9-19.

**3.       Best Available Evidence Policy, As Implemented In 2006 And 2007**

Among the other measures discussed in its May 5, 2006 memo, CMS articulated a "Best

Available Data" policy, later referred to as a Best Available Evidence ("BAE") policy, under

which PDP sponsors "are required to use the 'best available data' when they have knowledge that

a beneficiary's cost sharing level is not correct[ly]" indicated in the plan's records.  May 5, 2006

Memo, at L000167.  CMS instructed PDP sponsors that if, for example, they had "knowledge

from the nursing facility, or an advocate acting on behalf of the beneficiary, that the individual is

covered by Medicaid for his/her institutional stay," they must "make changes to [their] systems to

_____

        [8]This amount reflects the maximum copayment that a subsidy-eligible beneficiary would
owe for generic/nongeneric drugs covered by Part D.  See 42 C.F.R. § 423.782(b)(3).

accommodate the revised copayment level."  Id.  On May 25, 2006, CMS explained in a Q&A

post that "[f]or LTC facility residents, Part D plans should rely on information that clearly

indicates the elements necessary to confirm Medicaid eligibility and LTC facility admission dates

for purposes of establishing a full calendar month of LTC facility residency."  CMS, Q&A (May

25, 2006), at L000168 (ex. E).  On October 30, 2006, CMS reiterated the requirement that PDP

sponsors change their own records to "reflect the true cost sharing status [of a beneficiary] where

the plan has contrary evidence that . . . the individual qualifies for . . . $0 copayments as a full-

benefit dual eligible who is a resident in a long-term care facility for a full calendar month under

a covered Medicaid-covered stay."  CMS, Memo: Implementing our Best Available Data Policy

for Low-Income Subsidy (LIS) Status (Oct. 30, 2006), at L000173 (ex. F).  During the 2006

coverage year, CMS required PDP sponsors to keep records of changes made to their systems

under the best available data policy, for purposes of the final subsidy reconciliation process, but

did not limit the sources of "data" or information that PDP sponsors could rely upon in order to

make these changes.  See May 5, 2006 Memo, at L000167; May 25, 2006 Q&A, at L000168.

On December 6, 2006, CMS instructed PDP sponsors that for calendar year 2006,

"[p]lans will be permitted to report the actual LIS cost sharing charged . . . for th[o]se individuals

who were defaulted [to subsidy-eligible status] without documentation."  CMS, Memo:

Reconciling CMS Low Income Subsidy (LIS) Status and "Best Available Data" Policy for 2006

and 2007 (Dec. 6, 2006), at L000183 (ex. G).  On February 27, 2007, CMS notified PDP

sponsors that it had de-activated the Code 715 edit in CMS systems that would normally cause its

systems to reject a PDP sponsor's claim based on a discrepancy between the copayment level

indicated in the claim and the level indicated in CMS systems.  CMS, Memo: Reconciliation

Readiness Reviews (Feb. 27, 2007), at L000320 (ex. H).  CMS instructed PDP sponsors to "resubmit any 2006 PDEs that previously rejected with 715."  Id.  CMS then extended the deadline by which PDP sponsors were required to submit all PDEs for the 2006 coverage year by two months, to July 31, 2007.  Interrog. #7, at 18.

The December 6, 2006 Memo indicated that beginning in 2007, CMS would require PDP sponsors, after "initially rely[ing] on evidence presented at the pharmacy," to follow up with additional documentation confirming that a beneficiary is subsidy eligible.  Dec. 6, 2006 Memo at L000184.  A list of proposed acceptable documentation was attached to that memo.  Id. at L000185.  On June 27, 2007, CMS issued guidance to PDP sponsors providing the final list of acceptable documentation and instructing PDP sponsors on the process by which they could submit Correction Requests to CMS that would effect a change in subsidy eligibility status in CMS systems based on the documentation that the sponsors had obtained.  CMS, Part D Plan Sponsor Guidance – LIS Corrections Based on Best Available Evidence (Jun. 27, 2007) ("BAE Guidance"), at L000305-11 (attached as Exhibit A to Defs.' Reply (dkt. # 19)).

**4.    Payment Reconciliation Between CMS And PDP Sponsors**

As previously described, CMS does not attempt to fully reimburse PDP sponsors for the actual copayment amounts that were subsidized for eligible Part D beneficiaries until at least six months after the end of a full plan coverage year.  Defs.' Op. Br. at 8; Interrog. #7, at 17-18.  Meanwhile, during the coverage year, CMS makes monthly prospective subsidy payments to PDP sponsors, which reflect current information about the number of subsidy-eligible beneficiaries in a plan but rely on per capita estimates rather than actual costs.  Interrog. #7, at 16-17.  The final reconciliation process compares a PDP sponsor's actual subsidy costs, as

- 11 -

reported through prescription drug event ("PDE") records, to the prospective payments that CMS made.  Interrog. #7, at 17-18.  The final reconciliation also takes into account other factors. Block Dep. 106:15-22.  When CMS determines the final amount that it owes a PDP sponsor or a PDP sponsor owes it, the PDP sponsor either accepts that amount or appeals CMS' decision. Block Dep. 97:1-16.  However, the final reconciliation between CMS and a PDP sponsor does not have any impact on a PDP sponsor's ability, or its obligation, to pay pharmacies for any outstanding claims, or on the timing for any such payments.  Block Dep. 105:5-13; see Interrog. #7, at 16 ("A Part D sponsor will not face sanctions of any kind from CMS regardless of the amount of its payments to LTC pharmacies.").

**5.    Summary**

In sum, CMS has recognized that the process by which states transmit subsidy eligibility information to CMS and CMS in turn passes this information to PDP sponsors results in a lag time of between one and seven weeks.  See Block Dep. 94:8.  However, CMS has compensated for this inherent lag time in a number of different ways, including (1) through the reimbursement requirement set forth in 42 C.F.R. § 423.800(c); (2) through the BAE policy under which, in 2006, CMS made subsidy reimbursements to PDP sponsors based on PDP sponsors' attestations that they believed certain beneficiaries were subsidy eligible, without any documentation, and under which, in 2007, PDP sponsors may submit requests to correct CMS systems data based on best available evidence and may receive reimbursements from CMS where documentation has been provided; and (3) through the CMS-PDP payment system that provides for monthly prospective payments followed by a final reconciliation that occurs over six months after the end of a coverage year.

**ARGUMENT**

I.    **PLAINTIFFS HAVE FAILED TO ESTABLISH THAT THE TIMING OF SUBSIDY ELIGIBILITY NOTIFICATIONS HAS PLAYED A SUBSTANTIAL ROLE IN PDP SPONSORS' ALLEGED REFUSAL TO REIMBURSE LTC PHARMACIES FOR COPAYMENT AMOUNTS**

Plaintiffs have asserted an APA claim under 5 U.S.C. § 706(1), alleging that CMS has "unlawfully withheld or unreasonably delayed" notifications to PDP sponsors regarding the eligibility of some Medicare Part D beneficiaries for copayment subsidies.  Am. Compl. ¶¶ 48-49 [dkt. # 17].  As plaintiffs' failure to identify any particular beneficiaries that allegedly fall in this category suggests, and as their Amended Complaint and briefs have made clear, plaintiffs are not seeking to compel specific notifications in regard to particular beneficiaries.[9]  Rather, they are requesting that the Court remedy alleged "systemic data failures," Pls.' Supp. Opp. at 16, by ordering CMS to "[p]rovide complete, updated and accurate eligibility data to PDPs within a time to be defined by the Court," and to continue to do so "[o]n an ongoing basis."[10]  Am. Compl. Relief Requested ¶ 3.  This language can only be construed as seeking to compel CMS to change the process, which is already in place, as described above, for providing PDP sponsors with information about beneficiaries' subsidy eligibility.

The issue for purposes of the causation analysis is therefore whether the timing of

_____

[9]By failing to identify or seek notifications in regard to specific beneficiaries, of course, plaintiffs deprive CMS of any opportunity to respond on the question of whether those beneficiaries were actually subsidy eligible when plaintiffs' members allegedly failed to charge them copayment amounts.

[10]Plaintiffs here concede that there is no statutory or regulatory deadline for providing this information.  As defendants have previously argued, plaintiffs therefore fail to state a claim under 5 U.S.C. § 706(1).  Defs.' Op. Br. at 36; Defs.' Reply at 8; see Heckler v. Day, 467 U.S. 104, 110-11 (1984) (refusing to impose deadlines where Congress has declined to do so).

- 13 -

accurate notifications under the current process has an impact on whether or not a PDP sponsor

ever reimburses an LTC pharmacy for subsidy amounts that the pharmacy did not collect from a

subsidy-eligible beneficiary at the point of dispensing the medication. As defendants argued in

their opening brief, neither the Medicare Modernization Act ("MMA"), which established the

Medicare Part D program, nor CMS regulations implementing the MMA impose any

requirements on PDP sponsors in regard to when, whether, or under what circumstances, PDP

sponsors will reimburse LTC pharmacies for cost-sharing amounts that pharmacies did not

collect from Part D beneficiaries. Defs.' Op. Br. at 24-28. Plaintiffs have not seriously contested

this fact.[11] While plaintiffs have submitted declarations pointing to "standard terms and

conditions" that CMS requires to be included in PDP sponsor-LTC pharmacy contracts, see, e.g.,

Rutkowski Decl. ¶ 4 (Pls.' Opp. ex. 3), these terms and conditions do not concern the terms of

payment between the two contracting parties. Block Decl. ¶¶ 8-9; CMS, Prescription Drug

Benefit Manual, Ch. 5: Benefits and Beneficiary Protections, §§ 50.5.2, at L000278-80

---

[11]The only attempt plaintiffs make to suggest that CMS does actually require PDP sponsors to reimburse pharmacies is in connection with 42 C.F.R. § 423.800(c), which obligates PDP sponsors to "reimburse . . . organizations paying cost-sharing on behalf of [subsidy-eligible] individuals" any amounts that the organization paid after the individual became subsidy eligible. See Pls.' Supp. Opp. at 12 n.12. As previously explained, however, CMS indicated when promulgating this regulation that the term "organizations" referred to programs and charities that actually pay cost sharing expenses on behalf of beneficiaries, see Defs.' Op. Br. at 26 n.4 (citing CMS, Medicare Prescription Drug Benefit Final Rule, 70 Fed. Reg. 4194, 4389 (Jan. 28, 2005)), not to pharmacies, which either collect or do not collect copayments at the point of sale but clearly cannot be regarded as "paying" copayment amounts, since in effect they would be paying these amounts to themselves. Plaintiffs' assertion that the interpretation of § 423.800(c) is "an issue of merits," Pls.' Supp. Opp. at 12 n.12, suggests that some dispute has legitimately been raised over this interpretation. However, no challenge to CMS' interpretation of this provision has been asserted in this case, nor could such a challenge conceivably prevail. See Auer v. Robbins, 519 U.S. 452, 461 (1997) (recognizing that under Supreme Court's jurisprudence, an agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation" (internal quotation omitted)).

(specifying LTC pharmacy performance and service criteria that must be incorporated into PDP-LTC contracts), 50.5.3, at L000281 ("[CMS] generally do[es] not opine on contracting terms and conditions associated with compensation, billing, and business practices provided such terms and conditions are consistent with explicit Part D statutory and regulatory requirements.") (ex. I).

Despite the absence of any statutory or regulatory provision that conditions PDP sponsors' copayment  reimbursements to LTC pharmacies on information in CMS systems, plaintiffs nevertheless assert that the alleged delay in CMS' notifications constitutes a "substantial factor" contributing to PDP sponsors' alleged ongoing refusal to reimburse LTC pharmacies for cost-sharing amounts. Pls.' Supp. Opp. at 6 (asserting that PDP sponsors' reimbursement decisions "are substantially influenced (indeed, actually dictated) by whether the data in the CMS system recognizes the eligibility of such beneficiaries for zero co-payments (full subsidies by the government)." Plaintiffs' bald assertion that PDP decisions regarding reimbursement to LTC pharmacies are "dictated" by CMS data is plainly inconsistent with the fact, just mentioned, that CMS imposes no requirements on the terms of such reimbursements and is unsupported by reference to any statute, rule, or policy that could possibly be said to "dictate[]" any such thing.

Moreover, plaintiffs misapply the "substantial factor" standard in the circumstances of this case.  In order to establish causation at the motion to dismiss stage, a plaintiff must "demonstrate . . .that it is 'substantially probable' that the defendant's challenged actions, rather than the conduct of some unrelated third party, caused the injury to the plaintiff." Friends of the Earth v. U.S. Dep't of Interior, 478 F. Supp. 2d 11, 19 (D.D.C. 2007) (emphasis added) (quoting Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996)).  "The injury that provides

- 15 -

standing 'must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" Id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  Where, as here, third party actions are the direct cause of a plaintiff's alleged injuries, the government's action must be a substantial factor in motivating the third party to undertake the decision that directly caused the injury.  Cmty. for Creative Non-Violence v. Pierce, 814 F.2d 663, 669 (D.C. Cir. 1987) (explaining that it is not sufficient for the government's action to be "only one of many factors" that might have influenced a third party's decision).  A more recent D.C. Circuit decision has explained that in this category of cases, "the record [must] present[] substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress."  Nat'l Wrestling Coaches v. Dep't of Educ., 366 F.3d 930, 941 (D.C. Cir. 2004).

This causation analysis makes a crucial distinction between motivating a particular action and failing to prevent it from occurring.[12]  Where a third party's action is sufficiently independent – in other words, not substantially motivated one way or the other by the defendant – the chain of causation is broken and standing does not exist.  Here, the chain of causation is broken by the independent terms of payment that, as explained, necessarily exist in PDP-LTC contracts.

**A.    PDP Sponsors' Obligations, If Any, To Provide Copayment Reimbursements To LTC Pharmacies Depend Entirely On The Terms Of Their Contracts**

Plaintiffs have not submitted any examples of PDP-LTC contracts, despite the fact that they are the parties with access to that information.  However, the proceedings before this Court

_____

[12]This is not a situation where CMS is authorizing PDP sponsors to do what would otherwise be prohibited.  Cf. Nat'l Wrestling Coaches, 366 F.3d at 940-41 (recognizing the "causation by authorization" theory as one of two ways in which a defendant may be held to have "caused," for standing purposes, actions committed by third parties).

- 16 -

in a prior case brought by these plaintiffs against one PDP sponsor, UnitedHealth Group Inc. ("UHG"), indicated that the dispute there revolved around a disagreement between UHG and plaintiffs' members over whether UHG could require plaintiffs' members to resubmit claims in order to receive copayment reimbursements in accord with the terms of their contracts. On the one hand, UHG claimed that some of plaintiffs' members had not "resubmitted those claims to us within the timelines provided by the contracts." See LTCPA v. UHG, No. 06-1221, Tr. of Hr'g, at 18:7-18 (D.D.C. Mar. 29, 2007) ("Mar. 29, 2007 Hr'g"); see also LTCPA v. UHG, Tr. of Hr'g, at 5:4-10 (Mar. 22, 2007) ("Mar. 22, 2007 Hr'g") (indicating that "pharmacies have been free to . . . resubmit their pharmacy claims," and other pharmacies had done so, but that "several" of plaintiffs' members had not). On the other hand, plaintiffs claimed that other PDP sponsors had only required a "one-page certification that these are legitimate claims" but that UHG was "one of the very few" to "ask[] for resubmission of claims and rebilling." Mar. 22, 2007 Hr'g at 13:4-12; see also LTCPA v. UHG, Amended Compl. ¶ 27 (claiming that after CMS encouraged PDP sponsors to work out these reimbursement issues with LTC pharmacies, "many PDPs began to work with the LTC Pharmacies and reimbursed the backlog of inappropriately withheld copayments directly to the LTC Pharmacies" but that UHG "took a different approach").

Significantly, these proceedings concerned the question of whether UHG should be preliminarily enjoined from sending retroactive copayment reimbursements to beneficiaries. The fact that UHG recognized an obligation under 42 C.F.R. § 423.800(c) to reimburse subsidy-eligible beneficiaries for copayment amounts they should not have paid indicates that at that

point, those beneficiaries were recognized by all concerned as subsidy eligible.[13]  Any claims of

unreasonable delay in regard to CMS' notification process would have been moot in regard to

those beneficiaries.  The dispute in that case over reimbursements to LTC pharmacies thus had

nothing to do with any failure of CMS systems to show the relevant beneficiaries as subsidy

eligible.  Rather, it was purely a contractual matter.  Indeed, UHG conceded that while it had

made a business decision to send reimbursement checks to beneficiaries without ascertaining

whether the beneficiaries had actually paid copayments, with the aim of then submitting

corrected PDEs to CMS claiming those payments as costs for purposes of the 2006 coverage year

reconciliation, that decision would have no impact on its contractual obligations to plaintiffs'

members.  Mar. 22, 2007 Hr'g, at 7:8-19, 9:20-10:10.  UHG acknowledged that, in light of that

fact, it might ultimately have to pay some reimbursement amounts twice.  Id.[14]

Plaintiffs assert that here the government has "concede[d] causation" based on the

testimony of Abby Block, CMS' designated 30(b)(6) witness.  Pls.' Supp. Opp. at 8.  Plaintiffs

take Ms. Block's testimony out of context.  Ms. Block was responding to a hypothetical posed by

plaintiffs' counsel in which an institutionalized dual eligible had not yet been deemed subsidy

eligible by CMS, was himself unable to provide documentation of his subsidy-eligible status, had

no designated representative or nursing facility willing to provide such documentation, and

---

[13]The Court also recognized that the updated information that UHG now had might indicate that some of those whom plaintiffs claimed as subsidy eligible actually were not.  Mar. 22, 2007 Hr'g, at 17:14-17.

[14]The Court suggested at that hearing that CMS should extend the 2006 reconciliation deadline so that UHG and plaintiffs' members could figure out for which subsidy-eligible beneficiaries plaintiffs' members had not charged copayments.  Mar. 22, 2007 Hr'g. at 15:19-20. In fact, as indicated, CMS did extend the deadline by two months.

whose pharmacy was also unwilling to provide documentation.  Block Dep. 180:9-16.  Ms.

Block indicated that in that unlikely circumstance,[15] a PDP sponsor would have no reason to

believe that the beneficiary actually was subsidy eligible and would therefore pay a pharmacy's

claim based on the assumption that the beneficiary had paid the required copayment.  Ms. Block

proceeded to explain, however, that after this initial payment decision, it may later be possible to

cure the pharmacy's debt because, for one thing, "there are ways that a PDP and a pharmacy can

contract – in their contractual arrangement which has nothing to do with CMS – to handle such

situations."  Block Dep. 184:5-8.  Meanwhile, of course, CMS systems might be updated during

the next two months to show the beneficiary as subsidy eligible.  The isolated passage quoted by

plaintiffs thus can hardly be considered a "concession" that a PDP sponsor's ultimate decision

whether or not to reimburse an LTC pharmacy is motivated by whether or not CMS systems

accurately identified a beneficiary as subsidy eligible at the time a medication was dispensed.

Plaintiffs further assert that the declarations of three of their member pharmacies prove

that PDP sponsors' refusals to reimburse them for copayment amounts have been caused by

CMS' incorrect identification of the relevant beneficiaries as owing a copayment.  Pls.' Supp.

Opp. at 7-8.  According to plaintiffs, PDPs "assess[] cost-sharing amounts unless and until CMS'

system identifies them as having no cost-sharing responsibilities."  Id. at 8.  These declarations

reflect the opinions of plaintiffs' member pharmacies regarding PDP sponsors' motivations, not

the opinions of PDP sponsors themselves, and provide no credible evidence regarding PDP

---

[15]Ms. Block did not accept the premise of plaintiffs' question on this point.  Rather, she
testified that it was inconceivable to her that an institutionalized subsidy-eligible beneficiary, or
someone acting on his behalf, would be unable to obtain documentation verifying that the
beneficiary was in fact subsidy eligible, particularly given the "fairly extensive list of things that
would be acceptable as documentation."  Block Dep. 177:20-178:9.

sponsors' actual motivations.[16]  The declarations also lack credibility because they suggest that

PDP sponsors would refuse to grant beneficiaries themselves the benefit of their subsidies until

CMS systems reflect subsidy-eligible status, contradicting CMS' express instructions to PDP

sponsors to initiate an exceptions process in their own systems as soon as they have best

available evidence indicating a beneficiary is subsidy eligible, regardless of whether CMS

systems confirm that status.[17]  See, e.g., CMS May 5, 2006 Memo (instructing PDP sponsors that

upon receiving best available evidence, "the plan should make changes to its systems to

accommodate the revised copayment level"); BAE Guidance at L000305 (dkt # 19, ex. A).

   Plaintiffs also claim that the fact that CMS has encouraged PDP sponsors to work with

LTC pharmacies to provide them with reimbursements if reimbursements are owed should be

construed as an admission by CMS that CMS' subsidy eligibility data "is a substantial factor in

PDP reimbursement decisions."  Pls.' Supp. Opp. at 10 n.9.  In fact, however, CMS' statements

show just the opposite.  CMS has told PDP sponsors that sponsors are free to reimburse LTC

---

[16]In contrast, in Tozzi v. U.S. Dep't of Health & Human Servs., 271 F.3d 301 (D.C. Cir. 2001), one of the two "substantial factor" cases discussed in National Wrestling Coaches and a case on which plaintiffs' supplemental brief relies, the plaintiff submitted "affidavits and other record evidence demonstrating" that the third parties in question had made their decisions "as a direct result of" the government's action.  Nat'l Wrestling Coaches, 366 F.3d at 941 (discussing Tozzi).  In the other case, "the plaintiff submitted several declarations and affidavits detailing specific instances in which" the government's action directly motivated third party decisions.  Id. at 942 (discussing Block v. Meese, 793 F.2d 1303 (D.C. Cir. 1986)).

[17]These declarations suggest that LTC pharmacies may still fail to distinguish between institutionalized individuals who are eligible for a zero copayment and those who are not.  The declarants state their opinions that the nursing home residents served by LTC pharmacies serve are "obviously" or "necessarily" "institutionalized," as that term is defined by CMS.  Amorosi Decl. ¶ 5 (Pls.' Opp. ex. 4); Rutkowski Decl. ¶ 7.  However, not all institutionalized individuals are eligible for zero copayments; for example, they may not have been in a Medicaid-paid stay at the facility for an entire month.  To the extent this confusion is the cause of LTC pharmacies' alleged injuries, the timing of CMS notifications is clearly irrelevant.

pharmacies for copayment amounts that pharmacies have not collected from subsidy-eligible beneficiaries. July 7, 2006 Q&A, at L000172 (ex. C). PDP sponsors are similarly free to condition their reimbursement decisions on pharmacies' compliance with whatever requirements are set forth in PDP-LTC contracts. As discussed above, that is exactly what UHG evidently did, and the failure of plaintiffs' members to adhere to these contractual requirements is evidently the reason that UHG did not reimburse the amounts claimed.

**B.**     **Far From An Admission, CMS' BAE Policy Compensates For The Brief But Inevitable Lag Time Inherent In The Notification Process By Allowing Beneficiaries To Receive The Benefit Of Their Subsidies Immediately**

Plaintiffs further claim that CMS' development of the BAE policy amounts to "an admission by CMS that its notification of subsidy-eligibility and subsidy-amounts is inaccurate for many institutionalized dual eligible beneficiaries and is a substantial cause of PDPs not paying pharmacies the co-payment amount." Pls' Supp. Opp. at 11.[18] Again, this is untrue. Plaintiffs mischaracterize the BAE policy and its purpose. As discussed above, CMS has never intended the BAE policy to substitute for or replace the notification process that it has established by regulation. Rather, the BAE policy allows beneficiaries to obtain the benefit of their subsidies immediately, by presenting documentation indicating their subsidy-eligible status, even where CMS has not yet received or passed on to PDP sponsors information from states confirming that

_____

[18]Plaintiffs also suggest that defendants have improperly "inject[ed]" the BAE policy "into the discussion of causation" and assert that the BAE policy "is not a jurisdictional issue." Pls.' Supp. Opp. at 10. However, defendants were compelled to discuss the development of the BAE policy in response to plaintiffs' interrogatory requests, and plaintiffs' examination of CMS' 30(b)(6) witness focused an inordinate amount of time on this topic. To the extent a proper causation analysis relies solely on the statutory and regulatory framework, neither the BAE policy nor any of the other information produced during jurisdictional discovery is relevant. However, to the extent the causation analysis must take into account the way the subsidy program actually operates, the BAE policy is certainly relevant.

status.  In the vast majority of cases, CMS systems will catch up in the next round of information provided by states.  See BAE Guidance, at L000306.  In the rare instance where this does not occur within 30 to 60 days, PDP sponsors may submit a Correction Request so that CMS systems will reflect the same subsidy-eligible status that a PDP sponsor has established for a particular beneficiary based on BAE documentation.  See id.

Plaintiffs suggest that because the BAE policy does not require PDP sponsors to actively search for documentation proving beneficiaries' subsidy-eligible status, it imposes unreasonable costs and burdens on pharmacies.  This argument is a red herring, first of all, because the BAE policy does not impose any obligation on anyone to search for documentation.  Block Dep. 40:15-41:2.  It only provides an additional means for beneficiaries to obtain the benefit of their subsidies by presenting such documentation to pharmacies or to PDP sponsors.  Plaintiffs again rely on the curious premise that LTC pharmacies are for some unexplained reason forced to provide subsidies to beneficiaries who are neither recognized in CMS or PDP systems as subsidy eligible nor able to verify their eligibility with documentation.  It is unclear, and plaintiffs have failed to explain, how plaintiffs' members can be certain under such circumstances that a beneficiary is eligible for a subsidy.  CMS does not require PDP sponsors or LTC pharmacies to provide subsidies to beneficiaries who are not eligible for subsidies.  Based on the evidence plaintiffs have submitted, it is just as likely, if not more so, that the disconnect plaintiffs allege between those beneficiaries CMS recognizes as subsidy eligible – based either on information obtained from states or on BAE documentation – and those beneficiaries to whom LTC pharmacies provide subsidies, is due to LTC pharmacies' misunderstanding of the eligibility requirements for zero copayments rather than to "systemic data failures" on the part of CMS.

Moreover, because CMS does not restrict the terms of payment between PDP sponsors and LTC pharmacies, nothing prevents sponsors and pharmacies from negotiating among themselves who bears the burden and costs, if any, related to following the BAE policy. In addition, for coverage year 2006 – which at this point is the only coverage year for which final payment reconciliation between CMS and PDP sponsors has occurred – any question concerning the allocation of burdens associated with obtaining BAE documentation is irrelevant because CMS did not require documentation during 2006. As explained above, CMS accepted PDP sponsors' claimed subsidy costs as stated regardless of whether or not the data in CMS systems confirmed that a beneficiary was subsidy eligible. In order to do this, CMS changed its computer systems so that PDP sponsors' claims, in the form of PDE records, were not automatically rejected based on a mismatch in copayment levels between the PDE record and CMS data. CMS made this change in early 2007 and instructed PDP sponsors to resubmit PDEs that had previously been rejected on that basis.[19]  PDP sponsors had four months – between February 27, 2007, when they received final notification that the necessary computer system change had been made, and July 31, 2007, the deadline for the 2006 reconciliation – to resubmit PDEs. Moreover, as one PDP sponsor, UHG, has recognized, PDP sponsors' contractual obligations to LTC pharmacies are independent of the results of the reconciliation process between PDP sponsors and CMS for a particular coverage year. Again, plaintiffs fail to demonstrate that the timing of CMS notifications played any role whatsoever in plaintiffs' members' alleged injuries.

---

[19]Plaintiffs' contention that CMS never provided such a notification to PDP sponsors, Pls.' Supp. Opp. at 12 n.11, is clearly contradicted by CMS' February 27, 2007 Memo, at L000320. The fact that Ms. Block was unable to identify the document by which CMS communicated this information to PDP sponsors does not, contrary to plaintiffs' insinuation, amount to an admission that no communication occurred. See Block Dep. 98:17-101:10.

## II. PLAINTIFFS' MEMBERS' ALLEGED INJURIES ARE NOT REDRESSABLE BY A COURT ORDER COMPELLING CMS TO ALTER ITS NOTIFICATION PROCESS OR IMPOSING A DEADLINE BY WHICH CMS MUST PROVIDE PERFECTLY ACCURATE NOTIFICATIONS

Defendants have explained that no Court-ordered action by CMS can affect LTC pharmacies' claims to copayment reimbursements from individual PDP sponsors because these claims depend on the contracting parties' adherence to whatever obligations are set forth in their contracts, not on requirements set forth in Medicare law. Defs.' Op. Br. at 28-29. Jurisdictional discovery has provided no evidence that these reimbursements would be facilitated if the Court ordered CMS to somehow guarantee that PDP sponsors will be notified of beneficiaries' subsidy eligibility sooner than they are now. Even if the Court concluded that notification timing was a substantial factor in PDP reimbursement decisions, any delay at all in notifications would require PDP sponsors and LTC pharmacies to follow some process, worked out between themselves, for adjusting copayment claims retroactively. A Court order would not change the situation. The only remedy that could hypothetically eliminate the need for retroactive adjustments is purely imaginary: A Court cannot order CMS to do the impossible by making notifications instantaneous, all the more so where the data on which notifications depend come from states, whose cooperation with such an order neither CMS nor this Court can compel.

Plaintiffs suggest that "there are alternative ways in which CMS can verify a beneficiary's eligibility status" and claim – incorrectly – that CMS's 30(b)(6) witness conceded that to be the case. Pls.' Supp. Opp. at 15. Again, plaintiffs would have the Court force CMS to scrap the entire process by which states provide eligibility data to CMS in favor of some other method. There is absolutely no basis for allowing the interests of LTC pharmacies to dictate how CMS implements its Medicare Part D obligations. Moreover, plaintiffs cannot challenge CMS'

established process under 5 U.S.C. § 706(1).[20]  Any such challenge must be raised under §

706(2), not § 706(1), and – assuming it succeeded in stating an APA claim – would be reviewed

under a deferential standard based on the administrative record provided by CMS.  Meanwhile,

plaintiffs have failed to show that their ill-defined injuries can be redressed through this action.

## CONCLUSION

For the foregoing reasons as well as those set forth in defendants' prior briefing, the

claims raised in plaintiffs' Complaint should be dismissed in their entirety.


Dated: December 21, 2007                Respectfully submitted,
                                        JEFFREY S. BUCHOLTZ
                                        Acting Assistant Attorney General
                                        JEFFREY A. TAYLOR
                                        United States Attorney
                                        SHEILA M. LIEBER
                                        Deputy Director

                                        /s/ Kathryn L. Wyer
                                        KATHRYN L. WYER
                                        U.S. Department of Justice, Civil Division
                                        20 Massachusetts Ave., NW,
                                        Washington, D.C.  20530
                                        Telephone: (202) 616-8475 / Fax: (202) 616-8202
                                        kathryn.wyer@usdoj.gov
                                        *Attorneys for Defendants*

---

[20]Plaintiffs incorrectly claim that their Amended Complaint removes the concern that the
Court is being asked to run the Medicare Part D subsidy program. Pls.' Supp. Opp. at 15. To the
contrary, their Amended Complaint only removed plaintiffs' demand that the Court order CMS
to enforce Medicare laws against PDP sponsors.  It did not remove the demand that the Court
compel CMS to "run the program" in the manner that plaintiffs would prefer.  Plaintiffs suggest
they are asking the Court to direct CMS "to act" rather than "how to act."  Id.  As previously
explained, CMS has already established the process that plaintiffs claim is lacking, so any Court
order compelling CMS action would necessarily direct CMS how to act.  Plaintiffs here make a
further attempt to argue that their claims are cognizable under Norton v. SUWA, 542 U.S. 55
(2004). Yet again, plaintiffs fail to identify the discrete and legally required agency action that the
Court should compel.  See Defs.' Op. Br. at 34-37; Defs.' Reply at 5-10.

# EXHIBIT A

Defendants' Responses to Plaintiffs' First Set of Interrogatories

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LONG TERM CARE PHARMACY ALLIANCE et al.,** ) ) ) ) | |
| **Plaintiffs,** ) ) | |
| **v.** ) ) | **Case No. 1:07-cv-01115 (ESH)** |
| **MICHAEL O. LEAVITT et al.,** ) ) | |
| **Defendants.** ) ) ) | |

## DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Rules 33 of the Federal Rules of Civil Procedure, Defendant hereby responds as follows to Plaintiffs' first set of interrogatories.

## GENERAL OBJECTIONS

All responses are made subject to the following general objections, regardless of whether a specific objection also is made to a particular interrogatory:

1. Defendants will respond to Plaintiffs' interrogatories subject to, without waiving, and expressly preserving (a) any objections as to competency, relevancy, materiality, confidentiality, privilege and admissibility of any of the responses provided and (b) the right to object to other discovery requests involving or relating to the subject matter of the interrogatories.

2. Defendants object to the interrogatories to the extent they seek information

- 1 -

protected by the deliberative process privilege, the attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

3.      Defendants object to the interrogatories to the extent they seek information protected from disclosure by the Privacy Act, 5 U.S.C. § 552a.

4.      Defendants object to the interrogatories, including its "Instructions" and "Definitions," to the extent they seek to impose any obligation on Defendants that is beyond the scope of the Federal Rules of Civil Procedure or other applicable law.

5.      Defendants object to the interrogatories on the basis that they seek information that is not relevant to the issue of plaintiffs' standing.  To the extent the information might be relevant, defendants object to the interrogatories to the extent they seek information beyond the scope of the issues of causation and redressability as discussed in the Court's order granting in part Plaintiffs' request to conduct jurisdictional discovery.  See Order of November 1, 2007.

6.      Without limiting any general objections set forth herein, Defendants specifically object to Plaintiffs' definitions, particularly including the definition of "process" or "processes," to the extent they serve to broaden the scope of what the interrogatories are asking beyond what would be conceivably relevant to the issues of causation and redressability and would require a level of detail in responses that would be unduly burdensome.  Defendants will respond to each interrogatory in reasonable and appropriate detail.

7.      Defendants' responses are based solely upon information and documentation currently available and in Defendants' possession, custody or control.

8.      Defendants expressly reserve the right to assert additional objections and supplement their responses as appropriate.

- 2 -

## RESPONSES TO INDIVIDUAL INTERROGATORIES

**INTERROGATORY NO. 1:**  Identify by name, position title, and description of job duties, each of the persons responsible for answering each of the following interrogatories.

**RESPONSE:**  Subject to and without waiving the general and specific objections, defendant responds as follows:

Danielle Moon is responsible for answering Interrogatory Nos. 2, 3 and 4.  Ms. Moon is the Deputy Director of the Medicare Enrollment and Appeals Group ("MEAG") of the Center for Beneficiary Choices ("CBC") within the Centers for Medicare & Medicaid Services ("CMS"). MEAG is responsible for all Medicare enrollment and appeals policy under fee-for-service Medicare, the Medicare Advantage program, and the prescription drug program.  MEAG also directs all Medicare appeals operations at CMS, and has a consumer protection component that has primary responsibility at CMS for beneficiary notice and liability issues.  As its Deputy Director, Ms. Moon assists in overseeing all operations of MEAG.

Cynthia Tudor is responsible for answering Interrogatory Nos. 5, 6 and, along with Jeffrey Grant, No. 7.  Ms. Tudor is the Director of the Medicare Drug Benefit Group ("MDBG") of CBC.  MDBG is responsible for oversight and operations of all drug benefit plans offered under both the Medicare Advantage Program and the Part D prescription drug program.  As its director, Ms. Tudor oversees all operations of MDBG.

Jeffrey Grant is responsible for answering Interrogatory No. 7, along with Ms. Tudor. Mr. Grant is the Director of the Division of Payment Systems ("DPS") in the Medicare Plan Payment Group ("MPPG") of CBC.  The MPPG is responsible for supporting payment policy

- 3 -

development and implementing payment operations for the Medicare Advantage program and the

prescription drug program. DPS serves as the business owner of the systems that make

prospective payments, collect cost data, and calculate the payment reconciliation. As its

Director, Mr. Grant oversees the operations of DPS.

Ms. Moon, Ms. Tudor and Mr. Grant are with CMS, located at 7500 Security Boulevard,

Baltimore, Maryland, 21244-1850.


**INTERROGATORY NO. 2:** From 2005 to the present, specifically describe each step of the
process or processes by which States submit data to CMS relating to a beneficiary's eligibility for
low-income subsidies, particularly relating to full-benefit dual eligible beneficiaries.

**RESPONSE:** Subject to and without waiving the general and specific objections,

defendants respond to this interrogatory as follows:

Step 1: States submit monthly electronic files to CMS in which states identify individuals

(1) who are eligible for Medicare benefits and (2) who also either have full Medicaid benefits

(who qualify as "full duals") or participate in the Medicare Savings Programs (who are also

described as "partial duals"). Each monthly file contains all current information that the states

have about dual eligible status, including both newly identified dual-eligible beneficiaries and

those who were previously identified. The files also include retroactive changes in Medicaid or

institutional status, and changes in enrollment or disenrollment in prior months. States submit

these files between the 15th and the last day of each month.

Step 2: CMS matches the files submitted by states against data in its Medicare

Beneficiary Database to verify that the individuals identified as Medicare eligible in the state

files are Medicare eligible. CMS matches the files using the beneficiary's name, Health

- 4 -

Insurance Claim Number (HICN) or Social Security Number (SSN), and date of birth (DOB). If the beneficiary is verified as Medicare eligible, then CMS accepts information about that beneficiary's Medicaid status as supplied by the state.

Step 3: CMS sends a response file back to each state that includes the results of the matching process for each submitted individual. States may then examine the unmatched files to determine if the failure to match was due to a data error in their submission.  If so, states may resubmit corrected records in subsequent months' reporting.

Step 4: Those dual eligible beneficiaries who were matched in a given month are considered, or "deemed," eligible for the low-income subsidy (LIS), and the Medicare Beneficiary Database sets the premium subsidy and co-payment levels for those individuals based on the information contained in the state files concerning whether the individual is a partial or full dual eligible, income, and institutional status.

States began submitting test files to CMS in March 2005.  Starting in June 2005, CMS began using these files in its deeming process.

**INTERROGATORY NO. 3:**  From 2005 to the present, specifically describe each step of the process or processes by which CMS determines that a beneficiary is an institutionalized dual eligible beneficiary.

**OBJECTION:** Defendants object to this interrogatory to the extent it asks defendants to repeat responses to other interrogatories.  Defendants will respond by referring, when appropriate, to responses given elsewhere.

**RESPONSE:**  Subject to and without waiving the general and specific objections, defendants respond to this interrogatory as follows:

CMS learns that a beneficiary is an institutionalized dual eligible beneficiary from data submitted by the states as described in the Response to Interrogatory No. 2. A beneficiary's institutionalized status is determined by the state Medicaid agency that produces these monthly files, in accordance with specifications provided by CMS. (See Medicare Modernization Act (MMA) State File Specifications and Data Dictionary, last updated in December 2006.) States use different data and methods in order to identify institutional status. CMS may also learn that a beneficiary is an institutionalized dual eligible beneficiary through Part D sponsor-initiated Correction requests, following the procedures set forth in CMS's Best Available Evidence policy, as described in the Response to Interrogatory No. 6.

**INTERROGATORY NO. 4:** From 2005 to the present, specifically describe each step of the process or processes by which CMS notifies PDP sponsors of institutionalized dual eligible beneficiaries' subsidy-eligible status.

**OBJECTIONS:** Defendants object to this interrogatory to the extent it implies that CMS notification is the only available method through which Part D sponsors may learn of institutionalized dual eligible beneficiaries' subsidy-eligible status. The Response to Interrogatory No. 6 describes CMS's Best Available Evidence policy, through which Part D sponsors may receive information concerning institutionalized dual eligible beneficiaries' subsidy-eligible status from beneficiaries and may then submit Correction requests to CMS.

**RESPONSE:** Subject to and without waiving the general and specific objections, defendants respond to this interrogatory as follows:

As described in the Responses to Interrogatory Nos. 2 and 3, at the beginning of the month CMS uses data submitted from states to determine which beneficiaries are "deemed"

- 6 -

eligible for the low-income subsidy ("LIS"). The data submitted by each state indicate which beneficiaries the state has determined are institutionalized. This data is incorporated into CMS' systems through the process described in the Response to Interrogatory No. 2. Under the Best Available Evidence policy, as described in the Response to Interrogatory No. 6, CMS may also receive data from Part D sponsors regarding their enrollees' LIS eligibility status and will update its systems to reflect this information. Based on the current data in its systems, which also includes information about which beneficiaries are enrolled in which plans, CMS compiles reports which contain LIS-eligibility information specific to the beneficiaries enrolled in each plan. These reports are sent to each Part D sponsor electronically according to the option it specified when setting up connectivity with CMS' systems.

Each Part D sponsor interacts with CMS' systems by sending transactions (enrollments, disenrollments, corrections, and changes). CMS sends reports detailing the status of these transactions as well as periodic reports specific to each Part D sponsor. Specifically, CMS provides:

1.      Weekly Transaction Reply Reports (TRRs) – This file, issued every Saturday, includes information about confirmed enrollments and other pertinent information on active members for each plan. It notifies the Part D sponsors of all changes in their members' status, including, but not limited to, LIS premium subsidy level, LIS co-pay category and LIS co-pay effective start date.

2.      Bi-Weekly Deemed LIS/Premium Report Data Files (LISPRMD) – This report, issued biweekly, provides the current status of active members' LIS subsidy information including LIS subsidy percentage, LIS co-pay levels, and subsidy start and subsidy end dates.

- 7 -

3.      Monthly Full Enrollment File – This file is issued on or about the fourth Wednesday of the month and provides the current status of every active plan member, including the current LIS subsidy level, LIS co-pay category and LIS effective start date.

4.      LIS History Report. This report is a comprehensive picture of the LIS history of each member of a plan.  It has been issued monthly since April 2007.

In addition to the above reports that CMS transmits to plans, plans may query CMS' systems for LIS status via the Beneficiary Eligibility Query (BEQ) or the Common User Interface.  The BEQ is a vehicle for Part D sponsors to submit batch inquiries for determining beneficiary eligibility prior to submitting a Part D enrollment transaction.  The Common User Interface allows Part D sponsors to view enrollment, payment, premium and beneficiary information.

**INTERROGATORY NO. 5:**  Describe CMS's understanding of how PDP sponsors use the information provided by CMS about a beneficiary's subsidy-eligible status.

**OBJECTIONS:**  Defendants object to this interrogatory to the extent it calls for CMS to speculate regarding matters about which it has no direct knowledge.  Defendants will provide their understanding of how CMS regulations and guidance advise Part D sponsors to use LIS eligibility information.  Defendants further object to this interrogatory to the extent that the phrase "information provided by CMS" implies that Part D sponsors rely entirely on CMS to provide information about a beneficiary's subsidy-eligible status.  Defendants have addressed the process by which Part D sponsors may obtain information about subsidy-eligible status from beneficiaries themselves, most often through pharmacies, and may submit this information to

CMS for the purpose of correcting CMS records, in their response to Interrogatory No. 6.

**RESPONSE:** Subject to and without waiving the general and specific objections, defendants respond to this interrogatory as follows:

CMS provides Part D sponsors with response files as described in the Response to Interrogatory No. 4. Part D sponsors use the information in these files concerning a beneficiary's subsidy-eligible status to:

1.   **Set a member's cost-sharing and premium levels**. CMS presumes that, as a practical matter, Part D sponsors will use the response files to set their members' default low-income cost-sharing (LICS) and premium subsidy levels in their own payment systems, with an effective date based on the effective dates provided in these reports.

2.   **Communicate LIS status to beneficiaries.** Part D sponsors send LIS-eligible members information regarding their LIS status. Specifically:

a) The LIS Rider. CMS requires Part D sponsors to provide their member beneficiaries with an explanation of coverage (EOC) which should contain information regarding the beneficiary's plan benefit package, including cost sharing parameters. CMS requires that Part D sponsors develop a rider to the EOC to address the specific cost-sharing structure the beneficiary will be subject to under the plan benefit package. The LIS Rider provides LIS beneficiaries with information regarding their specific maximum premium and cost-sharing obligations. It is sent at least once a year, as well as whenever a change in subsidy eligibility changes the member's premium or cost-sharing liability within 30 days of receiving systems' notification from CMS.

b) A member notification to the member upon receiving notification that a

member's LIS has been terminated.

     **3.**    **Reconcile prior claims.**  When a Part D sponsor determines, based on

information provided by CMS or otherwise obtained, for example by applying the best available

evidence policy described in Defendants' response to Interrogatory No. 6, that a LIS-eligible

enrollee was assessed a higher level of cost-sharing than he or she qualified for, CMS requires

the Part D sponsor to make the enrollee whole by refunding any improperly collected cost-

sharing.  The Part D sponsor offering the Part D plan must reimburse all low-income subsidy

eligible individuals, as well as organizations paying cost-sharing or premiums on behalf of such

individuals, if the beneficiary is found eligible for the LIS, or if the beneficiary is

institutionalized and subject to a lower cost sharing than was assessed.  (See July 10, 2006 Q and

A "LIS Incorrect Cost-Sharing -- Making the Beneficiary Whole.)  The basis for ensuring that

LIS beneficiaries are charged the correct cost sharing is 42 CFR 423.782 and 423.800, which

require the sponsor to reduce cost sharing when individuals are entitled to LIS.  We also require

that sponsors reconcile with other payers under our coordination of benefit requirements at 42

CFR 423.464 and the COB guidelines. (See Medicare Prescription Drug Benefit Manual, Chapter

14 – Coordination of Benefits.)  CMS regulations do not require that Part D sponsors reimburse

network pharmacies for cost-sharing amounts that the pharmacies did not collect from LIS-

eligible enrollees.  However, CMS has encouraged Part D sponsors to work with their network

pharmacies to provide them with direct reimbursement for any cost-sharing amounts not

collected from LIS-eligible enrollees.  (See CMS Memorandum titled Reconciling Incorrect Cost

Sharing Paid by Long-term Care Pharmacies, dated December 22, 2006.)

**INTERROGATORY NO. 6:**  From 2005 to the present, specifically describe each step of the process or processes by which PDP sponsors share with CMS coverage and cost-sharing data for institutionalized dual eligible beneficiaries and what CMS does with that data.

**OBJECTIONS:**  Defendants object to this interrogatory on the basis that the phrase "share . . . coverage and cost-sharing data for institutionalized dual eligible beneficiaries" is ambiguous.  To the extent plaintiffs are asking about the information Part D sponsors provide to CMS for purposes of reconciling the accounting of cost-sharing subsidy payment amounts at the end of a coverage year, defendants address this question in their response to Interrogatory No. 7.  To the extent plaintiffs are asking about the process by which Part D sponsors may initiate changes to CMS's records by submitting information about beneficiaries' subsidy eligibility, defendants' response is set forth below.

**RESPONSE:**  Subject to and without waiving the general and specific objections, defendants respond to this interrogatory as follows:

On May 5, 2006 CMS articulated its Best Available Evidence (BAE) policy which directs Part D sponsors to update their own systems to recognize a beneficiary as eligible for a cost-sharing subsidy in some circumstances when they have knowledge that a beneficiary's cost sharing level is not correctly represented in CMS' systems.  (See CMS Memorandum to All Part D Sponsors Re: Incorrect Sharing Charges to Dual Eligible Beneficiaries.)  Under this policy, the Part D sponsors then share this information with CMS by requesting an LIS correction in CMS' systems based on the BAE supplied by the Part D sponsors.  The steps of this corrections process are set forth below.  CMS has instructed Part D sponsors to retain appropriate records of the evidence used to support Part D sponsor-initiated changes in cost-sharing in order to reconcile LIS payments with CMS at the end of a coverage year, through the process described in the

response to Interrogatory No. 7.  (See Q and A dated May 25, 2006.)

On December 6, 2006 CMS provided Part D sponsors with further instructions for

implementing BAE.  (See CMS Memorandum to All Part D Sponsors Re: Reconciling CMS

Low Income Subsidy (LIS) Status and "Best Available Evidence" Policy for 2006 and 2007.)

CMS noted that Part D sponsors may initially rely on evidence presented at the pharmacy to

provide a lower cost-sharing status at point-of-sale, and then must follow up with additional

documentation within a specified period of time.  On June 27, 2007, CMS provided guidance to

Part D sponsors on the procedures for initiating corrections to CMS' systems in cases in which

the Part D sponsor has documentation that constitutes "best available evidence" about a

beneficiary's Medicaid eligibility or residence in an institution under a Medicaid-covered stay.

(See CMS Memorandum to All Part D Sponsoring Organizations Re: Part D Guidance – Low

Income Subsidy (LIS) Status Corrections Based on [BAE]). This is known as the LIS Status

Correction request process.  The steps are outlined below.

**Step 1:  Updating Part D sponsor systems.**  The Part D sponsor corrects its own  data systems

upon receipt of documentation to substantiate the beneficiary's LIS status.  The Part D sponsor

should override the standard cost-sharing process and maintain an exceptions process for that

beneficiary until the CMS LIS correction is processed.  Part D sponsors must put processes in

place that obviate the need to require the resubmission of documentation each month pending the

correction of the beneficiary's LIS status in CMS' systems.  Part D sponsors are supposed to

develop appropriate member services and pharmacy help desk scripting to triage cases involving

BAE.  Before proceeding to step 2, Part D sponsors are also supposed to verify that CMS'

systems do not already reflect the beneficiary's correct Medicare/Medicaid institutional status for

the purposes of establishing the appropriate cost-sharing level.

**Step 2: The Part D sponsor collects necessary information into an LIS corrections file.**

There is no restriction on how often the LIS correction file is submitted. CMS recommends that the Part D sponsor waits at a minimum 30 days before submitting the correction (to allow state files to catch up), but should wait no more than 60 days. The Part D sponsor should ensure that its LIS corrections file has all beneficiary identifying information, such as the correct name, date of birth, and Health Insurance Claim Number (HICN). The file must contain information for all beneficiaries identified since the most recent prior request for an LIS status correction. In other words, the correction request file should not be a cumulative record of previously submitted beneficiaries

**Step 3: Certification.** A certification of the request must be signed by an authorized representative of the Part D sponsor before being submitted to CMS.

**Step 4: Preparation of document.** Once the certification is signed, the document should be scanned, saved as a pdf. file and attached to the email that must be used to transmit each Excel correction request file. The transmittal email must include the Part D sponsor's contract number.

**Step 5: Encryption.** To ensure the security of the beneficiary information contained in the Excel spreadsheet, the document must be encrypted using a Federal Information Processing Standards approved encryption method. Once encrypted, the file should be attached to transmittal email containing the information or a cover memo and submitted to the appropriate CMS regional office. The Part D sponsor must send the password for the encrypted file in a separate email.

**Step 6: Transmission of file to CMS.** LIS Status Correction requests from the Part D sponsors are submitted to CMS regional offices. CMS has designated an electronic mailbox in each

- 13 -

regional office to which LIS Status Correction Requests must be sent.  CMS recommends that

Part D sponsors establish a schedule for the monthly transmission of these requests.

**Step 7: CMS Processing of Correction Request.** CMS processes the correction request and the

new data is stored in the Medicare Beneficiary Database (MBD).  The MBD is a data repository

containing beneficiary information, such as date of birth, HICN, sex code, enrollment history,

and LIS history.  CMS' systems will then update during the next monthly deeming process as

described in the response to Interrogatory No. 2. This occurs at the beginning of each month.

The subsequent weekly Transaction Reply Report, described in the response to Interrogatory No.

4, will report the updated information verifying the change has been implemented in CMS'

systems.  When subsequent state reports are received, CMS' systems will compare each

beneficiary's current LIS status in CMS' systems to the state's reported information.  Changes

will be made to the beneficiary's LIS status only if the new information from the state is more

advantageous to the beneficiary.

      The LIS Status Correction request process does not supplant state MMA data files,

described above in response to Interrogatory No. 2, in which states report their dual eligible

beneficiaries to CMS between the 15th and the end of each month.  Rather, the Correction

request process is a manual update process that allows updates to occur when updated

information on a subsequent state MMA file does not automatically correct the data in CMS'

systems and the Part D sponsor has obtained BAE to support a change to a beneficiary's LIS

level.  CMS has advised Part D sponsors that prior to submitting a correction request, Part D

sponsors should allow a reasonable time for updated information to be automatically entered into

the CMS' systems and reported to the Part D sponsor. CMS recommends that the delay be a

minimum of 30 and a maximum of 60 days, as it is likely that a significant portion of those who

qualify under BAE policy in one month will be deemed for LIS via the normal process within the

next several weeks.

**INTERROGATORY NO. 7:** Describe the consequences PDP sponsors face if they reimburse
LTC pharmacies for co-payment amounts where the CMS system does not reflect the Medicare
beneficiary as an institutionalized dual eligible beneficiary.

    **OBJECTIONS:** Defendants object to this interrogatory on the basis that the phrase

"consequences PDP sponsors face" is ambiguous and overly broad.  Defendants interpret this

question as asking whether Part D sponsors will be denied payments by CMS if they reimburse

LTC pharmacies for copayment amounts where the CMS system does not reflect the Medicare

beneficiary as an institutionalized dual eligible beneficiary.  This interrogatory also does not

specify a particular time period.  The time period is relevant to defendants' answer insofar as

CMS's payment process is not a real-time system but is divided into two stages – during the

coverage year, when CMS payments to Part D sponsors are based on estimates; and after the

coverage year, when CMS reconciles its payments during the year with actual cost data.  The

time period is also relevant insofar as CMS has modified its process over time.  As of this date,

the final reconciliation process has occurred with respect to 2006 but not with respect to 2007.

Defendants will address these different time periods below.  Defendants assume, for purposes of

this interrogatory, that Part D sponsors and LTC pharmacies are behaving reasonably and are not

attempting to defraud each other or CMS.  Defendants therefore will not address hypothetical

consequences of fraudulent actions.

    **RESPONSE:** Subject to and without waiving the general and specific objections,

- 15 -

defendants respond to this interrogatory as follows:

A Part D sponsor will not face sanctions of any kind from CMS regardless of the amount of its payments to LTC pharmacies. CMS does not impose any requirements on Part D sponsors in regard to their payments to LTC pharmacies. CMS expects that the terms of payment between Part D sponsors and LTC pharmacies will be determined by contract. CMS does not consider a Part D sponsor to have violated any Medicare Part D requirement if the sponsor chooses to reimburse an LTC pharmacy for costs that the pharmacy claims as subsidy-related expenses where CMS' system does not reflect that a beneficiary is subsidy-eligible.

**Consequences during the coverage year:** A Part D sponsor will not face any adverse consequences from CMS, in terms of the amounts of the payments it receives from CMS, during a coverage year based on any payment decision that it makes during that year, including a decision to reimburse an LTC pharmacy for a copayment amount where CMS' systems do not show the beneficiary as eligible for a subsidy. The basis of the CMS to PDP payment process is found in Subpart G of the regulations codifying the statutory requirements of the Medicare Prescription Drug program. Generally, CMS provides monthly prospective payments to Part D sponsors (or "plans") based upon each Part D sponsor's standardized bid, which was submitted to CMS before the start of the coverage year. A Part D sponsor's bid includes assumptions about the numbers of its members who it expects will be eligible for low-income subsidies. CMS provides monthly payments to cover a Part D sponsor's prospective low-income cost-sharing estimated expenses based on the current data in CMS' systems at the beginning of that month. CMS calculates an amount per low-income subsidy-eligible member per month that represents an estimate of the total subsidy that a plan's members will be eligible for, on average, during the

month. The amount is adjusted to reflect retroactive recalculations of a previous month's

payment where the current data shows that a plan enrollee's subsidy eligible status has been

updated for the previous month. The total low-income cost-sharing amount is factored into the

total prospective monthly payments that CMS makes to Part D sponsors.  These monthly

payments do not take into account any payments that Part D sponsors have actually made to

pharmacies, nor are the payments intended to cover any specific beneficiary's costs during a

month or year.  The amounts are a flat per low-income member per month rate that is based on

bid estimates rather than actual utilization and intended in aggregate to pay for the plan's entire

low-income population.

 **Consequences after the coverage year:**  Following the end of the coverage year, CMS

reconciles the monthly prospective year disbursements to Part D sponsors with updated

enrollment and health status data based on the actual costs Part D sponsors have incurred,

including low-income subsidy costs.   The final reconciliation is conditional upon Part D

sponsors' provision of information to CMS (see 42 CFR 423.322).  The primary mechanism

through which Part D sponsors provide payment data to CMS is the prescription drug event

("PDE").  Each PDE reflects a specific prescription drug transaction for a particular beneficiary

on a particular date of service. The PDE notifies CMS of the cost that the Part D sponsor has

incurred with respect to the particular prescription drug transaction, and separately identifies

costs incurred due to low-income cost-sharing subsidies.  Part D sponsors submit PDEs on an

ongoing basis throughout the coverage year.  Specific details on the methods by which Part D

sponsors submit the PDE reports and the payment mechanisms are outlined in Subpart G of 42

C.F.R. Part IV  and in the PDE Instructions and Participant Training Guide.  (See PDE guidance;

see also

http://www.csscoperations.com/new/pdic/pdd-training/pdd-training.html .)  After Part D

sponsors submit a PDE to CMS, they receive a response one or two days later indicating whether

the PDE has been approved or rejected by CMS' systems.  CMS' systems generally have in place

an edit that rejects a PDE if the PDE claims an incurred cost based on a low-income cost-sharing

subsidy where CMS' systems do not indicate the beneficiary is subsidy-eligible.  If a PDE has

been rejected, the basis for that rejection is indicated by code.  Code 715 indicates a rejection

based on a discrepancy between the subsidy-eligible status of the beneficiary in CMS' systems

and whether or not the Part D sponsor incurred a subsidy-based cost.  Thus, a response indicating

rejection based on Code 715 places the Part D sponsor on notice of such a discrepancy.  Part D

sponsors may resubmit PDEs for the same drug event at any time until five months following the

end of a coverage year.  (In 2006, this deadline was extended by two months so that Part D

sponsors had until July 31, 2007, to submit PDEs.) Following that time, using the PDE data

submitted by the Part D sponsors and accepted by CMS' systems, CMS makes final

reconciliation of payments for low-income cost-sharing subsidies.  Under CMS regulations, if the

reconciliation process shows that either CMS or a Part D sponsor owes the other a balance, the

balance may be paid either through a lump-sum payment or by adjusting monthly prospective

payments during the remainder of the payment year following the coverage year for which the

reconciliation occurred. In 2006, at the end of the reconciliation process, the balance of any credit

that CMS owed to a Part D sponsor was paid in the payment month following the completion of

reconciliation. The balance of any credit that a Part D sponsor owed to CMS was offset against

the monthly payment that CMS provided to the Part D sponsor in the month following the

- 18 -

completion of reconciliation, and if necessary in future months.

In December 2006, CMS notified Part D sponsors that it was adopting an amnesty for the 2006 coverage year and would put in place a process whereby PDEs for the coverage year 2006 would not be rejected where Part D sponsors indicated they had incurred a subsidy-related cost but CMS' systems did not reflect subsidy eligibility. On January 5, 2007, CMS turned off the edit in CMS' systems that caused automatic rejection of PDEs based on subsidy eligibility discrepancies. CMS then notified Part D sponsors to resubmit any PDEs that had been rejected based on code 715. These PDEs would be approved where Part D sponsors had incurred subsidy costs based on their belief that a beneficiary was eligible for a subsidy, even where CMS' systems did not reflect a subsidy-eligible status.

Therefore, as long as Part D sponsors resubmitted the appropriate PDEs for the coverage year 2006, Part D sponsors did not incur any unreimbursed costs as a result of treating a plan member as eligible for LIS cost-sharing where CMS' systems did not indicate the member's eligibility.

On December 6, 2006, CMS issued a memorandum providing Part D sponsors with guidance on how to transition from the amnesty policy in effect for coverage year 2006 to new policies that would be applied in the 2007 reconciliation process. For those members who were not verified as LIS-eligible in CMS' systems but who had received LIS cost-sharing in 2006, CMS required Part D sponsors to determine whether these members qualify as LIS-eligible under CMS's BAE policy. If so, Part D sponsors were instructed to submit Corrections Requests to CMS to change their status in CMS' systems. If not, Part D sponsors were instructed to change the member's LIS status to match that indicated in CMS' systems. The December 6, 2006 memo proposed a list of evidence that CMS would consider sufficient for purposes of a Part D

sponsor's submission of a Corrections Request to CMS, and invited comments on this list.  Later guidance has confirmed to Part D sponsors that during the 2007 coverage year, they must accept best available evidence of a member's LIS eligibility.  If they receive sufficient evidence of a member's LIS status, they must apply that cost-sharing level to that plan member immediately, without waiting for CMS' systems to be updated through a Corrections Request.

For purposes of coverage year 2007 and forward, therefore, CMS does not anticipate that Part D sponsors will face adverse consequences during the final reconciliation, in terms of CMS payments, where Part D sponsors have accepted best available evidence of LIS eligibility.  Where CMS' systems do not show that a member is eligible at any given time, Part D sponsors may avoid any adverse consequences during the final reconciliation by applying the BAE policy and submitting Corrections Requests to CMS when appropriate.  If the Corrections Request is approved and CMS updates its system, the Part D sponsor may then submit or, if necessary, resubmit the appropriate PDE.

Where Corrections Requests are not approved, Part D sponsors may resubmit data or appeal the denial.  CMS records may also update as a result of new information provided by states.  As long as CMS' systems are updated when final reconciliation occurs, at least six months after the end of the coverage year, any discrepancy between PDP records and CMS records will not affect the final reconciliation.  Corrections may continue to be made after final reconciliation has occurred.  If necessary, the reconciliation process may be reopened.  Where Part D sponsors fail to submit the necessary evidence to justify a Correction, CMS will not be able to verify that the member is LIS-eligible.  During the final reconciliation, Part D sponsors will not be credited with cost-sharing amounts for those members.

Dated: November 30, 2007

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General
JEFFREY A. TAYLOR
United States Attorney
SHEILA M. LIEBER
Deputy Director

 /s/ Kathryn L. Wyer
KATHRYN L. WYER
U.S. Department of Justice, Civil Division
20 Massachusetts Ave., NW,
Washington, D.C.  20530
Telephone: (202) 616-8475 / Fax: (202) 616-8202
kathryn.wyer@usdoj.gov
*Attorneys for Defendants*

I hereby declare under penalty of perjury that Defendant's Responses to

Interrogatories 2, 3 and 4 are true and correct, based on information available to me in the

course of my official duties.

Executed on November 30, 2007, in Baltimore, Maryland.


*Danielle Moon*

Danielle Moon
Deputy Director, Medicare Enrollment and Appeals Group
Center for Beneficiary Choices
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850

I hereby declare under penalty of perjury that Defendant's Responses to

Interrogatories 5, 6 and 7 are true and correct, based on information available to me in the

course of my official duties.

Executed on November 30, 2007, in Baltimore, Maryland.


Cynthia Tudor
Director, Medicare Drug Benefit Group
Center for Beneficiary Choices
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850

I hereby declare under penalty of perjury that Defendant's Response to Interrogatory No. 7 is true and correct, based on information available to me in the course of my official duties.

Executed on November 30, 2007, in Baltimore, Maryland.


Jeffrey Grant
Director, Division of Payment Systems
Medicare Plan Payment Group
Center for Beneficiary Choices
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850

# EXHIBIT B

Transcript, Deposition of Abby Block - Errata

**ERRATA SHEET**
**DECEMBER 4, 2007  DEPOSITION OF ABBY BLOCK**
**LTCPA et al v. Leavitt**

I wish to make the following changes to my deposition:

| PAGE | LINE | TEXT AS TRANSCRIBED | CHANGE TO | REASON FOR CHANGE |
|------|------|---------------------|-----------|-------------------|
| 15 | 22 | Yes, I do. | Yes, I did. | Transcription error or misstatement (TE/M) |
| 31 | 18 | I can think … | A.  I can think. | TE |
| 34 | 3 | profit | process | TE |
| 48 | 20 | placement | replacement | TE/M |
| 55 | 18 | Medicaid Stay Operations | Medicaid State Operations | TE |
| 55 | 21 | Medicaid Stay Operations | Medicaid State Operations | TE |
| 56 | 4 | has | heads | TE/M |
| 66 | 11 | transmittal response report | Transaction Reply Report | M |
| 67 | 2 | plant | plans' | TE |
| 71 | 4 | best | that's | TE |
| 75 | 13 | state has filed | state has failed | TE |
| 100 | 22 | been | between | TE |
| 130 | 1 | fax sheet | Fact Sheet | TE |
| 131 | 12 | see | seek | TE/M |
|  |  |  |  | TE |

**ERRATA SHEET**
**DECEMBER 4, 2007  DEPOSITION OF ABBY BLOCK**
**LTCPA et al v. Leavitt**

| | | | | |
|---|---|---|---|---|
| 140 | 19 | complain | complaint | |
| 154 | 16 | in | on | TE |
| 154 | 22 | rules | duals | TE |
| 164 | 16 | co-share | co-pay | TE/M |
| 180 | 7 | in | on | TE |
| 203 | 7 | talk | we talk | TE/M |
| 217 | 18 | ships | SHIPs | TE |

Date: _12/18/2007_     ___Abby Block___
Abby Block

# EXHIBIT C

CMS, HPMS Release Q&A (July 7, 2006)

**LIS Incorrect Cost-Sharing - Making the Beneficiary Whole**

Q:   If a plan determines that a LIS-eligible enrollee was assessed a higher level of cost-sharing than CMS confirms he or she qualified for (e.g., $2/$5 rather than $1/$3), how can it make the enrollee whole?   If the amount owed by the plan is minimal, is the plan still obligated to make the enrollee whole?

A:  Given the vulnerability of this population, as well as our rules in 42 CFR 423.800(c), we believe the plan must make the enrollee whole by refunding any improperly collected cost-sharing. In general, a plan should send the enrollee a check for any amounts owed by the plan to the beneficiary.

A plan may also identify a minimal cut-off amount whereby, if the amount owed by the plan is less than that amount, it would reimburse the beneficiary through an offset of future cost-sharing rather than a check.  In other words, rather than send a check, the plan would choose to reimburse a beneficiary who is owed less than the cut-off amount via an offset.  However, an enrollee should always have the opportunity to request and receive reimbursement via check.

CMS regulations at 42 CRF 423.800(c) direct the plan to reimburse subsidy-eligible individuals, and any organizations paying cost sharing on behalf of such individuals, any excess premiums or cost sharing paid by such individual or organization.   The intent of this provision is to direct the plan to make reasonable efforts to determine the party that should be reimbursed for excess cost sharing before making reimbursement.  Therefore, CMS expects that plans will develop standard operating procedures (SOPs) to address the research and determinations of liability for cost sharing reimbursements, and will not adopt a "one size fits all" approach, such as always cutting checks to the beneficiary. Plans should consider such variables as institutionalized status or the presence of secondary payers reported on the COB files in their SOPs.  Moreover, any direct request for reimbursement with appropriate evidence of payment should be handled expeditiously.

Per previous guidance, when implementing retroactive subsidy level changes for a full-benefit dual eligible who meets the definition of an institutionalized individual but is incorrectly charged cost-sharing, plans should not automatically reimburse beneficiaries residing in long-term care (LTC) facilities.  In such situations, it is unlikely that LTC pharmacies have collected the applicable cost-sharing from beneficiaries due to the expectation that the plan eventually would reimburse the pharmacy retroactively for such amounts.  This may also be the case in non-LTC pharmacies, though probably not to the same degree as it has been the case in the LTC setting, where the LTC pharmacy is more likely to hold a receivable balance on its books, or may have recourse to the LTC facility for uncollected amounts.

Plans should work with their network pharmacies to provide them with direct reimbursement for any cost-sharing amounts not collected from LIS-eligible enrollees. Before reimbursement is made, plans should ensure that the pharmacies in question have

L000171

not collected cost-sharing amounts, otherwise waived the cost-sharing charges, and, in fact, are carrying a debt for the amounts incorrectly charged to the beneficiary. For auditing purposes, plans should ensure that pharmacies certify that the amounts reimbursed are appropriate, owed, and payable. Providing direct reimbursement to pharmacies for excess cost-sharing charges that have not been paid by Part D enrollees or that have been waived by the pharmacy does not conflict with the requirement in 42 CFR 423.800(c) that beneficiaries be made whole, since such amounts were never paid by either the enrollee or others on his or her behalf.

In addition, the plan should ensure that once it refunds any cost-sharing, the PDE is adjusted. Although both LICS and Patient Pay amounts are TrOOP-eligible amounts, the LICS amount must be correct because LICS is a cost-based payment mechanism and CMS uses the LICS Amount field to calculate the Part D Payment Reconciliation for LICS. The adjustment PDE shows that LICS increases and Patient Pay decreases by the same amount (provided the beneficiary receives no assistance from a TrOOP-eligible other payer like an SPAP). Plans must use the "Report-As-Adjusted" method to show changes in every affected PDE, and not the "Report-As-Administered" method, anytime a change in LICS amounts is involved.

L000172

# EXHIBIT D

CMS, Memo: Incorrect Cost Sharing Charges to Dual Eligible Beneficiaries
(May 5, 2006)

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



## CENTER FOR BENEFICIARY CHOICES

<u>MEMORANDUM</u>

TO:          All Part D Plan Sponsors

FROM:        Gary Bailey, Deputy Director

RE:          Incorrect Cost Sharing Charges to Dual Eligible Beneficiaries

DATE:        May 5, 2006

CMS has received numerous complaints concerning full benefit dual eligible beneficiaries being charged incorrect co-payments at the pharmacy. We are aware that a number of factors are contributing to the incorrect cost sharing for full benefit dual eligible individuals, including the lags associated with the scheduled reporting of information from the State to CMS, delays in Part D plans updating their systems, CMS's prior instruction to the States to report only current or prospective changes to beneficiary institutional status, and confusion in the long-term care provider community regarding when an institutionalized beneficiary qualifies for a zero copayment. To clarify this last point, an individual is considered institutionalized and qualified for a zero copayment when he or she is a full benefit dual eligible, a resident in a long-term care facility for a full calendar month, and under a covered Medicaid stay. Qualification for the zero copayment is effective on the first day of the month in which a beneficiary is expected to remain in a long term-facility for a full calendar month stay that is covered by Medicaid.

This memorandum is part of a three-step approach CMS is taking to address the issue of incorrect cost sharing. We initiated these efforts on March 22, 2006 by requesting that States begin to report retroactive changes in beneficiary institutional status on the State Monthly MMA Enrollment File no later than July 2006. As a second step, we are conducting additional outreach with the pharmacy community. In this outreach, we will explain when a beneficiary is considered institutionalized for the purposes of the zero copayment as well as address the data lag associated with monthly state reporting and its impact on the Part D plan's systems updates. We encourage you to undertake similar outreach efforts with your pharmacy networks.

The final step in this effort to mitigate incorrect cost sharing to dual eligible beneficiaries is to outline CMS's expectations in three areas related to Part D plans changing a beneficiary's cost sharing levels.

L000166

- <u>Best Available Data</u> -- Part D plans are required to use the "best available data" when they have knowledge that a beneficiary's cost sharing level is not correct. For example, if the plan has knowledge from the nursing facility, or an advocate acting on behalf of the beneficiary, that the individual is covered by Medicaid for his/her institutional stay or that the beneficiary is a full benefit dual eligible, the plan should make changes to its systems to accommodate the revised copayment level. As part of the confirmation process, plans will be required to keep appropriate records in order to reconcile low-income subsidy payments with CMS. We are working on an automated  process for updating our systems when after a lag the correct copayment level is still not reflected.

- <u>Plan Systems Lag</u> -- Part D plans must update their systems for changes in copayment status when processing the transaction reply reports (TRRs) from CMS. We are aware of examples where institutional status indicators have been successfully transmitted by the states, but the drug claims are being processed against non-zero copayment amounts. Plans must ensure these critical systems updates are processed timely in order to avoid a prolonged lag period in which plan databases are not reflecting correct beneficiary copayment status.

- <u>LTC Pharmacy Reimbursement for Incorrect Copayments Charged</u> – Part D plans are encouraged to reimburse LTC pharmacies directly when implementing retroactive subsidy level changes. Plans should not automatically reimburse beneficiaries residing in long-term care facilities because it is unlikely that the LTC pharmacies have billed the beneficiaries for their copayments.

Please contact your account manager is you have any questions concerning this memorandum.

# EXHIBIT E

CMS, Q&A (May 25, 2006)

Q:    CMS instructed Part D plans on May 5, 2006 that they are required to use the "best available data" to make changes to their systems when they have knowledge that a dual eligible beneficiary's cost sharing level is not correct. What does CMS mean by best available data?

A:    Part D plans have flexibility to develop their own procedures for determining whether best available information is sufficient to change or update their systems to reflect appropriate cost sharing levels for dual eligibles. For example, with respect to dual eligibles who are community residents, a Part D plan may rely on the beneficiary showing the contracted pharmacy a current Medicaid card or on information provided by a state Medicaid office as proof of low-income subsidy status. Since the Part D plan will not know the exact subsidy level for the dual eligible beneficiary, it should default the enrollee to a $2/$5 benefit package.

For full benefit dual eligibles who are residents of long term care (LTC) facilities, a plan may develop procedures that rely on attestations from LTC pharmacy and facility personnel that certain residents who are enrollees of the plan are Medicaid eligible, have been or are expected to be residents of the facility for a full calendar month, and are under a Medicaid-covered stay. For LTC facility residents, Part D plans should rely on information that clearly indicates the elements necessary to confirm Medicaid eligibility and LTC facility admission dates for purposes of establishing a full calendar month of LTC facility residency. This could include location codes on billing transactions from the LTC pharmacies, in conjunction with the institutional attestations necessary to confirm Medicaid eligibility and LTC facility admission dates for a Medicaid-covered inpatient stay. As part of their procedures, Part D plans should keep appropriate records in order to reconcile low-income subsidy payments with CMS after the end of the contract year.

# EXHIBIT F

CMS, Memo: Implementing our Best Available Data Policy for Low-Income Subsidy (LIS)
Status (Oct. 30, 2006)

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



## CENTER FOR BENEFICIARY CHOICES

**Date:**      October 30, 2006

**To:**        Part D Plan Sponsors

**From:**      Cynthia Tudor, Ph.D., Director, Medicare Drug Benefit Group

**Subject:**   Implementing our Best Available Data Policy for Low-Income Subsidy (LIS) Status


The purpose of this memo is to provide your organization with instructions on how to process LIS systems' notifications when your organization has contrary information about a beneficiary's cost sharing status under CMS' best available data guidance.

Background

As you may recall, CMS instructed Part D plan sponsors on May 5, 2006 that they are required to use "best available data" to make changes to their systems when they have knowledge that a dual eligible beneficiary's cost sharing level is not correct.  As a result of implementing this policy, a sponsor may not process a change that disadvantages a beneficiary if the sponsor has evidence that a beneficiary was <u>Medicaid eligible</u>, thereby entitling the beneficiary to a lower cost sharing status.

Generally, these situations arise when the beneficiary has applied for Medicaid later in the year after having applied for LIS through the Social Security Administration (SSA).  As a result of time lags associated with state-reported data, CMS plan enrollment and eligibility files may not yet reflect a beneficiary's dual eligible status that entitles the beneficiary -- as a full benefit dual eligible -- to a $2/$5, $1/$3 or $0 cost sharing for covered Part D drugs.  In accordance with our best available data policy, the plan sponsor must reflect the true cost sharing status where the plan has contrary evidence that either the individual qualifies for (1) $0 copayments as a full-benefit dual eligible who is a resident in a long-term care facility for a full calendar month under a covered Medicaid-covered stay, or (2) $1/$3 or $2/$5 copayments as a full benefit dual eligible meeting certain poverty level income thresholds.

Instructions for Part D plan sponsors

There are two scenarios that will occur in your LIS reports from CMS.  Plan sponsors should take action according to the following logic.

L000173

**If data places the individual in a less favorable status,** take these three steps:
- If you had applied the best available data policy and you determine that the information has a solid foundation, do not change the person's status.
- If you determine that the information you have does not have a solid foundation, change the member's LIS status as of the effective date provided in the CMS reports. The plan sponsor must then make reasonable attempts to collect the outstanding cost sharing (see Attachment). The plan sponsor must also adjust the associated prescription drug event data (PDEs).
- Follow the processes in the Marketing guidelines that describe providing the LIS Rider to the EOC to notify the member.

**If data places the individual in a more favorable status,** take these three steps:
- Change the status in your systems, using the effective date provided.
- Take appropriate actions to make the beneficiary whole, as appropriate, for excess cost sharing, and adjust the PDEs. (see Attachment)
- Follow the processes in the Marketing guidelines that describe providing the LIS Rider to the Evidence of Coverage document (EOC) to notify the member

*Summary of co-pay/premium hierarchy*

| Current LIS Status | | LIS Status as Reflected in the CMS LIS Plan Reports | | Action |
|---|---|---|---|---|
| *Co-Pay Category* | *Premium Subsidy Percentage* | *Co-Pay Category* | *Premium Subsidy Percentage* | |
| 1, 2 or 3 | 100 | 1 or 4 | 100 or 100,075,050,025 | Determine if best available data policy applies |
| 4 | 100, 75, 50, 25 or 0 | 1 or 4 | 100 or 100,075,050,025 | Apply change as of effective date indicated in report |

Subsidy Changes During the Year

It is important that Part D plan sponsors understand that there will continue to be changes throughout the year that may positively or negatively affect your members' LIS status. Changes can occur for a variety of reasons. For example, when a beneficiary appeals a determination, reports a subsidy changing event to SSA (e.g., changes in marital status), or becomes Medicaid eligible, the beneficiary's LIS status may change. Thus, it is important that plans understand when to update an enrollee's LIS status based on CMS reports, and when to apply our best available data policy.

Points of Contact

For **technical** questions about LIS notifications, please contact:
MMA Help Desk
Phone: 1-800-927-8069
Email: mmahelp@cms.hhs.gov

L000174

Hours of Operation: M-F 6 a.m. to 9 p.m. EST

For **policy** questions pertaining to reconciling LIS cost sharing, please contact:
Alissa Deboy 410-786-6041.

3

# EXHIBIT G

CMS, Memo: Reconciling CMS Low Income Subsidy (LIS) Status and "Best Available Data" Policy for 2006 and 2007 (Dec. 6, 2006)

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



## CENTER FOR BENEFICIARY CHOICES

**DATE**              December 6, 2006

**Memorandum to:**    All Part D Sponsors

**Subject:**          Reconciling CMS Low Income Subsidy (LIS) Status and "Best Available
                      Data" Policy for 2006 and 2007

**From:**             Cynthia Tudor, Ph.D., Director, Medicare Drug Benefit Group

Early in 2006, a number of factors contributed to the problem of incorrect cost-sharing levels for full-benefit dual eligibles and other LIS eligible individuals. The purpose of this memorandum is to provide instructions for reconciling CMS LIS status and implementing the best available data policy[1] for 2006 and for 2007. This memorandum amends certain instructions issued in our October 30, 2006 memorandum entitled, "Implementing our Best Available Data Policy for Low-Income Subsidy (LIS) Status".

**Instructions for 2006**

**SSA Subsidy Level Changes**: For those LIS beneficiaries who were included on the October 30, 2006 Special LIS Resynchronization Report, continue to follow the instructions contained in the October 30, 2006 memorandum entitled, "Implementing our Best Available Data Policy for Low-Income Subsidy (LIS) Status".

**Other LIS Changes**: Contrary to the October 30th memorandum, do **not** follow the instructions in the October 30, 2006 memo in the subsection "If data places the individual in a less favorable status" for other beneficiaries for whom LIS status was defaulted based on prior CMS guidance. Instead, for those beneficiaries for whom LIS status was defaulted in 2006, who were not included on the October 30, 2006 Special LIS Resynchronization Report, and for whom CMS data files have never substantiated the default level, you must determine whether you have supporting evidence (i.e., currently meet criteria such as those outlined in Attachment I) to substantiate the continued adjudication of a subsidy status in accordance with the best available data policy and take one of two actions:

---

[1] In an effort to address issues associated with incorrect cost-sharing, CMS issued a memorandum to all Part D sponsors in May 5, 2006 directing plans to use the "best available data" when they had knowledge that a beneficiary's cost sharing level was not correct. Plans were instructed to keep appropriate records of the evidence supporting these changes in order to reconcile low-income subsidy payments with CMS.

1. If documented evidence is available to substantiate the defaulted status (see Attachment I), do not change the beneficiary's subsidy status (i.e., continue to adjudicate the benefit at the same level into 2007).

2. If substantiating information cannot be secured, change the member's LIS status to the status indicated in CMS files effective January 1, 2007, and

    o Plans must immediately send the attached model notice (see Attachment II) to inform beneficiaries that the default LIS will not continue into 2007 *(Note that contrary to the October 30, 2006 instructions, plans will not recoup the amount that was subsidized at the default LIS level).*

    o Plans will be permitted to report the actual LIS cost sharing charged on the PDEs for these individuals who were defaulted without documentation. However, since this will require further systems modifications to prevent the rejection of these data, PDE reporting instructions will be issued separately.

Plans will shortly be receiving two separate reports from CMS, one of which will identify beneficiaries who will be losing LIS status effective December 31, 2006 and the other reporting 2007 LIS status, if any, for all beneficiaries. Plans should review these reports to identify any beneficiaries for whom LIS status has been defaulted. If any of these beneficiaries is shown on either report as losing LIS effective December 31st or as having no or less favorable LIS status for 2007, plans must secure solid supporting documentation in order to continue the beneficiary under best available data policy. Individuals who do not qualify for a continued subsidy under the best available data policy must have their subsidy status be discontinued after 2006 and be handled according to the instructions in #2, above.

**Instructions for 2007**

For 2007, Part D plan sponsors must match the LIS subsidy status reflected in CMS files unless the best available data policy applies. Plans must no longer default to LIS status without applying the best available data policy requirements. If best available data policy requirements have been met, the plan must override CMS subsidy-level data and apply the appropriate cost-sharing level until CMS systems are updated to accurately reflect information about a beneficiary's dual eligibility.

In early 2007, CMS will be implementing a systems change that will permit CMS staff to manually input a beneficiary's correct LIS deemed status once the plan sponsor has obtained and submitted documentation confirming the beneficiary's dual eligible status. This process will allow CMS and plan subsidy level records to be synchronized for those beneficiaries for whom Medicaid status has not been updated within a certain period of time.

CMS will be finalizing the 2007 best available evidence policy and procedures for correcting low-income subsidy levels in the next several weeks. The following bullets describe the policy direction CMS is considering pending final guidance. Comments on this list and on other points

L000183

of clarification should be directed to your Trade Associations for consolidation and discussion with CMS.

- In general, while plans may initially rely on evidence presented at the pharmacy, they will need to follow up with additional documentation within a specified period of time. Specifically:

- **When confirming documentation is obtained:** For beneficiaries for whom confirming documentation is obtained (see Attachment I), the plan sponsor will continue the individual's lower cost-sharing status and relay the documentation to CMS for correction of CMS systems.

- **When confirming documentation cannot be obtained:** If the plan sponsor is unable to substantiate a basis for the beneficiary's lower cost-sharing status, the plan must reinstate the CMS-provided subsidy level. In these cases, plans will be required to send the attached model notice (see Attachment III) to recover excess cost-sharing paid on behalf of the member during the discrepant period.

- **Timeframe for obtaining documentation:** Plan sponsors must allow no more than the last day of the 2nd month, after the month of the onset of default cost-sharing, to collect documentation confirming the beneficiary's dual status (and $0 copayment level for institutionalized dual eligibles). For example, if a member presents evidence of his or her dual status at the pharmacy on February 2nd, the Part D plan sponsor needs to confirm status no later than the end of April.

For questions concerning the best available data policy and reconciling LIS cost-sharing, please contact Deborah Larwood at 410-786-9500.

L000184

Attachment I

## Proposed Evidence Necessary to Document
## A Necessary Change in Subsidy Level

<u>Proof of Low-Income Subsidy Status:</u>

- A copy of a member's Medicaid card with includes the member's name and the eligibility date during the discrepant period;
- A copy of a letter from the State or SSA showing Medicare Low-Income Subsidy status
- The date that a verification call was made to the State Medicaid Agency, the name and telephone number of the state staff person who verified the Medicaid period, and the Medicaid eligibility dates confirmed on the call;
- A copy of a state document that confirms active Medicaid status during the discrepant period;  or
- A screen-print from the State's Medicaid systems showing Medicaid status during the discrepant period; or
- Evidence at point-of-sale of recent Medicaid billing and payment in the pharmacy's patient profile, backed up by one of the above indicators post point-of-sale.

<u>Proof of Institutional Status for a Full-Benefit Dual Eligible</u>:

- A remittance from the facility showing Medicaid payment for a full calendar month for that individual during the discrepant period;
- A copy of a state document that confirms Medicaid payment to the facility for a full calendar month on behalf of the individual; or
- A screen print from the State's Medicaid systems showing that individual's institutional status based on at least a full calendar month stay for Medicaid payment purposes during the discrepant period.

L000185

# EXHIBIT H

CMS, Memo: Reconciliation Readiness Reviews (Feb. 27, 2007)
(excerpts)

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



## CENTERS FOR BENEFICIARY CHOICES

**DATE:**        February 27, 2007

**TO:**          Medicare Advantage Organizations, Prescription Drug Plan Sponsors and
                 Other Interested Parties

**FROM:**        Thomas Hutchinson
                 Director, Medicare Plan Payment Group

**SUBJECT:**     Reconciliation Readiness Reviews

The deadline for submitting Prescription Drug Event (PDE) data for the 2006 benefit year
is May 31, 2007. CMS currently plans to provide a short extension of that deadline for
purposes of completing error correction, primarily those edits related to eligibility and
tied to the second phase of enrollment reconciliation. However, any extension will be
intended only to allow plans to submit data for errors that require CMS intervention to
resolve. All other data should be submitted by the deadline, including data that has
previously triggered edits but can be resolved through correction and resubmission by
plans. To assist plans as we move into the final phases of data collection for 2006, we are
providing the following guidance related to error correction.

Error correction is a process that should commence with the receipt of every PDE return
file from the Drug Data Processing System (DDPS). Plans should assess the types of
errors received and determine whether the plan is responsible for correcting the data or
whether the plan needs to bring a specific data issue to CMS' attention for assistance with
resolution. For errors that are within a plan's control to correct, plans should correct the
data and resubmit as early as possible.

We are providing three tables with guidance related to the most common errors impacting
PDEs. The tables divide edits into three main categories:
- Table 1: Edits which plans can and should resolve without needing CMS
  assistance;
- Table 2: Edits for which CMS has already taken an action to facilitate transactions
  passing DDPS editing;
- Table 3: Edits that CMS is working to address in order for all plan data to pass
  DDPS edits.

In addition, because some edits are related to coverage status for certain National Drug
Codes (NDCs) and National Council for Prescription Drug Programs (NCPDP) ID
numbers, CMS is providing additional attachments to this document. The first provides
the status of specific NDC changes in our system, including those that have been

L000316

instituted and those that remain to be addressed.  The second lists ID numbers that are failing in our system because they are reported as NCPDP numbers, but fail the NCPDP check digit algorithm (i.e., they are not legitimate ID numbers).

CMS expects that plans will respond to the errors listed in the first two tables in this document by making corrections as necessary and submitting data promptly.  All data that can be corrected (as delineated on those tables) should be resubmitted as quickly as possible.  CMS plans to provide ongoing updates related to the remaining edits and expects that plans will be prepared to respond rapidly as DDPS or its supporting databases are updated to facilitate PDE submission.  If you have questions about error correction, please contact the Customer Service and Support Center at (877) 534-2772.

**Table 2:  Edits that CMS has taken action to help resolve**

| Error Code | Message to be Reported | CMS Resolution/Plan Action to be Taken |
|---|---|---|
| 706 | This DOS does not fall in a valid P2P period.  The Beneficiary must be enrolled in this Contract on the DOS.) | In August 2006, CMS implemented plan to plan reconciliation (P2P) Phase I.  Effective Jan 5, 2007 CMS implemented P2P Phase II.  Resubmit any PDEs that have rejected with 706 error code *and* that were processed on or before January 5, 2007. |
| 715 | Dollars reported in LICS are greater than zero.  However, Beneficiary is not eligible for LICS subsidy. | For 2006 DOS, resubmit.  Effective Jan 5 2007, CMS discontinued this edit for 2006; instead of rejecting with 715, DDPS saves these records and returns an INF edit.  Plans should resubmit any 2006 PDEs that previously rejected with 715. |
| 737 | Inappropriate Drug Coverage Status Code.  Drug Coverage Status Code is not 'O' although the drug is on the OTC list. | CMS has updated several codes and is scheduled to update other groups of codes as annotated on the attached NDC lists.  Plans should resubmit NDCs when a specific code has been updated. |
| 738 | Inappropriate Drug Coverage. Drug Coverage Status Code is 'C' although the drug is on the exclusion list. | CMS has updated several codes and is scheduled to update other groups of codes as annotated on the attached NDC lists.  Plans should resubmit NDCs when a specific code has been updated. |
| 740 | NDC is DESI drug. | CMS updated reference tables to allow limited drugs on approved formularies.  All other DESI drug edits reflect Federal statute and will not be changed for 2006.  Updated DESI drugs are on attached NDC list. |
| 741 | The drug is always excluded from Part D; the drug is always covered by Part B. | CMS has updated several codes and is scheduled to update other groups of codes as annotated on the attached NDC lists.  Plans should resubmit NDCs when a specific code has been updated. |
| 784 | Duplicate PDE Record, originally submitted by a different Contract | CMS has created this edit to provide information on the original submitting contract.  The plan that receives this edit must contact the original submitting contract to determine how to resolve.  If pharmacy billed multiple plans, one of the plans must reverse the claim.  If the original submitting contract reversed the claim to the pharmacy previously and failed to submit deletion PDE, the original submitting contract must submit a deletion PDE; then the contract that received the 784 reject can resubmit. |

L000320

# EXHIBIT I

CMS, Prescription Drug Benefit Manual, Ch. 5: Benefits and Beneficiary Protections,
§§ 50.5.2, 50.5.3

# Prescription Drug Benefit Manual

# Chapter 5:  Benefits and Beneficiary Protections

---

**Table of Contents**

10      Benefits and Beneficiary Protections

      10.1 – Introduction
      10.2 – Definition of Terms

20      Requirements Related to Qualified Prescription Drug Coverage

      20.1 – General
      20.2 – Availability of Prescription Drug Plans
      20.3 – Standard Prescription Drug Coverage
            20.3.1 – Defined Standard Coverage
            20.3.2 – Actuarially Equivalent Standard Coverage
      20.4 – Alternative Prescription Drug Coverage
            20.4.1  – Basic Alternative Coverage
            20.4.2  – Enhanced Alternative Coverage
            20.4.3  – Restrictions on the Offering of Enhanced Alternative Coverage by PDP Sponsors
            20.4.4  – Restrictions on the Offering of Enhanced Alternative Coverage by MA Organizations
            20.4.5  – Restrictions on the Offering of Enhanced Alternative Coverage by Cost Plans
      20.5 – Negotiated Prices
      20.6 – Dispensing Fees

30      Incurred / "True Out-of-Pocket" (TrOOP) Costs

      30.1 – Costs that Count as Incurred Costs
      30.2 – Costs that Do Not Count as Incurred Costs
      30.3 – Summary of TrOOP-Eligible and TrOOP-Ineligible Payers
      30.4 – Pharmacy Waiver/Reduction of Cost-Sharing and Applicability toward TrOOP

40      Prescription Drug Plan Sponsor Service Areas

50      Access to Covered Part D Drugs

      50.1 – Retail Pharmacy Access

L000250

50.2 – Mail-Order Pharmacy Access
50.3 – Specialty Pharmacy Access
50.4 – Home Infusion Pharmacy Access
50.5 – Long-Term Care (LTC) Pharmacy Access
     50.5.1 –Convenient Access to LTC Pharmacies
     50.5.2 – Performance and Service Criteria for Network LTC Pharmacies
     50.5.3 Other LTC Contracting Terms and Conditions and Uniformity of Benefits
     50.5.4 – Access to LTC Pharmacies for Enrollees Residing in IMDs, ICFs/MR, and LTC Hospitals
50.6 – I/T/U Pharmacy Access
50.7 – Waiver of Pharmacy Access Requirement
     50.7.1 – Waiver of Retail Pharmacy Access Requirements for MA-PD Plans and Cost Plans with Plan-Owned and Operated Pharmacies
     50.7.2 – Waiver of Pharmacy Access Requirements for Private Fee-for-Service Plans
50.8 – Pharmacy Network Contracting Requirements
     50.8.1 – Any Willing Pharmacy Requirement
     50.8.2 – Insurance Risk
50.9 – Differential Cost-Sharing for Preferred Pharmacies
50.10 – Level Playing Field Between Mail-Order and Retail Pharmacies
50.11 – Use of Identification Card for Accessing Negotiated Prices

60     Out-of-Network Access

60.1 – Out-of-Network Pharmacy Access
60.2 –Access to Vaccines
     60.2.2 – Facilitated OON Vaccine Access Approaches
     60.2.1 – In Network Vaccine Distribution Approaches

70     Public Disclosure of Pharmaceutical Prices for Equivalent Drugs

80     Privacy, Confidentiality, and Accuracy of Enrollee Records

**Note:  This manual is subject to change to both periodic and annual updates and currently reflects CY 2007 guidance.**

L000251

under a CMS designated contract number, relative to the number of LTC pharmacies contracted by the sponsor and licensed in the State(s) and/or territory(ies) covered by the total service area.

- For regional MA-PD plan sponsors and PDP sponsors: The number of nursing home beds (provided by CMS) in each of the State(s) or territory(ies) covered under the CMS designated contract number, relative to the number of pharmacies contracted by the sponsor and licensed in the State(s) and/or territory(ies).

We expect LTC pharmacy contracting activity will be ongoing as Part D sponsors continue to identify LTC facilities and LTC pharmacies, and as they examine their auto-enrollment assignments and incoming enrollments. To the extent that a beneficiary is enrolled in a Part D sponsor's plan that does not have a contract with a LTC pharmacy that can serve the LTC facility in which he or she resides, the appropriate action for a Part D sponsor to take is to contract with the facility's contracted LTC pharmacy or – if that pharmacy will not sign a contract – with another LTC pharmacy that can serve that facility. In some cases, a retroactive contract may be necessary.

## 50.5.2 – Performance and Service Criteria for Network LTC Pharmacies (NTLCPs)

In order to participate in Part D sponsor LTC pharmacy networks, a pharmacy must be capable of meeting certain minimum performance and service criteria (and relevant State laws governing the practice of pharmacy in the LTC setting), as well as any other standard terms and conditions established by the Part D sponsor for its network pharmacies. The following minimum performance and service criteria for pharmacies providing LTC services are based on widely used best practices in the market. These performance and service criteria must be incorporated into an addendum to a Part D sponsor's standard network contract for those pharmacies that would like to be designated NLTCPs.

1. ***Comprehensive Inventory and Inventory Capacity*** – NLTCPs must provide a comprehensive inventory of plan formulary drugs commonly used in the long-term care setting. In addition, NLTCPs must provide a secured area for physical storage of drugs, with necessary added security as required by Federal and State law for controlled substances. This is not to be interpreted as requiring the pharmacy to have inventory or security measures outside of the normal business setting.

2. ***Pharmacy Operations and Prescription Orders*** – NLTCPs must provide services of a dispensing pharmacist to meet the requirements of pharmacy practice for dispensing prescription drugs to LTC residents, including but not limited to the performance of drug utilization review (DUR). In addition, the NLTCP pharmacist must conduct DUR to routinely screen for allergies and drug interactions, to identify potential adverse drug reactions, to identify inappropriate drug usage in the LTC population, and to promote cost effective therapy in the LTC setting. The NLTCP must also be equipped with pharmacy software and

L000278

systems sufficient to meet the needs of prescription drug ordering and distribution to an LTC facility. Further, the NLTCP must provide written copies of the NLTCP's pharmacy procedures manual and said manual must be available at each LTC facility nurses' unit. NLTCPs are also required to provide ongoing in-service training to assure that LTC facility staff are proficient in the NLTCP's processes for ordering and receiving of medications. NLTCPs must be responsible for return for destruction and/or disposal of unused medications following discontinuance, transfer, discharge, or death as permitted by State Boards of Pharmacy. Controlled substances and out of date substances must be disposed of within State and Federal guidelines.

3. *Special Packaging* – NLTCPs must have the capacity to provide specific drugs in Unit of Use Packaging, Bingo Cards, Cassettes, Unit Dose or other special packaging commonly required by LTC facilities. NLTCPs must have access to, or arrangements with, a vendor to furnish supplies and equipment including but not limited to labels, auxiliary labels, and packing machines for furnishing drugs in such special packaging required by the LTC setting.

4. *IV Medications* – NLTCPs must have the capacity to provide IV medications to the LTC resident as ordered by a qualified medical professional. NLTCPs must have access to specialized facilities for the preparation of IV prescriptions (clean room). Additionally, NLTCPs must have access to or arrangements with a vendor to furnish special equipment and supplies as well as IV trained pharmacists and technicians as required to safely provide IV medications.

5. *Compounding /Alternative Forms of Drug Composition* – NLTCPs must be capable of providing specialized drug delivery formulations as required for some LTC residents. Specifically, residents unable to swallow or ingest medications through normal routes may require tablets split or crushed or provided in suspensions or gel forms, to facilitate effective drug delivery.

6. *Pharmacist On-call Service* – NLTCPs must provide on-call, 24-hour-per-day/7-day-a-week service with a qualified pharmacist available for handling calls after hours and to provide medication dispensing available for emergencies, holidays and after hours of normal operations.

7. *Delivery Service* – NLTCPs must provide for delivery of medications to the LTC facility up to seven days each week (up to three times per day) and in-between regularly scheduled visits. Emergency delivery service must be available 24 hours a day, 7 days a week. Specific delivery arrangements will be determined through an agreement between the NLTCP and the LTC facility. NLTCPs must provide safe and secure exchange systems for delivery of medication to the LTC facility. In addition, NLTCPs must provide medication cassettes, or other standard delivery systems, that may be exchanged on a routine basis for automatic restocking. The NLTCP delivery of medication to carts is a part of routine "dispensing."

L000279

8. ***Emergency Boxes*** – NLTCPs must provide "emergency" supply of medications as required by the facility in compliance with State requirements.

9. ***Emergency Log Books*** – NLTCPs must provide a system for logging and charging medication used from emergency/first dose stock. Further, the pharmacy must maintain a comprehensive record of a resident's medication order and drug administration.

10. ***Miscellaneous Reports, Forms and Prescription Ordering Supplies*** – NLTCPs must provide reports, forms and prescription ordering supplies necessary for the delivery of quality pharmacy care in the LTC setting. Such reports, forms and prescription ordering supplies may include, but will not necessarily be limited to, provider order forms, monthly management reports to assist the LTC facility in managing orders, medication administration records, treatment administration records, interim order forms for new prescription orders, and boxes/folders for order storage and reconciliation in the facility.

To qualify as a LTC pharmacy for a Part D sponsor's LTC pharmacy network, a pharmacy must currently have the capacity – either by itself or through subcontracts with other entities – to meet all these performance and service criteria, even if a LTC facility that pharmacy serves does not need a particular service subsumed under those performance and service criteria. Pharmacies subcontracting with other entities to meet the performance and service criteria must ensure that they comply with all relevant Part D requirements, including all performance and service criteria for the provision of long-term care pharmacy services. However, it will ultimately be up to LTC facilities and their contracted LTC pharmacy(ies) to determine which of these specific items or services a nursing facility needs. In other words, a LTC pharmacy must be capable of meeting all the aforementioned performance and service criteria at the time it contracts with a Part D sponsor, but it will not be required to provide all those services to LTC facilities if those facilities do not have a need for certain of those services.

These performance and service criteria are not intended to be exclusive or exhaustive. Rather, they are intended to be minimum requirements for becoming a NLTCP. While payment terms for LTC pharmaceutical and dispensing services are subject to negotiations between the Part D sponsor and its NLTCPs, we note that payment to LTC pharmacies under Part D may only cover drug ingredient costs and dispensing fees as defined in <u>section 20.6</u>. Specialized services provided in the administration of drugs after they are dispensed and delivered from the LTC pharmacy are specifically not covered by the Part D benefit.

### 50.5.3 Other LTC Contracting Terms and Conditions and Uniformity of Benefits

Outside of the minimum performance and service criteria, Part D sponsors and pharmacies may propose a number of contracting terms and conditions. With rare exceptions, CMS does not generally involve itself in determining whether standard

L000280

contracting terms and condition are "reasonable and relevant," since these are fact-specific questions that are best left between negotiating parties.  Thus, for example, we generally do not opine on contracting terms and conditions associated with compensation, billing, and business practices provided such terms and conditions are consistent with explicit Part D statutory and regulatory requirements.

LTC pharmacies may propose other terms and conditions in their negotiations with Part D sponsors as additional beneficiary protections.  Such additional terms and conditions may be problematic because they explicitly conflict with statutory and/or regulatory requirements for the Part D program.  Some of these proposed contracting terms and conditions not only conflict with CMS rules, but could even be harmful to beneficiaries.  Following are several examples of such terms and conditions.  While these examples are not exhaustive – and others may exist with similar effects – ultimately, all contracting terms and conditions must comply with Part D rules and requirements in order to protect the interests of beneficiaries and safeguard the integrity of the Medicare prescription drug program.

> **Example 1**:  Requirements for a longer transition period than the plan has provided for in its transition process submission to CMS.
>
> As described in <u>section 30.4.6.1</u> of <u>Chapter 6</u>, in 2007, all plans must offer a temporary supply of non-formulary drugs of at least 31 days with multiple refills during a 90-day transition period in the LTC setting.  Some pharmacies may wish to extend that transition period to up to 180 days.  However, given uniform benefits requirements under the statute and our regulations, plans cannot agree to a differential transition policy for some of their LTC enrollees.  Transition policies must be applied uniformly to all similarly situated enrollees.  Moreover, extending a transition period for some plan enrollees has cost implications for plans that may ultimately drive up costs to both beneficiaries and the Medicare program.
>
> **Example 2**:  Waivers of prior authorization or other utilization management edits for LTC facility residents.
>
> Plans must determine whether a particular drug is a Part D drug and, in addition, must establish cost-effect utilization management programs.  Waivers of prior authorization management edits or other utilization management edits for some plan enrollees run counter to these program requirements.  In addition, given uniform benefits requirements under the statute and our regulations, plans cannot apply prior authorization or other utilization management edits differentially to a subset of their LTC enrollment.
>
> **Example 3**:  Waivers of certain drug utilization review (DUR) requirements for LTC facility residents.

L000281

Plans must optimize drug regimens, which requires an up-front and thorough review of enrollee drug files in order to ensure their safety (e.g., by preventing drug-drug interactions). In addition – and as stated above – uniform benefits requirements under the statute and our regulations mean that plans cannot apply DUR edits differentially to a subset of their LTC enrollees. All plan benefits must be applied uniformly to all similarly situated enrollees.

Part D sponsors may be out of compliance with uniform benefits requirements to the extent that they agree to particular contracting terms and conditions that have the net result of creating a non-uniform benefit for plan enrollees residing in LTC facilities serviced by network LTC pharmacies whose contracts with Part D sponsors may not include these same provisions. Plan benefits must also be applied uniformly across all enrollees (both those who reside in the community and those residing in LTC facilities) when there is no justification for applying different rules to enrollees residing in LTC facilities. However, there are instances in which it is appropriate or legally required under our Part D guidance for Part D sponsors to establish standards that differentiate between enrollees residing in LTC facilities and ambulatory patients.

For example, it is perfectly acceptable for Part D sponsors to adopt alternative standards applicable only in the LTC setting when clinically justified, legally required, or otherwise justified based on characteristics unique to beneficiaries residing in LTC facilities, such as extended transition periods for enrollees residing in LTC facilities or prior authorization or other utilization management requirements (for example, those that distinguish between Part B and Part D covered drugs given that some drugs covered for use in the home under Part B are not covered by Part B in LTC settings). However, Part D sponsors cannot agree to differential benefits which would result in a non-uniform benefit among enrollees in LTC facilities, such as an extended transition period, certain utilization management edits, or different drug utilization review protocols that are limited to those LTC enrollees who obtain their Part D drugs from a specific LTC pharmacy. Plan benefits must be applied uniformly to all similarly situated enrollees, meaning that all enrollees residing in LTC facilities must be subject to the same rules.

## 50.5.4 – Access to LTC Pharmacies for Enrollees Residing in IMDs, ICFs/MR, and LTC Hospitals

To the extent that an intermediate care facility for the mentally retarded (ICF/MR) or institute for mental disease (IMD) designated by a State as an institution has as an inpatient any institutionalized individuals – which means any full benefit dual eligible individual for whom payment is made under Medicaid throughout a month, as provided in section 1902(q)(1)(B) of the Act – it falls within our regulatory definition of the term "LTC facility." There exists a statutory Federal financial participation exclusion under Medicaid affecting residents of IMDs between the ages of 22 and 64. However, the IMD exception to the definition of "medical assistance" under section 1902(q)(1)(B) of the Act does not apply to individuals who are age 65 and older. Thus, all elderly full-benefit dual eligibles who are inpatients in an IMD designated by the State as an institution for a full month are considered institutionalized individuals for that month. Long-term care

L000282